No. 14-10499

_____
_____


IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Appellee,

v.

SUSAN XIAO-PING SU,

Appellant.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

(D.C. No. CR 11-0288-JST)
_____


APPELLANT'S OPENING BRIEF
_____



JOHN J. JORDAN (Cal. Bar No. 175678)
        400 Montgomery St. Ste. 200
        San Francisco, CA 94104
        Tel:  (415) 391-4814
        FAX:  (415) 391-4308

    Attorney for Appellant
    SUSAN XIAO-PING SU

_____
_____

# TABLE OF CONTENTS

I.   STATEMENT OF JURISDICTION. ...................... 1

a.   Appellant's Current Status. .................... 2

II.  STATEMENT OF ISSUES PRESENTED FOR APPEAL. ....... 2

III. STATEMENT OF THE CASE........................... 3

IV.  STATEMENT OF FACTS.............................. 8

A.   The Government's Case........................... 8

1.   Tri-Valley's Application Under SEVP............. 8

2.   Activities at Tri-Valley....................... 13

a.   Vishal Dasa.................................... 14

b.   Anji Dirisanala................................ 16

c.   Parth Patel.................................... 18

3.   Instructors at Tri-Valley...................... 20

4.   Former Students at Tri-Valley.................. 21

5.   The Homeland Security Investigation............ 23

6.   January 19, 2011 Execution of Search Warrants... 30

7.   Agent Mackay's Financial Analysis.............. 33

IV.  ARGUMENT....................................... 35

A.  THE DISTRICT COURT ERRED IN DENYING SU'S
    MOTION FOR A JUDGMENT OF ACQUITTAL, PURSUANT
    TO FED. R. CRIM. P. 29(c). ..................... 35

1.  Introduction. ................................. 35

2.  Standard of Review. .......................... 35

3.  Legal Argument. .............................. 36

a.  The evidence is insufficient to convict Su
    of the two counts of harboring. ............... 36

i.  Neither Dasa and Dirisanala were illegal aliens. 37

ii. Su did not harbor either Dasa or Dirisanala. ... 41

b.  Counts 5 through 12, the wire fraud charges
    involving the fictitious aliens and Counts 16
    through 19, charging visa fraud, were all
    factually impossible to commit. ............... 43

c.  The money laundering charges should be dismissed. 47

B.  THE DISTRICT COURT ERRED IN DENYING SU'S
    MOTION FOR A NEW TRIAL, PURSUANT TO
    FED. R. CRIM. P. 33. ......................... 49

1.  Introduction. ................................. 49

2.  Standard of Review. .......................... 49

3.  Legal Argument. .............................. 49

a.  Su'S mental health. .......................... 49

b.  The report by Dr. Gregory. .................. 54

c.  The Rule 33 hearing in the district court....... 55

d.  The district court erred in denying the motion.. 56

i.  The motion was timely......................... 56

ii. The motion should have been granted on
    the merits.................................... 61

C.  THE DISTRICT COURT ERRED IN SENTENCING SU TO
    196 MONTHS INCARCERATION. ..................... 67

1.  Introduction. ................................. 67

2.  Standard of Review. ........................... 67

3.  The District Court Committed Procedural Error... 68

a.  The government failed to meet its burden of
    establishing the loss figure. ................. 70

b.  The district court erred in not grouping
    all offenses. ................................. 76

i.  All offenses should be grouped. ............... 76

ii. The sentencing calculations are incorrect for
    Group Two. .................................... 79

c.  The district court erred in applying an
    obstruction enhancement. ...................... 82

4.  The 196 Month Sentence was Substantively
    Unreasonable. ................................. 83

D.  THE TRIAL COURT IMPROPERLY ISSUED A PRELIMINARY
    FORFEITURE ORDER AGAINST SU. .................. 87

1.   Introduction. ................................... 87

2.   Standard of Review. ............................ 87

3.   Legal Argument. ................................ 88

Conclusion......................................... 91

Statement of Related Cases

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**CASES:**

*Arizona v. United States,* 132 S.Ct. 2492 (2012)..... 39

*Jackson v. Virginia*, 443 U.S. 307 (1979)............ 36

*Harrington v. Richter*, 131 S.Ct. 770 (2011)........ 85

*Lafler v. Cooper*, 132 S.Ct. 1376 (2012)............ 62

*United States v. Aguilar*,
883 F.2d 662 (9th Cir. 1989)........................ 42

*United States v. Alaniz*,
726 F.3d 586 (5th Cir. 2013)........................ 66

*United States v. Alston*,
974 F.2d 1206 (9th Cir. 1992)....................... 56

*United States v. Alvarez-Moreno*,
657 F.3d 896 (9th Cir. 2011)........................ 88

*United States v. Archer*,
671 F.3d 149 (2d Cir. 2011)......................... 65

*United States v. Armstead*,
552 F.3d 769 (9th Cir. 2008)........................ 69

*United States v. Atandi*,
376 F.3d. 1186 (10th Cir. 2004)............. 38, 40, 41

*United States v. Bazargan*,
992 F.2d 844 (8th Cir. 1993)................... 40, 41

*United States v. Boone*,
951 F.2d 1526 (9th Cir. 1991)....................... 65

-v-

*United States v. Brissett*,
720 F. Supp. 90 (S.D. Tex. 1989)..................... 40

*United States v. Bush*,
626 F.3d 527 (9th Cir. 2010)................... 47, 48

*United States v. Camper*,
384 F.3d 1073 (9th Cir. 2004),
*cert. denied*, 546 U.S. 827 (2005).................. 65

*United States v. Carty*,
520 F.3d 984 (9th Cir.)(en banc),
*cert. denied,* 553 U.S. 1061 (2008)................. 68

*United States v. Christensen*,
732 F.3d 1094 (9th Cir. 2013).............. 67-69, 75

*United States v. Christian*,
749 F.3d 806 (9th Cir. 2014)....................... 64

*United States v. Conway*,
507 F.2d 1047 (5th Cir. 1975)...................... 44

*United States v. Costello*,
666 F.3d 1040 (7th Cir. 2012)...................... 43

*United States v. French*,
748 F.3d 922 (9th Cir.),
*cert. denied,* 135 S.Ct. 384 (2014)................ 65

*United States v. Harrington*,
410 F.3d 598 (9th Cir. 2005),
*cert. denied*, 546 U.S. 1115 (2006)................ 59

*United States v. Hernandez*,
913 F.2d 1506 (10th Cir. 1990),
*cert. denied*, 499 U.S. 908 (1991).............. 39, 40

*United States v. Holt*,
510 F.3d 1007 (9th Cir. 2007)....................... 68

*United States v. Joseph*,
716 F.3d 1273 (9th Cir. 2013)....................... 69

*United States v. Kellington*,
217 F.3d 1084 (9th Cir. 2000)....................... 56

*United States v. Kim*,
94 F.3d 1247 (9th Cir. 1996)....................... 87

*United States v. Luttrell*,
889 F.2d 806 (9th Cir. 1989), vacated in part
on other grounds, 923 F.2d 764 (9th Cir. 1991),
*cert. denied*, 112 S.Ct. 1558 (1992)................. 44

*United States v. Lofton*,
905 F.2d 1315 (9th Cir.),
*cert. denied*, 498 U.S. 948 (1990).............. 82, 83

*United States v. Mack*,
362 F.3d 597 (9th Cir. 2004)....................... 49

*United States v. Munoz*,
605 F.3d 359 (6th Cir. 2010),
*cert. denied,* 131 S.Ct. 1813 (2011)................. 57

*United States v. Nevils*,
598 F.3d 1158 (9th Cir. 2010)(en banc)............. 35

*United States v. Nielsen*,
694 F.3d 1032 (9th Cir. 2012)....................... 68

*United States v. Noriega-Perez*,
670 F.3d 1033 (9th Cir. 2012),
*cert. denied*, 133 S.Ct. 834 (2013)................. 37

*United States v. Nguyen*,
73 F.3d 887 (9th Cir. 1995)......................... 66

*United States v. Pelisamen*,
641 F.3d 399 (9th Cir. 2011)....................... 65

*United States v. Ressam*,
679 F.3d 1069 (9th Cir. 2012) (en banc)............ 84

*United States v. Rocha*,
598 F.3d 1144 (9th Cir. 2010)...................... 35

*United States v. Santos*, 553 U.S. 507 (2008).... 47, 48

*United States v. Santos*,
527 F.3d 1003 (9th Cir. 2008)...................... 72

*United States v. Shakur,*
691 F.3d 979 (8th Cir. 2012),
*cert. denied,* 133 S.Ct. 1510 (2013)............ 89, 90

*United States v. Smith*,
196 F.3d 1034 (9th Cir. 1999),
*cert. denied*, 529 U.S. 1028 (2000)......... 77, 78, 81

*United States v. Smith*,
656 F.3d 821 (8th Cir. 2011),
*cert. denied*, 132 S.Ct. 1586 (2012)................ 90

*United States v. Stroud*,
893 F.2d 504 (2d Cir. 1990)........................ 83

*United States v. Torres-Flores*,
502 F.3d 885 (9th Cir. 2007).................... 65, 66

*United States v. Tulaner*,
512 F.3d 576 (9th Cir. 2008)...................... 68

*United States v. Vargas-Cordon*,
733 F.3d 366 (2nd Cir. 2013)........................ 42

*United States v. Willis*,
476 F.3d 1121 (10th Cir.),
*cert. denied,* 531 U.S. 1154 (2007)................. 66

*United States v. Zhen Zhao Wu*,
711 F.3d 1 (1st Cir.),
*cert. denied*, 134 S.Ct. 365 (2013)................. 65

## Statutes and Rules

8 U.S.C. § 1324(a)(1)(A).................... 4, 36, 42

18 U.S.C. § 2................................... 3, 4

18 U.S.C. § 371................................... 4

18 U.S.C. § 1001(a)(2)............................ 4

18 U.S.C. § 1001(a)(4)............................ 4

18 U.S.C. § 1030(a)(3)............................ 4

18 U.S.C. § 1341.................................. 4

18 U.S.C. § 1343.................................. 3

18 U.S.C. § 1546(a)............................... 4

18 U.S.C. § 1957(a)...................... 4, 47, 48

18 U.S.C. § 3553(a).............................. 69

21 U.S.C. § 853.................................. 90

28 U.S.C. § 1291................................. 2

28 U.S.C. § 3231.................................... 2

Fed. R. Crim. P. 29......... 2, 5-8, 35, 36, 57-59, 88

Fed. R. Crim. P. 32.2(b)(1)(B)..................... 89

Fed. R. Crim. P. 33......... 2, 6-8, 49, 55-59, 61, 88

Fed. R. Crim. P. 45(b)......................... 57, 58

U.S.S.G. § 2B1.1................................... 72

U.S.S.G. § 2B2.3(c)(1)............................. 80

U.S.S.G. § 2L2.1................................... 80

U.S.S.G. § 3B1.1(a)................................ 81

U.S.S.G. § 3C1.1.............................. 81, 82

U.S.S.G. § 3D1.2............................... 77, 79

U.S.S.G. § 3D1.2(b)........................... 76, 77

U.S.S.G. § 3D1.2(c)............................ 76-78

U.S.S.G. § 3D1.4(c)................................ 82

**Other Authorities**

Cal. Welf. & Inst. Code § 5150.................... 51

No. 14-10499

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Appellee,

v.

SUSAN XIAO-PING SU,

Appellant.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(D.C. No. CR 13-00288-JST)
_____

APPELLANT'S OPENING BRIEF
_____

I.   STATEMENT OF JURISDICTION

Susan Xiao-Ping Su appeals from her conviction,

after a jury trial, of engaging in a scheme to defraud

F-1 non-immigrant foreign students, and related

charges, while President of Tri-Valley University.

1

The District Court had jurisdiction over this federal criminal case pursuant to 28 U.S.C. § 3231. This Court has jurisdiction over this federal appeal pursuant to 28 U.S.C. § 1291.

## a.  Appellant's Bail Status

Su is currently incarcerated at Federal Detention Center in Dublin, California, serving the 196-month sentence imposed in this case.  The Bureau of Prison's website indicates a release date is not yet calculated.

## II.  STATEMENT OF ISSUES PRESENTED FOR APPEAL

1.  Whether the District Court Erred in Failing to Grant, in Whole or in Part, Su's Motion for Judgment of Acquittal, pursuant to Fed. R. Crim P. 29(c)?

2.  Whether the District Court Erred in Failing to Grant Su's Motion for a New Trial, Pursuant to Fed. R. Crim. P. 33?

3.  Whether the District Court Erred in Sentencing Su to 196 months incarceration?

4.  Whether the District Court Erred in Entering into a Preliminary Order of Forfeiture Against Su?

## III. STATEMENT OF THE CASE

On April 28, 2011, Su was named in a 33-count indictment, charged with a scheme to defraud foreign F-1 visa students and other charges. CR 1; ER 151.[1]

On October 18, 2011, Su filed a motion to dismiss the indictment, arguing that the mail and wire fraud charges wrongly listed the United States as the victim, rather than the foreign students. CR 19, ER 172.

On November 10, 2011, the government filed a response, arguing that its superseding indictment met Su's concerns. CR 20; ER 181.

That same day, the government filed a 35-count indictment, charging Su with a scheme to defraud foreign F-1 students of money and property, specifically tuition and other fees. CR 21; ER 182.

The indictment charged 12 counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (counts 1 through 12); two counts of mail fraud, in violation of 18

---

[1] "CR" refers to the District Court docket sheet; "ER" refers to the Excerpts of Record.

3

U.S.C. §§ 1341 and 2 (counts 13 and 14); one count of
conspiracy to commit visa fraud, in violation of 18
U.S.C. § 371 (count 15); four counts of visa fraud, in
violation of 18 U.S.C. §§ 1546(a) and 2 (counts 16
through 19); one count of using a false document, in
violation of 18 U.S.C. §§ 1001(a)(3) and 2 (count 20);
one count of false statements, in violation of 18
U.S.C. § 1001(a)(2) (count 21); three counts of alien
harboring, in violation of 8 U.S.C. §§ 1324(a)(1)(A)
(iii) and 2 (counts 22 through 24); one count of
unauthorized access of a government computer, in
violation of 18 U.S.C. §§ 1030(a)(3) and 2 (count 25);
and ten counts of money laundering, in violation of 18
U.S.C. §§ 1957(a) and 2 (counts 26 through 35). *Id.*

The superseding indictment also contained four
forfeiture allegations. *Id.*

On December 8, 2011, the district court denied Su'
motion to dismiss the original indictment as moot. CR
30; ER 1.

4

On March 3, 2014, trial on the superseding indictment began with jury selection.  CR 99.

On March 18, 2014, the court granted the government's motion to dismiss one count of alien harboring (count 23) and three counts of money laundering (counts 28, 30 and 33).  TR 1713.[2]

On March 18, 2014 and March 19, 2014, Su orally moved, pursuant to Fed. R. Crim. P. 29, for a judgment of acquittal at the close of the prosecution's case. CR 78; TR 1714, 1765.  The Court reserved ruling on the motion "until after the jury has returned its verdict or until such other time as the Court may say."  TR 1765.

On March 24, 2014, the jury found Su guilty of all 31 remaining counts.  CR 118-20; ER 4-10.  The district court then granted Su's oral motion to re-set the briefing schedule for the Rule 29 motion.  ER 22.

---

[2]  "TR" refers to the court reporters transcript.

5

On April 1, 2014, Su informed the court that new counsel was being retained, and the court continued briefing on the Rule 29 motion.  CR 122; ER 27, 38-39.

On April 22, 2014, new counsel appeared, and the court granted a continuance to May 9, 2014, to set a briefing schedule for the Rule 29 motion.  CR 127; ER 42-45.

On May 1, 2014, the government filed an application for a preliminary order of forfeiture.  CR 129; ER 206.

On May 9, 2014, new counsel was relieved, and the undersigned counsel made a general appearance.  ER 50. The district court then granted Su's request to set a new briefing schedule for both Rule 29 and Rule 33 motions.  ER 52-55.

On August 29, 2014, Su filed a motion to dismiss, pursuant to Fed. R. Crim. P. 29(a).  CR 166; ER 219. Su also filed a motion for a new trial, pursuant to Fed. R. Crim. P. 33.  CR 167; ER 249.

Su also filed a response to the government's request for a preliminary order of forfeiture, requesting a stay of the forfeiture proceedings pending a decision on the Rule 29 and 33 motions, and then a hearing. CR 168; ER 272.

On September 26, 2014, the government filed oppositions to Su's Rule 29 and Rule 33 motions. CR 185, 195; ER 274, 284.

On October 9, 2014, Su filed reply briefs on the pending Rule 29 and Rule 33 motions. CR 188-90; ER 310, 320.

On October 24, 2014, the government filed a sentencing memorandum. CR 195, 196; ER 327.

The same day, Su filed a sentencing memorandum, setting out objections to the U.S.S.G. guidelines provisions being proposed by the Probation Department. CR 198; ER 357.

On October 24, 2014, the district court issued a preliminary order of forfeiture, rejecting Su's request

7

that the forfeiture proceedings be stayed.  CR 199; ER 56.

On October 30, 2014, the district court held a motions and sentencing hearing.  CR 203; ER 61.

The district court first denied Su's Rule 29 motion on all grounds.  ER 85-90.  The court also denied Su's Rule 33 motion for a new trial, on alternate grounds that the motion was untimely and on the merits.  ER 94.

After ruling on various sentencing issues, the court sentenced Su to 196 months imprisonment; 3 years supervised release; and a $3100 penalty assessment.  CR 203; ER 94-142.

On November 3, 2014, Su timely filed an amended notice of appeal.  CR 205; ER 397.

## IV. STATEMENT OF FACTS

### A.  The Government's Case

### 1.  Tri-Valley's Application Under SEVP

The Department of Homeland Security issues F-1 visas to foreign students who qualify to study in the

United States.  TR 264.  A school wishing to enroll F-1 students applies under the Department's Student Exchange Visitor Program (SEVP) for certification that the school can enroll F-1 students.  TR 256.  Once this certification is granted, the school is able to access SEVIS (the Homeland Security computer program and database that monitors the status of F-1 students) and issue immigration "I-20" forms that certify that the F-1 students are enrolled for study in the United States.  TR 267-68.

The government contended at trial that federal regulations limit F-1 students to one online class a semester, with the remaining classes taken physically at the facility.  TR 768-69.  In addition, F-1 students failing or not attending classes were subject to deportation.  TR 637.

Appellant Susan Su established Tri-Valley University in March 2008.  TR 264-65.  After its

9

establishment, Tri-Valley began the process of applying to enroll foreign students under the SEVP.  TR 262-65.

On September 15, 2008, Tri-Valley University registered with Homeland Security through SEVIS.  TR 262.  Tri-Valley then electronically filed a Petition for Approval of School for Attendance by Non-Immigrant Students ("Form I-17").  TR 248-49, 262-63.  Su, as President of Tri-Valley, signed the petition, certifying that Tri-Valley would comply with the applicable requirements.  TR 271-73.  Tri-Valley indicated it was attempting to obtain accreditation, listed its standards for graduation and expulsion, and stated that it had an average of 30 students and 9 teachers.  TR 266-70.

Once a school is approved by SEVP, it must limit its own access to SEVIS to designated school officials (DSOs).  TR 251.  The SEVIS system warned users that the system was limited to authorized DSO users only.  TR 254-54.

Tri-Valley next filed with SEVP a signed I-17a, which designated Sophie Su (appellant's sister) as the principal designated school official (DSO) and Susan Su and Vince Wang as secondary DSOs, and certified that the DSOs were familiar with and would follow SEVP rules and regulations.  TR 301-07, 750-52.

If a school is not accredited, then SEVP requires the school get three articulation agreements from other accredited schools.  TR 258-59.  The articulation agreement must specify that the accredited school has been and would continue to unconditionally accept transfer credits from the unaccredited school.  TR 259-60.

Because Tri-Valley was unaccredited, Homeland Security requested it supply articulation agreements.  TR 297.  On February 10, 2009, Su forwarded to SEVP three original articulation agreements.  TR 320.

One signed agreement purported to be an amended agreement between San Francisco State University and

11

Tri-Valley, with a signature of Dr. Shy Sheng Liou of
San Francisco State University, certifying that San
Francisco State, an accredited school, had been
accepting transfer credits in computer science and
engineering courses at Tri-Valley since May 2008, and
would continue to do so. TR 321-24.

Dr. Liou testified at trial that he did not sign
the amended articulation agreement; that he never
approved transfer credits for any engineering course
taught at Tri-Valley; and that he did not have
authority to bind San Francisco State as set out in the
agreement. TR 494-96.

A second agreement purported to be an agreement
between the University of Central Florida and
Tri-Valley, with a signature of Xiao-Gang Su, the
defendant's brother and a teaching assistant at Central
Florida University, certifying that Central Florida, an
accredited school, had been accepting transfer credits
in computer science and engineering courses at

12

Tri-Valley since May 2008, and would continue to do so. TR 324-26.

Scott Cole, vice president and General Counsel at Central Florida University, testified at trial that the purported articulation agreement was not valid, and that the statement that Central Florida had accepted and would continue to accept transfer credits from Tri-Valley was not true. TR 777-79. In Cole's opinion, Xiao-Gang Su did not have authority to enter into an articulation agreement on behalf of CFU. TR 779-80.

On February 17, 2009, after receiving the articulation agreements, Homeland Security approved Tri-Valley to begin accepting F-1 students. TR 329.

## 2. Activities at Tri-Valley

The government called past employees Vishal Dasa, Anji Dirisanala, and Parth Patel, who testified as to the activities at Tri-Valley.

13

## a. **Vishal Dasa**

Viashal Dasa testified as a cooperating witness, after pleading guilty to conspiracy to commit unauthorized access of a government computer system. TR 816-17.

In 2009, Dasa, an F-1 student from India, transferred to Tri-Valley after meeting with Susan Su. TR 789-96, 841. When Dasa did not receive a class schedule, he called Su, who transferred him to two different courses that he could audit. TR 800-02, 852.

Dasa later received a transcript from Tri-Valley, which listed "A" grades for the two courses, as well as a third course he had not signed up for. TR 803-05.

In January 2010, Su hired Dasa as her assistant. TR 806-09, 845. Su would log onto the SEVIS system on a laptop computer, then hand the laptop to Dasa to complete I-20 forms. TR 813-14. Dasa was told to enter the El Camino Real address for any student who did not have a California address. TR 809. The I-20

14

forms would be pre-printed with the DSO listed and Susan Su would sign them in the name of the DSO printed on the form.  TR 814-15.

Dasa asked Su about the notice that only authorized DSOs were to access the system.  Su told him she was aware of the rules and not to question her about it. TR 815-16.

Su told Dasa to admit all students who applied, even if documents were missing.  TR 810.  She told Dasa to update student transcripts by adding the new courses, but keeping the same grades for the new courses.  TR 811-12.  The transcripts were sent out electronically every semester, and hard copies with a registrar stamp would be mailed out on request.  TR 811-12.

Dasa earned extra money at Tri-Valley through a referral fee program, receiving a percentage of the tuition for each new student he referred.  TR 820.

15

Dasa never saw a live course taught, although he
did see online courses being taught.  TR 818.  Dasa
never saw an instructor for any of his own online
classes.  TR 819.

**b.  Anji Dirisanala**

Anji Dirisanala testified after signing a plea
agreement and pleading guilty to conspiracy to commit
unauthorized access of a government computer, to create
false I-20 forms.  TR 1212-16.

Dirisanala entered the United States in January
2010, on an F-1 visa, to study for his Masters at
International Technical University.  TR 1146-48, 1280.
But Dirisanala could not afford ITU, so he transferred
to Tri-Valley, where he could get a campus job.  TR
1150.

On February 9, 2010, Dirisanala met Susan Su at
Tri-Valley, who gave him a campus job after he
enrolled.  TR 1153-56.  Dirisanala filled out I-20s
after Su gave him a laptop computer logged onto SEVIS.

16

TR 1156-1160, 1164, 1167-68.  Dirisanala saw the SEVIS notice against unauthorized access, but Su told him she was the University President and he should not worry about it.  TR 1184.  Su told him to enter the El Camino Real apartment as the student addresses.  TR 1160-62, 1173.

Su gave Dirisanala a manual to use in filling out the I-20s, which supplied a fixed amount to be entered for student financial resources.  TR 1160-62.  Su told him to admit everyone, no matter what documents were missing.  TR 1172-74.  Susan Su signed Sophie Su and Wenchao Vince Wang's names on the I-20s.  TR 1176-78.

Dirisanala also made approximately $20,000 by funneling student referrals to a friend.  TR 1201-03, 1255-59.

After working at Tri-Valley, Dirisanala realized there were no physical classes for students.  TR 1185.  He was worried about his F-1 visa status, because he was taking no classes, but Su told him to switch to

17

Mechanical Engineering and she would instruct him.  TR 1186.

At one point, online classes started, but frequently there were no instructors for the classes and students would complain.  TR 1187, 1192.  Su told him that only three or four courses were actually being taught.  TR 1188.  Dirisanala learned at some point that some of the instructors were F-1 students themselves.  TR 1200.

Dirisanala received emails from an instructor about one of his own class, but he was working too many hours to attend, and Su told him not to worry about it.  TR 1188-89.

On May 12, 2010, Dirisanala stopped working at Tri-Valley when Su accused him of misusing a student's credit card.  TR 1205.

**c.  Parth Patel**

Parth Patel worked at Tri-Valley in 2010 while he attended San Jose University on an F-1 visa.  TR 1493.

18

His work included processing admissions and payments. TR 1501-05, 1509-10, 1530.

Su told Patel to admit all students who applied, even if required documents were missing. TR 1506-07, 1512-14. Patel would bring completed I-20s, with the names of the DSOs Wenchao Wang and Sophie Su and Susan Su, to Susan Su, and she would sign them. TR 1515-16.

Patel was instructed to tell all students that the classes were online, and that if students complained about classes or grades, that the school was working on the problem. TR 1508, 1518. Patel never saw any students attend a class at Tri-Valley. TR 1518.

Su told Patel to look up what classes the student was enrolled in, and then give grades of "A, A, and A-." TR 1511. Su said never to give a "B" grade because it did not look good, and not to give straight "A" grades because it would look suspicious. TR 1511.

19

Su asked Patel to teach an online class, in return for her providing him with a car. He thought he was unqualified, but did try it once. TR 1520, 1522-24.

Patel thought there were two types of students enrolled at Tri-Valley. TR 1543. The first group just wanted to maintain their status to stay in the United States; and the second group were students who really want to attend the classes. TR 1543. Patel believed that 65 percent to 70 percent of the students were just interested in maintaining their immigration status. TR 1543-44.

## 3. Instructors Listed for Tri-Valley

The government called several professors who testified they were listed as instructors at Tri-Valley without their permission.

Dr. Hao Lao testified that he met Susan Su in 2007 in meetings for a potential start up company. TR 442, 444-47. Dr. Lao's name and academic credentials later appeared on the list of instructors for Tri-Valley,

even though Lao never gave Tri-Valley permission to list him as an instructor and had no contract to teach at the school.  TR 448-50.

Dr. Qi Jing, Dr. Lao's wife, was also listed as an instructor, even though Dr. Jing had never met Susan Su and never agreed to teach a course at Tri-Valley.  TR 451-52, 467-68.

Dr. Miller Allen met Susan Su at a party for Su's husband, Hang Yang.  TR 557-58.  Approximately three years later, Allen learned that he was listed as a lecturer on the website for Tri-Valley, even though he had never agreed to teach there.  TR 560-61.

## 4. **Students at Tri-Valley**

The government called five former students of Tri-Valley at the trial.  These students included Vandana Virmani, an H-1 visa student (TR 172-74); and F-1 students Bhanu Teja Challagundla (TR 886-893, 936-37), Santhosh Ignatius  (TR 1345-51), Kalpana

21

Challa (TR 1416-19) and Naveen Kundur.  TR 1567,
1570-71.

The students testified that there were no physical
classes taught at Tri-Valley (TR 1363, 1405, 1420-21,
1464-65, 1572, 1577); that there were problems with the
online class program (TR 179-81, 210, 907-09, 1428-29,
1465, 1572-1586); and grades were received for classes
not taken.  TR 184-86, 909-12, 1385-86, 1438-39.

Vandana Virmani testified that when she requested a
refund from Su, Su threatened to have the visas for
Virmani and her husband cancelled and get them
deported.  TR 180-83.  But, after Virmani complained to
the Better Business Bureau, she received a partial
refund.  TR 183.

The other students testified that when they tried
to transfer to another school after experiencing
problems with their classes, Su refused to do so,
telling them that government regulations prevented them

22

from immediately transferring.  TR 916-24; 1367-71;
1439-40.

Ignatius testified that he worked one day at
Tri-Valley, checking items on a laptop computer.  TR
1383.  Su left and locked the office at lunch time.
Ignatius tried to open the door, but it was locked.
Vishal Dasa and other workers stayed with Ignatius in
the office, and Ignatius ate his lunch.  TR 1384-85.
Ignatius worked 8 hours and was paid $60.00.  TR 1385.

After Tri-Valley was closed down, Challangunda was
able to get reinstated to F-1 status and completed his
MBA at DeVry University.  TR 933-34.

Homeland Security agents interviewed Challa and she
was put on deferred action.  TR 1452-53.

**5.  The Homeland Security Investigation**

In May 2010, Special Agent Dale Taylor of Homeland
Security began an investigation by reviewing
Tri-Valley's initial I-17 application, which indicated
that Tri-Valley was enrolling 30 students.  TR 569-71,

23

993.  However, the SEVIS database indicated that in May
2010, Tri-Valley had now enrolled 900 students, with
many reporting they lived at the same two apartments on
El Camino Real or Iris Avenue in Sunnyvale, CA.  TR
571-74, 689.

In June 2010, agents had Anji Dirisanala, a former
student and employee at Tri-Valley, go to Tri-Valley
and enroll two fictitious graduate students, Kadir
Dirikan and Sparsh Agrawat, and a fictitious
undergraduate student, Mohammad Rizwan.  TR 994-95,
1016-17 1105, 1216-18.  Dirisanala met with Su at
Tri-Valley several times while wearing recording
devices.  TR 994-97, 1105, 1216-18.  Dirisanala
received admission letters and initial I-20s for the
students, signed by Susan Su in the name of Wenchao
Wang.  TR 998-1000, 1020, 1030-31, 1110, 1222, 1240-42.

On September 7, 2010, Agent Rajeev Bhatia, acting
in an undercover capacity under the name of Rajiv
Batra, enrolled as a student at Tri-Valley.  TR 1049,

24

1310-11.   Bhatia met with Vishal Dasa, explaining he
had arrived in 2002 on a now-expired F-1 visa.   Bhatia
told Dasa he had only completed the 10th grade in India
and did not have a college degree, but Dasa signed
Bhatia up for an MBA program.   TR 1312-17.

Dasa printed out an I-20, which Susan Su signed in
the name of Wenchao Vince Wang.   TR 1051-52, 1321-24,
1329.

Bhatia said that he worked two jobs in New York, so
he would not have time to attend any classes, nor did
he have access to the Internet.   TR 1319.   Bhatia was
told that he would still get a certificate even if he
did not attend classes.   TR 1319.

On September 20, 2010, Agents Taylor and Mackey
placed a recorded ruse telephone call to Su at
Tri-Valley, claiming a Tri-Valley student, Sparsh
Agrawat (one of the fictitious students enrolled by
Dirisanala), had arrived at SFO Airport without proper
documentation.   TR 1055-57.   The agents requested that

25

Su forward Agrawat's I-20 and a current transcript.  TR
1057.

In response, Taylor received by email an I-20 for
Agrawat, with a signature of Sophie Su; a transcript
that showed the student had two "A" grades and a "B"
grade; and a letter that Agrawat was a student in good
standing at Tri-Valley.  TR 1060-66.

On September 24, 2010, Taylor placed another
recorded ruse call to Su, claiming a second Tri-Valley
student, Kadir Dirikan (the second fictitious student
enrolled by Dirisanala), had arrived at SFO without
proper documentation.  TR 1066-68.  Taylor requested
that Su forward Dirikan's I-20 and a current
transcript.  TR 1068.

Su emailed Taylor an I-20 for Dirikan, with a
signature of Sophie Su; a transcript that showed
Dirikan had two "A" grades and a "B" grade; and a
letter that he was a student in good standing at
Tri-Valley.  TR 1068-74.

26

On December 1, 2010, Taylor and Mackey visited Tri-Valley. TR 1075, 1131. Taylor had spoken with Su the day before to set up the visit and requested that Sophie Su, the principal DSO, be present. TR 1075-77. Taylor met Sophie Su in the staff area. TR 1082-84. Wenchao Vince Wang, the third listed DSO, was not present at the college. TR 1085.

The agents interviewed Susan Su, who told them that Sophie Su and Wenchao Wang were part-time DSOs. TR 1086. Su said the DSOs had assistants who used to "open" the SEVIS window, but that stopped after Su learned it was wrong. TR 1087. Su said there were 50 instructors at Tri-Valley, of which five were full-time, and 50 classes were offered. TR 1088, 1090. Su stated there were currently 500 students, of which 80 percent were F-1 visa students. TR 1089.

Su explained that only students with 3.0 GPAs were admitted. Su said the school had records for 3,500 students, but only 1,500 were active. TR 1138.

27

Su stated that the courses were taught at the school in the evenings, but that students could watch the classes online. TR 1091. Su said that two business courses were taught online and did not require physical attendance. TR 1092. Su explained that instructors monitored student attendance and the DSOs reviewed the records. TR 1091.

Taylor asked Su to provide a copy of Tri-Valley's most current catalog; a copy of Tri-Valley's current teaching staff roster; and a copy of attendance records for the three courses that the agent Rajeev Bhatia had enrolled in under the name of Rajiv Batra. TR 1093-94.

Su later forwarded the materials. When Taylor reviewed the attendance records for the three courses, he noted that Batra was not listed. TR 1096-98.

On January 7, 2011, Special Agent David Ramirez placed a ruse telephone call to Tri-Valley, claiming he was an inspector at JFK airport, and asking Su to

28

verify the status of the fictitious students Rajiv
Batra and Mohammad Rizwan.  TR 1099, 1600-03.

Su emailed Ramirez I-20s and letters of good
standing for both students, as well as attendance
records for Batra and transcripts for Rizwan.  TR
1605-10.

After the telephone call, Agents Dylan Critten and
Mackey went to Tri-Valley.  TR 959, 972, 1101, 1610.
Critten met Susan Su and asked her to provide
identification for Mohammad Rizwan and Rajiv Batra, to
verify that they were students in good standing.  TR
960-61.

Su gave Critten an I-20, letters of good standing,
and transcripts with "A, A, and A-" grades for Rizwan
and Batra.  TR 961-65, 968-69, 979.  Su also provided
Critten with attendance records for Batra.  TR 967-68.

Critten told Su that attendance records for
Mohammad Rizwan were missing, but Su told Critten that

Rizwan had been attending class and she had personally taught a class for both Rizwan and Batra. TR 969.

## 6. January 19, 2011 Execution of Search Warrants

On January 19, 2011, Homeland Security closed down Tri-Valley and executed search warrants at Su's residence and Tri-Valley. TR 584, 686. Computer hard drives, credit card and financial records, and Tri-Valley transcripts were seized. TR 647-53.

Agents recovered email messages between Su and Bhargav Boinpally, in which Bhargav requested and received a degree in computer programming for a relative. TR 653-60, 670-72.

Agents recovered email exchanges between Su and three student recruiters, in which Su thanked them for getting students, telling them she had enrolled them, and charging them $3000 tuition. TR 664-66.

Agents also recovered emails that agents believed were attempts by Su to obtain other articulation agreements. TR 667-69, 673-77.

Agents found emails between students and Su regarding course complaints, and assurances by Su that the students would get good grades.  TR 679-85.

During the execution of the search warrant, Agent Mackey interviewed Susan Su at her residence in Pleasanton, California.  TR 584.

Su told MacKey that Sophie Su and Wang had full-time jobs and did not intend on actually being DSOs for Tri-Valley, that she had prepared the original and amended articulation agreements with San Francisco State University, and that Shy Sheng Liou had signed both agreements.  TR 590-93.

Su said her brother, Xiao-Gang Su, a student advisor at the University of Central Florida, had signed the articulation agreement with Tri-Valley.  TR 593-94. Su said no students had ever transferred credits and asked Mackey not to contact the signers of the articulation agreement.  TR 596.

31

Su explained that the 22 instructors she had
submitted on the I-17 had originally agreed to teach
courses, but only three ended up teaching.  TR 598-99,
745.  Su said she taught all the courses in the
beginning.  TR 598-99.

When Mackey told Su that surveillance showed no
student activity at Tri-Valley, she explained that
students attended through an online mechanism that
allowed for student interaction, which she considered
being physically present.  TR 603, 769-71.

Su explained she had instructed staff members to
enter the Sunnyvale apartments as addresses for students
who were not yet in the United States or who lived
outside of California.  TR 605.  Su told Mackey that she
used students as DSOs because hiring a full time DSO
would cost $50,000.  TR 625.

Su explained that many transcripts at Tri-Valley
listed "A" grades because she was creating a template
and the grades were placeholders, and when the real

32

grades came in, she would correct the grades.  TR 626.

She said Tri-Valley had a policy not to give a grade

below B minus even if a student was not attending class,

to avoid immigration problems.  TR 626-27.

Su told Mackey that she used proceeds from Tri-

Valley to purchase the residences at 2890 Victoria Ridge

Court, 1371 Germano Way, 1087 Murrieta Boulevard, Number

133,  Livermore, and 405 Boulder Court, Suites 700 and

800.  TR 628-33.  Su used proceeds from Tri-Valley to

purchase a Mercedes Benz automobile.  TR 633-35.  Su

wrote checks for $30,000 from Tri-Valley's accounts to

her two daughters.  TR 635.  She also wrote a check for

$75,000 to her husband from a Tri-Valley account, to

have him relinquish his spousal property rights to one

property she was purchasing.  TR 636-37.

## 7.  Agent Mackey's Financial Analysis

Agent Mackey testified at trial regarding the

results of his examination of the financial records of

Tri-Valley.

In summary, Mackey testified that he traced a total of approximately $5.4 million in proceeds from tuition payments by F-1 students going into various Tri-Valley bank accounts.  TR 1635-41.

Mackey testified that he traced funds from Tri-Valley bank accounts to purchases of various assets in the name of Susan Su, including a red Mercedes (TR 1645); the Murrieta Road condo (TR 1647-49); the Boulder Court property (TR 1654-58); the Germano Way property (TR 1658-63); and the Victoria Ridge property.  TR 1663.

Mackey also testified that Su filed a claim against Homeland Security for damages.  TR 1676-83.

Mackey testified that Tri-Valley had $1,500,000 in cash funds on January 19, 2011.  TR 1699.

34

# IV.   ARGUMENT

## A.   THE DISTRICT COURT ERRED IN DENYING SU'S MOTION FOR A JUDGMENT OF ACQUITTAL, PURSUANT TO FED. R. CRIM. P. 29(c).

### 1.   Introduction

The government introduced insufficient evidence to convict Su at trial.  At the close of the trial, Su moved for a judgment of acquittal under Fed. R. Crim. P. 29, but the trial court erred in denying the motion.

### 2.   Standard of Review

The Court reviews de novo a challenge to the sufficiency of the evidence.  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

"First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).  Second, "the reviewing court must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a

35

reasonable doubt.'" *Id.*, quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## 3. **Legal Argument**

At the close of the prosecution's case, Su moved, pursuant to Fed. R. Crim. P. 29(a), that the prosecution had not met its burden of proof on any of the counts in the indictment. TR 1765. Su renewed the motion at the close of the entire case, pursuant to Fed. R. Crim. P. 29(c).

In addition to Su's general motion that the government's trial evidence was insufficient, there were specific proof issues as to multiple counts in the indictment, such that the Rule 29 motion should have been granted.

## a. **The evidence is insufficient to convict Su of the two counts of harboring**

Su was convicted, in counts 22 and 24 of the indictment, of alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). However, viewing the evidence in the light most favorable to the government, no rational

36

trier of fact could have found Su guilty of either count of alien harboring, because the government failed to prove that the two named aliens were here illegally, or that Su harbored them.

**i. Neither Dasa and Dirisanala were illegal aliens**

The government had the burden of proving that the aliens named in counts 22 and 24, Vishal Dasa and Anji Dirisanala, were illegal aliens. *United States v. Noriega-Perez*, 670 F.3d 1033, 1037 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 834 (2013). However, Dasa and Dirisanala were actually legal aliens.

Count 22 names Dasa as the illegal alien who was harbored. But, the government's evidence established that in the fall of 2009, Dasa was legally in this country on an F-1 student visa from India, when he transferred to Tri-Valley from International Technical University. TR 789-99, 841. Dasa stayed enrolled as an F-1 student at Tri-Valley until the school was shut down in January 2011. TR 836.

37

Count 24 names Dirisanala as the illegal alien who was harbored. The government's evidence established that Dirisanala entered the United States in January 2010, on an F-1 visa, to study for his Masters at International Technical University in Sunnyvale, California. TR 1146-48, 1280. On February 9, 2010, he transferred to Tri-Valley, receiving an I-20 form and an admission letter. TR 1150-54. Dirisanala stayed enrolled as an F-1 student until May 18, 2010, when he transferred to another school. TR 1190, 1207-1210.

The government's position was that both Dasa and Dirisanala were here illegally because Tri-Valley was a fraudulent school, which, without any notice or action by the government, voided their visas. TR 1849.

The district court, in denying Su' Rule 29 motion on this ground, agreed with the government's position, stating it believed that under *United States v. Atandi*, 376 F.3d. 1186 (10th Cir. 2004), the two aliens here were illegal because the school was a fraud. ER 89.

The district court erred. At the times charged in the indictment, Tri-Valley was authorized by Homeland Security to admit foreign students with F-1 visas. While it later lost its authorization, that was an event that had not yet happened. Potentially being out of status at a future date is not the equivalent of being an illegal alien at the time charged in the indictment.

Moreover, even if Dasa and Dirisanala were potentially removable, this did not make them illegal aliens. See *Arizona v. United States,* 132 S.Ct. 2492, 2496 (2012)("As a general rule, it is not a crime for a removable alien to remain in the United States."). This Supreme Court holding, cited to the district court by Su (ER 243), appears to settle the issue in favor of Su, but was not followed by the district court.

Title 8 does not define "illegal alien." But, in a case dealing with the issue in the context of whether an alien in possession of a firearm was an illegal alien, the 10th Circuit, in *United States v. Hernandez*, 913

39

F.2d 1506, 1513 (10th Cir. 1990), *cert. denied*, 499 U.S. 908 (1991), held that an alien was not illegal if he had an ongoing amnesty application, seeking legal status.

Similarly, *United States v. Brissett*, 720 F. Supp. 90 (S.D. Tex. 1989) held that "because the defendant had an application for adjustment of status to permanent resident pending at the time he obtained the firearm, he was not an alien illegally or unlawfully in the United States." *Id.*, at 90.

Moreover, *Atandi,* the case relied on by the district court, involved a defendant who put himself out of status in 1999 by stopping attendance at school; had removal proceedings instituted against him in 2000; was found deportable by an immigration judge in March 2002; and then was arrested as an illegal alien in possession of a firearm in May 2002. *United States v. Atandi*, 376 F.3d. at 1187.

In another case cited by the government*, United States v. Bazargan*, 992 F.2d 844 (8th Cir. 1993), the

40

alien again put himself out of status; was warned by an
immigration official that his asylum application had
been denied; and was served with an order to show cause
why he should not be deported, all before he was
arrested for possession of a firearm by an illegal
alien. *Id.*, at 845.

Here, contrary to *Atandi* and *Bazargan,* there was no
immigration court finding of a status violation for
either Dasa or Dirisanala, nor any finding by an
immigration judge that either alien was removable. Even
when Tri-Valley was closed down, all the affected F-1
students could transfer to another eligible school and
preserve their legal status. In fact, to this day, it
appears both Dasa and Dirisanala legally remain in this
country.

## ii. Su did not harbor either Dasa or Dirisanala

The government also failed to prove that Su
harbored Dasa or Dirisanala, because it only proved that
Su provided employment to them. This is insufficient.

41

Instead, the government must also show that Su engaged in conduct that is intended both to substantially help an unlawfully present alien remain in the United States and to help prevent the detection of the alien by the authorities.

"The mere act of providing shelter to an alien, when done without intention to help prevent the alien's detection by immigration authorities or police, is thus not an offense under § 1324(a)(1)(A)(iii)." *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2nd Cir. 2013).

The district court found that while Su's conduct did not qualify as harboring or concealing the two aliens, it did qualify as shielding them from detection, citing *United States v. Aguilar*, 883 F.2d 662, 689-90 (9th Cir. 1989).

However, the evidence that Su shielded Dasa and Dirisanala from detection is still insufficient under *Vargas-Cordon*. There is no credible evidence that Su

42

provided employment with the intent to help prevent the detection of the aliens by the authorities.

The Seventh Circuit rejected a similar broad definition of harboring in *United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012), pointing out that under this broad definition of harboring, the number of potential violators might well be two million. *Id*., at 1047.

**b.  Counts 5 through 12, the wire fraud charges involving the fictitious aliens and Counts 16 through 19, charging visa fraud, were all factually impossible to commit.**

Su was convicted by the jury of 12 counts of wire fraud (counts one through 12) and four counts of visa fraud (counts 16 through 19), in addition to the other counts of conviction.  However, the government's proof was insufficient as to the wire fraud convictions in counts 5 through 12, as well as all four visa fraud convictions in counts 16 through 19, because the charges

all involve fictitious aliens created by the government during its undercover operations.

These convictions cannot stand because the crimes were all factually impossible to commit, as there were no real persons who could be defrauded, and there were no real persons who could receive visas or who needed immigration papers. Thus, it was factually impossible for Su to commit these crimes. See *United States v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989), vacated in part on other grounds, 923 F.2d 764 (9th Cir. 1991), *cert. denied*, 112 S.Ct. 1558 (1992).

"Legal impossibility exists when the intended acts would not constitute a crime under the applicable law. Factual impossibility refers to those situations in which, unknown to the defendant, the consummation of the intended criminal act is physically impossible." *United States v. Luttrell*, 889 F.2d at 810; see also *United States v. Conway*, 507 F.2d 1047, 1050 (5th Cir. 1975).

44

Here, it was factually impossible for Su to commit the wire fraud charges in counts 5 through 12, and the visa fraud charges in counts 16 through 19, because the named victims were all fictitious. These "victims" were part of the ruse undercover sting operation conducted by the government.

Count 5 (Sparsh Agrawat); count 6 (Kadir Dirikan); count 7 (Mohammad Rizwan); and count 8 (Rajeev Batra) all charge Su with wire fraud, based on SEVIS entries by Tri-Valley for these fictitious students. TR 995, 1105, 1217, 1016-20, 1049, 1310-11.

Similarly, count 9 (Agrawat); count 10 (Dirikan); count 11 (Rizwan); and count 12 (Batra) all charge Su with wire fraud, for sending emails to Homeland Security in response to ruse phone calls that the fictitious students were stranded at airports. TR 1057-63; 1068-74; 1600-10.

Finally, count 16 (Agrawat); count 17 (Dirikan); count 18 (Rizwan); and count 19 (Batra) all charge Su

45

with committing visa fraud by falsely making Form I-20s for the same four fictitious students, alleging the same underlying transactions charged in counts 5 through 8.

All these counts charge crimes that were factually impossible for Su to commit. First, for counts 5 through 12, Su could not commit wire fraud, under the theory charged in the indictment, because real victims that could be defrauded did not exist. The scheme to defraud alleged in the indictment charged Su with engaging in an "illegal scheme to defraud non-immigrant aliens of money and property, specifically tuition and other fees." ER 189. But, Agrawat, Dirikan, Rizwan, and Batra were all fictitious students, and not actual aliens, and could not be defrauded.

Nor could the actions charged in these counts be viewed as furthering the general scheme to defraud, as the government was already investigating Su and contrived these actions to gather evidence against her.

It was similarly factually impossible for Su to commit visa fraud, as charged in counts 16 through 19. The indictment charges that Su committed visa fraud, by fraudulently making Form I-20s for the same four fictitious students. But, these "individuals" were not real students who got real visas. Thus, no visa fraud could be committed.

**c. The money laundering charges should be dismissed**

Su was found guilty by the jury of seven counts of money laundering, in violation of 18 U.S.C. § 1957(a) (counts 26, 27, 29, 31, 32, 34 and 35).

However, under the merger doctrine, these charges cannot stand, because the withdrawal of funds was an essential element of the fraud scheme and consequently cannot constitute a financial transaction involving the proceeds of independent illegal activity. See *United States v. Bush*, 626 F.3d 527 (9th Cir. 2010), citing *United States v. Santos*, 553 U.S. 507, 516-517 (2008).

47

In *Bush*, the Ninth Circuit held that under 18 U.S.C. § 1957, a transaction in criminally-derived property can create a "merger" problem of the kind that troubled the plurality and concurrence in *Santos*. *Id.*, at 537. In *Bush*, the court found that the circumstances surrounding the fraud convictions in that case were all distinct from the money laundering, thus alleviating any merger concerns. *Id.*

Here, however, the circumstances surrounding the fraud convictions were not distinct from the money laundering. Su was charged with engaging in a scheme for her to defraud immigrant aliens of tuition and other fees. The government charged that it was an essential part of the scheme to defraud that she used the money fraudulently transferred from Tri-Valley accounts for her own purposes, including purchasing real estate and an automobile. Su's withdrawal of funds is thus an essential element of the charged frauds and consequently cannot constitute a financial transaction involving the

48

proceeds of independent illegal activity.  Under the merger doctrine, the money laundering charges must be dismissed.

**B.  THE DISTRICT COURT ERRED IN DENYING SU'S MOTION FOR A NEW TRIAL, PURSUANT TO FED. R. CRIM. P. 33**

**1.  Introduction**

Su's Rule 33 motion for a new trial should have been granted by the district court, on the grounds that the jury was not presented relevant evidence that Su was suffering from a mental impairment.

**2.  Standard of Review**

This Court reviews for an abuse of discretion the district court's ruling on a defendant's motion for a new trial.  *United States v. Mack*, 362 F.3d 597, 600 (9th Cir. 2004).

**3.  Legal Argument**

**a.  Su's mental health**

Susan Su had a long history, starting well before the trial, of behavior exhibiting symptoms of mental illness.

49

As detailed in the Pre-Sentence Report, Su, at
times, heard voices and saw visions "like in a movie."
PSR 92.  Su stated that these voices and visions occur
mostly when she is under stress.  PSR 92.

The PSR described that in 2005 (well before these
criminal allegations), Su was hospitalized at Valley
Care Medical Center for two weeks after her "imaginary
things became big" and she could not recognize her
husband.  PSR 92.  The PSR noted that reports from
Valley Care Medical Center in Pleasanton corroborated
that Su was admitted for "acute onset, first episode of
confusion, flight of thoughts and ideas, tangential
thoughts and pressured speech."  PSR 92.

The admission diagnosis was Acute Psychotic
Episode.  PSR 92.  Su was later diagnosed
with Acute Psychosis of undetermined origin, possible
Acute Paranoid Schizophrenia.  PSR 92.  The PSR
describes that the medical records "also indicated that
she had been talking to herself and having grandiose

50

delusions about Britain's royal family, at times with visual hallucinations." PSR 92.

The PSR describes a second incident in 2011, when Su was placed on an involuntary Cal. Welf. & Inst. Code § 5150 psychiatric hold, as she was considered a danger to herself. PSR 93. This occurred after she was served with the Federal search warrant in this case and she threatened to kill herself. Su was released after she presented as "calm, with organized thoughts." PSR 93.

Then, after legal proceedings started in the district court, there were several new instances involving Su's behavior.

Prior to trial, the magistrate judge, concerned as to whether Su was suicidal, ordered that Su attend therapy. ER 18-19.

There were additional instances regarding Su's behavior during the trial.

On March 4, 2014, Su talked audibly during the government and defense counsel's examination of a

51

government witness, even though defense counsel had
admonished Su to remain composed during the trial.  TR
274-75.

The next morning, March 5, 2014, right after the
district court had strongly admonished Su that she was
to avoid any contact with any victim or witness in the
trial, which she said she understood (TR 354-55), Su
attempted to talk to the government's next witness, Dr.
Liou, outside of court, right in front of government
agents.  TR 405.

On March 10, 2014, the very next court date, while
defense counsel was questioning a witness, Su rose from
the defense table, carrying a laptop, and was attempting
to talk to counsel in a loud voice.  TR 721.

The following day, March 11, 2014, the district
court again admonished Su for "cheering" defense counsel
on during his questioning of a witness, saying "Yes,
Yes" in a loud voice.  TR 883.  The court noted that
while it was describing the incident, Su was smiling at

52

the court, and had smiled earlier during her outburst.
TR 883.

On March 19, 2014, Su was very late arriving at the
courtroom.  TR 1739, 1756.  While the parties were
waiting for her to arrive, the court put on the record
that Su had sent an email, with a 2,000 page attachment,
directly to the court, with copies to the government and
defense counsel.  TR 1740.  Defense counsel noted that
the email was received at 5:30 a.m.  TR 1741.

Unfortunately, the district court, with the consent
of the parties, deleted the email.  TR 1742

After the guilty verdicts were returned, the
district court held a bail hearing.  TR 1933.  When
granting the government's motion to detain Su, the court
stated that it found that Su had demonstrated an
incapacity to comply with the Court's orders.  TR 1935.
But, noting Su's history of mental health issues, the
court stated that "it was true that she was either
unwilling or unable, and I think it might have been not

53

able.  She just couldn't stop herself from contacting
other persons in the case."  TR 1935.

**b.   The Report by Dr. Gregory**

Following the trial, new counsel retained Dr.
Amanda Gregory to evaluate the defendant.  PSR 93.

Dr. Gregory's report detailed that Su had a history
of psychotic symptoms, with hospitalizations in 2005 and
2011.  PSR 93; SER 3-5.[3]  These psychotic features
included grandiose and paranoid delusions (thinking she
could communicate with God, thinking she was being
followed and people were trying to harm her),
disorganized speech and hallucinations.  SER 5.

Dr. Gregory concluded that Su's symptoms were
consistent with a diagnosis of Schizoaffective Disorder,
Bipolar Type.  PSR 95; SER 12.

In Dr. Gregory's opinion, while Su may have
exaggerated some symptoms during her assessment, Su's
"untreated mental illness appears to have played a role

---

[3]  "SER" refers to Sealed Excerpts of Record.

54

in her behavior that resulted in her convictions and her
erratic behavior during the trial... Her grandiose
delusional thinking and unstable mood may also have
played a role in her behavior that resulted in her
charges." SER 13.

**c.    The Rule 33 hearing in the district court**

Su moved for a new trial pursuant to Fed. R. Crim.
P. 33, on the ground that she was suffering from an
unrecognized mental impairment that impacted her right
to a fair trial, attaching Dr. Gregory's report under
seal. CR 167, 169, 170; ER 320; SER 1.

The district court denied Su's motion. First, the
court found the motion untimely, and also concluded that
the evidence was not newly discovered. ER 90, 94. It
also denied the motion on the merits, stating that it
disagreed with Dr. Gregory's conclusion that Su's mental
health affected her actions. ER 91-94.

**d.   The district court erred in denying the motion**

The district court erred in not ordering a new trial, in the interest of justice.

A "district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Kellington*, 217 F.3d 1084, 1094-95 (9th Cir. 2000), quoting *United States v. Alston*, 974 F.2d 1206, 1210-1211 (9th Cir. 1992).  The district court need not view the evidence in the light most favorable to the verdict, instead it may weigh the evidence.  *United States v. Kellington*, 217 F.3d at 1095, citing *United States v. Alston*, 974 F.2d at 1210-11 and citing Fed. R. Crim. P. 33 ("On a defendant's motion, the court may grant a new trial to that defendant if the interests of justice so require.")

**i.  The motion was timely**

The district court preliminarily agreed with the government's argument that Su's Rule 33 motion in the

56

interest of justice was untimely, because it was filed
more than 14 days after the jury verdict.  See Fed. R.
Crim. P. 33(b)(2).

However, the time limits in Rule 33 "must be read
in conjunction with Federal Rule of Criminal Procedure
45, which provides that "[w]hen an act must or may be
done within a specified period, the court ... may extend
the time ... on a party's motion made ... after the time
expires if the party failed to act because of excusable
neglect." *United States v. Munoz*, 605 F.3d 359, 367
(6th Cir. 2010)*, cert. denied,* 131 S.Ct. 1813 (2011),
quoting Fed. R. Crim. P. 45(b).

Here, the district court granted the request of the
defense to allow additional time to brief a post-verdict
Rule 29 motion.  While previous counsel had not
specifically mentioned also filing a Rule 33 motion, at
the May 9, 2014, hearing, undersigned counsel, new to
the case, informed the court that both Rule 29 and Rule
33 motions would be filed, and the district court

57

acknowledged that the post-trial motions to be filed
included both Rule 29 and Rule 33 motions.  ER 52-55.

Under a broad view, then, Su's earlier request for
additional time to file the Rule 29 motion can be found
to have encompassed the Rule 33 motion.

If this view is too broad, then the failure to file
the motion within the 14-day limit was the result of
excusable neglect, due to the delay in the hiring of new
counsel.  See Fed. R. Crim. P. 33(b)(1) & 45(b)(1)(B).
After all, finding the motion timely would have raised
no danger of prejudice to the nonmoving party, the
government.  In addition, the filing of the Rule 33
motion did not delay the proceedings, as it was filed on
the same day that the timely filed Rule 29 motion was
filed.  Finally, the reason for the delay was the
retention of new counsel.  There is no suggestion that
Su was acting in bad faith, as once the issue of new
counsel was settled on May 9, 2014, counsel immediately

58

asked for a new briefing schedule that included both
Rule 29 and Rule 33 motions.

Alternatively, the motion was timely filed under
Fed. R. Crim. P. 33(b)(1), because the proffered
testimony of Dr. Gregory qualified as newly discovered
evidence.  See *United States v. Harrington*, 410 F.3d 598
(9th Cir. 2005), *cert. denied*, 546 U.S. 1115 (2006).

The *Harrington* factors are: (1) the evidence must
be newly discovered; (2) the failure to discover the
evidence sooner must not be the result of the
defendant's lack of diligence; (3) the evidence must be
"material" to the issues at trial; (4) the evidence may
not be (a) cumulative or (b) "merely impeaching"; and
(5) the evidence must indicate that a new trial would
"probably" result in acquittal.  *United States v.
Harrington*, 410 F.3d at 601.

These factors are met here.

First, the report of Dr. Gregory is newly
discovered.  No such detailed report was done earlier,

59

and there was certainly no prior in-depth analysis,
equal to that done by Dr. Gregory.  This is
understandable, as Su's mental condition worsened and
came to a climax at the close of the trial, when she
emailed the district court after a late night breakdown.
Su's behavior was more balanced prior to the stress of
the trial, a circumstance that is consistent with the
findings of Dr. Gregory.

Second, the failure to discover the evidence was
not the result of the defendant's lack of due diligence.
The earlier therapy ordered by the magistrate did not
disclose the extent of Su's mental condition.  The
stress of the trial exposed the depth of the problem,
and now Dr. Gregory's report describes the issue in
detail.

Third, Dr. Gregory's testimony is material to the
issue of intent.  Her testimony regarding Su's
diminished capacity would be offered at trial not as an

60

affirmative defense, but to negate the mens rea element of the crimes charged in the indictment.

Fourth, Dr. Gregory's proffered testimony is in no way cumulative or merely impeaching. There was no evidence of Su's mental condition presented at trial, and the testimony goes to Su's ability to form the requisite intent, not to any issues of credibility.

Thus, the motion was timely.

## ii. **The motion should have been granted on the merits**

The district court erred in denying the Rule 33 motion for a new trial.

First, Su's mental condition impacted her pre-trial ability to consider and weigh the pre-trial plea offer made by the government. Prior to trial, Su was presented with a written plea offer with an agreed recommended sentence of 41 months. ER 374-75. In light of the government's evidence, and 196 month sentence imposed after she went to trial, rejection of this 41-

61

month plea offer raised a red flag that Su's mental condition was affecting her decision making process. Her mental ability, particularly any delusional view of the government's evidence and strength of its case, appears to have impacted her ability to intelligently consider the 41-month plea offer before trial.

The Supreme Court, in *Lafler v. Cooper*, 132 S.Ct. 1376 (2012), recently emphasized the importance of a fair plea bargaining process. *Id.*, at 1388-91. At a minimum, the district court should have held an evidentiary hearing on this issue.

Second, Su's mental condition impacted her right to a fair trial, in terms of the jury's view of her during the trial. The increasing stress facing Su as the trial progressed resulted in repeated instances of in-court behavior that could only have prejudiced her before the jury. The district court noted at one point that her behavior might be distracting to the jury (TR 721-22), and described at another point her inappropriate smiling

in court with the jury present.  TR 883.  A fair
inference is that Su's behavior during the trial
prejudiced her before the jury, who did not hear any
testimony in explanation of Su's mental condition.

Third, the stress peaked at the moment when Su had
to make an intelligent decision on whether to testify.
While the district court viewed Su's behavior as a
normal reaction to the stress of trial (ER 94), her
actions were far from normal.  In particular, emailing
the district court, early in the morning, a message with
a 2000 page attachment (TR 1740), is far from normal and
is evidence of Su's mental unraveling.  Yet, at that
time, Su was deciding whether or not to testify on her
own behalf.

Fourth, the most compelling reason to grant a new
trial in the interest of justice is that Su was not able
to present Dr. Gregory's expert testimony to the jury on
Su's diminished capacity.

63

In *United States v. Christian*, 749 F.3d 806 (9th
Cir. 2014), this Court recognized the relevance of such
testimony, when it vacated a conviction for
transmitting email communications containing threats to
injure another, in a case in which the defendant argued
that the district court should have allowed his expert,
a psychologist who had earlier examined him for
competency to stand trial, to testify regarding his
diminished capacity defense.  *Id.,* at 813-14.

Dr. Gregory's report similarly reveals that Su had
a diminished capacity.  Su's Schizoaffective Disorder
could have affected her ability to appreciate the nature
and quality of the criminal conduct for which she was
convicted, and may have played a role in her behavior at
Tri-Valley  SER 1-13.

Dr. Gregory's expert testimony is particularly
relevant here, because many, if not all, of the charges
brought against Su require specific intent, or
intentional conduct.

64

Both the wire and mail fraud charges require the specific intent to defraud.  *United States v. French*, 748 F.3d 922, 935 (9th Cir.), *cert. denied,* 135 S.Ct. 384 (2014); *United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011).

The visa fraud charges, and the related charge of conspiracy to commit visa fraud, all have a mens rea requirement of guilty knowledge.  See *United States v. Zhen Zhao Wu*, 711 F.3d 1, 30 (1st Cir.), *cert. denied*, 134 S.Ct. 365 (2013) and *United States v. Archer*, 671 F.3d 149, 154 (2d Cir. 2011).

The charges of using a false document and making a false statement are both specific intent crimes.  *United States v. Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004), *cert. denied*, 546 U.S. 827 (2005), citing *United States v. Boone*, 951 F.2d 1526, 1544 (9th Cir. 1991).

The two charges of alien harboring have an implied specific intent element.  See *United States v.*

*Torres-Flores*, 502 F.3d 885 (9th Cir. 2007); *United States v. Nguyen*, 73 F.3d 887, 894 n.4 (9th Cir. 1995).

The unauthorized access of a government computer charge requires proof that a defendant intentionally accessed information from a protected computer. See *United States v. Willis*, 476 F.3d 1121, 1125-26 (10th Cir.), *cert. denied,* 531 U.S. 1154 (2007).

Finally, in the seven remaining counts of money laundering, the government must prove the defendant knew the proceeds were derived from specified unlawful conduct. *United States v. Alaniz*, 726 F.3d 586, 602 (5th Cir. 2013).

Yet, Su was convicted by a jury who had not had the opportunity to hear any evidence as to defendant's mental condition, as it might impact her ability to form the requisite mens rea. This is precisely the type of evidence that, if presented to the jury, would have made it unlikely that the government would be able to prove Su's intent beyond a reasonable doubt.

66

## C.  THE DISTRICT COURT ERRED IN SENTENCING SU TO 196 MONTHS INCARCERATION

### 1.  Introduction

The district court erred in sentencing Dr. Su, a forty-four year old woman with no prior criminal record and a history of mental illness that included grandiose delusions about Britain's royal family (PSR 92) to 16 years, 4 months in prison.

The sentencing process, however, was marred by procedural error, because the court incorrectly denied several of Su's objections to the Sentencing Guidelines Calculations, which resulted in a final offense level significantly higher than the correct level.

In addition, the sentence was substantively unreasonable, in light of the circumstances of this case.

### 2.  Standard of Review

This Court reviews a sentence for reasonableness, and "only a procedurally erroneous or substantively unreasonable sentence will be set aside." *United States*

67

*v. Christensen*, 732 F.3d 1094, 1100 (9th Cir. 2013), citing *United States v. Carty*, 520 F.3d 984, 993 (9th Cir.)(en banc), *cert. denied,* 553 U.S. 1061 (2008).

This Court reviews the district court's construction and interpretation of the Guidelines de novo. *Christensen*, 732 F.3d at 1100, citing *United States v. Nielsen*, 694 F.3d 1032, 1034 (9th Cir. 2012).

The district court's application of the Guidelines is reviewed for abuse of discretion. *Id.*, citing *United States v. Holt*, 510 F.3d 1007, 1010 (9th Cir. 2007).

This Court reviews the district court's factual determinations for clear error. *Id.,* citing *United States v. Tulaner*, 512 F.3d 576, 578 (9th Cir. 2008).

## 3. The District Court Committed Procedural Error

The district court committed procedural error before imposing the sentence in this case.

"Procedural errors include, but are not limited to, incorrectly calculating the Guidelines range, treating the Guidelines as mandatory, failing to properly

68

consider the [18 U.S.C.] § 3553(a) factors, using clearly erroneous facts when calculating the Guidelines range or determining the sentence, and failing to provide an adequate explanation for the sentence imposed." *United States v. Christensen*, 732 F.3d at 1100, citing *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008).

"A sentencing error prejudices the substantial rights of a defendant when there is a reasonable probability that he would have received a different sentence had the district court not erred." *United States v. Christensen, supra,* citing *United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013). "The defendant bears the burden of showing a reasonable probability that he would have received a different sentence absent the error." *Id*.

The district court committed procedural error here in: (a) its loss calculations; (b) its grouping decision; and (c) its decision on obstruction.

69

a.  **The government failed to meet its burden of
    establishing the loss figure**

This case should have been viewed as primarily a
case of visa fraud, with the Guideline sentencing range
of that offense used as the starting point in the
sentencing process.  As pointed out in the government's
sentencing memorandum, its own estimate of the Guideline
range for the visa fraud was a final offense level of 26
ER 339.  This results in a guideline sentencing range of
63 to 78 months.

Instead, the government pitched this case as a
scheme to defraud F-1 foreign students, which inflated
the Guideline offense level.  It then claimed that the
loss figure for the scheme to defraud included all
tuition payments by all F-1 students (ER 339), including
the large portion of students, who, in the words of the
district court, were "co-conspirators" in the activities
at Tri-Valley.  ER 109.

Over Su's objection, the Probation Department
adopted this position.  The PSR noted that the wire/mail

70

fraud charges, as part of a scheme to defraud

non-immigrant aliens of money and property, carried a

base offense level of 7.  PSR 50.

The PSR then upwardly adjusted the base offense

level 18 levels, stating that "the loss in this case was

determined to be $5,601,844.72.  This is the amount Su

deposited during her time at Tri-Valley."  PSR 51.

This $5.6 million figure was based on Agent

Mackay's financial analysis of all the funds he

calculated were paid by all the F-1 students who had

enrolled at Tri-Valley.  TR 1635-36.

In Su's sentencing memorandum, Su again objected to

this approach, arguing that the large group students who

just wanted to maintain their status in the United

States, were not victims of a scheme to defraud.  ER

369-71.

Su again argued against this inclusion at the

sentencing hearing (ER 105-08), but the district court

adopted the government's position, even though it

71

stated: "I take it as a given that many of the students who paid TVU tuition only wanted visas, and never actually expected to go to class... Those people are just co-conspirators in Dr. Su's visa fraud."  ER 109.

Inclusion of the tuition payments of those co-conspirators, over continued defense objection in the district court, was clear error.

"The government bears the burden of proving loss for the purposes of § 2B1.1 by a preponderance of the evidence."  *United States v. Santos*, 527 F.3d 1003, 1006-07 (9th Cir. 2008).

The government clearly failed to meet its burden here.  The government charged a scheme to defraud, where the victims are alleged to have been F-1 students who were defrauded of their tuition payment.  Then, instead of making any attempt at all to determine who were true victims as opposed to willing participants, the government just lumped all the students together.

It is quite apparent from the trial evidence that
many of the F-1 students willingly paid a significantly
lower tuition payment than a traditional school would
charge, in order to maintain F-1 visas, while being free
to work without having to attend classes.

The government's own witness, Parth Patel,
testified at trial there were two types of students
enrolled at Tri-Valley, the first group who just wanted
to maintain their status to stay in the United States,
and a second group who just wanted to attend the
classes. TR 1543. Patel believed that 65 percent to 70
percent of the students were just interested in
maintaining their immigration status. TR 1543-44.
While this might be visa fraud, it is not wire or mail
fraud as to these students. Those 65 to 75 percent are
not victims.

Another government witness, Dirisanala, testified
that he was too busy working at Tri-Valley to be
bothered with attending his online class, a class that

actually existed with an instructor.  TR 1188-89.  Yet,
the government views him as a "victim" of a scheme to
defraud.

Patel's estimate of the large percentage of non-
victim students fits in with the facts of the case.

Quite unusually for a $5 million federal fraud
case, there were no outraged victims at the sentencing
hearing, no victim impact statements, no letters to the
judge.  The restitution requests were limited to
$904,198.84 in claims, filed not by angry F-1 students
but by two finance companies.  PSR Sentencing
Recommendation at p. 5.

Quite significantly, the government could name only
two actual victims, Bhanu Teja Challagundla (count
three) and Kalpana Challa (count four) out of the 12
fraud counts charged in the scheme to defraud.  The
government had to use eight of its own fictitious
students, in counts five through 12, to inflate the
total number of "victims."

74

Moreover, the government only called five students at the trial, one of whom Vandana Virmani, was not even an F-1 student, but instead an H-1 visa student (TR 172-74).

Further, the government's argument that it can use intended loss, or intended gain, as a basis for its loss figure is again erroneously grounded in the theory that the intended gain from co-conspirators can be considered as uncomplaining victims in a scheme to defraud.

Su was clearly prejudiced by this error, as there is a reasonable probability that she would have received a different sentence had the district court not erred. See *United States v. Christensen*, 732 F.3d at 1102.

The final offense level for the group one offense, the scheme to defraud, due to the 18 level increase for loss, was level 39. PSR 50-57. The loss figure was also used to inflate the Guideline score for the group two offense, which resulted in an additional one point increase. PSR 59. The end result was a final offense

75

level 40, criminal history I, with a sentencing range of 292-365 months.  While the district court concluded that a downward variance was warranted, it varied downward from a highly inflated starting point.

As pointed out above, the government's estimate of the Guideline range for the visa fraud was a final offense level of 26, resulting in sentencing range of 63 to 78 months.  ER 339.  This should have been the starting point of the sentencing analysis by the district court, and Su was prejudiced by the use instead of the inflated scheme to defraud figures.

**b.  The district court erred in not grouping all offenses**

**i.  All offenses should be grouped**

The district court also erred in not grouping all counts of conviction under U.S.S.G. § 3D1.2(b) and (c).

The Probation Department proposed that the counts should be split into two groups.  PSR 50-72.  Group One contained the substantive wire and mail fraud counts, as well as the money laundering counts.  PSR 50-57.  Group

Two contained the substantive visa fraud counts, the conspiracy to commit visa fraud count, the use of a false document counts, the alien harboring counts, and the unauthorized use of a government computer count. PSR 58-65.

Su filed a written objection, arguing that one group was appropriate under U.S.S.G. §§ 3D1.2(b) and 3D1.2(c). PSR Addendum.

Su again objected in her sentencing memorandum, arguing that there should be only one group, under U.S.S.G. §§ 3D1.2(b) and 3D1.2(c). ER 365-69.

Su also argued that splitting the offenses into two groups would result in impermissible double counting, citing *United States v. Smith*, 196 F.3d 1034, 1036-37 (9th Cir. 1999), *cert. denied*, 529 U.S. 1028 (2000). ER 366.

At the sentencing hearing, Su again objected, arguing that all groups should be grouped under U.S.S.G. § 3D1.2 for involving the same harm, as the

77

crimes involve the same set of victims and the acts are
all connected by a common objective or are part of a
common scheme or plan.  ER 102.  Su also again argued
that grouping was appropriate under U.S.S.G. § 3D1.2(c)
because all the counts share the same conduct that is
treated as the specific offense characteristics, and
share the same adjustments.  ER 102.

Finally, Su argued that splitting the offenses into
two groups would result in impermissible double
counting.  ER 103.

The government argued that the district court
should create two groups, with all the offenses except
the use of the government computer count in Group One,
and the computer count alone in Group Two.  ER 103-04.

The district court adopted the government's
position.  ER 104.

This was error.  The offense conduct for the
unauthorized use of the government SEVIS computer
program was part and parcel of the scheme to defraud, as

well as the convictions for visa fraud and conspiracy to commit visa fraud. Indeed, without using the SEVIS program, the crimes in Group One could not have been committed. U.S.S.G. § 3D1.2 specifically provides that for purposes of sentencing, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group."

Here, all the charges involved the same harm, the same victims, and connected by a common objective or are part of a common scheme or plan. See U.S.S.G. § 3D1.2(b). In addition, all the counts share the same conduct that are treated as the specific offense characteristics, and share the same adjustments. See U.S.S.G. § 3D1.2(c). Thus, the charges should all be in one group.

## ii. The sentencing calculations are incorrect for Group Two

Alternatively, if the district court was correct that there are two groups because of separate victims,

79

then the sentencing calculations in Group Two are incorrect.

First, the PSR calculations for Group Two were based on the false document charges. PSR 58. But, the PSR calculations for Group Two were rejected by the trial court, when it adopted the government's view that only the unauthorized use of a computer was in Group Two. However, the PSR did not separately calculate an offense level for the computer count, so the district court did not have an accurate final PSR before sentencing Su. This alone was procedural error.

In addition, the government's calculations were wrong. The government concluded that the conviction for unauthorized access of a government computer had an offense level of 32. The government's figures, however, included a 20 level increase under a cross reference to U.S.S.G. §§ 2B2.3(c)(1) & 2L2.1, claiming the offense was committed with intent to commit a felony offense (visa fraud). The government also added a 4 level

80

upward adjustment for role, under U.S.S.G. §3B1.1(a),
and a two level upward adjustment for obstruction, under
U.S.S.G. §3C1.1.  ER 341.

These calculations resulted in impermissible double
counting, as one part of the Guidelines was applied to
increase Su's punishment on account of a harm that has
already been fully accounted for by application of
another part of the Guidelines. *United States v. Smith*,
196 F.3d at 1036-37 (further citations omitted).

That is just what the government's guideline
calculations did.  The government added 20 additional
levels for the visa fraud cross-reference, even though
the visa fraud conviction is already in Group One.  PSR
50.  In addition, the 4 level upward adjustment for role
(even though count 23 names only Su for accessing the
computer) and the further 2 levels upward adjustment for
obstruction, were both already included in the Group One
calculation.  PSR 55, 56.

Thus, grouping here would result in impermissible double counting.

Moreover, if the double counting is avoided by eliminating these upward adjustments, then Group Two's guideline score would be too low to qualify for grouping.  See U.S.S.G. § 3D1.4(c)("Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level.").

**c.  The district court erred in applying an obstruction enhancement**

The district court also erred in applying a 2-level upward adjustment for willful obstruction of justice under U.S.S.G. § 3C1.1(a) (PSR 56; ER 116), because Su's mental state negated the specific mens rea needed.  Dr. Su's mental condition and the stress of trial were the root cause of the incidents in question.

"Sentencing Guidelines § 3C1.1 contains a clear mens rea requirement that limits its scope to those who 'willfully' obstruct or attempt to obstruct the administration of justice."  *United States v. Lofton*,

82

905 F.2d 1315, 1316 (9th Cir.), *cert. denied*, 498 U.S. 948 (1990). The "term 'willfully' requires that the defendant 'consciously act with the purpose of obstructing justice.'" *Id*. at 1316-17, quoting *United States v. Stroud*, 893 F.2d 504, 507 (2d Cir. 1990).

The report of Dr. Gregory corroborates and supports the defense's contention at sentencing that Su's delusional thinking was the motivation behind her efforts to have the various witnesses she contacted testify consistently with her version of the evidence.

At a minimum, the district court should have held a hearing on the matter, instead of summarily denying Su's objection to the enhancement.

## 4.  The 196 Month Sentence was Substantively Unreasonable

The district court abused its discretion by the imposition of a 196-month sentence. The United States Probation Officer had recommended a lower sentence of 168 months (PSR Sentencing Recommendation), and the defense had asked for a sentence of 70 months, with a

requirement of mental health/alcohol treatment both before and after incarceration. ER 381.

Of course, the district court was free to disregard these two recommendations. But, the 196-month sentence imposed was an unreasonable sentence for a 44-year-old woman who has no prior criminal record and a history of mental illness.

"The abuse of discretion standard is deferential, but it does not mean anything goes." *United States v. Ressam*, 679 F.3d 1069, 1087 (9th Cir. 2012) (en banc). And, as the Supreme Court has observed in a related context, this Court should "not indulge [in] post hoc rationalization" of the sentencing court's "decision-making that contradicts the available evidence ...." *Harrington v. Richter*, 131 S.Ct. 770, 790 (2011).

Here, the district court explained its decision by describing this case as "a massive fraud that was done for greed, for which Dr. Su still refuses to take responsibility." ER 135.

84

Su acknowledges the seriousness of the underlying offense cannot be minimized. But, there are several mitigating factors present in this case.

First, the use of the scheme to defraud guidelines results here in an inflated guideline score for what is really a visa fraud case. The guidelines for a visa fraud case are significantly lower, as the government's own sentencing memorandum acknowledged. ER 340.

Second, contrary to many fraud cases, any victim here can be made whole. All, or almost all, of the proceeds from Tri-Valley were used by Su to buy real estate, or kept in cash in bank accounts. The government has seized all those assets, allowing for full restitution.

Third, the 196-month sentence is far out of proportion to the much lower sentences imposed against the accomplices. Anji Dirisanala was sentenced to 1 day probation; Vishal Dasa was sentenced to 30 days probation; Ramakrishna Karra was sentenced to 6 months

probation and a $2000 fine; and Tushar Tambe was
sentenced to three years probation, in the parallel case
CR 11-0742-KAW.  ER 380.  The sentenced imposed against
Su is far higher, yet no attempt was made in the
district court to explain this extreme disparity.

Fourth, Su has been suffering from a mental
condition that has been largely untreated.  As the
probation officer notes, despite the family noting that
the defendant had significant mental health issues, "the
family chose not to pursue help for her, even after her
two hospitalizations.  Left untreated and sometimes
ignored by her family, Su was able to create her own
world without being held accountable by anyone."  PSR
Sentencing Recommendation.

Su acknowledges that this is a serious offense, and
that the district court did grant a variance from the
original guidelines.  However, 196 months is a lengthy
prison sentence, particularly for a defendant with a
documented mental illness.

86

## D. THE TRIAL COURT IMPROPERLY ISSUED A PRELIMINARY FORFEITURE ORDER AGAINST SU

### 1. Introduction

Su's appeal includes an appeal from the preliminary forfeiture order. In particular, Su disputes the loss amount, which was used as the basis for the judgment. In addition, as there is insufficient evidence to support the alien harboring charges, the forfeiture of the Boulder Court properties based solely on those convictions (ER 59), should be reversed.

Su also separately appeals the forfeiture order, as her right to due process was violated when the district court issued a preliminary forfeiture order without first holding a requested hearing.

### 2. Standard of Review

This court reviews de novo the district court's interpretation of federal forfeiture law. *United States v. Kim*, 94 F.3d 1247, 1249 (9th Cir. 1996). The Court reviews de novo the district court's interpretation and application of the Federal Rules of Criminal Procedure.

87

See *United States v. Alvarez-Moreno*, 657 F.3d 896, 900 n.2 (9th Cir. 2011).

## 3. Legal Argument

The superseding indictment contained four forfeiture allegations, seeking the forfeiture of approximately $5,601,844.72 in property derived from proceeds traceable to the crimes charged in the indictment. CR 21.

Following the jury conviction, on May 1, 2014, the government filed a motion for a preliminary order of forfeiture. CR 129.

On August 29, 2014, along with her Rule 29 and Rule 33 motions, Su filed a response to the government's motion for a preliminary forfeiture order, and requested that the district court stay the forfeiture proceedings pending a decision on the Rule 29 and 33 motions, and then hold a hearing. ER 272-73. Su specifically requested that a hearing be held on the forfeiture

allegations, pursuant to Fed. R. Crim. P. 32.2(b)(1)(B).
ER 273.

However, on October 24, 2014, the district court
issued a written preliminary order of forfeiture,
rejecting Su's request for a stay, with a later hearing
held prior to the entrance of the order. CR 199; ER 56.

The preliminary forfeiture order should be vacated
because Su was never granted the opportunity to
challenge its contents. Rule 32.2(b)(1)(B) requires
that, "[i]f the forfeiture is contested, on either
party's request the court must conduct a hearing after
the verdict or finding of guilty." Su requested a
hearing, so that she could have the opportunity in open
court to dispute the forfeiture allegations.

As the district court noted, Su had agreed to waive
a jury trial on the forfeiture issue. ER 32. But,
"Rule 32.2(b) does not provide that submitting the issue
to the jury is the only way to 'contest' a forfeiture
allegation." *United States v. Shakur,* 691 F.3d 979, 989

(8th Cir. 2012), *cert. denied,* 133 S.Ct. 1510 (2013).

As in *Shakur*, Su agreed not to submit forfeiture issues

to the jury, not waive all forfeiture objections.

"Procedural due process requires that an individual

receive adequate notice and procedures to contest the

deprivation of property rights" that result from

criminal forfeiture under 21 U.S.C. § 853. *United*

*States v. Smith*, 656 F.3d 821, 827 (8th Cir. 2011),

*cert. denied*, 132 S.Ct. 1586 (2012).

Here, Su timely contested the government's

allegations and requested a hearing.  The district

court's summary ruling before any such hearing denied Su

a meaningful opportunity to contest the deprivation of

her property rights, such that the preliminary

forfeiture order should be reversed.  See *United States*

*v. Shakur,* 691 F.3d at 989-90.

90

## Conclusion

Su's convictions should be dismissed for lack of evidence and the forfeiture reversed.  Alternatively, Su should be granted a new trial.

If the conviction is upheld, then this Court should reverse Su's sentence and remand for re-sentencing.


January 29, 2015.            Respectfully submitted,

                             /S/ John J. Jordan
                             JOHN J. JORDAN
                             Attorney for Appellant

91

**STATEMENT OF RELATED CASES**

Appellant is unaware of any related cases pending before this Court.

**CERTIFICATE OF COMPLIANCE**

Counsel for appellant hereby certifies that this opening brief uses 14 point monospaced typeface, is 91 pages in length, and contains approximately 13,688 words, which complies with F.R.A.P. 32.

/S/ John J. Jordan
JOHN J. JORDAN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on January 29, 2015, I electronically filed the foregoing with the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system:

APPELLANT'S OPENING BRIEF and EXCERPTS OF RECORD

I certify that the United States Attorney, 450 Golden Gate Ave., San Francisco, CA 94102, the attorney for the appellee, is a registered CM/ECF user and that service will be accomplished by the appellate CM/ECF system.

I further certify that:

APPELLANT'S SEALED EXCERPTS OF RECORD

was served today on the United States Attorney by U.S. Mail, in a stamped envelope, properly addressed.


Dated: January 29, 2015.        /S/ John J. Jordan
                                JOHN J. JORDAN