No. 14-10499

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

UNITED STATES OF AMERICA,

Appellee,

v.

SUSAN XIAO-PING SU,

Appellant.

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

(D.C. No. CR 11-0288-JST)

———

APPELLANT'S EXCERPTS OF RECORD

VOLUME I

———

JOHN J. JORDAN (Cal. Bar No. 175678)
400 Montgomery St. Ste. 200
San Francisco, CA 94104
Tel: (415) 391-4814
FAX: (415) 391-4308

Attorney for Defendant-Appellee
SUSAN XIAO-PING SU

**ITEM**                                                                    **PAGE**

1.  12/8/11 Court Order Denying Motion to
    Dismiss Indictment  .......................... 001

2.  3/24/14 Transcript of verdict and court
    orally amending briefing schedule
    of Fed. R. Crim. P. 29 Motion  ............... 002

3.  4/1/14 Transcript of district court
    orally amending Rule 29 briefing schedule  .... 026

4.  4/22/14 Transcript of district court
    orally amending Rule 29 briefing schedule  .... 041

5.  5/9/14 Transcript of district court
    orally amending briefing schedule of
    Fed. R. Crim. P. 29/33 motions  ............... 048

6.  10/24/14 Preliminary Order of Forfeiture  ..... 056

7.  10/31/14 Transcript of Court Order Denying
    Post-Verdict Motions and Sentencing  .......... 061

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: CR 11-00288 SBA |
| Plaintiff, | **ORDER DENYING DEFENDANT'S MOTION TO DISMISS** |
| vs. | Dkt. 18 |
| SUSAN SU, | |
| Defendant. | |

Defendant has filed a motion to dismiss Counts 1 through 12 of the Indictment. Dkt. 18. However, Defendant's motion is now moot in light of the Superseding Indictment filed by the Government on November 10, 2011. Dkt. 21. Accordingly,

IT IS HEREBY ORDERED THAT Defendant's motion to dismiss is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: December 8, 2011

_Saundra B. Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

1916

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    BEFORE THE HONORABLE JON S. TIGAR

4    UNITED STATES OF AMERICA,           )
                                         ) Volume 13
5              Plaintiff,                ) Pages 1916 - 1938
                                         )
6         VS.                            ) NO. 11-00288 JST
                                         )
7    SUSAN XIAO-PING SU,                 )
                                         ) San Francisco, California
8              Defendant.               ) Monday, March 24, 2014
     _____) 11:40 a.m.

9

10                   **TRANSCRIPT OF COURT PROCEEDINGS**

11

     **APPEARANCES:**

12

13   **For Plaintiff:**          MELINDA HAAG
                                 UNITED STATES ATTORNEY
14                               1301 Clay Street, Suite 340S
                                 Oakland, California 94612
15                      BY:      **HARTLEY M.K. WEST, ESQ.**
                                 **WADE M. RHYNE, ESQ.**
16                               **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**          Law Offices of Erik G. Babcock
18                               717 Washington Street, Second Floor
                                 Oakland, California 94607
19                      BY:      **ERIK G. BABCOCK, ESQ.**
                                 **ATTORNEY AT LAW**

20

21

22

23

24
     Reported By:   James C. Pence, RMR, CRR, CSR No. 13059
25                  Official Court Reporter - U.S. District Court
                    Computerized Transcription By Case CATalyst

1917

1    **I N D E X**

2    Monday, March 24, 2014 – Volume 13

3                                                    **PAGE**  **VOL.**

4    Verdict                                         1918   13

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1918

```
 1    Monday, March 24, 2014                        11:40 a.m.

 2                            ---oOo---

 3         (Proceedings heard in the presence of the jury:)

 4         THE COURT:  Good morning.  It's still morning barely.

 5    All the jurors are in their newly assigned seats because our

 6    alternates have been excused.  So we shuffled people around a

 7    little bit.  The lawyers and the defendant are at counsel

 8    table.

 9         Would the foreperson of this jury please identify himself.

10         Good morning, Mr. Sockolov.  I have received a note from

11    the jury that the jury has reached a unanimous verdict; is that

12    true?

13         JUROR NO. 5:  Yes.  Yes, your Honor.

14         THE COURT:  Would you please hand the verdict form to

15    my courtroom deputy, please.

16         Mr. Noble, will you now read the verdict in open court?

17         THE CLERK:  Yes, your Honor.

18         Ladies and gentlemen of the jury, listen to your verdict as

19    it will stand recorded.

20         United States District Court, Northern District of

21    California, United States of America, Plaintiff, versus Susan

22    Xiao-Ping Su, Defendant, Case No. CR 11-00288 JST.  Verdict

23    Form.

24         Count 1.  We, the jury, find defendant Susan Xiao-Ping Su

25    in the above-entitled case guilty of wire fraud as charged in
```

VERDICT

1    Count 1 relating to an electronic submission of a Form I-17 on

2    or about September 15th, 2008.

3         Count 2.  We, the jury, find defendant Susan Xiao-Ping Su

4    in the above-entitled case guilty of wire fraud as charged in

5    Count 2 relating to an e-mail from defendant regarding

6    recruiting Indian students on or about February 21st, 2009.

7         Count 3.  We, the jury, find defendant Susan Xiao-Ping Su

8    in the above-entitled case guilty of wire fraud as charged in

9    Count 3 relating to a Student and Exchange Visitor Information

10   System, SEVIS, entry for B.C. on or about January 10th, 2010.

11        Count 4.  We, the jury, find defendant Susan Xiao-Ping Su

12   in the above-entitled case guilty of wire fraud as charged in

13   Count 4 relating to a SEVIS entry for K.C. on or about

14   January 27th, 2010.

15        Count 5.  We, the jury, find defendant Susan Xiao-Ping Su

16   in the above-entitled case guilty of wire fraud as charged in

17   Count 5 relating to a SEVIS entry for S.A. on or about

18   July 27th, 2010.

19        Count 6.  We, the jury, find defendant Susan Xiao-Ping Su

20   in the above-entitled case guilty of wire fraud as charged in

21   Count 6 relating to a SEVIS entry for K.D. on or about

22   July 27th, 2010.

23        Count 7.  We, the jury, find defendant Susan Xiao-Ping Su

24   in the above-entitled case guilty of wire fraud as charged in

25   Count 7 relating to a SEVIS entry for M.R. on or about

VERDICT

1     August 31st, 2010.

2       Count 8. We, the jury, find defendant Susan Xiao-Ping Su

3     in the above-entitled case guilty of wire fraud as charged in

4     Count 8 relating to a SEVIS entry for R.B. on or about

5     September 7th, 2010.

6       Count 9. We, the jury, find defendant Susan Xiao-Ping Su

7     in the above-entitled case guilty of wire fraud as charged in

8     Count 9 relating to an e-mail from defendant containing a Form

9     I-20, transcript, and a letter of good standing for S.A. on or

10     about September 20th, 2010.

11       Count 10. We, the jury, find defendant Susan Xiao-Ping Su

12     in the above-entitled case guilty of wire fraud as charged in

13     Count 10 relating to an e-mail from defendant containing a Form

14     I-20, transcript, and a letter of good standing for K.D. on or

15     about September 24th, 2010.

16       Count 11. We, the jury, find defendant Susan Xiao-Ping Su

17     in the above-entitled case guilty of wire fraud as charged in

18     Count 11 relating to an e-mail from defendant containing a Form

19     I-20, transcript, and letter of good standing for M.R. on or

20     about January 7th, 2011.

21       Count 12. We, the jury, find defendant Susan Xiao-Ping Su

22     in the above-entitled case guilty of wire fraud as charged in

23     Count 12 relating to an e-mail from defendant containing a Form

24     I-20, transcript, and letter of good standing for R.B. on or

25     about January 7th, 2011.

VERDICT

1      Count 13.  We, the jury, find defendant Susan Xiao-Ping Su

2    in the above-entitled case guilty of mail fraud as charged in

3    Count 13 relating to a Form I-17 and accompanying documents,

4    including a DSO verification letter from defendant to the

5    Student and Exchange Visitor Program, SEVP, on or about

6    December 23rd, 2008.

7      Count 14.  We, the jury, find defendant Susan Xiao-Ping Su

8    in the above-entitled case guilty of mail fraud as charged in

9    Count 14 relating to three articulation agreements sent from

10   defendant to SEVP on or about February 10th, 2009.

11     Count 15.  We, the jury, find defendant Susan Xiao-Ping Su

12   in the above-entitled case guilty of conspiracy to commit visa

13   fraud as charged in Count 15.

14     Count 16.  We, the jury, find defendant Susan Xiao-Ping Su

15   in the above-entitled case guilty of visa fraud as charged in

16   Count 16 relating to S.A. on or about July 27th, 2010.

17     16a.  We, the jury, unanimously find that defendant Susan

18   Xiao-Ping Su forged or falsely made the Form I-20; knowingly

19   used, attempted to use, possessed, obtained, or received the

20   Form I-20.

21     Count 17.  We, the jury, find defendant Susan Xiao-Ping Su

22   in the above-entitled case guilty of visa fraud as charged in

23   Count 17 relating to K.D. on or about July 27th, 2010.

24     17a.  We, the jury, unanimously find that defendant Susan

25   Xiao-Ping Su forged or falsely made the Form I-20; knowingly

VERDICT

1    used, attempted to use, possessed, obtained, or received the

2    Form I-20.

3        Count 18.  We, the jury, find defendant Susan Xiao-Ping Su

4    in the above-entitled case guilty of visa fraud as charged in

5    Count 18 relating to M.R. on or about August 31st, 2010.

6        18a.  We, the jury, unanimously find that defendant Susan

7    Xiao-Ping Su forged or falsely made the Form I-20; knowingly

8    used, attempted to use, possessed, obtained, or received the

9    Form I-20.

10        Count 19.  We, the jury, find defendant Susan Xiao-Ping Su

11    in the above-entitled case guilty of visa fraud as charged in

12    Count 19 relating to R.B. on or about September 7th, 2010.

13        19a.  We, the jury, unanimously find that defendant Susan

14    Xiao-Ping Su forged or falsely made the Form I-20; knowingly

15    used, attempted to use, possessed, obtained, or received the

16    Form I-20.

17        Count 20.  We, the jury, find defendant Susan Xiao-Ping Su

18    in the above-entitled case guilty of use of a false document as

19    charged in Count 20 on or about September 24th, 2010.

20        Count 21.  We, the jury, find defendant Susan Xiao-Ping Su

21    in the above-entitled case guilty of false statement to a

22    government agency as charged in Count 21 on or about

23    January 7th, 2011.

24        Count 22.  We, the jury, find defendant Susan Xiao-Ping Su

25    in the above-entitled case guilty of alien-harboring as charged

VERDICT

1    in Count 22 relating to V.D.

2        22a.  We, the jury, unanimously find that defendant Susan

3    Xiao-Ping Su acted for the purpose of commercial advantage or

4    private financial gain.  Yes.

5        Count 24.  We, the jury, find defendant Susan Xiao-Ping Su

6    in the above-entitled case guilty of alien-harboring as charged

7    in Count 24 relating to A.D.

8        24a.  We, the jury, unanimously find that defendant Susan

9    Xiao-Ping Su acted for the purpose of commercial advantage or

10   private financial gain.  Yes.

11       Count 25.  We, the jury, find defendant -- defendant Susan

12   Xiao-Ping Su in the above-entitled case guilty of unauthorized

13   access of a government computer as charged in Count 25.

14       Count 26.  We, the jury, find defendant Susan Xiao-Ping Su

15   in the above-entitled case guilty of money-laundering as

16   charged in Count 26 relating to a $36,783.61 check used to

17   purchase a 2009 Mercedes Benz on or about November 28th, 2009.

18       Count 27.  We, the jury, find defendant Susan Xiao-Ping Su

19   in the above-entitled case guilty of money-laundering as

20   charged in Count 27 relating to a $78,700 wire transfer to

21   purchase 1087 Murrieta Boulevard, Number 133, in Livermore,

22   California, on or about February 25th, 2010.

23       Count 29.  We, the jury, find defendant Susan Xiao-Ping Su,

24   in the above-entitled case guilty of money-laundering as

25   charged in Count 29 relating to a $160,986.87 cashier's check

1  used to purchase 405 Boulder Court, Suite 800, in Pleasanton,

2  California, on or about April 9th, 2010.

3      Count 31.  We, the jury, find defendant Susan Xiao-Ping Su

4  in the above-entitled case guilty of money-laundering as

5  charged in Count 31 relating a -- to a $261,307.49 cashier's

6  check used to purchase 405 Boulder Court, Suite 700, in

7  Pleasanton, California, on or about July 8th, 2010.

8      Count 32.  We, the jury, find defendant Susan Xiao-Ping Su

9  in the above-entitled case guilty of money-laundering as

10  charged in Count 32 relating to a $700,000 cashier's check used

11  to purchase 2890 Victoria Ridge Court in Pleasanton,

12  California, on or about July 20th, 2010.

13      Count 34.  We, the jury, find defendant Susan Xiao-Ping Su

14  in the above-entitled case guilty of money-laundering as

15  charged in Count 34 relating to a $600,000 wire transfer to

16  purchase 1371 Germano Way in Pleasanton, California, on or

17  about December 15th, 2010.

18      Count 35.  We, the jury, find defendant Susan Xiao-Ping Su

19  in the above-entitled case guilty of money-laundering as

20  charged in Count 35 relating to a $1,200,000 wire transfer to

21  purchase 1371 Germano Way in Pleasanton, California, on or

22  about December 15th, 2010.

23      Dated March 24th, 2014.  Signed, Steven Sockolov,

24  Foreperson.

25          THE COURT:  Thank you, Mr. Noble.

1925

1      Does any party wish to have the jury polled?

2          MR. BABCOCK:  Yes, please, your Honor.

3          THE COURT:  Members of the jury, as I previously

4   instructed you, either side can request that the jury in any

5   jury case, civil or criminal, be polled, and the purpose for

6   that is just to make sure that the verdict as read in open

7   court is actually the jury's verdict.

8      We won't go through each of the counts as you just heard

9   read in open court one by one, but we will ask each of you just

10  to say whether or not the verdict that you just heard read in

11  open court represents your personal verdict.

12     Mr. Noble?

13         THE CLERK:  Yes, sir.

14  Juror No. 1, is this your true and correct verdict?

15         JUROR NO. 1:  Yes.

16         THE CLERK:  Juror No. 2, is this your true and

17  correct verdict?

18         JUROR NO. 2:  Yes.

19         THE CLERK:  Juror No. 3, is this your true and

20  correct verdict?

21         JUROR NO. 3:  Yes.

22         THE CLERK:  Juror No. 4, is this your true and

23  correct verdict?

24         JUROR NO. 4:  Yes.

25         THE CLERK:  Juror No. 5, is this your true and

1926

1    correct verdict?

2              JUROR NO. 5:  Yes.

3              THE CLERK:  Juror No. 6, is this your true and

4    correct verdict?

5              JUROR NO. 6:  Yes.

6              THE CLERK:  Juror No. 7, is this your true and

7    correct verdict?

8              JUROR NO. 7:  Yes.

9              THE CLERK:  Juror No. 8, is this your true and

10   correct verdict?

11             JUROR NO. 8:  Yes.

12             THE CLERK:  Juror No. 9, is this your true and

13   correct verdict?

14             JUROR NO. 9:  Yes.

15             THE CLERK:  Juror No. 10, is this your true and

16   correct verdict?

17             JUROR NO. 10:  Yes.

18             THE CLERK:  Juror No. 11, is this your true and

19   correct verdict?

20             JUROR NO. 11:  Yes, it is.

21             THE CLERK:  Juror No. 12, is this your true and

22   correct verdict?

23             JUROR NO. 12:  Yes.

24             THE CLERK:  Your Honor, the verdict is unanimous.

25             THE COURT:  Mr. Noble, I'll direct you to file and

1927

1    record the verdict because the polling does verify the

2    unanimity of the jury's verdict.

3         Well, this is the last time I get to talk to you.  What you

4    just did is an extraordinary thing, but it happens every day in

5    the United States.  Both of those things are true, and that is

6    it can be commonplace in this incredible justice system that we

7    have, and nonetheless every individual incident of it, I think,

8    is tremendous.

9         You've just completed your jury service in this case

10   effective with the polling that Mr. Noble just did, and I want

11   to thank you again not only on my behalf but on behalf of all

12   the judges of this court and on behalf of all the people of the

13   United States, particularly the people in the Northern District

14   of California.

15        I told you this once before, but I think it bears

16   repeating.  Generally, we hire people to make decisions that

17   are important in the community.  We hire Congressmen,

18   Congresswomen, and we hire mayors and people on the zoning

19   board and the President and federal judges and other people,

20   and they make important decisions in our community, but the

21   Founding Fathers reserved one category of decisions to be made

22   directly by people in the community.

23        We don't hire somebody.  We go in the community and we get

24   you, and I think that the -- the results speak for themselves

25   that juries in the United States have an unparalleled

1    reputation for fairness and conscientiousness and diligence,

2    and so I really want to thank you because that's what you

3    brought to this system, and this was not an easy case.

4        The trial was a little bit long, and I know that jury room

5    right behind me is not very comfortable, and many of you came

6    from very far away, and I'm sure that you made sacrifices to do

7    this trial that I'll never know about because you didn't tell

8    me what they were, but I know there were some, and so I thank

9    you for that also.

10       Some of you may have questions about the confidentiality of

11   these proceedings.  Sometimes jurors ask, "Now can I talk about

12   it?"  And now that the case is over, I'm releasing you from my

13   prior admonition.  You can talk about this case with anybody

14   that you'd like, but it has to be with anybody that you choose

15   because you are under no obligation whatsoever to discuss this

16   case with any person.

17       There was a very light amount of media attention to the

18   case.  We have a very robust press in this country, and the

19   First Amendment is very important, and so it's possible -- I

20   don't know how likely.  It is possible members of the press may

21   choose to try to contact you, but they're in the same shoes as

22   anybody else, meaning that the decision whether to talk about

23   the case with somebody is your decision, regardless of whether

24   you're initiating the conversation or someone is initiating it

25   with you.

1929

1    If someone wants to discuss it with you -- and I don't know

2    whether that will happen.  If you want to, you can, but you can

3    also just say, "No.  Thank you" and end the conversation.

4    That's up to you.

5    If you do decide to discuss the case with anyone, I would

6    suggest that you treat it with the degree of solemnity and that

7    whatever you do decide to say, you should act as though you

8    would be willing to say it in the presence of other jurors or

9    under oath here in open court in the presence of all the

10   parties.

11   We all need a certain measure of -- of lightness and humor

12   to get through our day, but it will always be true that -- that

13   the service that you just performed, that the task that you

14   just did is a serious one, and you should -- you should treat

15   it that way.

16   Also, please bear in mind if you do decide to discuss this

17   case that when you were deliberating, you and the other jurors

18   fully and freely stated your opinions with the understanding

19   that they were being expressed in confidence.  Confidence of

20   the deliberation process is very important to our system.  So

21   please respect the privacy of the views of other jurors.

22   I thank you so much for your service.  You've been a great

23   group of jurors, and you're now excused.

24          THE CLERK:  All rise.

25   ///

1930

```
 1              (Proceedings were heard outside the presence of the jury:)
 2              THE COURT:  Everyone can retake their seats.
 3       I do want to pause the proceedings and just allow Mr. Noble
 4  to come into the courtroom so that he can make accurate notes
 5  of whatever further proceedings transpired, but we'll just wait
 6  a minute for that to happen.
 7       All right.  Mr. Noble has now reentered the courtroom.  I
 8  would like to set a sentencing date in this case, and if it's
 9  available -- if it's available on counsel's calendar, perhaps
10  in San Francisco on June the 27th in the afternoon, which is a
11  Friday afternoon.
12              MR. RHYNE:  That's fine with the Government, your
13  Honor.
14              MR. BABCOCK:  I'm sorry, your Honor.  I'm going to be
15  out of the country that whole week.
16              THE COURT:  Okay.
17              MR. BABCOCK:  I'm returning on Monday the week after
18  that, I believe.  I actually have a flight then, but I
19  appreciate it's Monday.
20              THE COURT:  Could counsel appear the prior week on
21  the 20th in the afternoon in Oakland?
22              MR. RHYNE:  That's fine with the Government, your
23  Honor.
24              MR. BABCOCK:  That should -- that should be fine,
25  your Honor.  I just hesitate because I don't see my flight
```

1931

1    actually information in the calendar, but I'm virtually

2    positive it's not until the weekend after that Friday.  So the

3    20th should be fine.

4         THE COURT:  All right.  Well, if it turns out there's

5    a conflict, you can talk to the Government and request a

6    continuance.

7         MR. BABCOCK:  Sorry.  What time -- what time?

8         THE COURT:  For now, I'll set the sentencing on June

9    the 20th, 2014, at 2:00 p.m. in the Oakland court.  It's

10   difficult for me to be more specific about the courtroom

11   because they move me around over there.  I don't have a

12   permanent courtroom.

13      Ms. Su, I'm ordering you to be in the Oakland courthouse at

14   2:00 p.m. on June 20th, 2014, for sentencing.

15      I'm going to refer this matter to the probation department

16   for a written presentence report.  Ms. Su, you can have your

17   lawyer there if you'd like.  They will interview you to obtain

18   information for the presentence report, and it should be --

19   well, I'll let your lawyer give you advice about how to respond

20   to their questions.

21        MR. BABCOCK:  I'll take care of that after I get the

22   process started.

23        THE COURT:  Now, I need to address the defendant's

24   presentencing release status.

25      Mr. Babcock?

1932

```
 1         MR. BABCOCK:  I'd ask the Court to let her stay out.

 2   You know, I didn't actually -- she originally had retained

 3   counsel.  So I didn't do the original bail hearing, but -- the

 4   Government can correct me if I'm wrong, but she is a U.S.

 5   citizen, has been for more than 20 years, and I believe the

 6   clerk or pretrial or someone has her passport.

 7         MR. RHYNE:  I think that's right.

 8         MR. BABCOCK:  She was -- the specific conditions that

 9   she was required -- the main one that she had to do for a while

10   was to see a therapist, which she did for the first year or

11   longer after her original conditions were set, until the

12   therapist eventually said that things seemed to be going okay,

13   and the magistrate -- I believe you allowed her to stop going

14   to court-ordered therapy.

15         Not unmindful of the fact that she's had what I would call

16   some tardiness at trial but never a failure to appear -- as the

17   Court notes, she's been here every day mostly on time but not

18   always.  So I really don't think she's going anywhere.

19         Her whole family is here, her mom, her sister, her

20   children, her two daughters; that is, her whole life is in the

21   Bay Area.  And she's really actually without any financial

22   resources any longer.  The Government has seized every account

23   that was associated with her, and -- which is why she needed

24   court-appointed counsel.

25         I don't see her as a flight risk at this point.
```

0018

```
 1              MR. RHYNE:  Your Honor, we are moving for remand

 2       pursuant to 3143(a), which states that the Court shall order

 3       the defendant detained unless there's a finding by clear and

 4       convincing evidence that the defendant is not a flight risk or

 5       a danger.  We think that the procedural posture of the case has

 6       obviously changed a lot since Ms. Su -- or since Dr. Su was out

 7       on pretrial release.

 8              As defense counsel noted, she had trouble throughout trial

 9       showing up on time and comporting herself with the expectations

10       of the Court, but most importantly, the fact that she was

11       reaching out and interfering with witnesses during the trial

12       after being repeatedly warned by the Court not to do so raises

13       serious concerns with the Government.

14              That's also coupled with Judge Ryu's initial concerns about

15       Ms. -- about Dr. Su possibly harming herself at the beginning

16       of this case.  We think that --

17              THE COURT:  Wasn't there evidence in this trial that

18       she was committed at least once pursuant to California Welfare

19       and Institutions Code Section 5150?

20              MR. RHYNE:  There was one reference to that --

21              MR. BABCOCK:  Yes.

22              MR. RHYNE:  -- in Exhibit 850, and that was the claim

23       that she filed against the Department of Homeland Security.  I

24       think that might be what the Court is referring to.

25              THE COURT:  And that was during the investigatory --
```

1    that was in the phase following her arrest?

2            MR. BABCOCK:  You know, actually, your Honor, if I

3    might, she was 5150 once.  To my knowledge, it was before --

4    before Tri-Valley University was even started.  I want to say

5    in 2007.  It was only for 48 hours.  She basically had a

6    nervous breakdown at the time, and I'm not aware of any

7    subsequent commitments.

8            MR. RHYNE:  I don't know for certain, your Honor.

9    All I know is what was in Exhibit 850.  So we would have to

10   check on that in order to get an accurate answer for the Court.

11   We know that Judge Ryu's concerns at the time were probably

12   more present now given the procedural posture of the case.

13       And on that, we'd submit.

14           THE COURT:  Mr. Babcock?

15           MR. BABCOCK:  I don't think she's -- I -- I'm always

16   a little leery speaking -- predicting psychiatric issues.  I'm

17   not a particular expert, but she's -- the Court can consider, I

18   suppose -- and I wasn't there for the original hearing.  So I

19   don't know exactly what raised Judge Ryu's concerns, but I do

20   know there were concerns, and she did order therapy, which

21   Ms. -- Dr. Su went to for over a year.

22       So -- but I really don't think she's a flight risk.  I --

23   based on my personal interactions and observations, I have not

24   seen any evidence that she's a danger to herself, but I'm not

25   opposed to sending her to therapy just to alleviate any concern

1    in that regard.

2         MR. RHYNE:  Your Honor, we renew our motion.  We do

3    believe she should be remanded.

4         THE COURT:  I find the defendant has failed to meet

5    her burden by clear and convincing evidence that she's not

6    likely to flee or pose a danger to the safety of any other

7    person or the community, and I will remand her into the custody

8    of the United States Marshal pending sentencing.

9         Nobody would remand someone just for being tardy a couple

10   of times, but I think that -- and that's not what's occurring

11   here.  Dr. Su has a demonstrated incapacity to comply with the

12   Court's reasonable orders, and it is true that she was either

13   unwilling or unable, and I think it might have been not able.

14   She just couldn't stop herself from contacting other persons in

15   the case.

16        She does have a history of mental health issues that give

17   me actually at least as much concern about her safety as

18   anybody else's, but now that she stands convicted of these many

19   counts and is suddenly facing for the first time the

20   possibility of the consequences of those convictions, I -- in

21   light of her prior failures to comply with the Court's orders

22   and her prior history of mental health issues, I don't think

23   she can meet the clear and convincing burden that she has, and

24   so I'll order her remanded.

25        Is there anything further that we need to discuss at this

1936

1    point?

2              MR. BABCOCK:  There are two things, I think, one

3    having to do with our -- my Rule 29 motion and I guess the

4    other having to do with the forfeiture end of the case.  Both

5    are just more, I think, scheduling and briefing matters.

6              MS. WEST:  As to the forfeiture, the Government

7    intends to file a preliminary order of forfeiture in the near

8    future, and then if there are issues that are contested, then

9    we can figure out if there needs to be a hearing.

10             THE COURT:  All right.  Does the defendant wish to

11   brief her Rule 29 motion?

12             MR. BABCOCK:  You know, I'd like to think about it

13   and be given an opportunity if I might.

14             THE COURT:  I can set this for status in a week.  The

15   Government will probably have a time frame for its forfeiture.

16   You all can talk about that, and you can decide whether or not

17   you want to file a brief.

18             MR. BABCOCK:  What day are we talking about?

19             THE COURT:  Either this Friday or the following one

20   in the morning, both in San Francisco.

21             MR. BABCOCK:  I'm sorry, your Honor.  Those are both

22   particularly complicated days for me.

23             THE COURT:  What if we did --

24             MR. BABCOCK:  When is the Court's San Francisco

25   calendar?

1937

1      THE COURT: The two days I just gave you.

2      MR. BABCOCK: Oh. It's Fridays.

3      THE COURT: We can specially set this thing. Just

4   give me a minute.

5      MR. BABCOCK: Sorry. I had planned on originally

6   estimating this trial going to April. So all my other things

7   have been --

8      THE COURT: Yes.

9      MR. BABCOCK: -- stepped up on Fridays.

10      THE COURT: Well, we can do this a week from today in

11   the afternoon. That would be the 31st.

12      MR. BABCOCK: Actually, I'm going to be out of the

13   immediate Bay Area. I can do -- I don't mean to -- mean to be

14   difficult, your Honor. I can make virtually any other --

15      THE COURT: Tuesday morning, April 1st?

16      MR. BABCOCK: Perfect.

17      THE COURT: Done.

18   The Court will set this matter for a status conference at

19   9:30 a.m. on April 1st, 2014, in Courtroom 9.

20      MR. BABCOCK: Thank you.

21      THE COURT: Other matters?

22      MS. WEST: I don't believe so.

23      MR. RHYNE: No, your Honor.

24      MR. BABCOCK: I think that wraps it up.

25      THE COURT: Thank you.

1938

1    Court's in recess.

2              MS. WEST:  Oh.  Your Honor --

3              THE COURT:  Yes.

4              MS. WEST:  -- I think we need something from the

5    Marshal's Office to receive Dr. Su.

6              MR. BABCOCK:  I can take her upstairs to the

7    marshals.

8              THE COURT:  They're -- we anticipated this

9    eventuality.  Marshal staff is in the room.  If -- it may save

10   the marshal staff -- is it possible for -- if Mr. Babcock wants

11   to convey Ms. Su up through the front door, that you can

12   accompany in that way?

13       All right.  Thank you.

14             MR. RHYNE:  Thank you, your Honor.

15             MS. WEST:  Thank you.

16             THE CLERK:  All rise.

17       Court is in recess.

18                (Proceedings adjourned at 12:17 p.m.)

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5       I, James C. Pence, Federal Official Realtime Court

6  Reporter, in and for the United States District Court for the

7  Northern District of California, do hereby certify that

8  pursuant to Section 753, Title 28, United States Code that the

9  foregoing is a true and correct transcript of the

10  stenographically reported proceedings held in the

11  above-entitled matter and that the transcript page format is in

12  conformance with the regulations of the Judicial Conference of

13  the United States.

14

15              Dated this 30th day of June, 2014.

16

17              _____

          JAMES C. PENCE, RMR, CRR, CSR NO. 13059

18          FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

**0025**

Pages 1 - 14

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

```
UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )
                               )
  VS.                          )        NO. CR 11-00288 JST
                               )
SUSAN XIAO-PING SU, also known )
as Susan Su,                   )
                               )
          Defendant.           )
_____)
```

San Francisco, California
Tuesday, April 1, 2014

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:
> MELINDA HAAG
> United States Attorney
> 450 Golden Gate Avenue
> San Francisco, California  94102
> BY:  HARTLEY M. K. WEST
> WADE M. RHYNE
> DAVID COUNTRYMAN
> ASSISTANT UNITED STATES ATTORNEYS

For Defendant:
> LAW OFFICE OF ERIK G. BABCOCK
> 717 Washington Street - 2nd Floor
> Oakland, California  94607
> BY:  ERIK G. BABCOCK
> ATTORNEY AT LAW

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Official Reporter

1    **Tuesday - April 1, 2014**                                    **9:35 a.m.**

2                           P R O C E E D I N G S

3                                ---000---

4         **THE CLERK:**  Calling Criminal Case 11-288,

5    United States of America versus Sue Xiao-Ping Su.

6         Counsel, will you please make your appearances.

7         **MS. WEST:**  Good morning, Your Honor.  Hartley West and

8    Wade Rhyne for the United States.

9         **THE COURT:**  Good morning.

10        **MR. RHYNE:**  Good morning, Your Honor.

11        **MR. BABCOCK:**  Good morning, Your Honor.  Erik Babcock

12   for Ms. Su.

13        **THE COURT:**  Good morning.

14        **MR. BABCOCK:**  Dr. Su.

15        **THE COURT:**  I have on my list to find out what the

16   schedule of the forfeiture proceedings is.  We had left it as

17   an open question last time, whether the defendant wanted to

18   brief her Rule 29 motion.

19        I'm going to ask the Government to pick up their exhibits

20   and retain them so that the court is not put to the expense of

21   shipping them to Oakland, which is the other alternative.

22        Then I want to find out what is on all of your lists.

23   Let's start with the Government.

24        **MR. BABCOCK:**  Actually, I'll actually probably hop in,

25   Your Honor, because I think the Government's aware about it,

1    but there's an issue.

2        I received a voice mail last night, or yesterday

3    afternoon, from Michael Cardoza, who's an attorney in the

4    Walnut Creek area, saying that he'd been retained by Ms. Su's

5    family to represent her.

6            THE COURT:  Cardoza with an A?

7            MR. BABCOCK:  Yes, I believe so.

8            THE COURT:  All right.

9            MR. BABCOCK:  I spoke with him briefly this morning on

10   my way to court.  He did say that he's been retained.  I

11   understand from my client that she's not met with him yet.

12       My suggestion would be -- I mean, certainly I think if she

13   wants to seek new counsel, that's her right, and I don't want

14   to stand in the way of that.

15       Mr. Cardoza was on his way to Hayward to start a

16   time-not-waived jury trial in aggravated mayhem this morning,

17   so he's pretty much out-of-pocket, it sounds like, for about

18   the next two weeks.

19       His request to me to convey to the Court was to see if

20   there's a way we could put this over to later in April to allow

21   him to finish his trial and make arrangements to appear here.

22   That's sort of the long and short of it.

23           MS. WEST:  And I spoke with Mr. Cardoza yesterday, he

24   gave me a call as well, conveyed the same information to me,

25   asked that we set it out for at least two weeks as he expects

1   his trial will be approximately two weeks.

2        Mr. Rhyne and I are both unavailable the week of the 14th.

3   So if the Court would be available the following week, it

4   sounds like that would work for all parties; but we, I think,

5   can still address some of the issues in terms of forfeiture for

6   the Court today.

7        **THE COURT:**  Okay.  Well, let's take this very

8   important issue of counsel first.

9        I am available the week of the 21st, and my preference

10  would be to set the matter on Friday the 25th with my regular

11  criminal calendar.  I believe that will be here in

12  San Francisco.

13       Mr. Noble; is that right?

14       **THE CLERK:**  Yes, Your Honor.

15       **THE COURT:**  To set the matter for hearing in

16  San Francisco here at 9:30 in the morning.

17       Of course, Ms. Su has the right to counsel of her choice.

18  If her family has retained new counsel, I'll preserve for the

19  record.  I thought Mr. Babcock did a marvelous job in this

20  case.  That's just one man's opinion.

21       **MR. BABCOCK:**  I don't take these things personally one

22  way or the other, Your Honor.  It comes with the territory.

23       **THE COURT:**  Understood.

24       **MR. BABCOCK:**  I am not available the 25th.  As long

25  as -- Mr. Cardoza said either if the -- I told him that you

1   were on Fridays, and that might be your preference.  He said

2   any of the later Fridays in April would work.

3            THE COURT:  My question for the parties would be is:

4   If he's beginning the trial in Hayward today, two weeks from

5   this Friday would have him in trial almost three weeks.  So if

6   the parties were available on Friday the 18th in Oakland, we

7   could do that also.

8            MR. BABCOCK:  I'm not available that week, but --

9            THE COURT:  You're not available that week?

10            MR. BABCOCK:  Right.

11            THE COURT:  I see.

12            MR. BABCOCK:  I think all of us --

13            MS. WEST:  Neither are Mr. Rhyne --

14            THE COURT:  Okay.  I'm not paying attention to the

15   information you already gave me.

16            MR. BABCOCK:  That's okay.

17       I think the 25th is --

18            THE COURT:  Oh, you were about to say?  I'm sorry?

19            MR. BABCOCK:  What I started to say is I'm sure the

20   25th works for Mr. Cardoza.  It doesn't work for me, I don't

21   think.  I have a misdemeanor trial.

22            THE COURT:  I'm not going to have a situation -- I

23   think it's best for the Court to avoid a situation in which I

24   release lawyer one but I haven't seen lawyer two.  So my

25   suggestion would be that we specially set this on Monday,

1    April 21st, if that is available for the parties, here in

2    San Francisco just as we've specially set this morning's

3    proceeding.

4                        (Pause in proceedings.)

5            MR. BABCOCK:  That's a complicated day, Your Honor.  I

6    have a trial set in --

7            THE COURT:  Is April the 22nd simpler?

8            MR. BABCOCK:  Much better.  Thank you.

9            THE COURT:  How about the morning of April 22nd at

10   9:30?

11           MR. RHYNE:  That will be fine.

12           THE COURT:  Mr. Noble, are there other conflicts on

13   that day that I'm not seeing?

14                   (Court and clerk conferring.)

15           THE COURT:  The Court will set this matter for hearing

16   on April 22nd, 2014, in the San Francisco courthouse at

17   9:30 a.m.

18       Ms. Su, you're ordered to be personally present on that

19   date and at that time in this location.

20       Forfeiture.

21           MS. WEST:  We invite David Countryman to present his

22   expertise to the Court.

23           MR. COUNTRYMAN:  Good morning, Your Honor.

24           THE COURT:  Good morning, Mr. Countryman.

25           MR. COUNTRYMAN:  The Government is going through the

1  assets that are to be seized and calculated for the money

2  judgment it seeks to ask for.  If the Court -- if it's amenable

3  to the Court, we could have that ready in 30 days.

4          THE COURT:  I don't have any idea what the customary

5  schedule for these things is.  It's my first time at this

6  particular rodeo.

7      I never know whether it's a good idea for a brand new

8  federal judge to admit the things he doesn't know, but I do it

9  all the time.

10     If 30 days is how you like to do it, and if no one says

11  there's any objection, that's fine with the Court.

12     Is there any objection?

13         MR. BABCOCK:  No objection.

14         THE COURT:  All right.

15         THE DEFENDANT:  I ask for a jury trial on forfeiture.

16         THE COURT:  I can hear from the defendant's table that

17  Dr. Su is asking for a jury trial on the question of

18  forfeiture.

19         THE DEFENDANT:  Yes, I did, Your Honor.

20         MR. COUNTRYMAN:  Your Honor, if I may respond to that.

21  The defendant has the right to a jury trial, but that right

22  must be exercised before the jury is impaneled because you have

23  the right --

24         THE COURT:  Yes.  I believe the question of forfeiture

25  was waived on the record with Dr. Su's consent.

1          THE DEFENDANT:  I did not --

2          THE COURT:  In this court, Dr. Su, you will not talk

3    while I'm talking.  Let me be very plain with you, very plain.

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  I have done everything I can in this trial

6    to accommodate the fact that trial must be very stressful for

7    you.  I know this morning's proceedings are very stressful for

8    you, but I also need to enforce the rules of the courtroom.

9          One rule is that only one person can talk.  When I'm

10   talking, I'm that person.  That's not just a rule of decorum;

11   it's a rule of courtroom administration.  It is impossible for

12   the court reporter to take down more than one person at a time,

13   and it's very important to have a clear record.

14         Also, as you and I have previously discussed, right now

15   you're represented by counsel.  If, in fact, Mr. Babcock is

16   relieved as your attorney in this case because Mr. Cardoza

17   comes in, you'll still be represented by counsel.  Because

18   you're represented by counsel, you speak to the Court through

19   counsel.

20         I made a note on the record, in other words, I said on the

21   record just a moment ago that you were asserting your right to

22   a jury trial because, although I remember that you had waived

23   your right already, I simply wanted to have a complete record.

24   But that doesn't take away from two things that I just said:

25   First, you need to address the Court through counsel; and,

```
 1    secondly, only one person at a time can talk.

 2         Do we need to set a hearing on the question of forfeiture?

 3    When you say 30 days, what does that mean?

 4         MR. COUNTRYMAN:  Your Honor, the statute says that we

 5    should do it sufficiently in advance of sentencing to allow the

 6    parties to modify the order or correct errors if necessary.

 7              THE COURT:  Yes.  And sentencing is set for June?

 8         MR. BABCOCK:  20th.

 9         THE COURT:  June 20th.  Thank you.

10         MR. COUNTRYMAN:  So it's up to the Court how

11    sufficiently in advance of sentencing it would like to have a

12    preliminary order of forfeiture presented to it.

13         THE COURT:  Well, when you say 30 days, that's the

14    Government will file a brief of some kind?

15         MR. COUNTRYMAN:  The Government will file an

16    application for a preliminary order of forfeiture.

17         THE COURT:  30 days from today is May 1st, 2014.

18    We're going to have new counsel come into the case just about

19    nine days before that, I believe, or eight.

20         Well, what I'll do is set a tentative schedule now; and

21    then if new Defense counsel does come in and they feel the

22    schedule is unreasonable, they can move the Court for a

23    continuance after discussing the matter with the

24    U.S. Attorney's Office.

25         So anticipating that you will file something on the 1st,
```

1    Mr. Babcock, if you were still in the case at that time, what

2    would you think is a reasonable amount of time to respond to

3    that?

4            MR. BABCOCK:  30 days, Your Honor.  I think primarily

5    I would expect -- yeah, by the end of May would be plenty of

6    time.

7            THE COURT:  So if we have the Government's

8    presentation on May 1st and the defendant has until May

9    the 30th to respond, does the Government typically file a reply

10   brief in these things?

11           MR. COUNTRYMAN:  They don't happen often.  The

12   Government has in the past.  In this case, the Government

13   intends to rely a lot on --

14           THE COURT:  I'm not looking for one.

15           MR. COUNTRYMAN:  Only if novel issues are raised,

16   Your Honor.  We believe that the record deals with this issue

17   adequately.

18           THE COURT:  All right.  Well, I'll set a hearing in

19   the spirit of optimism that there won't be any novel issues.

20   So why don't we put the matter on for a hearing on....

21                     (Pause in proceedings.)

22           MR. COUNTRYMAN:  If you'd like me to walk you through

23   the procedure, I can, so you can figure out what time is

24   necessary.

25           THE COURT:  Sure.  That will be helpful.

1    MR. COUNTRYMAN:  The Government is supposed to enter

2    a -- submit an application for preliminary order of forfeiture,

3    which the Court then should rule on sufficiently in advance of

4    sentencing to work out any of the kinks.

5         Defendant has the right to a hearing to submit additional

6    evidence, but the Court can rely on evidence already in the

7    record.  It can rely on hearsay.  It can -- you know, this is a

8    part of sentencing so the rules of sentencing apply.

9         At that point, at sentencing the order becomes final as to

10   the defendant; and then the Government will provide notice to

11   the rest of the world through Internet publication and the

12   mailing of notice to, let's say, mortgage holders on real

13   property, that they can say that they have an interest in the

14   property the Government is seeking to forfeit.

15        THE COURT:  Yes.

16        MR. COUNTRYMAN:  In this situation the Government is

17   going to be seeking a money judgment for which no ancillary

18   proceeding is necessary, because it's an *in personam* money

19   judgment against the defendant, for approximately $5.6 million.

20        It will also be seeking actual direct forfeiture of all of

21   the property listed in the Indictment and the Bill of

22   Particulars, and there may be third-party interests in that

23   property.

24        So as to the money judgment, the Government feels that,

25   you know, in large part, the testimony of Special Agent Mackey

Case: 14-10499, 01/29/2015, ID: 9401076, DktEntry: 10-2, Page 39 of 152
Case4:11-cr-00288-JST   Document160   Filed08/12/14   Page12 of 15

12

1    dealt with that at length.

2        Also, as for money judgment -- or, I should say, as to

3    money laundering counts, the Government is entitled to any

4    property involved in the money laundering transaction, which

5    would include the entirety of the real property.

6        So after the final order of forfeiture becomes final at

7    sentencing, the Government will publish.  If it is unable to

8    work out the third-party interests, there can be an ancillary

9    hearing.  The Government doesn't anticipate that.

10       So once the third-party interests are resolved, the

11   Government will issue an application for final order of

12   forfeiture, which the Court can sign.

13       After the preliminary order of forfeiture, the defendant

14   has no right to challenge that ancillary process because his

15   rights are determined finally at the preliminary-order-of-

16   forfeiture stage.

17       THE COURT:  Is June 6th available on the parties'

18   calendars?  That would be in Oakland at 9:30.

19       MR. COUNTRYMAN:  Yes, Your Honor.

20       MR. BABCOCK:  That's fine.

21       THE COURT:  Okay.  So we'll set a hearing on the

22   preliminary application -- application for preliminary order of

23   forfeiture on June 6, 2014, at 9:30 a.m. in the Oakland

24   courthouse.

25       MR. BABCOCK:  Sorry.  The clerk said the 22nd is here;

1  right?

2       **THE COURT:**  Yes, that's true.  Frankly, I'd rather set

3  that hearing on the 13th, but I want to make sure I've left

4  enough time before the sentencing.  So that's what I have to

5  say.

6       (Pause in proceedings.)

7       **THE COURT:**  Thank you, Mr. Countryman.

8       **MR. COUNTRYMAN:**  Thank you, Your Honor.

9       **THE COURT:**  Mr. Babcock, Rule 29 motion.  I understand

10  that there's some issues maybe with your --

11       **MR. BABCOCK:**  Well, my suggestion would be this:  I

12  was thinking about that.  I would like to brief some of the

13  issues; but rather than file it, I will either give it to

14  Mr. Cardoza when he's available or bring it on the 22nd; and if

15  he comes in, he can decide what to do with it, or I can argue

16  it then if he prefers.  He obviously wasn't here during trial

17  and is at a disadvantage to argue a sufficiency claim, which is

18  what this is.

19       **THE COURT:**  Yes.

20       **MR. BABCOCK:**  So I think he might want my view on the

21  sufficiency arguments, and he can look at the briefing and

22  decide.  He's obviously not going to be -- the other way to do

23  it, I suppose, was if he ordered a transcript and did it from

24  the paper record.  I don't know if he's planning to do that.  I

25  didn't have that conversation with him.

1          THE COURT:  Let me set a backstop.  If this issue has

2   not been resolved, obviously, before sentencing, I'll just rule

3   on the motion before I sentence the defendant --

4          MR. BABCOCK:  Fair enough.

5          THE COURT:  -- whether or not briefing has been filed,

6   the motion.  I stated on the record the motion is pending, so

7   I'll issue a ruling on it based on my own recollection of the

8   evidence if nothing further has happened before I sentence

9   Dr. Su.

10         MR. BABCOCK:  If he doesn't pursue it, I do intend to

11  follow it through.

12         THE COURT:  All right.

13         MR. BABCOCK:  So one way or another.

14         THE COURT:  Very good.

15     We will address -- the minutes should reflect we will

16  address that issue again when we convene on April 22nd.

17     Anything further on the parties' to-do lists?

18         MR. BABCOCK:  I don't think so.

19         MS. WEST:  Not for the Government.

20         THE COURT:  All right.  Thank you.

21             (Proceedings adjourned at 9:52 a.m.)

22                     ---oOo---

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Monday, August 11, 2014

8

9

10

11     _____

12          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                       U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

Pages 1 — 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

```
UNITED STATES OF AMERICA,        )
                                 )
             Plaintiff,          )
                                 )
   vs.                           )  NO. CR 11-288 JST
                                 )
SUSAN SU,                        )
                                 )  San Francisco, California
             Defendant.          )  Tuesday,
                                 )  April 22, 2014
_____  )  9:42 a.m.
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

```
For Plaintiff:          MELINDA L. HAAG
                        United States Attorney
                        1301 Clay Street
                        Suite 340S
                        Oakland, California  94612
                 BY:    WADE RHYNE
                        Assistant United States Attorney


For Defendant:          LAW OFFICES OF ERIK BABCOCK
                        717 Washington Street, 2nd Floor
                        Oakland, California  94607
                 BY:  KEVIN MORLEY, ESQ. Specially Appearing

Also Present:           THE CARDOZA LAW OFFICES
                        1220 Oakland Boulevard
                        Suite 200
                        Walnut Creek, California  94596
                 BY:  BARRY MORRIS, ESQ.
```

Reported by DEBRA PAS, CSR, CRR, RMR
Transcribed by BELLE BALL, CSR 8785, CRR, RDR
Official Reporters, U.S. District Court

0041

Case: 14-10499, 01/29/2015, ID: 9401076, DktEntry: 10-2, Page 44 of 152
Case4:11-cr-00288-JST Document183 Filed09/18/14 Page2 of 7

2

```
 1  TUESDAY, APRIL 22, 2014                         9:42 A.M.

 2                       P R O C E E D I N G S

 3          THE CLERK:  Calling Criminal Case 11-288, United

 4  States of America versus Susan Su.

 5      Counsel, will you please make your appearances.

 6          MR. RHYNE:  Good morning, Your Honor.  Wade Rhyne for

 7  the United States.

 8          THE COURT:  Good morning, Mr. Rhyne.

 9          MR. MORRIS:  Good morning, Your Honor.  Barry Morris

10  appearing for Michael Cardoza, who makes a general appearance

11  at this time.

12          THE COURT:  Good morning, Mr. Morris.

13          MR. MORLEY:  Good morning, Your Honor.  Kevin Morley

14  appearing on behalf of Erik Babcock.

15          THE COURT:  Good morning, Mr. Morley.

16          MR. MORRIS:  Mr. Cardoza is presently in trial in

17  front of Judge Jacobson in Alameda County.  They have dark days

18  on Fridays.  So, I understand that a date has to be set for a

19  Rule 29 motion.

20      Mr. Cardoza indicated he's available on the 9th, to be

21  here personally.  Not to hear the Rule 29 motion on the 9th --

22  obviously it hasn't been filed yet -- but to set a date for a

23  hearing.

24          THE COURT:  Mr. Morris, have you had a chance to talk

25  to my clerk about our calendar here?
```

```
 1              MR. MORRIS:  Yes, I did.  I was told the 9th was a
 2   possibility.
 3              THE COURT:  I'm in Oakland that morning.
 4              MR. MORRIS:  Oh, that's even better.
 5              THE COURT:  So -- so what do you contemplate will
 6   happen on May 9th?
 7              MR. MORRIS:  Mr. Cardoza will appear and a date will
 8   be set to hear a Rule 29 motion.
 9              THE COURT:  All right.  We have a sentencing set in
10   this case on June 20th.
11              MR. MORRIS:  I'm aware of that.
12              THE COURT:  Is Mr. Cardoza able to indicate to the
13   Court now when he thinks a Rule 29 -- let me just say a few
14   things.
15              MR. MORRIS:  Okay, sure.
16              THE COURT:  First, if Mr. Cardoza knows he's in
17   trial, it's a good idea for him to make a motion to continue a
18   hearing if he needs that.
19        Although, it sounds to me like maybe we'll get some things
20   done today.
21              MR. MORRIS:  Okay.
22              THE COURT:  I would be curious to know if Mr. Cardoza
23   has given any thought to the relationship between the Rule 29
24   motion and the sentencing.
25        I don't know whether Mr. Cardoza has talked to Mr. Babcock
```

1  about who will have summoned for briefing that motion.  I would

2  be curious to know that.

3      Obviously, it's important to the Court to honor Ms. Su's

4  right to counsel of her choice.  But I also have to manage the

5  deadlines in the case.  And it also needs to be clear to the

6  Court who's responsible for what.

7      And, I also think that Mr. Babcock is -- has been

8  representing Ms. Su as a member of our CJA panel.  So, I would

9  like to get a handle on all of those housekeeping issues.  It

10  may be that I may need to hear from Mr. Babcock, too.

11      Do you think -- oh, and let me also say:  I've had to

12  think about the -- I had to think about the Rule 29 motion,

13  when it was made.  I don't have a tentative ruling about a

14  motion that hasn't been filed yet.

15      I would say, as I sit here, probably the one area where I

16  could use a little help in terms of briefing is the

17  alien-harboring conviction.

18      Obviously, I'll read the motion closely.  And, it may be

19  that something will be called to my attention that I missed

20  during the trial.

21      With regard to the other counts, my recollection of the

22  evidence is it would be difficult for the Court to conclude

23  that no reasonable juror could find that the counts had been

24  proven beyond a reasonable doubt.

25      But as to that, as to those alien-harboring counts, I

1   actually would look forward to getting some briefing.

2            MR. MORRIS:  I will convey that to Mr. Cardoza.

3            THE COURT:  Mr. Rhyne, is the government available on

4   May 9th in Oakland?

5            MR. RHYNE:  We are, Your Honor.

6            THE COURT:  Mr. Morley, do you know if Mr. Babcock

7   and Mr. Cardoza have spoken about the transition between

8   counsel --

9            MR. MORRIS:  You know, Judge, I was told that Mike

10  was still in trial, and I should come here today.  And I

11  was told --

12           THE COURT:  I directed my question to Mr. Morley.

13           MR. MORRIS:  Oh, I'm sorry.

14           MR. MORLEY:  My understanding is that they only had

15  brief conversations about it.  And I think they were planning

16  to talk more today.

17      Obviously, it's not happening.

18           THE COURT:  Okay.  May 9th at 9:30 a.m.

19           MR. MORRIS:  Your Honor?

20           THE COURT:  Yes.

21           MR. MORRIS:  One additional matter.  My client has

22  requested that I ask you if she could be released pending

23  sentencing.

24           THE COURT:  That request is denied.

25           MR. MORRIS:  Okay.  Would the Court be willing to

```
1   refer the matter for Pretrial Services for that purpose?  To

2   make -- to renew the request?

3          THE COURT:  On an oral motion this morning?  No.

4      Court is in recess.

5          THE CLERK:  All rise.

6          (Conclusion of Proceedings)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States

Court, Northern District of California, hereby certify that the

foregoing is a true and correct transcript, to the best of my

ability, of the above pages, of the stenographic notes of

Official Court Reporter DEBRA PAS, CSR, CRR, RMR, provided to

me by the U.S. District Court for the Northern District of

California, of the proceedings taken on the date and time

previously stated in the above matter.  I further certify that

I am neither counsel for, related to, nor employed by any of

the parties to the action in which this hearing was taken, and

further that I am not financially nor otherwise interested in

the outcome of this action.


/s/   Belle Ball

Wednesday , September 17, 2014

Belle Ball, CSR 8785, CRR, RDR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA  *CERTIFIED COPY*

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | HEARING RE: |
| | ) | APPOINTMENT OF ATTORNEY |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | NO. CR 11-00288JST |
| | ) | |
| SUSAN XIAO-PING SU, | ) | PAGES 1 - 7 |
| | ) | |
| DEFENDANT. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | FRIDAY, MAY 9, 2014 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF:        MELINDA L. HAAG, ESQ.
                       UNITED STATES ATTORNEY
                       1301 CLAY STREET, SUITE 340S
                       OAKLAND, CALIFORNIA 94612
         BY:  WADE M. RHYNE,
                       ASSISTANT UNITED STATES ATTORNEY

FOR DEFENDANT:        LAW OFFICE OF JOHN J. JORDAN
                       400 MONTGOMERY STREET, SUITE 200
                       SAN FRANCISCO, CALIFORNIA 94104
         BY:  JOHN J. JORDAN, ATTORNEY AT LAW

                       LAW OFFICE OF ERIK G. BABCOCK
                       717 WASHINGTON STREET, SECOND FLOOR
                       OAKLAND, CALIFORNIA 94607
         BY:  KEVIN MORLEY, ATTORNEY AT LAW

                       THE CARDOZA LAW OFFICES
                       1220 OAKLAND BOULEVARD, SUITE 200
                       WALNUT CREEK, CALIFORNIA 94596
         BY:  MICHAEL CARDOZA, ATTORNEY AT LAW

REPORTED BY:          RAYNEE H. MERCADO
                       CSR. NO. 8258

    PROCEEDINGS REPORTED BY ELECTRONIC/MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
1    FRIDAY, MAY 9, 2014                              10:26 A.M.

2                      P R O C E E D I N G S

3         THE CLERK:  CALLING CRIMINAL CASE 11-288, UNITED

4    STATES OF AMERICA VERSUS SUSAN XIAO-PING SU.

5       COUNSEL, ONCE THE DEFENDANT IS PRESENT, WILL YOU PLEASE

6    MAKE YOUR APPEARANCES.

7                 (PAUSE IN THE PROCEEDINGS.)

8         MR. RHYNE:  GOOD MORNING, YOUR HONOR.  WADE RHYNE FOR

9    THE UNITED STATES.

10        MR. CARDOZA:  AND GOOD MORNING, YOUR HONOR.  MICHAEL

11   CARDOZA.

12        MR. JORDAN:  GOOD MORNING, YOUR HONOR.  JOHN JORDAN.

13        THE CLERK:  AND WE HAVE...?

14        MR. MORLEY:  GOOD MORNING.  KEVIN MORLEY APPEARING

15   FOR ERIK BABCOCK.

16        MR. JORDAN:  YOUR HONOR, I BELIEVE WE HAVE A

17   RESOLUTION OF THE REPRESENTATION ISSUE.  I DID MEET WITH

18   MS. SU FOR THE FIRST TIME THIS WEDNESDAY AT HER FACILITY AT

19   SANTA RITA, SPOKE WITH HER.  SHE INDICATED SHE WISHED TO GO

20   FORWARD WITH ME.

21       I'VE MET WITH THE FAMILY AND FINALIZED THOSE ARRANGEMENTS.

22   I BELIEVE SHE'S INFORMED MR. CARDOZA THAT SHE PREFERS TO GO

23   WITH ME WITH THANKS TO HIM FOR THE WORK HE'S DONE SO FAR.

24       I SPOKE TO MR. BABCOCK YESTERDAY BY TELEPHONE, WHO SAID HE

25   WAS HAPPY TO GET ME THE FILE NEXT WEEK, AND AGREED TO THE
```

```
 1   SUBSTITUTION, SO I THINK WITH ALL THAT SAID, I'M PREPARED TO
 2   ENTER A GENERAL APPEARANCE TODAY TO TAKE OVER THE CASE.
 3           THE COURT:  DOES ANYONE ON THE DEFENSE SIDE OF THE
 4   COURTROOM WISH TO BE HEARD TO SUPPLEMENT OR AMEND ANYTHING
 5   THAT MR. JORDAN HAS SAID?
 6           MR. CARDOZA:  I DO NOT.  THAT IS ACCURATE, WHAT HE
 7   SAID.
 8           THE COURT:  MR. MORLEY, IS THAT ALSO ACCURATE FROM
 9   YOUR AND MR. BABCOCK'S PERSPECTIVE?
10           MR. MORLEY:  YES, YOUR HONOR.
11           THE COURT:  VERY GOOD.  MR. JORDAN, YOUR GENERAL
12   APPEARANCE ON BEHALF OF MS. SU IS NOTED FOR THE RECORD.
13      GOOD MORNING AGAIN, MS. SU.
14           MR. CARDOZA:  MAY WE BE EXCUSED?
15           THE COURT:  YOU ARE EXCUSED.  THANK YOU, MR. CARDOZA.
16           MR. CARDOZA:  I APPRECIATE IT.
17           THE COURT:  YOU FINISHED -- YOU JUST A TRIAL IN MY
18   OLD STOMPING GROUNDS IN FRONT OF JUDGE JACOBSEN; IS THAT TRUE?
19           MR. CARDOZA:  I DID, A MONTH AND A HALF.  AND
20   ACTUALLY IT WAS ENJOYABLE TO A CERTAIN LEVEL.
21           THE COURT:  YEAH.  WELL, HE'S A GOOD TRIAL JUDGE.
22      ANYWAY, THANK YOU.
23           MR. CARDOZA:  I KNOW.  THANK YOU.  GOOD TO SEE YOU.
24           THE COURT:  SO WE'VE GOT SOME SCHEDULING ISSUES IN
25   THE CASE.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1      IS THE PROBATION DEPARTMENT HERE THIS MORNING?

2           **MR. RHYNE:**  YES, THEY ARE, YOUR HONOR.

3           **THE COURT:**  GOOD MORNING.

4           **THE PROBATION OFFICER:**  GOOD MORNING.  JESSICA

5  GOLDSBERRY FOR THE PROBATION OFFICE.

6           **THE COURT:**  IS IT GOLDSBERRY WITH AN "S"?

7           **THE PROBATION OFFICER:**  YES.

8           **THE COURT:**  MS. GOLDSBERRY, GOOD MORNING TO YOU.

9           **THE PROBATION OFFICER:**  GOOD MORNING.

10           **THE COURT:**  SO HERE ARE ALL THE THINGS I WANT TO

11  FIGURE OUT.  WE HAVE A SENTENCING DATE.  THERE WAS AN ORAL

12  RULE 29 MOTION MADE DURING THE TRIAL.  I DEFERRED RULING ON

13  THAT UNTIL AFTER THE VERDICT.  THE VERDICT CAME IN, AS WE

14  KNOW.  MR. BABCOCK HAD RESERVED THE RIGHT TO HIMSELF TO BRIEF

15  THAT MOTION.  WE ACTUALLY HAVE A HEARING DATE FOR THAT MOTION.

16  WE HAVE A SENTENCING DATE.  AND PERHAPS THE PARTIES HAVE

17  TALKED AMONGST THEMSELVES TO HARMONIZE THE FIRMAMENT OF ALL

18  THESE DATES AND THEIR RESPECTIVE SCHEDULES.

19      WHO WANTS TO ADDRESS SCHEDULING?

20           **MR. JORDAN:**  YOUR HONOR, IF I MIGHT, WE HAD SOME TIME

21  THIS MORNING, AND ALSO I TALKED TO MS. HARTLEY WEST YESTERDAY

22  AND MS. GOLDSBERRY AT LENGTH, AND THEN THIS MORNING WITH

23  MR. RHYNE, SO WE HAVE SOME PROPOSALS FOR YOU WHICH SEEM TO

24  HARMONIZE EVERYTHING.

25      WE WOULD ASK THAT YOU VACATE, I GUESS, ALL THE DATES AND

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  SET THIS DOWN ON SEPTEMBER 12TH, WHICH WE'VE TALKED TO YOUR

2  LAW CLERK, IS AN AVAILABLE TIME TO BE SPECIALLY SET IN THE

3  AFTERNOON.  I WILL ORDER THE TRANSCRIPTS IF THEY HAVEN'T BEEN

4  ORDERED ALREADY.  I'LL NEED TO REVIEW THOSE, AND THAT SHOULD

5  TAKE ABOUT A MONTH FOR THEM TO BE PREPARED.

6      I WOULD THEN NEED AN APPROXIMATE MONTH TO PREPARE THE

7  VARIOUS RULE 29/RULE 33 MOTIONS, AND I WOULD PROPOSE TO FILE

8  THOSE ON JULY 18TH.  GIVE THE GOVERNMENT A MONTH TO RESPOND,

9  WHICH WOULD BE AUGUST 15TH.  I WOULD HAVE TWO DAYS TO FILE A

10 REPLY, WHICH WOULD BE AUGUST 29TH.

11     AND THEN WE'VE GIVEN YOUR HONOR APPROXIMATELY TWO WEEKS TO

12 REVIEW IT, COMING BACK HERE ON THE 12TH.  THAT'S A LITTLE

13 LONGER, BUT WE NEED TO GET THE TRANSCRIPTS READY.

14     MS. GOLDSBERRY AND OTHER PEOPLE HAVE VACATIONS IN AUGUST.

15 AUGUST IS USUALLY A SLOW MONTH.  AND IN MY MIND, THIS IS LIKE

16 THE VERDICT DATE TODAY.  I'M JUST COMING IN.  SO WE WOULD

17 NORMALLY SET THE CASE OUT --

18         **THE COURT:**  I DON'T -- JUST SO THAT YOU KNOW, ABSENT

19 ANY SHOWING OF PREJUDICE THAT THE GOVERNMENT MIGHT MAKE, WHICH

20 I WOULD BE SURPRISED IF THEY COULD, BECAUSE MS. SU IS NOW IN

21 CUSTODY -- SHE'S EFFECTIVELY SERVING HER SENTENCE RIGHT NOW, I

22 DON'T HAVE ANY OBJECTION TO GIVING YOU, MR. JORDAN, THE TIME

23 THAT YOU NEED, AND I RECOGNIZE THAT YOU'RE NEW AND I WANT YOU

24 TO BE ABLE TO DO A GOOD JOB.  SO YOU DON'T NEED TO CONVINCE ME

25 ON THE LENGTH OF TIME.  THAT'S FINE.

6

```
 1          MR. JORDAN:  THANK YOU, YOUR HONOR.  I VERY MUCH
 2   APPRECIATE THAT.  SO THAT'S OUR PROPOSAL.
 3      THERE WAS ALSO FORFEITURE FILED.  I'VE TALKED TO
 4   MR. RHYNE.  WE'VE AGREED TO SUBSTITUTE THESE DAYS FOR THAT AND
 5   HAVE EVERYTHING HEARD ON THE 12TH IN ONE OMNIBUS PROCEEDING.
 6          THE COURT:  THAT SOUNDS FINE.  SO YOU'RE
 7   CONTEMPLATING -- WHAT DATE OF THE WEEK, PLEASE, IS SEPTEMBER
 8   THE 12TH?
 9          MR. JORDAN:  A FRIDAY.
10          THE COURT:  FRIDAY.  I SEE.  SO --
11          MR. JORDAN:  THAT WAS SUGGESTED ABOUT YOUR COURTROOM
12   DEPUTY.
13              (PAUSE IN THE PROCEEDINGS.)
14          THE COURT:  OKAY.  SO I'M GOING TO SET THIS ON
15   SEPTEMBER THE 12TH, 2014, AT 1:30 P.M.
16      MS. SU, YOU'RE ORDERED TO BE PERSONALLY PRESENT AT THAT
17   TIME.
18      ON THAT DATE, WE WILL HEAR THE DEFENDANT'S RULE 29 MOTION,
19   WE'LL ALSO HEAR ANY FORFEITURE REQUESTS THAT HAVE BEEN MADE
20   AND MS. GOLDSBERRY OR SOMEBODY TELL ME ABOUT WHAT'S HAPPENING
21   WITH SENTENCING.
22          MR. JORDAN:  THAT WOULD BE ON THE DIFFERENT TRACK,
23   BUT WE TALKED ABOUT THAT.  I DO PLAN TO HAVE A DOCTOR LOOK AT
24   MS. SU.  I WOULD LIKE TO GET THAT TO MS. GOLDSBERRY BEFORE SHE
25   INTERVIEWS THE DEFENDANT, SO WE WORKED OUT THIS SCHEDULE SO
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

```
1    THAT I WOULD GET MS. GOLDSBERRY THAT REPORT TOWARDS THE END OF
2    JUNE.  AND THEN SHE COULD INTERVIEW THE DEFENDANT FIRST WEEK
3    OF JULY, END OF JUNE, AND STILL HAVE TIME TO GET THE 35-DAY
4    REPORT IN FOR THE SEPTEMBER 12TH DATE.  THAT'S ACTUALLY WHY
5    WE --
6              THE COURT:  SO THAT ALSO WOULD BE A SENTENCING
7    DATE --
8              THE PROBATION OFFICER:  YES.
9              THE COURT:  -- ASSUMING THAT RULE 29 MOTION WERE
10   (SIC) NOT GRANTED.
11             THE PROBATION OFFICER:  (NODS HEAD.)
12             THE COURT:  ALL RIGHT.  IT WILL BE A BUSY AFTERNOON.
13      MR. RHYNE, DOES THIS SCHEDULE ALSO -- IS THIS SCHEDULE
14   ALSO AGREEABLE TO THE GOVERNMENT?
15             MR. RHYNE:  THAT WILL BE FINE, YOUR HONOR.
16             THE COURT:  AND, MS. GOLDSBERRY, THIS WORKS FOR YOU,
17   TOO?
18             THE PROBATION OFFICER:  IT DOES, YOUR HONOR.  THANK
19   YOU.
20             THE COURT:  THE COURT WILL ALSO SET THE MATTER FOR
21   SENTENCING ON SEPTEMBER 12TH, 2014, AT 1:30 P.M.
22             MR. JORDAN:  JUST ONE FINAL CLARIFICATION, YOUR
23   HONOR.
24      I MAY ALSO, ALTHOUGH I'M NOT -- FILE RULE 33 MOTION WITH
25   THE RULE 29 BUT ON THE SAME BRIEFING SCHEDULE.
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1      **THE COURT:**  THAT'S UNDERSTOOD.

2      **MR. JORDAN:**  OKAY.

3      **THE COURT:**  ANYTHING ELSE?

4      **MR. JORDAN:**  NO, YOUR HONOR.

5      **MR. RHYNE:**  NO, YOUR HONOR.

6      **THE COURT:**  ALL RIGHT.  THANK YOU ALL.

7      **MR. RHYNE:**  THANK YOU.

8          (PROCEEDINGS WERE CONCLUDED AT 10:33 A.M.)

9                      --O0O--

10

11                **CERTIFICATE OF REPORTER**

12

13          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

14     FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

15     I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO,

16     NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS

17     HEARING WAS TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY NOR

18     OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

19

20          _Raynee H. Mercado_

21          RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

22              FRIDAY, OCTOBER 10, 2014

23

24

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA, | Case No.  11-cr-00288-JST-1 |
|         Plaintiff, | |
| v. | **PRELIMINARY ORDER OF FORFEITURE** |
| SUSAN XIAO-PING SU, | Re: ECF No. 129 |
|         Defendant. | |

In this application of the United States for a Preliminary Order of Forfeiture, the United States moves for criminal forfeiture of the following types of property: (1) proceeds from Defendant Susan Su's fraudulent scheme; (2) property involved in her money laundering; and (3) property that facilitated her harboring of aliens. ECF No. 129 at 3. The Court will GRANT the application.

## I.   BACKGROUND

From September 2008 to January 2011, Su created and ran Tri-Valley University, a school in Pleasanton, California that collected tuition and other fees from non-immigrant aliens in return for maintaining their student visa status. ECF No. 129 at 1-2. Su defrauded its students and the federal government, collecting at least $5.6 million in "tuition fees," and using those funds to purchase a number of properties. Id. at 5-8. On March 24, 2014, Su was found guilty on all thirty-five counts of criminal charges related to this fraudulent scheme. Id. at 1-2. The charges included wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), conspiracy to commit visa fraud (18 U.S.C. § 371), visa fraud (18 U.S.C. § 1546(a)), use of a false document and false statements (18 U.S.C. § 1001(a)(3)), alien harboring (18 U.S.C. §§ 1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), (a)(1)(B)(i)), unauthorized use of a government computer (18 U.S.C. § 1030(a)(3)), and money laundering (18 U.S.C. § 1957(a)). Id. at 2.

1    In its application, the United States asserts it is entitled to the criminal forfeiture of all

2    proceeds traceable to the offenses she committed. Id. at 3-4. The United States claims all funds

3    and real property that were related to the fraudulent scheme, and properties "involved in" the

4    money laundering are subject to forfeiture. Id. The United States has shown through the existing

5    record and testimony from a special agent that, as derivatives of the $5,601,844.72 in total tuition

6    fees Su collected, a 2009 Mercedes Benz and five other real estate properties are subject to

7    forfeiture. Id. at 6-7. Defendant has not offered any defense or opposition to the Government's

8    application, except to ask that the decision on forfeiture be delayed until the Court rules on

9    Defendant's motions under Federal Rules of Criminal Procedure 29 and 33. ECF No. 168.

10   **II.     LEGAL STANDARD**

11   The general forfeiture statute, 18 U.S.C. § 982, was enacted to separate criminal

12   defendants from their "ill-gotten gains." United States v. Newman, 659 F.3d 1235, 1243 (9th Cir.

13   2011). Forfeiture is a portion of the sentence imposed upon a person found guilty of certain

14   crimes, and the propriety of forfeiture must be proven by a preponderance of the evidence.

15   Libretti v. United States, 516 U.S. 29, 49 (1995). To establish criminal forfeiture, the government

16   must prove "the requisite nexus between the property and the offense," the "nexus" being supplied

17   by the forfeiture provision applicable to the crime. Fed. R. Crim. Pro. 32.2(b)(1)(A). The court

18   can make its determination regarding forfeiture "on evidence already in the record . . . and on any

19   additional evidence or information submitted by the parties and accepted by the court as relevant

20   and reliable." Id., subsection (B). Once the government meets its burden of establishing that

21   forfeiture is proper, forfeiture is mandatory – a court has no discretion, unlike other aspects of

22   sentencing, to decide whether or in what amount to impose forfeiture. Newman, 659 F.3d at

23   1239-40.

24   A court imposes criminal forfeiture on a defendant after the government has provided

25   notice, either through the indictment or through other means, that the government is seeking

26   "forfeiture of property as part of any sentence in accordance with the applicable statute." Fed. R.

27   Crim. Pro. 32.2(a). The indictment does not need to "identify the property . . . or specify the

28   amount of any forfeiture money judgment" the government is seeking. Id.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1   "The court, in imposing sentence on a person convicted of an offense in violation of

2   section 1957 [money laundering] . . . , shall order that the person forfeit to the United States any

3   property, real or personal, involved in such offense, or any property traceable to such property."

4   18 U.S.C. § 982(a)(1); see also Newman, 659 F.3d at 1243.  Additionally, the court must order

5   forfeiture of any "property constituting, or derived from, proceeds the person obtained directly or

6   indirectly, as the result of" their fraud or false statements.  18 U.S.C. §§ 982(a)(2)(A),

7   982(a)(3)(B), (E), (F).  Where the defendant is convicted of alien harboring under 8 U.S.C.

8   §1324(a)(1)(A), the court must also, in imposing sentence, order forfeiture of any real or personal

9   property "used to facilitate, or intended to be used to facilitate, the commission of the offense."  18

10   U.S.C. § 982(a)(6)(A)(ii)(II), (B).

11   **III.   DISCUSSION**

12   The United States has met its burden to show that the properties it seeks to forfeit were

13   obtained from the commission of various offenses for which Su was convicted.  The government

14   has also provided Su with proper notice in the indictment that it would be seeking forfeiture.  ECF

15   No. 1.

16   Under 18 U.S.C. § 982(a)(3)(B), all proceeds gained from Su's fraudulent scheme are

17   subject to criminal forfeiture.  The United States examined bank records, invoices, and receipts for

18   payments made to Tri-Valley University, and traced movement of tuition payments between Su's

19   bank accounts to determine the total amount of fraud proceeds in her possession.  ECF No. 129 at

20   5; ECF No. 125 at 7-18.  Adding up all the funds seized from several of Defendant's accounts, the

21   government has shown from documents in the record that the total of the fraud proceeds is

22   approximately $5,601,844.72.  ECF No. 129 at 5-6.  Those proceeds are subject to forfeiture.  18

23   U.S.C. § 982(a)(3)(B).

24   Under 18 U.S.C. Sections 982(a)(1)-(3), the government is also entitled to the criminal

25   forfeiture of properties Su obtained through money laundering and wire fraud.  The government

26   has demonstrated, using evidence already in the record, that Su committed money laundering by

27   using those proceeds to purchase real property.  Id. at 7-8; ECF No. 125 at 32-37, 39-55.  The

28   properties involved in Defendant's money laundering and wire fraud are: (1) a 2009 Mercedes

3

1    Benz; (2) 1087 Murrieta Blvd., #113, Livermore, CA; (3) 405 Boulder Court, Suite 700,

2    Pleasanton, CA; (4) 405 Boulder Court, Suite 800, Pleasanton, CA; (5) 2890 Victoria Ridge Court,

3    Pleasanton, CA; and (6) 1371 Germano Way, Pleasanton, CA.  ECF No. 129 at 7-8.

4         The government asserts that Su used two of the subject properties, suites 700 and 800 at

5    405 Boulder Court, Pleasanton, CA, to facilitate her commission of alien harboring under 8 U.S.

6    C. § 1324(a)(1)(A), and that the properties are subject to forfeiture on that additional basis.  At

7    trial, the government provided evidence that Su employed several of the aliens she harbored, and

8    those aliens worked at 405 Boulder Court, in suites 700 and 800.  Accordingly, the Court finds

9    that Defendant used the properties at 405 Boulder Court to facilitate her crime.  United States v.

10   Sabhnani, 599 F.3d 215, 261-62 (2d Cir. 2010) (holding that where harbored aliens were

11   employed within the office of a home, the entire home was subject to forfeiture, as it was used to

12   facilitate the commission of the alien-harboring offense by concealing the aliens within, although

13   the aliens did not live at the home).  Accordingly, the Court finds that, pursuant to 18 U.S.C. §

14   982(a)(6)(A)(ii)(II), suites 700 and 800 at 405 Boulder Creek are subject to forfeiture.

15   **IV.    CONCLUSION**

16        Having considered the application for a preliminary order of forfeiture filed by the United

17   States and the guilty verdict pursuant to trial on March 24, 2014, and good cause appearing,

18        IT IS HEREBY ORDERED the following property is forfeited to the United States:

19        1.    Approximately $5,601,844.72 in property derived from total tuition proceeds

20   traceable to Defendant's crimes, including:

21             a.    a 2009 Mercedes Benz, VIN XXXXXXX;

22             b.    1087 Murrieta Blvd., #113, Livermore, CA;

23             c.    405 Boulder Court, Suites 700 and 800, Pleasanton, CA;

24             d.    2890 Victoria Ridge Court, Pleasanton CA;

25             e.    1371 Germano Way, Pleasanton, CA; and

26             f.    any remaining funds in bank accounts identified in the government's

27                  application for forfeiture, ECF No. 129 at 6-7, which the government calls "Bank

28                  Proceeds,"

*United States District Court*
*Northern District of California*

4

**0059**

1     g.  any interest or appreciation accrued on the aforementioned property, and

2     h.  a monetary judgment in the amount of the difference between

3     $5,601,844.72 and the total value of the aforementioned property subject to

4     forfeiture, if the total value of the aforementioned property is less than

5     $5,601,844.72,

6 pursuant to Title 18, United States Code, Sections 982(a)(1) - (3).

7    IT IS FURTHER ORDERED that the United States, through its appropriate agency, shall

8 seize the forfeited property forthwith and publish on www.forfeiture.gov, a government website

9 for at least thirty days, notice of this Order, notice of the government's intent to dispose of the

10 property in such manner as the Attorney General may direct and provide notice that any person,

11 other than the defendant, having or claiming a legal interest in the property, must file a petition

12 with the Court and serve a copy on government counsel within thirty days of the final publication

13 of notice or of actual receipt of notice, whichever is earlier.

14    IT IS FURTHER ORDERED that the government may conduct discovery to identify,

15 locate, or dispose of property subject to forfeiture in accordance with Rule 32.2(b) of the Federal

16 Rules of Criminal Procedure; and

17    IT IS FURTHER ORDERED that the Court retain jurisdiction to enforce the Preliminary

18 Order of Forfeiture, and to amend it as necessary, pursuant to Federal Rule of Criminal Procedure

19 32.2(e).

20    IT IS SO ORDERED this 24th day of October, 2014.

JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

5

Pages 1 – 89

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 11-288 JST |
| | ) | |
| SUSAN XIAO-PING SU, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Friday |
| | ) | October 31, 2014 |
| | ) | 9:47 a.m. |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:      MELINDA L. HAAG
                    United States Attorney
                    1301 Clay Street
                    Suite 340S
                    Oakland, California  94612
             BY:    WADE RHYNE
                    DAVID COUNTRYMAN
                    HARTLEY WEST
                    Assistant United States Attorneys


For Defendant:      LAW OFFICE OF JOHN J. JORDAN
                    400 Montgomery Street
                    Suite 200
                    San Francisco, California  94104
             BY:    JOHN JORDAN, ESQ.



Also Present:       JESSICA GOLDSBERRY, U.S. Probation



Reported by BELLE BALL, CSR 8785, CRR, RDR
            Official Reporter, U.S. District Court

2

```
 1   FRIDAY, OCTOBER 31, 2014                        9:47 A.M.

 2                    P R O C E E D I N G S

 3        THE CLERK:  Calling Criminal Case 11-288, United

 4   States of America versus Susan Xiao-Ping Su.  Counsel, will

 5   you please make your appearances for the Record.

 6        MR. RHYNE:  Good morning, Your Honor.  Wade Rhyne,

 7   Hartley West and David Countryman for the United States.

 8        MS. WEST:  Good morning.

 9        THE COURT:  Good morning.

10        MR. JORDAN:  Good morning, Your Honor.  John Jordan

11   on behalf of my client, Dr. Susan Su.

12     Your Honor, with your permission, may she sit at the

13   counsel table during the arguments?

14        THE COURT:  Yes.

15        MR. JORDAN:  Thank you.

16        PROBATION OFFICER GOLDSBERRY:  Good morning, Your

17   Honor.  Jessica Goldsberry for the Probation Office.

18        THE COURT:  Good morning.

19     This morning we have several matters on calendar.  The

20   Defendant has filed a Rule 29 motion and a Rule 33 motion.

21   Those need to be heard.  If those motions are denied, then

22   this morning also is set for Dr. Su's sentencing.

23     And so I'll talk for -- in just a moment about time

24   management to make sure we are able to give all these very

25   important matters the time that they deserve and require.
```

3

1    But before I did that, I just wanted to say that I'm sure

2    that there are people here in the audience who are family

3    members of Dr. Su and supporters of Dr. Su, and perhaps you

4    will take the opportunity to come to the microphone and

5    address the Court.  And if you do that, I'll hear from you

6    then.  Perhaps there are victims of the offense here, too.  I

7    don't know.

8    Perhaps you will take that opportunity.  But if you don't,

9    I just want you to know that I appreciate you coming here.

10   Even when I don't hear from the victims of an offense directly

11   or I don't hear from family members or supporters directly, I

12   welcome your attendance here.  And I know that the government

13   and the Defendant also are glad that you're here.  And so, I

14   wanted to just welcome you this morning.

15   My suggestion, unless Counsel have a different one, is

16   that we set aside a certain amount of time for argument on

17   these motions at the beginning, and then proceed to

18   sentencing.  And that we do it that way to make sure that if

19   there's to be a sentencing in this case, that adequate time is

20   allocated to it.  I think that is likely to be the most of

21   complicated part of the proceedings this morning.

22   And my suggestion would be that we allow a maximum of an

23   hour for argument on these motions with 15 minutes for each

24   side of both of the two motions.  You don't have to use all

25   your time.  If you don't, the other side won't use it.  That

```
 1   will just be more time that we have for our sentencing.
 2       How does that sound?
 3           MR. RHYNE:  Very good, Your Honor.
 4           MR. JORDAN:  Sounds very reasonable, Your Honor.
 5           THE COURT:  All right, then let's proceed on that
 6   basis.
 7       What I would like to do is to first address the Rule 29
 8   motion and then the Rule 33 motion.
 9       And the Rule 29 motion -- and I should tell the parties
10   that I have read everything that both sides have filed in
11   connection with all three of these matters very carefully and
12   to those of you in the audience who submitted letters on
13   behalf of Dr. Su, I read those also.
14       But I don't think that we have enough time to go through
15   each and every item in the Rule 29 motion.  You should address
16   the parts that you think are most important to you.  I.
17       Will tell you that from the Court's perspective the
18   knottiest parts of the motion were the factual-impossibility
19   portion, with regard to Counts 5 through 12 and 16 through 19.
20   Although, I'll tell you I see 5 through 12 and 16 through 19
21   in very different lights.
22       But, anyway.  That issue, and then the concealment --
23   Concealing, Harboring or Shielding from Detection count --
24   counts for violations of 18 United States Code Section 1324.
25   As to those matters, I think that as to Counts 5 through 12 --
```

5

1   the Defendant actually has a pretty good factual-impossibility

2   argument.  Factual impossibility is not a defense to inchoate

3   crimes like conspiracy or attempt.  And had the crimes been

4   charged that way, factual impossibility would not be

5   available.

6       But and I think it is -- I can fairly say that I read

7   every Ninth Circuit case in which the phrase "factual

8   impossibility" -- every criminal case in which "factual

9   impossibility," that phrase, appears.  At least for the

10  purposes of determining -- at least enough of it that it would

11  help me decide the issue this morning.

12      I did read the government's -- the one case the government

13  cites, *United States versus Lane*.  And I recognize that these

14  remarks -- that I'm going on at some length, but because I

15  thought that these issues were the hardest, I thought it would

16  be helpful to provide the parties with the equivalent of a

17  tentative ruling.

18      The government cites *Lane* for the proposition that each of

19  the wires charged in these counts was part of the execution of

20  the scheme, and that the wire itself does not need to have

21  deprived anyone of money or property, citing *United States*

22  *versus Lane*, 474 U.S. 438, at 453.

23      It's true, *Lane* holds that.  But, *Lane* is not a

24  factual-impossibility case.  In *Lane*, the Defendant committed

25  mail fraud in connection with his arson of one of his own

6

1    buildings and his subsequent claim to his insurance company.

2         Secondly, in *Lane*, there was a victim.  It was Lane's

3    insurance company.  And the issue in that case was whether the

4    letters that Lane sent to the insurance company after they had

5    already paid him could be counted against him for mail fraud

6    purposes.  And the Court held that they could because the

7    letters had a lulling effect on the insurance company that

8    made it more likely that Lane could keep the proceeds that he

9    had already received.

10        So, I wish there were more case-law guidance on factual

11   impossibility.  Frankly, there isn't a lot.  But I do think

12   that the Defendant has shown that, unknown to her, the

13   consummation of the intended criminal act is physically

14   impossible.

15        I'm taking that definition from *United States versus*

16   *McCormick*.  72 F.3d, 1404 at 1408.

17        But I think that analysis only applies to Counts 5 through

18   12.  Counts 16 through 19, as to which the Defendant also

19   asserts this defense, charge visa fraud.  In visa fraud, the

20   victims of that crime are not the non-existent fake students,

21   but the United States.  And the fact that Dr. Su used fake

22   names in her visa application doesn't prevent the claim from

23   being committed; it just makes the applications more

24   fraudulent.

25        So, that is how the Court at the moment is likely to rule

1   with regard to that issue.

2       With regard to harboring an alien, for reasons I could go

3   into in more detail, I don't think that the government has

4   shown concealing and harboring.  But I do think they have

5   shown shielding from detection.

6       And, I thought the government did a very good job in its

7   brief of reciting all of the many things that Dr. Su did:

8   Enrolling these fake students in classes that didn't exist,

9   showing bogus grades in transcripts and on and on and on.  And

10  certainly, viewing that evidence favorably to the government,

11  I think the evidence was more than sufficient to show that

12  Dr. Su engaged in conduct tending to: directly or

13  substantially facilitate an alien's remaining in the United

14  States unlawfully with the intent to prevent detection from

15  the immigration authorities." Which was the definition in

16  *United States versus Aguilar*, 883 F.2d, 662.

17      The other basis for the Defendant's motion with regard to

18  those counts is that Messrs. DASA, D-A-S-A, and DIRISANALA,

19  D-I-R-I-S-A-N-A-L-A, were not illegal aliens for the purposes

20  of this statute.  I've not been able to find a case that

21  addresses that issue in the context of a harboring allegation,

22  but I think the government's citation to the Tenth Circuit

23  case *United States versus Atandi*, A-T-A-N-D-I, is persuasive

24  on this point.

25      And, I think that these non-immigrant F1 student aliens

8

1    were failing to comply with immigration regulations; they were

2    out of status; they were unlawfully in the United States.  So,

3    I think the government has satisfied that element.

4        So, I would deny the Rule 29 as to the remainder of the

5    counts in the case.  I would grant it tentatively as to Counts

6    5 through 12.  That would be the Court's tentative ruling.

7        Mr. Jordan.

8        **MR. JORDAN:**  Yes, Your Honor.  Of course, I

9    appreciate all Your Honor's comments, and just briefly, in one

10   or two sentences, would submit to the Court that we do ask

11   that you grant them as to all counts that Dr. Su believes the

12   evidence is insufficient of those.  And we would object to any

13   rulings contrary to that.

14       Getting to Your Honor's comments, I appreciate the

15   guidance for Counts 5 through 12.  Of course I'm in agreement

16   with the Court.  Those are legitimate law-enforcement

17   techniques to gather evidence.  But the way they're charged,

18   they simply don't fit that statute.

19       Like Your Honor, I'm sure -- I searched through Lexis for

20   every factual-impossibility case in Ninth Circuit and others,

21   and there were few, but this does seem to fit squarely within

22   those few cases.

23       It's simply not part of the scheme to defraud.  It can't

24   be a lulling technique or something to keep the government

25   from finding out about the scheme to defraud, because the

9

1   government is actually using this as an investigative

2   technique to build a case.

3       The evidence is relevant to the scheme to defraud in the

4   other counts.  But it doesn't make out these counts.  There's

5   no victim; it was factually impossible for her to commit wire

6   fraud for these victims.  It's never going to get -- any

7   furtherance of her scheme with these four.

8       I'll switch to the counts for the visa fraud, 16 through

9   19, which I see, of course, are different.  The U.S. is a

10  victim.  My point on that was:  Although there were

11  immigration forms -- if you want to call them that --

12  generated, the government knew these forms were invalid from

13  the get-go, because they're generated for aliens that don't

14  exist.

15      So the documents, themselves, although they might say

16  "I-17" on top of them, or they might be generated by Dr. Su at

17  the school, they're not legitimate, not real immigration

18  documents, because persons they are being given to, the United

19  States government, knows before receiving them that they are

20  invalid.  That they are for fictitious people.

21      So, that's my point on the other four counts.

22          **THE COURT:**  Well, that just makes it unlikely.

23  Factual impossibility is a very high bar.  This is a Rule 29

24  motion.  The Court has to view the evidence in the light most

25  favorable to the government.

10

1      And, I hear what you're saying about the visa fraud

2  counts, and I considered that point. And I continue to

3  consider it. But, it depends on the absolute inevitability of

4  certain things taking place after the -- after the forms are

5  submitted.

6      And obviously, we would expect Agent Mackey to pick up the

7  phone and say, "Hey, by the way, you probably don't want to

8  issue those visas." But it's not factually impossible.

9      That's the defense, right?

10        **MR. JORDAN:** It is, Your Honor. And it is

11  interesting, it goes really back to my first year of law

12  school with a professor there talking about if you're playing

13  chess, it's fine. If two people change the rules and are

14  cheating, and they agree to play, are they still playing

15  chess? Or have they invented a new game?

16      And that is what I think happened here. My simple point

17  in one sentence is: It's impossible for the government to

18  prove that Dr. Su committed visa fraud for these four counts

19  because the government can't be defrauded. They know these

20  four people are not immigrants. So it's going to be

21  impossible for them to be defrauded. That's my point.

22        **THE COURT:** The point is well argued.

23        **MR. JORDAN:** Thank you, Your Honor.

24      Switching to the harboring.

25        **THE COURT:** Yes.

1    **MR. JORDAN:** Well, I disagree.  I think the defense

2  has proven under the case law that the two named victims are

3  simply not here illegally under the statute.

4    They might be potentially out of status, but at the time

5  charged in the indictment, I look at it this way:  If they

6  were pulled over by an immigration officer, and he said, "What

7  is your status here" and they told him they were at the school

8  and they showed him their paperwork, that would be valid in

9  the system.  They're just --

10    **THE COURT:** Here is the difficulty I have with that

11  argument.  And again, I thought the point was exceedingly well

12  made in the papers, and very well argued by you.  And that is

13  why it's one of the items that I wanted to address at our

14  hearing this morning.

15    But the only thing in the Court's mind that gives these

16  two individuals the superficial patina of lawful status is

17  that Dr. Su was given the power by the United States

18  government to get access to the SEVIS system, and so, let's

19  use as an example the family in *Dann*, I think the case is

20  *Dann*, D-A-N-N, where you have an illegal nanny working in a

21  house.

22    What if the husband and wife in that house had the power

23  to somehow use their computers to submit forms to the

24  government that would all of a sudden make their housekeeper

25  lawful?

1    The only thing that gave these two individuals this
2    superficial gloss of lawful status was Dr. Su's underlying
3    illegal conduct.

4    Now, is there another case in which that's not the way
5    someone got their lawful status in which this *Atandi* analysis
6    might not apply?  Perhaps.  The Court's analysis is limited to
7    the facts here.  But that's what gave me the most difficulty
8    in going your way.

9         **MR. JORDAN:**  Your Honor, if I might address a couple
10    of points.  One, in the situation hypothetically you just came
11    up with, that seems wrong what they did, and it is wrong.  But
12    it is visa fraud.  That is the crime that you would be
13    committing.  There were other facts in that case which you
14    argue are not present here that also show harboring.

15    My second rebuttal would be:  If you imagine these two
16    named victims in the two counts, if one of them was arrested
17    for having a gun then, he would have a defense under the cases
18    I cited -- *Salman, Hernandez* and *Brissett* -- to being an
19    illegal alien with a gun.  He would say "No, I'm not out of
20    status."

21    "Well, but the school's a fraud and we're going to prove
22    that."

23    "Yes, but right, now I'm not out of status.  You can't
24    prove this charge against me."

25    I think under those cases, he would prevail.  And again,

1  as I said in the brief, we have *Arizona versus United States*

2  where the Supreme Court has said it's generally not a crime

3  for -- for a removable alien to remain in the United States.

4      I saw the cases cited by the government, and I (Inaudible)

5  in my reply brief.

6      In all those cases, there had already been steps taken by

7  the U.S. government to place those individuals out of status.

8  Removal proceedings were started; orders to show cause were

9  issued.  Here, there's nothing against these two individuals

10  to in any way show that they are illegal aliens.

11      Finally, one brief point which occurred to me last night:

12  On the harboring count, we can't forget that Dr. Su did notify

13  the government through SEVIS where these people were, that

14  they're students at the school, which cuts against harboring

15  them or secreting them.

16      I also think the government has to prove that she was

17  doing that to hide them from an imminent ICE raid, you know,

18  enforcement action by the Homeland Security.  And here there's

19  just no showing on that.

20      I would submit my points on those grounds.

21          **THE COURT:**  Thank you.

22      Mr. Rhyne?

23          **MR. RHYNE:**  Yes, Your Honor.  I'll obviously start by

24  addressing Counts 5 through 12.  And I think the best place to

25  start is really the only place I can start, is looking at the

1    elements of the offense that we have to prove in the case.

2        And, as we stated in our brief, there's no requirement for

3    wire fraud, mail fraud, or visa fraud, for that matter, that

4    there be an actual victim harmed as a result of the wire, the

5    underlying wire for each count.

6        **THE COURT:**  Well, there doesn't have to be harm.  But

7    your summary of the elements of the Court's jury instruction

8    elide over the phrase "a person."  I went back and checked the

9    jury instruction that I gave.  And that phrase appears in the

10    instruction, but not in your brief.  And what about that?

11        **MR. RHYNE:**  Well, I think the focus of the Court's

12    inquiry needs to be:  Is there a scheme to defraud?  From

13    there:  Is this wire sent in furtherance of that scheme to

14    defraud?

15        And I think the only way to answer that question on this

16    record is:  Yes.  It was a scheme conceived by her at the time

17    she sent these wires.  Even though these were not real

18    students, the scheme, as conceived by her, she sent these

19    wires in furtherance of that scheme.  And I think it's

20    important to start from that -- that first opening element.

21        **THE COURT:**  Isn't the scheme described in the

22    indictment as a scheme to defraud students out of their money?

23        **MR. RHYNE:**  (Nods head)

24        **THE COURT:**  I mean --

25        **MR. RHYNE:**  Yes.

15

```
 1          THE COURT:  -- I'm using too few words.  But that's
 2   the essence of it.
 3          MR. RHYNE:  Yes.
 4          THE COURT:  So, the scheme is described in the
 5   indictment as a scheme to defraud students out of their money.
 6   And then this -- so, so it's -- the focus in the government's
 7   indictment is on the student in question.  And there may be
 8   others.  Certainly, there were.  Thousands --
 9          MR. RHYNE:  Very good.
10          THE COURT:  -- of other incidents of wire or mail
11   fraud that defrauded real people.
12          MR. RHYNE:  Here is the problem with that analysis:
13   That analysis would require for every wire that Dr. Su sends
14   to have some degree of success.  She has to strike gold with
15   every wire that she sends.  Somebody has to be harmed.
16       That's not the elements of the offense.  The offense is
17   that she has to send a wire in furtherance of a larger scheme.
18   The fact that we create an opportunity for her to send wires
19   in furtherance of her pre-existing scheme, we shouldn't be
20   penalized by saying, "Hey, those wires she sent didn't
21   actually harm anybody because we knew the score at the time
22   she sent them."
23       That would require basically every wire-fraud or
24   mail-fraud count that the government charges to be based on a
25   wire or a mailing that actually, for lack of a better term,
```

1  strikes gold (Indicating quotation marks). That's successful,

2  that causes harm to a real person. And that's not the

3  elements of the offense. It's just not.

4      **THE COURT:** So, I have tried as hard as I could to

5  survey the law on this point. And go beyond the authorities

6  that were cited by the parties in their briefs.

7      There are -- the cases are legion that make the point that

8  in essence you don't reward the pick-pocketer by dismissing

9  the indictment just because the pocket he tried to pick was

10 empty.

11     So, there are cases in which the government will create a

12 fake victim for purposes of internet sex solicitation, or give

13 somebody drugs to sell that aren't really drugs. That kind of

14 thing. Those cases are generally charged as conspiracy or

15 attempt.

16     And if this had been charged that way, we wouldn't really

17 be having this discussion. I mean, perhaps the Defendant

18 would assert that defense, but it wouldn't go anywhere.

19     And of course, with regard to the thousands of other --

20 it's not that she -- the Court is saying -- is not she has to

21 strike gold in the sense of there being harm in connection

22 with every wire. She could send a wire or make a phone call

23 with regard to a real person, and not have it harm anybody.

24 The law is good for you on that point.

25     It's the not-a-real-person part, that's where I'm stuck.

1    **MR. RHYNE:** And I understand the Court's analysis.

2  Again, I have to keep running back to the elements of the

3  offense. And I feel like that analysis almost adds an element

4  that we need to prove in a wire fraud or a mail fraud type of

5  setting.

6      And I think if you look at it from a common-sense

7  standpoint of undercover operations or ruse operations, it's

8  going to be very difficult if the Court is going to impose

9  essentially a sixth or seventh element for mail or wire fraud.

10     Because again, she sent these wires in furtherance of a

11  preexisting scheme that she had created that was then ongoing.

12  And I just don't see how another element can be added to the

13  offense.

14     **THE COURT:** This isn't the first undercover operation

15  that the United States has engaged in?

16     **MR. RHYNE:** It is not.

17     **THE COURT:** There are thousands of such operations in

18  the reported cases, right?

19     **MR. RHYNE:** Yes.

20     **THE COURT:** You and I can both feel confident that

21  there are several ongoing elsewhere in the United States, even

22  as we are conducting this hearing.

23     **MR. RHYNE:** Certain of it.

24     **THE COURT:** And yet, there is not a single reported

25  case in your favor. Why is that?

1    **MR. RHYNE:**  Well, I think it's -- I don't know if

2    this has been raised.  I don't know if -- I don't think that

3    this argument has been successful before in this context.

4          **THE COURT:**  There isn't one in Mr. Jordan's favor

5    either, just so we don't -- I'm setting the table in a fair

6    way.

7          **MR. RHYNE:**  I think it's because the courts focus on

8    the elements of the offense.  And I don't think that that

9    element is there that requires us to use a real person.

10    With respect to attempt, I agree, she would be guilty of

11    attempt.  But just because she's guilty of attempt doesn't

12    mean she's not guilty of wire fraud.

13          **THE COURT:**  All right.

14          **MR. RHYNE:**  And then, I'll move to the alien

15    harboring.  Obviously, we agree with the Court's analysis on

16    the unlawful component of that offense.  She's hiding these

17    people in plain sight.

18    And the reason she's able to do it, as the Court noted, is

19    because she's making the entries in SEVIS, she's cutting these

20    false transcripts, she's creating the facade and the

21    perception that there is nothing to worry about, that these

22    people are complying with their immigration status.

23    I think that there is a big difference between, as what

24    the defense noted, that it's not in and of itself illegal to

25    be in the United States in an unlawful status.  I think that;

1   the case law says that.  But there's a difference between

2   being that person and shielding or hiding that person from

3   detection from the United States.

4       I also think there is a distinction that is made in the

5   case law between that person who may not be unlawfully in the

6   United States for purposes of 922 or 1324 like we have in the

7   case law, and in this case, and somebody that's actually going

8   through immigration proceedings.

9       We're not required to have the aliens that underlie our

10  counts here to actually have gone through some due process and

11  have a finding by an immigration judge that they are

12  unlawfully in the United States.  That would be -- that would

13  make it almost impossible to charge these crimes.

14      From a harboring standpoint or shielding standpoint, as we

15  noted, SEVIS transcripts, school record, repeated assurances

16  to multiple students that their immigration status was secure,

17  she's signing I-20s.  There was testimony in the record at

18  trial that she locked some of them in at one point.  She had

19  them paint houses, or at least had Anji Dirisinala paint her

20  house, and also move furniture.  So, I think there is ample

21  evidence in the record to support the 1324 counts.

22      And I believe I covered Your Honor's issues at that point,

23  unless you have more questions.

24          **THE COURT:**  I don't.  I think what I would like to do

25  is take argument with regard to the Rule 33 motion, and take a

```
 1    short break.  There's something I want to look at back in
 2    chambers.  And then I can come out and rule on those motions.
 3        So let's turn to the -- first of all, is the Rule 29
 4    motion submitted?
 5            MR. JORDAN:  It is, Your Honor.
 6            MR. RHYNE:  Yes, Your Honor.
 7            THE COURT:  Let's turn to the Rule 33 motion.
 8    Mr. Jordan.
 9        MR. JORDAN:  Well, Your Honor, I was hoping you would
10    give us some guidance if you had any concerns.
11        Do you have any questions specifically I could focus in
12    on, given the low -- certainly have sufficient time to argue
13    the motion; I know you'll give me all the time I need.
14        But, was there a concern you had a point to address?
15            THE COURT:  The Court doesn't intend to provide a
16    tentative with regard to this motion.
17        MR. JORDAN:  Your Honor, I would argue -- I don't
18    want to repeat what's in my brief -- that you were at the
19    trial.  You saw the behavior of Dr. Su.
20        And, from my reading of the cold transcript, I was struck
21    at one point when I realized I was making notes of, you know,
22    incidents by Dr. Su.  And then I looked at the dates and it
23    occurred to me that it looked like it was every single day,
24    and they were getting increasingly severe toward the end date.
25    I wasn't here, so I'm reading from a cold transcript, but that
```

1   was my view of the matter.

2       Having gotten the case, at that point I would say Dr. Su

3   was, if I could use a layman's term, frantic. And at times,

4   saying things that seem to indicate some delusional thinking.

5       Now, at all times, it seems to be a big concern of the

6   government if I'm making an incompetency motion. I am not.

7   My view today was that Dr. Su was competent during the trial

8   and is competent today. However, that is not the issue we're

9   raising.

10      The issue is whether in the interest of justice, under the

11  first prong of the motion, the jury didn't hear evidence that

12  they should have as to her mental state. My opening brief

13  lays out that I believe *mens rea*, intentional conduct, is an

14  element for all the crimes charged, if not all the significant

15  ones.

16      Dr. Amanda Gregory -- who, by the way, Your Honor is

17  present in court if you have any questions for her -- did

18  evaluate the Defendant. I've submitted now two reports. The

19  initial report, and then the last updated report, which I

20  think are material both to this motion and sentencing.

21      But if I was focusing on this motion, I would rely heavily

22  on the case out of Puerto Rico in the District Court case, I

23  believe it's *Gutierrez*.

24          **THE COURT:** Yes.

25          **MR. JORDAN:** Where the Judge faced almost the exact

1  same situation.  A jury decided guilt without hearing critical

2  evidence on *mens rea*.  Here, I think we have a couple of added

3  factors.

4      The added point I was making was that the jury saw Dr. Su,

5  and her behavior, which was unexplained to them.  And that

6  could have prejudiced her separately, even apart from the jury

7  not hearing evidence of guilt or innocence on the intent part.

8      That is the summary of the Defendant's motion.  There was

9  an objection by the government that it's untimely.  As I read

10 the statute, there are two grounds:  Interest of justice,

11 newly-discovered evidence.  Interest of justice has to be made

12 within a certain time period.  However, Your Honor did reserve

13 a right to set a motions schedule at a later date.

14     I think the fair inference from that is that you intended

15 that to include both Rule 29 and potential Rule 33 motions, so

16 that this motion would be timely under the first prong.

17     And if one were to even to take a strict view of what

18 Your Honor said as to what motions were reserved, I believe

19 the statute still provides you may find just cause for

20 allowing it to be filed at a later date.

21     The second prong, newly-discovered evidence, as I recall,

22 allows the motion to be filed within, I believe, two years.  A

23 certain period of time longer than the initial setting.  And I

24 think here, there is a good argument that this is newly

25 discovered.

23

1    Although the Defendant's behavior was at some point

2 apparent to Defense Counsel, it seems from the record that it

3 got much worse as it went along, to the point it became

4 obvious.  And at that point, we did have Dr. Su evaluated by

5 Dr. Gregory.

6    I'll submit on it that, unless Your Honor has questions.

7         **THE COURT:**  I don't.  Thank you, Mr. Jordan.

8    Ms. West?

9         **MS. WEST:**  Yes, thank you.

10    Beginning with the untimeliness, I'm not quite sure what

11 Your Honor intended, but what was actually articulated on the

12 Record was that the Court would set the date for filing the

13 Rule 29 motion when counsel was ready to set that date.  There

14 was no discussion of a Rule 33.  It was only with regard to

15 Rule 29.

16    Moving on to the more substantive matters, what I hear

17 from defense counsel now is actually slightly different than

18 what was articulated in the brief.  And that is that the only

19 argument they are now raising is that expert testimony was

20 required to provide evidence as to the Defendant's mental

21 state.  So, that's what I'm hearing now.

22    That argument is basically an

23 ineffective—assistance—of—counsel argument.  They are saying

24 that prior counsel was ineffective in not retaining an expert

25 to opine as to her mental state, to form the *mens rea* for the

1    offenses, or -- or -- and to explain what they describe as,

2    you know, erratic or inappropriate behavior during trial.

3        Both of those arguments at core come down to an argument

4    of ineffective assistance of counsel, which is not properly

5    before this Court now. The cases are clear that that needs to

6    be raised post-sentencing, in the habeas context.

7        So, I think really the only other thing for the Court to

8    consider is: Is there some other interest of justice. And I

9    would submit that that's premature; it is not properly before

10   the Court.

11       But even if the Court were to consider that on the merits,

12   there isn't. This Court was here. This Court isn't going

13   from a cold record. This Court was able to see the

14   Defendant's behavior during the trial, and the Court also has

15   the benefit of knowing -- partly from the cold record, but

16   partly from the Court's own experience during the trial and

17   with prior counsel -- no prior counsel thought that this was

18   appropriate for the Defendant to raise some sort of

19   mental-health defense or to challenge her competency. It was

20   something that they had certainly considered, and we made sure

21   that that was articulated to this Court on the Record when

22   Your Honor took over this case, as well.

23       So, unless the Court has any questions, this seems like an

24   easy one.

25           **THE COURT:** Mr. Jordan, reply argument?

1          **MR. JORDAN:**  Yes, Your Honor.

2      I think my argument has been consistent throughout.  Under

3  *Gutierrez*, the District Court there said:  No, this could be

4  made now.  We don't have to wait for a 2255.  It fits under

5  the statute for either newly-discovered evidence or evidence

6  in the interest of justice that the jury should have heard.

7      So, I'll submit it on that.

8          **MS. WEST:**  I think the only newly-discovered evidence

9  is that the Defendant was malingering and doing some research

10  and faking some symptoms, Your Honor.  Everything else was

11  historical.

12          **THE COURT:**  Is the motion submitted?

13          **MR. JORDAN:**  It is, Your Honor.

14          **MS. WEST:**  It is.

15          **THE COURT:**  Thank you.  Both of these motions have

16  now been submitted.

17      As I said a moment ago, I would like to take a brief

18  break.  There's something I would like to look up before I

19  provide a ruling on both these motions.  And so, the Court

20  will now take a brief recess.

21          **THE CLERK:**  All rise.

22      (Recess taken from 10:21 to 10:32 a.m.)

23          **THE COURT:**  The Court will now provide its ruling

24  regarding the Defendant's Rule 29 motion and Rule 33 motion.

25      I think I will remember to say this at the end, but in

1  case I don't, these transcripts -- excuse me -- the transcript

2  of this hearing will serve as the Court's order with regard to

3  both of these motions.  And that has been my -- I've attempted

4  this morning to place sufficient reasons on the Record that it

5  will be clear to any reviewing court why the Court rules the

6  way that it does.

7         With regard to the Rule 29 motion, and Counts 5

8  through 12, I conclude that my prior tentative ruling with

9  regard to those counts was in error.  And that I would be

10  making new law if I were to acquit the Defendant of those

11  counts.  Perhaps a reviewing court will feel differently.  As

12  I've said earlier, there isn't a great deal of law that

13  supports either side of this issue.

14    Also, I think it bears mention that this particular ruling

15  doesn't have any effect on the sentence that will be imposed

16  later this morning because of the way these offenses are

17  grouped.  Nonetheless, I took the motion seriously, and it

18  gave me serious pause.  But ultimately I conclude that as to

19  those counts, the motion has to be denied.

20    I think it bears mention that the defense asserted here

21  was not raised at trial.  I think it bears mention here that

22  the Court can find no case reported or otherwise that would

23  support the granting of the motion.

24    I have rereviewed the wire fraud and mail fraud jury

25  instructions, and I find that the evidence that was adduced at

1  trial was more than sufficient for the jury to find that the

2  government had proven each element.

3      And so, for those reasons, the Court will reverse its

4  tentative ruling and deny the motion as to those counts.

5      With regard to alien harboring I'll adopt my tentative

6  ruling, but I would like to place some further analysis on the

7  Record for the benefit of any reviewing court and for the

8  benefit of the parties.

9      This portion of the motion relates to Dr. Su's conviction

10  for harboring an alien pursuant to 18 United States Code

11  Section 1324, which criminalizes the conduct of any person

12  who, quote, "willfully or knowingly conceals, harbors or

13  shields from detection, an unlawful alien."

14      And as we discussed earlier this morning, there really are

15  two issues at play in the motion.  The first is whether the

16  Defendant did anything that would constitute concealing,

17  harboring and shielding.

18      I don't think -- well, let me start by saying, just a few

19  days ago the Seventh Circuit decide a case called *The United*

20  *States versus Campbell* which appears at 2014 Westlaw 533,

21  4645.  And the only reason I mention that is they note that

22  the terms "conceal," "harbor" and "shield from detection" are

23  not defined in the statute, and the courts have devoted a lot

24  of effort to pinning down their precise meaning in the context

25  of the statute.

1    So it just bears mention that it is not plain from the

2  face of the statute, itself, what kind of conduct necessarily

3  would constitute a violation.

4    So let's talk first about harboring and concealing, which

5  I don't think the Defendant did, and next about shielding

6  which I think the Defendant did do.

7    I think the terms "harboring and concealing" denote

8  putting the alien in a physical space such as a home in which

9  they are unlikely to be detected.

10    The plain meaning of "harbor" means to give shelter or

11 refuge to.  That is the way the phrase is used in *United*

12 *States versus Dann*, 652 F.3d, 1160, the case cited by the

13 government.  That court used the phrase "provided the alien

14 with shelter."

15    And in the *Campbell* case the Seventh Circuit case I

16 mentioned a moment ago, the Court defined harboring as, quote,

17 "providing or offering a known illegal alien a secure haven, a

18 refuge, a place to stay, in which the authorities are unlikely

19 to be seeking him."  Close quote.

20    That's not what happened here.  The fake students -- which

21 is what I'll call them -- were free to come and go.  They

22 didn't live at TVU; they didn't live with Dr. Su.  There was a

23 lunch hour, it's true, in which Dr. Su locked the door.  But

24 that was aberrational.  And, it wasn't -- this wasn't like the

25 *Dann* case in which somebody was locked in a house and not free

1    to go all the time.

2        So I don't think the conduct qualifies as harboring or

3    concealing.  But that still leaves shielding from detection.

4    And the Ninth Circuit has defined that term as, quote,

5    "Conduct tending to directly or substantially facilitate an

6    alien's remaining in the United States unlawfully with the

7    intent to prevent detection by the Immigration and

8    Naturalization Service."  And that is the *United States versus*

9    *Aguilar*, 883 F.2d, 662, at Pages 689 to-90.  That is a 1989

10   case.

11       I think that definition is met here.  Dr. Su fraudulently

12   created and maintained Dasa and Dirisinala's F1 immigration

13   status in order to employ them at TVU.  She enrolled them in

14   classes that did not exist; she issued them bogus grades and

15   transcripts; she assured them that their immigration status

16   was secure.  She transmitted fraudulent SEVIS -- S-E-V-I-S --

17   entries to the government.  She printed fraudulent I-20 forms.

18       Viewing this evidence favorably to the government, there

19   was more than enough evidence here to qualify as shielding

20   from detection.

21       I won't say anything further about the question of whether

22   Dasa and Dirisinala were unlawful aliens within the meaning of

23   the statute.  As I said earlier, I think that the analysis in

24   the *Atandi* case -- A-T-A-N-D-I -- applies here, as the

25   government urges in its brief.  And so, the Court will deny

1    the Rule 29 motion in all respects.

2       With regard to those counts we haven't discussed, I'll say

3    only that the evidence was more than sufficient to meet the

4    government's burden of permitting the jury to find against the

5    Defendant with regard to each of the elements contained --

6    each of the elements supporting a conviction for each of the

7    counts for which the Defendant was convicted, and the

8    transcript of this hearing shall serve as the Court's order.

9       With regard to the Rule 33 motion, the Defendant asserts

10    two grounds:  That new evidence has been discovered, and that

11    the interests of justice require a new trial.

12       In order to obtain a new trial based on newly-discovered

13    evidence, Dr. Su must establish five things:

14       First, that the evidence is newly discovered.  Secondly,

15    that her failure to discover the evidence sooner was not the

16    result of a lack of diligence.  Thirdly, that the evidence is

17    material.  Fourth, that the evidence is neither cumulative nor

18    merely impeaching.  And fifth, that the evidence indicates a

19    new trial would probably result in acquittal.

20       That comes from a very recent case, *United States versus*

21    *Wilkes*, 744 F.3d, 1101 and 1110.  It's a 2014 case.

22       Here, I find the evidence is not newly discovered in the

23    exercise of diligence.  Had Dr. Su wanted to present

24    information regarding her mental health at trial, she could

25    have done that.

1    While there is some discussion of Dr. Su's behavior during

2  the trial, which parenthetically I think is consistent with

3  someone who is experiencing the stress of a multi-week

4  wire-fraud case in which she has to sit and listen to a lot of

5  very unfavorable evidence, putting that to one side, almost

6  all the evidence referenced in Dr. Gregory's report occurred

7  before trial.  And even before Dr. Su's arrest.  So, had

8  Dr. Su wanted to present this evidence, she could have.

9  There's nothing that would have prevented that.

10   Also, with regard to the last element under the *Wilkes*

11  test, I cannot find, do not find that this evidence indicates

12  that a new trial would probably result in an acquittal.  And

13  it fails that element also.

14   Dr. Gregory concludes in her report -- and I read both

15  reports closely -- that Dr. Su suffers from schizo-affective

16  disorder, bipolar type.  And I accept that tentative diagnosis

17  for purposes of this hearing.  It's not that I don't think

18  that Dr. Gregory's diagnosis is correct, or that I in any way

19  doubt her qualifications or the thoroughness of her testing.

20   There also is no doubt that Dr. Su was hospitalized in

21  2005 for an acute psychotic episode.  And it does appear to

22  the Court that she could benefit from mental-health treatment.

23  But I don't accept Dr. Gregory's conclusions about the effect

24  of Dr. Su's mental health or her ability to make the decisions

25  that led to her conviction in this case.

1     Dr. Gregory also noted Dr. Su's exaggeration of her

2  symptoms.  And that also informed the Court's analysis of her

3  report.

4     I think Dr. Su's conduct during her interview with

5  Dr. Gregory and the information she provided during that

6  interview do support Dr. Gregory's diagnosis.  But, they also

7  appear at the same time to be motivated by the desire to

8  obtain a report that would result in a positive outcome in

9  Dr. Su's criminal case, rather than simply to provide

10  Dr. Gregory with the objective information she needed to make

11  a good diagnosis.

12     Finally, Dr. Gregory's report does -- I don't think would

13  permit a reasonable jury to conclude that Dr. Su was not

14  responsible for her criminal conduct, or her forming the

15  specific intent to defraud someone.  I don't read the report

16  as doing that.

17     *Gutierrez* is cited by the Defendant.  I think to support

18  both the new-evidence and the interest-of-justice aspects of

19  the motion, so I'll discuss it now, that's a very interesting

20  case.  And I think that the District Court judge in that case

21  is to be commended for -- for taking the bull by the horns,

22  frankly, and making sure that the Defendant in that case got a

23  fair trial.

24     But that's a very different case from this case.  In

25  *Gutierrez*, the court and counsel discovered after the jury

1    verdict and before sentencing that the defendant suffered

2    severe cognitive impairment, and the defendant is described as

3    being someone with subnormal intellectual functioning.

4    Quoting from the *Gutierrez* case now, the Court said, I quote

5    (As read):

6            "The test results revealed that Defendant was

7            functioning at slightly above the moderate mental

8            retardation range of intelligence with an IQ of 57.

9            According to the profile of a person within this

10           range, Defendant is a person who is trainable, can

11           talk, and take care of himself with some supervision.

12           Would probably be unable to pass the second grade in

13           academic subjects."

14      That's not Dr. Su.  And, were we in a situation like the

15   one faced by the court in the *Gutierrez* case, I hope that I

16   would acquit myself as well as the District Court judge did in

17   that case.  But, I don't think this is that case.

18      With regard to the portion of the motion grounded on the

19   interest of justice, the District Court should grant a Rule 33

20   motion on that basis only in extraordinary circumstances.  The

21   Second Circuit has gone so far as to indicate that such a

22   motion should be granted only if there exists a real concern

23   that an innocent person may have been convicted.

24      This isn't the standard here, this isn't the Second

25   Circuit, but I say that only to make it plain that the federal

1    courts agree that the bar on a Rule 33 motion on the grounds

2    of the interests of justice is a very high bar.

3        It's true that a District Court's power to grant a motion

4    for a new trial is much broader than its power to grant a

5    motion for judgment of acquittal.  I don't have to view the

6    evidence in the light most favorable to the government as I do

7    on a Rule 29 motion.  I'm free to weigh the evidence and

8    evaluate for myself the credibility of the witnesses.  But, my

9    focus has to be whether letting a guilty verdict stand would

10   be a manifest injustice.

11       Let me just say first, I find that the motion is not

12   timely.  But, I want to go ahead and address the motion on the

13   merits anyway because secondly, I do not conclude that

14   allowing the verdict to stand would work a manifest injustice.

15       Dr. Gregory's report does not succeed in raising a doubt

16   in my mind that Dr. Su knew what she was doing.  She was

17   taking advantage of her position of authority to make a lot of

18   money.  And she was using that money to support an extravagant

19   lifestyle.  So, Defendant's Rule 33 motion will be denied.

20       And, the transcript of this hearing shall serve as the

21   Court's order with regard to that motion.

22       The Court is now prepared to proceed to sentencing, if the

23   parties also are ready.

24       **MR. RHYNE:**  We are, Your Honor.

25       **MR. JORDAN:**  Yes, Your Honor.

```
 1          THE COURT:  Very good.  So, let me start in the

 2   interest of making sure that everyone is appropriately heard

 3   this morning, and the Court has the ability to consider all

 4   the information the parties want to give the Court.

 5       Let me start by finding out whether there is anyone here

 6   besides Dr. Su and her lawyer who wish to speak on the

 7   Defendant's behalf.

 8          MR. JORDAN:  Your Honor, her family is here.  I

 9   submitted letters to you from everyone who's here, I believe.

10   And I've asked them if they wanted to speak to you, and I

11   think they did tell me they would rely on the letters.

12          THE COURT:  All right.

13          MR. JORDAN:  They are fairly comprehensive.

14          THE COURT:  So I'll tell those of you who are here, I

15   thank you very much for your letters.  The letters are a very

16   important part of what I read in getting ready for any

17   sentencing.  And I've read your letter closely.  But if you

18   came to court and you wanted to address the Court, you have

19   that right.

20       And, and so I just want to ask, is there anyone here who

21   came this morning in order to speak to the Court about Dr. Su

22   this morning?  At the microphone?

23       (No response)

24          THE COURT:  Okay, I'm not seeing any hands.

25       And I hope I'm not trespassing on your role as counsel
```

```
1   there.  I just wanted to make sure I was doing everything I
2   could.
3           MR. JORDAN:  Not at all, Your Honor.
4           THE COURT:  Is there anyone in court here who was a
5   victim of these crimes, who wishes to address the Court?
6      (No response)
7           THE COURT:  Mr. Rhyne, are you aware of anybody who
8   wishes to address the Court in that capacity?
9           MR. RHYNE:  I am not, Your Honor.
10          THE COURT:  All right.
11      Ms. Goldsberry, good morning.
12          PROBATION OFFICER GOLDSBERRY:  Good morning.
13          THE COURT:  Is there anything further that Probation
14  wants to say this morning in regard to the substance of the
15  presentence report or any of the objections?  All of which I
16  know you address in the report, itself, but is there anything
17  further you would like to say this morning?
18          PROBATION OFFICER GOLDSBERRY:  There's nothing
19  further, Your Honor.
20          THE COURT:  All right.  Before we begin, I need to
21  just say for the Record what it is specifically that I have
22  read in preparing for this morning's hearing.  I did read the
23  presentence report; I read the sentencing memoranda submitted
24  by both parties.  I read the letters attached to Mr. Jordan's
25  sentencing memorandum.
```

1    I read Dr. Gregory's report.  I read it in connection with

2    the Rule 33 motion, but I have taken it into account in regard

3    to the sentencing of Dr. Su.

4      And I have also read Dr. Gregory's supplemental report,

5    which she prepared after interviewing Dr. Su's ex-husband and

6    other of her family members.

7      So, that's what I've read so far.

8      I think the order that I would suggest, subject to hearing

9    from counsel, is that I determine whether Dr. Su wants to

10   address the Court, and I hear from her; that we then resolve

11   any objections to the presentence report.

12     And there are some weighty issues there involving grouping

13   and many, many issues related to various enhancements.  And,

14   that the Court then finally impose sentence.

15        **MR. RHYNE:**  Your Honor, one issue I wanted to put on

16   the Record.  There was also a declaration that I submitted

17   with a binder of attachments that I wanted to make sure you

18   referenced.

19        **THE COURT:**  Thank you.  I did, I did read that

20   declaration.  And I did read a sufficient amount of the

21   attachments to satisfy myself that the materials there were as

22   they were described by the government.

23     And just so that the transcript is clear, I think it's

24   important for me to be candid with the Record about there's

25   these hundreds and hundreds and hundreds of pages of

1    attachments to a large -- handful, but nonetheless, a handful

2    of emails Dr. Su sent to government witnesses, for the most

3    part.  And, either immediately prior to or during the trial of

4    this case.  And it is to those materials that Mr. Rhine is

5    referring.

6        And, as I say, I've read a lot of them, and I've read

7    enough to satisfy myself that they say what the government

8    says they say.  So, I have read that.

9        Going back to the order of proceedings, does anyone want

10   to suggest an alternative order of proceedings, or add

11   something that the Court may have left out?

12           **MR. JORDAN:**  No, Your Honor.

13           **MR. RHYNE:**  No, Your Honor.

14           **THE COURT:**  All right.  Mr. Jordan, does Dr. Su wish

15   to address the Court this morning?

16           **MR. JORDAN:**  Your Honor, when I spoke to her on

17   Monday when I met with her and then -- on Tuesday when I met

18   with her and on Thursday by phone, she indicated she did not

19   want to speak.  And I think she is visually affirming that

20   decision.

21           **THE COURT:**  Yes.  And the Record will reflect that

22   Mr. Jordan looked at Dr. Su as he made his remarks, and Dr. Su

23   shook her head from side to side to indicate she did not wish

24   to address the Court this morning.

25       And so, we can move on to the next item, which is to

1   resolve any objections to the presentence report.  I think the
2   most sensible thing is to go through the objections one at a
3   time to allow each side to address the Court, and then for the
4   Court to make a final ruling.

5       The Probation Office obviously very carefully considered
6   the parties' objections, and even went back to the Sentencing
7   Commission at one point to -- Ms. Goldsberry, to satisfy
8   herself that her grouping was correct.  And, I appreciate the
9   work that the Probation Department did in putting together
10  this report.

11      I think what I will do is let me just tell you what my
12  tentative rulings are regarding these various objections, and
13  then you can address those -- Counsel can address those they
14  want to address further.

15      I think the United States' grouping methodology is
16  correct, actually.  I don't think it has a sentencing effect.
17  But, in any event, I do think that the crimes in what the
18  United States describes as Group 1, which is essentially
19  everything except misuse of a government computer, those are
20  all crimes in which the guideline sentence is based on loss,
21  harm or quantity, or otherwise contemplate continuing
22  behavior.  That language comes from a comment to Section
23  3D1.2D of the sentencing guidelines.  And, I recognize that
24  the Probation Department heard directly from the Sentencing
25  Commission, so perhaps someone will have a different view down

1    the line, but I thought the United States' analysis on that

2    point was correct.

3        I would overrule the Defendant's objections for reasons I

4    can put on the Record later, with one exception.  And that is

5    the misrepresentation the Defendant was acting on behalf of an

6    educational organization I do not think is an appropriate

7    enhancement here, because the comments to the sentencing

8    guidelines make clear that the purpose of that enhancement is

9    to reach conduct where the Defendant represents that the money

10   is going to be to an educational, religious or charitable

11   organization, but the money is really going to her.  And here,

12   the money actually was going to TVU.

13       Now, of course, TVU is a sham, but that fact is already

14   accounted for in other portions of the sentencing

15   calculations.  So I think that the group offense level for

16   Counts 20 and 21 is 34, not 36.  And that the Defendant's

17   objection on that point is well-taken.

18       I apologize to the parties and the Defendant.  I know

19   you're not supposed to eat in court but I'm doing too much

20   talking, and I'm starting to get a sore throat, so I'm going

21   to put a lozenge in my mouth.

22       So anyway, that would be the Court's tentative ruling with

23   regard to the objections.

24       Mr. Jordan, let me hear first from you.  Let's talk about

25   grouping first.

1    **MR. JORDAN:**  Your Honor, before we get to that,

2  there's just one little minor point.  I very much appreciate

3  the work done by the probation officer in this case.  But in

4  the second reading --

5    **THE COURT:**  Oh --

6    **MR. JORDAN:**  We did come up with a few little

7  corrections.

8    **THE COURT:**  You did.  And thank you for reminding me.

9  I made a note of those, and I meant to put those in my outline

10  for this morning's proceedings.  And if you will give me just

11  a second, I'll make a good record of this.

12    In addition to objections to various enhancements and so

13  forth, the Defendant also interposed more minor objections, as

14  set forth on the bottom of Page 4 of the Defendant's

15  sentencing memorandum.  These are described by the Defendant

16  as "minor corrections."

17    The first is that in Paragraph 85, the name of David Kerns

18  needs to be spelled differently.  In Paragraph 26, the salary

19  should read "$1,000 per month" instead of what it actually

20  says.  And that in Paragraphs 22 and 35, the lowest grade

21  should read "B-."

22    Does anyone object to the Court sustaining these

23  objections and ordering that these corrections be made?

24    **MR. RHYNE:**  Your Honor, the only comment that I would

25  want in the Record is that there were -- I believe there were

42

1    times in trial where people testified that the lowest grade

2    should be a B+.  I know Mr. Jordan has cited a reference here

3    to B-, but I believe that there was some differing testimony

4    on that.

5        So, I have no objection to B- being in there as long as

6    there is reference to the fact other students -- employees

7    said the instruction was B+.

8            **THE COURT:**  The transcript of this hearing now does

9    contain such a reference.

10           **MR. RHYNE:**  (Nods head)

11           **THE COURT:**  And so, the Court will order the

12   Probation Department to make each of the corrections that are

13   contained on Page 4 of the Defendant's sentencing memorandum

14   at Lines 21 through 25.

15       Mr. Jordan, grouping.

16           **MR. JORDAN:**  Thank Your Honor.  Well, Your Honor, the

17   -- the papers filed by both parties, I think, really briefed

18   well, if I may say that.

19       The technical issue is, so I won't repeat too much, it's

20   the Defendant's view that all the counts should be grouped

21   because under 3D1.2B, they're all part of a common scheme or

22   plan.  So I think that covers all of the counts here.

23       To a lesser extent, they could be grouped under 3D1.2C

24   because it's the same conduct.  I know even under the

25   government's calculations, there are additions to those

1    guideline scores based on visa fraud, which is already being

2    counted in Group 1.

3        So I think that's where the Defendant is prejudiced here,

4    where an additional count which comprises the same common

5    scheme and which relies on conduct charged in Group 1 is being

6    used to increase her potential sentence.  I think the whole

7    rationale between -- behind the grouping scheme, as pointed

8    out in 3D1.2 is that if it's substantially the same harm,

9    there should be no further increase.

10       I will also add that although my arguments were as to the

11   scheme heard by the Probation Officer, the double-counting

12   scheme under *US v. Smith* cited in my brief, I think, also

13   applies to the government scheme.  If you're going to increase

14   the score because of the visa fraud, which is already in

15   Group 1, that's double-counting.

16       I will submit it on that.

17           **THE COURT:**  Mr. Rhyne, further comment?

18           **MR. RHYNE:**  Your Honor, I'll be very brief.

19       The only response I have with respect to 3D1.2B is:  I

20   believe it's problematic because that subsection is premised

21   on the same victim.  And I think that there are different

22   victims based on the counts in this case, which I think is why

23   it makes more sense, as the Court noted, to go to 3D1.2.  And

24   for the reasons we stated in our sentencing memo, we believe

25   that that's correct.

44

1    As far as double counting goes, I don't there's any issue

2    with respect to double counting.  I think that each individual

3    offense level is computed correctly, and they are adequately

4    accounted for in the end when the units are assigned to the

5    different groups in this case.  So, I don't think there is any

6    issue there.  So, I would submit on grouping.

7         **THE COURT:**  The Court will adopt the United States'

8    grouping methodology, and place all of the counts in Group 1,

9    save and except the misuse of a government computer count.

10    Next, the Defendant objects to the calculation of actual

11    loss.  I have to say, also -- this is really probably a side

12    note -- the government cites Section 2B1.1, Comment N of the

13    sentencing guidelines, 2002 edition, for the proposition that

14    the Court can rely on the Defendant's personal gain as an

15    alternate measure of the loss when it is unable to determine

16    actual or intended loss with sufficient certainty.

17         **MR. RHYNE:**  May I have a moment, Your Honor?

18         **THE COURT:**  Yes.

19    And what I will say is I didn't find that comment.  To

20    prepare for the hearing, I actually used both the 2010 and

21    2013 versions of the sentencing manual because the conduct in

22    the case occurred predominately in 2010, seemed like the right

23    thing to do.  And in neither of those manuals did I find that

24    comment.

25    I don't doubt that it appeared in 2002.  I didn't look.

1    But perhaps you could help me.

2        **MR. RHYNE:**  Your Honor, that might be an erroneous

3    cite.  I believe the -- as I'm quickly looking here, the gain

4    is noted in Allocation Note 3 and 4 (As read):

5            "...shall use the gain that resulted from the offense

6            as an alternative measure of loss only if there is a

7            loss but it reasonably cannot be determined."

8        **THE COURT:**  This is at comment 3 -- 2B1.1?

9        **MR. RHYNE:**  Yes, Your Honor.  And I don't -- I think

10    gain and loss are computed exactly the same in this case.  It

11    will be on Page 87 of the November 1st, 2013, guideline.

12        **THE COURT:**  I have it now.  Thank you.  It's comment

13    3, large B.

14      Okay, Mr. Jordan.

15        **MR. JORDAN:**  Your Honor, again, I'll emphasize what I

16    wrote in my papers:  The defense believes that the loss here

17    is exaggerated based on the government's proof.

18      And we are pointing to the trial testimony of Parth Patel

19    who testified at trial, frankly, that in his view, there were

20    two types of students here.  On the one hand those who were

21    unhappy and defrauded, and a second group which he estimated

22    as 65 to 70 percent of the students as those, in his words,

23    "just interested in maintaining their immigration status."

24      The counts here for loss don't view -- don't list the

25    United States as a victim.  They list a scheme to defraud

1    students.  My point is if -- there is not sufficient evidence

2    by the government -- and it's their burden -- to show that all

3    the students were defrauded here.  If students, as Mr. Patel

4    testified, were willing participants, they are not victims.

5    And the money they paid shouldn't be included in the loss

6    figure.  I can't say it any simpler than that.

7         **MR. RHYNE:**  Your Honor, I think there is a difference

8    in the victims in this case.  I think that there are certainly

9    victims that were bona-fide victims from start to finish.  And

10   I think the government has to reasonably concede that there

11   were people that came here as victims, and then realized: Hey,

12   I can -- I can stay in the country, I don't have to go to

13   class, and I can go work in Silicon Valley and make an income

14   that I can't make in India, and this works out great for me.

15        That doesn't mean that they weren't defrauded at the

16   beginning of this scheme, though.

17        It doesn't mean that Susan Su gets to escape the loss that

18   she caused those people when they initially came into the

19   country just because it turned out that they, for lack of a

20   better term, liked being a victim in this scheme.

21        I think that the evidence in this case is overwhelming

22   that the school was not what it purported to be.  Its

23   projection publicly was that it was a real school, on its

24   website and all its course material.  And as soon as it got

25   SEVIS approval, the money started rolling in.

1    And I think there is adequate evidence in the record for

2  the Court to find by a preponderance of the evidence, and for

3  that matter, by clear and convincing evidence, that the loss

4  amount in this case is at least $5.6 million.

5    I note also that that's a conservative number. As Jason

6  Mackey testified at trial, it's actually probably more like

7  5.9 million. And that discrepancy was a result of the trial

8  subpoenas and grand jury subpoenas that went out in this case

9  that limited the returns to certain dollar amounts. So he

10 wasn't able to capture some of the smaller charges.

11    Add to that we haven't spoken about intended loss here.

12 The government could be asking for a lot more than it actually

13 is. Based on the exponential growth that TVU was experiencing

14 just in the snapshot of the of time that we have, I think that

15 Susan Su's claim that she made to ASI and DHS is compelling.

16 I don't think she was going to make $20 million the next year

17 but I think she was going to make a lot more than she made the

18 year before. And she certainly intended to do that and she

19 certainly was on a vector to do that.

20    So for the government to stand here before the Court and

21 say "We know $5.6 million is a safe number, and we should go

22 with that," I think we are taking a very reasonable approach.

23 I think we could be asking for a lot more.

24    And on that, I would submit.

25    **MR. JORDAN:** Just briefly in reply, Your Honor,

1  again, it's the government's burden to prove that all of these

2  people at the beginning were defrauded; that they didn't know

3  at the beginning what TVU was.

4      Secondly, briefly, even under the government's view if

5  somebody comes here at first and is defrauded, but then sees:

6  Oh, this is good, I can work in Silicon Valley, his or her

7  subsequent payments should be deducted from that loss figure.

8      **THE COURT:**  The Court will overrule the objection and

9  adopt the $5.6 million figure.  For several reasons.

10     First, I think that the government makes a good point

11 about intended loss.  It would be easy for the government to

12 put too much weight on the $20 million figure that Dr. Su

13 included in her tort claim.  But I don't think they do that.

14 I think what the government simply says is all we need to show

15 is that the intended loss was at least this much.

16     And since Dr. Su asked for a lot more from the government,

17 in her tort claim, based on her reasonable expectations about

18 the growth of TVU, 5.6 is reasonable.  And I think on an

19 intended-loss basis, that argument is reasonable.

20     Secondly, I think that there -- this income came from a

21 scheme that included an element of -- of visa fraud that has

22 as its victim, the United States government.  And, it's not

23 just that these individual students were defrauded, although

24 most of them probably were.  There are separate and

25 independent -- these are all separate and independent bases

1    for the court to feel comfortable with this loss figure.

2        I take it as a given that many of the students who paid

3    TVU tuition only wanted visas, and never actually expected to

4    go to class.  How many were there?  I don't know.  Was there

5    at least one?  Is it reasonable to think that there was at

6    least one who was in on it from the beginning?  We don't -- I

7    can't say for certain.  That person didn't testify.  But, the

8    argument that there were such people is not frivolous.  Those

9    people are just co-conspirators in Dr. Su's visa fraud.

10       And even accepting that argument, there's no way to

11   quantify the number of students who were intent on visa fraud

12   versus the number who thought they were getting actual

13   classes, because the only evidence on that point is the

14   estimate of a TVU student who didn't have good information,

15   and I find that estimate to be unreliable.

16       And then lastly, to the point that it's hard to know how

17   many of the students were actually defrauded and how many were

18   in on it, to the extent that that's even relevant, and I'm not

19   sure that it is, then we get back to this comment that

20   Mr. Rhine had to straighten out a few minutes ago.  And that

21   is that the actual loss is hard to determine.

22       And, and we know what Dr. Su's gain from this conduct was.

23   It was at least $5.6 million.  Because her only source of

24   income during this time was TVU, and TVU was a sham.  And, and

25   that money has been adequately traced.

1    So the Court will overrule that objection, and adopt an

2    actual loss of $5.6 million for sentencing purposes.

3       Next, we come to sophisticated means and organizer leader.

4    And I would like to discuss those two enhancements together,

5    if we might.

6       **MR. JORDAN:** I think that is a good idea, Your Honor.

7       And first, with the sophisticated means, we did raise an

8    objection to that. But frankly, it's there also to -- of

9    course it's relevant to the 3553 arguments later, which is

10   perhaps technically, this is a sophisticated scheme.

11      But, how many schemes involving this amount of money

12   wouldn't also qualify for that? Of course, that is not

13   properly in this section (Indicating). It's an argument we

14   make later. But, that's one reason we raise it now, to relate

15   it back to that point.

16      Focusing more perhaps on the role. Just looking at 3B1.1,

17   Application Note 1 says a participant is a person who is

18   criminally responsible for the commission of this offense.

19   When I read the transcript under the government's theory of

20   the case, it seemed very much a one-person scheme. No one

21   else apparently profited directly. I didn't see any evidence

22   in the trial that anyone else knew about these articulation

23   agreements. There might have been people working at TVU, of

24   course there were; might have been other people there.

25      But, are they participants under 3B1.1? That I think is

1   the only question.  Are they part of a criminal conspiracy

2   that Dr. Su is properly being penalized for being the

3   organizer or the leader of criminal activity that involved

4   other participants?

5       That's, I think, a technical argument.  But here, I think

6   the other people fall below the definition of "participant"

7   under 3B1.1.

8           **THE COURT:**  Mr. Rhyne?

9           **MR. RHYNE:**  Yes, Your Honor.

10      With respect to sophisticated means, I think it's briefed

11  in our sentencing memo.  There's obviously many cases on the

12  subject.  I don't think there's any case that I was able to

13  find that included the degree of sophistication and layers of

14  lies that we saw in this case that didn't qualify for

15  sophisticated means.

16      I spelled out in a list why the government believed that

17  this qualified on Page 13 of the sentencing memo.  And it

18  includes the first lies that she tells to DHS in order to

19  obtain the SEVIS approval in the I-17.  The forgery of the two

20  articulation agreements using the photo shop type program.

21  The aid of her family members to forge I-17 documents as DSOs.

22      And although they didn't testify, Jason Mackey testified

23  that Susan Su told him that they had no intention to be DSOs.

24  She knew it; they knew it.

25      The assistance of her sister Sophie, to pose as a DSO

1    during SEVIS site visit.  There was an actual skit that was

2    run for the site inspector that was there.  Sophie sat at a --

3    roughly a card table just to be a prop, so that they could

4    pull the ruse over on the actual physical site inspector,

5    which was roughly a government contractor who was there to

6    just kind of take a look around.

7        You've got the creation of -- preservation of the facade

8    of the university, including the website, the course catalog,

9    the bogus instructors that she listed.  She also -- I don't

10   think there's any evidence to dispute the fact that Dr. Su had

11   specialized knowledge.  Not only in her field of expertise,

12   but she was trying very hard to navigate the specialized

13   knowledge that she learned in the visa fraud regulations.

14       She knew where she needed to improve the school's

15   appearance and where she needed to skirt around certain issues

16   to avoid detection.  I think that the daily entry of false

17   information into SEVIS also contributes to the sophistication

18   of this scheme per her orchestration --

19       (Document handed up to the Court)

20       (Reporter interruption)

21       **MR. RHYNE:**  Her orchestration of multiple DSOs to

22   carry this out.  And I use "DSOs" in quotes because they

23   obviously were not DSOs; they were people whom she controlled

24   with laptops that she distributed to them that were

25   pre-admitted or pre-logged on into SEVIS.

1    You've got those daily entries in turn are creating the

2  appearance to the government that TVU students are complying

3  with their visa regulations.

4    There's, although closely related, the creation and

5  issuance of bogus school schedules and transcripts.  Again, a

6  completely kind of new dimension of the facade that she's

7  creating here.

8    You have the marketing of her own academic credentials as

9  president of the school, and her academic credentials as a

10  Ph.D. from Cal.  You've got the use of multiple bank accounts

11  at the back end of the scheme that she used to collect the

12  money, and later spend the money after the scheme was done.

13    So, we just think that her orchestration of these multiple

14  facets of this crime go well beyond what the case law shows

15  would be required for sophisticated means.

16    And on that, we would submit.

17        **THE COURT:**  Submitted?

18        **MR. JORDAN:**  Yes, Your Honor.

19        **THE COURT:**  The Court will overrule the Defendant's

20  objection, and adopt both of these enhancements.  I'll say --

21  first let me make a couple of comments.

22    First, I take the Defendant's point that at least with

23  regard to sophisticated means, and I think frankly also with

24  regard to organizer/leader, that these arguments have at least

25  as much force in the context of 3553(a) as they do to the

54

```
 1    technical application of the sentencing guidelines.
 2        I think sophisticated means is an easy call on this case.
 3    You look at the amount of computer work, forms, the number of
 4    people who had to be in on it at least to some extent.  And,
 5    this seems to me like a textbook sophisticated-means case.
 6        With regard to organizer/leader, I think the Defendant
 7    made a very good argument, but there's a comment in the
 8    guidelines that says:
 9            "In assessing whether an organization is otherwise
10            extensive, all persons involved during the course of
11            the entire offense are to be considered.  Thus a
12            fraud that involved only three participants but used
13            the unknowing services of many outsiders could be
14            considered extensive."
15        And I think that's what happened here.  I think there were
16    a few people who knew everything.  Then there was a layer of
17    people who knew not everything, but they knew enough to serve
18    Dr. Su's purposes.
19        And then there was a third layer of people who really
20    didn't know in any respect that this university was one big
21    scam.  But they were nonetheless providing their services in
22    some form to Dr. Su, unknowingly.  And so within the meaning
23    of that comment, they helped make the organization extensive.
24    So, I think that those enhancements are both appropriate.
25        Let's turn to obstruction of justice.  Mr. Jordan?
```

1    **MR. JORDAN:** Your Honor, I think at this point

2    Dr. Gregory's report would be relevant also. Obstruction of

3    justice does have, as I briefed, a *mens rea*, an element of

4    willfulness. I've looked at, of course, the emails sent by

5    Dr. Su and reviewed the transcript for her, you know, comments

6    or actions during the trial. And I think there is a strong

7    argument to be made here that of course, the emails were sent.

8    And of course, she did what she did at trial.

9    But, was it willful? Was she really trying to obstruct

10   justice? She had her own view, I believe, of what the truth

11   was here. And she was urging the witnesses to testify in

12   accordance with that. In her mind, I don't think she was

13   trying to get them to perjure themselves. Or urge them to do

14   that. She was urging them to testify consistent with her

15   beliefs, with her belief system that she was operating under.

16   So, the question just resolves down to: Did she really

17   have the intent to willfully obstruct justice? And I think

18   that's not proven here.

19   **THE COURT:** Mr. Rhyne?

20   **MR. RHYNE:** Then, why use an alias? If what she's

21   doing is okay, why can't she just be herself? The reason is

22   because she doesn't want people to know that it's her. She's

23   trying to influence the testimony of multiple people that were

24   on the government's witness list.

25   I think the opening email is probably one of the most

1    compelling ones where she talks about, with Vishal Dasa, "Look

2    what they did to Anji Reddy" R-E-D-D-Y, "they used him as a

3    decoy and right after they arrest him."  That follows through

4    the rest of her emails that she is sending.  It's clear she

5    has a theory that she thinks is going to be successful on

6    different components of this trial.  And she's trying to get

7    witnesses to get on board with it.

8        And she's using an alias because she knows that she

9    shouldn't be doing it, which underscores the fact that it is

10   willful.

11       And on that, we would submit.

12             **THE COURT:**  Reply?

13       **MR. JORDAN:**  Your Honor, again I think she explained

14   there that the use of the alias was because she was suspicious

15   of the government interfering with her attempts -- again I

16   think under this belief system she had a -- to get the

17   witnesses to tell the truth as she saw it.

18       I'll submit it with that.

19             **THE COURT:**  Submitted?

20       **MR. RHYNE:**  Submitted.

21             **THE COURT:**  The Court will overrule the objection,

22   and adopt the obstruction-of-justice enhancement.

23       This is a case in which Dr. Su contacted witnesses before

24   and during the trial, and urged them to give false testimony.

25   The Defendant in connection with a separate motion has already

 1  made it plain that she is not making a competency argument;

 2  she's not arguing legally that she was unable to distinguish

 3  between right and wrong.

 4      And I don't think that she didn't know that what she did

 5  was a criminal offense.  I don't think that she didn't know

 6  that what she was doing -- and I mean, doing in the underlying

 7  conduct involving TVU -- was wrong.

 8      And, and perhaps I'll say a little bit more about that

 9  later in the hearing.  But, for those reasons I don't -- I am

10  unable to conclude that she sent these emails for the purpose

11  of encouraging witnesses to give what she honestly believed to

12  be truthful testimony.  And so I think the

13  obstruction-of-justice enhancement is appropriate.

14      I think that leaves only, other than the -- than the

15  imposition of sentence itself, the defendant's objection that

16  the enhancement for her having acted on behalf of -- falsely

17  on behalf of an educational organization is inappropriate.

18      And Mr. Rhyne, let me start with you.

19      **MR. RHYNE:**  Your Honor, we actually talked about this

20  this morning, and it is the government's position that we

21  actually agree with Mr. Jordan that this probably is not an

22  offense characteristic that should be included.  So, those two

23  levels should come off.

24      I note that the application notes for that have some

25  examples, and they are not the fact pattern we see in this

1    case.  It's more like you noted:  Fundraising and seeking

2    donations.  And I don't think that that's what she's doing in

3    this case.

4         **THE COURT:**  Those -- I read those examples, myself,

5    last night, and they were informative of the Court's

6    tentative.

7         **MR. RHYNE:**  I don't think it changes the final

8    calculation of the guidelines.  It knocks that -- for Count 20

9    to 21, it knocks it down to 34.  Which is a subset of Group 1

10   that does not affect the ultimate unit grouping.  So --

11        **THE COURT:**  The Court will sustain the objection

12   without opposition, and rule that the enhancement for -- I

13   wish I had put the report in front of me, I could cite the

14   right provision of the sentencing guidelines.

15      But, the enhancement for falsely acting on behalf of an

16   educational organization is not appropriate, and that the

17   group offense level for Counts 20 and 21 be reduced from 36 to

18   34.

19      So, that will be the Court's order.

20        **MR. RHYNE:**  (Nods head)

21        **THE COURT:**  Is there any matter raised by either side

22   in connection with this sentencing this morning, other than

23   the length of sentence, that we have not yet addressed?

24        **MR. JORDAN:**  I don't believe so, Your Honor.

25        **MR. RHYNE:**  No, Your Honor.  We don't believe so.

1    THE COURT:  All right.  Then what we will do this

2 morning is I'll allow Mr. Jordan to make an argument on behalf

3 of the Defendant.  I will allow Mr. Rhyne to make an argument

4 on behalf of the government.  I will allow Mr. Jordan to very

5 briefly make a reply argument if he wants.

6    And then the Court probably will take a brief recess and

7 then I'll come out, and I'll impose sentence.

8    Mr. Jordan?

9    MR. JORDAN:  Thank you, Your Honor.

10   Your Honor, I appreciate the work done by the probation

11 officer and the recommendation by her for a variance down to

12 168 months.  But, I think even that sentence is too high for

13 this offense.

14   Of course, at this point you've denied the Rule 29 and the

15 Rule 33 motions.  We take objection to that.  But, we are now

16 faced with you finding that the Defendant is guilty and is

17 going forward to sentencing.

18   So, assuming those facts, putting us in that context, I

19 will go back to a statement you said earlier about how in this

20 case, there are two groups of victims.  I think we all agree

21 to that.  Some were defrauded, under Your Honor's findings.

22 But others were not.  And guidelines here are being driven by

23 that high loss figure.

24   That loss figure and the other factors result in a

25 guideline offense level of 40 which was -- I believe the

60

1    highest the guidelines go to are Level 43?  Which is the

2    equivalent for major, major crimes.  Not to say that this

3    isn't a major crime, but murders, treason, and the like.

4           **THE COURT:**  Yes.  43 is the highest offense level.

5           **MR. JORDAN:**  In talking with the Probation Officer

6    informally before this, I believe I said to her "This

7    situation here -- we have almost a perfect storm where various

8    factors are in here that keep increasing her score."

9        Some of which we take exception to Your Honor's rulings,

10   but those are the rulings, and those are the guideline

11   provisions.  But some of which, although not legally

12   double-counting, have the same effect.

13       My strong opinion that a fraud that Your Honor finds is

14   5.6, $5.8 million is going to have sophisticated means.  It's

15   going to have more than one person.  It's going to have many

16   of these other factors in there.

17       So, again, is it legally double-counting?  Not under

18   Your Honor's rulings.  But does it have the effect of

19   exponentially increasing the punishment here?  And I think it

20   does.

21       So I believe the guidelines, themselves, as ruled on by

22   Your Honor, overstate the severity of the crime.  That's my

23   first point.

24       The second point under 3553 is there are other factors

25   here.  Now, taking note of the government's comments today,

1   and its comments in the sentencing memorandum, I know they

2   think Dr. Su is malingering, that she is exaggerating her

3   mental condition.  And that, I guess, it should not be taken

4   into account here today.

5       I strongly disagree with that.  We have Dr. Gregory here

6   if you want to ask any questions.  We submitted the report.  I

7   was well aware of Dr. Gregory's statements about Dr. Su

8   perhaps trying to exaggerate her symptoms.  That wasn't in any

9   way to try to hide that from the Court or submit a report that

10  didn't have all of the information in it.  That's all true.

11      It doesn't take away from the fact that Dr. Su has been

12  suffering, I believe, from a mental disease for some time.

13  The earlier incidents were well before any criminal

14  proceedings started.  So there can't be any argument that she

15  was malingering then to try to avoid guilt now.

16      Reading Dr. Gregory's report, this isn't a situation where

17  Dr. Su got treatment, was cured -- if you want to use that

18  phrase -- for a mental condition, and is now reinventing it.

19      I think instead, and I believe the Probation Officer

20  recognizes this, that Dr. Su is suffering from an untreated

21  mental condition.  And that you may take that into account at

22  sentencing as a mitigating factor.

23      Although she isn't present here today, because she goes to

24  Duke University, I really think Dr. Su's youngest daughter

25  really just hit the nail on the head when she stated that

1    Dr. Su in her mind probably believed what she was doing was

2    good.  She had this delusional belief that she was running a

3    school that was going to rival Harvard or Stanford, and that

4    she was going to be a world-famous educator, and people would

5    respect her, her family would respect her, and she would

6    accomplish this on her own.

7        We are not saying she's innocent.  We're not saying she's

8    not guilty by reason of insanity.  We're not saying that she

9    should not be punished, after Your Honor has now ruled in

10   denying the Rule 29 and Rule 33 motions.  There were victims

11   under Your Honor's rulings.  The sentence should be imposed.

12   But the sentence recommended by the Probation Officer, which I

13   appreciate, I believe is still too high.

14       Finally, we have, as Your Honor realizes, the family in

15   court.  We have a lot of the good factors we often look at

16   when we are structuring the sentence.  Lack of a prior record.

17   Good family support.  I think an argument that this is

18   aberrant behavior, which we used to argue a lot back when the

19   guidelines were mandatory, just a situation where I believe

20   Your Honor can look at this, and say, "This is a situation

21   where the guidelines over-calculate some of the factors here

22   and that the reasonable sentence should be lower."

23       I've explained in my sentencing memorandum the rationale

24   how I came up with my recommendation for the 70 months.  I

25   think that's a fair sentence, a reasonable sentence.  It

1  doesn't punish her for going to trial.  And I would urge

2  Your Honor consider adopting that sentence.

3          **THE COURT:**  Thank you, Mr. Jordan.

4          **MR. JORDAN:**  (Nods head)

5          **THE COURT:**  Mr. Rhyne?

6          **MR. RHYNE:**  Yes, Your Honor.  I'll start with the

7  request that we are making at 292 months.  Obviously it is the

8  low end of the guideline.  And, we don't want the Court to

9  think that just because it's the low end of the guideline we

10  think that's what the Court should impose.  There's some

11  rationale as far as the amount of time or opportunity costs

12  that Dr. Su caused other people to lose.

13      And just doing some rough calculations I would just like

14  to, if you start with the $5.6 million that she made, and you

15  figure as the evidence at trial was that it cost $2,800 per

16  student per semester at the school, that means that she took

17  about 2,000 semesters from those students if you multiply a

18  semester by three months, roughly the length of a semester,

19  probably that is conservative, that is 6,000 months that she

20  cost other people in opportunity cost to go somewhere else.

21  That is not taking into account the additional loss that they

22  suffered of their out-of-pocket money that went into her

23  pocket.

24      Now, again, we're reasonable with respect to probably not

25  every dollar of that $5.6 million came from somebody who was

64

1   completely defrauded from beginning to end, so take half of

2   that.  If you have take half of that, 2.8 million, divided by

3   2,800, follow it through, obviously it's half.  It's 3,000

4   months lost, of lost student time.

5       And if you compare those 3,000 months of lost time that

6   she caused other people against the backdrop of the 292 months

7   we are asking for, it is one tenth of the time that she took

8   from other people.  So that, that is at least a starting point

9   or at least a rationale as to how we think that 292 is -- is

10  reasonable and appropriate on this record.

11      The next thing I would like to address is Mr. Jordan

12  mentioned a preliminary plea offer that was based --

13          **THE COURT:**  I don't wish there to be any discussion

14  of that topic at this hearing.

15          **MR. RHYNE:**  Very good, Your Honor.

16          **THE COURT:**  I don't -- and I'll be clear about why I

17  say that.  I don't think that it's helpful to the Court -- I'm

18  not saying it is inappropriate.  I don't know that there is

19  any rule against it.  But I don't think it is helpful to the

20  Court for the Court to consider the parties' various pretrial

21  plea negotiations positions in determining what a fair

22  sentence is.

23      And I would feel that way regardless of whether the

24  position in question were the one advanced by the government

25  or the Defendant.  Certainly, if the shoe were -- in this

1  case, the Defendant has said that the government made a

2  certain offer to resolve the case.  Certainly if the shoe were

3  on the other foot, and the Defendant had in negotiations

4  offered to accept a higher sentence than the one that the

5  Court -- that the Defendant was urging the Court to impose at

6  sentencing, the Court would feel justifiably uncomfortable in

7  using that offer as a floor that the Defendant was allowed to

8  argue.  And I -- I think the same reasoning applies the other

9  way.  So, you don't need to talk about that.

10         **MR. RHYNE:**  Okay, Your Honor.

11     So I think the next question becomes:  What, if any, facts

12  are in this record to justify a well-founded variance below

13  the low end of the guidelines?

14     And I think that Mr. Jordan makes fair points.  I think

15  that the strongest point that they have is -- is her mental

16  health condition.  But, I keep coming back to the undisputed

17  facts in this case, and that is that that condition did not

18  cause her to commit these offenses, and it certainly didn't

19  slow her down from committing the offenses.

20     When she was confronted by law enforcement about her

21  conduct, it didn't stop her from lying to Jason Mackey when he

22  was interviewing her at her kitchen table when she's still

23  trying to conceal things that she knew she was doing that were

24  wrong.  So, I don't think it's compelling at all for Dr. Su to

25  argue that, you know, this is somehow a mistake.

1    And I noted in our sentencing memo, her statement in the
2  PSR.  It sounds of negligence.  Still, today, she doesn't
3  believe that what she did was wrong.  And she committed so
4  many acts that are so clearly wrong.  She lied from start to
5  finish in this case.  And for her to stand here before the
6  Court and not make any -- not express any remorse or any
7  recognition that what she did was wrong I think is compelling.
8    And it's compelling against the backdrop of the fact that
9  even before this trial started, while she was aware she was
10  under indictment, she tried to start a new school.  And before
11  that, she was soliciting donations to save Tri-Valley
12  University.
13    I think it proves that she is relentless.  I think it
14  raises serious concerns that if she were released today, she
15  would be right back at this, a little bit -- well a lot
16  smarter.  But, still under the belief that what she did was
17  not wrong.
18    And I think from a 3553(a) factor, the Court can consider
19  that with respect to the characteristics of the offense,
20  deterrence, risk to the community, I think it -- it transcends
21  many of the relevant factors that the Court should be
22  considering.
23    And I also think that undercuts Mr. Jordan's argument that
24  it was aberrant behavior.  I think it was up until this point,
25  but I think the record since then shows that it's what she

1  wants to do.  So, I think that should be a concern.

2      With respect to the guideline calculation overstating the

3  harm, there -- there aren't any close calls in this

4  calculation.  Every base offense level, offense characteristic

5  and adjustment that is applied in this case is well-founded on

6  multiple pieces of evidence that came not from a plea --

7  guilty plea record, but from trial.

8      So for those reasons, we think that the recommendation of

9  292 months is appropriate.

10     I should note that I should have responded to Your Honor's

11 question before about whether there were any other issues that

12 we should raise.  And obviously, restitution and forfeiture

13 are something that, at least with respect to forfeiture,

14 Mr. Countryman is here to address, if there's any issues on

15 that.

16     But, on that basis, we would submit.

17     **THE COURT:**  Mr. Jordan, reply argument with regard to

18 the length of sentence?

19     And also, the Court did enter a preliminary order of

20 forfeiture, and I'm prepared at the conclusion of the

21 proceedings this morning to make that order final.  So if you

22 wish to be heard on that issue, you should say so.

23     **MR. JORDAN:**  I do, Your Honor.  That would go to our

24 earlier points made under the argument about loss.  Again we

25 object to that forfeiture amount, because it's -- it's the

1  defense position the government hasn't proved that amount of
2  loss.

3      And Dr. Su would request a continuation of the stay
4  through the appeal until that issue is resolved.  She's said
5  that to me several times, and I did promise I would mention
6  that to the Court as her position.

7      I understand Your Honor's rationale in the forfeiture
8  order.  But again, the defense believes that the loss is
9  overstated, that the government hasn't met its proof, and that
10  the forfeiture amount should be limited to the restitution
11  amount as proposed by Ms. Goldsberry of the Probation Office.

12      And then briefly, in reply, hearing what Mr. Rhyne said at
13  the very end, we just disagree on whether there is any
14  reasonable view that Dr. Su will get right back at it.  When I
15  see the facts in this case, the testimony, and I read it and
16  then I talk to Dr. Su and she tells me again and again and
17  again that she didn't intend to defraud, that the government
18  doesn't understand, I think that goes more to her mental
19  illness than it does to any evilness on her or some kind of
20  belief that she's going to now become a career criminal or
21  habitual criminal.

22      Obviously, Your Honor is going to impose a custodial
23  sentence.  I will be asking Your Honor to attach Dr. Gregory's
24  reports to the PSR.  What she needs, even if Your Honor is
25  going to impose a custodial sentence, which you will, is

1  mental-health treatment, which she has never gotten.

2      And I'll submit it on that, Your Honor.

3          THE COURT:  Mr. Rhyne, is the matter submitted?

4          MR. RHYNE:  It is, Your Honor.

5          THE COURT:  The Court will now take a brief recess.

6          THE CLERK:  All rise.

7      (Recess taken from 11:40 to 11:48 a.m.)

8          THE CLERK:  Remain seated and come to order.  The

9  Court is now in session.

10         THE COURT:  The Defendant and the counsel will please

11 rise.

12     Dr. Su, you are ordered to stand up.

13     (Request complied with by the Defendant)

14         THE COURT:  This is the time for the Court to impose

15 sentence.  And before I impose sentence, it is my obligation

16 to explain why I'm doing what I'm doing.

17     The Court is required always, in every criminal case, in

18 the Federal Court, to start by consulting the guidelines

19 manual promulgated by the United States Sentencing Commission.

20 And to perform a calculation under those guidelines.  We've

21 done that, and spent a substantial amount of time.

22     And I appreciate the work of the Probation Department in

23 putting together its presentence report, and the work of

24 counsel in arriving at the sentencing recommendation -- excuse

25 me -- in arriving at the sentencing calculation that results

1    in a total offense level of 40.

2        But, the guidelines are not mandatory.  They are a

3    necessary starting point for the Court in making its

4    calculations, and they are to be given serious weight.  The

5    Court also has to consider the factors set out in 18 United

6    States Code Section 3553(a).

7        Although there are many considerations set out there, the

8    predominant ones in most sentencing hearings are the ones set

9    forth in subpart (a)(1) and subpart (a)(2) which, itself, has

10   several subparts.  We'll talk about those a little more in a

11   second.

12       The Defendant has asked that the Court impose a sentence

13   of 70 months.  I will not be adopting that sentence, for

14   reasons that I'll state in a moment.  The government has

15   requested that the Court impose a sentence of 292 months,

16   which is the bottom of the sentencing range at Defendant's

17   total offense level.  And for reasons that I'll explain in a

18   moment, I will not be imposing that sentence, either.

19       Sentencing is, I think, the most important and the hardest

20   thing that federal judges do.  And, if this were just a case

21   of baseball arbitration then I would have to choose one

22   party's proposal or the other.  But it isn't.  I have the

23   obligation to consider each case on its facts, and fashion a

24   sentence that is sufficient, but not greater than necessary to

25   comply with the purposes of the federal law and the sentencing

1    guidelines.

2        Let me talk first about why I will not adopt the

3    Defendant's proposed sentence of 70 months.  I do not think a

4    sentence of 70 months begins to come close to capturing the

5    magnitude of the Defendant's crime.  This was a massive,

6    lucrative fraud scheme that generated at least a thousand

7    false visas.  TVU in its totality was a sham.  The scope of

8    the fraud was enormous.

9        In May, 2009, TVU had 11 "students."  And I put "students"

10   in quotation marks because the school did not offer any

11   classes or have real instructors.  By September, 2009 it had

12   75 students.  By January of 2010 it had 447.  By May, 2010, it

13   had 939.  Those numbers were taken from the documents that

14   were submitted to me before the hearing.

15       My recollection of the testimony at trial -- I'm just

16   operating from recollection -- is that by the time of her

17   arrest, Dr. Su had more than a thousand students.

18       More than half of the students, these fake students, were

19   registered as living at the same address in Sunnyvale.  They

20   were registered by her as living at the same address in

21   Sunnyvale.

22       Although the defense at trial was that this university was

23   a legitimate enterprise, the evidence was overwhelmingly to

24   the contrary.  There were no classes beyond the playing of a

25   few online videos.  And even in those, there were no

1  examinations, or grades, or instructors.

2     Dr. Su lied to the federal government about who her

3  instructors would be. She made up classes that didn't exist.

4  She issued transcripts for classes that had never occurred.

5  For many of the courses listed in the university's catalog,

6  there were no classes whatsoever.

7     There was no relationship between the grades on students'

8  transcripts and their performance in these largely-nonexistent

9  classes, because Dr. Su or her subordinates issued transcripts

10  from their central office, assigning grades largely at random,

11  except that Dr. Su required that no one be given less than a B

12  or a B- or a B+.

13     TVU was nothing more than a mill for the issuance of F1

14  visas, for the sole purpose and effect of massively enriching

15  Dr. Susan Su.

16     The fraud started from the beginning. The SEVIS petition

17  was false. This is not a situation where it started as a

18  legitimate enterprise and slowly crept over to the realm of

19  illegality. Dr. Su knew that the DSOs listed on her SEVIS

20  petition were never going to be involved in the administration

21  of TVU. She listed professors she hadn't hired or even talked

22  to. She listed three universities as willing to accept

23  credits from TVU, when that assertion was knowingly false as

24  to two of them. She submitted forged paperwork to the federal

25  government.

1    There weren't instructors.  There weren't classrooms;

2  there weren't real classes.  It wasn't a case of Dr. Su giving

3  people less than they bargained for in their education.  It

4  was a case of TVU giving people nothing at all.  It was a

5  fraudulent visa mill.  It was a fraud on TVU students, and a

6  fraud on the people of the United States.

7    When immigration authorities confer the right to supply

8  visa information to the SEVIS system, to someone, they create

9  a bond of trust.  A person with SEVIS authority holds the keys

10  to the right to remain lawfully in the United States.  Dr. Su

11  violated that trust, for her own personal financial gain.  And

12  she made approximately $6 million doing it.

13    A sentence of 70 months does not capture that conduct.

14    There has there has been some talk about Dr. Su's good

15  motives.  About how she wanted to introduce new educational

16  methods.  About how she wanted to instill good values in her

17  students.  About how her school rested on Christian

18  principles.  I find that none of that has any basis in fact.

19    The Defendant's lack of remorse in this case is striking.

20  I'm attempted to say "stunning," but that might be a little

21  overly dramatic.

22    Shortly after her arrest in this case, she attempted

23  almost immediately to establish another fake university called

24  "Global University," which fortunately never got off the

25  ground.

74

1    She continues to this day to maintain to her family

2  members and acquaintance that's she was trying to do the right

3  thing, and that this was awful some kind misunderstanding.

4  Selling completed visa paperwork for $2,000 is not doing the

5  right thing.  Providing transcripts for classes that never

6  took place is not doing the right thing, or trying to.  Having

7  a policy of awarding no grade lower than a B is not doing the

8  right thing.  Issuing forms for students who don't actually

9  exist is not doing the right thing.

10   It's always difficult to predict recidivism.  It's

11  something that federal judges are asked to do all the time.

12  And usually there is no information from which the judge can

13  make as good a decision as he or she would like.

14   There isn't great information here.  I won't pretend to

15  predict the future.  But, I would say uniquely in my

16  experience, at least to this date, it seems that the Defendant

17  simply hasn't learned any significant lesson from her arrest

18  or prosecution in this case.  And that concerns me.

19   Dr. Su is someone who could easily have made better

20  choices.  She's an intelligent, well-educated woman with a

21  sophisticated background who has held a variety of

22  interesting, well-paid jobs.  She is a loving mother.  She had

23  many advantages in life that others don't enjoy.

24   And, I will say that I feel sorry for her family.  It is

25  probably -- it is one of the most heartbreaking parts of being

75

1  a judge that when you impose a sentence, it has a consequence

2  on loving, close family members like Dr. Su's daughters. And

3  it may be that one of you is here. And if you are, I'm sorry

4  you have to see this.

5      Dr. Su urges the Court to place the responsibility for her

6  crimes on her mental illness. She does appear to have some

7  mental-health issues. I said earlier I accept Dr. Gregory's

8  diagnosis.

9      I think she is entitled to some consideration for her

10  mental illness which in part will lead the Court to vary

11  somewhat from the sentencing guidelines. And, I do think she

12  needs treatment. But I don't think that her mental illness is

13  an explanation or excuse for her crimes. At the end, I think

14  this was a massive fraud that was done for greed, for which

15  Dr. Su still refuses to take responsibility.

16      Having said all that, I think a guideline sentence is

17  necessary -- I think a guideline sentence of 292 months is

18  greater than necessary to accomplish the goals of the

19  sentencing guidelines.

20      Let me start by saying for those of you who haven't done

21  the math, that 292 months is 24 and 1/3 years. It's difficult

22  even to hear that without recognizing its enormity. And I

23  think there are crimes that deserve that sentence, and there

24  are cases in which I imposed sentences longer than that.

25      And I think clearly, a substantial sentence in this case

1   is appropriate.  But for a few reasons, I think that some

2   reduction from that lower boundary is appropriate in this

3   case.

4      First of all, I do think that Dr. Su's mental condition is

5   entitled to some consideration.  I think she knew what she was

6   doing was wrong, but I think that she also operated under

7   delusions of grandeur or other beliefs that mitigate her

8   criminal conduct.

9      I think it is significant that this is Dr. Su's first

10   offense.  And obviously, the guidelines take account of that

11   in some respects by providing for the addition of a criminal

12   history calculation.

13      But, when you are at the place that we are in the

14   sentencing guidelines, and all the proposed sentences are so

15   severe, I don't think that the sentencing guidelines

16   adequately take that into account.

17      And lastly, I think to a small extent, Mr. Jordan is

18   right, that the guidelines overstate the severity of this

19   crime.

20      Mr. Rhyne is a very good lawyer.  I hadn't thought of the

21   metric of the various months and so forth of lost opportunity.

22   And Mr. Rhyne knows, I think from prior experience, that I

23   think like an economist, and it was a very good argument.

24      And there is no doubt that this crime was severe.  But

25   just for example, even if you were to reduce the guidelines

1  total offense level by four points, Dr. Su would be in the
2  range of 188 to 235 months. And, and I'm not saying that that
3  is precisely the amount of overstatement, because that is not
4  the only ground on which I would base a variance in this case.
5  But, I do think that there has been some overstatement.

6      And I conclude that an appropriate sentence in this case
7  is 198 months, which is 16 and 1/2 years. And, that is the
8  sentence that the Court will impose.

9      Having placed on the Record the Court's -- well, let me
10 say a few more things before I actually impose sentence.

11     I hope that Dr. Su does receive mental-health treatment
12 while she is in custody. And I will order that it be
13 provided.

14     I don't have any doubt that 198 months is an adequate
15 sentence to provide the general-deterrence effect that I am
16 required to attempt to achieve. I think anybody looking at
17 this conduct -- and I know it's been reported in the press --
18 will conclude that this sentence very much made this crime not
19 worth it. And that's what deterrence is.

20     Secondly, I think any reasonable viewer would conclude
21 that a sentence of that length reflects the seriousness of
22 this offense and promotes respect for the law.

23     And, lastly, the offense is of -- excuse me -- that
24 sentence is of a sufficient length that while I have the
25 concerns about recidivism and specific deterrence that I

1    articulated earlier, it's my hope that after a sentence of

2    that length, Dr. Su will have learned her lesson, and we don't

3    have to worry any further about Dr. Su believing that she can

4    commit crimes like this and get away with them.

5        So, I've considered all of the factors under United States

6    Code 3553(a) in addition to the sentencing guidelines.

7        Turning now to the imposition of sentence itself, Dr. Su,

8    pursuant to the Sentencing Reform Act of 1984, it is my

9    judgment that you are hereby committed to the custody of the

10    Bureau of Prisons, to be imprisoned for a term of 198 months.

11    This term consists of 198 months on Counts 1 through 14, 60

12    months on Counts 15 through 19, 188 -- excuse me.

13        188 months on Counts 20 through 21, 26, 27, 29, 31, 32,

14    34, and 35.  And 12 months on Count 25.  All counts to be

15    served concurrently.

16        Upon release from imprisonment, you shall be placed on

17    supervised release for a term of three years.  This term

18    consists of three years on each of Counts 1 through 22, 24,

19    26, 27, 29, 31, 32, 34, 35; and one year on Count 25, all such

20    terms to run concurrently.

21        Within 72 hours of release from the custody of the Bureau

22    of Prisons, the Defendant shall report -- excuse me you shall

23    report in person to the Probation Office in the district to

24    which you are released.  Unless you are deported.

25        A copy of Dr. Gregory's report shall be attached to this

1  transcript when the record is transmitted to the Bureau of
2  Prisons.  It is recommended by the Court that the Bureau of
3  Prisons place Dr. Su in a facility where she can receive
4  mental-health treatment.

5      While on supervised release, Dr. Su, you shall not commit
6  another federal, state or local crime; you shall comply with
7  the standard conditions that have been adopted by this Court,
8  except that the mandatory drug-testing provision is suspended;
9  and you shall comply with the following additional conditions.

10     First, you shall participate in a mental-health program --
11 a mental-health treatment program, as directed by your
12 Probation Officer.  You shall pay part or all of the costs of
13 that treatment, at an amount not to exceed the cost of
14 treatment, as deemed appropriate by your Probation Officer.
15 The payments shall never exceed the total cost of
16 mental-health counseling, and the actual co-payment schedule
17 shall be determined by the Probation Officer.

18     You shall abstain from the use of all alcoholic beverages.
19 You shall not maintain a position of fiduciary capacity
20 without the prior permission of your Probation Officer.  You
21 shall pay any restitution and special assessment that is
22 imposed by this judgment, and that remains unpaid at the
23 commencement of the term of supervised release.  You shall not
24 open any new lines of credit, or incur new debt without the
25 prior permission of the Probation Officer.

1    You shall provide your Probation Officer with access to

2  any financial information, including tax returns, and you

3  shall authorize the Probation Officer to conduct credit checks

4  and obtain copies of income tax returns.  You will be subject

5  to a search clause, pursuant to which you shall submit your

6  person, residence, office, vehicle, or any property under your

7  control to a search.

8    For sake of clarity, "residence" means anywhere you are

9  living, and "office" means anywhere you are working.

10    Such a search shall be conducted by a United States

11  Probation Officer at a reasonable time and in a reasonable

12  manner, based upon reasonable suspicion of contraband or

13  evidence of a violations of a condition of release.  Failure

14  to submit to such a search may be grounds for revocation.  And

15  you need to warn any residents where you're staying that those

16  premises are subject to search.

17    You shall not possess any false identification.  And you

18  shall provide your true identity at all times.  You shall

19  cooperate in the collection of DNA as directed by your

20  Probation Officer.

21    You shall not own or possess any firearms, ammunition,

22  destructive devices, or other dangerous weapons.  And I will

23  advise you that that is not only a condition of your

24  supervised release, but that you have now been convicted of a

25  felony, and that the possession of a firearm, destructive

1    devices or ammunition is a crime in every jurisdiction in the

2    United States, for which you could be separately punished.

3        I further order that you shall pay to the United States a

4    special assessment of $3,025, which shall be due immediately.

5        While you are incarcerated, the payment of criminal

6    monetary penalty is due during imprisonment at the rate of not

7    less than $25 per quarter.  And payment shall be through the

8    Bureau of Prisons Inmate Financial Responsibility Program.

9    The address for those payments will be contained in your

10   paperwork.

11       I find that you don't have the ability to pay a fine, and

12   I order the fine waived.

13       I further order that you pay restitution totaling

14   $904,198.84.  That restitution is owing to the student

15   charge-backs that are described in the presentence report.

16   And those amounts have not been contested.

17       That amount shall by due immediately to the following

18   victims in the following amounts:  To the victim PayPal, Inc.,

19   Attention Michael Rou, Global Regulatory Policy, 2211 North

20   First Street, San Jose California, 950131, restitution in the

21   amount of $595,111.

22       To the victim Total Merchant Services Inc., Attention

23   Director of Operations, 255 Gold River Road, Third Floor,

24   Basalt, Colorado, 81621, the amount of $309,087.84.

25       For a total restitution order of $904,198.84.

1    While you are incarcerated, payment of restitution is due

2  during imprisonment at the rate of not less than $25 per

3  quarter.  And payment shall be through the Bureau of Prisons

4  Inmate Financial Responsibility Program at an address that

5  will be contained in your paperwork.

6    With regard to the issue of forfeiture, the Court orders

7  that its preliminary order of forfeiture now be made final.

8  The Defendant's request for a stay of that order is denied.

9    Are there further matters the Court needs to take up?

10    **MR. RHYNE:**  Your Honor, there is one matter.  Excuse

11  me.  About a week ago, we got a revised restitution total from

12  Total Merchant Services.  I forwarded it to Probation.  And I

13  failed to raise it in this proceeding.

14    We did include the number in our sentencing memo.  It is

15  actually $420,684.64.  And, the evidence that we sent to

16  Probation is a detailed spreadsheet of that calculation of

17  loss.

18    And, that was my fault.  I apologize for not raising that

19  earlier, or noticing that it was in the original PSR.

20    **THE COURT:**  I think the Defendant is entitled to

21  consider that question on something other than a pop-quiz

22  basis.

23    **MR. RHYNE:**  (Nods head)

24    **THE COURT:**  So perhaps that matter, alone, need to be

25  set for separate hearing.

1       Mr. Jordan, would you like to respond?

2           **MR. JORDAN:**  Yes, Your Honor, this is -- you know,

3   getting -- at this point it's a little late.  So --

4           **THE COURT:**  What is the Court to do, Mr. Rhyne, this

5   morning, that doesn't include ordering that amount of

6   restitution from the bench?

7           **MR. RHYNE:**  I think that you can order the 309,000 at

8   this point, subject to us coming back after we are able to

9   review this.  And I should say I forwarded this as soon as we

10  got it.  I apologize for the late notice.

11          **THE COURT:**  That's all right.  I don't have any

12  problem implementing that request, and that is that the

13  Court's order of a moment ago will stand, and if the

14  government want to seek further relief it obviously has the

15  right to do that.

16      Further matters to be taken up this morning?

17          **MR. JORDAN:**  Yes, Your Honor.  Just briefly, we would

18  note our objection to your forfeiture order.

19          **THE COURT:**  Oh.  Actually, you reminded me of

20  something.  And I'm going to want to hear from the government

21  about this.

22      Oh, I had a copy of my preliminary order in my hand, but I

23  must have left it in chambers.

24      The issue is this:  The forfeiture order rests on

25  alternate grounds.  As to the first ground, there is no issue.

1    The second ground is: The use of the properties for the
2   -- oh, never mind. Well, let me say -- and I'll invite both
3   Counsel to comment on this -- and Mr. Jordan, I see you have a
4   copy of the order there.
5          **MR. JORDAN:** Yes.
6          **THE COURT:** That would be a courtesy to the Court if
7   I could just borrow it. Thank you.
8          (Document handed up to the Court)
9          **THE COURT:** This paragraph -- and I'm addressing
10  myself to Page 4 at Lines 4 through 14. I think the Defendant
11  did use the properties at 405 Boulder Court to facilitate her
12  crime. But, I think not exactly in the way that perhaps this
13  paragraph describes.
14   As I said earlier, the basis of my belief that the
15  evidence with regard to these counts was adequate really isn't
16  so much simply the provision of employment. It was all the
17  other things that Dr. Su did. Now, she used Suite 700 and 800
18  to do all those things.
19   So, I think that those properties were used to facilitate
20  her crimes of alien harboring. It's from these properties,
21  for example, that she generated all of this fraudulent
22  paperwork, and that sort of thing. So the adjustment is a
23  minor one.
24   But, I want to ask Counsel if, based on that statement on
25  the Record, the Court believed -- that either counsel thinks

85

```
 1    the Court needs to do anything further before reducing this to
 2    a final order of forfeiture, understanding that the Defendant
 3    objects to the reduction to a final order at all.
 4        Mr. Countryman?
 5        MR. COUNTRYMAN:  No, Your Honor, that comports with
 6    the government's understanding.
 7        Just one sort of language question, to have a final order
 8    of forfeiture, the government still needs to publish to allow
 9    third parties to claim.  So it becomes final as to Defendant
10    Su, but it's not a final order of forfeiture per se.
11        THE COURT:  Yes.  I saw that in the statute earlier
12    this morning.  Does that require that we set a further date
13    here?  Or is this Court simply --
14        MR. COUNTRYMAN:  (Shakes head)
15        THE COURT:  Okay.
16        MR. COUNTRYMAN:  Third-party claimants could file
17    petitions.  I think there could be an ancillary proceeding
18    where those third-party petitions are resolved.  But -- and
19    unless and until that happens, there is no further date that
20    needs to be set, Your Honor.
21        THE COURT:  I see.  All right.
22        Mr. Jordan, any further comment on that point?
23        MR. JORDAN:  No, Your Honor.  Just that we have our
24    objection on the Record.
25        THE COURT:  Very good.  Dr. Su, you are remanded into
```

1 the custody --

2   **MR. JORDAN:** Your Honor I'm sorry. Sorry, I had two

3 or three other ancillary requests.

4   **THE COURT:** Yes.

5   **MR. JORDAN:** Of course --

6  (Reporter interruption)

7   **MR. JORDAN:** Of course, mental-health treatment is

8 the biggest priority. But if that could be ordered to a

9 facility closest to her family so they could visit her, if

10 Dublin is appropriate, we would make that recommendation.

11   **THE COURT:** The Court recommends to the Bureau of

12 Prisons that the Defendant, Dr. Su, be designated to the

13 closest facility to the Bay area consistent with her

14 classification, to facilitate visitation with her family

15 members, including her two daughters.

16   **MR. JORDAN:** And then finally, my last request is

17 that Your Honor consider recommending her placement in RDAP.

18 She does have an alcohol issue. Your Honor just ordered her

19 not to use alcohol at all during her supervised release. And

20 I think the program would help her now, and help her comply

21 with that requirement when she's released.

22   **THE COURT:** The Court will recommend to the Bureau of

23 Prisons that Dr. Su participate in the RDAP program, and that

24 she be designated to a facility that offers that program.

25   **MR. JORDAN:** Thank you, Your Honor.

1    **PROBATION OFFICER GOLDSBERRY:** Your Honor, out of an

2    abundance of caution, I wonder if we could go through the

3    custody sentence one more time a little slower, to ensure we

4    don't hit any of the stat maxes on any of the counts.

5        **THE COURT:** Okay. This is not a statement of the

6    imposition of sentence. This is the Court's recollection of

7    what it said earlier.

8        My recollection of what I said earlier is that I imposed a

9    sentence of 198 months on Counts 1 through 14. Sixty months

10   on Counts 15 through 19, which is different from the counts

11   that you listed in your probation report.

12       **PROBATION OFFICER GOLDSBERRY:** Exactly. That is what

13   threw me off.

14       **THE COURT:** And I think I did that after checking the

15   indictment.

16       **PROBATION OFFICER GOLDSBERRY:** Okay.

17       **THE COURT:** But if you think I made an error, this is

18   a great time to tell me.

19       **PROBATION OFFICER GOLDSBERRY:** I think you're okay.

20       **THE COURT:** It's different on purpose. 188 months on

21   Counts 20 through 21, 22 --

22       **PROBATION OFFICER GOLDSBERRY:** Your Honor, I have 20

23   and --

24       **MR. JORDAN:** 21 has a five-year max.

25       **PROBATION OFFICER GOLDSBERRY:** Both 20 and 21 are

1     five-year statutory maxes.

2           **THE COURT:**  Oh, I see what I did.  Yes, no, I made a

3     mistake in this transposition.  So I need to correct my

4     earlier statement.

5           Sixty months applies to Counts -- 60 months applies to

6     Counts -- it does apply -- 60 months applies to Counts 15

7     through 19, 20 and 21.  I see the error that I made.

8           **MR. JORDAN:**  So Your Honor, 15 through 21, 60 months.

9           **PROBATION OFFICER GOLDSBERRY:**  No, 15 through 19 --

10          **THE COURT:**  15 through 19.

11          **PROBATION OFFICER GOLDSBERRY:**  Yes, 20 and 21.

12          **THE COURT:**  And 20 and 21.  That's right.  And then,

13    188 months on Counts 22, 24, 26, 27, 29, 31, 32, 34, 35.

14          **MR. JORDAN:**  But Your Honor, I think 20 and 24 are

15    ten-year maximums.

16          **PROBATION OFFICER GOLDSBERRY:**  That's correct.  20

17    and 24 are ten years.  20 -- 27, 29, 31, 32, 34, 35 are 120.

18          **THE COURT:**  I think the safest thing to do is simply

19    with regard to the counts other than 1 through 14, simply to

20    adopt the Probation Department's recommendation.  And that's

21    what the Court will do.  And therefore, I will now restate the

22    sentence, for the sake of clarity.

23          Dr. Su is committed to the custody of the Bureau of

24    Prisons to be imprisoned for a term of 198 months.  This term

25    consists of 198 months on Counts 1 through 14; 60 months on

1    Counts 15 through -- excuse me, 15, 20, and 21; 120 months on

2    Counts 16 through 19, 22, 24, 26, 27, 29, 31, 32, 34 and 35;

3    and 12 months on Count 25, all counts to be served

4    concurrently.

5              **PROBATION OFFICER GOLDSBERRY:**  Thank you.

6              **THE COURT:**  I appreciate very much the correction.

7        Anything else?

8              **MR. JORDAN:**  No, Your Honor.

9              **MR. RHYNE:**  Submitted, Your Honor.

10             **THE COURT:**  Thank you.

11             **THE CLERK:**  All rise.

12       Court is now in recess.

13       (Conclusion of Proceedings)

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball *Belle Ball*

Monday, December 15, 2014

Belle Ball, CSR 8785, CRR, RDR