No. 14-10499

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———

UNITED STATES OF AMERICA,

Appellee,

v.

SUSAN XIAO-PING SU,

Appellant.

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

(D.C. No. CR 11-0288-JST)

---

APPELLANT'S EXCERPTS OF RECORD

VOLUME II

---

JOHN J. JORDAN (Cal. Bar No. 175678)
400 Montgomery St. Ste. 200
San Francisco, CA 94104
Tel: (415) 391-4814
FAX: (415) 391-4308

Attorney for Defendant-Appellee
SUSAN XIAO-PING SU

**ITEM**                                                          **PAGE**

1.  Indictment  .................................... 151

2.  Su's Motion to Dismiss Indictment  ............ 172

3.  Government's Opposition to Motion to Dismiss  . 181

4.  Superseding Indictment  ....................... 182

5.  Government's Application for a Preliminary
    Order of Forfeiture  .......................... 205

6.  Su's Fed. R. Crim. P. 29(c) Motion  ........... 219

7.  Su's Fed. R. Crim. P. 33 Motion  .............. 249

8.  Su's Notice of Objection and Request for Stay
    of Government's Application for a Preliminary
    Order of Forfeiture  .......................... 272

9.  Government's Opposition to Rule 33 motion  .... 274

10. Government's Opposition to Rule 29(c) motion  . 284

11. Su's Reply re Fed. R. Crim. P. 29(c) Motion  .. 310

12. Su's Reply re Fed. R. Crim. P. 33 Motion  ..... 320

13. Government's Sentencing Memorandum  ........... 327

14. Su's Sentencing Memorandum and Exhibits  ...... 357

15. Amended Notice of Appeal  ..................... 397

16. Judgment and Commitment  ...................... 399

District Court Docket Sheet ...................... 407

Case4:11-cr-00288-JST Document1 Filed04/28/11 Page1 of 21

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT
☐ SUPERSEDI~~NG~~

| Name of District Court, and/or Judge/Magistrate Location |
| --- |
| ~~NORT~~HERN DISTRICT OF CALIFORNIA |
| OAKLAND DIVISION |

— OFFENSE CHARGED —

See Attachment.

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: See Attachment.

┌─ DEFENDANT - U.S. ─────────────┐
│ ► SUSAN SU │
│ *FILED* │
│ *APR 28 2011* │
│ RICHARD W. WIEKING │
│ DISTRICT COURT NUMBER CLERK, U.S. DISTRICT COURT │
│ NORTHERN DISTRICT OF CALIFORNIA │
│ (OAKLAND) │
│ **CR11-00288** SBA │
└────────────────────────────────┘

─── PROCEEDING ───

Name of Complaintant Agency, or Person (& Title, if any)

**Immigration and Customs Enforcement**

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE }

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }

Name and Office of Person Furnishing Information on this form    MELINDA HAAG

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    HARTLEY M.K. WEST, AUSA
WADE M. RHYNE, AUSA

─── DEFENDANT ───

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ►

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

IS IN CUSTODY
4) ☐ On this charge

5) ☐ On another conviction } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer ☐ Yes    If "Yes" give date filed
been filed?  ☐ No

DATE OF ARREST    Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY    Month/Day/Year ►

☐ This report amends AO 257 previously submitted

─── ADDITIONAL INFORMATION OR COMMENTS ───

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: _____

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____    Before Judge: _____

Comments:

**0151**

## PENALTY SHEET ATTACHMENT
## DEFENDANT SUSAN SU

<u>COUNTS ONE THROUGH TEN</u>: (18 U.S.C. §§ 1343 & 2 – Wire Fraud; Aiding and Abetting)

<u>PENALTY</u>:   <u>Statutory Penalty Generally</u>:

| | |
|---|---|
| Imprisonment: | Maximum 20 Years |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 5 Years |
| Special Assessment: | Mandatory $100 |

<u>COUNTS ELEVEN AND TWELVE</u>: (18 U.S.C. §§ 1341 & 2 – Mail Fraud; Aiding and Abetting)

<u>PENALTY</u>:   Same as Counts One through Ten.

<u>COUNT THIRTEEN</u>: (18 U.S.C. § 371 – Conspiracy to Commit Visa Fraud)

| | | |
|---|---|---|
| <u>PENALTY</u>: | Imprisonment: | Maximum 5 Years |
| | Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| | Supervised Release: | Maximum 1 Year |
| | Special Assessment: | Mandatory $100 |

<u>COUNT FOURTEEN THROUGH SEVENTEEN</u>: (18 U.S.C. §§ 1546(a) & 2 – Visa Fraud; Aiding and Abetting)

| | | |
|---|---|---|
| <u>PENALTY</u>: | Imprisonment: | Maximum 10 Years |
| | Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| | Supervised Release: | Maximum 3 Years |
| | Special Assessment: | Mandatory $100 |

<u>COUNT EIGHTEEN</u>: (18 U.S.C. §§ 1001(a)(3) & 2 – Use of False Document; Aiding and Abetting)

| | | |
|---|---|---|
| <u>PENALTY</u>: | Imprisonment: | Maximum 5 Years |
| | Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |

Supervised Release:     Maximum 3 Years
Special Assessment:     Mandatory $100

COUNT NINETEEN: (18 U.S.C. §§ 1001(a)(2) & 2 – False Statements to a Government
            Agency; Aiding and Abetting)

PENALTY:    Same as ~~Counts One through~~ Eighteen.

COUNTS TWENTY THROUGH TWENTY-TWO: (8 U.S.C. §§ 1324(a)(1)(A)(iii),
                        1324(a)(1)(A)(v)(II), 1324(a)(1)(B)(I) –
                        Alien Harboring)

PENALTY:    Imprisonment:       Maximum 10 Years
            Fine:               Maximum $250,000 or an amount equal to
                                twice the amount pecuniary gain or loss.
            Supervised Release: Maximum 3 Years
            Special Assessment: Mandatory $100

COUNT TWENTY-THREE: (18 U.S.C. §§ 1030(a)(3) & 2 – Unauthorized Access of a
            Government Computer; Aiding and Abetting)

PENALTY:    Statutory Penalty Generally:

            Imprisonment:       Maximum 1 Year
            Fine:               Maximum $250,000 or an amount equal to
                                twice the amount pecuniary gain or loss.
            Supervised Release: Maximum 1 Year
            Special Assessment: Mandatory $100

COUNTS TWENTY-FOUR THROUGH THIRTY-THREE: (18 U.S.C. §§ 1957(a) & 2 –
                        Money Laundering; Aiding and
                        Abetting)

PENALTY:    Imprisonment:       Maximum 10 Years
            Fine:               Maximum $250,000 or an amount equal to
                                twice the amount pecuniary gain or loss, or
                                twice the amount of the criminally derived
                                property involved in the transaction.
            Supervised Release: Maximum 3 Years
            Special Assessment: Mandatory $100

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

VENUE: Oakland



FILED

APR 2 8 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

### UNITED STATES OF AMERICA,

### V.

SUSAN SU,

# CR11-00288   SBA

### DEFENDANT.

---

INDICTMENT

18 U.S.C. § 1343–Wire Fraud; 18 U.S.C. § 134 –Mail Fraud;18 U.S.C. § 371
–Conspiracy to Commit Visa Fraud; 18 U.S.C. § 1546(a)–Visa Fraud; 18
U.S.C. § 1001(a)(3)–Use of a False Document; 18 U.S.C.
§ 1001(a)(2)–False Statement to a Government Agency; 8 U.S.C. § 1324(a)
(1)(A)–Alien Harboring; 18 U.S.C. § 1030(a)(3)–Unauthorized Access to a
Government Computer; 18 U.S.C. § 1957–Money Laundering; 18 U.S.C. § 2
– Aiding and Abetting; 18 U.S.C. § 982(a)(6)(A)(ii)–Visa Fraud Forfeiture;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)–Mail Fraud, Wire Fraud,
and Alien Harboring Forfeiture; 18 U.S.C.
§ 982(a)(1) – Money Laundering Forfeiture

---

A true bill.

_____ Foreman

Filed in open court this  28  day of April 2011

_____ Clerk
Ivy L. Garcia   4/28/11

Bail $   no bail warrant

Document No.

District Court
Criminal Case Processing

1 MELINDA HAAG (CABN 132612)
United States Attorney

2

**FILED**

3

APR 2 8 2011

4

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

5

6

7

8 UNITED STATES DISTRICT COURT

9 NORTHERN DISTRICT OF CALIFORNIA

10 OAKLAND DIVISION

11 **CR11-00288** S B A

12 No.

13 UNITED STATES OF AMERICA,

14   Plaintiff,

15   v.

16

17 SUSAN XIAO-PING SU,

18   Defendant.

VIOLATIONS: 18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1341 – Mail Fraud; 18 U.S.C. § 371
– Conspiracy to Commit Visa Fraud; 18 U.S.C.
§ 1546(a) – Visa Fraud; 18 U.S.C. § 1001(a)(3)
– Use of a False Document; 18 U.S.C.
§ 1001(a)(2) – False Statement to a Government
Agency; 8 U.S.C. § 1324(a)(1)(A) – Alien
Harboring; 18 U.S.C. § 1030(a)(3) –
Unauthorized Access to a Government
Computer; 18 U.S.C. § 1957 – Money
Laundering; 18 U.S.C. § 2 – Aiding and
Abetting; 18 U.S.C. § 982(a)(6)(A)(ii) – Visa
Fraud Forfeiture; 18 U.S.C. § 981(a)(1)(C) and
28 U.S.C. § 2461(c) – Mail Fraud, Wire Fraud,
and Alien Harboring Forfeiture; 18 U.S.C.
§ 982(a)(1) – Money Laundering Forfeiture

OAKLAND VENUE

23 INDICTMENT

24 The Grand Jury charges:

25 BACKGROUND

26   At all times relevant to this Indictment:

27   1.   Defendant SUSAN XIAO-PING SU was the founder, Chief Executive Officer,

28 and President of Tri-Valley University (TVU), located at 4455 Stoneridge Drive, and then at 405

INDICTMENT

1    Boulder Court, Suites 700 and 800, both in Pleasanton, California.  SU also resided in

2    Pleasanton, California.

3         2.      TVU's course catalog described the school as "a Christian higher education

4    institution aiming to offer quality higher education in Engineering, Business and Ministry."  SU

5    established a bank account for TVU at Wells Fargo Bank, account number ending -0454, and

6    maintained signature authority over that account.

7         3.      SU established a web domain name, trivalleyuniversity.org, and email accounts

8    for TVU using the trivalleyuniversity.org domain, through a web hosting provider called

9    HostMonster located in East Provo, Utah.  All emails to and from this domain name route

10    through a server in East Provo, Utah.

11                       STUDENT VISA PROGRAM

12         4.      The Immigration and Nationality Act, Title 8, United States Code, Section 1101,

13    identifies several categories of foreign nationals who may be admitted to the United States for

14    nonimmigrant purposes.  One such category, designated "F-1" based on the applicable statutory

15    subsection, comprises bona fide students coming temporarily to study at an approved school.

16         5.      Students entering the United States on a F-1 visa are admitted for a temporary

17    period called "duration of status," which federal regulations define as the time during which the

18    student is pursuing a full course of study at an approved school.  When a student stops pursuing a

19    full course of study, the duration of status ends and the temporary period for which the individual

20    was admitted expires.

21         6.      A school seeking approval to admit foreign students must submit a Petition for

22    Approval of School for Attendance by Nonimmigrant Student, also called a Form I-17, to the

23    United States Department of Homeland Security (DHS), Student and Exchange Visitor Program

24    (SEVP) in Washington, DC.  Through the I-17, the school must establish that (1) it is a bona fide

25    school; (2) it is an established institution of learning; (3) it has the necessary facilities, personnel,

26    and finances to instruct recognized courses; and (4) it actually is engaged in instructing those

27    courses. An unaccredited school must also provide "articulation agreements" establishing that its

28    courses have been and are unconditionally accepted to at least three accredited institutions of

INDICTMENT                2

1  higher learning.

2        7.    The school's I-17 must identify "Designated School Officials" (DSOs), who

3  certify their knowledge of and intent to comply with student immigration laws and regulations.

4  Once a school is approved, its DSOs are issued login IDs and passwords enabling them to access

5  the Student and Exchange Visitor Information System (SEVIS).  SEVIS is a nonpublic computer

6  system located in Rockville, Maryland, which is used by the United States government and

7  operated through SEVP for the purpose of collecting nonimmigrant student information from

8  approved schools and monitoring such aliens' status.  Upon login, a pop-up warning banner

9  advises the user that SEVIS is a Privacy Act system of records for authorized users only, and that

10  use evidencing possible criminal activity may be reported to law enforcement.

11        8.    To enter the United States on a student visa, a foreign national must present a

12  Certificate of Eligibility for Nonimmigrant (F-1) Student Status, also known as a Form I-20,

13  which is printed from SEVIS.  An "initial I-20" certifies that the student has been accepted for

14  enrollment in a full course of study, and is signed by a DSO.  The school activates the student's

15  SEVIS record and prints an "active I-20" after the student arrives and begins making normal

16  progress toward a full course of study, with physical attendance as an element.  The school's

17  DSOs are required to report in SEVIS within 21 days the failure of any student to maintain active

18  status.

19                    THE SCHEME TO DEFRAUD

20        9.    From in or about September 2008 through on or about January 19, 2011, in the

21  Northern District of California and elsewhere, defendant

22                    SUSAN XIAO-PING SU

23  and others engaged in an illegal scheme to defraud the United States by submitting fraudulent

24  documents to DHS in support of TVU's petition for approval to admit foreign students and, after

25  having obtained such approval, fraudulently issuing visa-related documents to aliens in exchange

26  for tuition and fees.

27        10.    As part of the scheme to defraud, SU and others caused TVU to submit a Form I-

28  17 to admit foreign students, along with revisions, supplements, and attachments, to SEVP in

INDICTMENT                  3

1    Washington, DC.  These submissions contained materially false representations regarding TVU's

2    administrators, instructors, and articulation agreements, as well as materially false promises by

3    TVU's DSOs to comply with all federal regulations regarding nonimmigrant students.

4         11.    As a further part of the scheme to defraud, after TVU received SEVP approval to

5    admit F-1 students, SU and others recruited and admitted aliens as TVU students without regard

6    to their academic qualifications or intent to pursue a full course of study.

7         12.    As a further part of the scheme to defraud, SU and others caused TVU student-

8    employees to access DSOs' SEVIS accounts to enter data concerning TVU students, and to

9    create SEVIS entries according to SU's instructions.  Many of these SEVIS entries contained

10   materially false representations regarding the applicant's residence, means of support, course of

11   study, and purpose of entry, among other things.  SU then signed the printed I-20s from SEVIS,

12   forging the signature of the DSO from whose account the form was printed.

13        13.    As a further part of the scheme to defraud, SU and others made materially false

14   representations and submitted materially false documents to DHS agents, who are routinely

15   tasked with contacting SEVP-approved schools to verify the F-1 status of nonimmigrants in the

16   United States or seeking to reenter the country.  In response to such requests for verification, SU

17   and others repeatedly provided materially false I-20s, letters of good standing, transcripts, and

18   attendance records.  Similarly, during DHS site visits, SU made materially false representations

19   regarding TVU's classes, instructors, DSOs, office staff, and school policies.

20        14.    As a further part of the scheme to defraud, SU and others collected tuition and

21   other payments from aliens in exchange for maintaining them in active F-1 status.  SU paid a

22   percentage of these fees to recruiters as commissions for referrals of new alien students.

23

24   COUNTS ONE THROUGH TEN: (18 U.S.C. §§ 1343 & 2 – Wire Fraud; Aiding and Abetting)

25        15.    Paragraphs 1 through 14 of this Indictment are hereby re-alleged and

26   incorporated by reference as if set forth in full herein.

27        16.    From in or about September 2008 through on or about January 19, 2011, in the

28   Northern District of California and elsewhere, for the purpose of executing a scheme and artifice

INDICTMENT                                    4

1  to defraud as to a material matter, and for obtaining money and property by means of materially

2  false and fraudulent pretenses, representations, promises, and omissions, defendant

3  SUSAN XIAO-PING SU

4  did knowingly cause to be transmitted the following wire communications in interstate and

5  foreign commerce:

| Count | Approx. Date | From | To | Description of Wire |
|-------|--------------|------|-----|---------------------|
| 1 | 9/15/08 | Pleasanton, CA | SEVIS | Electronic submission of original Form I-17 |
| 2 | 2/21/09 | TVU | HostMonster | Email from SU re: recruiting Indian students |
| 3 | 7/27/10 | TVU | SEVIS | SEVIS entry for S.A. |
| 4 | 7/27/10 | TVU | SEVIS | SEVIS entry for K.D. |
| 5 | 8/31/10 | TVU | SEVIS | SEVIS entry for M.R. |
| 6 | 9/7/10 | TVU | SEVIS | SEVIS entry for R.B. |
| 7 | 9/20/10 | TVU | HostMonster | Email from SU containing I-20, transcripts, and letter of good standing for S.A. |
| 8 | 9/24/10 | TVU | HostMonster | Email from SU containing I-20, transcripts, and letter of good standing for K.D. |
| 9 | 1/7/11 | TVU | HostMonster | Email from SU containing I-20, transcript, and enrollment verification for M.R. |
| 10 | 1/7/11 | TVU | HostMonster | Email from SU containing I-20, transcript, attendance sheets, and enrollment verification for R.B. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS ELEVEN AND TWELVE: (18 U.S.C. §§ 1341 & 2 – Mail Fraud; Aiding and Abetting)

17.     Paragraphs 1 through 14 of this Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

18.     From in or about September 2008 through on or about January 19, 2011, in the

INDICTMENT                                          5

1  Northern District of California and elsewhere, for the purpose of executing a scheme and artifice

2  to defraud as to a material matter, and for obtaining money and property by means of materially

3  false and fraudulent pretenses, representations, promises, and omissions, defendant

4  SUSAN XIAO-PING SU

5  did knowingly cause the following items to be delivered by mail according to the directions

6  thereon:

| Count | Approx. Date | Description of Mailing |
|-------|--------------|------------------------|
| 11 | 12/23/08 | Revised Form I-17 and accompanying documents, including DSO verification letter, from SU to SEVP |
| 12 | 2/10/09 | Three articulation agreements in support of TVU's Form I-17 from SU to SEVP |

12      All in violation of Title 18, United States Code, Sections 1341 and 2.

14  COUNT THIRTEEN: (18 U.S.C. § 371 – Conspiracy to Commit Visa Fraud)

15      19.     Paragraphs 1 through 14 of this Indictment are hereby re-alleged and

16  incorporated by reference as if set forth in full herein.

17      20.     Beginning in or about February 2009 and continuing through on or about January

18  19, 2011, in the Northern District of California and elsewhere, defendant

19  SUSAN XIAO-PING SU

20  and others did knowingly and willfully conspire to execute and attempt to execute a material

21  scheme to commit offenses against the United States, namely forging and falsely making

22  documents prescribed by statute and regulation for entry into and as evidence of authorized stay

23  in the United States, specifically, Forms I-20, in violation of Title 18, United States Code,

24  Section 1546(a).

25  OVERT ACTS

26      21.     In furtherance of the conspiracy and to effect the objects of that conspiracy, in the

27  Northern District of California and elsewhere, SU and others committed the acts alleged in

28  Paragraphs 1 through 14 of this Indictment, and the following additional overt acts:

INDICTMENT                                  6

1          a.     On or about February 21, 2009, SU sent an email to an unindicted co-
2    conspirator regarding recruiting students from India.

3          b.     On or about April 30, 2010, TVU issued a $945 check, drawn on TVU's
4    Wells Fargo Bank account -0454, as a commission payment to an unindicted co-conspirator for
5    recruiting an alien student.

6          c.     On or about July 27, 2010, SU falsely signed another DSO's name on a
7    Form I-20 for S.A.

8          d.     On or about July 27, 2010, SU falsely signed another DSO's name on a
9    Form I-20 for K.D.

10         e.     On or about September 7, 2010, SU falsely signed another DSO's name on
11   a Form I-20 for R.B.

12         f.     On or about January 7, 2011, SU falsely told a DHS agent that M.R.
13   attended a TVU class that she taught.

14         All in violation of Title 18, United States Code, Section 371.

15   COUNT FOURTEEN THROUGH SEVENTEEN: (18 U.S.C. §§ 1546(a) & 2 – Visa Fraud;
16                                        Aiding and Abetting)

17         22.    Paragraphs 1 through 14 of this Indictment are hereby re-alleged and
18   incorporated by reference as if set forth in full herein.

19         23.    Between in or about February 2009 and on or about January 19, 2011, in the
20   Northern District of California and elsewhere, defendant

21                              SUSAN XIAO-PING SU

22   did knowingly forge and falsely make a document prescribed by statute and regulation for entry
23   into and as evidence of an authorized stay in the United States, specifically a Form I-20 for the
24   following individuals, and did knowingly use, attempt to use, possess, obtain, and receive such
25   document, knowing it to be forged, falsely made, and procured by means of a false claim and
26   statement, and to have been otherwise procured by fraud and unlawfully obtained:

27   / / /
28   / / /

INDICTMENT                              7

| Count | Approx. Date | Name |
|-------|--------------|------|
| 14    | 7/27/10      | S.A. |
| 15    | 7/27/10      | K.D. |
| 16    | 8/31/10      | M.R. |
| 17    | 9/7/10       | R.B. |

All in violation of Title 18, United States Code, Sections 1546(a) and 2.

COUNT EIGHTEEN: (18 U.S.C. §§ 1001(a)(3) & 2 – Use of False Document; Aiding and Abetting)

24.     Paragraphs 1 through 14 of this Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

25.     On or about September 24, 2010, in the Northern District of California and elsewhere, defendant

SUSAN XIAO-PING SU

did knowingly make and use a false document knowing it to contain a materially false, fictitious, and fraudulent statement, in a matter within the jurisdiction of the executive branch of the United States, by emailing three false documents to a DHS Special Agent, while in the course of the agent's duties, including a materially false TVU transcript for K.D., in violation of Title 18, United States Code, Sections 1001(a)(3) and 2.

COUNT NINETEEN: (18 U.S.C. §§ 1001(a)(2) & 2 – False Statements to a Government Agency; Aiding and Abetting)

26.     Paragraphs 1 through 14 of this Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

27.     On or about January 7, 2011, in the Northern District of California and elsewhere, defendant

SUSAN XIAO-PING SU

did knowingly and willfully make a materially false, fictitious, and fraudulent statement in a matter within the jurisdiction of the executive branch of the United States, by stating to a DHS Special Agent, while in the course of the agent's duties, that M.R. had attended a class that SU

INDICTMENT                          8

1    had taught at Tri-Valley University, despite knowing that M.R. had never attended such class, in

2    violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

3

4    COUNTS TWENTY THROUGH TWENTY-TWO: (8 U.S.C. §§ 1324(a)(1)(A)(iii),
                                          1324(a)(1)(A)(v)(II), 1324(a)(1)(B)(i) –
5                                          Alien Harboring)

6        28.    Paragraphs 1 through 14 of this Indictment are hereby re-alleged and

7    incorporated by reference as if set forth in full herein.

8        29.    Between in or about February 2009 and on or about January 19, 2011, in the

9    Northern District of California and elsewhere, defendant

10                           SUSAN XIAO-PING SU

11   knowingly and in reckless disregard of the fact that the following aliens had unlawfully come to,

12   entered, and remained in the United States, did conceal, harbor, and shield such aliens from

13   detection, and attempt to conceal, harbor, and shield such aliens from detection, through

14   employment at TVU for the purpose of commercial advantage and private financial gain:

15

16   | Count | Name |
     |-------|------|
17   | 20    | V.D. |
     | 21    | T.T. |
18   | 22    | A.D. |

19

20       All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii),

21   1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i).

22
     COUNT TWENTY-THREE: (18 U.S.C. §§ 1030(a)(3) & 2 – Unauthorized Access of a
23                                       Government Computer; Aiding and Abetting)

24       30.    Paragraphs 1 through 14 of this Indictment are hereby re-alleged and incorporated

25   by reference as if set forth in full herein.

26       31.    Between in or about February 2009 and on or about January 19, 2011, in the

27   Northern District of California and elsewhere, defendant

28                           SUSAN XIAO-PING SU

INDICTMENT                          9

0163

1  did knowingly, intentionally, and without authorization, access a nonpublic computer of a

2  department and agency of the United States, specifically DHS's SEVIS, which is used by and for

3  the Government of the United States and such conduct affects that use by and for the

4  Government of the United States, in violation of Title 18, United States Code, Sections

5  1030(a)(3) and 2.

6

7  COUNTS TWENTY-FOUR THROUGH THIRTY-THREE: (18 U.S.C. §§ 1957(a) & 2 –
8                                                                          Money Laundering; Aiding and
                                                                           Abetting)

9      32.    Paragraphs 1 through 14 of this Indictment are hereby re-alleged and incorporated

10  by reference as if set forth in full herein.

11     33.    Between in or about November 2009 and in or about December 2010, in the

12  Northern District of California and elsewhere, defendant

13                           SUSAN XIAO-PING SU

14  did knowingly engage in the following monetary transactions, in and affecting interstate

15  commerce, in criminally derived property of a value greater than $10,000, that was derived from

16  specified unlawful activity, namely visa fraud in violation of Title 18, United States Code,

17  Section 1546(a), and did aid and abet the same.

| Count | Approx. Date | Description of Transaction |
|-------|--------------|----------------------------|
| 24 | 11/28/09 | $36,783.61 check (#1037) drawn on Wells Fargo Bank account -0454 used to purchase 2009 Mercedes Benz (VIN: WDDGF54X79R073026) |
| 25 | 2/25/10 | $78,700 wire transfer from Wells Fargo Bank account -0454 to Fidelity National Title Escrow for purchase of 1087 Murrieta Boulevard, #133, in Livermore, CA |
| 26 | 4/2/10 | $50,000 check (#1144) drawn on Wells Fargo Bank account -0454 paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 800, in Pleasanton, CA |
| 27 | 4/9/10 | $160,986.87 cashier's check purchased with funds from Wells Fargo Bank account -0454, paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 800, in Pleasanton, CA |
| 28 | 6/10/10 | $50,000 check (#1014) drawn on Wells Fargo Bank account -0454 paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 700, in Pleasanton, CA |

INDICTMENT                              10

0164

| 29 | 7/8/10 | $261,307.49 cashier's check purchased with funds from Wells Fargo Bank account -0454, paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 700, in Pleasanton, CA |
|----|--------|---|
| 30 | 7/20/10 | $700,000 cashier's check purchased with funds from Wells Fargo Bank account -3640, paid to Placer Title Company escrow account for purchase of 2890 Victoria Ridge Court in Pleasanton, CA |
| 31 | 7/20/10 | $122,990.90 cashier's check purchased with funds from Wells Fargo Bank accounts -4780 and -0454, paid to Placer Title Company escrow account for purchase of 2890 Victoria Ridge Court in Pleasanton, CA |
| 32 | 12/15/10 | $600,000 wire transfer from Wells Fargo Bank account -4780 to Prominent Escrow Services, Inc. for purchase of 1371 Germano Way in Pleasanton, CA |
| 33 | 12/15/10 | $1,200,000 wire transfer from CitiBank account -3045 to Prominent Escrow Services, Inc. for purchase of 1371 Germano Way in Pleasanton, CA |

All in violation of Title 18, United States Code, Sections 1957(a) and 2.

FIRST FORFEITURE ALLEGATION: (18 U.S.C. § 982(a)(6)(A)(ii) – Visa Fraud Forfeiture)

34.     Paragraphs 1 through 14 and 19 through 23 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(6)(A)(ii).

35.     Upon conviction of an offense set forth in Counts 13 through 17 of this Indictment, a violation of Title 18, United States Code, Section 1546(a) or conspiracy to violate the same, defendant

SUSAN XIAO-PING SU

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(6)(A)(ii), any property, real or personal (I) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of conviction; or (II) that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of conviction. The property to be forfeited includes, but is not limited to, the following:

INDICTMENT                              11

0165

1         a.    approximately $63,317.59 from Wells Fargo account ending in 9937;

2         b.    approximately $3,000.18 from Wells Fargo account ending in 6782;

3         c.    approximately $100.00 from Wells Fargo account ending in 2773;

4         d.    approximately $7,526.98 from Citibank account ending in 3045;

5         e.    approximately $934,058.04 from PayPal account ending in 1921;

6         f.    approximately $15,184.71 from Wells Fargo account ending in 3640;

7         g.    approximately $338,319.07 from Wells Fargo account ending in 4780;

8         h.    approximately $227,439.98 from Wells Fargo account ending in 0454;

9         i.    approximately $30,000.00 from Citibank account ending in 5029;

10        j.    approximately $30,000.00 from Citibank account ending in 3045;

11        k.    405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN

12            946-4547-297), Pleasanton, California;

13        l.    2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018);

14        m.    1371 Germano Way in Pleasanton, California (APN 950-29-18);

15        n.    1087 Murrieta Boulevard #133, Livermore, California (APN

16            097-0085-132); and

17        o.    2009 Mercedes Benz (VIN: WDDGF54X79R073026).

18     36.   If any of the property described above, as a result of any act or omission of the

19  defendant:

20        a.    cannot be located upon the exercise of due diligence;

21        b.    has been transferred or sold to, or deposited with, a third party;

22        c.    has been placed beyond the jurisdiction of the court;

23        d.    has been substantially diminished in value; or

24        e.    has been commingled with other property which cannot be divided

25            without difficulty,

26  the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

27  States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

28     All pursuant to 18 U.S.C. § 982(a)(6)(A)(ii).

INDICTMENT             12

1  SECOND FORFEITURE ALLEGATION: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) –
   Wire and Mail Fraud Forfeiture)
2
3      37.    Paragraphs 1 through 18 of this Indictment are hereby realleged and incorporated
4  by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code,
5  Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).
6      38.    Upon conviction of an offense set forth in Counts 1 through 12 of this Indictment,
7  a violation of Title 18, United States Code, Sections 1341 and 1343, defendant
8                             SUSAN XIAO-PING SU
9  shall forfeit to the United States, pursuant to Title 18, United States Code, Section § 981(a)(1)(C)
10 and Title 28, United States Code, Section § 2461(c), any property, real or personal that
11 constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from
12 the commission of the offense of conviction. The property to be forfeited includes, but is not
13 limited to, the following:
14      a.    approximately $63,317.59 from Wells Fargo account ending in 9937;
15      b.    approximately $3,000.18 from Wells Fargo account ending in 6782;
16      c.    approximately $100.00 from Wells Fargo account ending in 2773;
17      d.    approximately $7,526.98 from Citibank account ending in 3045;
18      e.    approximately $934,058.04 from PayPal account ending in 1921;
19      f.    approximately $15,184.71 from Wells Fargo account ending in 3640;
20      g.    approximately $338,319.07 from Wells Fargo account ending in 4780;
21      h.    approximately $227,439.98 from Wells Fargo account ending in 0454;
22      i.    approximately $30,000.00 from Citibank account ending in 5029;
23      j.    approximately $30,000.00 from Citibank account ending in 3045;
24      k.    405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN
25            946-4547-297), Pleasanton, California;
26      l.    2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018);
27      m.    1371 Germano Way in Pleasanton, California (APN 950-29-18);
28      n.    1087 Murrieta Boulevard #133, Livermore, California (APN

INDICTMENT                              13

0167

1                 097-0085-132); and

2           o.       2009 Mercedes Benz (VIN: WDDGF54X79R073026).

3      39.    If any of the property described above, as a result of any act or omission of the

4  defendant:

5           a.       cannot be located upon the exercise of due diligence;

6           b.       has been transferred or sold to, or deposited with, a third party;

7           c.       has been placed beyond the jurisdiction of the court;

8           d.       has been substantially diminished in value; or

9           e.       has been commingled with other property which cannot be divided

10                  without difficulty,

11  the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

12  States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

13      All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

14

15  <u>THIRD FORFEITURE ALLEGATION</u>: (18 U.S.C. § 982(6)(A)(ii) and/or 18 U.S.C.
                                     § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Alien
16                                       Harboring Forfeiture)

17      40.    Paragraphs 1 through 14, 28, and 29 of this Indictment are hereby realleged and

18  incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States

19  Code, Section 982(6)(A)(ii) and/or Title 18, United States Code, Section 981(a)(1)(C) and Title

20  28, United States Code, Section 2461(c)

21      41.    Upon conviction of an offense set forth in Counts 20 through 22 of this

22  Indictment, a violation of Title 8, United States Code, Section 1324, defendant

23                          SUSAN XIAO-PING SU

24  shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(6)(A)(ii)

25  and/or Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

26  Section § 2461(c), any property, real or personal, (I) that constitutes, or is derived from or is

27  traceable to the proceeds obtained directly or indirectly from the commission of the offense of

28  conviction; or (II) that is used to facilitate, or is intended to be used to facilitate, the commission

INDICTMENT                   14

1   of the offense of conviction. The property to be forfeited includes, but is not limited to, the

2   following:

3         a.    approximately $63,317.59 from Wells Fargo account ending in 9937;

4         b.    approximately $3,000.18 from Wells Fargo account ending in 6782;

5         c.    approximately $100.00 from Wells Fargo account ending in 2773;

6         d.    approximately $7,526.98 from Citibank account ending in 3045;

7         e.    approximately $934,058.04 from PayPal account ending in 1921;

8         f.    approximately $15,184.71 from Wells Fargo account ending in 3640;

9         g.    approximately $338,319.07 from Wells Fargo account ending in 4780;

10        h.    approximately $227,439.98 from Wells Fargo account ending in 0454;

11        i.    approximately $30,000.00 from Citibank account ending in 5029;

12        j.    approximately $30,000.00 from Citibank account ending in 3045;

13        k.    405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN

14             946-4547-297), Pleasanton, California;

15        l.    2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018);

16        m.    1371 Germano Way in Pleasanton, California (APN 950-29-18);

17        n.    1087 Murrieta Boulevard #133, Livermore, California (APN

18             097-0085-132); and

19        o.    2009 Mercedes Benz (VIN: WDDGF54X79R073026).

20     42.   If any of the property described above, as a result of any act or omission of the

21   defendant:

22         a.    cannot be located upon the exercise of due diligence;

23         b.    has been transferred or sold to, or deposited with, a third party;

24         c.    has been placed beyond the jurisdiction of the court;

25         d.    has been substantially diminished in value; or

26         e.    has been commingled with other property which cannot be divided

27             without difficulty,

28   the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

INDICTMENT               15

0169

1    States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

2            All pursuant to 18 U.S.C. § 982(a)(6)(A)(ii) and/or 18 U.S.C. § 981(a)(1)(C) and 28

3    U.S.C. § 2461(c).

4    FOURTH FORFEITURE ALLEGATION: (18 U.S.C. § 982(a)(1) – Money Laundering
5                                   Forfeiture)

6            43.    Paragraphs 1 through 14, 32, and 33 of this Indictment are hereby realleged and

7    incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States

8    Code, Section 982(a)(1).

9            44.    Upon conviction of an offense set forth in Counts 24 through 33 of this

10   Indictment, a violation of Title 18, United States Code, Section 1957, defendant

11                                SUSAN XIAO-PING SU

12   shall forfeit to the United States, pursuant to Title 18, United States Code, Section § 982(a)(1),

13   any property, real or personal, involved in such offense, or any property traceable to such

14   property.  The property to be forfeited includes, but is not limited to, the following:

15           a.    405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN
16                 946-4547-297), Pleasanton, California;

17           b.    2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018);

18           c.    1371 Germano Way in Pleasanton, California (APN 950-29-18);

19           d.    1087 Murrieta Boulevard #133, Livermore, California (APN
20                 097-0085-132); and

21           e.    2009 Mercedes Benz (VIN: WDDGF54X79R073026).

22           45.   If any of the property described above, as a result of any act or omission of the

23   defendant:

24           a.    cannot be located upon the exercise of due diligence;

25           b.    has been transferred or sold to, or deposited with, a third party;

26           c.    has been placed beyond the jurisdiction of the court;

27           d.    has been substantially diminished in value; or

28

INDICTMENT                           16

1          e.      has been commingled with other property which cannot be divided

2                  without difficulty,

3    the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

4    States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

5          All pursuant to 18 U.S.C. § 982(a)(1).

6

7    DATED: April___, 2011                        A TRUE BILL.

8

9

10                                                FOREPERSON

11

12   MELINDA HAAG
     United States Attorney
13

14

15   MIRANDA KANE
     Chief, Criminal Division
16

17   (Approved as to form: _____)
                            AUSAs WEST/RHYNE
18

19

20

21

22

23

24

25

26

27

28

INDICTMENT                              17

Case4:11-cr-00288-JST   Document18   Filed10/18/11   Page1 of 2

1   David Billingsley, CSBN 179068
    BONJOUR, THORMAN, BARAY & BILLINGSLEY
2   24301 Southland Dr., Ste 312
    Hayward, Ca. 94545
3   (510) 785-8400 (phone)
    (510) 670-0995 (fax)
4   david@btbandb.com

5   Attorneys for Defendant SUSAN SU

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11
    UNITED STATES OF AMERICA,              No.  CR 11-00288 SBA
12
                      Plaintiff,           **MOTION TO DISMISS INDICTMENT**
13                                         **FOR FAILURE TO STATE AN**
    v.                                     **OFFENSE**
14
    SUSAN SU,
15
                      Defendants.          Date: December 12, 2011
16                                         Time: 11:00 a.m.
                                           Courtroom: Hon. Saundra Armstrong
17  _____/

18        PLEASE TAKE NOTICE that on December 12, 2011, at 11:00 a.m. in the courtroom of

19  the Honorable Saundra Brown Armstrong, defendant SUSAN SU will move the court for an

20  order dismissing counts 1 - 12 of the indictment filed against her on the grounds that those counts

21  fail to state an offense.

22        This motion is founded on the present notice of motion; the accompanying memorandum

23  of points and authorities; the papers and records on file in the action; an on such oral and

24  documentary evidence as may be presented at the time of the hearing.

25

26

    Motion of Dismiss Indictment
     CR - 11- 00288 SBA                      1

**0172**

1    Dated: October 17, 2001                  Respectfully submitted,

2

3

4                                       _____/s/_____

                                      David Billingsley
                                      Attorney for Susan Su

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Motion of Dismiss Indictment
CR - 11- 00288 SBA                         2

1   David Billingsley, CSBN 179068
    BONJOUR, THORMAN, BARAY & BILLINGSLEY
2   24301 Southland Dr., Ste 312
    Hayward, Ca. 94545
3   (510) 785-8400 (phone)
    (510) 670-0995 (fax)
4   david@btbandb.com

5
    Attorneys for Defendant SUSAN SU
6

7

8

9                   IN THE UNITED STATES DISTRICT COURT
10
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

12

13  UNITED STATES OF AMERICA,                No. CR 11-00288 SBA

14                       Plaintiff,

15  v.
                                             Date: December 12, 2011
16  SUSAN SU,                                 Time: 11:00 a.m.
                                             Courtroom: Hon. Saundra Armstrong
17                       Defendants.

18  _____/

19  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
20  DISMISS COUNTS 1-12 OF THE INDICTMENT FOR FAILURE TO STATE AN
                               OFFENSE**
21

22                            **INTRODUCTION**

23
            Defendant, Susan Su, was the president and owner of Tri Valley University. Tri Valley
24
    was started in 2008 as an institute of higher education which offered classes at the masters and
25
26  P.H.D. level.  Tri Valley went through the application process and the U.S. Government gave Tri

27  Valley University permission to issue I-20 forms to facilitate the application for student visas by

28
    Motion of Dismiss Indictment
      CR - 11- 00288 SBA                    1

0174

foreign nationals. After receiving approval from the U.S. Government, Tri Valley University

began admitting students who were foreign nationals in 2009. The foreign nationals that were

admitted to the school were issued I-20 by the school and obtained student visas from the U.S.

Government. Tri Valley University continued to operate until January 19, 2011 when the

Government executed search warrants at the school and at Defendant's residence.

Counts 1-10 of the indictment charge Defendant, Susan Su, with mail fraud. Counts 11

and 12 charge Defendant, Susan Su, with wire fraud. In support of the mail and wire fraud

charges, the Government alleges facts upon which they are relying to establish "THE SCHEME

TO DEFRAUD" in paragraphs 9-14 of the Indictment.

The Government identifies the United States as the victim of the scheme to defraud.

Indictment, Paragraph 9. The Government alleges that Defendant submitted fraudulent

documents to Department of Homeland Security (DHS) in support of Tri Valley University's

petition for approval to admit foreign students and after having obtained such approval,

fraudulently issued visa-related documents to aliens in exchange for tuition and fees. Indictment,

paragraph 9. The Government also alleges that Defendant made materially false representations

and submitted materially false documents to DHS agents, who are routinely tasked with

contacting Student Exchange Visitor Program (SEVP) approved schools to verify the F-1 status of

non-immigrants in the United States, or seeking to reenter the country. Indictment, paragraph 13.

The indictment does not allege that Defendant sought to defraud the victim, the United

States Government, of money or property, a required element of mail and wire fraud.

///

///

Motion of Dismiss Indictment
  CR - 11- 00288 SBA                                    2

**ARGUMENT**

**I.     COUNTS 1-12 OF THE INDICTMENT FAIL TO STATE AN OFFENSE
BECAUSE THE INDICTMENT FAILS TO IDENTIFY MONEY OR PROPERTY
OF THE VICTIM THAT WAS THE SUBJECT OF THE DEFENDANT'S
SCHEME TO DEFRAUD.**

**A.  LEGAL STANDARD.**

In a pretrial motion to dismiss an indictment for failure to state an offense, the indictment
is invalid unless it "allege[s] that the defendant performed acts which [if] proven constituted a
violation of the law that he or she is charged with violating." *United States v. Hedaithy*, 392 F.3d
580, 589 (3d cir. 2004).

Moreover, "a charging document fails to state an offense if the specific facts alleged in the
charging document fall beyond the scope of the relevant criminal statue, as a matter of statutory
interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d cir. 2002).

The indictment must be a plain, concise, and definite written statement of the essential
facts constituting the offense charged.  Fed. R. Crim. P. 7(c)(1).

In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the
District Court is bound by the four corners of the indictment. *United States v. Jensen*, 93 F.3d 667,
669 (th Cir. 1996); *United States v. Caicedo*, 47 F.3d 370, 371 (9th Cir. 1995), *United States v.
Buckley*, 689 F.2d 893, 897 (9th Cir. 1982).  On a motion to dismiss an indictment for failure to
state an offense, the court must accept the truth of the allegations in the indictment in analyzing
whether a cognizable offense has been charged. *U.S. v. Jensen, supra* at p. 669.  The indictment
either states an offense or it does not, and if not, the indictment or offending counts must be
dismissed. *U.S. v. Shipsey*, 363 F.3d 962, 965 (9th Cir. 2004).

0176

**B.    COUNTS 1-12 FAIL TO STATE AN OFFENSE BECAUSE THE INDICTMENT FAILS TO ALLEGE THAT THE OBJECT OF THE SCHEME TO DEFRAUD WAS MONEY OR PROPERTY OF THE VICTIM, A REQUIRED ELEMENT.**

Defendant challenges the indictment as failing to state on an offense under 18 U.S.C. section 1343 (Wire Fraud) and 18 U.S.C. section 1341 (Mail Fraud) in counts 1-12 of the Indictment because the Government fails to make factual allegations that the money or property of the identified victim, the U.S. Government, was the object of the scheme to defraud.

In relevant part, the elements of Wire and Mail Fraud are as follows:

First, the defendant devised a scheme or plan for obtaining money or property by making false promises or statements;

Second, the defendant knew that the promises or statements were false or fraudulent;

Third, the promises or statements were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

Fourth, the defendant acted with the intent to defraud; and

Fifth, the defendant used, or cause to be used, the mails (or interstate wire facilities) to carry out or attempt to carry out an essential part of the scheme. 18 U.S.C. 1341, 18 U.S.C. 1343, 9th Circuit Model Criminal Jury Instructions 8.101 & 8.103.

In *McNally v. United States*, 483 U.S. 350, 360 (1987), the Supreme Court held that the federal mail fraud statute is "limited in scope to the protection of property rights." Subsequent to *McNally*, Congress amended the law specifically to cover "the intangible right of honest services." 18 U.S.C. section 1346. The Supreme Court then ruled in *Skilling v. U.S.,* 130 S.Ct. 2896 (2010) that "honest services fraud" applies only to bribes and kickbacks. The Indictment in the present case makes no mention of bribes or kickbacks and alleges no facts consistent with such a theory.

0177

1   The Government thus appears to rely on the theory that the fraudulent scheme sought to deprive

2   the victim, the U.S. Government, of money or property. Yet, the Indictment fails to allege facts

3
    sufficient to establish this element under sections 1341 and 1343.
4

5       In *Cleveland v. U.S. 531* U.S.12 (2000), the Supreme Court further clarified section 1341

6   by explaining that the property being protected is property of the victim. In *Cleveland v. United*

7   *States*, 531 U.S. 12 (2000), the defendant was accused of mail fraud for allegedly making false

8
    statements in applying to the Louisiana State Police for licenses to operate video poker machines.
9
10  Among the issues the Supreme Court addressed was whether the money or property that is the

11  object of the scheme needed to be possessed by the victim. The Government argued that even if

12  the license was not "property" in the hands of the State, it became property in the hands of the

13  licensee (defendant) and therefore would still satisfy the element of a scheme to obtain money or

14  property. *Id*. at 25-26. The Supreme Court rejected that argument. The Supreme Court stated,
15
    "[i]t does not suffice, we clarify, that the object of the fraud may become property in the
16
17  recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the

18  hands of the victim." *Id.* at 15.

19      The Indictment against Defendant in the present case does not contain any factual

20  allegations that Defendant sought to defraud the United States Government of money or property.

21
    The facts alleged in the Indictment regarding the fraud against the United States related to two
22
23  areas: (1) fraud by the Defendant in order to receive the approval and permission of the United

24  States Government to issue student visas (I-20's) to aliens; and (2) material false representations

25  and the submission of materially false documents by the Defendant to Government agents

26  concerning aliens to whom Defendant had issued student visas. None of the allegations mention
27
28  any money or property of the United States Government which the fraud was intended to reach.

Motion of Dismiss Indictment
  CR - 11- 00288 SBA                              5

The only facts alleged by the Government in the Indictment related to money are the Government's allegations that Defendant received money from students for tuition and fees. But it is the United States Government, not the students, whom the Prosecution alleges is the victim in this case and the one to whom Defendant made false representations. As in *Cleveland*, The Indictment in this case fails to state a offense in counts 1 - 12 because facts alleged do not support a finding that the object of the scheme to defraud was money or property of the victim.

### C.   GOVERNMENT'S INTEREST IN MAINTAINING THE INTEGRITY OF THE VISA PROCESS IS A REGULATORY INTEREST, NOT A PROPERTY INTEREST.

The allegations in the Indictment described a scheme to defraud the U.S. Government with respect to its ability to regulate and control entry of foreign nationals in the U.S. and to keep track of them once they enter the country.   Although the Government has an important regulatory interest regarding the admittance and behavior of foreign nationals within its borders, that interest is not a property interest for purposes of sections 1341 and 1343.

In *Cleveland v. United States*, *supra*, the Supreme Court addressed whether a license issued by the State was "property" under section 1341.  As explained above, the defendant in *Cleveland* was charged with mail fraud for allegedly making false statements in applying to the Louisiana State Police for licenses to operate video poker machines.  The Supreme Court held that such a permit or license did not qualify as "property" under section 1341. *Id.* at 15.  In reaching that conclusion the Supreme Court found it significant that the State's primary concern regarding the licenses was a regulatory one which reflected an exercise of the government's police power.

The Court stated, "[t]o begin with, we think it beyond genuine dispute that whatever interests Louisiana might be said to have in its video poker licenses, the States's core concern is *regulatory*." *Id.* at 20.  With respect to the licenses issued by Louisiana, the Court went on to say,

"[i]t licenses subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization.  In this regard, it resembles other licensing schemes long characterized by this Court as exercises of state police powers." *Id.* at 21 (citations omitted).  "Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." *Id.* at 24.

The U.S. Government's control over foreign nationals entering its borders is precisely the type of exercise of state police power to engage in regulatory action as was addressed in *Cleveland.*  As in *Cleveland*, the approval granted by the United States Government to Defendant and Tri Valley University to issue I-20's and admit foreign nationals as students was a grant of permission to engage in ". . . pursuits that private actors may not undertake without official authorization." *Id.* at 21.  The facts alleged in the Indictment fail to support a conclusion that the object of the scheme to defraud was money or property of the victim, the U.S. Government.  For that reason, the Indictment concerning Defendant Susan Su fails to state an offense in counts 1 - 12.

### CONCLUSION

For the foregoing reasons, Defendant Susan Sue, requests that the Court dismiss counts 1 - 12 of the Indictment for failing to state an offense.

DATED: October 17, 2011                    Respectfully submitted,

                                           _____/S/_____
                                           David Billingsley
                                           Attorney for Defendant Susan Su

Motion of Dismiss Indictment
 CR - 11- 00288 SBA                    7

**0180**

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  HARTLEY M.K. WEST (CABN 191609)
   WADE M. RHYNE (CABN 216799)
5  Assistant United States Attorneys

6     1301 Clay Street, Suite 340S
      Oakland, CA 94612
7     Telephone: (510) 637-3680
      Fax: (510) 637-3724
8     E-Mail:    hartley.west@usdoj.gov
                 wade.rhyne@usdoj.gov
9
   Attorneys for Plaintiff
10
                   UNITED STATES DISTRICT COURT
11
                 NORTHERN DISTRICT OF CALIFORNIA
12
                        OAKLAND DIVISION
13
   UNITED STATES OF AMERICA,        )    CR-11-00288 SBA
14                                   )
          Plaintiff,                 )
15                                   )    **UNITED STATES' RESPONSE TO**
       v.                            )    **DEFENDANT'S MOTION TO DISMISS**
16                                   )    **INDICTMENT**
   SUSAN XIAO-PING SU,               )
17                                   )    Date:   December 12, 2011
          Defendant.                 )    Time:   11:00 a.m.
18                                   )    Judge:  Hon. Saundra Brown Armstrong
                                     )
19 ───────────────────────────────────)

20        The United States of America does not oppose defendant Susan Su's motion to dismiss

21 the mail and wire fraud counts (Counts One through Twelve) of the indictment.  On November

22 10, 2011, the Grand Jury returned a superseding indictment addressing the issues raised in

23 defendant's motion.

24 DATED: November 10, 2011              Respectfully submitted,

25                                       MELINDA HAAG
                                         United States Attorney
26                                       wmRy

27                                       ─────────────────────────
                                         WADE M. RHYNE
28                                       Assistant United States Attorneys

   U.S. RESP. TO DEF.'S MOT. TO DISMISS
   CR-11-00288 SBA

Case4:11-cr-00288-JST   Document21   Filed11/10/11   Page1 of 23

AO 257 (Rev. 6/78)

FILED

2011 NOV 10 P 3:23

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☒ SUPERSEDING

**─ OFFENSE CHARGED ─**

See Attachment.

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  See Attachment.

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

**─ DEFENDANT - U.S**

SUSAN XIAO-PING SU

DISTRICT COURT NUMBER

CR 11-00288 SBA

**─ PROCEEDING ─**

Name of Complainant Agency, or Person (& Title, if any)

Immigration and Customs Enforcement

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form

MELINDA HAAG

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)

HARTLEY M.K. WEST, AUSA
WADE M. RHYNE, AUSA

**DEFENDANT**

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

Northern District of California

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges

} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer ☐ Yes    If "Yes"
been filed?  ☐ No     give date filed

DATE OF ARREST ▶    Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶    Month/Day/Year

☐ This report amends AO 257 previously submitted

**─ ADDITIONAL INFORMATION OR COMMENTS ─**

PROCESS:
☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT

Bail Amount: _____

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time: _____    Before Judge: _____

Comments:

0182

FILED

## PENALTY SHEET ATTACHMENT
## DEFENDANT SUSAN SU

<u>COUNTS ONE THROUGH TWELVE:</u>     (18 U.S.C. §§ 1343 & 2 – Wire Fraud; Aiding and Abetting)

    <u>PENALTY:</u>   <u>Statutory Penalty Generally:</u>

| | |
|---|---|
| Imprisonment: | Maximum 20 Years |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 5 Years |
| Special Assessment: | Mandatory $100 |

<u>COUNTS THIRTEEN AND FOURTEEN:</u>   (18 U.S.C. §§ 1341 & 2 – Mail Fraud; Aiding and Abetting)

    <u>PENALTY:</u>   Same as Counts One through Twelve.

<u>COUNT FIFTEEN:</u>   (18 U.S.C. § 371 – Conspiracy to Commit Visa Fraud)

    <u>PENALTY:</u>

| | |
|---|---|
| Imprisonment: | Maximum 5 Years |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 3 Years |
| Special Assessment: | Mandatory $100 |

<u>COUNT SIXTEEN THROUGH NINETEEN:</u>   (18 U.S.C. §§ 1546(a) & 2 – Visa Fraud; Aiding and Abetting)

    <u>PENALTY:</u>

| | |
|---|---|
| Imprisonment: | Maximum 10 Years |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 3 Years |
| Special Assessment: | Mandatory $100 |

0183

COUNT TWENTY:   (18 U.S.C. §§ 1001(a)(3) & 2 – Use of False Document; Aiding and Abetting)

PENALTY:   

| | |
|---|---|
| Imprisonment: | Maximum 5 Years |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 3 Years |
| Special Assessment: | Mandatory $100 |

COUNT TWENTY-ONE:   (18 U.S.C. §§ 1001(a)(2) & 2 – False Statements to a Government Agency; Aiding and Abetting)

PENALTY:   Same as Count Twenty.

COUNTS TWENTY-TWO THROUGH TWENTY-FOUR: (8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), 1324(a)(1)(B)(I) – Alien Harboring)

PENALTY:   

| | |
|---|---|
| Imprisonment: | Maximum 10 Years |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 3 Years |
| Special Assessment: | Mandatory $100 |

COUNT TWENTY-FIVE:   (18 U.S.C. §§ 1030(a)(3) & 2 – Unauthorized Access of a Government Computer; Aiding and Abetting)

PENALTY:   Statutory Penalty Generally:

| | |
|---|---|
| Imprisonment: | Maximum 1 Year |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 1 Year |
| Special Assessment: | Mandatory $100 |

Statutory Penalty if for Financial Gain:

| | |
|---|---|
| Imprisonment: | Maximum 5 Years |
| Fine: | Maximum $250,000 or an amount equal to twice the amount pecuniary gain or loss. |
| Supervised Release: | Maximum 3 Years |
| Special Assessment: | Mandatory $100 |

FILED

2011 NOV 10 P 3: 23

COUNTS TWENTY-SIX THROUGH THIRTY-FIVE:   (18 U.S.C. §§ 1957(a) & 2 –
                                          Money Laundering; Aiding and
                                          Abetting)

PENALTY:   Imprisonment:            Maximum 10 Years
           Fine:                    Maximum $250,000, or an amount equal to
                                    twice the amount pecuniary gain or loss, or
                                    twice the amount of the criminally derived
                                    property involved in the transaction.
           Supervised Release:      Maximum 3 Years
           Special Assessment:      Mandatory $100

0185

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

CR 11-00288 SBA   VENUE: Oakland

FILED

2011 NOV 10  P 3: 23

UNITED STATES OF AMERICA,

**V.**

SUSAN XIAO-PING SU,

DEFENDANT.

---

### SUPERSEDING INDICTMENT

18 U.S.C. § 1343 – Wire Fraud; 18 U.S.C. § 1341 – Mail Fraud; 18 U.S.C. §
371 – Conspiracy to Commit Visa Fraud; 18 U.S.C. § 1546(a) – Visa Fraud;
18 U.S.C. § 1001(a)(3) – Use of a False Document; 18 U.S.C.
§ 1001(a)(2) – False Statement to a Government Agency; 8 U.S.C. § 1324(a)
(1)(A) – Alien Harboring; 18 U.S.C. § 1030(a)(3) – Unauthorized Access to a
Government Computer; 18 U.S.C. § 1957 – Money Laundering; 18 U.S.C. § 2
– Aiding and Abetting; 18 U.S.C. § 982(a)(6)(A)(ii) – Visa Fraud Forfeiture;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Mail Fraud, Wire Fraud,
and Alien Harboring Forfeiture; 18 U.S.C.
§ 982(a)(1) – Money Laundering Forfeiture

---

A true bill.

_____
Foreman

Filed in open court this **10** day of
**Nov 2011**

_____ Clerk
Kristen Selk

Bail, $ _____

Timothy J. Bommer
United States Magistrate Judge

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                              OAKLAND DIVISION

11

12                                    )    No. CR 11-00288 SBA
                                      )
13  UNITED STATES OF AMERICA,         )    VIOLATIONS: 18 U.S.C. § 1343 – Wire Fraud;
                                      )    18 U.S.C. § 1341 – Mail Fraud; 18 U.S.C. § 371
14         Plaintiff,                 )    – Conspiracy to Commit Visa Fraud; 18 U.S.C.
                                      )    § 1546(a) – Visa Fraud; 18 U.S.C. § 1001(a)(3)
15                                    )    – Use of a False Document; 18 U.S.C.
           v.                         )    § 1001(a)(2) – False Statement to a Government
16                                    )    Agency; 8 U.S.C. § 1324(a)(1)(A) – Alien
                                      )    Harboring; 18 U.S.C. § 1030(a)(3) –
17  SUSAN XIAO-PING SU,               )    Unauthorized Access to a Government
                                      )    Computer; 18 U.S.C. § 1957 – Money
18         Defendant.                 )    Laundering; 18 U.S.C. § 2 – Aiding and
                                      )    Abetting; 18 U.S.C. § 982(a)(6)(A)(ii) – Visa
19                                    )    Fraud Forfeiture; 18 U.S.C. § 981(a)(1)(C) and
                                      )    28 U.S.C. § 2461(c) – Mail Fraud, Wire Fraud,
20                                    )    and Alien Harboring Forfeiture; 18 U.S.C.
                                      )    § 982(a)(1) – Money Laundering Forfeiture
21  _____ )
                                      )    OAKLAND VENUE
22

23                        S U P E R S E D I N G   I N D I C T M E N T

24  The Grand Jury charges:

25                                   BACKGROUND

26         At all times relevant to this Superseding Indictment:

27         1.      Defendant SUSAN XIAO-PING SU was the founder, Chief Executive Officer,

28  and President of Tri-Valley University (TVU), located at 4455 Stoneridge Drive, and then at 405

SUPERSEDING INDICTMENT
CR 11-00288 SBA

0187

1    Boulder Court, Suites 700 and 800, both in Pleasanton, California.  SU also resided in

2    Pleasanton, California.

3          2.       TVU's course catalog described the school as "a Christian higher education

4    institution aiming to offer quality higher education in Engineering, Business and Ministry."  SU

5    established a bank account for TVU at Wells Fargo Bank, account number ending -0454, and

6    maintained signature authority over that account.

7          3.       SU established a web domain name, trivalleyuniversity.org, and email accounts

8    for TVU using the trivalleyuniversity.org domain, through a web hosting provider called

9    HostMonster located in East Provo, Utah.  All emails to and from this domain name route

10   through a server in East Provo, Utah.

11                                    STUDENT VISA PROGRAM

12         4.       The Immigration and Nationality Act, Title 8, United States Code, Section 1101,

13   identifies several categories of foreign nationals who may be admitted to the United States for

14   nonimmigrant purposes.  One such category, designated "F-1" based on the applicable statutory

15   subsection, comprises bona fide students coming temporarily to study at an approved school.

16         5.       Students entering the United States on a F-1 visa are admitted for a temporary

17   period called "duration of status," which federal regulations define as the time during which the

18   student is pursuing a full course of study at an approved school.  When a student stops pursuing a

19   full course of study, the duration of status ends and the temporary period for which the individual

20   was admitted expires.

21         6.       A school seeking approval to admit foreign students must submit a Petition for

22   Approval of School for Attendance by Nonimmigrant Student, also called a Form I-17, to the

23   United States Department of Homeland Security (DHS), Student and Exchange Visitor Program

24   (SEVP) in Washington, DC.  Through the I-17, the school must establish that (1) it is a bona fide

25   school; (2) it is an established institution of learning; (3) it has the necessary facilities, personnel,

26   and finances to instruct recognized courses; and (4) it actually is engaged in instructing those

27   courses.  An unaccredited school must also provide "articulation agreements" establishing that its

28   courses have been and are unconditionally accepted to at least three accredited institutions of

SUPERSEDING INDICTMENT
CR 11-00288 SBA                    2

1  higher learning.

2      7.      The school's I-17 must identify "Designated School Officials" (DSOs), who

3  certify their knowledge of and intent to comply with student immigration laws and regulations.

4  Once a school is approved, its DSOs are issued login IDs and passwords enabling them to access

5  the Student and Exchange Visitor Information System (SEVIS).  SEVIS is a nonpublic computer

6  system located in Rockville, Maryland, which is used by the United States government and

7  operated through SEVP for the purpose of collecting nonimmigrant student information from

8  approved schools and monitoring such aliens' status.  Upon login, a pop-up warning banner

9  advises the user that SEVIS is a Privacy Act system of records for authorized users only, and that

10  use evidencing possible criminal activity may be reported to law enforcement.

11      8.      To enter the United States on a student visa, a foreign national must present a

12  Certificate of Eligibility for Nonimmigrant (F-1) Student Status, also known as a Form I-20,

13  which is printed from SEVIS.  An "initial I-20" certifies that the student has been accepted for

14  enrollment in a full course of study, and is signed by a DSO.  The school activates the student's

15  SEVIS record and prints an "active I-20" after the student arrives and begins making normal

16  progress toward a full course of study, with physical attendance as an element.  The school's

17  DSOs are required to report in SEVIS within 21 days the failure of any student to maintain active

18  status.

19                          THE SCHEME TO DEFRAUD

20      9.      From in or about September 2008 through on or about January 19, 2011, in the

21  Northern District of California and elsewhere, defendant

22                          SUSAN XIAO-PING SU

23  and others engaged in an illegal scheme to defraud non-immigrant aliens of money and property,

24  specifically tuition and other fees.

25      10.     In furtherance of this scheme to defraud, SU and others caused TVU to submit a

26  Form I-17 to admit foreign students, along with revisions, supplements, and attachments, to

27  SEVP in Washington, DC.  These submissions contained materially false representations

28  regarding TVU's administrators, instructors, and articulation agreements, as well as materially

SUPERSEDING INDICTMENT
CR 11-00288 SBA                          3

1  false promises by TVU's DSOs to comply with all federal regulations regarding nonimmigrant
2  students.

3      11.    As a further part of the scheme to defraud, after TVU received SEVP approval to
4  admit F-1 students, SU and others recruited and admitted aliens as TVU students without regard
5  to their academic qualifications and intent to pursue a full course of study.

6      12.    As a further part of the scheme to defraud, SU and others caused TVU student-
7  employees to access DSOs' SEVIS accounts to enter data concerning TVU students, and to
8  create SEVIS entries according to SU's instructions.  Many of these SEVIS entries contained
9  materially false representations regarding the applicant's residence, means of support, course of
10  study, and purpose of entry, among other things.  SU then signed the printed I-20s from SEVIS,
11  sometimes forging the signature of the DSO from whose account the form was printed.

12      13.    As a further part of the scheme to defraud, SU and others collected tuition and
13  other payments from aliens in exchange for maintaining them in active F-1 status.  SU paid a
14  percentage of these fees to recruiters as commissions for referrals of new alien students.

15      14.    As a further part of the scheme to defraud, SU and others made materially false
16  representations and submitted materially false documents to DHS agents, who are routinely
17  tasked with contacting SEVP-approved schools to verify the F-1 status of nonimmigrants in the
18  United States or seeking to reenter the country.  In response to such requests for verification, SU
19  and others repeatedly provided materially false I-20s, letters of good standing, transcripts, and
20  attendance records.  Similarly, during DHS site visits, SU made materially false representations
21  regarding TVU's classes, instructors, DSOs, office staff, and school policies.

22

23  COUNTS ONE THROUGH TWELVE: (18 U.S.C. §§ 1343 & 2 – Wire Fraud; Aiding and
                                          Abetting)
24

25      15.    Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and
26  incorporated by reference as if set forth in full herein.

27      16.    From in or about September 2008 through on or about January 19, 2011, in the
28  Northern District of California and elsewhere, for the purpose of executing a scheme and artifice

SUPERSEDING INDICTMENT
CR 11-00288 SBA                             4

to defraud as to a material matter, and for obtaining money and property by means of materially

false and fraudulent pretenses, representations, promises, and omissions, defendant

SUSAN XIAO-PING SU

did knowingly cause to be transmitted the following wire communications in interstate and

foreign commerce:

| Count | Approx. Date | From | To | Description of Wire |
|-------|-------------|------|-----|---------------------|
| 1 | 9/15/08 | Pleasanton, CA | SEVIS | Electronic submission of original Form I-17 |
| 2 | 2/21/09 | TVU | HostMonster | Email from SU re: recruiting Indian students |
| 3 | 1/10/10 | TVU | SEVIS | SEVIS entry for B.C. |
| 4 | 1/27/10 | TVU | SEVIS | SEVIS entry for K.C. |
| 5 | 7/27/10 | TVU | SEVIS | SEVIS entry for S.A. |
| 6 | 7/27/10 | TVU | SEVIS | SEVIS entry for K.D. |
| 7 | 8/31/10 | TVU | SEVIS | SEVIS entry for M.R. |
| 8 | 9/7/10 | TVU | SEVIS | SEVIS entry for R.B. |
| 9 | 9/20/10 | TVU | HostMonster | Email from SU containing I-20, transcripts, and letter of good standing for S.A. |
| 10 | 9/24/10 | TVU | HostMonster | Email from SU containing I-20, transcripts, and letter of good standing for K.D. |
| 11 | 1/7/11 | TVU | HostMonster | Email from SU containing I-20, transcript, and enrollment verification for M.R. |
| 12 | 1/7/11 | TVU | HostMonster | Email from SU containing I-20, transcript, attendance sheets, and enrollment verification for R.B. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

/ / /

/ / /

/ / /

/ / /

SUPERSEDING INDICTMENT
CR 11-00288 SBA                     5

0191

COUNTS THIRTEEN AND FOURTEEN: (18 U.S.C. §§ 1341 & 2 – Mail Fraud; Aiding and Abetting)

17.     Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

18.     From in or about September 2008 through on or about January 19, 2011, in the Northern District of California and elsewhere, for the purpose of executing a scheme and artifice to defraud as to a material matter, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, defendant

SUSAN XIAO-PING SU

did knowingly cause the following items to be delivered by mail according to the directions thereon:

| Count | Approx. Date | Description of Mailing |
|-------|-------------|------------------------|
| 13 | 12/23/08 | Revised Form I-17 and accompanying documents, including DSO verification letter, from SU to SEVP |
| 14 | 2/10/09 | Three articulation agreements in support of TVU's Form I-17 from SU to SEVP |

All in violation of Title 18, United States Code, Sections 1341 and 2.

COUNT FIFTEEN: (18 U.S.C. § 371 – Conspiracy to Commit Visa Fraud)

19.     Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

20.     Beginning in or about February 2009 and continuing through on or about January 19, 2011, in the Northern District of California and elsewhere, defendant

SUSAN XIAO-PING SU

and others did knowingly and willfully conspire to execute and attempt to execute a material scheme to commit offenses against the United States, namely forging and falsely making documents prescribed by statute and regulation for entry into and as evidence of authorized stay in the United States, specifically, Forms I-20, in violation of Title 18, United States Code,

SUPERSEDING INDICTMENT
CR 11-00288 SBA                                    6

0192

1   Section 1546(a).

2                                     OVERT ACTS

3       21.     In furtherance of the conspiracy and to effect the objects of that conspiracy, in the

4   Northern District of California and elsewhere, SU and others committed the acts alleged in

5   Paragraphs 1 through 14 of this Superseding Indictment, and the following additional overt acts,

6   among others:

7               a.     On or about February 21, 2009, SU sent an email to an unindicted co-

8   conspirator regarding recruiting students from India.

9               b.     On or about April 30, 2010, TVU issued a $945 check, drawn on TVU's

10  Wells Fargo Bank account -0454, as a commission payment to an unindicted co-conspirator for

11  recruiting an alien student.

12              c.     On or about July 27, 2010, SU falsely signed another DSO's name on a

13  Form I-20 for S.A.

14              d.     On or about July 27, 2010, SU falsely signed another DSO's name on a

15  Form I-20 for K.D.

16              e.     On or about September 7, 2010, SU falsely signed another DSO's name on

17  a Form I-20 for R.B.

18              f.     On or about January 7, 2011, SU falsely told a DHS agent that M.R.

19  attended a TVU class that she taught.

20      All in violation of Title 18, United States Code, Section 371.

21

22  COUNT SIXTEEN THROUGH NINETEEN: (18 U.S.C. §§ 1546(a) & 2 – Visa Fraud;
                                        Aiding and Abetting)
23

24      22.     Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and

25  incorporated by reference as if set forth in full herein.

26      23.     Between in or about February 2009 and on or about January 19, 2011, in the

27  Northern District of California and elsewhere, defendant

28                              SUSAN XIAO-PING SU

SUPERSEDING INDICTMENT
CR 11-00288 SBA                        7

1  did knowingly forge and falsely make a document prescribed by statute and regulation for entry
2  into and as evidence of an authorized stay in the United States, specifically a Form I-20 for the
3  following individuals, and did knowingly use, attempt to use, possess, obtain, and receive such
4  document, knowing it to be forged, falsely made, and procured by means of a false claim and
5  statement, and to have been otherwise procured by fraud and unlawfully obtained:

| Count | Approx. Date | Name |
|-------|--------------|------|
| 16    | 7/27/10      | S.A. |
| 17    | 7/27/10      | K.D. |
| 18    | 8/31/10      | M.R. |
| 19    | 9/7/10       | R.B. |

11  All in violation of Title 18, United States Code, Sections 1546(a) and 2.

13  COUNT TWENTY: (18 U.S.C. §§ 1001(a)(3) & 2 – Use of False Document; Aiding and
          Abetting)

15      24.    Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and
16  incorporated by reference as if set forth in full herein.
17      25.    On or about September 24, 2010, in the Northern District of California and
18  elsewhere, defendant
19                          SUSAN XIAO-PING SU
20  did knowingly make and use a false document knowing it to contain a materially false, fictitious,
21  and fraudulent statement, in a matter within the jurisdiction of the executive branch of the United
22  States, by emailing three false documents to a DHS Special Agent, while in the course of the
23  agent's duties, including a materially false TVU transcript for K.D., in violation of Title 18,
24  United States Code, Sections 1001(a)(3) and 2.
25  / / /
26  / / /
27  / / /
28  / / /

SUPERSEDING INDICTMENT
CR 11-00288 SBA                      8

0194

COUNT TWENTY-ONE: (18 U.S.C. §§ 1001(a)(2) & 2 – False Statements to a Government Agency; Aiding and Abetting)

26.     Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

27.     On or about January 7, 2011, in the Northern District of California and elsewhere, defendant

SUSAN XIAO-PING SU

did knowingly and willfully make a materially false, fictitious, and fraudulent statement in a matter within the jurisdiction of the executive branch of the United States, by stating to a DHS Special Agent, while in the course of the agent's duties, that M.R. had attended a class that SU had taught at Tri-Valley University, despite knowing that M.R. had never attended such class, in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

COUNTS TWENTY-TWO THROUGH TWENTY-FOUR: (8 U.S.C. § 1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), (a)(1)(B)(i) – Alien Harboring)

28.     Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

29.     Between in or about February 2009 and on or about January 19, 2011, in the Northern District of California and elsewhere, defendant

SUSAN XIAO-PING SU

knowingly and in reckless disregard of the fact that the following aliens had unlawfully come to, entered, and remained in the United States, did conceal, harbor, and shield such aliens from detection, and attempt to conceal, harbor, and shield such aliens from detection, through employment at TVU for the purpose of commercial advantage and private financial gain:

///

///

///

///

SUPERSEDING INDICTMENT
CR 11-00288 SBA                    9

0195

| Count | Name |
|-------|------|
| 22 | V.D. |
| 23 | T.T. |
| 24 | A.D. |

All in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i).

COUNT TWENTY-FIVE: (18 U.S.C. §§ 1030(a)(3) & 2 – Unauthorized Access of a Government Computer; Aiding and Abetting)

30.     Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

31.     Between in or about February 2009 and on or about January 19, 2011, in the Northern District of California and elsewhere, defendant

SUSAN XIAO-PING SU

did knowingly, intentionally, and without authorization, access a nonpublic computer of a department and agency of the United States, specifically DHS's SEVIS, which is used by and for the Government of the United States and such conduct affects that use by and for the Government of the United States, in violation of Title 18, United States Code, Sections 1030(a)(3) and 2.

COUNTS TWENTY-SIX THROUGH THIRTY-FIVE: (18 U.S.C. §§ 1957(a) & 2 – Money Laundering; Aiding and Abetting)

32.     Paragraphs 1 through 14 of this Superseding Indictment are hereby re-alleged and incorporated by reference as if set forth in full herein.

///

///

///

SUPERSEDING INDICTMENT
CR 11-00288 SBA                         10

0196

Case4:11-cr-00288-JST   Document21   Filed11/10/11   Page16 of 23

33.    Between in or about November 2009 and in or about December 2010, in the Northern District of California and elsewhere, defendant

SUSAN XIAO-PING SU

did knowingly engage in the following monetary transactions, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, that was derived from specified unlawful activity, namely visa fraud in violation of Title 18, United States Code, Section 1546(a), and did aid and abet the same.

| Count | Approx. Date | Description of Transaction |
|-------|-------------|----------------------------|
| 26 | 11/28/09 | $36,783.61 check (#1037) drawn on Wells Fargo Bank account -0454 used to purchase 2009 Mercedes Benz (VIN: WDDGF54X79R073026) |
| 27 | 2/25/10 | $78,700 wire transfer from Wells Fargo Bank account -0454 to Fidelity National Title Escrow for purchase of 1087 Murrieta Boulevard, #133, in Livermore, CA |
| 28 | 4/2/10 | $50,000 check (#1144) drawn on Wells Fargo Bank account -0454 paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 800, in Pleasanton, CA |
| 29 | 4/9/10 | $160,986.87 cashier's check purchased with funds from Wells Fargo Bank account -0454, paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 800, in Pleasanton, CA |
| 30 | 6/10/10 | $50,000 check (#1014)  drawn on Wells Fargo Bank account -0454 paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 700, in Pleasanton, CA |
| 31 | 7/8/10 | $261,307.49 cashier's check purchased with funds from Wells Fargo Bank account -0454, paid to Chicago Title Company escrow account for purchase of 405 Boulder Court, Suite 700, in Pleasanton, CA |
| 32 | 7/20/10 | $700,000 cashier's check purchased with funds from Wells Fargo Bank account -3640, paid to Placer Title Company escrow account for purchase of 2890 Victoria Ridge Court in Pleasanton, CA |
| 33 | 7/20/10 | $122,990.90 cashier's check purchased with funds from Wells Fargo Bank accounts -4780 and -0454, paid to Placer Title Company escrow account for purchase of 2890 Victoria Ridge Court in Pleasanton, CA |
| 34 | 12/15/10 | $600,000 wire transfer from Wells Fargo Bank account -4780 to Prominent Escrow Services, Inc. for purchase of 1371 Germano Way in Pleasanton, CA |

SUPERSEDING INDICTMENT
CR 11-00288 SBA                    11

0197

| 35 | 12/15/10 | $1,200,000 wire transfer from CitiBank account -3045 to Prominent Escrow Services, Inc. for purchase of 1371 Germano Way in Pleasanton, CA |
|----|----------|---------|

All in violation of Title 18, United States Code, Sections 1957(a) and 2.

FIRST FORFEITURE ALLEGATION: (18 U.S.C. § 982(a)(6)(A)(ii) – Visa Fraud Forfeiture)

34.     Paragraphs 1 through 14 and 19 through 23 of this Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(6)(A)(ii).

35.     Upon conviction of an offense set forth in Counts 15 through 19 of this Superseding Indictment, a violation of Title 18, United States Code, Section 1546(a) or conspiracy to violate the same, defendant

SUSAN XIAO-PING SU

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(6)(A)(ii), any property, real or personal (I) that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of conviction; or (II) that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of conviction.  The property to be forfeited includes, but is not limited to, the following:

a.     approximately $63,317.59 from Wells Fargo account ending in 9937;

b.     approximately $3,000.18 from Wells Fargo account ending in 6782;

c.     approximately $100.00 from Wells Fargo account ending in 2773;

d.     approximately $7,526.98 from Citibank account ending in 3045;

e.     approximately $934,058.04 from PayPal account ending in 1921;

f.     approximately $15,184.71 from Wells Fargo account ending in 3640;

g.     approximately $338,319.07 from Wells Fargo account ending in 4780;

h.     approximately $227,439.98 from Wells Fargo account ending in 0454;

i.     approximately $30,000.00 from Citibank account ending in 5029;

SUPERSEDING INDICTMENT
CR 11-00288 SBA                    12

0198

| 1 | | j. | approximately $30,000.00 from Citibank account ending in 3045; |
| 2 | | k. | 405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN |
| 3 | | | 946-4547-297), Pleasanton, California; |
| 4 | | l. | 2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018); |
| 5 | | m. | 1371 Germano Way in Pleasanton, California (APN 950-29-18); |
| 6 | | n. | 1087 Murrieta Boulevard #133, Livermore, California (APN |
| 7 | | | 097-0085-132); and |
| 8 | | o. | 2009 Mercedes Benz (VIN: WDDGF54X79R073026). |

9    36.    If any of the property described above, as a result of any act or omission of the

10   defendant:

11           a.    cannot be located upon the exercise of due diligence;

12           b.    has been transferred or sold to, or deposited with, a third party;

13           c.    has been placed beyond the jurisdiction of the court;

14           d.    has been substantially diminished in value; or

15           e.    has been commingled with other property which cannot be divided

16                 without difficulty,

17   the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

18   States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

19           All pursuant to 18 U.S.C. § 982(a)(6)(A)(ii).

20

21   SECOND FORFEITURE ALLEGATION: (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) –
                                    Wire and Mail Fraud Forfeiture)
22

23           37.    Paragraphs 1 through 18 of this Superseding Indictment are hereby realleged and

24   incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States

25   Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

26   / / /

27   / / /

28   / / /

SUPERSEDING INDICTMENT
CR 11-00288 SBA                    13

Case4:11-cr-00288-JST   Document21   Filed11/10/11   Page19 of 23

1    38.   Upon conviction of an offense set forth in Counts 1 through 14 of this

2    Superseding Indictment, a violation of Title 18, United States Code, Sections 1341 and 1343,

3    defendant

4                              SUSAN XIAO-PING SU

5    shall forfeit to the United States, pursuant to Title 18, United States Code, Section § 981(a)(1)(C)

6    and Title 28, United States Code, Section § 2461(c), any property, real or personal that

7    constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from

8    the commission of the offense of conviction.  The property to be forfeited includes, but is not

9    limited to, the following:

10        a.    approximately $63,317.59 from Wells Fargo account ending in 9937;

11        b.    approximately $3,000.18 from Wells Fargo account ending in 6782;

12        c.    approximately $100.00 from Wells Fargo account ending in 2773;

13        d.    approximately $7,526.98 from Citibank account ending in 3045;

14        e.    approximately $934,058.04 from PayPal account ending in 1921;

15        f.    approximately $15,184.71 from Wells Fargo account ending in 3640;

16        g.    approximately $338,319.07 from Wells Fargo account ending in 4780;

17        h.    approximately $227,439.98 from Wells Fargo account ending in 0454;

18        i.    approximately $30,000.00 from Citibank account ending in 5029;

19        j.    approximately $30,000.00 from Citibank account ending in 3045;

20        k.    405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN

21              946-4547-297), Pleasanton, California;

22        l.    2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018);

23        m.    1371 Germano Way in Pleasanton, California (APN 950-29-18);

24        n.    1087 Murrieta Boulevard #133, Livermore, California (APN

25              097-0085-132); and

26        o.    2009 Mercedes Benz (VIN: WDDGF54X79R073026).

27    ///

28    ///

SUPERSEDING INDICTMENT
CR 11-00288 SBA                    14

1    39.    If any of the property described above, as a result of any act or omission of the

2  defendant:

3          a.    cannot be located upon the exercise of due diligence;

4          b.    has been transferred or sold to, or deposited with, a third party;

5          c.    has been placed beyond the jurisdiction of the court;

6          d.    has been substantially diminished in value; or

7          e.    has been commingled with other property which cannot be divided

8                without difficulty,

9  the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

10  States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

11          All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

12

13  THIRD FORFEITURE ALLEGATION: (18 U.S.C. § 982(6)(A)(ii) and/or 18 U.S.C.
                                § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Alien
14                              Harboring Forfeiture)

15    40.    Paragraphs 1 through 14, 28, and 29 of this Superseding Indictment are hereby

16  realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18,

17  United States Code, Section 982(6)(A)(ii) and/or Title 18, United States Code, Section

18  981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

19    41.    Upon conviction of an offense set forth in Counts 22 through 24 of this

20  Superseding Indictment, a violation of Title 8, United States Code, Section 1324, defendant

21                          SUSAN XIAO-PING SU

22  shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(6)(A)(ii)

23  and/or Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code,

24  Section § 2461(c), any property, real or personal, (I) that constitutes, or is derived from or is

25  traceable to the proceeds obtained directly or indirectly from the commission of the offense of

26  conviction; or (II) that is used to facilitate, or is intended to be used to facilitate, the commission

27  of the offense of conviction.  The property to be forfeited includes, but is not limited to, the

28  following:

SUPERSEDING INDICTMENT
CR 11-00288 SBA                    15

1   a. approximately $63,317.59 from Wells Fargo account ending in 9937;

2   b. approximately $3,000.18 from Wells Fargo account ending in 6782;

3   c. approximately $100.00 from Wells Fargo account ending in 2773;

4   d. approximately $7,526.98 from Citibank account ending in 3045;

5   e. approximately $934,058.04 from PayPal account ending in 1921;

6   f. approximately $15,184.71 from Wells Fargo account ending in 3640;

7   g. approximately $338,319.07 from Wells Fargo account ending in 4780;

8   h. approximately $227,439.98 from Wells Fargo account ending in 0454;

9   i. approximately $30,000.00 from Citibank account ending in 5029;

10   j. approximately $30,000.00 from Citibank account ending in 3045;

11   k. 405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN
12    946-4547-297), Pleasanton, California;

13   l. 2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018);

14   m. 1371 Germano Way in Pleasanton, California (APN 950-29-18);

15   n. 1087 Murrieta Boulevard #133, Livermore, California (APN
16    097-0085-132); and

17   o. 2009 Mercedes Benz (VIN: WDDGF54X79R073026).

18 42. If any of the property described above, as a result of any act or omission of the

19 defendant:

20   a. cannot be located upon the exercise of due diligence;

21   b. has been transferred or sold to, or deposited with, a third party;

22   c. has been placed beyond the jurisdiction of the court;

23   d. has been substantially diminished in value; or

24   e. has been commingled with other property which cannot be divided
25    without difficulty,

26 the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

27 States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

28 ///

SUPERSEDING INDICTMENT
CR 11-00288 SBA     16

1     All pursuant to 18 U.S.C. § 982(a)(6)(A)(ii) and/or 18 U.S.C. § 981(a)(1)(C) and 28

2    U.S.C. § 2461(c).

3

4    <u>FOURTH FORFEITURE ALLEGATION</u>: (18 U.S.C. § 982(a)(1) – Money Laundering

5                              Forfeiture)

6     43.    Paragraphs 1 through 14, 32, and 33 of this Superseding Indictment are hereby

7    realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18,

8    United States Code, Section 982(a)(1).

9     44.    Upon conviction of an offense set forth in Counts 26 through 35 of this

10   Superseding Indictment, a violation of Title 18, United States Code, Section 1957, defendant

11                            SUSAN XIAO-PING SU

12   shall forfeit to the United States, pursuant to Title 18, United States Code, Section § 982(a)(1),

13   any property, real or personal, involved in such offense, or any property traceable to such

14   property. The property to be forfeited includes, but is not limited to, the following:

15          a.    405 Boulder Court, Suite 700 (APN 946-4547-296) and Suite 800 (APN

16                 946-4547-297), Pleasanton, California;

17          b.    2890 Victoria Ridge Court, Pleasanton, California (APN 946-4580-018);

18          c.    1371 Germano Way in Pleasanton, California (APN 950-29-18);

19          d.    1087 Murrieta Boulevard #133, Livermore, California (APN

20                 097-0085-132); and

21          e.    2009 Mercedes Benz (VIN: WDDGF54X79R073026).

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

SUPERSEDING INDICTMENT
CR 11-00288 SBA              17

1    45.    If any of the property described above, as a result of any act or omission of the

2    defendant:

3                   a.    cannot be located upon the exercise of due diligence;

4                   b.    has been transferred or sold to, or deposited with, a third party;

5                   c.    has been placed beyond the jurisdiction of the court;

6                   d.    has been substantially diminished in value; or

7                   e.    has been commingled with other property which cannot be divided

8                         without difficulty,

9    the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United

10   States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

11          All pursuant to 18 U.S.C. § 982(a)(1).

12

13   DATED: November 10, 2011                           A TRUE BILL.

14

15

16                                                      _____
                                                        FOREPERSON
17

18   MELINDA HAAG
     United States Attorney
19

20

21   MIRANDA KANE
     Chief, Criminal Division
22

23   (Approved as to form:
                            AUSAs WEST/RHYNE
24

25

26

27

28

     SUPERSEDING INDICTMENT
     CR 11-00288 SBA                        18

0204

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  DAVID COUNTRYMAN (CABN 226995)
   Assistant United States Attorney
5
       450 Golden Gate Avenue, Box 36055
6      San Francisco, California 94102-3495
       Telephone: (415) 436-7303
7      FAX: (415) 436-7234
       david.countryman@usdoj.gov
8
   Attorneys for United States of America
9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13
   UNITED STATES OF AMERICA,           )  CASE NO. CR 11-00288 JST
14                                      )
           Plaintiff,                   )  APPLICATION OF THE UNITED STATES FOR A
15                                      )  PRELIMINARY ORDER OF FORFEITURE
       v.                               )
16                                      )
   SUSAN XIAO-PING SU,                  )
17                                      )
           Defendant.                   )
18  _____)

19        The United States of America, by and through the undersigned Assistant United States

20  Attorney(s), respectfully submits this Application of the United States for Issuance of a Preliminary

21  Order of Forfeiture in the above-captioned case.  In support thereof, the United States sets forth the

22  following:

23                            BACKGROUND

24        Between September 2008 and January 2011, defendant Susan Su engaged in a scheme to defraud

25  non-immigrant aliens of money and property, specifically tuition and other fees, through her

26  establishment of a school called Tri-Valley University ("TVU"), located in Pleasanton, California.  In

27  furtherance of her scheme, she fraudulently obtained authorization from the U.S. Department of

28
                                                                                1
   APP. PRELIM. ORDER OF FORFEITURE
   CR 11-00288 JST

1  Homeland Security ("DHS"), Student and Exchange Visitor Program ("SEVP"), to admit foreign

2  students. Su then collected more than $5.6 million in tuition and other payments from the aliens in

3  exchange for maintaining them in an active student visa status. Su employed some of these aliens at

4  TVU to process student payments, causing them to access government databases without authorization

5  and to create fraudulent visa-related documents. Defendant Su then laundered some of these proceeds

6  through the purchase of millions of dollars of real property and a Mercedes.

7  On November 10, 2011, the Grand Jury returned a thirty-five count Superseding Indictment,

8  charging Su with wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-12); mail fraud, in violation of

9  18 U.S.C. § 1341 (Counts 13-14); conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371

10  (Count 15); visa fraud, in violation of 18 U.S.C. § 1546(a) (Counts 16-19); use of a false document, in

11  violation of 18 U.S.C. § 1001(a)(3) (Count 20); false statements, in violation of 18 U.S.C. § 1001(a)(2)

12  (Count 21); alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A) (Counts 22-24); unauthorized

13  access, in violation of 18 U.S.C. § 1030(a)(3) (Count 25); and money laundering, in violation of 18

14  U.S.C. § 1957 (Counts 26-35). The Superseding Indictment also contains four forfeiture allegations.

15  United States v. Su, CR 11-00288 JST, Docket No. ("ECF") 21.[1]

16  On March 24, 2014, the jury returned guilty verdicts against Su, finding her guilty of all

17  remaining counts charged in the Superseding Indictment. ECF 119.

18  ## LEGAL DISCUSSION

19  Criminal forfeiture is part of the sentence imposed on a person who has been found guilty in a

20  criminal case. Libretti v. United States, 516 U.S. 29 (1995). As a part of the criminal sentence, the

21  government need only establish the forfeiture by a preponderance of the evidence. Id. However, unlike

22  discretionary sentencing considerations, criminal forfeiture is mandatory. United States v. Monsanto,

23  491 U.S. 600, 606 (1989); United States v. Davis, 706 F.3d 1081, 1084 (9th Cir. 2013); United States v.

24  Newman, 659 F.3d 1235, 1239 (9th Cir. 2011). Therefore, "unlike a fine, which the district court retains

25  discretion to reduce or eliminate, the district court has no discretion to reduce or eliminate mandatory

26  criminal forfeiture." Newman, 659 F.3d. at 1240. Similarly, because forfeiture is separate from

27

28  [1] On March 18, 2014, the United States dismissed Counts 23s, 28s, 30s, and 33s.

APP. PRELIM. ORDER OF FORFEITURE
CR 11-00288 JST

2

1   restitution, defendants may be required to pay restitution in addition to forfeiture for the same criminal

2   activity, and payment of restitution does not entitle a defendant to a reduction in the forfeiture amount.

3   Id. at 1241.

4        One of the chief goals of forfeiture is to remove the profit from crime by separating the criminal

5   from his or her dishonest gains. See Newman, 659 F.3d 1235, 1242 (9th Cir. 2011); United States v.

6   Casey, 444 F.3d 1071, 1073 (9th Cir. 2006).  To that end, if property appreciates in value or earns

7   interest, any appreciation or interest is subject to forfeiture. See United States v. Betancourt, 422 F.3d

8   240, 250 (5th Cir. 2005); United States v. Hawkey, 148 F.3d 920, 928 (8th Cir. 1998).  Conversely,

9   forfeiture is not limited to specific assets directly traceable to the offense:  it can also take the form of an

10   in personam judgment against the defendant, even where the defendant has spent or otherwise dissipated

11   the funds and is insolvent.  See United States v. Newman, 659 F.3d 1235, 1242-43 (9th Cir. 2011) citing

12   Federal Rule of Criminal Procedure 32.2.[2]

13        The United States is entitled to criminal forfeiture under three theories: (1) forfeiture of the

14   proceeds from Su's fraudulent scheme; (2) forfeiture of property "involved in" her money laundering;

15   and (3) any property that facilitated the alien harboring.  ECF 21 12:6-18:11.

16        Pursuant to 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C), and 18 U.S.C. § 982(a)(6)(A)(ii),

17   upon conviction, the government is entitled to criminally forfeit any property, real or personal, which

18   constitutes or is derived from proceeds traceable to the charged wire fraud, mail fraud, visa fraud, and

19   alien harboring.  In determining proceeds where the defendant has entered into a conspiracy, the

20   proceeds of his or her crime is equal the total amount of the proceeds obtained by the conspiracy as a

21   whole.  United States v. Newman, 659 F.3d 1235, 1243-46 (9th Cir. 2011).

22        Pursuant to 18 U.S.C. § 982(a)(1), upon conviction, the government is entitled to criminally

23   forfeit any property, real or personal, "involved in" the charged money laundering.  Property that is the

24   subject of a purchase, sale, exchange, or disbursement—the subject matter or corpus of the transaction—

25   is involved in the purchase, sale, or exchange.  See United States v. Nektalov, 461 F.3d 309, 319 (2d

26

_____

27      [2] "Congress sought to punish equally the thief who carefully saves his stolen loot and the thief
who spends the loot on 'wine, women, and song.'"  Newman, 659 F.3d at 1243 citing Casey, 444 F.3d at

28   1073-74.

APP. PRELIM. ORDER OF FORFEITURE                   3
CR 11-00288 JST

1   Cir. 2006); <u>United States v. Kennedy</u>, 201 F.3d 1324, 1326 (11th Cir. 2000); <u>United States v. One 1988</u>

2   <u>Prevost Liberty Motor Home</u>, 952 F. Supp. 1180, 1210 (S.D. Tex. 1996). Such property is forfeitable in

3   its entirety, even if some legitimate funds were also invested in the property. <u>See United States v.</u>

4   <u>Kivanc</u>, 714 F.3d 782, 794-95 (4th Cir. 2013); <u>United States v. Huber</u>, 404 F.3d 1047, 1060 n.11 (8th

5   Cir. 2005).

6       Pursuant to 18 U.S.C. § 982(a)(6)(A)(ii)(II), upon conviction, the government is entitled to

7   criminally forfeit any property, real or personal, that is used to facilitate, or is intended to be used to

8   facilitate the charged alien harboring. "Facilitating property," is not limited to property that is integral,

9   essential or indispensable to the offense, but includes any property that makes the prohibited conduct

10  "less difficult or more or less free from obstruction or hindrance." <u>See United States v. Huber</u>, 404 F.3d

11  1047, 1060 (8th Cir. 2005); <u>see also United States v. Schifferli</u>, 895 F.2d 987, 990 (4th Cir. 1990). This

12  includes real property where harbored aliens are employed. <u>See United States v. Sabhnani</u>, 599 F.3d

13  215, 263 (2d Cir. 2010).

14      Rule 32.2 (b)(1) of the Federal Rules of Criminal Procedure provides that as soon as practicable

15  after entering a guilty verdict or accepting a plea of guilty or nolo contendere on any count in an

16  indictment or information with regard to which criminal forfeiture is sought, the court shall determine

17  what property is subject to forfeiture under the applicable statute. If the government seeks a personal

18  money judgment against the defendant, the court shall determine the amount of money that the

19  defendant will be ordered to pay. Rule 32.2(b)(1)(A). The court's determination may be based on

20  evidence already in the record, or on evidence or information presented by the parties at a hearing after

21  the verdict or finding of guilt. Pursuant to Rule 32.2(b)(2), if the court finds that property is subject to

22  forfeiture, it shall promptly enter a preliminary order of forfeiture setting forth the amount of any money

23  judgment or directing the forfeiture of specific property without regard to any third party's interest in all

24  or part of it. Determining whether a third party has such an interest shall be deferred until any third

25  party files a claim in an ancillary proceeding under Rule 32.2(c).

26      Rule 32.2(b)(3) further provides that the entry of a preliminary order of forfeiture authorizes the

27  Attorney General (or a designee) to seize the specific property subject to forfeiture; to conduct any

28

APP. PRELIM. ORDER OF FORFEITURE
CR 11-00288 JST

4

1   discovery the court considers proper in identifying, locating, or disposing of the property; and to

2   commence proceedings that comply with any statutes governing third party rights. At sentencing or at

3   any time before sentencing if the defendant consents   the order of forfeiture becomes final as to the

4   defendant and shall be made part of the sentence and included in the judgment.  The court may include

5   in the order of forfeiture conditions reasonably necessary to preserve the property's value pending any

6   appeal.

7                    SU'S SCHEME GENERATED MORE THAN $5.6 MILLION IN PROCEEDS

8           Count 15 of the Superseding Indictment charged defendant Su with participating in a conspiracy

9   to commit visa fraud. ECF 21, 6:20-28.  Specifically, it was charged that between February 2009

10  through and January 19, 2011, defendant Su conspired to commit fraud against the United States by

11  forging and falsely making "Certificates of Eligibility for Nonimmigrant (F-1) Student Status," known

12  as Forms I-20.  Id.  At trial, the government presented evidence that TVU's "Petition for Approval of

13  School for Attendance by Nonimmigrant Student," known a Form I-17, which authorized TVU to issue

14  Forms I-20, contained materially false statements.  These fraudulent submissions formed the basis of

15  Counts 1, 13, and 14 (the "I-17 Counts").  On March 24, 2014, the jury found the defendant guilty of

16  that conspiracy, the I-17 Counts, as well as 15 related counts of fraud (Counts 2-12 and 16-19) and two

17  counts of alien harboring (Counts 22 and 24).  ECF 119.

18          Without the fraudulently obtained I-17, TVU could not have generated Forms I-20 or admitted

19  F-1 students.  See March 4, 2014 Trial Transcript, Susan Warren.  Thus, all tuition payments from F-1

20  students are proceeds of the visa fraud conspiracy and the I-17 Counts.  At trial, Special Agent Jason

21  Mackey testified that he reviewed bank records, invoices, and credit card receipts for payments made to

22  Tri Valley University.  He compared tuition payments with names on the SEVIS database to determine

23  whether or not the payment was coming from or on behalf of an F-1 student.  March 18, 2014 Trial

24  Transcript, Mackey Testimony ("Mackey Tr."), pp. Mackey Tr., pp. 7-18.  Special Agent Mackey used

25  that information to calculate that TVU and defendant Su received a total of $5,601,844.72 of tuition fees

26  from F-1 students.

27  ///

28

APP. PRELIM. ORDER OF FORFEITURE
CR 11-00288 JST

                                                                                      5

| Bank Accounts | Total F-1 Payments by Account |
|---|---|
| WFB# 0454 | $2,571,927.00 |
| WFB# 3640 | $105,628.52 |
| WFB# 4780 | $16,517.00 |
| PayPal# 1921 | $2,907,772.20 |
| F-1 Payment Total | $5,601,844.72 |

See Trial Exhibits 109 and 653. Therefore, because these tuition payments are fraud proceeds, the government is entitled to forfeiture of the $5,601,844.72 of proceeds from the fraud for which defendant Su has been convicted pursuant to 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C), and 18 U.S.C. § 982(a)(6)(A)(ii).

The United States has shown that funds seized from the following accounts consisted of proceeds traceable to the defendant's fraud:

1.  $63,317.59 from Wells Fargo account ending in 9937 held in the name TRI-VALLEY UNIVERSITY, INC. / Susan Xiao-Ping SU (hereafter "Account 9937");

2.  $3,000.18 from Wells Fargo account ending in 6782 held in the name TRI-VALLEY UNIVERSITY, INC. / Susan Xiao-Ping SU ("Account 6282");

3.  $100.00 from Wells Fargo account ending in 2773 held in the name TRI-VALLEY UNIVERSITY, INC. / Susan Xiao-Ping SU ("Account 2773");

4.  $37,526.98 from Citibank account ending in 3045 held in the name Susan X SU ("Account 3045");

5.  $934,058.04 seized from Pay Pal account ending in 1921 held in the name Susan SU / ssu@trivalleyuniversity.org ("Account 1921");

6.  $15,184.71 seized from Wells Fargo account ending in 3640 held in the name TRI-VALLEY UNIVERSITY, INC. / Susan Xiao-Ping SU ("Account 3640");

7.  $338,319.07 seized from Wells Fargo account ending in 4780 held in the name TRI-VALLEY UNIVERSITY, INC. / Susan Xiao-Ping SU ("Account 4780");

8.  $227,439.98 seized from Wells Fargo account ending in 0454 held in the name TRI-VALLEY UNIVERSITY, INC. / Susan Xiao-Ping SU ("Account 0454");

APP. PRELIM. ORDER OF FORFEITURE
CR 11-00288 JST

6

Case4:11-cr-00288-JST   Document129   Filed05/01/14   Page7 of 14

9.      $30,000.00 seized from Citibank account ending in 5029 held in the name Susan X. SU ("Account 5029" collectively the "Bank Proceeds");

Special Agent Mackey traced the deposit of over $5.6 million in fraud proceeds deposits into Accounts 1921, 0454, 3640, and 4780. See Mackey Tr. 22-32; Trial Exhibits 109, 501, 501A, 501B, 502, 503, 503A, 650, and 651. He then followed the movement of fraud proceeds between and among those accounts and into Accounts 9937, 6782, 2773, 5029, and 3045. Mackey Tr. 22-32, 55-58; Trial Exhibits 109, 504, 505, 505A, 505B, 506, 507, 508, 509 and 651; see also January 18, 2011 Affidavit by Special Agent Jason Mackey in Support of Seizure Warrants ¶¶ 11-13, attached hereto as Exhibit A; January 21, 2011 Affidavit by Special Agent Bryan Jang in Support of Seizure Warrant ¶¶ 16-17, attached hereto as Exhibit B. Therefore, the Bank Proceeds are subject to forfeiture pursuant to 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C), and 18 U.S.C. § 982(a)(6)(A)(ii).

## PROPERTY INVOLVED IN MONEY LAUNDERING

The jury found the defendant guilty of seven counts of money laundering, in violation of 18 U.S.C. § 1957: Counts 26, 27, 29, 31, 34, and 35. Verdict Form, ECF 119. Each of those counts involved the purchase of a vehicle or one of five pieces of real property in violation of 18 U.S.C. § 1957:

1.  Count 26, a $36,783.61 check used to purchase a 2009 Mercedes Benz, VIN XXXXXXXX;

2.  Count 27, a $78,700.00 wire transfer to purchase 1087 Murrieta Blvd., #113, Livermore, CA;

3.  Count 29, a $160,986.87 cashier's check used to purchase 405 Boulder Court, Suite 800, Pleasanton, CA;

4.  Counts 31, a $261,307.49 cashier's check used to purchase 405 Boulder Court, Suite 700, Pleasanton, CA;

5.  Count 32, a $700,000.00 cashier's check used to purchase 2890 Victoria Ridge Court, Pleasanton, CA;

6.  Counts 34, a $600,000.00 wire transfer used to purchase 1371 Germano Way, Pleasanton, CA; and

APP. PRELIM. ORDER OF FORFEITURE
CR 11-00288 JST

7

1    7.  Counts 34, a $1,200,000.00 wire transfer used to purchase 1371 Germano Way, Pleasanton,

2    CA; (collectively the "Money Laundering Property").

3  ECF 119; see also Mackey Tr., pp. 32-37, 39-55.  Therefore, because the Money Laundering Property

4  was subject matter of the money laundering transactions for which defendant Su was convicted, the

5  Money Laundering Property is subject to forfeiture pursuant to 18 U.S.C. § 982(a)(1).

6

7                  PROPERTY THAT FACILITATED ALIEN HARBORING

8        The jury found the defendant guilty of two counts of alien harboring, in violation of 8 U.S.C. §

9  1324(a)(1)(A): Counts 22 and 24.  Verdict Form, ECF 119.  Those counts charged Su with

10  harboring and shielding aliens from detection through employment at TVU for the purpose of

11  commercial advantage and private financial gain.  Superseding Indictment, ECF 21.  18 U.S.C.

12  § 982(a)(6)(A)(ii)(II) explicitly authorizes the forfeiture of real property used to facilitate alien

13  harboring, and courts have forfeited real property where aliens are employed.  See United States v.

14  Sabhnani, 599 F.3d 215, 263 (2d Cir. 2010).  From the evidence presented at trial, it is clear the TVU's

15  offices were integral to the harboring of the aliens it employed.

16        In Sabhnani, 599 F.3d at 225, the defendants were convicted of harboring aliens, who were

17  forced to work as domestic servants.   Upon conviction, the district court forfeited the defendants' home,

18  which contained a home office, where the aliens worked but did not live.  Id. 261-62.  On appeal, the

19  defendants challenged the forfeiture of the office.  In upholding the forfeiture of the office, the Court of

20  Appeals held it had "no difficulty concluding that the office was 'used or intended to be used to commit

21  or to facilitate the commission of' the crimes." Id. at 261.  The court noted:

22

23        The testimony at trial establishing that Samirah and Enung cleaned the bathroom of the
           office on Mahender's instructions, washed the office floor, and served Mahender drinks
           in the office, demonstrates that some of the labor the maids were forced to do took place

24        in the office.  Moreover, because the maids were "concealed" within the residence and
           they entered the office on occasion, the office was also used to "conceal" them in

25        violation of the harboring statute.  Consequently Mahender's office was used to commit
           the crimes at issue, and it was properly included in the forfeiture.

26
  Id. at 261-62.  Like Sabhnani, the aliens Su harbored were employed at TVU's offices at 405 Boulder

27  Court, Suites 700 and 800.  Similarly, because the aliens physically worked in the offices, and their

28

                                            8

1 student visas provided them with a purported reason to be in the county, the offices concealed them in

2 violation of the harboring statute. Therefore, 405 Boulder Court, Suites 700 and 800 are subject to

3 forfeiture pursuant to 18 U.S.C. § 982(a)(6)(A)(ii), as property used to facilitate, or intended to be used

4 to facilitate the charged alien harboring.

5                                               CONCLUSION

6        WHEREFORE, for the foregoing reasons, and based on the record herein, the United States

7 respectfully requests that this Court enter a Preliminary Order of Forfeiture which provides for the

8 following:

9        a.      forfeiture of the Money Laundering Property and the Bank Proceeds, and all interest and

10 appreciation accrued thereon, to the United States;

11       b.      to the extent that forfeiture of the Money Laundering Property and the Bank Proceeds

12 does not total at least $5,601,844.72, entry of a forfeiture money judgment in the amount of the

13 difference between the forfeited funds and $5,601,844.72;

14       c.      directs the United States, through its appropriate agency, to seize the forfeited property

15 forthwith;

16       d.      authorizes the government to conduct discovery in order to identify, locate or dispose of

17 property subject to forfeiture in accordance with Rule 32.2(b)(3) of the Federal Rules of Criminal

18 Procedure;

19       e.      directs the United States to publish on a government website for at least thirty days,

20 notice of this Order, notice of the government's intent to dispose of the property in such manner as the

21 Attorney General may direct and provide notice that any person, other than the defendants, having or

22 claiming a legal interest in the property must file a petition with the Court and serve a copy on

23 government counsel within thirty (30) days of the final publication of notice or of receipt of actual

24 notice, whichever is earlier; and

25 ///

26 ///

27 ///

28

APP. PRELIM. ORDER OF FORFEITURE
CR 11-00288 JST

9

1    f.    the Court retains jurisdiction to enforce the Preliminary Order of Forfeiture, and to amend

2  it as necessary, pursuant to Federal Rule of Criminal Procedure 32.2(e).

3

4  DATED:                              Respectfully submitted,

5                                      MELINDA HAAG
6                                      United States Attorney

7

8                                      DAVID COUNTRYMAN
9                                      Assistant United States Attorney

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APP. PRELIM. ORDER OF FORFEITURE                                           10
CR 11-00288 JST

# Exhibit A

SEALED

Exhibit B

SEALED

1   JOHN J. JORDAN, ESQ.   (State Bar No. 175678)
    400 Montgomery Street, Suite 200
2   San Francisco, CA   94104
    (415) 391-4814
3   (415) 391-4308 (FAX)

4   Attorney for Defendant
    SUSAN XIAO-PING SU
5

6                 UNITED STATES DISTRICT COURT

7              NORTHERN DISTRICT OF CALIFORNIA

8                 SAN FRANCISCO DIVISION

9   UNITED STATES OF AMERICA,     )     No. CR-11-00288 JST

10             Plaintiff,     )     **NOTICE OF MOTION  AND**
                            )     **MOTION PURSUANT TO**
11   v.                         )     **FED. R. CRIM. P. 29(c)**
                            )
12   SUSAN XIAO-PING SU,        )
                            )     Date:   October 31, 2014
13             Defendant.     )     Time:  9:30 a.m.
                            )     Hon. Jon S. Tigar
14

15   **TO:**     **MELINDA HAAG, UNITED STATES ATTORNEY, AND TO ASSISTANT
          UNITED STATES ATTORNEYS HARTLEY M.K. WEST AND WADE M.
16          RHYNE**

17        PLEASE TAKE NOTICE that at the time and place specified above, or as soon thereafter

18 as the matter may be heard, in the courtroom of the Honorable Jon S. Tigar, United States

19 District Judge, the defendant SUSAN XIAO-PING SU,  through her above-listed counsel, will

20 move and does hereby move this Honorable Court for entry of a judgment of acquittal, pursuant

21 to Federal Rule of Criminal Procedure 29(c).

22        The defendant separately moves  this Court for entry of an order granting a new trial,

23 pursuant to Federal Rule of Criminal Procedure 33.

24        This request is made pursuant to the Fifth and Sixth Amendments to the United States

25 Constitution; Federal Rules of Criminal Procedure 29; subsequent case law; the accompanying

26 //

27 //

28 DEF RULE 29 MTN              1

1     memorandum and declaration; the pleadings and records on file in this matter; and upon such

2     evidence and argument which may be presented prior to and at the hearing on this motion.

3     Dated: August 29, 2014              Respectfully submitted,

4

5                             /s/ John J. Jordan
                            JOHN J. JORDAN
                            Attorney for Defendant

6                             SUSAN XIAO-PING SU

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28     DEF RULE 29 MTN                           2

1  JOHN J. JORDAN, ESQ.   (State Bar No. 175678)
   400 Montgomery Street
2  Suite 200
   San Francisco, CA   94104
3  (415) 391-4814
   (415) 391-4308 (FAX)
4

5  Attorney for Defendant
   SUSAN XIAO-PING SU
6
                     UNITED STATES DISTRICT COURT
7
                   NORTHERN DISTRICT OF CALIFORNIA
8
                      SAN FRANCISCO DIVISION
9
   UNITED STATES OF AMERICA,          )    No. CR-11-00288 JST
10                                     )
               Plaintiff,             )    **MEMORANDUM IN SUPPORT**
11                                     )    **OF MOTION PURSUANT TO**
   v.                                 )    **FED. R. CRIM. P. 29(c)**
12                                     )
   SUSAN XIAO-PING SU,                )
13                                     )
                                      )    Date:   October 31, 2014
14             Defendant.             )    Time:  9:30 a.m.
   _____)    Hon. Jon S. Tigar
15

16

17

18

19

20

21

22

23

24

25                                        '

26

27

28  DEF RULE 29 MTN

0221

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION AND PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. The Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1. Tri-Valley University. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2. The Homeland Security Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I. The Defendant's Motion for a Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29(c) . . . . 8

A. The Evidence was Insufficient to Convict Su on All Counts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B The Government's Proof Was Insufficient as to Multiple Counts. . . . . . . . . . . . . . . . . . . . . . 9

1. There was insufficient proof that counts 1 and 13 were part of a scheme. . . . . . . . . . . . . . . . 9

2. Counts 5 through 12, the wire fraud charges involving the fictitious aliens and counts 16 through 19, charging visa fraud, cannot stand because the crimes were all factually impossible to commit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3. The government's proof was insufficient as to count 15, conspiracy to commit visa fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4. The evidence was insufficient to convict Su of the two counts of harboring. . . . . . . . . . . . 17

a. Both Dasa and Dirisanala were not illegal aliens. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

b. Su did not harbor either Dasa or Dirisanala. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5. The money laundering charges must be dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

DEF RULE 29 MTN                                    i

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3    *Arizona v. United States,* 132 S.Ct. 2492 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4    *Cleveland v. United States,* 531 U.S.12 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

5    *INS v. Lopez-Mendoza,* 468 U.S. 1032 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6    *Jackson v. Virginia,* 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15

7    *Kann v. United States,* 323 U.S. 88 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8    *McNally v. United States,* 483 U.S. 350 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9    *Pereira v. United States,* 347 U.S. 1 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

10   *Schmuck v. United States,* 489 U.S. 705 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11   *Skilling v. United States,* 561 U.S. 358 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

12   *United States v. Alonso,* 48 F.3d 1536 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

13   *United States v. Alarcon-Simi,* 300 F.3d 1172 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 8

14   *United States v. Alston,* 974 F.2d 1206 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15   *United States v. Brissett,* 720 F. Supp. 90 (S.D. Tex. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

16   *United States v. Bush,* 626 F.3d 527 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

17   *United States v. Conway,* 507 F.2d 1047 (5th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18   *United States v. Costello,* 666 F.3d 1040 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

19   *United States v. Cruz,* 554 F.3d 840 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

20   *United States v. Damra,* 621 F.3d 474 (4th Cir. 2010),
21   *cert. denied,* 131 S.Ct. 2930 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     *United States v. Daychild,* 357 F.3d 1082 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17
22
     *United States v. Grice,* 319 F.3d 1174 (9th Cir.), *cert. denied,* 539 U.S. 950 (2003). . . . . . . . . 10
23
     *United States v. Hamrick,* 43 F.3d 877 (4th Cir.) (en banc),
24   *cert. denied,* 516 U.S. 825 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25   *United States v. Hernandez,* 913 F.2d 1506 (10th Cir. 1990),
26   *cert. denied,* 499 U.S. 908 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     *United States v. Hubbard,* 96 F.3d 1223 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
27

28   DEF RULE 29 MTN                              ii

*United States v. Jimenez Recio,* 537 U.S. 270 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Jinian,* 725 F.3d 954 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*United States v. Kellington,* 217 F.3d 1084 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Kim,* 193 F.3d 567 (2nd Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Litteral,* 910 F.2d 547 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Luttrell,* 889 F.2d 806 (9th Cir. 1989),
vacated in part on other grounds, 923 F.2d 764 (9th Cir. 1991),
*cert. denied,* 112 S. Ct. 1558 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Manarite,* 44 F.3d 1407 (9th Cir.), *cert. denied,* 516 U.S. 851 (1995). . . . . . . . 10

*United States v. Morgan,* 238 F.3d 1180 (9th Cir.),  *cert denied,* 534 U.S. 863 (2001) . . . . . . . . . 9

*United States v. Noriega-Perez,* 670 F.3d 1033 (9th Cir. 2012),
 *cert. denied,* 133 S.Ct. 834 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Nukida,* 8 F.3d 665 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Ozcelik,* 527 F.3d 88 (3rd Cir. 2008), *cert. denied,* 555 U.S. 1153 (2009) . . . . 20

*United States v. Pelisamen,* 641 F.3d 399 (9th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Penagos,* 823 F.2d 346 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Price,* 542 F.3d 617 (8th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Rubio-Gonzalez,* 674 F.2d 1067 (5th Cir. 1982*)*. . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Salman,* 266 F. Supp. 2d 1367; (C.D. Fl. 2003),
rev'd on other grounds, *United States v. Salman,* 387 F.3d 1266 (11th Cir. 2004). . . . . . . . . . . 19

*United States v. Santos,* 553 U.S. 507 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Vargas-Cordon,* 733 F.3d 366 (2nd Cir. 2013). . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Von Stoll,* 726 F.2d 584 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . .14

*United States v. Williams,* 553 U.S. 285 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**FEDERAL STATUTES AND RULES**

8 U.S.C. section 1324(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 20, 21

18 U.S.C. section 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 17

18 U.S.C. section 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

DEF RULE 29 MTN                          iii

**0224**

1  | 18 U.S.C. section 922(g)(5)................................................................. 19

2  | 18 U.S.C. section  924(a)(2).. ................................................................ 19

3  | 18 U.S.C. section 1001(a)(2)................................................................. 1

4  | 18 U.S.C. section 1001(a)(3)................................................................. 1

5  | 18 U.S.C. section 1030(a). ................................................................... 2

6  | 18 U.S.C. section 1341 ............................................................ 1, 9, 10, 13

7  | 18 U.S.C. section 1343............................................................ 1, 9, 10, 11, 13

8  | 18 U.S.C. section 1546(a). ................................................................ 1, 11

9  | 18 U.S.C. section 1957. ............................................................... 2, 21, 22

10 | Fed. R. Crim. P. 29. ...................................................................... *passim*

11 | Fed. R. Crim. P. 33. ........................................................................ 1

12 | **OTHER AUTHORITIES**

13 | 2 W. LaFave, Substantive Criminal Law § 11.5(a)(2) (2d ed. 2003)....................... 14

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 | DEF RULE 29 MTN                                 iv

1   JOHN J. JORDAN, ESQ.   (Cal. State Bar No. 175678)
    400 Montgomery Street, Ste. 200
2   San Francisco, CA   94104
    (415) 391-4814
3   (415) 391-4308 (FAX)

4   Attorney for Defendant
    SUSAN XIAO-PING SU

5

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8                      SAN FRANCISCO DIVISION

9   UNITED STATES OF AMERICA,          )   No. CR-11-00288 JST
                                        )
10                    Plaintiff,        )   **MEMORANDUM IN SUPPORT**
                                        )   **OF MOTION PURSUANT TO**
11  v.                                  )   **FED. R. CRIM. P. 29(c)**
                                        )
12  SUSAN XIAO-PING SU,                 )
                                        )   Date:   October 31, 2014
13                    Defendant.        )   Time:   9:30 a.m.
                                        )   Hon. Jon S. Tigar

14              **INTRODUCTION AND PROCEDURAL HISTORY**

15       The defendant, Susan Su, through her above-listed counsel, John J. Jordan, files this

16  memorandum of points and authorities, and accompanying declaration, in support of her post-

17  verdict motion pursuant to Fed. R. Crim. P. 29(c), for entry of a judgment of acquittal.  The

18  defendant moves separately for a new trial pursuant to Fed. R. Crim. P. 33.

19       The defendant was tried on a thirty-five count superseding indictment, charged with a

20  scheme to defraud non-immigrant aliens of money and property, specifically tuition and other

21  fees.  The indictment charged 12 counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2

22  (counts 1 through 12); two counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2 (counts

23  13 and 14); one count of conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371 (count

24  15); four counts of visa fraud, in violation of 18 U.S.C. §§ 1546(a) and 2 (counts 16 through 19);

25  one count of using a false document, in violation of 18 U.S.C. §§ 1001(a)(3) and 2 (count 20); one

26  count of false statements, in violation of 18 U.S.C. §§ 1001(a)(2) (count 21); three counts of alien

27

28   DEF RULE 29 MTN                        1

0226

1   harboring, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 2 (counts 22 through 24); one count

2   of unauthorized access of a government computer, in violation of 18 U.S.C. §§ 1030(a)(3) and 2

3   (count 25); and ten counts of money laundering, in violation of 18 U.S.C. §§ 1957(a) and 2

4   (counts 26 through 35).

5          The superseding indictment also contained four forfeiture allegations.

6          Trial on the superseding indictment began on March 3, 2014, with jury selection. CR 99.

7          On March 18, 2014, the court granted the government's motion to dismiss counts 23, 28,

8   30 and 33. TR 1713.

9          On March 18, 2014, and more formally on March 19, 2014, the defendant orally moved,

10  pursuant to Fed. R. Crim. P. 29, for a judgment of acquittal at the close of the prosecution's case.

11  Docket Entry 78, TR 1714, 1765. The Court stated it would "reserve ruling on Defendant's Rule

12  29 motion until after the jury has returned its verdict or until such other time as the Court may

13  say." TR 1765.

14         On March 24, 2014, the trial ended with the jury finding Su guilty of all 31 remaining

15  counts in the indictment. CR 118-20; ER 652.

16         Now that the evidence has been received, and the jury has found Su guilty, the defendant

17  moves post-verdict under Rule 29(c) for a judgment of acquittal. Su moves this Court to consider

18  the Rule 29 issues anew, now that receipt of the trial transcripts allows a more thorough

19  examination of the government's case.

20         First, as to all the counts, the defendant moves for a judgment of acquittal, on the grounds

21  that the government introduced insufficient evidence to convict the defendant; the proof at trial

22  did not establish the crimes set out in the indictment; and there was insufficient proof on the

23  defendant's intent to commit the crimes charged in the indictment.

24         Second, there were specific proof issues as to several counts in the indictment, such that

25  the defendant's Rule 29 motion should be granted.

26

27

28  DEF RULE 29 MTN                                    2

1                              **FACTUAL BACKGROUND**

2  **A.    The Government's Case**

3  **1.    Tri-Valley University**

4           The government contended at trial that the defendant Susan Su engaged in a scheme to

5  defraud various non-immigrant foreign students, by submitting false articulation agreements to the

6  Department of Homeland Security, in order to improperly qualify for certification under the

7  Department's Student Exchange Visitor Program (SEVP), so that Tri-Valley could enroll foreign

8  students with F-1 visas, and access SEVIS, the Department of Homeland Security computer

9  program and database for monitoring the status of F-1 students.

10          If a school is not accredited by an accrediting association recognized by the U.S.

11  Department of Education, then SEVP requires the school to get three articulation agreements from

12  other accredited schools. TR 258-59. The articulation agreement must specify that the accredited

13  school has been and would continue to unconditionally accept transfer credits from the

14  unaccredited school. TR 259-60.

15          On February 10, 2009, Susan Su forwarded to SEVP three original articulation

16  agreements. TR 320.

17          One signed agreement purported to be an amended agreement between San Francisco State

18  University and Tri-Valley, with a signature of Dr. Shy Shenq Liou of San Francisco State

19  University certifying that San Francisco State, an accredited school, had been accepting transfer

20  credits in computer science and engineering courses at Tri-Valley since May 2008, and would

21  continue to do so. TR 321-24.

22          The government contended at trial that the articulation agreement was fraudulent, and Dr.

23  Liou testified that he did not sign the second articulation agreement, that he never approved

24  transfer credits for any engineering course taught at Tri-Valley, and did not have authority to bind

25  San Francisco State as set out in the agreement. TR 494-96.

26

27

28  DEF RULE 29 MTN                           3

1    A second signed agreement purported to be an agreement between the University of

2  Central Florida and Tri-Valley, bearing a signature of Su's brother, Xiao-Gang Su, a teaching

3  assistant at Central Florida.  The agreement certified that Central Florida, an accredited school,

4  had been accepting transfer credits in computer science and engineering courses at Tri-Valley

5  since May 2008, and would continue to do so.  TR 324-26.

6    The government contended that this second articulation agreement was also false. Scott

7  Cole, vice president and General Counsel at Central Florida, testified  that the agreement was not

8  valid, and that the statement that Central Valley had accepted transfer credits from Tri-Valley and

9  would continue to accept transfer credits in the future was not true.  TR 777-79.  In Cole's

10 opinion, Xiao-Gang Su, who was listed on the purported articulation agreement, did not have

11 authority to enter into an articulation agreement on behalf of Central Florida.  TR 779-80.

12    SEVP approved Tri-Valley on February 17th, 2009.  TR 329.

13    The government presented testimony that once a school is approved by SEVP, it must

14 limit its own access to SEVIS to designated school officials (DSOs).  TR 251.  The SEVIS system

15 warned users that the system was limited to authorized users only.  TR 254-54.

16    In December 2008, Tri-Valley filed with SEVP a signed I-17a, which designated Sophie

17 Su (the defendant's sister) as the principal designated school official (DSO), and the defendant

18 and Vince Wang as DSOs, and certified that the DSOs were familiar with and would follow

19 SEVP rules and regulations.  TR 301-07, 750-52.

20    The government presented evidence that Su regularly logged onto SEVIS with various

21 laptop computers and then handed the laptops to employees such as Vishal Dasa, Anji Dirisanala,

22 and Parth Patel, who would enter data  into the SEVIS system and print out I-20s.  TR 809, 813-

23 14, 845, 1157-68, 1501-13.  The workers would then take the I-20 forms to Su to sign, and she

24 would sign them, in the name of the DSO printed on the form.  TR 814-15, 1176-78, 1515-16.

25    The government also contended that under SEVP regulations, only three course units a

26

27

28  DEF RULE 29 MTN                              4

**0229**

1  semester could be taken online, and the remaining course units must be taken physically at the

2  school facility, taught by qualified instructors.  TR 289, 768-69.

3         The government presented testimony at trial from cooperating witnesses Dasa, Patel, and

4  Dirisanala, that Tri-Valley did not physically hold classes on campus (TR 818, 1185; 1518); that

5  its online class frequently did not function correctly (TR 818-19, 1187-88, 1192, 1200, 1508-10);

6  that students received grades without attending classes; (TR 803-05, 811-12, 836, 1511); and

7  would admit all students who applied.  TR 810, 1172-74, 1212-16, 1506-07, 1512-14.

8         The government presented evidence that Su listed several individuals as instructors at Tri-

9  Valley who had not agreed to teach a course. Dr. Hao Lao, his wife Dr. Qi Jing, and Dr. Miller

10  Allen testified that they never agreed to teach a course at Tri-Valley, and never gave permission

11  for Tri-Valley to list them as instructors.   TR 448-50, 467-68,  560-61.

12        The government called a number of former students of Tri-Valley at the trial, including

13  Vandana Virmani (TR 172-74); Bhanu Teja Challagundla (TR 886-893, 936-37); Santhosh

14  Ignatius (TR 1345-51); Kalpana Challa (TR 1416-19); and Naveen Kundur (TR 1567, 1570-71),

15  who testified that there were no physical classes taught at Tri-Valley (RT 1363, 1405, 1420-21,

16  1464-65, 1572, 1577); that there were problems with the online class program (RT 179-81, 210,

17  907-09, 1428-29, 1465, 1572-1586); and grades were received for classes not taken.  RT 184-86,

18  909-12, 1385-86, 1438-39.

19  **2.     The Homeland Security Investigation**

20        Special Agent Jason Mackey of Homeland Security testified that he reviewed Tri-Valley's

21  initial 2008 I-17 application, which indicated that Tri-Valley was enrolling 30 students.  TR 569-

22  71.  The SEVIS database indicated that in May 2010, Tri-Valley had enrolled 900 students, with a

23  large number of students listed as living in either an apartment on El Camino Real or another

24  apartment at 20 Iris Avenue in Sunnyvale.  TR 571-74, 689.

25        During his investigation of Tri-Valley, Agents Mackey and Dale Taylor participated with

26  other Homeland Security Agents in several undercover operations, in which that agent used Anji

27

28  DEF RULE 29 MTN                              5

**0230**

1   Dirisanala, a former student and employee at Tri-Valley, to enrol fictitious students at Tri-Valley.
2   TR 994-1031, 1110, 1140-41, 1216-22. The agents also had Agent Rajeev Bhatia, acting in an
3   undercover capacity under the name of "Rajiv Batra," enroll as a student at Tri-Valley. TR 1049,
4   1310-17. The agents also placed several ruse telephone calls and a ruse site visit with Su at Tri-
5   Valley, asking for and receiving documentation that the three fictitious students were students in
6   good standing. TR 959-672, 979, 1055-57, 1060-74, 1093-1101, 1605-10, 1075-77, 1131.

7           During one site visit, Su told Agent Dylan Critten that two of the fictitious students had
8   been attending classes and she had personally taught a class for both. TR 969.

9           On January 19, 2011, Mackey and other agents executed search warrants on businesses
10  and accounts related to Susan Su and Tri-Valley. TR 584, 686. At that time, there were
11  approximately 1700 students listed as enrolled at Tri-Valley. TR 688, 1139. Various computers
12  hard drives, credit card and financial records, and Tri-Valley transcripts for Bhargav Boinpally,
13  Samuel Steven Kancharakuntla, and Abhilash Surineni, the three ABS employees, were seized
14  during the searches. TR 647. 650-53.

15          Agents were later able to access email messages that the government contended showed
16  Su arranging to provide graduate degrees for relatives of Bhargav Boinpally. TR 653-62, 670-72,
17  708. Agents also recovered an email exchange between Su and Bjorn Frogner, which agents
18  believed was an attempt by Su to purchase an articulation agreement. TR 667-69, 673-75. Agents
19  recovered another email in which Su contacted San Francisco State University, requesting an
20  articulation agreement be established with the university. TR 676-77.

21          Agents also found emails from students, requesting information about courses and missing
22  materials, that Su responded to by stating that the courses were being developed, that instructors
23  would be shortly hired, and that the students would get good grades. TR 679-85.           During
24  the execution of the search warrant, Mackey interviewed Susan Su at her residence in Pleasanton,
25  California. TR 584. Su voluntarily agreed to the interview. TR 688. Mackey testified that Susan
26  Su made various statements to him during the interview, including that Sophie Su and Wang had

27

28      DEF RULE 29 MTN                            6

1  full-time jobs, and did not intend on actually being DSOs for Tri-Valley (TR 589-90); that she had
2  prepared the initial and amended articulation agreements with San Francisco State University; that
3  Shy Shenq Liou had signed both agreements (TR 592-93), and that her brother, Xiao-Gang Su, a
4  student advisor at the University of Central Florida, signed the articulation agreement with Tri-
5  Valley, after a department chair said the college had a policy against signing a blanket agreement.
6  TR 593-94.  Su said no students had ever transferred credits from Tri-Valley and asked Mackey
7  not to contact the signers of the articulation agreement.  TR 596.

8        Su told Mackey that the 22 instructors she had submitted on the I-17 had originally agreed
9  to teach courses, but only three actually ended up teaching a course.  TR 598-99, 745.  She said  in
10 the beginning she taught all the courses.  TR 598-99.  Su explained that the students attended
11 through an online mechanism that allowed for student interaction.  TR 603.  Su said she
12 considered that being physically present.  TR 769-71.

13       Su explained she had instructed staff members at Tri-Valley to enter the El Camino Real
14 or Iris Avenue apartments in Sunnyvale for students who were not in the United States yet or who
15 lived outside of California.  TR 605.  Su also explained that many transcripts listed "A" grades for
16 all courses, because she was creating a template and the "A" grades were placeholders.      Su told
17 Mackey that she used proceeds from Tri-Valley to purchase the residences at 2890 Victoria Ridge
18 Court, 1371 Germano Way, 1087 Murrieta Boulevard, Number 133,  Livermore, and 405 Boulder
19 Court, Suites 700 and 800.  TR 628-33.  Su also used proceeds to purchase a Mercedes Benz
20 automobile.  TR 633-35.  Su also wrote checks for $30,000 from Tri-Valley bank accounts to her
21 two daughters.  TR 635.  She also wrote a check for $75,000 to her husband from a Tri-Valley
22 account, to have him relinquish his property rights to one property she was purchasing.  TR 636-
23 37.

24       Agent Mackey conducted a financial analysis of Tri-Valley and Susan Su's financial
25 records, testifying that he traced proceeds from Tri-Valley used to purchase the various properties
26 he questioned Su about on January 19, 2011.  TR 1636-63.

27

28   DEF RULE 29 MTN                          7

**ARGUMENT**

**I.    Defendant's Motion for a Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29(c)**

The defendant now moves, post-verdict, pursuant to Fed. R. Crim. P. 29(c), for entry of a judgment of acquittal.

"A judgment of acquittal is improper if, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Kellington,* 217 F.3d 1084, 1094-95 (9th Cir. 2000), quoting *United States v. Alston*, 974 F.2d 1206, 1210-1211 (9th Cir. 1992), see also *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) ("In ruling on a Rule 29 motion, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (internal quotation marks omitted)).

**A.    The Evidence was Insufficient to Convict Su on All Counts**

At the close of the prosecution's case, the defendant moved, pursuant to Fed. R. Crim. P. 29(a), that the prosecution had not met its burden of proof on any of the counts in the indictment. TR 1765. The defense now renews this motion at the close of the entire case, pursuant to Fed. R. Crim. P. 29(c).

The defendant submits that the government's evidence at trial was insufficient to convict the defendant on the charges contained in the indictment; that the proof at trial did not establish the crimes set out in the indictment; and there was insufficient proof on the defendant's intent to commit the crimes charged in the indictment. Su contends that the evidence of her intent to engage in a scheme to defraud with others was insufficient.

Moreover, the defendant renews her motion now at the close of the evidence, to preserve the issue on appeal. "The proper way . . . to challenge the sufficiency of the government's evidence pertaining to [a] jurisdictional element . . . is a motion for acquittal under Rule 29, presented at the close of the government's case-in-chief." *United States v. Cruz,* 554 F.3d 840,

DEF RULE 29 MTN                                           8

**0233**

1  844 (9th Cir. 2008), citing  *United States v. Morgan,* 238 F.3d 1180, 1186 (9th Cir.)*, cert denied,*

2  534 U.S. 863 (2001)  (quoting *United States v. Nukida,* 8 F.3d 665, 672-73 (9th Cir. 1993).

3  **B.      The Government's Proof Was Insufficient as to Multiple Counts**

4           There were specific proof issues as to multiple counts in the indictment, such that the

5  defendant's Rule 29 motion should be granted.

6  **1.      There was insufficient proof that counts 1 and 13 were part of a scheme**

7           Count 1 of the indictment charges wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

8  The indictment specifies that the basis of count 1 is Su's electronic submission on September 15,

9  2008, of the initial I-17 application to SEVP.  Count 13 of the indictment charges mail fraud, in

10 violation of 18 U.S.C. §§ 1341 and 2.  The indictment specifies that the basis of count 13 is Su's

11 mailing on or about December 23, 2008, of the revised Form I-17 and documents to SEVP.

12          Neither count was proven at trial, because even assuming that Su engaged in a scheme to

13 defraud, the government failed to introduce any evidence that the scheme had begun at the time

14 the initial form I-17 was submitted on September 15, 2008, or at the time the revised form I-17

15 was submitted on December 23, 2008.

16          Sufficient evidence to support a wire fraud conviction exists if, "after viewing the

17 evidence in the light most favorable to the prosecution, any rational trier of fact could have found

18 the essential elements of the crime beyond a reasonable doubt." *United States v. Jinian,* 725 F.3d

19 954, 960  (9th Cir. 2013), citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

20          The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of

21 wire, radio, or television to further the scheme; and (3) a specific intent to defraud.  *United States*

22 *v. Jinian,* 725 F.3d at 960, citing *United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011).

23          The wire fraud statute criminalizes conduct by any person who, "having devised or

24 intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by

25 means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals,

26 pictures, or sounds for the purpose of executing such scheme or artifice . . . ." *Jinian,* 725 F.3d at

27 960, citing 8 U.S.C. § 1343 (2006).  Section 1343, however, "does not purport to reach all frauds,

28  DEF RULE 29 MTN                          9

**0234**

1  but only those limited instances" wherein use of a wire "is a part of the execution of the fraud,

2  leaving all other cases to be dealt with by appropriate state law." *Id.,* at 960, citing *Kann v. United*

3  *States*, 323 U.S. 88, 95 (1944).

4         *Jinian* also pointed out since mail and wire fraud are both defined as "any scheme or

5  artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

6  representations, or promises, ... the wire fraud statute is read in light of the case law on mail

7  fraud," *Id.,* citing *United States v. Manarite*, 44 F.3d 1407, 1411 n.5 (9th Cir.), *cert. denied,* 516

8  U.S. 851 (1995).

9         For purposes of the mail fraud statute, the mailings must be "sufficiently closely related"

10  to the scheme. *United States v. Grouse,* 319 F.3d 1174 (9th Cir.), *cert. denied,* 539 U.S. 950

11  (2003), citing *United States v. Hubbard*, 96 F.3d 1223, 1228 (9th Cir. 1996) (quoting *Pereira v.*

12  *United States*, 347 U.S. 1, 8-9 (1954)).

13         Similarly, for purposes of 18 U.S.C. § 1343, a wire communication has to be in

14  furtherance of the defendant's fraudulent scheme. *United States v. Jinian,* 725 F.3d at 960.  The

15  "relevant question at all times" is whether a wire "is part of the execution of the scheme as

16  conceived by the perpetrator at the time." *United States v. Jinian,* 725 F.3d at 961, citing *Schmuck*

17  *v. United States*, 489 U.S. 705, 715 (1989).

18         Here, neither count 1 or 13 was proven at trial, because there was insufficient proof that

19  the emailing of the form I-17 sent on September 15, 2008 (count 1), or the mailing of the revised

20  form I-17 on December 23, 2009 (count 13), was part of the execution of the scheme.  The

21  government assumes that Tri-Valley was a fraud at its inception, but there was no proof of that at

22  trial.  Not every unaccredited school is a fraud, and not every school offering on line courses is a

23  fraud.  Looking at the trial evidence in the light most favorable to the government, there was no

24  evidence that any scheme started no earlier than on or about February 10, 2009, when the

25  government alleges the articulation agreements were mailed.

26         Accordingly, this Court should grant defendant's Rule 29 motion for a judgment of

27  acquittal as to counts 1 and 13.

28  DEF RULE 29 MTN                                     10

**0235**

2.     **Counts 5 through 12, the wire fraud charges involving the fictitious aliens and Counts 16 through 19, charging visa fraud, cannot stand because the crimes were all factually impossible to commit.**

Su was convicted by the jury of all 12 counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (counts one through 12) and all four counts of visa fraud, in violation of 18 U.S.C. §§ 1546(a) and 2 (counts 16 through 19) in addition to the other counts of conviction. However, the government's proof was insufficient as to the wire fraud convictions in counts 5 through 12, as well as all four visa fraud convictions in counts 16 through 19, because the charges all involve fictitious aliens.

These convictions cannot stand, however, because the crimes were all factually impossible to commit, as there were no real persons who could be defrauded, and there were no real persons who could receive visas or who needed immigration papers.  Thus it was factually impossible for Su to commit these crimes.  See *United States v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989), *vacated in part on other grounds*, 923 F.2d 764 (9th Cir. 1991), *cert. denied*, 112 S. Ct. 1558 (1992).

"Legal impossibility exists when the intended acts would not constitute a crime under the applicable law. Factual impossibility refers to those situations in which, unknown to the defendant, the consummation of the intended criminal act is physically impossible." See *United States v. Luttrell*, 889 F.2d at 810. "Factual impossibility exists 'where the objective is proscribed by the criminal law but a factual circumstance unknown to the actor prevents him from bringing it about.'" *United States v. Conway*, 507 F.2d 1047, 1050 (5th Cir. 1975).

Here, it was factually impossible for Su to commit the wire fraud charged in counts 5 through 8, because the named victims were all fictitious.  These "victims" were part of the ruse undercover sting operation conducted by the government.

Count 5 specifies that the basis for the charge was the July 27, 2010 SEVIS entry by Tri-Valley for "S.A."  Count 6 specifies that the basis for the charge was the July 27, 2010 SEVIS entry by Tri-Valley for "K.D."

DEF RULE 29 MTN                              11

1    "S.A" and "K.D." are the initials of the names of the two fictitious graduate students
2  Sparsh Agrawat and Kadir Dirikan, that Anji Dirisanala pretended to enroll at Tri-Valley.  TR
3  995, 1105, 1217.   Viewed in the light most favorable to the government, the trial testimony
4  establishes that on July 27, 2010, Dirisanala went to Tri-Valley, made payments for Diriken and
5  Agrawat, and received continued attendance I-20s. TR 1005-09, 1112-13, 1225-31.  The
6  government argued to the jury that these acts constituted proof that Su committed wire fraud as
7  charged in counts 5 and 6.  TR 1825-26.

8    Count 7 specifies that the basis for the charge was the August 31, 2010 SEVIS entry by
9  Tri-Valley for "M.R."

10    "M.R." are the initials for the name of the fictitious undergraduate student Mohammad
11  Rizwan, that the Homeland Security agents again gave to Dirisanala, who they directed to pretend
12  to enroll at Tri-Valley.  TR 1016-20.  Viewed in the light most favorable to the government, the
13  trial testimony establishes that on August 31, 2010, Dirisanala went to Tri-Valley, made a tuition
14  payment for Rizwan, and received a continued attendance I-20.  TR 1016-20, 1038-45, 1242.  The
15  government then argued to the jury that these acts constituted proof that Su committed wire fraud
16  as charged in count 7.  TR 1826-27.

17    Count 8 specifies that the basis for the charge was the September 7, 2010 SEVIS entry by
18  Tri-Valley for "R.B."

19    "R.B." are the initials for the undercover name  of "Rajeev Batra" that was adopted by
20  Special Agent Rajeev Bhatia, who acted in an undercover capacity while investigating Tri-Valley.
21  TR 1049, 1310-11.  Viewed in the light most favorable to the government, the trial testimony
22  establishes that on September 7, 2010, Agent Bhatia, acting in an undercover capacity under the
23  name of "Rajeev Batra," went to Tri-Valley and enrolled as a student, receiving an I-20 after
24  making a tuition payment.  TR 1049, 1310-11, 1318, 1051-52.  The government then argued to
25  the jury that these acts constituted proof that Su committed wire fraud as charged in count 8.  TR
26  1827-28.

27

28   DEF RULE 29 MTN                            12

**0237**

1    Similarly, count 9 (Sparsh Agrawat); count 10  (Kadir Dirikan); count 11 (Mohammad

2  Rizwan); and count 12 (Rajeev Batra) all charge Su with wire fraud, for sending emails to

3  Homeland Security in response to ruse phone calls that the fictitious students were stranded at

4  airports. TR 1057-63; 1068-74; 1600-10.  The government then argued to the jury that these acts

5  constituted proof that Su committed wire fraud as charged in count 8.  TR 1828-35.

6    Finally, count 16 (Sparsh Agrawat); count 17 (Kadir Dirikan); count 18 (Mohammad

7  Rizwan); and count 19 (Rajeev Batra) all charge SU with committing visa fraud by falsely making

8  Form I-20s for the fictitious students, alleging the same underlying transactions on the same dates

9  charged as wire fraud in count 5 (Sparsh Agrawat); count 6 (Kadir Dirikan); count 7 (Mohammad

10  Rizwan); and count 8 (Rajeev Batra). The government then argued to the jury that these acts

11  constituted proof that Su committed visa fraud.  TR 1842-43.

12    All 12 of these counts charge crimes that were factually impossible for Su to commit.

13  First, for counts 5 through 12, Su could not commit wire fraud, under the theory charged in the

14  indictment, because real victims that could be defrauded did not exist.  The scheme to defraud

15  alleged in the indictment charged Su with engaging in an "illegal scheme to defraud non-

16  immigrant aliens of money and property, specifically tuition and other fees."  See Indictment. But,

17  Sparsh Agrawat, Kadir Dirikan, Mohammad Rizwan, and Rajeev Batra were fictitious students,

18  and not actual non-immigrant aliens.

19    At best, these counts are a back door effort by the government to get around defendant

20  Su's October 11, 2011 pre-trial motion to dismiss the indictment.  CR 19.  The original indictment

21  filed by the government attempted to criminalize a scheme to defraud the U.S. Government with

22  respect to its ability to regulate and control entry of foreign nationals in the United States.  But,

23  the defendant pointed out that the indictment did not charge a property interest for purposes of

24  sections 1341 and 1343.  The defendant pointed out that in *McNally v. United States*, 483 U.S.

25  350, 360 (1987), the Supreme Court held that the federal mail fraud statute is "limited in scope to

26  the protection of property rights."  When Congress amended the law to cover the intangible right

27  of honest services, the Supreme Court then ruled in *Skilling v. United States*, 561 U.S. 358 (2010)

28  DEF RULE 29 MTN                          13

1 that "honest services fraud" applies only to bribes and kickbacks. Finally, in *Cleveland v. United*
2 *States,* 531 U.S.12 (2000), the Supreme Court explained that the property being protected is
3 property of the victim.

4     The government filed a response, stating that a superseding indictment it was filing would
5 address Su's concerns. CR 20, 21. But, even though the government was put on notice by the
6 defense motion, it filed a superseding indictment that still contained counts where there were no
7 actual non-immigrant victims. None of the allegations mention any money or property of the
8 United States Government which the fraud was intended to reach, and any attempt to do so now
9 would be fatal, as the evidence offered at trial would prove facts materially different from those
10 alleged in the indictment. See *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984).
11 Thus, Su's Rule 29 motion regarding counts 5 through 12 should be granted.

12     Finally, it was similarly factually impossible for Su to commit visa fraud, as charged in
13 counts 16 through 19. The indictment charges that Su committed visa fraud, by fraudulently
14 making Form I-20s for the four individuals Sparsh Agrawat, Kadir Dirikan, Mohammad Rizwan,
15 and Rajeev Batra. See Indictment. But, these "individuals" were not real students who would be
16 able to continue their status as F-1 students thanks to any I-20s issued by Tri-Valley. Thus, no
17 visa fraud could be committed.

18     Nor should the charges be reduced at this time to an attempt to commit the crimes in
19 question. In *United States v. Williams*, 553 U.S. 285 (2008), the Supreme Court noted that "All
20 courts are in agreement that what is usually referred to as 'factual impossibility' is no defense to a
21 charge of attempt." *Id.,* at 300, citing 2 W. LaFave, Substantive Criminal Law § 11.5(a)(2) (2d ed.
22 2003; *United States v. Hamrick*, 43 F.3d 877, 885 (4th Cir.) (en banc) *cert. denied,* 516 U.S. 825
23 (1995) (further citations omitted). But, the government did not charge attempt, and did not ask for
24 a lesser included instruction at trial. It is too late now to seek to substitute charges, as the
25 defendant's trial is now over and Su has no chance of defending against an attempt charge.

26     Accordingly, Su's Rule 29 motion should be granted as to counts 5 through 12 and 16
27 through 19.

28   DEF RULE 29 MTN          14

**0239**

**3.     The government's proof was insufficient as to count 15, conspiracy to commit visa fraud.**

The government's proof at trial was insufficient to prove that the defendant was guilty in count 15 of conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371, because there was insufficient proof introduced that anyone conspired with Su.

A conviction for conspiracy is supported by sufficient evidence if, in viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Alonso,* 48 F.3d 1536, 1543 (9th Cir. 1995). The elements of conspiracy are 1) an agreement to accomplish an illegal objective, 2) along with one or more acts in furtherance of that objective, and 3) the intent necessary to commit the underlying substantive offense. *United States v. Alonso,* 48 F.3d at 1543.

The Supreme Court has held that the "essence of a conspiracy" is "an agreement to commit an unlawful act." *United States v. Daychild,* 357 F.3d 1082, 1096 (9th Cir. 2004), quoting *United States v. Jimenez Recio,* 537 U.S. 270, 274 (2003) (internal quotation marks and citation omitted).

The government's evidence at trial focused almost, if not totally, on Su. The government failed to show that anyone else reached an agreement with Su to engage in a conspiracy to commit visa fraud. The defendant is unaware of any testimony that any of the workers at Tri-Valley knew about the articulation agreements; that Sophie Su or Vince Wang knew about the articulation agreements; and that any of the recruiters or consultants knew about the articulation agreement. The defendant is also unaware of any testimony regarding the signing of the Central Florida articulation agreement.

Moreover, while there was testimony by some of the workers that Tri-Valley was not holding physical classes, workers such as Dirisanala testified he was worried about this circumstance (TR 1186), not that he voluntarily engaged in a conspiracy with Su. In fact, the government contended that Su threatened the workers and refused to allow transfers. This fails to show that anyone knowingly and voluntarily joined a conspiracy. See *United States v. Damra,*

DEF RULE 29 MTN                                    15

1 | 621 F.3d 474, 499 (4th Cir. 2010), *cert. denied*, 131 S.Ct. 2930 (2011) (defendant must

2 | knowingly and voluntarily join conspiracy).

3 |       No co-conspirators are identified the indictment, instead the indictment only states that Su

4 | conspired with "others." Further, all the overt acts but one listed in the indictment were alleged to

5 | have been committed by Su. Overt act (b) lists a fact that Tri-Valley issued a check on April 30,

6 | 2010, to an unidentified co-conspirator as a commission payment for recruiting a student. While

7 | the government argues that Su conspired with ABS, there is nothing per-se illegal about recruiters

8 | such as ABS. Su is unaware of any testimony that the ABS recruiters, or any recruiters, joined

9 | into a conspiracy with Su. Instead, there was testimony that when Santhosh Ignatius, came to the

10 | United States and was met by Ramakrishna Karra, Karra told him that Tri-Valley was not a real

11 | university and he should transfer to another school. TR 1351-55, 1400-01.

12 |       Further, the testimony by agent Taylor regarding the transfer of funds out of Tri-Valley

13 | also focused solely on Su. There is no testimony that defendant is aware of that established that

14 | some unidentified co-conspirator shared in proceeds from Tri-Valley. And, while employees were

15 | paid money for working at Tri-Valley, their testimony again painted a picture of a boss giving

16 | orders to workers, often in an uncomfortable atmosphere.

17 |       Importantly, none of the workers who were separately charged by the government were

18 | actually convicted of conspiracy to engage in visa fraud. Instead, all four pled guilty and were

19 | sentenced to a different charge, conspiracy to commit authorized access of a government

20 | computer. TR 816-17, 1212-16; also see *United States v. Dasa, et. al.,* CR 11-0742 KAW.

21 |       In short, while there may have been testimony that others may have been aware of some of

22 | the activities at Tri-Valley, there was insufficient evidence to show that anyone entered into an

23 | agreement with Su to engage in visa fraud. Even assuming there was illegal activity ongoing and

24 | even assuming others knew of it, mere knowledge of a criminal activity is insufficient to show

25 | participation in a conspiracy. See *United States v. Price,* 542 F.3d 617, 620 (8th Cir. 2008)

26 | ("Mere knowledge of a criminal conspiracy is insufficient.").

27 |

28 | DEF RULE 29 MTN              16

1    The government may argue that the "connection to the conspiracy, however slight, is

2  sufficient to sustain a conviction." *United States v. Daychild,* 357 F.3d at 1096, citing *United*

3  *States v. Litteral,* 910 F.2d 547, 550 (9th Cir. 1990); *United States v. Penagos,* 823 F.2d 346, 348

4  (9th Cir. 1987).  "However, this minimal standard of proof to sustain a conviction is only

5  triggered 'once a conspiracy exists,' not as a means of proving at the threshold that two

6  defendants have conspired to commit unlawful acts." *United States v. Daychild,* 357 F.3d at

7  1096, quoting *United States v. Penagos,* 823 F.2d at 348.

8    Thus, the government failed to prove that Su conspired to commit visa fraud.

9  **4.    The evidence is insufficient to convict Su of the two counts of harboring**

10    The jury convicted Su in counts 22 and 24 of alien harboring, in violation of 8 U.S.C. §§

11  1324(a)(1)(A)(iii) and 2.

12    Su was charged in counts 22 and 24, between February 2009 and January 19, 2011, with

13  acting in knowing or in reckless disregard of the fact that Vishal Dasa and Anji Dirisanala had

14  unlawfully come to, entered, or remain in the United States, concealed, harbored, or shielded from

15  detection, or attempted to conceal, harbor, or shield from detection, such alien, through

16  employment at Tri-Valley.   See Superseding Indictment, at page 14.

17    However, viewing the evidence in the light most favorable to the government, no rational

18  trier of fact could have found the defendant guilty beyond a reasonable doubt of either count of

19  alien harboring, because the government failed to prove two separate elements of the crime.  First,

20  contrary to the assumptions of the government, neither named alien in counts 22 and 24 was

21  actually an illegal alien at the times specified in the counts in the indictment.  Second, the

22  government failed to prove that Su concealed, harbored, or shielded from detection either alien.

23  **a.    Both Dasa and Dirisanala were not illegal aliens**

24    Count 22 names Vishal Dasa as the illegal alien who was harbored.  But, the trial

25  testimony established that in the fall of 2009, Dasa was legally in this country on an F-1 student

26  visa from India, when he transferred to Tri-Valley from International Technical University.  TR

27  789-96, 841.  After enrolling at Tri-Valley, Dasa received an I-20 form, attesting to standing as an

28  DEF RULE 29 MTN                       17

1   enrolled student.  TR 797-99.  Dasa stayed enrolled as an F-1 student at Tri-Valley from 2010

2   until the school was shut down in January 2011.  TR 836.

3        Count 24 names Anji Dirisanala as the illegal alien who was harbored.  The trial testimony

4   established that Dirisanala entered the United States in January 2010, on an F-1 visa, to study for

5   his Masters at International Technical University in Sunnyvale, California.  TR 1146-48, 1280.

6   But Dirisanala could not afford ITU, and so on February 9, 2010, he transferred to Tri-Valley,

7   receiving an I-20 form and an admission letter.  TR 1150-54.  Dirisanala stayed enrolled as an F-1

8   student until May 18, 2010, when he transferred to another school.  TR 1190, 1207-1210.

9        For both counts, the government had the burden of proving that both aliens named in the

10  indictment were illegal aliens. *United States v. Noriega-Perez*, 670 F.3d 1033, 1037 (9th Cir.

11  2012), *cert. denied,* 133 S.Ct. 834 (2013), citing 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii), (B)(ii).

12  However, neither was actually an illegal alien at the time period charged in the indictment.

13  Instead, both had valid F-1 visas and were enrolled at Tri-Valley, which at the date specified in

14  both counts 22 and 24, was still an authorized school in SEVP.

15       The government's position is that both Dasa and Dirisanala were here illegally because

16  Tri-Valley was fraudulent.  The government argued to the jury that "these people were not

17  maintaining the full course of study, they were not lawfully in the United States because their

18  durational status, given that they were not attending physical classes or even on line, which is just

19  grading, means they're out of status." TR 1849.

20       But, at the times charged in the indictment, Tri-Valley was authorized throughout that

21  time period by Homeland Security to admit foreign students with F-1 visas. Potentially being out

22  of status at a future date is not the equivalent of being an illegal alien.

23       There is strong support for Su's position.  The Supreme Court has recently reiterated that

24  "As a general rule, it is not a crime for a removable alien to remain in the United States." *Arizona*

25  *v. United States,* 132 S.Ct. 2492, 2496 (2012), citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038

26  (1984).

27

28   DEF RULE 29 MTN                    18

**0243**

1      In *United States v. Salman,* 266 F. Supp. 2d 1367; (C.D. Fl. 2003), rev'd on other grounds,

2   *United States v. Salman,* 378 F.3d 1266 (11th Cir. 2004), the defendant was charged with

3   possession of five different firearms, and a sixth count charging possession of ammunition, by an

4   alien illegally and unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5) and

5   924(a)(2).  The court in *Salman* granted a pre-trial motion to dismiss, because it concluded that

6   Salman was lawfully in this county when he possessed the firearms.  The district court's decision

7   was reversed by the 11th Circuit, but on the ground that there are no summary judgment motions

8   in federal criminal law.  See *United States v. Salman,* 378 F.3d at 1268-69.

9      The district court in *Salman* explained that the defendant was present in this country under

10   a "duration of status" F-1 student visa.  While the Government maintained Salman had violated

11   his student status at the time of the alleged offense, with the result that he was no longer lawfully

12   in this country, the court held that "unlawful presence is not triggered by a status violation alone."

13   *United States v. Salman,* 266 F. Supp. 2d at 1374-75.  The court noted that while removal

14   proceedings were now pending against Salman at the time of its decision, no such proceedings

15   had been commenced at the time of the alleged offense.  *Id.*

16      In *United States v. Hernandez,* 913 F.2d 1506, 1513 (10th Cir. 1990), *cert. denied*, 499

17   U.S. 908 (1991), the 10th Circuit held that "to be prosecuted under § 922(g)(5), an alien seeking

18   amnesty . . . must either receive a firearm before filing an amnesty application or after such

19   application is denied."  Similarly the court in *United States v. Brissett,* 720 F. Supp. 90 (S.D. Tex.

20   1989) held that "because the defendant had an application for adjustment of status to permanent

21   resident pending at the time he obtained the firearm, he was not an alien illegally or unlawfully in

22   the United States." *Id.,* at 90.

23      Here, at the time charged in the indictment, there was no immigration court finding of a

24   status violation while adjudicating a request for an immigration benefit for either Dasa or

25   Dirisanala, nor any finding by an immigration judge that either alien was removable.  Even when

26   Tri-Valley was closed down, all the affected F-1 students had a time period in which they could

27   transfer to another eligible school and preserve their legal status.  In fact, to this day, it appears

28   DEF RULE 29 MTN                    19

1  both Dasa and Dirisanala legally remain in this country. Accordingly, government has not proven
2  that either was an illegal alien at the time period specified in counts 22 and 24.

3  **b.      Su did not harbor either Dasa or Dirisanala**

4       The government also failed to prove that Su harbored Dasa or Dirisanala, because its
5  theory in the indictment that merely providing employment constitutes harboring is flawed.
6  Instead, the government must also show that Su engaged in conduct that is intended both to
7  substantially help an unlawfully present alien remain in the United States and to help prevent the
8  detection of the alien by the authorities. "The mere act of providing shelter to an alien, when done
9  without intention to help prevent the alien's detection by immigration authorities or police, is thus
10  not an offense under § 1324(a)(1)(A)(iii)." *United States v. Vargas-Cordon,* 733 F.3d 366, 382
11  (2nd Cir. 2013).

12       The Seventh Circuit rejected a similar broad definition by the government in *United States*
13  *v. Costello,* 666 F.3d 1040 (7th Cir. 2012), pointing out that with the number of illegal aliens in
14  the United States estimated at 10.8 million in 2010, under the government's broader definition of
15  harboring, the number of violators of section 1324(a)(1)(A)(iii) might well be two million. *Id.,* at
16  1047, see also *United States v. Ozcelik,* 527 F.3d 88, 100 (3rd Cir. 2008), *cert. denied,* 555 U.S.
17  1153 (2009), citing *United States v. Rubio-Gonzalez,* 674 F.2d 1067, 1073 (5th Cir. 1982*),* ("We
18  agree with the Fifth Circuit that the terms "shielding," "harboring," and "concealing" under § 1324
19  encompass conduct "tending to substantially facilitate an alien's remaining in the United States
20  illegally" and to prevent government authorities from detecting the alien's unlawful presence.").

21       Then, in *Vargas-Cordon*, the Second Circuit held that "conduct which is intended to
22  facilitate an alien's remaining in the United States illegally and to prevent detection by the
23  authorities of the alien's unlawful presence--is the correct interpretation of that term as it is used in
24  § 1324(a)(1)(A)(iii)." *United States v. Vargas-Cordon,* 733 F.3d at 382, citing *United States v.*
25  *Kim*, 193 F.3d 567, 574 (2nd Cir. 1999). The court stressed that to ""harbor" under § 1324, a
26  defendant must engage in conduct that is intended both to substantially help an unlawfully present
27  alien remain in the United States--such as by providing him with shelter, money, or other material

28  DEF RULE 29 MTN                          20

1  comfort--and also is intended to help prevent the detection of the alien by the authorities. The
2  mere act of providing shelter to an alien, when done without intention to help prevent the alien's
3  detection by immigration authorities or police, is thus not an offense under § 1324(a)(1)(A)(iii)."
4  *Id.*

5      The government argued here that Su harbored Dasa and Dirisanala by providing
6  employment at Tri-Valley. This evidence is insufficient under the holdings of *Costello* and
7  *Vargas-Cordon.* There is no credible evidence either alien needed this employment to stay in the
8  United States, or that Su provided employment with the intent to help prevent the detection of the
9  aliens by the authorities.

10     There was a brief reference by the government that Santosh Ignatius testified that in the
11  one day he worked at Tri-Valley, Su locked the door when she left for lunch. TR 1848. This
12  testimony is also insufficient. There was no testimony that access through another door or
13  through a window was blocked; there was no evidence why Su locked the door; there was no
14  evidence that anyone wanted to leave during the lunch hour; and there was no evidence that Su
15  knew an immigration raid was imminent and locked the door to keep the agents out.

16     Thus, this Court should grant Su's Rule 29 motion as to counts 22 and 24.

17  **5.    The money laundering charges should be dismissed**

18     Su was found guilty by the jury of seven counts of money laundering, in violation of 18
19  U.S.C. §§ 1957(a) (counts 26, 27, 29, 31, 32, 34 and 35).

20     However, under the merger doctrine, if this Court upholds the scheme to defraud charged
21  in the wire and mail fraud counts, then the money laundering charges cannot stand, because the
22  withdrawal of funds was an essential element of the wire and mail fraud scheme and consequently
23  cannot constitute a financial transaction involving the proceeds of independent illegal activity.
24  See *United States v. Bush,* 626 F.3d 527 (9th Cir. 2010), citing *United States v. Santos,* 553 U.S.
25  507, 516-517 (2008).

26     In *Bush,* the Ninth Circuit held that under 18 U.S.C. § 1957, a transaction in criminally-
27  derived property can create a "merger" problem of the kind that troubled the plurality and

28  DEF RULE 29 MTN                    21

**0246**

1  concurrence in *Santos*. *Id.,* at 537.  However,  the court found that the circumstances surrounding

2  the securities, wire, and mail-fraud convictions in that case were all distinct from the money

3  laundering, thus alleviating any merger concerns.  *Id.*

4         Here, however, as charged in the indictment, the circumstances surrounding that wire,

5  mail, and visa fraud convictions were not distinct from the money laundering.  Su was charged in

6  the indictment with engaging in a scheme for her to defraud immigrant aliens of money and

7  property, specifically tuition and other fees. She could not defraud anyone of money and property

8  unless the money was transferred from Tri-Valley's accounts to her custody.  The government

9  charged that is was an essential part of the scheme to defraud that she used the money fraudulently

10 transferred from Tri-Valley accounts for her own purposes, including purchasing real estate and

11 an automobile.  Her withdrawal of funds is thus an essential element of the charged frauds and

12 consequently cannot constitute a financial transaction involving the proceeds of independent

13 illegal activity.  Under the merger doctrine, the money laundering charges must be dismissed.

14        Alternatively, if the Court grants the Rule 29 motions on the wire, mail, and visa fraud

15 accounts, then the money laundering charges cannot stand, as Su has been acquitted of the

16 underlying criminal activity.

17

18                                    **CONCLUSION**

19        The Court should grant defendant's motion.

20 Dated: August 29, 2014                     Respectfully submitted,

21

22                                    /s/ John J. Jordan
                                      JOHN J. JORDAN
23                                    Attorney for Defendant
                                      SUSAN XIAO-PING SU
24

25

26

27

28
   DEF RULE 29 MTN                     22

1 | JOHN J. JORDAN, ESQ.   (Cal. State Bar No. 175678)
400 Montgomery Street
2 | Suite 200
San Francisco, CA   94104
3 | (415) 391-4814
(415) 391-4308 (FAX)
4 |
Attorney for Defendant
5 | SUSAN XIAO-PING SU

6 | UNITED STATES DISTRICT COURT

7 | NORTHERN DISTRICT OF CALIFORNIA

8 | SAN FRANCISCO DIVISION

9 | UNITED STATES OF AMERICA,            )        No. CR-11-00288 JST
                                                          )
10 |                     Plaintiff,                 )        **DECLARATION IN SUPPORT**
                                                          )        **OF MOTION PURSUANT TO**
11 | v.                                                  )        **FED. R. CRIM. P. 29(c)**
                                                          )
12 | SUSAN XIAO-PING SU,                    )
                                                          )
13 |                                                     )        Date:    October 31, 2014
                    Defendant.                  )        Time:  9:30 a.m.
14 | _____ )        Hon. Jon S. Tigar

15 |            **DECLARATION OF COUNSEL IN SUPPORT OF MOTION:**

16 |            I, JOHN J. JORDAN, am an attorney licensed to practice in the State of California and do

17 | hereby declare under the penalty of perjury as follows:

18 |            1.  I am an attorney-at-law duly authorized to practice before the Courts of the State of

19 | California, and the attorney of record for Defendant Susan Su.  I have reviewed the attached

20 | Motion, and I believe the factual statements made therein are true and correct to the best of my

21 | information and belief.

22 |            2.  In preparing this motion, I have reviewed the trial transcripts; prior motions filed in this

23 | case; reports; and other discovery materials provided by the government in this case.

24 |            I declare under penalty of perjury under the laws of the State of California that the

25 | foregoing is true and correct.

26 | DATED: August 29, 2014.            /s/ John J. Jordan
                                                       JOHN J. JORDAN
27 |                                                    Attorney for SUSAN XIAO-PING SU

28 |
      DEF RULE 29 MTN

**0248**

1   JOHN J. JORDAN, ESQ.   (State Bar No. 175678)
    400 Montgomery Street, Suite 200
2   San Francisco, CA   94104
    (415) 391-4814
3   (415) 391-4308 (FAX)

4   Attorney for Defendant
    SUSAN XIAO-PING SU
5
                    UNITED STATES DISTRICT COURT
6
                   NORTHERN DISTRICT OF CALIFORNIA
7
                       SAN FRANCISCO DIVISION
8
    UNITED STATES OF AMERICA,          )   No. CR-11-00288 JST
9                                      )
                     Plaintiff,        )   **NOTICE OF MOTION  AND**
10                                     )   **MOTION PURSUANT TO**
    v.                                 )   **FED. R. CRIM. P. 33**
11                                     )
    SUSAN XIAO-PING SU,                )
12                                     )
                                       )   Date:    October 31, 2014
13                   Defendant.        )   Time:  9:30 a.m.
                                       )   Hon. Jon S. Tigar
14  _____)

15  **TO:    MELINDA HAAG, UNITED STATES ATTORNEY, TO ASSISTANT UNITED
           STATES ATTORNEYS HARTLEY M. K. WEST AND WADE M. RHYNE**

16          PLEASE TAKE NOTICE that at the time and place specified above, or as soon thereafter

17  as the matter may be heard, in the courtroom of the Honorable Jon S. Tigar, United States

18  District Judge, the defendant SUSAN XIAO-PING SU,  through her above-listed counsel, will

19  move and does hereby move this Honorable Court for entry of an order granting a new trial,

20  pursuant to Federal Rule of Criminal Procedure 33.

21          The defendant separately moves this Honorable Court for entry of a judgment of

22  acquittal, pursuant to Federal Rule of Criminal Procedure 29(c).

23          This request is made pursuant to the Fifth and Sixth Amendments to the United States

24  Constitution; Federal Rules of Criminal Procedure 33; subsequent case law; the accompanying

25  //

26  //

27

28  DEF RULE 33 MTN                          1

0249

1  declarations and report; the pleadings and records on file in this matter; and  upon such evidence

2  and argument which may be presented prior to and at the hearing on this motion.

3  Dated: August 29, 2014.                    Respectfully submitted,

4

5                                      /s/ John J. Jordan
                                       JOHN J. JORDAN
                                       Attorney for Defendant
6                                      SUSAN XIAO-PING SU

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  DEF RULE 33 MTN                              2

1    JOHN J. JORDAN, ESQ.   (State Bar No. 175678)
     400 Montgomery Street
2    Suite 200
     San Francisco, CA   94104
3    (415) 391-4814
     (415) 391-4308 (FAX)
4

5    Attorney for Defendant
     SUSAN XIAO-PING SU
6
                     UNITED STATES DISTRICT COURT
7
                   NORTHERN DISTRICT OF CALIFORNIA
8
                      SAN FRANCISCO DIVISION
9

10   UNITED STATES OF AMERICA,        )     No. CR-11-00288 JST
                                      )
11                    Plaintiff,      )     **MEMORANDUM IN SUPPORT**
                                      )     **OF MOTION PURSUANT TO**
12   v.                               )     **FED. R. CRIM. P. 33**
                                      )
13   SUSAN XIAO-PING SU,              )
                                      )
14                                    )     Date:   October 31, 2014
                      Defendant.      )     Time:  9:30 a.m.
15   ─────────────────────────────── )     Hon. Jon S. Tigar

16

17

18

19

20

21

22

23

24

25

26

27

28   DEF RULE 33 MTN


                                                                    0251

1

## TABLE OF CONTENTS

2    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4    1.  Su's behavior during the proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5    2.  The report by Dr. Gregory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7    I.  This Court Should Grant a New Trial Pursuant to Fed. R. Crim. P. 33. . . . . . . . . . . . . . . . . . 6

8    A.  This Court Should Grant a New Trial in the Interest of Justice. . . . . . . . . . . . . . . . . . . . . . 6

9    1.  Dr. Gregory's testimony would provide the jury with an accurate and relevant
         description of Su's mental condition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10   2.  The charged crimes all contain a  mens rea or intentional element. . . . . . . . . . . . . . . . . . 11

11   B.  The Court Should Grant a New Trial for Newly-Discovered Evidence. . . . . . . . . . . . . . . . 13

12   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   DEF RULE 33 MTN                              -i-

0252

1 **TABLE OF AUTHORITIES**

2 **FEDERAL CASES**

3 *Estate of Barabin v. Asten Johnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) (en banc)..... 8-9

4 *Lafler v. Cooper,* 132 S.Ct. 1376 (2012)....................................... 7

5 *Liparota v. United States,* 471 U.S. 419 (1985).............................. 12

6 *Rock v. Arkansas*, 483 U.S. 44 (1987)...................................... 10

7 *Staples v. United States*, 114 S. Ct. 1793 (1994) ........................... 12

8 *United States v. Alaniz,* 726 F.3d 586 (5th Cir. 2013)....................... 13

9 *United States v. Alston,* 974 F.2d 1206 (9th Cir. 1992)....................... 6

10 *United States v. Archer*, 671 F.3d 149 (2d Cir. 2011)....................... 11

11 *United States v. Barajas-Montiel*, 185 F.3d 947 (9th Cir. 1999),
12 *cert. denied*, 531 U.S. 849 (2000). ........................................ 12

13 *United States v. Boone*, 951 F.2d 1526 (9th Cir. 1991)....................... 11

*United States v. Camper*, 384 F.3d 1073 (9th Cir. 2004),
14 *cert. denied,* 546 U.S. 827 (2005) ......................................... 11

15 *United States v. Christian*, 749 F.3d 806 (9th Cir. 2014). ................... 8

16 *United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002)....................... 8

17 *United States v. French,* 748 F.3d 922 (9th Cir. 2014). ...................... 11

18 *United States v. Gutierrez,* 783 F. Supp.1538 (Dist. P.R. 1991)............. 9, 10, 14

19 *United States v. Gutierrez,* 1992 U.S. App. LEXIS 5610 (1st Cir. 1992)........... 10

20 *United States v. Harrington,* 410 F.3d 598 (9th Cir. 2005),
21 *cert. denied,* 546 U.S. 1115 (2006). ..................................... 13, 14

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009 ) (en banc),
22 modified, 611 F.3d 1098 (9th Cir. 2010), *cert. denied,* 131 S.Ct. 2096 (2011) ....... 13

23 *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000). .................. 6

24 *United States v. Morales,* 108 F.3d 1031 (9th Cir 1997) ..................... 8

25 *United States v. Nguyen*, 73 F.3d 887 (9th Cir. 1995) ...................... 12

26 *United States v. Parmelee*, 42 F.3d 387 (7th Cir. 1994),
27 *cert. denied,* 516 U.S. 812 (1995). ....................................... 12

28 DEF RULE 33 MTN                    -ii-

1 | *United States v. Pelisamen*, 641 F.3d 399 (9th Cir. 2011)........................ 11

2 | *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987),
  | *cert. denied*, 484 U.S. 1011 (1988)........................................... 9

3 |

4 | *United States v. Torres-Flores*, 502 F.3d 885 (9th Cir. 2007)................. 11, 12

5 | *United States v. Villanueva-Sotelo*, 515 F.3d 1234 (D.C. Cir. 2008),
  | *cert. denied*, 556 U.S. 1234 (2009)........................................... 11

6 | *United States v. Willis*, 476 F.3d 1121 (10rh Cir. 2007)...................... 12

7 | *United States v. Zhen Zhao Wu*, 711 F.3d 1 (1st Cir.),
8 | *cert. denied*, 134 S.Ct. 365 (2013).......................................... 11

9 | **FEDERAL STATUTES AND RULES**

10 | 8 U.S.C. section 1324(a). ...................................... 11, 12

11 | 18 U.S.C. section 2.................................................. 12

12 | 18 U.S.C. section 17. ............................................... 9

13 | 18 U.S.C. section 1001(a)(2)......................................... 11

14 | 18 U.S.C. section 1001(a)(3)......................................... 11

15 | 18 U.S.C. section 1030(a). .......................................... 12

16 | 18 U.S.C. section 1546(a). .......................................... 11

17 | 18 U.S.C. section 1957(a). .......................................... 13

18 | 28 U.S.C. section 2255............................................... 9

19 | Fed. R. Crim. P. 29. ................................................ 6

20 | Fed. R. Crim. P. 33. ............................................ 1, 6, 9

21 | Fed. R. Evid. 704................................................... 8

22

23

24

25

26

27

28 | DEF RULE 33 MTN                    -iii-

**0254**

1  JOHN J. JORDAN, ESQ.  (Cal. State Bar No. 175678)
   400 Montgomery Street, Ste. 200
2  San Francisco, CA  94104
   (415) 391-4814
3  (415) 391-4308 (FAX)

4  Attorney for Defendant
   SUSAN XIAO-PING SU

5

6                    UNITED STATES DISTRICT COURT

7                NORTHERN DISTRICT OF CALIFORNIA

8                     SAN FRANCISCO DIVISION

9  UNITED STATES OF AMERICA,        )    No. CR-11-00288 JST
                                    )
10                Plaintiff,         )    **MEMORANDUM IN SUPPORT**
                                    )    **OF MOTION PURSUANT TO**
11 v.                               )    **FED. R. CRIM. P. 33**
                                    )
12 SUSAN XIAO-PING SU,              )
                                    )    Date:   October 31, 2014
13                Defendant.         )    Time:  9:30 a.m.
   _____)    Hon. Jon S. Tigar

14

15                         **INTRODUCTION**

16        The defendant, Susan Su, through her above-listed counsel, John J. Jordan, files this

17 memorandum of points and authorities, and accompanying declaration, in support of her motion

18 for a new trial pursuant to Fed. R. Crim. P. 33.

19        The defendant Susan Su moves for a new trial pursuant to Fed. R. Crim. P. 33, on the

20 ground that the defendant is and was suffering from an unrecognized mental impairment.  The

21 report of Dr. Gregory supports the defense arguments that a new trial is warranted because the

22 jury did not hear crucial evidence on the defendant's inability to form the requisite mens rea;  the

23 jury was exposed to her behavior at trial, yet did not hear any testimony regarding Su's mental

24 health, that would have explained her behavior and mitigated its impact on the jury; and Su's

25 ability to decide whether to testify on her own behalf was affected by her untreated mental

26 illness.

27

28 DEF RULE 33 MTN                         1

# FACTUAL BACKGROUND

**1.      Su's behavior during the proceedings**

The defendant was tried on a thirty-five count superseding indictment, charged with a scheme to defraud non-immigrant aliens of money and property, specifically tuition and other fees.  The government contended at trial that Su engaged in a scheme to defraud various non-immigrant foreign students, by submitting false articulation agreements to the Department of Homeland Security, in order to improperly qualify under the Department's Student Exchange Visitor Program (SEVP) for certification that Tri-Valley could enroll foreign students with F-1 visas, and access SEVIS, Homeland Security computer program for monitoring F-1 students.

During the proceedings, there were several instances involving Su's behavior, that support this motion for a new trial.

One instance happened outside of court.  Counsel has been informed that at one point, Su went without her defense counsel to the offices of the United States Attorney and would not voluntarily leave.

There were additional instances put on the record regarding Su's behavior during the trial.

On March 4, 2014, the government stated it had observed Su talking in a "stage whisper" that was audible to the jury, during defense counsel's cross-examination of a government witness.  TR 274.  The government believed that Su was attempting to convey her pleasure with her counsel's performance.  TR 274.  Defense counsel also noted that Su had been talking to him quite audibly during the government's direct examination of a witness, and told the Court he had admonished Su to remain composed during the trial.  TR 275.

The next day, on March 5, 2014, at the start of the proceedings, the government notified the Court that it believed Su had sent an email the day before, or very early that morning, to the witness who had testified for the government the day before.  TR 349.  The government also stated that it believed Su, using different names, had been sending emails for the past week to

DEF RULE 33 MTN                         2

**0256**

1   various government witnesses. TR 350. In response, defense counsel told the Court he had told

2   Su that it was not appropriate for her to have any contact with the Court, the prosecutors, and

3   particularly any witnesses. TR 353.

4        This Court, noting that Su was late in appearing for trial that day, amended her conditions

5   of release to require her to be in court by 8:00 a.m., unless otherwise excused. TR 354. The

6   court then strongly admonished Su that she was to avoid any contact with any victim or witness

7   in the trial. The Court told Su directly that "effective immediately there's no further contact and

8   that you're going to be on time for this proceeding." TR 354. Su told the Court that she

9   understood the admonition. TR 355.

10       After the court admonition, the government told the court that it had been notified by

11   court security officers that Su may have had contact with potential jurors before the jury was

12   empaneled. TR 355.

13       Later that morning, the government informed the Court that Su had attempted to talk to

14   its next witness, Dr. Shy Shenq Liou, who Su had earlier sent emails to prior to the trial. TR

15   405. Defense counsel admitted the contact, but explained that Su was "probably" just trying to

16   say hello to Dr. Liou. TR 405-06. This Court again admonished Su not to have any contact with

17   a witness. TR 406-07.

18       On March 10, 2014, the next court date, this Court put on the record that earlier in the

19   session, while defense counsel was questioning a witness, Su had risen from the defense table,

20   carrying a laptop, and was attempting to talk to counsel in a loud voice. TR 721. The Court

21   expressed its concern that Su's behavior could pose a distraction to the jury. TR 721-22.

22       The following day, March 11, 2014, this Court again admonished Su for "cheering"

23   defense counsel on during his questioning of a witness, saying "Yes, Yes" is a loud voice. TR

24   883. This Court noted that while it was describing the incident, Su was smiling at the Court, and

25   had smiled earlier during her outburst. TR 883. In reply, defense counsel stated that Su found it

26   genuinely hard to stay quiet during the trial. TR 884. The Court again admonished Su, pointing

27

28   DEF RULE 33 MTN             3

1   out that "every day there's one more thing, and every day the Court repeats itself, and in
2   retrospect, it's a case of continuing conduct."  TR 885.

3          On March 19, 2014, Su was very late arriving at the courtroom.  TR 1739, 1756.  While
4   the parties were waiting for her to arrive, the Court put on the record that Su had sent an email,
5   with a 2,000 page attachment, directly to the Court, with copies to the government and defense
6   counsel.  TR 1740.  Defense counsel noted that he received the email at 5:30 a.m.  TR 1741.

7          On March 24, 2014, the trial ended with the jury finding Su guilty of the  remaining 31
8   counts in the indictment.  CR 118-20.

9          After the verdict was returned, this Court held a hearing on the government's motion to
10  revoke Su's bail and remand her pending sentencing.   TR 1933.  During the hearing, defense
11  counsel described a prior "nervous breakdown" in 2007 that resulted in a state civil commitment.
12  TR 1934.  The government and defense counsel also both mentioned a prior order of the
13  magistrate in this case, ordering mental health therapy for Su.  TR 1934.

14         The court granted the government's motion to detain Su, stating that it found that Su had
15  demonstrated an incapacity to comply with the Court's orders.  TR 1935.  Noting Su's history of
16  mental health issues, the court stated that "it was true that she was either unwilling or unable, and
17  I think it might have been not able.  She just couldn't stop herself from contacting other persons
18  in the case."  TR 1935.  Finally, the court granted defense counsel additional time to brief post-
19  trial motions.  TR 1936.

20  **2.      The Report by Dr. Gregory**

21         Following the trial, the defense retained Dr. Amanda Gregory to evaluate the defendant,
22  in light of these series of events.   Dr. Gregory has now supplied counsel with a summary
23  analysis, based on her review of the defendant to date.  A copy of Dr. Gregory's report is being
24  submitted separately under seal, in light of the confidential information contained in the report.

25         Dr. Gregory states that "the current assessment results, inpatient psychiatric records from
26  2005, and treatment records from 2011, all suggest that Ms. Su has significant mental health

27

28  DEF RULE 33 MTN                                    4

**0258**

1    issues. Ms. Su has a history of unstable mood including depressive symptoms and more

2    prominently episodes of mania involving euphoric or abnormally elevated or irritable mood,

3    agitation, impulsivity and poor decision-making, pressured speech, racing thoughts, decreased

4    need for sleep, and increased energy and hyper focus on specific goal-directed activities."

5    Report at p. 11. The report details that "Su also has a history of psychotic symptoms, which

6    appear to escalate during episodes of mania. Psychotic features include grandiose and paranoid

7    delusions (thinking she can communicate with God, thinking she is being followed and people

8    are trying to harm her), disorganized speech and hallucinations." *Id.* Dr. Gregory notes that Su

9    appears to have a history of psychotic symptoms in the absence of prominent mood symptoms.

10    Report at 11.

11       Dr. Gregory concludes that Su's symptoms are consistent with a diagnosis of

12    Schizoaffective Disorder, Bipolar Type, and explains that Schizoaffective disorder is a

13    combination of symptoms of bipolar disorder and schizophrenia and tends to involve episodes of

14    severe symptoms followed by periods of improvement and less severe symptoms. *Id.* Dr.

15    Gregory also stated that "Other diagnoses to be considered for Ms. Su include Bipolar Disorder

16    with Psychotic Features and Schizophrenia, depending on the relative prominence over time of

17    psychotic versus mood symptoms. These disorders are all considered to be major mental

18    illnesses." Report at 11.

19       In Dr. Gregory's opinion, Su's "untreated mental illness appears to have played a role in

20    her behavior that resulted in her convictions and her erratic behavior during the trial. People

21    experiencing manic and psychotic symptoms often exhibit impulsive behavior and extremely

22    poor judgment. These symptoms likely played a role in Ms. Su's decisions to contact the judge

23    and witnesses during her trial. Her grandiose delusional thinking and unstable mood may also

24    have played a role in her behavior that resulted in her charges, i.e. enrolling large numbers of

25    students without the staff to teach classes, not paying adequate attention to the rules of the

26    process." Report at 12.

27

28    DEF RULE 33 MTN            5

1                                    **ARGUMENT**

2   **I.    This Court Should Grant a New Trial Pursuant to Fed. R. Crim. P. 33**

3          The defendant Susan Su moves for a new trial pursuant to Fed. R. Crim. P. 33, on the

4   ground that the defendant is and was suffering from an unrecognized mental impairment, such

5   that the jury did not hear crucial evidence on the defendant's inability to form the requisite mens

6   rea, required to find her guilty.  In addition, the defendant did not receive a fair trial, because the

7   jury was exposed to her behavior at trial, yet did not hear any testimony regarding Su's mental

8   health, that would have explained her behavior and mitigated its impact on the jury.  Finally, Su's

9   ability to decide whether to testify on her own behalf was affected by her untreated mental

10  illness.

11         In contrast to a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29, a

12  "district court's power to grant a motion for new trial is much broader than its power to grant a

13  motion for judgment of acquittal."  *United States v. Kellington,* 217 F.3d 1084, 1094-95 (9th Cir.

14  2000), quoting *United States v. Alston*, 974 F.2d 1206, 1210-1211 (9th Cir. 1992).  "The district

15  court need not view the evidence in the light most favorable to the verdict; it may weigh the

16  evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v.*

17  *Kellington,* 217 F.3d at 1095, quoting *United States v. Alston*, 974 F.2d at 1210-11 (further

18  citations and internal quotation marks omitted); and citing Fed. R. Crim. P. 33 ("On a defendant's

19  motion, the court may grant a new trial to that defendant *if the interests of justice so require*.")

20  (emphasis in *Kellington*).

21  **A.    This Court Should Grant a New Trial in the Interest of Justice**

22  **1.    Dr. Gregory's testimony would provide the jury with an accurate and relevant
       description of Su's mental condition**

23

24         The defendant submits that this Court should order a new trial, in the interest of justice,

25  so that the jury can hear testimony regarding the defendant's mental capacity to form the criminal

26  intent that is an element of the crimes charged in the indictment.  Dr. Gregory can offer expert

27

28  DEF RULE 33 MTN                            6

**0260**

1    testimony directly relevant to the issues of whether Su had a diminished capacity to form the

2    specific intent or the knowing and intentional conduct that are elements in most, if not all, the

3    charges in the indictment.

4         Preliminarily, the defense must note that Su's mental condition may have also impacted

5    her pre-trial ability to consider and weigh the pre-trial plea offer made by the government.

6    Counsel is informed that prior to trial, the defendant was presented with a written plea offer with

7    an agreed recommended sentence of 41 months.  Her mental ability, particularly any delusional

8    view of the government's evidence and strength of its case, appears to counsel to have impacted

9    her ability to intelligently consider the plea offer before trial  The Supreme Court, in *Lafler v.*

10   *Cooper*, 132 S.Ct. 1376 (2012), recently emphasized the importance of a fair plea bargaining

11   process. *Id.,* at 1388-91.

12        Moreover, Su's mental condition impacted her right to a fair trial.  The increasing stress

13   facing Su as the trial progressed resulted in repeated instances of in-court behavior that could

14   only have prejudiced her before the jury.  The Court noted at one point that her behavior might be

15   distracting to the jury (TR 721-22), and described at another point her inappropriate smiling in

16   court with the jury present.  TR 883.  A fair inference is that Su's behavior during the trial

17   prejudiced her before the jury, who did not hear any testimony in explanation of Su's mental

18   condition.   On this ground alone a new trial could be ordered by this Court.

19        Moreover, the stress peaked at the moment when Su had to make an intelligent decision

20   on whether to testify.   At the end of the trial, Su emailed this Court and the parties, early in the

21   morning, a message with a 2000 page attachment, which is evidence of Su's mental unraveling.

22   Yet, at that time, Su was deciding whether or not to testify on her own behalf.  Dr. Gregory can

23   now give evidence as to whether Su was mentally capable at the time of making an intelligent

24   decision about so crucial a matter.   This also goes to the issue of a fair trial.

25        But, the most compelling reason to grant a new trial in the interest of justice is that Su

26   was not able to present Dr. Gregory's proffered expert testimony to the jury on Su's diminished

27   capacity.

28   DEF RULE 33 MTN                         7

1      In *United States v. Christian*, 749 F.3d 806 (9th Cir. 2014), the Ninth Circuit very

2   recently vacated a conviction for  transmitting email communications containing threats to injure

3   another, in a case in which the defendant argued that the district court should have allowed his

4   expert, a psychologist who had earlier examined him for competency to stand trial, to testify

5   regarding his diminished capacity defense.

6      The court held that the district court abused its discretion by excluding the defendant's

7   expert.  Instead, the district court should have evaluated whether the substance of the expert's

8   testimony would have helped the jury decide whether the defendant could form the specific intent

9   to threaten the recipients of his emails.  The Ninth Circuit held that the district court should not

10   have excluded such testimony without conducting a voir dire or otherwise giving the expert an

11   opportunity to explain how he could provide meaningful and relevant testimony on diminished

12   capacity from the competency evaluation he had conducted.

13      The court in *Christian* acknowledged that Fed. R. Evid. 704(b) would have limited the

14   scope of the defense expert's testimony, but rejected the government's argument that the rule

15   would have prohibited him from testifying at all, stating that the rule "allows expert testimony on

16   a defendant's mental state so long as the expert does not draw the ultimate inference or

17   conclusion for the jury." *Id.,* quoting *United States v. Finley*, 301 F.3d 1000, 1015 (9th Cir.

18   2002); see also *United States v. Morales,* 108 F.3d 1031, 1033 (9th Cir 1997) (holding that an

19   expert may "give an opinion on a predicate matter from which a jury might infer the defendant's

20   required mens rea").  The court concluded that the defense expert's diagnoses and the results of

21   the psychological evaluation should not run afoul of this restriction. *Id.,* citing *Finley*, 301 F.3d

22   at 1015 (holding that expert testimony regarding the defendant's "atypical belief system" did not

23   violate Rule 704(b)'s prohibition because "[t]he jury was free to conclude that [the defendant]

24   knew the notes were fraudulent, despite the rigidity of his belief system").

25      The court also held that the rule requiring a new trial when a district court erroneously

26   admits prejudicial expert testimony in a civil trial also applies to the erroneous exclusion of

27   expert testimony from a criminal trial. *Id.,* citing *Estate of Barabin v. Asten Johnson, Inc.*, 740

28   DEF RULE 33 MTN                          8

1  F.3d 457 (9th Cir. 2014) (en banc).  The court accordingly vacated the defendant's conviction and

2  remanded for a new trial.

3        Similarly, in *United States v. Pohlot*, the Third Circuit concluded "that although Congress

4  intended § 17(a) to prohibit the defenses of diminished responsibility and diminished capacity,

5  Congress distinguished those defenses from the use of evidence of mental abnormality to negate

6  specific intent or any other mens rea, which are elements of the offense." *United States v. Pohlot,*

7  827 F.2d 889, 890 (3d Cir. 1987), *cert. denied*, 484 U.S. 1011 (1988).  The court pointed out

8  that  where evidence of diminished capacity is offered to negate the intent element of an offense,

9  the evidence is not being used to establish an affirmative defense (which would be prohibited by

10 18 U.S.C. § 17) but rather is proffered to negate the mens rea element. *Id.*

11        In a case very similar in fact and procedural status as this one, the district court in *United*

12 *States v. Gutierrez,* 783 F. Supp.1538 (Dist. P.R. 1991), considered the same situation, where it

13 was determined, post-trial, that the defendant was suffering from an impairment in intellectual

14 functioning.  As the district court put it: "It was at this point that the court found itself in a

15 quandary.  The psychologist's report revealed that defendant suffered from a mental defect that

16 might affect his ability to appreciate the nature and quality of the criminal conduct for which he

17 was convicted.  At the same time, he had been convicted by a jury who had not had the

18 opportunity to hear any evidence as to defendant's mental condition." *Id.*, at 1542.

19        The district court ordered a hearing to be held, stating "Counsel and the government are

20 expected to address these serious issues, inasmuch as  we all have an obligation to make certain

21 that a miscarriage of justice does not occur.  The time to correct any mistake is now, and not

22 years down the road through 28 U.S.C. § 2255 habeas corpus proceedings." *Id.* , at 1542-43.

23        After holding a hearing on the matter and considering the psychiatric testimony, the

24 district court granted a new trial under Fed. Crim. P. 33.  The court found that the defendant's

25 mental condition went "to the element of mens rea, that is, defendant's ability  to form the

26 requisite criminal intent to commit the offense." *Id.*, at 1545.  The court concluded that the

27 "psychological evidence clearly creates a material issue as to intent that was not raised at trial in

28 DEF RULE 33 MTN                              9

1   any way, shape or form." The court believed that had the jury been presented with evidence of

2   defendant's mental condition, it would have been "unlikely that the government will be able to

3   prove the necessary intent beyond a reasonable doubt." *Id*., at 1546.

4         The court ordered a new trial, holding that evidence of defendant's mental condition

5   should be placed before the jury in order to determine whether he could form the necessary mens

6   rea to commit the offense. The court found that "Failure to give defendant an opportunity to

7   present this testimony may implicate his constitutional rights to due process and to offer

8   testimony in his own defense." *Id*., at 1549, citing *Rock v. Arkansas*, 483 U.S. 44 (1987).

9         The First Circuit later affirmed the district court's decision in an unpublished

10   memorandum, finding that its decision to grant a new trial was within the permissible scope of

11   the district court's discretion. See *United States v. Gutierrez*, 1992 U.S. App. LEXIS 5610

12   (1st Cir. 1992).

13         Here, as in *Gutierrez*, a psychologist's report reveals that Su suffers from a mental defect

14   that might affect her ability to appreciate the nature and quality of the criminal conduct for which

15   she was convicted. Dr. Gregory's report details that Su's symptoms are consistent with a

16   diagnosis of Schizoaffective Disorder, Bipolar Type, and that other diagnoses to be considered

17   include Bipolar Disorder with Psychotic Features and Schizophrenia. Report at 11. Dr. Gregory

18   reports that these disorders are all considered to be major mental illnesses. Report at 11. Dr.

19   Gregory concludes that Su's grandiose delusional thinking and unstable mood may also have

20   played a role in her behavior that resulted in her charges. Report at 12.

21         At the same time, she had been convicted by a jury who had not had the opportunity to

22   hear any evidence as to defendant's mental condition. This is precisely the type of evidence that

23   the district court in *Gutierrez* believed that if presented to the jury, it would have been "unlikely

24   that the government will be able to prove the necessary intent beyond a reasonable doubt."

25   *Gutierrez*, 783 F. Supp. at 1546. Su's delusional thinking process is directly relevant to her

26   inability to form the requisite intent that is an element of the crimes charged in the indictment.

27

28   DEF RULE 33 MTN                              10

**2.  The charged crimes all contain a mens rea or intentional element**

Dr. Gregory's expert testimony is relevant here, because many, if not all, of the charges brought against Su require specific intent, or intentional conduct.  A jury might therefore infer from Dr. Gregory's testimony that Su lacked the required mens rea as to those counts.

Both wire and mail fraud charged in counts 1 through 14 require the specific intent to defraud.  *United States v. French*, 748 F.3d 922, 935 (9th Cir. 2014); *United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011).

The crime of visa fraud charged in counts 16-19, and the related charge of conspiracy to commit visa fraud charged in count 15, has a mens rea requirement of guilty knowledge.  The First Circuit, in *Zhen Zhao Wu*, recently stated: "The statute, 18 U.S.C. § 1546(a), makes it a felony to submit false information on an application for a visa or other immigration document. The statute "'unambiguously extends a mens rea requirement' of knowledge." *United States v. Zhen Zhao Wu*, 711 F.3d 1, 30  (1st Cir.), *cert. denied,* 134 S.Ct. 365 (2013), quoting *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1239 (D.C. Cir. 2008), *cert. denied*, 556 U.S. 1234 (2009); and *United States v. Archer*, 671 F.3d 149, 154 (2d Cir. 2011).

The charges of using a false document, in violation of 18 U.S.C. § 1001(a)(3) (count 20) and making a false statement, in violation of 18 U.S.C. § 1001(a)(2) (count 21), are both specific intent crimes.   In general, proof of five elements is essential to sustain a conviction under 18 U.S.C. § 1001: a statement, falsity, materiality, specific intent, and agency jurisdiction. *United States v. Camper,* 384 F.3d 1073, 1075 (9th Cir. 2004), *cert. denied,* 546 U.S. 827 (2005), citing *United States v. Boone*, 951 F.2d 1526, 1544 (9th Cir. 1991).

The two charges of alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii),  charged in counts 22 and 23, would appear to have an implied specific intent element.

In *United States v. Torres-Flores,* 502 F.3d 885 (9th Cir. 2007), the Ninth Circuit examined the closely related crime of 8 U.S.C. § 1324(a)(2), which makes it both a felony and a misdemeanor to knowingly or recklessly bring to the United States "an alien [who] has not received prior official authorization to come to, enter, or reside in the United States." The court

DEF RULE 33 MTN                                    11

1   noted that whether the crime is a misdemeanor, punishable by no more than one year

2   imprisonment, or a felony, punishable by up to 15 years imprisonment, depends on the existence

3   of certain aggravating factors laid out in subsections 1324(a)(2)(B)(I)-(iii).  The court stated that

4   it had held that the felony offense contains an implied specific intent element, that defendant

5   acted with intent to "violate immigration laws." *Id.,* citing *United States v. Barajas-Montiel*, 185

6   F.3d 947, 952-53 (9th Cir. 1999), *cert. denied*, 531 U.S. 849 (2000) and *United States v. Nguyen*,

7   73 F.3d 887, 894 n.4 (9th Cir. 1995) (noting that when criminal intent is an implied element of a

8   crime it "is no less an element of the offense here than if it had been expressly provided for in the

9   statute").

10           In *United States v. Nguyen*, 73 F.3d at 895, the Ninth Circuit similarly held, in reviewing

11   another closely related crime, section 1324(a)(1)(A), that the government must show that the

12   defendant acted with criminal intent.

13           Finally, in *United States v. Parmelee*, 42 F.3d 387 (7th Cir. 1994), *cert. denied,* 516 U.S.

14   812 (1995), the Seventh Circuit stated: "We have no question that section 1324(a)(1)(B)

15   implicitly requires the government to prove beyond a reasonable doubt not only that the

16   defendant knew the alien he transported had entered this country in violation of immigration law,

17   but also that the defendant knowingly transported the alien to further that violation, that is, acted

18   willfully." *Id.*, at 390.  The court pointed out that "without a mens rea requirement, section

19   1324(a)(1)(B) could penalize purely innocent conduct." *Id.,* at 390-91, citing *Staples v. United*

20   *States*, 114 S. Ct. 1793, 1799 (1994) and *Liparota v. United States*, 471 U.S. 419, 426 (1985).

21           These three cases make clear that the Ninth Circuit would similarly find that 8 U.S.C. §

22   1324(a)(1)(A)(iii) also has an implied specific intent element.

23           As for unauthorized access of a government computer,  in violation of 18 U.S.C. §§

24   1030(a)(3) and 2, charged in count 25 of the indictment, the Tenth Circuit, in *United States v.*

25   *Willis,* 476 F.3d 1121, 1125-26 (10rh Cir. 2007), noted that while the section does not require

26   proof of intent to defraud, it does require that a defendant intentionally accessed information

27   from a protected computer.

28   DEF RULE 33 MTN                         12

**0266**

1    Finally, as to the seven remaining counts of money laundering, in violation of 18 U.S.C. §

2    1957(a), the government must prove defendant knew the proceeds were derived from specified

3    unlawful conduct. *United States v. Alaniz,* 726 F.3d 586, 602 (5th Cir. 2013) The court in

4    *Alaniz* pointed out that the knowledge inquiry looks to whether the property was derived from an

5    unlawful activity. Thus, while the mens rea element of the offense does not extend to whether

6    the defendant knowingly laundered the funds, the government must prove that the defendant

7    knew the funds were illicit and engaged in a "financial transaction" with them regardless. *Id.*, at

8    602, n. 6.

9        Dr. Gregory's report establishes that she has relevant testimony to offer a jury as to Su's

10   ability to form the requisite intent for these crimes, as in her opinion Su's untreated mental

11   illness appears to have played a role in her behavior that resulted in her convictions. While Dr.

12   Gregory could not testify as to the ultimate fact, that Su lacked the requisite mental intent, she

13   could testify as to Su's mental health. This testimony goes to Su's inability to form the requisite

14   intent. Operating under delusions goes directly to the ability to intent to commit frauds, or to

15   form the intent to violate federal immigration laws.

16   **B.      This Court Should Grant a New Trial for Newly Discovered Evidence**

17       Alternatively, this Court may grant a new trial on the grounds of newly discovered

18   evidence.

19       The proffered testimony of Dr. Gregory also qualifies as newly discovered evidence. See

20   *United States v. Hinkson*, 585 F.3d 1247, 1257 (9th Cir. 2009 ) (en banc), modified, 611 F.3d

21   1098 (9th Cir. 2010), *cert. denied,* 131 S.Ct. 2096 (2011), citing *United States v. Harrington,* 410

22   F.3d 598 (9th Cir. 2005), *cert. denied,* 546 U.S. 1115 (2006). The *Harrington* factors are:  (1)

23   the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not

24   be the result of the defendant's lack of diligence; (3) the evidence must be "material" to the issues

25   at trial; (4) the evidence may not be (a) cumulative or (b) "merely impeaching"; and (5) the

26   evidence must indicate that a new trial would "probably" result in acquittal. *United States v.*

27   *Harrington,* 410 F.3d at 601.

28   DEF RULE 33 MTN                              13

**0267**

1    First, the report of Dr. Gregory is newly discovered. No such detailed report was done

2    earlier, and there was certainly no prior in-depth analysis, equal to that done by Dr. Gregory.

3    This is understandable, as Su's mental condition worsened and came to a climax at the close of

4    the trial, when she emailed this Court and the lawyers after a late night breakdown. Su's

5    behavior was more balanced prior to the stress of the trial, a circumstance that is consistent with

6    the findings of Dr. Gregory. Now, however, the defendant's mental health issues have come to

7    the surface and been recognized.

8    Second, the failure to discover the evidence was not the result of the defendant's lack of

9    due diligence. The earlier therapy ordered by the magistrate did not disclose the extent of Su's

10   mental condition. While there was an earlier incident, counsel for the defense believed that was

11   a nervous breakdown. TR 1934. Again, the stress of the trial exposed the depth of the problem,

12   and now Dr. Gregory's report describes the issue in detail.

13   Third, as argued above in Section A, Dr. Gregory's testimony is material to the issue of

14   intent. Her testimony regarding Su's diminished capacity would be offered at trial not as an

15   affirmative defense, but to negate the mens rea element of the crimes charged in the indictment.

16   Fourth, Dr. Gregory's proffered testimony is in no way cumulative or merely impeaching.

17   There was no evidence of Su's mental condition presented at trial, and the testimony goes to Su's

18   ability to form the requisite intent, not to any issues of credibility.

19   Here, as in *Gutierrez,* a psychologist's report reveals that Su suffers from a mental defect

20   that might affect her ability to appreciate the nature and quality of the criminal conduct for which

21   she was convicted. At the same time, she had been convicted by a jury who did hear any

22   evidence as to her mental condition. Again, this is precisely the type of evidence that the district

23   court in *Gutierrez* believed that if presented to the jury, it would have been "unlikely that the

24   government will be able to prove the necessary intent beyond a reasonable doubt." *Gutierrez,*

25   783 F. Supp. at 1546. Dr. Gregory's testimony should be heard by a jury, so that the jury could

26   have all the relevant evidence it needs to determine if Su had the requisite intent and mens rea

27   required by the elements of the crimes charged in the indictment.

28   DEF RULE 33 MTN                             14

**CONCLUSION**

The Court should grant defendant's motion.

Dated: August 29, 2014.                    Respectfully submitted,

                                           /s/ John J. Jordan
                                           JOHN J. JORDAN
                                           Attorney for Defendant
                                           SUSAN XIAO-PING SU

DEF RULE 33 MTN                    15

0269

1  JOHN J. JORDAN, ESQ.   (Cal. State Bar No. 175678)
   400 Montgomery Street
2  Suite 200
   San Francisco, CA   94104
3  (415) 391-4814
   (415) 391-4308 (FAX)
4
   Attorney for Defendant
5  SUSAN XIAO-PING SU

6                    UNITED STATES DISTRICT COURT

7                 NORTHERN DISTRICT OF CALIFORNIA

8                    SAN FRANCISCO DIVISION

9  UNITED STATES OF AMERICA,        )     No. CR-11-00288 JST
                                    )
10                  Plaintiff,      )     **DECLARATION IN SUPPORT**
                                    )     **OF MOTION PURSUANT TO**
11 v.                               )     **FED. R. CRIM. P. 33**
                                    )
12 SUSAN XIAO-PING SU,              )
                                    )
13                                  )     Date:   October 31, 2014
                    Defendant.      )     Time:   9:30 a.m.
14 _____  )     Hon. Jon S. Tigar

15           **DECLARATION OF COUNSEL IN SUPPORT OF MOTION:**

16         I, JOHN J. JORDAN, am an attorney licensed to practice in the State of California and do

17 hereby declare under the penalty of perjury as follows:

18         1. I am an attorney-at-law duly authorized to practice before the Courts of the State of

19 California, and the attorney of record for Defendant Susan Su.  I have reviewed the attached

20 Motion, and I believe the factual statements made therein are true and correct to the best of my

21 information and belief.

22         2. In preparing this motion, I have reviewed the trial transcripts; prior motions filed in

23 this case; reports; and other discovery materials provided by the government in this case.

24         I declare under penalty of perjury under the laws of the State of California that the

25 foregoing is true and correct.

26 DATED: August 29, 2014.        /s/ John J. Jordan
                                  JOHN J. JORDAN
27                                Attorney for SUSAN XIAO-PING SU

28 DEF RULE 33 MTN

0270

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF RULE 33 MTN

1   JOHN J. JORDAN, ESQ.  (State Bar No. 175678)
    400 Montgomery Street, Suite 200
2   San Francisco, CA  94104
    (415) 391-4814
3   (415) 391-4308 (FAX)

4   Attorney for Defendant
    SUSAN XIAO-PING SU

5

                UNITED STATES DISTRICT COURT
6
             NORTHERN DISTRICT OF CALIFORNIA
7
                SAN FRANCISCO DIVISION
8

9   UNITED STATES OF AMERICA,    )    No. CR-11-00288 JST
                      )
10            Plaintiff,    )    **NOTICE OF OBJECTION AND**
                      )    **REQUEST FOR A STAY RE**
11   v.                     )    **GOVERNMENT'S APPLICATION**
                      )    **FOR A PRELIMINARY ORDER OF**
12   SUSAN XIAO-PING SU,     )    **FORFEITURE**
                      )
13            Defendant.    )    Date:   October 31, 2014
                      )    Time:  9:30 a.m.
14   _____)    Hon. Jon S. Tigar

15           **NOTICE OF OBJECTION AND REQUEST FOR STAY**
              **PURSUANT TO FED. R. CRIM. P. 32.2(b)(1)**
16

17       The defendant, Susan Su, through her above-listed counsel, John J. Jordan, files this

18   Notice of Objection and Request for a Stay, pursuant to Fed. R. Crim. P. 32.2(b)(1), in response

19   to the Government's Application for a Preliminary Order of Forfeiture, filed May 1, 2014, in

20   light of the fact that the defendant has now filed a post-verdict motion pursuant to Fed. R. Crim.

21   P. 29(c), for entry of a judgment of acquittal, and a separate motion for a new trial pursuant to

22   Fed. R. Crim. P. 33.

23       First, the defendant submits that the Application is premature and issuance of a

24   Preliminary Order of Forfeiture is not practical at this point.  Fed. R. Crim. P. 32.3(b)(1)(A)

25   provides that this Court should make a forfeiture determination as soon as practical after a

26   verdict or finding of guilty.  But, while there has been a jury verdict, the defendant has now filed

27

28   REQ STAY RE FORFEITURE           1

1  both a Rule 29 motion for a judgment of acquittal and a separate Rule 33 motion for a new trial.

2  If either motion is granted, then the government's motion would be moot.

3       Moreover, even if the Rule 29 motion was only granted in part, there could be an impact

4  on the forfeiture proceedings.  For example, the government alleges in its Application that one

5  theory for the forfeiture is "any property that facilitated the alien harboring."  See Application at

6  p. 3.  However, the defendant's Rule 29 motion makes a strong argument that the harboring

7  charges should be dismissed.

8       In addition, it appears that there is no threat of loss of any assets here, and therefore no

9  compelling need to proceed forward at this point.  Instead, there appears to be no prejudice to the

10  government to stay these proceedings until a decision has been reached on the Rule 29 and Rule

11  33 motions.

12       Thus, it is not practical to grant the government's application until the defendant's

13  motions have been decided, and defendant requests a stay of the forfeiture proceedings until that

14  point.

15       Second, the defendant Susan Su has informed counsel that she wishes, at this point, to

16  contest the forfeiture, and requests a hearing before this Court to do so.  Accordingly, under Rule

17  32.2(b)(1)(B), before a preliminary order of forfeiture can be ordered, it appears this Court must

18  hold a hearing.  Again, it appears prudent to stay any such hearing until the defendant's Rule 29

19  and Rule 33 motions are decided.

20                              **CONCLUSION**

21       The Court should stay the government's Application for a Preliminary Order of Forfeiture

22  until decision on the defendant's Fed. R. Crim. P. 29 and 33 motions.

23  Dated: August 29, 2014.                    Respectfully submitted,

24

25                                   /s/ John J. Jordan
                                     JOHN J. JORDAN
26                                   Attorney for Defendant
                                     SUSAN XIAO-PING SU
27

28  REQ STAY RE FORFEITURE                      2

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  HARTLEY M. K. WEST (CABN 191609)
   WADE M. RHYNE (CABN 216799)
5  Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-6747
        FAX: (415) 436-7234
8       Hartley.West@usdoj.gov
        Wade.Rhyne@usdoj.gov
9
   Attorneys for United States of America
10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13               SAN FRANCISCO DIVISION

| 14 | UNITED STATES OF AMERICA, | ) | CR 11-0288 JST |
|----|---|---|---|
| 15 | Plaintiff, | ) | UNITED STATES' OPPOSITION TO |
| 16 | v. | ) | DEFENDANT'S RULE 33 MOTION |
| 17 | SUSAN SU, | ) | |
| 18 | Defendant. | ) | |

19

20              **I.   INTRODUCTION**

21         Convicted of 31 counts arising out of a fraud scheme from which she made more than $5.5

22  million, defendant Susan Su now moves for a new trial on the basis that expert testimony from a

23  forensic psychologist would have negated her mens rea and established her incompetence before and

24  during trial.  This motion is untimely under Federal Rule of Criminal Procedure 33, and premature as a

25  mislabeled ineffective assistance of counsel claim.  Moreover, defendant's mental health history is

26  neither newly discovered evidence, nor sufficient to raise a question as to defendant's competence.  For

27  all these reasons, the Court should deny defendant's motion for a new trial.

28  / / /

U.S. OPP. TO DEFT'S RULE 33 MTN.              1

## II.    SUMMARY OF RELEVANT FACTS

A.    **Pretrial Proceedings**

Defendant was originally indicted by a federal grand jury on April 28, 2011.  Clerk's Record (CR) 1.  Agents with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) arrested Su the morning of May 2, 2011.  CR 6.  She was arraigned and released on a $300,000 personal recognizance bond the same day, represented by retained counsel David Billingsley.  CR 3.  Mental health counseling was a condition of her release.  CR 4.

At a July 26, 2011 appearance before U.S. District Judge Saundra Brown Armstrong, Billingsley noted that he had been assessing defendant's mental health and believed defendant to be competent:

> I'd asked the Court for a couple weeks to give me a chance to review the situation to see whether it would be appropriate for me to request a referral for a mental health competency. . . .  I've had an opportunity to conduct that review, and I've concluded that there is not a reasonable basis for me to ask the Court to have Ms. Su referred for mental competency evaluation, and that's based upon my discussions I've had with Ms. Su and also some discussions I've had with her mental health counselor.

(7/26/11 Tr. 3:24.)

The United States superseded the indictment on November 10, 2011, alleging 35 counts of conspiracy, visa fraud, mail fraud, wire fraud, false statements, alien harboring, and money laundering. CR 21.  Billingsley moved to withdraw on November 21, 2011.  CR 25.  Granting the motion on December 12, 2011, the district court appointed Erik Babcock as new counsel under the Criminal Justice Act (CJA).  CR 32.

Two and a half years later, on February 7, 2014, the parties appeared before the Honorable Jon S. Tigar, to whom the case had been reassigned, for a status and trial setting conference.  CR 94. During this appearance, the government advised the Court that defendant's father had sent a letter concerning defendant's mental health, and that there had "been some discussion of the defendant's mental health over the course of this" case.  (2/7/14 Tr. 10-11.)  The government requested that Babcock confirm on the record that he had no concerns regarding defendant's competency: "We've spoken with defense counsel and just wanted to make sure that we do have on the record defense counsel's belief and full familiarity with the case law that this defendant is competent to stand trial and

U.S. OPP. TO DEFT'S RULE 33 MTN.          2

1    that he does not have any concerns as her attorney, so I think Mr. Babcock's prepared to do that."

2    (2/7/14 Tr. 11.)

3         Defense counsel flagged for the Court that defendant had an involuntary psychiatric hold "about

4    nine years ago for a couple of nights," that the magistrate judge had some concerns as to whether

5    defendant was suicidal, and that defendant had attended therapy as a condition of her pretrial release.

6    (2/7/14 Tr. 11-12.)  Babcock continued: "[B]ut I have not declared a doubt as to her competence to

7    stand trial at this point. . . . I do believe she understands the proceedings and is able to help me to the

8    extent required."  (2/7/14 Tr. 12.)

9         The government clarified that "whatever conditions had been put in place by the [Magistrate]

10   Court at that early stage were lifted at defense counsel's request."  (2/7/14 Tr. 12.)  Counsel further

11   observed that defendant had not proffered any mental health defense, concluding "so we did want to

12   raise it and . . . advise the Court that despite this filing, there has been no concern raised by either

13   defense counsel as to the competency of this defendant."  (2/7/14 Tr. 12-13.)

14        The Court stated "Those comments are noted for the record."  (2/7/14 Tr. 13.)

15   **B.     Trial**

16        The case proceeded to jury trial on March 3, 2014.  CR 99.  Three weeks later, on March 24,

17   2014, the jury convicted defendant of all 31 counts presented, the government having voluntarily

18   dismissed the other four counts.  CR 119.  During the course of the trial, the Court reprimanded

19   defendant for speaking during trial proceedings, contacting trial witnesses, and appearing late for Court.

20        Following the verdict, the government requested that the Court remand defendant into custody,

21   based on her failure to comply with court orders and concerns about her inflicting self-harm.  (3/24/14

22   Tr. 1933.)  The Court agreed:

23              Dr. Su has a demonstrated incapacity to comply with the Court's reasonable
              orders, and it is true that she was either unwilling or unable, and I think it might
24             have been not able.  She just couldn't stop herself from contacting other persons
              in this case.
25
              She does have a history of mental health issues that give me actually at least as
26             much concern about her safety as anybody else's, but now that she stands
              convicted of these many counts and is suddenly facing for the first time the
27             possibility of the consequences of those convictions, I – in light of her prior

28   / / /

U.S. OPP. TO DEFT'S RULE 33 MTN.          3

1    failures to comply with the Court's orders and her prior history of mental health
     issues, I don't think she can meet the clear and convincing burden that she has,
2    and so I'll order her remanded.

3    (3/24/14 Tr. 1935.)

4         Defense counsel stated that he intended to move for judgment of acquittal under Federal

5    Rule of Criminal Procedure 29, and the Court set the matter over to April 1, 2014.  (3/24/14 Tr.

6    1936.)

7    **C.     Post-Trial Proceedings**

8         On April 1, 2014, Babcock advised the Court that he was being terminated as counsel and that

9    defendant's family had retained attorney Michael Cardoza.  CR 122.  On April 22, 2014, Cardoza's

10   associate reiterated defendant's intent to file a Rule 29 motion.  CR 127.  At the next appearance on

11   May 9, 2014, current counsel John Jordan substituted in as counsel and, for the first time, announced

12   defendant's intention to file a Rule 33 motion.  CR 132.  Defendant filed her Rule 29 and Rule 33

13   motions on August 29, 2014.  CR 167.

14        In support of her motion, defendant filed under seal a report of forensic psychologist Dr.

15   Amanda Gregory.  In her report, Dr. Gregory describes defendant's mental health history based on

16   medical records, which the defense has produced to the government.  As the report states, these records

17   show that defendant had two psychiatric hospitalizations, two days in 2005 and one day in 2011.  The

18   2005 records reveal that defendant suffered from "grandiose delusions," hallucinations, and mood

19   swings; her diagnosis was "acute psychosis of undetermined origin, possible paranoid schizophrenia,"

20   with a possibility of bipolar disorder.  In 2011, records show that defendant was involuntary committed

21   for one day when agents executing a search warrant in connection with this case feared she might be

22   suicidal.  Defendant denied feeling suicidal and was released.

23        Records further show, and Dr. Gregory's report recounts, that defendant had a mental health

24   assessment on May 9, 2011, followed by eight and a half months of therapy.  Both were conducted as a

25   condition of defendant's pretrial release, and it is to this therapist that Billingsley spoke in determining

26   that defendant was competent in July 2011.

27        Dr. Gregory also interviewed defendant in preparing her report.  Regarding her educational

28   background, defendant advised that she has a Ph.D. in Engineering from UC Berekeley and a Master's

U.S. OPP. TO DEFT'S RULE 33 MTN.         4

1   degree from UC Davis . Regarding her psychiatric issues, defendant reported feeling "up and down,"

2   and said she had been spending hours researching and writing a legal brief for her case, showing Dr.

3   Gregory a 50-page document.

4          Dr. Gregory reported that defendant "appeared to want to emphasize her mental health issues.

5   She appeared to be exaggerating some of her difficulties in a rather unsophisticated manner." (Rpt. at

6   6.) According to Dr. Gregory, defendant "reported recently taking a class in jail where they watched a

7   DVD on the brain and mental disorders," "reported that she has been doing legal research including

8   reviewing a case where a person with Paranoid Schizophrenia was found not guilty because of his

9   mental illness," and "was anxious to convey that she was not suicidal because she thought this would

10  facilitate her release." (Rpt. at 6, 10.) Based on Dr. Gregory's psychological and cognitive assessment

11  tests, she found that defendant's "responses fell in the range of scores for individuals who are likely to

12  be malingering. . . . [She] appeared to be exaggerating or feigning some symptoms of psychosis and

13  mood on this test." (Rpt. at 6.)

14         Dr. Gregory concluded that defendant's mental health may have "played a role in behaviors that

15  resulted in her charges" and "help to explain her more bizarre, reckless, and impulsive behavior." (Rpt.

16  at 12.) Nonetheless, "her behavior does not appear to be only driven by mental illness throughout the

17  process." (Rpt. at 12.)

18                            **III.   ARGUMENT**

19  **A.   DEFENDANT'S MOTION IS UNTIMELY**

20         The Court should deny defendant's Rule 33 motion as untimely. "Any motion for a new trial

21  grounded on any reason other than newly discovered evidence must be filed within 14 days after the

22  verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). The time is extended to three years when the

23  motion is based on newly discovered evidence. Fed. R. Crim. P. 33(b)(1). Because defendant did not

24  file her motion within 14 days and there is no newly discovered evidence, the motion is untimely.

25         Defendant asserts that his motion is based on both "the interests of justice" (mtn. at 6) and

26  newly discovered evidence (mtn. at 13). Defendant's historical mental health issues, however, are not

27  newly discovered. They were known to and considered by both of defendant's prior counsel.

28  Billingsley even talked to her therapist. Neither attorney believed defendant was incompetent, and

U.S. OPP. TO DEFT'S RULE 33 MTN.          5

1 | neither pursued a mental health defense.

2 |      Nor can Dr. Gregory's report constitute new evidence, as it is essentially a summary of

3 | defendant's prior medical reports. Dr. Gregory's assessment of defendant does not differ significantly

4 | from her 2005 and 2011 assessments. The only new evidence is that defendant is conducting legal

5 | research and then faking psychiatric symptoms in an effort to get her convictions reversed.

6 |      Under the 14-day deadline, defendant's motion for new trial comes too late. The jury delivered

7 | its verdict on March 24, 2014. Counsel advised the Court that day that he intended to move for

8 | judgment of acquittal pursuant to Rule 29. The defense reiterated that intent, either through current or

9 | substituted counsel, at the April 1 status appearance and again on April 22. Not until May 9 – a month

10 | and a half after the jury verdict – did the defense first announce its intent to file a Rule 33 motion. The

11 | motion, ultimately filed August 29, is thus untimely.

12 | **B.**     **DEFENDANT'S MOTION IS NOT PROPERLY BEFORE THIS COURT**

13 |      Defendant's motion does not use the words "ineffective assistance of counsel" but – distilled –

14 | that is her claim. She contends that the jury needed to hear from the forensic psychiatrist to better

15 | evaluate her mens rea and to explain her inappropriate behavior in the courtroom. She also contends

16 | that she became incompetent during the trial. The only way to prevent these purported errors was if her

17 | attorney had called a psychiatrist to testify at trial and to evaluate her competence mid-trial.

18 |      Ineffective assistance claims may not be couched as motions for new trial based on newly

19 | discovered evidence. *United States v. Pirro*, 104 F.3d 297, 299 (9th Cir. 1997) (rejecting "the use of a

20 | Rule 33 motion for new trial based on 'newly discovered evidence' involving the ineffective assistance

21 | of counsel") (citing *United States v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir.1994)).

22 |      The proper vehicle for her "newly discovered ineffective assistance of counsel" is a habeas

23 | corpus petition under 28 U.S.C. § 2255. *Hanoum*, 33 F.3d at 1131; *see also Pirro*, 104 F.3d at 299

24 | ("The customary procedure for challenging the effectiveness of defense counsel in a federal criminal

25 | trial is by collateral attack on the conviction under 28 U.S.C. § 2255.") (quoting *United States v.*

26 | *Miskinis*, 966 F.2d 1263, 1269 (9th Cir. 1992)). "Under habeas corpus, the court can look directly at

27 | what counsel should have done, and decide whether the defense was prejudiced." *Hanoum*, 33 F.3d at

28 | 1131 (citing *Strickland v. Washington*, 466 U.S. 668, 692 (1984)). "The extra step of looking at the

U.S. OPP. TO DEFT'S RULE 33 MTN.      6

1    effect of the ineffectiveness is already built into the analysis." *Id.*

2         Defendant's remedies under § 2255 become available once she has been sentenced.  28 U.S.C.

3    § 2255(a).  Until then, her ineffective assistance claim is premature, and not properly before this Court.

4    **C.     A NEW TRIAL IS NOT WARRANTED ON THE MERITS**

5         Defendant contends the interests of justice afford a new trial because (1) she had a mental

6    deficiency at the time of the offense conduct, and expert testimony was necessary to help the jury

7    determine whether she had the ability to form the specific intent required for conviction (mtn. at 6-7);

8    (2) mental condition deteriorated during trial, causing her to behave inappropriately, and expert

9    testimony would have helped the jury understand her behavior (mtn. at 7); (3) her mental defect may

10   have impaired her ability to consider the government's plea offer prior to trial (mtn. at 7); and (4) her

11   mental defect prevented her from making an intelligent decision on whether to testify (mtn. at 7).  She

12   also argues that Dr. Gregory's report is newly discovered evidence of the above, thus requiring a new

13   trial.

14        As already explained, Dr. Gregory's report does not constitute newly discovered evidence.  It is

15   based on pre-existing mental health records from 2005 and 2011, based on conditions and conduct of

16   which defendant's prior counsel were already aware.  The only new evidence arising out of Dr.

17   Gregory's personal assessment of defendant is that she appeared to be "malingering" – or, put more

18   simply, faking it – because she believed it might help her get her convictions reversed.

19        Nor do the interests of justice warrant a new trial, as there was no reasonable basis for

20   questioning defendant's competence, and counsel made an informed decision not to offer expert

21   testimony as to defendant's mental health.

22        Due process requires a court to conduct a competency hearing when it "is presented with

23   evidence that creates a 'bona fide doubt' about the defendant's competency to stand trial." *United*

24   *States v. Loyola Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997) (quoting *Hernandez v. Ylst*, 930 F.2d

25   714, 716 (9th Cir. 1991)).  "A good faith doubt about a defendant's competence arises if there is

26   substantial evidence of incompetence." *United States v. Lewis*, 991 F.2d 524, 527 (9th Cir. 1993).

27        The substantive test for competence to stand trial is whether the defendant has "sufficient

28   present ability to consult with his lawyer with a reasonable degree of rational understanding – and

U.S. OPP. TO DEFT'S RULE 33 MTN.            7

**0280**

Case4:11-cr-00288-JST Document185 Filed09/26/14 Page8 of 10

1   whether [she] has a rational as well as factual understanding of the proceedings against [her]." *Dusky v.*
2   *United States*, 362 U.S. 402, 402 (1960). "There are no particular facts which invariably signal
3   incompetence, but important factors which merit a judge's attention include: irrational behavior,
4   demeanor before the trial court, and available medical evaluations." *Lewis*, 991 F.2d at 527 (citing
5   *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

6       No one involved in the trial process thought there was a good faith doubt as to defendant's
7   competence. Government counsel drew the attention of each attorney who represented defendant, as
8   well as the magistrate judge and both district judges to whom defendant's case was assigned, to
9   defendant's mental health issues for the express purpose of ensuring everyone was aware of them.
10   Defense counsel advised the government and the Court that they were mindful of her mental health
11   history and status. Billingsley stated on the record that he had even spoken to defendant's therapist.
12   Notwithstanding this awareness, prior counsel determined that it was not appropriate to raise a mental
13   health defense and that there was no reasonable basis to question defendant's competence to stand trial.
14   Similarly, neither the magistrate judge, who terminated defendant's pretrial release condition of mental
15   health treatment, nor Judge Armstrong, before whom defendant appeared several times, questioned
16   defendant's competence before trial.

17       This Court had perhaps the greatest opportunity to observe defendant, as she sat in the
18   courtroom for her three-week trial. Defendant was actively participating in her defense throughout the
19   trial. She paid careful attention to witness testimony, pored over exhibits, took detailed notes, and
20   made numerous suggestions to counsel about questions to ask and documents to show the witnesses.
21   She wrote lengthy, coherent emails to witnesses, counsel, and the Court discussing what she believed to
22   be inconsistencies and weaknesses in the government's case. She clearly understood the proceedings
23   against her, and was able to "consult with his lawyer with a reasonable degree of rational
24   understanding." *Dusky*, 362 U.S. 402.

25       The court of appeals "deem[s] significant the fact that the trial judge, government counsel, and
26   [defendant's] own attorney did not perceive a reasonable cause to believe [defendant] was
27   incompetent." *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991). "While the opinion of [defense]
28   counsel certainly is not determinative, a defendant's counsel is in the best position to evaluate a client's

U.S. OPP. TO DEFT'S RULE 33 MTN.      8

1  comprehension of the proceedings." *Id.* (citing *United States v. Clark*, 617 F.2d 180, 186 (9th Cir.

2  1980)).

3       Cases finding sufficient evidence of incompetency have generally involved "either extremely

4  erratic and irrational behavior during the course of the trial . . . or lengthy histories of acute psychosis

5  and psychiatric treatment." *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985). *See also Tillery v.*

6  *Eyman*, 492 F.2d 1056, 1057 58 (9th Cir. 1974) (defendant screamed throughout the nights, laughed at

7  the jury, made gestures at the bailiff, disrobed in the courtroom, and butted his head through a glass

8  window).

9       That defendant exhibited inappropriate courtroom decorum – displaying pleasure with her

10  attorney's performance during witness examination, speaking to her counsel in a stage whisper, and

11  showing up late for court – does not come close to rendering her incompetent.  Nor does her

12  disagreement with her attorney's approach to the case.

13       In *United States v. Woodard*, the Seventh Circuit found that defendant's mental illness and

14  behavior of "continuously firing her counsel, filing pro se motions that did not appear to be relevant to

15  her case, and checking herself into a mental health unit" did not warrant a competency hearing.  744

16  F.3d 488, 494 (7th Cir. 2014).  The record showed "that for almost four years, Woodard interacted with

17  her attorneys and participated in her defense. In fact, some of her former attorneys might argue that she

18  participated too much." *Id.*  The defendant was actively taking notes during proceedings and "appeared

19  to be conversing with, and being helpful to, her counsel." *Id.*  The court stated: "Although it is clear

20  that Woodard suffers from mental illness," as revealed by an earlier competency hearing, "the record

21  does not conclusively show that her mental illness prevented her from fully participating in her defense

22  preparation." *Id.* at 494-95. *See also Davis v. Woodford*, 384 F.3d 628, 645 (9th Cir. 2004) (finding no

23  error in failure to hold sua sponte competency hearing where, despite defendant's recalcitrance,

24  rejection of attorney's advice, and other actions detrimental to his case, "his interactions with the trial

25  judge indicated that he understood what was at stake . . . and could make informed decisions").

26       Similarly here, defendant's history of mental illness must be weighed against her interactions

27  with counsel and the court, which clearly revealed she understood the proceedings against her and was

28  an active participant in her defense case.

U.S. OPP. TO DEFT'S RULE 33 MTN.       9

1    Not only does defendant's behavior during trial fail to call her competence into question, it also

2    requires no expert testimony to explain it. And although the Court advised defendant to sit quietly and

3    show up on time, it did so outside the presence of the jury.

4    Finally, no expert testimony was necessary to challenge defendant's mens rea underlying the

5    charged conduct. Defendant committed fraud and her other offenses between September 2008 and

6    January 2011. Defendant's only mental health records before she got caught committing these crimes

7    were from 2005. When she was committed on suicide watch immediately following the search

8    warrant, she was released the next day, and her subsequent therapy upon her arrest was terminated by

9    the Court, at defendant's request, as unnecessary. Any assessment by a forensic psychiatrist retained

10    after trial is inherently of limited use in determining defendant's ability to form an intent to defraud

11    several years before. Nor does it add significantly to the argument defense counsel already made to the

12    jury in closing that defendant did not intend to defraud, but was simply making mistakes while trying –

13    in good faith – to start a school.

14    Because there was no reasonable basis to question defendant's competence prior to or during

15    trial, and because defense counsel made an informed and reasonable judgment not to pursue a mental

16    health defense, the interests of justice do not support a new trial.

17                      **IV.   CONCLUSION**

18    Defendant's motion for new trial is untimely, not based newly discovered evidence, and not

19    supported by the interests of justice. If defendant wishes to assert an ineffective assistance of counsel

20    claim, she may do so through a habeas petition. The Court should accordingly deny defendant's

21    motion.

22

23    DATED: September 26, 2014             Respectfully submitted,

24                             MELINDA HAAG
                                  United States Attorney

25

26                             /s/

27                             HARTLEY M. K. WEST
                             WADE M. RHYNE
                             Assistant United States Attorneys

28

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  HARTLEY M.K. WEST (CABN 216799)
   WADE M. RHYNE (CABN 216799)
5  Assistant United States Attorneys

6       1301 Clay Street, Suite 340S
        Oakland, California 94612
7       Telephone: (510) 637-3680
        FAX: (510) 637-3724
8       E-Mail:  hartley.west@usdoj.gov
             wade.rhyne@usdoj.gov
9
   Attorneys for United States of America
10

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                         OAKLAND DIVISION

14

15  UNITED STATES OF AMERICA,          )  CASE NO. CR-11-00288 JST
                                       )
16       Plaintiff,                    )  **UNITED STATES' OPPOSITION TO**
                                       )  **DEFENDANT'S RULE 29(c) MOTION**
17    v.                               )
                                       )  Hearing Date: October 31, 2014
18  SUSAN XIAO-PING SU,                )  Time: 9:30 a.m.
                                       )  Judge: Hon. Jon S. Tigar
19       Defendant.                    )
                                       )
20  _____)

21

22       Plaintiff United States of America, by and through its counsel of record, Assistant United States

23  Attorneys Wade M. Rhyne and Hartley M. K. West, hereby submits this memorandum of points and

24  authorities in opposition to Defendant Susan Xiao-Ping Su's motion for judgment of acquittal pursuant

25  to Federal Rule of Criminal Procedure Rule 29(c).

26

27

28
   UNITED STATES OPP.
   TO DEF'S RULE 29 MOT.
   No. CR-11-00288 JST

Case4:11-cr-00288-JST   Document186   Filed09/26/14   Page2 of 26

1                              **TABLE OF CONTENTS**

2   INTRODUCTION ..................................................................................................1

3   RELEVANT PROCEDURAL HISTORY .........................................................2

4   SUMMARY OF RELEVANT FACTS ..............................................................3

5       A.  Summary ...............................................................................................3

6       B.  Student Visa Program ..........................................................................3

7       C.  TVU's Fraudulent Form I-17 Petition ..............................................4

8       D.  Student Recruiting, Admission, and Form I-20s ...............................5

9       E.  Student Victims ....................................................................................6

10          1.    TVU Student Bhanu Challagundla ............................................6

11          2.    TVU Student Kalpana Challa .....................................................7

12      F.  Su Enrolls Fictitious TVU Students for Money.................................9

13          1.    S.A. and K.D. ..............................................................................9

14          2.    M.R. and R.B. ...........................................................................10

15      G.  Su's Money Laundering.....................................................................11

16      H.  Search Warrants and Su's Interview ...............................................12

17  LEGAL STANDARD..........................................................................................12

18  ARGUMENT ......................................................................................................13

19      A.  Su's I-17 Submissions Were Part of Her Fraud Scheme ...............13

20      B.  Su Committed Wire and Visa Fraud When She Created and Maintained Immigration
    Status for the Fictitious Students ...............................................................15

21
        C.  Su Conspired With Others to Commit Visa Fraud .......................16
22
        D.  Su Harbored Dasa and Dirisanala .................................................17
23
        E.  Su's Money Laundering Does Not Merge With Her Fraud Scheme ............................20
24
    CONCLUSION..................................................................................................22
25
26

27

28

                                              i

0285

1                          **TABLE OF AUTHORITIES**

2    Glasser v. United States, 315 U.S. 60 (1942) ............................................................. 13

3    Jackson v. Virginia, 443 U.S. 307 (1979)................................................................. 13

4    Mohammadi–Motlagh v. INS, 727 F.2d 1450 (9th Cir. 1984).................................. 20, 21

5    Schmuck v. United States, 489 U.S. 705 (1989) ...................................................... 14, 16

6    United States v. Arbelaez, 719 F.2d 1453 (9th Cir. 1983)....................................... 18

7    United States v. Atandi, 376 F.3d 1186 (10th Cir. 2004) ........................................ 20

8    United States v. Bazargan, 992 F.2d 844 (8th Cir. 1993) ....................................... 20

9    United States v. Bosch, 951 F.2d 1546 (9th Cir. 1991)........................................... 13

10   United States v. Bush, 626 F.3d 527 (9th Cir. 2010)............................................... 23

11   United States v. Chao Fan Xu, 706 F.3d 965 (9th Cir. 2013).................................. 18

12   United States v. Christoffel, 952 F.2d 1086 (9th Cir. 1991).................................... 13

13   United States v. Dann, 652 F.3d 1160 (9th Cir. 2011) ........................................... 21, 22

14   United States v. Dreitzler, 577 F.2d 539 (9th Cir. 1978)......................................... 13

15   United States v. French, 748 F.3d 922 (9th Cir. 2014)............................................ 13, 14, 16

16   United States v. Garlick, 240 F.3d 789 (9th Cir. 2001) .......................................... 14, 16

17   United States v. Gillock, 886 F.2d 220 (9th Cir. 1989)........................................... 13

18   United States v. Igbatayo, 764 F.2d 1039 (5th Cir. 1985) ...................................... 20

19   United States v. Jinian, 725 F.3d 954 (9th Cir. 2013) ............................................ 14, 16

20   United States v. Lane, 474 U.S. 438 (1986) ........................................................... 16, 17, 18

21   United States v. Lo, 231 F.3d 471 (9th Cir. 2000)................................................... 14, 16

22   United States v. Louderman, 576 F.2d 1383 (9th Cir. 1978).................................... 14

23   United States v. McNally, 483 U.S. 350 (1989) ...................................................... 16

24   United States v. Mincoff, 574 F.3d 1186 (9th Cir. 2009) ........................................ 13

25   United States v. Montgomery, 150 F.3d 983 (9th Cir. 1998) ................................... 18

26   United States v. Nelson, 419 F.2d 1237 (9th Cir. 1969)........................................... 13

27   United States v. Phillips, 704 F.3d 754 (9th Cir. 2012)........................................... 23

28   United States v. Reyes-Alvarado, 963 F.2d 1184 (9th Cir. 1992) ........................... 13

                                        ii

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1   <u>United States v. Salman</u>, 266 F.Supp.2d 1367 (C.D. Fla. 2003) ................................ 20

2   <u>United States v. Van Alstyne</u>, 584 F.3d 803 (9th Cir. 2009) ................................ 23

3                                **STATUTES**

4   8 U.S.C. § 1324(a)(1)(A) ................................................................................ 2, 22

5   18 U.S.C. § 371 ................................................................................................. 2

6   18 U.S.C. § 1001(a)(2) ...................................................................................... 2

7   18 U.S.C. § 1001(a)(3) ...................................................................................... 2

8   18 U.S.C. § 1030(a)(3) ...................................................................................... 2

9   18 U.S.C. § 1324(a)(1)(B)(i) ........................................................................... 19

10  18 U.S.C. § 1341 ............................................................................................... 2

11  18 U.S.C. § 1343 ............................................................................................... 2

12  18 U.S.C. § 1546 ............................................................................................. 17

13  18 U.S.C. § 1546(a) .......................................................................................... 2

14  18 U.S.C. § 1957 ............................................................................................... 2

15                                 **RULES**

16  Federal Rule of Criminal Procedure Rule 29(c) ................................................ 1

17

18

19

20

21

22

23

24

25

26

27

28

1                                    **INTRODUCTION**

2          The United States respectfully requests this Court to deny defendant Dr. Susan Xiao-Ping Su's

3   motion for judgment of acquittal. Each of Su's challenges to the sufficiency of the trial evidence fails.

4   The jury could and did rationally conclude that Su engaged in a scheme to defraud non-immigrant

5   student aliens of money by fraudulently creating and operating an unaccredited east bay university

6   known as "Tri-Valley University" (TVU).

7          First, there was sufficient trial evidence for the jury to find that Su's fraudulent I-17 petitions

8   were part of her fraud scheme. Su's scheme began during her creation of TVU when she fraudulently

9   petitioned the government to grant TVU authorization to admit non-immigrant student aliens – the same

10  student aliens who would be her victims. Because Su's fraudulent petition was an essential part of

11  kicking off her scheme, the Court should reject Su's arguments to carve it from her offense conduct.

12         Second, there was sufficient evidence for the jury to conclude that Su committed wire fraud and

13  visa fraud when she granted admission and immigration status to, and later created and transmitted

14  bogus school records for, four fictitious student aliens created by law enforcement as part of a ruse.

15  Because Su's conduct met the elements for wire and visa fraud, the Court should deny Su's motion as to

16  those counts as well.

17         Third, there was sufficient evidence for the jury to decide that Su conspired with ABS

18  Consultancy, and with her own TVU student employees, to commit visa fraud by fraudulently creating

19  and maintaining F-1 visa status for TVU's tuition-paying students.

20         Fourth, there was sufficient evidence for the jury to conclude that Su harbored Anji Dirisanala

21  and Vishal Dasa when she fraudulently created and maintained their F-1 immigration status in order for

22  them to work at TVU. Su used fraudulent SEVIS entries to create the appearance that both men were in

23  compliance with their visa requirements. Because Su knew that both aliens were out of status, and

24  therefore not lawfully in the United States, there was sufficient evidence for the jury to convict her of

25  alien harboring.

26         Finally, there was sufficient evidence for the jury to find that Su committed money laundering

27  when she spent the fraud proceeds on commercial properties, residences, and a luxury car. And, because

28

                                                    1

1   Su's financial transactions in spending the money constituted separate and distinct acts from the

2   predicate fraud scheme, the money laundering counts are not barred by the merger doctrine.

3        For each of these reasons, the Court should deny Su's motion for judgment of acquittal and

4   proceed to sentencing.

5                    **RELEVANT PROCEDURAL HISTORY**

6        On November 10, 2011, the Grand Jury returned a thirty-five count Superseding Indictment,

7   charging Su with wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-12); mail fraud, in violation of

8   18 U.S.C. § 1341 (Counts 13-14); conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371

9   (Count 15); visa fraud, in violation of 18 U.S.C. § 1546(a) (Counts 16-19); use of a false document, in

10   violation of 18 U.S.C. § 1001(a)(3) (Count 20); false statements, in violation of 18 U.S.C. § 1001(a)(2)

11   (Count 21); alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A) (Counts 22-24); unauthorized

12   access, in violation of 18 U.S.C. § 1030(a)(3) (Count 25); and money laundering, in violation of 18

13   U.S.C. § 1957 (Counts 26-35). (Dkt. 41.) The Superseding Indictment also included four forfeiture

14   allegations.

15        Trial commenced on March 3, 2014. (Dkt. 99.) On March 18, the Court granted the United

16   States' motion to dismiss Counts 23, 28, 30, and 33. (TR 1713.) On March 19, both parties rested, after

17   which Su moved for a judgment of acquittal on all counts pursuant to Rule 29. (TR 1764-65.) The

18   Court reserved ruling on Su's motion until after the verdict. (TR 1765.) On March 24, the jury returned

19   guilty verdicts as to all remaining counts. (Dkt. 119, TR 1919-24.)

20        On April 22, the Court addressed the merits Su's anticipated written Rule 29 motion. Requesting

21   briefing on the alien harboring counts, the Court stated: "With regard to the other counts, my

22   recollection of the evidence is it would be difficult for the Court to conclude that no reasonable juror

23   could find that the counts had been proven beyond a reasonable doubt." (Dkt. 183 at 4)

24   ///

25   ///

26   ///

27   ///

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1
2

### SUMMARY OF RELEVANT FACTS

**A.    Summary**

3        The United States' trial evidence consisted of testimony from 25 witnesses along with 156

4   exhibits over three weeks.  This evidence showed that, between September 2008 and January 2011, Su

5   engaged in a scheme to defraud non-immigrant aliens of money and property, specifically tuition and

6   other fees, through her establishment and operation of TVU, located in Pleasanton, California.  In

7   furtherance of her scheme, she fraudulently obtained authorization from the U.S. Department of

8   Homeland Security (DHS), Student and Exchange Visitor Program (SEVP), to admit foreign students.

9   Su then collected over $5.6 million in tuition and other payments from the aliens in exchange for

10   maintaining them in an active student visa status, and used these funds to purchase millions of dollars'

11   worth of real property and other assets.  Su employed some of these aliens at TVU, causing them to

12   access government databases without authorization and to create fraudulent visa-related documents.

13   When questioned by DHS agents regarding certain students' status, Su made materially false

14   representations and submitted materially false documents to the agents.

15        **B.    Student Visa Program**

16        The testimony of Special Agent (SA) William R. Elliott of the United States Department of State

17   established that there are different categories of foreign nationals who may be admitted to the United

18   States for nonimmigrant purposes, and that one such category, designated "F-1" based on the applicable

19   statutory subsection, comprised bona fide students coming temporarily to study at an approved school.

20   (TR 232.)  Aliens wishing to study in the United States obtain F-1 visas, and those students are admitted

21   for a temporary period called "duration of status," which federal regulations define as the time during

22   which the student is pursuing a full course of study at an approved school.  (TR 228-33.)

23        In turn, Susanna Warner, a SEVP section chief, testified that schools seeking to admit foreign

24   students must submit a petition known as a Form I-17 to SEVP in Washington, DC, and meet the criteria

25   for approval.  (TR 247-48.)  Among other things, the school must establish that it is a bona fide

26   educational institution and, if unaccredited, must provide "articulation agreements" showing that its

27   courses have been and are unconditionally accepted to at least three accredited institutions of higher

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1     learning. (TR 256-60.)  The I-17 must also identify "Designated School Officials" (DSOs), who certify

2     their knowledge of and intent to comply with student immigration laws and regulations.  (TR 284.)  The

3     I-17 warned DSOs that they could "not delegate [their] designation to any other person." (Exh. 1 and 3.)

4         Once a school's I-17 is approved, SEVP issues the DSOs login IDs and passwords enabling them

5     to access the Student and Exchange Visitor Information System (SEVIS) – a nonpublic computer system

6     located in Rockville, Maryland, which is used by the United States government and operated through

7     SEVP for the purpose of collecting nonimmigrant student information from approved schools and

8     monitoring such aliens' status.  (TR 248 -54.)  SEVIS is used to create student records, including a

9     Certificate of Eligibility for Nonimmigrant (F-1) Student Status, also known as a Form I-20, which is

10     required to obtain a student visa. (TR 287, 296, 329-38.)  SEVP may decertify a school that fails to

11     follow immigration laws and regulations.  (TR 243, 271-72.)

12     **C.   TVU's Fraudulent Form I-17 Petition**

13         DHS's approval of Su's fraudulent I-17 was a foundational component of her scheme.  Su

14     electronically submitted her I-17 to SEVIS on September 15, 2008, on behalf of TVU.  (TR 261-62, 278,

15     311; Exh. 1.)  Su's I-17 was full of materially false statements.  It fraudulently identified as TVU's

16     administrators and DSOs Su's sister, Sophie Su, and Sophie's husband, Vince Wang.  (TR 301, 590.)

17     Su admitted to agents that when she submitted the I-17 she knew that her DSOs had no intention to be

18     DSOs but that she submitted the false I-17 anyway. (TR 589-90.)  Su also included with her I-17 a

19     fraudulent list of instructors, many of whom never agreed to teach at TVU, as Su later admitted to

20     agents. (TR 447-51, 467-68, 561-62, 599.)  Su's I-17 also contained materially false representations

21     about TVU's admissions standards, grading policies, and graduation requirements. (Exh. 1.)  In

22     December 2008, in response to SEVP's request for clarification, Su mailed SEVP a revised Form I-17,

23     which contained the same materially false statements. (TR 316-17, 411; Exh. 3.)

24         As part of TVU's approval process Su also provided materially false documents to a DHS

25     contractor who had physically inspected TVU's campus as part of the approval process.  Su gave the

26     contractor a signed copy of her I-17, as well as articulation agreements from three schools, which the

27     contractor passed on to SEVP. (TR 278-82; Exh. 5 at p. 8.)

28

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**0291**

1    Su later mailed revised articulation agreements to SEVP on February 10, 2009, two of which

2   were confirmed to be forgeries based on testimony from two school officials and from a DHS expert

3   forensic document examiner.  (TR 319-28; Exh. 4, 102, 112.)  The school officials testified they never

4   entered into articulation agreements with TVU.  (TR 774-80, 474-97.)  The forensic document examiner

5   established that the signatures of the purported school officials on TVU's articulation agreements were

6   essentially lifted from other "source" documents.  (TR 511-52.)  SA Mackey confirmed that those

7   source documents were located on Su's computer and in her residence during execution of the search

8   warrant.  (TR 667, 649.)

9    Relying on Su's materially false submissions, SEVP approved TVU to admit F-1 students on

10  February 19, 2009.  (Exh. 7.)  Su's SEVIS electronic I-17 submission and supplemental mailings formed

11  the basis of the first wire fraud charge (Count 1), and both mail fraud charges (Counts 13 and 14).

12   **D.** **Student Recruiting, Admission, and Form I-20s**

13   After TVU received SEVP's approval to admit F-1 students, Su entered into recruiting

14  agreements, paying as commissions a percentage of tuition fees for each new F-1 student recruited.  Su

15  agreed to pay these "referral" commissions to ABS Consultancy (ABS) and to her own TVU students to

16  find, recruit, and enroll non-immigrant student aliens.  (Exh. 303b, 580-592 at TR 617-24, 711-12; Exh.

17  330 at TR 679-680; Exh. 477, 478 at TR 820-29; Exh. 588A at TR 831-32.)  Indeed, Su's visa fraud

18  conspiracy with ABS began with an email proposal that she sent only two days after she had defrauded

19  SEVP.  (Exh. 300; TR 609-13.)  ABS well knew that TVU was not a legitimate school, as confirmed by

20  email correspondence in which Su sells TVU diplomas and transcripts to ABS's clients.  (Exh. 305; TR

21  660, Exh. 307; TR 654, Exh. 309 at TR 658, Exh. 311 at TR 756.)  ABS's knowledge of TVU's

22  illegitimacy was further confirmed by more emails and by Su's admissions to the agents all showing that

23  she used TVU to fraudulently maintain F-1 immigration status for her ABS's coconspirators.  (Exh. 315;

24  TR 610-12.)

25   To process the admission of the new student recruits, Su admitted that she hired her own F-1

26  students to work in the TVU office.  (TR 605, 624-25.)  Multiple F-1 students testified that Su gave

27  them access to SEVIS through DSO accounts and instructed them to create and print Form I-20s for new

28

5

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1  F-1 students, after which time Su forged DSO signatures on the I-20s.  (TR 813-815, 1163-65, 1213-14,

2  1223-24, 1228-30, 1244-45, 1323-24, 1445, 1449, 1514-15.)  TVU employees also testified that Su

3  admitted all alien applicants without regard to their academic qualifications or intent to pursue a full

4  course of study (TR 809-11, 1172-74, 1506-07); that she instructed them to enter false addresses and

5  other information in SEVIS for hundreds of students (TR 809-11, 1173, 1514-15); that there were no

6  physical classes although some were taught online (TR 818, 920-21, 1186-87, 1518, 1525, 1362, 1405,

7  1407, 1420-21, 1464-65); and that Su directed passing grades for everyone, with none below a B+ (TR

8  626, 801, 804, 811-12, 912, 914, 1186, 1385-86, 1575).  The student-employees testified that they did

9  not attend online classes at TVU, as Su knew.  (Id.)

10       TVU student-employees, Vishal Dasa and Anji Dirisanala, testified that they were criminally

11  charged for their criminal conduct with Su, pleaded guilty pursuant to plea agreements, were

12  cooperating with the United States' investigation of TVU, and were awaiting sentencing.  (TR 876,

13  1292.)  In his plea agreement, admitted in evidence by, Dasa admitted that he conspired with Su to

14  commit visa fraud by creating false I-20s, and to commit unauthorized access to SEVIS.  (Exh. 450.)

15       The unauthorized SEVIS access was charged in Count 25.  The agreement between Su and her

16  student-employees to create fraudulent SEVIS records was charged as conspiracy to commit visa fraud,

17  Count 15.  Su's employment of two student-employees was charged as alien harboring in Counts 22 and

18  24.  The above-referenced email from Su soliciting recruiters of Indian students was charged as wire

19  fraud in Count 2.

20       **E.    Student Victims**

21       By January 2011, TVU had approximately 1,760 active students in SEVIS, many of whom

22  enrolled believing it was a legitimate school.  (TR 572.)  At least two such students testified at trial –

23  Bhanu Challagundla (identified in the Superseding Indictment as "B.C.") and Kalpana Challa (identified

24  in the Superseding Indictment as "K.C.").  Their I-20s contained signatures forged by Su, and formed

25  the basis of wire fraud Counts 3 and 4.

26       1.    TVU Student Bhanu Challagundla

27       Bhanu Challagundla testified that she had an undergraduate degree in Pharmacy from a

28

6

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**0293**

1    university in India and was seeking to enroll in a Master's program in the United States.  (TR 887-88.)

2    Using a consultancy in India, she applied to TVU and another university, ultimately choosing TVU

3    primarily because it admitted her immediately and provided an initial I-20.  (TR 888-93.)  The I-20 was

4    dated January 11, 2010, and signed in the name of Sophie Su.  (Exh. 12 at TR 892-95.)

5            Shortly after arriving in the United States, Challagundla reported to TVU on May 10, 2010.  (TR

6    896-97.)  TVU was a single room office rather than a traditional university like she had expected.  (TR

7    898-99.)  Challagundla paid tuition to Su for the fall semester but never received confirmation of her

8    classes.  (TR 899-903, 907.)  Her multiple calls to TVU went unreturned and, on August 28, 2010, she

9    received a transcript with passing grades for classes she had never taken.  (Exh. 15; TR 902-03, 909-12.)

10           Challagundla went to TVU to ask Su about receiving a transcript for classes she had not taken.

11   (TR 912-16.)  Su told her she could not help her because she was busy working on TVU's accreditation

12   but promised that TVU would have classes in a couple of weeks.  (TR 919-20.)  When Challagundla

13   informed Su that she wanted to transfer to another school immediately, Su said that the rules precluded

14   transfers until students had completed three semesters.  (TR 918-20.)  Challagundla testified that she

15   was "stuck," that she felt she had to continue at TVU until she completed three semesters, and that she

16   therefore registered for the following semester and made a tuition payment.  (TR 919-20.)  Shortly

17   thereafter, Challagundla received an email with links for her classes but, when she logged in, she found

18   that the classes were online and the instruction was a looping audio tape.  (TR 921-22.)

19                    2.    TVU Student Kalpana Challa

20           Kalpana Challa testified that she had a university degree from Paris and was looking for an MBA

21   degree from the United States.  (TR 1415-17.)  She was enrolled in another Bay Area school and later

22   transferred to TVU because it was less expensive for international students, among other reasons.  (TR

23   1417-18.)  After looking at TVU's website, Challa called Su and set up a campus visit.  (Id.)

24           When Challa arrived at TVU for the visit she noted that TVU consisted of a single small room

25   and a couple of student employees.  (TR 1419.)  Su told Challa that TVU was providing online classes

26   but that physical classes would be starting soon in a nearby building.  (TR 1420.)  Challa explained that

27   physical classes were important for her to comply with her student visa requirements.  (TR 1421.)  After

28

                                        7
U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

0294

1  speaking with Su, Challa enrolled at TVU for the Spring semester, registered for three classes, and made

2  a tuition payment to Su. (Exh. 530; TR 1421-22.) Su gave Challa an I-20 in the name of Sophie Su,

3  dated January 27, 2010. (Exh. 32; TR 1423-24.) Challa testified that she also paid tuition to Su for her

4  husband and a friend, who were also enrolling as TVU students. (Exh. 531 at TR 1426-27.)

5         However, Challa never received any information from Su or TVU about her Spring classes. (TR

6  1428.) She unsuccessfully attempted to log in to her classes and was unable to get assistance from Su or

7  TVU. (TR 1427-28.) When Challa was finally able to log in, her classes did not exist and there was no

8  instructor. (TR 1429.)

9         At the end of the Spring semester Challa raised her concerns with Su who told Challa that TVU

10  would have physical classes in the fall. (TR 1429-30.) Challa testified that she elected to come back in

11  the fall but first had to pay the balance of her Spring tuition. (TR 1430-36.) In doing so, Challa paid

12  tuition for herself and her husband with a bank check in amount of $6,217. (Exh. 532; TR 1433-35.)

13  Because the bank check amount exceeded what Challa owed to TVU, Challa asked Su for change. (TR

14  1434-35.) Su refused to provide change and directed Challa to use the balance to pay for her friends'

15  tuition, telling her to settle up with her friends for the change owed by TVU. (Exh. 35; TR 1435-38.)

16  Challa later received TVU transcripts with passing grades despite the fact that classes for that semester

17  did not exist. (Exh. 36; TR 1438-39.)

18         After taking a summer break, Challa returned to TVU for the Fall 2010 semester and told Su she

19  wanted to transfer out. (TR 1439-40.) Su told her she could not until she had paid for three semesters;

20  otherwise Su would terminate Challa's F-1 status. (TR 1440-41.) To keep her immigration status,

21  Challa paid Su with two post-dated $500 checks. (Exh. 533, 534; TR 1441-44.) After receiving

22  Challa's payment, Su provided her with an I-20, forged in the name of another DSO. (Exh. 33 at TR

23  1444-45.) Su promptly cashed Challa's post-dated checks despite Challa's instructions to hold them.

24  (TR 1446-47.) When Challa confronted Su about the checks, Su told her she was too busy to talk. (TR

25  1448.)

26         Challa tried to attend her Fall semester classes but continued having problems logging in. (TR

27  1450.) In November, she re-approached Su about transferring out of TVU and Su again told her that she

28

8

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1   needed to pay the rest of her fees to transfer out. (TR 1451-52.) Challa testified that she planned to pay

2   the remainder with another post-dated check, and then promptly cancel payment. (Id.) Before that

3   happened, however, TVU was shut down. (TR 1453.)

4       **F.**    **Su Enrolls Fictitious TVU Students for Money**

5          HSI agents and student-employee Dirisanala testified regarding his enrolling four fictitious

6   students at TVU during nine undercover operations in late 2010 and early 2011.

7          1.    <u>S.A. and K.D.</u>

8          On June 3, 2010, HSI equipped Dirisanala with an audio recording device and provided him with

9   written identifying information for two foreign nationals – Sparsh Agrawat (identified in the

10  Superseding Indictment as "S.A.") and Kadir Dirikan (identified in the Superseding Indictment as

11  "K.D.") – whose student status had been terminated in SEVIS. (TR 993-1004; Exh. 200b, 50, 60.)

12  Dirisanala told Su that he had two friends in New York who had been terminated in SEVIS and needed

13  TVU admission and new I-20s reflecting their admission. (TR 1218-21.) Su told him to obtain I-20s

14  from Dasa. (TR 1221-22.) Dasa created and printed admissions letters for TVU's Ph.D. program,

15  entered Agrawat and Dirikan's data into SEVIS, and printed their initial I-20s. (TR 1221-25; Exh.

16  200b.) Dirisanala observed Su sign the I-20s in DSO Wang's name. (Id.)

17         On July 27, 2010, Dirisanala, again wearing a wire, went to TVU's office and paid Su $2,000 to

18  activate Agrawat and Dirikan's status as students at TVU. (TR 1004-24, 1225-35; Exh. 202d, 202c,

19  202d.) Dirisanala saw Su sign new I-20s, again in DSO Wang's name. (TR 1228.) Despite neither

20  student actually attending classes at TVU, a SEVIS search confirmed that TVU maintained them in

21  active status. (Exh. 51, 61.) The SEVIS entries and forged I-20s for Agrawat and Dirikan were charged

22  as wire and visa fraud in Counts 5, 6, 16, and 17.

23         The jury also heard a recorded call by an HSI agent, posing as an immigration officer at San

24  Francisco International Airport, on September 20, 2010. (Exh. 206, 206a.) The agent told Su that he

25  had stopped S.A. attempting to reenter the United States, and Su confirmed that her records reflect

26  Agrawat was a current, full-time student at TVU. (Id.) The agent asked Su to email him scanned copies

27  of Agrawat's I-20, transcripts, and a letter confirming his active full-time status. (Id.) After the call

28

                                       9

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1     concluded, a surveilling agent saw Su quickly exit the TVU office, get an item from her Mercedes Benz,

2     and go back into the TVU office. (TR 1059-60.) A few minutes later, the calling agent received an

3     email from ssu@trivalleyuniversity.org, with three attachments: an active Form I-20 for Agrawat

4     bearing a signature of "Sophie Su"; TVU transcripts for Agrawat; and a letter signed by "Sophie Su"

5     representing that Agrawat is a "full time" graduate student "in good standing." (Exh. 206b.) This

6     emailing was charged as wire fraud in Count 9.

7            On September 24, 2010, an HSI agent telephoned TVU, spoke to Su, and stated that he was an

8     immigration officer who had stopped Dirikan returning from Yemen. (TR 1066-70; Exh. 207, 207a.)

9     Again, Su advised that her records confirmed Dirikan was a current TVU student and, from the same

10    email account, emailed the agent an active I-20, transcript, and letter confirming that Dirikan is a full

11    time student in good standing. (Id.; Exh. 207b.) The I-20 and letter again bore the name "Sophie Su."

12    (Id.) This email was charged as wire fraud in Count 10 and as use of a false document in Count 20.

13            2.    M.R. and R.B.

14            On August 11, 2010, Dirisanala, wearing a wire, went to TVU's offices to request initial I-20s

15    for three foreign nationals purportedly residing in New York, one of whom was Mohammed Rizwan

16    (identified in the Superseding Indictment as "M.R."), using names, dates of birth, foreign addresses, and

17    email addresses all provided by HSI. (TR 1024-36.) Su instructed Dirisanala to obtain the I-20s from

18    student-employee Tuchar (Jimmy) Tambe, after which Dirisanala brought them back to Su for signing.

19    (TR 1239-41.) Su later emailed the three I-20s to Dirisanala. (Exh. 203e.) The I-20s were signed by Su

20    in her own name. (Id.)

21            On August 31, 2010, Dirisanala returned to TVU's office, again wearing a wire, to make a

22    $1,000 tuition payment for Rizwan, using funds provided by HSI, and get an active I-20. (TR 1038-49;

23    Exh. 204b.) Su instructed Dirisanala to give Rizwan's information to Dasa and wait outside. (Id.) A

24    secretary then handed Dirisanala an active I-20 in Rizwan's name and bearing a signature for DSO

25    Wang, who was not in the office. (Id.; Exh. 204d.) This I-20 was the basis of wire fraud Count 7 and

26    visa fraud Count 18.

27            On September 7, 2010, an undercover HSI agent went to TVU, wearing an audio and video

28

10

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1   recording device and posing as a prospective foreign student. (TR 1048-55 and Exh. 205c). The agent

2   was introduced to Dasa, with whom he conversed in Hindi. (Id.) The agent advised Dasa that his F-1

3   visa had expired in 2002 because he never went to school, that he was now "completely out of status,"

4   that he feared being deported, that he lived and worked in New York, and that he would not attend

5   classes physically or online. (TR 1310-26.) Dasa created an admission letter and an initial I-20 in

6   SEVIS, using the name provided by the agent, Rajiv Batra (identified in the Superseding Indictment as

7   "R.B."). (Id.) Dasa instructed the agent to return later that day for his "madam" to sign. (TR 1320-21.)

8   When he returned, Dasa walked Batra's I-20 to Su, who signed it and handed it back to Dasa, forged

9   with DSO Wang's name. (TR 1322-25; Exh. 205c.) SEVIS records confirm Batra was placed in active

10  student status at TVU the same day, and that he remained in such status despite the agent never

11  attending class. (Exh. 81, 205b.) This I-20 was the basis of wire fraud Count 8 and visa fraud Count 19.

12       On January 7, 2011, an HSI agent called TVU, identifying himself as from Immigration at JFK

13  airport, and spoke to Su. (TR 1099-1101; Exh. 209, 209a.) The agent said that Rizwan and Batra had

14  entered the country from Pakistan without I-20s, claiming to be F-1 students at TVU, and were being

15  held at secondary inspection. (Exh. 209, 209a; TR 1600-10.) To verify their status, the agent requested

16  that she email him – for both students – signed I-20s, transcripts, attendance records from the most

17  recent grading period, and letters confirming their active status. (Id.) Three hours later, the agent

18  received an email from Su, attaching I-20s for Rizwan and Batra, transcripts for both (although

19  Rizwan's stated at the bottom "TVU transcript of Rajiv Batra"), attendance records for Batra, and letters

20  bearing signatures of Sophie Su. (Id.; Exh. 209b.) These emails supported wire fraud Counts 11 and 12.

21       Two hours later, an HSI agent went to TVU, claiming a problem with the email transfer, and

22  collected the documents in person from Su. (TR 958-71.) Su advised the agent that she had not had

23  time to complete Rizwan's attendance sheets, but that he had attended a class that she personally taught,

24  and that the attendance log reflected that his attendance had been good. (Id.) These false statements

25  were charged as Count 21.

26       **G.     Su's Money Laundering**

27       The jury convicted Su of money laundering in Counts 26, 27, 29, 31, 32, 34, and 35, arising out

28

11

0298

Case4:11-cr-00288-JST   Document186   Filed09/26/14   Page16 of 26

1   of her purchases of commercial properties, three residences, and a Mercedes Benz. (Dkt 119.) The jury

2   heard testimony that the funds used came from TVU business accounts controlled by Su, about 99% of

3   which consisted of money received from F-1 students, commingled with about 1% that was in the

4   account before she got F-1 approval. (Exh. 650, 651.) Su admitted to SA Mackey that she purchased

5   these assets entirely with TVU F-1 student proceeds. (TR 630, 633, 634.) SA Mackey further testified

6   how his financial analysis tracked the money into and out of Su's accounts. (Exh. 650, 651.)

7       **H.   Search Warrants and Su's Interview**

8       SA Mackey testified that Su's fraud scheme ended on January 19, 2011, when HSI executed

9   search warrants at TVU's offices, Su's homes, and Su's car. (TR 584.) SA Mackey testified to finding

10  the Articulation Agreements, draft I-17 Petitions, student records, Form I-20s and other SEVIS

11  documents, emails, and correspondence, among other things.

12      Su consented to an interview at the time of the search and then made a series of incriminating

13  admissions. (TR 587.)  She admitted hiring recruiters and paying commissions to get F-1 students (TR

14  610-12, 620); instructing her staff to enter false addresses in SEVIS as applicants' residences (TR 605);

15  providing her student-employees with unauthorized access to SEVIS (TR 624-25); and instructing her

16  staff not to give students grades below B+ (TR 626).  She also admitted sending the I-17 and its

17  supplements (TR 588), and the emails and attachments to HSI regarding Agrawat, Dirikan, Rizwan, and

18  Batra. (TR 642-43, 1060-61, and 1071).  While Su denied falsifying the articulation agreements, she

19  asked the agents "please, please, please" not to contact the schools. (TR 591-96.)  When the agents said

20  they already did, she refused to discuss the articulation agreements further. (TR 597.)

21      **LEGAL STANDARD**

22      The Supreme Court and Ninth Circuit have held that when considering a motion for acquittal

23  under Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable

24  to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond

25  a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original); <u>United</u>

26  <u>States v. Mincoff</u>, 574 F.3d 1186, 1192 (9th Cir. 2009) (same); <u>see</u> <u>also</u> <u>United States v. Dreitzler</u>, 577

27  F.2d 539, 545 (9th Cir. 1978).  In making this determination, the evidence and all the inferences from

28

12

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1   the evidence must be viewed in the light most favorable to the Government; the defendant bears a heavy

2   burden. See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Christoffel, 952 F.2d

3   1086 (9th Cir. 1991); United States v. Bosch, 951 F.2d 1546, 1550 (9th Cir. 1991). The court must

4   consider that it is "the exclusive province of the jury to determine the credibility of witnesses, to resolve

5   evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury

6   resolved all such matters in a matter which supports the verdict." United States v. Gillock, 886 F.2d

7   220, 222 (9th Cir. 1989). Circumstantial evidence and reasonable inferences drawn from that evidence

8   are sufficient to sustain a conviction. United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir.

9   1992); see also United States v. Nelson, 419 F.2d 1237, 1239 (9th Cir. 1969).

10                                            **ARGUMENT**

11       **A.    Su's I-17 Submissions Were Part of Her Fraud Scheme**

12           There was sufficient evidence for the jury to find that Su's I-17 petitions were part of her fraud

13   scheme. Su's materially false I-17 submissions seeking TVU's approval to admit non-immigrant

14   student aliens were the initial stage in her scheme. Because the success of Su's scheme depended first

15   upon TVU's ability to admit student aliens, her I-17 submissions were essential to the crime. Simply

16   put, SEVP's approval of Su's fraudulent I-17 petitions made it possible for Su to admit a pool of tuition-

17   paying student alien victims. Because the I-17s were an essential part of Su's fraud scheme, the Court

18   should deny her motion as to Counts 1 and 13.

19           The elements of wire and mail fraud are closely related. See 9th Cir. Model Jury Ins. Nos. 8.121

20   and 8.124; see also Joint Jury Instruction Nos. 47 and 48, TR 1765-1803; United States v. French, 748

21   F.3d 922, 935 (9th Cir. 2014). The basic elements of wire fraud are: (1) the defendant participated in a

22   scheme to defraud to obtain money or property by means of false statements; (2) the statements made or

23   facts omitted as part of the scheme were material; (3) the defendant acted with the intent to defraud; (4)

24   the defendant used, or caused to be used, the wires to carry out or attempt to carry out an essential part

25   of the scheme; and (5) the wire communication traveled in interstate commerce. See 9th Cir. Model

26   Jury Ins. Nos. 8.121 and 8.124; see also Joint Jury Instruction Nos. 47 and 48. The elements of mail

27   fraud are the same but substitute the use of the "wires" with the use of the "mails" – which is anything to

28

                                                    13

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1  be sent or delivered by the Postal Service or by any private or commercial interstate carrier – to carry

2  out or attempt to carry out an essential part of the scheme. See id.; see also United States v. Louderman,

3  576 F.2d 1383, 1387-88 (9th Cir. 1978) (noting similarity in construing wire and mail fraud statutes.)

4      Su contends that her wire and mail communications to SEVP were not in furtherance of her fraud

5  scheme. In addressing this issue, the Ninth Circuit has held that a communication is "in furtherance" of

6  a fraud scheme if it is "incident to the execution of the scheme," United States v. Lo, 231 F.3d 471, 478

7  (9th Cir. 2000), meaning that it "need not be an essential element of the scheme, just a 'step in the

8  plot,'" United States v. Garlick, 240 F.3d 789, 795 (9th Cir. 2001) (quoting Schmuck v. United States,

9  489 U.S. 705, 711 (1989). Put another way, the communication need only be "incident to an essential

10  part of the scheme." Schmuck, 489 U.S. at 710 (citations omitted). It does not matter whether the

11  information wired or mailed was itself false or deceptive so long as the wires or mails were used to

12  execute the scheme. See id. at 714-15 (innocent and routine mailings satisfy mail fraud statute when

13  sent incident to a fraud scheme.); see also United States v. Jinian, 725 F.3d 954, 965 (9th Cir. 2013).

14      Su's electronic transmissions of her initial I-17 petition on September 15, 2008 (charged in

15  Count 1), and her mailing of the revised I-17 on December 23, 2008 (charged in Count 13), were an

16  essential part of her fraud scheme. Indeed, the I-17 petitions were a procedural prerequisite for TVU to

17  admit non-immigrant student aliens. (TR 247-72.) SEVP's I-17 school adjudication expert, Susanna

18  Warner, testified that in order to obtain approval to admit non-immigrant student aliens, SEVP requires

19  schools to submit an I-17 petition, (TR 247-72), and that SEVP relies on the school's I-17

20  representations in deciding whether to grant approval (TR 257-59, 272, 288, 313).

21      These I-17s were loaded with material misrepresentations as to DSOs who had no intention of

22  working at TVU, instructors who had no intention of teaching at TVU, and TVU's admissions standards,

23  grading policies, and graduation requirements. The I-17s also incorporated a catalogue of classes that

24  did not exist and forged articulation agreements. The evidence showed that Su immediately began

25  enrolling students, and collecting money from them, despite knowing that TVU could not provide the

26  educational services it had promised in its I-17 materials, on its website, or in its catalogue. (Exh. 650,

27  651.) This evidence established that TVU was fraudulent from its inception with the false I-17s, and

28

14

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**0301**

1    that Su's transmission of these documents was an essential part of her fraud scheme.

2       The Court should therefore deny Su's motion as to Counts 1 and 13.

3       **B.**     **Su Committed Wire and Visa Fraud When She Created and Maintained**
                    **Immigration Status for the Fictitious Students**

4

5       Sufficient evidence supports Su's wire fraud and visa fraud convictions relating to the fictitious

6    students (Counts 1-12 and 16-19). Su argues that these counts must fail because the purported victims

7    were not real people, and as such could not actually be harmed. But real harm is not an element of

8    either offense.

9       Wire fraud requires the government to prove: (1) the defendant participated in a scheme to

10    defraud to obtain money or property by means of false statements; (2) the statements made or facts

11    omitted as part of the scheme were material; (3) the defendant acted with the intent to defraud; (4) the

12    defendant used, or caused to be used, the wires to carry out or attempt to carry out an essential part of

13    the scheme; and (5) the wire communication traveled in interstate commerce. <u>See</u> 9th Cir. Model Jury

14    Ins. Nos. 8.121 and 8.124. The "relevant question at all times" is whether a transmission "is part of the

15    execution of the scheme as conceived by the perpetrator at the time, regardless of whether [the

16    transmission] may . . . return to haunt the perpetrator of the fraud." <u>Schmuck</u>, 489 U.S. at 715.

17       Here, the evidence showed that Su participated in a scheme to defraud TVU student aliens out of

18    money (tuition and fees) through materially false representations, that Su intended to defraud, and that

19    she used interstate wires to carry out her offense. In Counts 5 through 8, these wires were the SEVIS

20    entries to create I-20s, which she caused through her scheme. In Counts 9 through 12, the wires were

21    the emails attaching false I-20s, transcripts, attendance records, and admission letters, which she sent to

22    DHS agents based on their ruse calls pretending to be immigration officials. Each of these wires was

23    part of the execution of the scheme as Su conceived it. The wire itself does not need to have deprived

24    anyone of money or property. <u>See United States v. Lane</u>, 474 U.S. 438, 453 (1986) ("[transmissions]

25    which facilitate concealment of the scheme are covered by the statute.") Accordingly, the evidence was

26    sufficient to support wire fraud in Counts 5 through 8.

27       Visa fraud requires the government to prove either that the defendant forged or falsely made an

28

15

1 | immigration document and acted knowingly, or that the defendant knowingly used, attempted to use,
2 | possessed, obtained, or received an immigration document, which the defendant knew was forged,
3 | falsely made, or procured by fraud. See 9th Cir. Model Jury Ins. Nos. 8.132 and 8.133. Again, it is not
4 | an element that the immigration forged or false immigration document be for a true person.

5 |      The evidence established that Su knowingly forged and caused her employees to falsely make I-
6 | 20s for fictitious students. It also established that she knowingly used I-20s for the fictitious students,
7 | which she knew were forged, falsely made, and procured by fraud. Accordingly, the evidence was
8 | sufficient to support visa fraud in Counts 16 through 19.

9 |      **C.**    **Su Conspired With Others to Commit Visa Fraud**

10 |      Su next contends there was insufficient proof that she conspired to commit visa fraud as charged
11 | in Count 15. However, the jury heard evidence that Su conspired with: (1) TVU's purported I-17 DSOs,
12 | Sophie Su and Vince Wang, neither of whom intended to work at TVU; (2) ABS, who agreed to recruit
13 | student aliens from India; and (3) TVU's student employees, who routinely accessed SEVIS for the
14 | purpose of creating fraudulent Form I-20s for Su.

15 |      The elements of conspiracy are: (1) an agreement; (2) the defendant became a member knowing
16 | of at least one of its objects and intending to help accomplish it; and (3) one of the members performed
17 | at least one overt act to carry out the conspiracy. See 9th Cir. Model Jury Ins. No. 820; TR 1784-85.
18 | The crime does not require a formal agreement or consensus on every detail. Id.; see also United States
19 | v. Chao Fan Xu, 706 F.3d 965, 980 (9th Cir. 2013). The agreement may be inferred from the
20 | conspirators' acts pursuant to the scheme, or other circumstantial evidence. Chao Fan Xu, 706 F.3d at
21 | 980. Not all conspirators need to have full knowledge of all the details and they can join at different
22 | times. United States v. Montgomery, 150 F.3d 983, 998 (9th Cir. 1998). The overt act need not be itself
23 | illegal so long as it is done in furtherance of the conspiracy. See 9th Cir. Model Jury Ins. No. 820. Only
24 | a slight connection is necessary to convict a defendant of knowing participation in a conspiracy. United
25 | States v. Arbelaez, 719 F.2d 1453, 1459 (9th Cir. 1983).

26 |      The evidence amply supports Su's visa fraud conspiracy conviction. The jury heard evidence
27 | that she conspired with family members in completing the fraudulent I-17 submissions to SEVP. Su
28 |

16

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1 admitted to SA Mackey that when her sister and brother-in-law signed the I-17 promising to be DSOs,

2 they had no intention of actually working at TVU and that Su knew was so aware. (TR 589-90.)

3          The jury also heard evidence that Su conspired with ABS members by enlisting their help in the

4 scheme. Two days after defrauding SEVP, Su emailed an ABS member seeking assistance in recruiting

5 student aliens, (Exh. 300 at TR 609-13), and approximately a week later, Su and ABS memorialized

6 their recruitment agreement with an MOU, (Exh. 303b at TR 617-24). Consistent with the MOU, Su

7 paid a series of referral checks to ABS in amounts up to $39,010. (Exh. 580-592 at TR 617-24, 711-12.)

8 The jury also heard Su's admission to SA Mackey that she used TVU to fraudulently maintain F-1

9 immigration status for her ABS coconspirators even though they did not attend classes. (TR 663-66 and

10 TR 610-12.) Corroborating that admission, Su sent an August 2009 email to ABS thanking them for

11 their productivity and offering to further maintain their immigration status in exchange for the payment

12 of tuition, which she described as "the most generous good deal." (Exh. 315.) Finally, the jury heard

13 that ABS and Su agreed on the sale of fraudulent TVU diplomas and transcripts to ABS's clients, further

14 showing that ABS knew TVU was not a legitimate school. (Exh. 305 at TR 660, Exh. 307 at TR 654,

15 Exh. 309 at TR 658, Exh. 311 at TR 756.)

16          The evidence showed that Su also conspired to commit visa fraud with her own F-1 employees.

17 Dasa and Dirisanala testified that Su instructed them to create and print fraudulent I-20s from SEVIS for

18 TVU's students (TR 809-14, 1168-77), and Dasa's plea agreement specifically states that he agreed with

19 Su "to create fraudulent Forms I-20 for purported TVU students and then submit the forms to DHS."

20 (Exh. 450, 3:8-11 at TR 874.)

21          The jury could and did rationally conclude that Su conspired with multiple people in committing

22 visa fraud.

23          **D.    Su Harbored Dasa and Dirisanala**

24          The evidence adequately establishes that Su harbored Dasa and Dirisanala as alleged in Counts

25 22 and 24, when she fraudulently created and maintained their F-1 immigration status in order to employ

26 them at TVU.

27          Alien harboring requires the government to prove: (1) the student – Dasa or Dirisanala – was an

28

17

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

1    alien; (2) the student was not lawfully in the United States; (3) Su knew or acted in reckless disregard of

2    the fact that the individual was not lawfully in the United States; (4) Su either: (a) harbored, concealed,

3    or shielded from detection the student through employment at TVU, for the purpose of avoiding his

4    detection by immigration authorities, or (b) attempted to harbor, conceal, or shield from detection the

5    student, through employment at TVU, for the purpose of avoiding his detection by immigration

6    authorities and did something that was a substantial step toward committing the crime; and (5) Su acted

7    for the purpose of commercial advantage or private financial gain. See 9th Cir. Model Jury Ins. No. 9.3,

8    see also, 18 U.S.C. § 1324(a)(1)(B)(i). An alien is a person who is not a natural-born or naturalized

9    citizen of the United States. Id.

10          Su argues the government failed to prove that Dasa and Dirisanala were illegal aliens, or that

11   they were harbored.  However, the government proved Dasa and Dirisanala were aliens through their

12   testimony that they were in the United States on F-1 visas, and that they were here illegally because they

13   were not engaged in a full course of study and thus out of status.  A non-immigrant F-1 student alien

14   who fails to comply with immigration regulations is considered to be out of status and "unlawfully in the

15   United States."  See United States v. Atandi, 376 F.3d 1186, 1190 (10th Cir. 2004) (discussing alien's

16   unlawful presence in the context of possession of a firearm under § 922(g)(5)) (citing United States v.

17   Igbatayo, 764 F.2d 1039, 1040 (5th Cir. 1985) and United States v. Bazargan, 992 F.2d 844, 847 (8th

18   Cir. 1993)).

19          In Atandi, an F-1 student alien was found to be removable after he failed to maintain his status

20   by not attending classes.  Atandi, 376 F.3d at 1187.   Thereafter he was found in possession of a firearm

21   and charged under § 922(g)(5)(A).  Id.  The defendant argued that because removal proceedings were

22   ongoing at the time he had the firearm, his presence in the United States could not be said to be then

23   "unlawful."  The Tenth Circuit disagreed and held that once the alien had committed a status violation,

24   i.e., failing to maintain his student status – which was a prerequisite for his lawfully remaining in

25   country – he was "not lawfully in the United States" and could be charged under § 922(g)(5)(A).  Id. at

26   1188.

27          Su relies on United States v. Salman, 266 F.Supp.2d 1367 (C.D. Fla. 2003) for the proposition

28

18

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

0305

1  that an alien's "unlawful presence is not triggered by a status violation alone." (Def.'s Mot. at 19:9-15.)

2  However, Salman's proposition relies on Atandi's district court decision, which was overruled by the

3  Tenth Circuit holding that once an alien committed a status violation, he was "not lawfully in the United

4  States." Atandi, 376 F.3d at 1188.

5       Similarly, in Bazargan, an F-1 student alien was found to be out of status when he failed to

6  follow immigration regulations pertaining to a school transfer. Bazargan, 992 F.2d at 845. The

7  defendant argued that he was not unlawfully in the United States because he had been provided

8  employment authorization pending a ruling on an amnesty application. Id. at 848-49. The Eighth

9  Circuit similarly disagreed finding that once the defendant fell out of status not even his pending

10  employment authorization could "convert [him] back into a legal alien." Id. at 848; see also

11  Mohammadi–Motlagh v. INS, 727 F.2d 1450, 1453 (9th Cir. 1984) (affirming immigration board

12  finding that student alien was not lawfully in the United States because he violated conditions of his F-1

13  visa.). Accordingly, the government's theory was legally sound – an F-1 student who falls out of status

14  is "not lawfully in the United States." And, there was sufficient evidence for the jury to conclude that

15  Dasa and Dirisanala were out of status, and therefore "not lawfully in the United States."

16       There was also sufficient evidence for the jury to find that Su knowingly harbored Dasa and

17  Dirisanala. Both aliens expressed concern to Su about the visa status she had granted them. (TR 789-

18  90, 796-809, 1152-57, 1184-86.) The jury heard repeated testimony that TVU was not offering physical

19  classes, that TVU had only a few online classes, and that Su knew that Dasa and Dirisanala were

20  working 10-12 hours per day in TVU's office rather than attending classes. (TR 830, 1158-59.) Dasa

21  testified that after raising concerns about TVU's lack of classes, Su told him that he could take a break

22  from classes and continue in his F-1 visa status while he worked for TVU. (TR 805-07.) Dasa never

23  attended or saw a physical class during his entire employment at TVU. (817-18.) Dirisanala testified

24  that when he expressed similar concern about classroom attendance, Su stated: "Since you are working

25  in the university, you don't worry. I'll take care of you." (TR 1185-86.)

26       Su did take care of them – as part of their TVU employment, she concealed their unlawful status

27  in SEVIS by creating the appearance that they were making satisfactory progress in their studies despite

28

19

1    knowing that neither was attending classes. (Id.; see also, Exh. 420 and 440.)   The evidence was

2    sufficient for the jury to find that Su harbored Dasa and Dirisanala.

3          Su contends that employment alone does not constitute alien harboring.  She relies on United

4    States v. Vargas-Cordon, 733 F.3d 366 (2d Cir. 2013), for the proposition that the government must

5    prove "conduct which is intended to facilitate an alien's remaining in the United States illegally and to

6    prevent detection by the authorities of the alien's unlawful presence." Id. at 382.  She also cites United

7    States v. Rubio-Gonzalez, 674 F.2d 1067 (5th Cir. 1982), among other cases, for the same principle.

8          But the government's evidence meets this test.  The jury heard evidence that, as part of their

9    employment, Su engaged in and caused a series of acts designed to conceal their unlawful status and

10   shield them from detection.  She enrolled them in classes that did not exist, issued them bogus grades

11   and transcripts, assured them that their immigration status was secure, transmitted fraudulent SEVIS

12   entries to the government, printed fraudulent I-20s, and locked them inside the TVU office when she left

13   for lunch.  About being locked in, one alien employee testified: "I did try to open [the door] and leave,

14   but I couldn't open [it]." (Id.)  Such evidence is sufficient.  See United States v. Dann, 652 F.3d 1160,

15   1174 (9th Cir. 2011) (sufficient evidence for jury to conclude that defendant harbored alien and

16   prevented detection by employing her as a nanny and housekeeper, restricting her movement, and

17   forbidding her to speak to anyone outside the home.).

18         The jury also heard evidence that Su employed one of the aliens outside of TVU.  Dirisanala

19   testified that she employed him to paint her apartment after which Su then refused to pay him for the

20   completed work (TR 1204-05), and later to move furniture at Su's mother's house (TR 1203-04).

21         Because the jury heard sufficient evidence to conclude that Su concealed Dasa and Dirisanala

22   from detection through the series of steps she took to employ them at TVU the Court should deny her

23   motion as to Counts 22 and 24.

24         **E.    Su's Money Laundering Does Not Merge With Her Fraud Scheme**

25         Su contends that her money laundering counts should be dismissed under the merger doctrine.

26   As time for motions to dismiss has passed, the government interprets her motion as one for acquittal for

27   insufficient evidence.

28
                                              20
U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**0307**

1    A "merger problem" arises when the government relies on a single transaction to charge both a

2  predicate illegal offense (such as mail or wire fraud) and a money laundering offense. See United States

3  v. Phillips, 704 F.3d 754, 765 (9th Cir. 2012) (citing United States v. Bush, 626 F.3d 527, 537 (9th Cir.

4  2010)). The essential concern is not to punish the defendant twice for the same transaction. See Bush,

5  626 F.3d at 535. The appropriate test for merger is whether the charged money laundering transaction

6  "was a central component of the defendant's criminal scheme." Id. (quoting United States v. Van

7  Alstyne, 584 F.3d 803, 815 (9th Cir. 2009)). When the transactions are separate and distinct, there are

8  no merger concerns. See Bush, 626 F.3d at 537.

9    Here, Su's merger argument fails because it blends her initial receipt of the F-1 student proceeds

10  with her future expenditures of those proceeds. The evidence established that Su engaged in fraud and

11  subsequently laundered the proceeds of that fraud by buying residences, commercial properties, and a

12  luxury car. Moreover, none of the purchases underlying the money laundering counts was also charged

13  as a substantive offense. The wire and mail fraud counts were based on  SEVIS entries, DHS emails,

14  coconspirator emails, and I-17 mailings, while the money laundering counts relied on financial

15  transactions – Su's expenditures for the Mercedes Benz (Exh. 600), the two commercial properties (Exh.

16  603 and 605), and the three residences (Exh. 606, 608, and 609). Because the predicate fraud counts and

17  the money laundering counts originate from completely distinct transactions occurring at different times,

18  there is no merger problem. The Court should therefore deny Su's motion as to Counts 26, 27, 29, 32,

19  34, and 35.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

21

U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**0308**

1

**CONCLUSION**

2        For each of these reasons, the United States respectfully requests this Court to deny Su's motion

3    for judgment of acquittal.

4

5    DATED: September 26, 2014                    Respectfully submitted,

6                                                  MELINDA HAAG
                                                   United States Attorney
7

8                                                       /s/
                                                   HARTLEY M. K. WEST
9                                                  WADE M. RHYNE
                                                   Assistant United States Attorneys

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          22
U.S. OPP. TO DEF.'S RULE 29 MOT.
No. CR-11-00288 JST

**0309**

1 | JOHN J. JORDAN, ESQ.  (Cal. State Bar No. 175678)
400 Montgomery Street, Ste. 200
2 | San Francisco, CA  94104
(415) 391-4814
3 | (415) 391-4308 (FAX)

4 | Attorney for Defendant
SUSAN XIAO-PING SU

5

6 |                    UNITED STATES DISTRICT COURT

7 |                  NORTHERN DISTRICT OF CALIFORNIA

8 |                     SAN FRANCISCO DIVISION

9 | UNITED STATES OF AMERICA,        )      No. CR-11-00288 JST
                                     )
10 |            Plaintiff,            )      **REPLY BRIEF IN SUPPORT**
                                     )      **OF MOTION PURSUANT TO**
11 | v.                               )      **FED. R. CRIM. P. 29(c)**
                                     )
12 | SUSAN XIAO-PING SU,              )
                                     )      Date:  October 31, 2014
13 |            Defendant.            )      Time:  9:30 a.m.
     _____)      Hon. Jon S. Tigar

14 |            **INTRODUCTION AND PROCEDURAL HISTORY**

15 |        The defendant, Susan Su, through her above-listed counsel, John J. Jordan, files this reply

16 | brief in support of her post-verdict motion pursuant to Fed. R. Crim. P. 29(c).

17 |        First, as to all the counts, the defendant moves for a judgment of acquittal, on the grounds

18 | that the government introduced insufficient evidence to convict the defendant.  Second, there

19 | were specific proof issues as to several counts in the indictment, such that the defendant's Rule

20 | 29 motion should be granted.

21 |                              **ARGUMENT**

22 | **A.     The Evidence was Insufficient to Convict Su on All Counts**

23 |        Su has moved, pursuant to Fed. R. Crim. P. 29 that the prosecution had not met its burden

24 | of proof on any of the counts in the indictment.  Su submitted in the opening brief that the

25 | government's evidence was insufficient to convict the defendant on the charges contained in the

26 | indictment; that the proof at trial did not establish the crimes set out in the indictment; and there

27

28 | DEF RULE 29 REPLY                    1

1   was insufficient proof of the defendant's intent to commit the crimes charged in the indictment.

2        The government has now filed a brief in opposition, arguing that the defendant's motion

3   should be denied.  The defendant disagrees, and asks this Court to grant the motion.

4   **B.     The Government's Proof Was Insufficient as to Multiple Counts**

5        There were specific proof issues as to multiple counts in the indictment, such that the

6   defendant's Rule 29 motion should be granted.

7   **1.     There was insufficient proof that counts 1 and 13 were part of a scheme**

8        Neither count 1, involving Su's electronic submission on September 15, 2008, of the

9   initial I-17 application to SEVP, nor count 13, involving Su's mailing on or about December 23,

10  2008, of the revised Form I-17 and documents to SEVP,  was proven by the government at trial,

11  because even assuming that Su engaged in a scheme to defraud, the government failed to

12  introduce any evidence that the scheme had begun at the time of either communication.

13       The key question for this point is whether either communication charged in counts 1 and

14  13 "is part of the execution of the scheme as conceived by the perpetrator at the time." *United*

15  *States v. Jinian,* 725 F.3d  725 F.3d 954, 961 (9th Cir. 2013), citing *Schmuck v. United States*,

16  489 U.S. 705, 715 (1989).

17       Su contends that neither count was proven at trial, because the government failed to meet

18  its burden of proving that either communication was part of the execution of the scheme at the

19  time of the communication.  Reviewing the trial evidence, the defense can find no actual hard

20  evidence that Su intended, from the onset, to conduct a scheme to defraud.

21       The government now argues that these two initial communications were essential to the

22  scheme to defraud, because the I-17 petitions were a procedural prerequisite for Tri-Valley to

23  admit non-immigrant student aliens.  Opp. at 14.  But, I-17 petitions are always a prerequisite for

24  a school to admit non-immigrant student aliens, for all schools.  While there could be no scheme

25  to defraud without a school, it does not follow that establishing a school in the first place is part

26  of the scheme to defraud, absent some evidence that the defendant had the requisite intent to

27

28  DEF RULE 29 REPLY                    2

1   defraud from the onset.

2        The government assumes that Tri-Valley was a fraud at its inception, and infers from later

3   activities that Su knowingly included false representations in these two initial communications

4   about how Tri-Valley was going to be run.  But, an equally strong, if not stronger, inference is

5   that Su intended at the start to get accredited.

6        In any event, the government failed to meet its burden of proving beyond a reasonable

7   doubt, that Su intended at the outset to use Tri-Valley as a scheme to defraud.  Su contends that

8   there was no evidence that any scheme started any earlier than on or about February 10, 2009,

9   when the government alleges the articulation agreements were mailed.

10       Accordingly, this Court should grant defendant's Rule 29 motion for a judgment of

11  acquittal as to counts 1 and 13.

12  **2.    Counts 5 through 12, the wire fraud charges involving the fictitious aliens, and
        Counts 16 through 19, charging visa fraud, cannot stand because the crimes were**
13      **all factually impossible to commit.**

14       Su was convicted by the jury of all 12 counts of wire fraud, in violation of 18 U.S.C. §§

15  1343 and 2 (counts one through 12) and all four counts of visa fraud, in violation of 18 U.S.C. §§

16  1546(a) and 2 (counts 16 through 19) in addition to the other counts of conviction.  However, the

17  government's proof was insufficient as to the wire fraud convictions in counts 5 through 12, as

18  well as all four visa fraud convictions in counts 16 through 19, because the charges all involve

19  fictitious aliens.  Thus it was factually impossible for Su to commit these crimes.  See *United*

20  *States v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989), vacated in part on other grounds, 923 F.2d

21  764 (9th Cir. 1991), *cert. denied*, 112 S. Ct. 1558 (1992).

22       Su contends that all 12 of these charges were factually impossible for her to commit.

23  First, for counts 5 through 12, Su could not commit wire fraud, under the theory charged in the

24  indictment, because real victims that could be defrauded did not exist.  The scheme to defraud

25  alleged in the indictment charged Su with engaging in a scheme to defraud non-immigrant aliens.

26  But, Sparsh Agrawat, Kadir Dirikan, Mohammad Rizwan, and Rajeev Batra were fictitious

27

28  DEF RULE 29 REPLY                          3

**0312**

1   students, and not actual non-immigrant aliens.

2       The government now argues that Su's motion should be denied because real harm is not

3   an element of wire or mail fraud.   Opp. at 15.   While that may be true, Su contends that real

4   victims, here F-1 students, as charged in the indictment are required.   These counts all involve

5   actions by the government to collect evidence against Su, for use at the subsequent trial.   While

6   that might have been a legitimate law enforcement technique, the actions were outside the

7   charged scheme to defraud, which involved actual F-1 students.

8       It was also factually impossible for Su to used these communications to conceal the

9   scheme, because the "students" were federal agents who were already investigating Tri-Valley.

10      It was similarly factually impossible for Su to commit visa fraud, as charged in counts 16

11  through 19.   The indictment charges that Su committed visa fraud, by fraudulently  making Form

12  I-20s for the four individuals Sparsh Agrawat, Kadir Dirikan, Mohammad Rizwan, and Rajeev

13  Batra. See Indictment.   But, these "individuals" were not real students who would be able to

14  continue their status as F-1 students thanks to any I-20s issued by Tri-Valley.   Su could never

15  commit visa fraud, because the named individuals could never receive or use an F-1 visa.

16      Accordingly, Su's Rule 29 motion should be granted as to counts 5 through 12 and 16

17  through 19.

18  **3.      The government's proof was insufficient as to count 15, conspiracy to commit visa
        fraud.**

19

20      The government's proof at trial was insufficient to prove that the defendant was guilty in

21  count 15 of conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371, because there was

22  insufficient proof introduced that anyone conspired with Su.

23      The "essence of a conspiracy" is "an agreement to commit an unlawful act." *United States*

24  *v. Daychild,* 357 F.3d 1082, 1096 (9th Cir. 2004), quoting *United States v. Jimenez Recio,* 537

25  U.S. 270, 274 (2003) (internal quotation marks and citation omitted).   Here, there is no evidence

26  that others entered into a conspiracy with Su to run and operate Tri-Valley as a scheme to defraud

27

28  DEF RULE 29 REPLY                    4

**0313**

1    or commit visa fraud.

2       In its opposition, the government argues that Sophie Su and Vince Wang conspired with

3    the defendant. Opp. at 16-17. But, defense is unaware of any evidence introduced at trial that

4    Sophie Su or Vince Wang knew about the articulation agreements, or knew about any of the

5    other government accusations of fraudulent activities.

6       The government also argues that the ABS members were co-conspirators. Opp. at 17.

7    But, again, the defendant is unaware of any testimony that any of the recruiters or consultants

8    knew about the articulation agreement. The government also argues that the ABS workers knew

9    Tri-Valley was not a legitimate school. Even assuming this is true, mere knowledge of a

10    criminal activity is insufficient to show participation in a conspiracy. See *United States v. Price*,

11    542 F.3d 617, 620 (8th Cir. 2008) ("Mere knowledge of a criminal conspiracy is insufficient").

12       Moreover, while there was testimony by some of the workers that Tri-Valley was not

13    holding physical classes, workers such as Dirisanala testified he was worried about this

14    circumstance (TR 1186), not that he voluntarily engaged in a conspiracy with Su. In fact, the

15    government contended that Su threatened the workers and refused to allow transfers. This fails

16    to show that any of the workers knowingly and voluntarily joined a conspiracy. See *United*

17    *States v. Damra*, 621 F.3d 474, 499 (4th Cir. 2010), *cert. denied*, 131 S.Ct. 2930 (2011)

18    (defendant must knowingly and voluntarily join conspiracy).

19       Finally, there is no testimony that defendant is aware of that established that some

20    unidentified co-conspirator shared in proceeds from Tri-Valley.

21       Thus, the government failed to prove that Su conspired to commit visa fraud.

22    **4.     The evidence is insufficient to convict Su of the two counts of harboring**

23       The jury convicted Su in counts 22 and 24 of alien harboring of Vishal Dasa and Anji

24    Dirisanala, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii) and 2.

25       However, viewing the evidence in the light most favorable to the government, no rational

26    trier of fact could have found the defendant guilty beyond a reasonable doubt of either count of

27

28    DEF RULE 29 REPLY           5

1  alien harboring, because the government failed to prove two separate elements of the crime.

2  First, contrary to the assumptions of the government, neither Dasa nor Dirisanala was actually an

3  illegal alien at the times specified in the counts in the indictment.  Second, the government failed

4  to prove that Su concealed, harbored, or shielded from detection either alien.

5  **a.     Both Dasa and Dirisanala were not illegal aliens**

6          For both counts 22 and 24, the government had the burden of proving that both aliens

7  named in the indictment were illegal aliens. *United States v. Noriega-Perez*, 670 F.3d 1033, 1037

8  (9th Cir. 2012), *cert. denied*, 133 S.Ct. 834 (2013), citing 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii),

9  (B)(ii).  However, neither was actually an illegal alien at the time period charged in the

10  indictment.  Instead, both had valid F-1 visas and were enrolled at Tri-Valley, which at the date

11  specified in both counts 22 and 24, was still an authorized school in SEVP.

12          The government's position is that both Dasa and Dirisanala were here illegally because

13  Tri-Valley was fraudulent.  The government argued this to the jury (TR 1849) and argues it now

14  in its brief in opposition. Opp. at 18.

15          But, as pointed out in Su's opening memorandum, at the times charged in the indictment,

16  Tri-Valley was authorized throughout that time period by Homeland Security to admit foreign

17  students with F-1 visas.  Potentially being out of status at a future date is not the equivalent of

18  being an illegal alien at the time period charged in the indictment.

19          In Su's opening brief, the defense argued that there is strong support for Su's position,

20  and cited the Supreme Court's very recent statement that "As a general rule, it is not a crime for a

21  removable alien to remain in the United States." *Arizona v. United States,* 132 S.Ct. 2492, 2496

22  (2012), citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).  This Supreme Court holding

23  is the most recent pronouncement on the issue and appears to firmly settle the issue in favor of

24  Su.  The government's opposition, however, fails to acknowledge or discuss in any way the

25  *Arizona* case.

26          In an even more recent Ninth Circuit criminal case, the court in *United States v. Lopez*

27

28  DEF RULE 29 REPLY                          6

**0315**

1   quoted *Arizona* in holding, "'As a general rule, it is not a crime for a removable alien to remain

2   present in the United States.' Rather, the criminal act is returning to the United States after the

3   government has ordered the alien excluded, deported, or removed." *United States v. Lopez,* 762

4   F.3d 852 (9th Cir. 2014), quoting *Arizona v. United States*, 132 S. Ct. at 2505.

5          Here, neither named alien had been ordered excluded, deported, or removed at the time

6   charged in the indictment. Indeed, it appears neither alien has ever been ordered excluded,

7   deported, or removed. Thus, *Arizona* is an insurmountable roadblock to this prosecution.

8          Su also cited *United States v. Salman,* 266 F. Supp. 2d 1367 (C.D. Fl. 2003), rev'd on

9   other grounds, *United States v. Salman,* 378 F.3d 1266 (11th Cir. 2004), for support. The

10  government argues that *Salmon*'s support is limited, because it relied on a district court holding

11  that was reversed by the Tenth Circuit in *United States v. Atandi,* 376 F.3d. 1186 (10th Cir.

12  2004). However, *Salman* also cited and relied for support on other cases, such as *United States*

13  *v. Hernandez,* 913 F.2d 1506, 1513 (10th Cir. 1990), *cert. denied*, 499 U.S. 908 (1991), and

14  *United States v. Brissett,* 720 F. Supp. 90 (S.D. Tex. 1989) which also held that "because the

15  defendant had an application for adjustment of status to permanent resident pending at the time

16  he obtained the firearm, he was not an alien illegally or unlawfully in the United States." *Id.,* at

17  90. But, the government fails to cite or discuss either *Hernandez* or *Brissett,* both of which

18  remain valid precedents.

19         Moreover, the case principally relied on by the government, *United States v. Atandi,* 376

20  F.3d. 1186 (10th Cir. 2004), involved a defendant who put himself out of status in 1999 by

21  stopping attendance at school; had removal proceedings instituted against him in 2000; was

22  found deportable by an immigration judge in March, 2002; and then was arrested as an illegal

23  alien in possession of a firearm in May, 2002. *Id.,* at 1187. These facts distinguish *Atandi* from

24  this case.

25         Similarly, in another case cited by the government, *United States v. Bazargan,* 992 F.2d

26  844 (8th Cir. 1993), the alien again put himself out of status; was warned by an immigration

27  official that his asylum application had been denied; and was served with an order to show cause

28  DEF RULE 29 REPLY                         7

**0316**

1  why he should not be deported; all before he was arrested for possession of a firearm by an

2  illegal alien. *Id.*, at 845. These facts again distinguish *Bazargan* from this case.

3  The third case cited by the government, *Mohammadi-Motlagh v. INS,* 772 F.2d 1450 (9th

4  Cir. 1984), has little or no relevance to this case, as it is a simple removal case.

5  Here, in contrast, at the time charged in the indictment, there was no immigration finding

6  or warning of a status violation for either Dasa or Dirisanala, nor any finding by an immigration

7  judge that either alien was removable. Even after Tri-Valley was closed down, the affected F-1

8  students were given time to transfer and preserve their legal status.

9  Accordingly, the government has not proven that either was an illegal alien at the time

10  period specified in counts 22 and 24.

11  **b.    Su did not harbor either Dasa or Dirisanala**

12  The government also failed to prove that Su harbored Dasa or Dirisanala, because its

13  theory in the indictment that merely providing employment constitutes harboring is flawed.

14  Instead, the government must also show that Su engaged in conduct that is intended both to

15  substantially help an unlawfully present alien remain in the United States and to help prevent the

16  detection of the alien by the authorities. "The mere act of providing shelter to an alien, when

17  done without intention to help prevent the alien's detection by immigration authorities or police,

18  is thus not an offense under § 1324(a)(1)(A)(iii)." *United States v. Vargas-Cordon,* 733 F.3d

19  366, 382 (2nd Cir. 2013), see also *United States v. Costello,* 666 F.3d 1040 (7th Cir. 2012).

20  The government argued to the jury that Su harbored Dasa and Dirisanala by providing

21  employment at Tri-Valley. This evidence is insufficient under the holdings of *Costello* and

22  *Vargas-Cordon.* There is no credible evidence that either alien needed this employment to stay

23  in the United States, or that Su provided employment with the intent to help prevent the detection

24  of the aliens by the authorities.

25  The government now argues that it can meet the test of *Vargas-Cordon.* But, it is too

26  late for that, because the jury would have had to have done so. In any event, the case cited by the

27  government, *United States v. Dann,* 652 F.3d 1160 (9th Cir. 2011), is fatal to the government's

28  DEF RULE 29 REPLY                              8

1   position. In *Dann,* the defendant restricted the nanny's movement and forbade her to talk to

2   anyone outside the house. *Id.,* at 1174. There is no such evidence here that Su restricted Dasa or

3   Dirisanala's movement, or forbade them to talk to anyone.

4           There was brief testimony at trial by Santosh Ignatius that in the one day he worked at

5   Tri-Valley, Su locked the door when she left for lunch. TR 1385, 1848. Su argued in her

6   opening memorandum that this testimony is insufficient, as there was no testimony that all access

7   was blocked; there was no evidence why Su locked the door; there was no evidence that anyone

8   wanted to leave during the lunch hour; and, critically, there was no evidence that Su knew an

9   immigration raid was imminent and locked the door to keep the agents out.

10          Despite this argument, the government, in its opposition, repeats this point. Opp. at 20.

11  However, Ignatius is not even one of the named aliens in either count 22 or count 24. While

12  Ignatius testified that Dasa was there that day, there was no testimony by Dasa that he was locked

13  in, that he wanted to leave, or that he ever had his movements curtailed by Su. So, the

14  circumstance that a door was briefly locked the one day Ignatius worked in the office has nothing

15  to do with the named aliens, Dasa and Dirisanala.

16          Thus, this Court should grant Su's Rule 29 motion as to counts 22 and 24.

17  **5.      The money laundering charges should be dismissed**

18          Su was found guilty by the jury of seven counts of money laundering, in violation of 18

19  U.S.C. §§ 1957(a) (counts 26, 27, 29, 31, 32, 34 and 35).

20          However, under the merger doctrine, if this Court upholds the scheme to defraud charged

21  in the wire and mail fraud counts, then the money laundering charges cannot stand, because the

22  withdrawal of funds was an essential element of the wire and mail fraud scheme and

23  consequently cannot constitute a financial transaction involving the proceeds of independent

24  illegal activity. See *United States v. Bush,* 626 F.3d 527 (9th Cir. 2010), citing *United States v.*

25  *Santos,* 553 U.S. 507, 516-517 (2008).

26          As the government itself argues, the appropriate test for merger is whether the charged

27  money transaction "was a central part of the defendant's criminal scheme." *United States v.*

28  DEF RULE 29 REPLY                           9

0318

1  *Phillips,* 704 F.3d 754, 765 (9th Cir. 2012), *cert. denied,* 133 S.Ct. 2796 (2013), citing *United*

2  *States v. Van Alstyne,* 584 F.3d 803, 815 (9th Cir. 2009).

3        The government now argues that Su's argument fails because "it blends her initial receipt

4  of the F-1 student proceeds with her future expenditure of those proceeds." Opp. at 21. But, that

5  is the problem here, the charged money laundering transactions were blended with the receipt of

6  the money, making the charged money laundering transactions a central component of the

7  scheme to defraud.  See *United States v. Phillips,* 704 F.3d at 765.

8        Su was charged in the indictment with engaging in a scheme for her to defraud immigrant

9  aliens of money and property, specifically tuition and other fees. She could not defraud anyone of

10  money and property unless the money was transferred from Tri-Valley's accounts to her custody.

11  Her withdrawal of funds is thus an essential element of the charged frauds and consequently

12  cannot constitute a financial transaction involving the proceeds of independent illegal activity.

13  Under the merger doctrine, the money laundering charges must be dismissed.

14        Alternatively, if the Court grants the Rule 29 motions on the wire, mail, and visa fraud

15  accounts, then the money laundering charges cannot stand, as Su has been acquitted of the

16  underlying criminal activity.

## CONCLUSION

18        The Court should grant defendant's motion.

19  Dated: October 9, 2014.              Respectfully submitted,

20

21                                      /s/ John J. Jordan
                                        JOHN J. JORDAN
22                                      Attorney for Defendant
                                        SUSAN XIAO-PING SU
23

24

25

26

27

28  DEF RULE 29 REPLY                    10

**0319**

Case4:11-cr-00288-JST   Document189   Filed10/09/14   Page1 of 7

1    JOHN J. JORDAN, ESQ.   (Cal. State Bar No. 175678)
     400 Montgomery Street, Ste. 200
2    San Francisco, CA   94104
     (415) 391-4814
3    (415) 391-4308 (FAX)

4    Attorney for Defendant
     SUSAN XIAO-PING SU
5

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8                    SAN FRANCISCO DIVISION

9    UNITED STATES OF AMERICA,        )    No. CR-11-00288 JST
                                      )
10                    Plaintiff,      )    **REPLY BRIEF IN SUPPORT**
                                      )    **OF MOTION PURSUANT TO**
11   v.                               )    **FED. R. CRIM. P. 33**
                                      )
12   SUSAN XIAO-PING SU,              )
                                      )    Date:   October 31, 2014
13                    Defendant.      )    Time:   9:30 a.m.
     _____)    Hon. Jon S. Tigar
14

15                        **INTRODUCTION**

16          The defendant, Susan Su, through her above-listed counsel, John J. Jordan, files this reply

17   brief in support of her motion for a new trial pursuant to Fed. R. Crim. P. 33.

18          Su has moved for a new trial on the ground that the defendant is and was suffering from

19   an unrecognized mental impairment, relying for support on the report of Dr. Amanda Gregory.

20   Su contends that a new trial is warranted because the jury did not hear crucial evidence on the

21   defendant's inability to form the requisite mens rea;  the jury was exposed to her behavior at trial,

22   yet did not hear any testimony regarding Su's mental health that would have explained her

23   behavior and mitigated its impact on the jury; and Su's ability to decide whether to testify on her

24   own behalf was affected by her untreated mental illness.

25          The government has now filed a brief in opposition, arguing that the motion should be

26   summarily denied.   Su disagrees, and asks this Court to grant the motion.

27

28   DEF RULE 33 REPLY                    1

0320

1        **ARGUMENT**

2   **I.   This Court Should Grant a New Trial Pursuant to Fed. R. Crim. P. 33**

3         The defendant Susan Su moves for a new trial pursuant to Fed. R. Crim. P. 33, on the

4   ground that the jury did not hear crucial evidence on the defendant's inability to form the

5   requisite mens rea, required to find her guilty.  In addition, the defendant did not receive a fair

6   trial, because the jury was exposed to her behavior at trial, yet did not hear any testimony

7   regarding Su's mental health, that would have explained her behavior and mitigated its impact on

8   the jury.  Finally, Su's ability to decide whether to testify on her own behalf was affected by her

9   untreated mental illness.

10  **A.   This Court Should Grant a New Trial in the Interest of Justice**

11  **1.   Su's Motion is Timely**

12        The government first argues that Su's Rule 33 motion in the interest of justice is

13  untimely, because it was filed more than 14 days after the jury verdict, citing Fed. R. Crim. P.

14  33(b)(2).

15        However, the time limits in Rule 33 "must be read in conjunction with Federal Rule of

16  Criminal Procedure 45, which provides that "[w]hen an act must or may be done within a

17  specified period, the court . . . may extend the time . . . on a party's motion made . . . after the

18  time expires if the party failed to act because of excusable neglect." *United States v. Munoz,* 605

19  F.3d 359, 367 (6th Cir. 2010),  quoting Fed. R. Crim. P. 45(b), citing Advisory Comm. Notes to

20  2005 Amendments of Rule 33 ("[U]nder Rule 45(b)(1)(B), if for some reason the defendant fails

21  to file the underlying motion for new trial within the specified time, the court may nonetheless

22  consider that untimely underlying motion if the court determines that the failure to file it on time

23  was the result of excusable neglect.") and *United States v. Robinson*, 430 F.3d 537, 541 (2d Cir.

24  2005) ("The time limitations specified in Rule 33 are read in conjunction with Rule 45, which

25  establishes how to compute and extend time.").

26        This court granted the request of the defense to brief post-verdict motions.  This court has

27

28  DEF RULE 33 REPLY                     2

**0321**

1    great discretion to do so.  Rule 33 "affords judges great flexibility to set a new due date." *United*

2    *States v. Hall,* 370 F.3d 1204, 1206 (D.C. Cir. 2004), citing *United States v. Marquez*, 351 U.S.

3    App. D.C. 373, 291 F.3d 23, 28 (D.C. Cir. 2002), see also *United States v. Acosta,* 2012 U.S.

4    Dist. LEXIS 10383 (N.D. CA January 30, 2012), unpublished.

5    Moreover, at the hearing on May 9, 2014, the defense recalls that this Court

6    acknowledged that the post-trial motions included both Rule 29 and Rule 33 motions.

7    **2.**      **Defendant is Not Raising an Ineffective Assistance of Counsel Argument**

8    The government, in its opposition, spends considerable space arguing that the defense is

9    really raising an habeas corpus/ineffective assistance of counsel argument in the guise of a Rule

10    33 motion, perhaps for the reason that such a petition would be untimely.  Not so.  The defendant

11    is making its arguments here solely under Fed. R. Crim. P. 33, as a motion for a new trial.  See

12    *United States v. Gutierrez,* 783 F. Supp.1538 (Dist. P.R. 1991).  It is incumbent on counsel to

13    bring this information to the Court at the earliest possible moment, hence this motion.

14    **3.**      **Defendant is Not Raising a Competency Argument**

15    The government also spends considerable space in its opposition arguing that Su is

16    competent to stand trial.  However, the Rule 33 motion is not a competency motion.

17    **4.**      **Dr. Gregory's testimony would provide the jury with an accurate and relevant description of Su's mental condition**

18

19    The argument that the defense did make in its motion is that this Court should order a

20    new trial, in the interest of justice, so that the jury can hear testimony regarding the defendant's

21    mental capacity to form the criminal intent, an element of the crimes charged in the indictment.

22    Dr. Gregory can offer expert testimony directly relevant to the issues of whether Su had a

23    diminished capacity to form the specific intent or the knowing and intentional conduct that are

24    elements in most, if not all, the charges in the indictment.

25    In its brief response to this argument, the government argues that no expert testimony was

26    necessary to challenge defendant's mens rea to the underlying criminal conduct.  Opp. at 10.

27

28    DEF RULE 33 REPLY         3

1   The government wrongly minimizes the importance of expert testimony on a complex subject, a

2   subject that courts repeatedly recognize is appropriate for allowing expert testimony.

3         As cited in Su's opening brief, in *United States v. Christian*, 749 F.3d 806 (9th Cir.

4   2014), the Ninth Circuit vacated a conviction for transmitting email communications containing

5   threats to injure another, in a case in which the defendant argued that the district court should

6   have allowed his expert, a psychologist who had earlier examined him for competency to stand

7   trial, to testify regarding his diminished capacity defense.  Instead of finding that such testimony

8   was unnecessary, or that the expert could only give limited testimony, the Ninth Circuit held the

9   district court abused its discretion (a high hurdle to establish on appeal) by excluding the

10  defendant's expert.  This is directly contrary to the government's view of the importance of

11  expert testimony on mental state.

12        Similarly, in *United States v. Pohlot*, 827 F.2d 889, 890 (3d Cir. 1987), *cert. denied*, 484

13  U.S. 1011 (1988), the Third Circuit recognized the admissibility of expert evidence of

14  diminished capacity when offered to negate the intent element of an offense.

15        Finally, in a case very similar to this one, the district court in *United States v. Gutierrez*,

16  783 F. Supp.1538 (Dist. P.R. 1991), considered the same situation, where it was determined,

17  post-trial, that the defendant was suffering from an impairment in intellectual functioning.  The

18  court pointed out that the defendant "had been convicted by a jury who had not had the

19  opportunity to hear any evidence as to defendant's mental condition." *Id.*, at 1542.  After holding

20  a hearing on the matter and considering the psychiatric testimony, the district court granted a new

21  trial under Rule 33.  The court found that the defendant's mental condition went "to the element

22  of mens rea, that is, defendant's ability to form the requisite criminal intent to commit the

23  offense." *Id.*, at 1545.  The court ordered a new trial, holding that evidence of defendant's

24  mental condition should be placed before the jury in order to determine whether he could form

25  the necessary mens rea to commit the offense.  The court found that "Failure to give defendant

26  an opportunity to present this testimony may implicate his constitutional rights to due process

27

28  DEF RULE 33 REPLY                    4

1    and to offer testimony in his own defense." *Id.*, at 1549, citing *Rock v. Arkansas*, 483 U.S. 44

2    (1987).   This decision was later affirmed by the First Circuit.  See *United States v. Gutierrez*,

3    1992 U.S. App. LEXIS 5610 (1st Cir. 1992).

4         The government fails to discuss any of the three cases cited by the defense.  It also fails to

5    cite a single case in support of its own argument that no expert testimony is necessary to

6    challenge defendant's mens rea.

7         Here, as in *Gutierrez*, a psychologist's report reveals that Su suffers from a mental defect

8    that might affect her ability to appreciate the nature and quality of the criminal conduct for which

9    she was convicted.  Dr. Gregory's report details that Su's symptoms are consistent with a

10   diagnosis of Schizoaffective Disorder, Bipolar Type, and that other diagnoses to be considered

11   include Bipolar Disorder with Psychotic Features and Schizophrenia.  Report at 11.  Dr. Gregory

12   reports that these disorders are all considered to be major mental illnesses.   Report at 11.  Dr.

13   Gregory concludes that Su's grandiose delusional thinking and unstable mood may also have

14   played a role in her behavior that resulted in her charges.  Report at 12.   While Dr. Gregory

15   candidly discusses Su's personal actions in self-researching her mental illness, this in no way

16   changes Dr. Gregory's conclusion that Su is suffering from a mental disorder.

17        In addition, as detailed in Dr. Gregory's report, Su suffered from earlier, documented,

18   episodes, well before the allegations in this case surfaced, strongly cutting against any argument

19   that Su is now malingering.

20        And here, as in *Gutierrez,* Su has been convicted by a jury who had not had the

21   opportunity to hear any evidence as to defendant's mental condition.  As pointed out in Su's

22   opening memorandum, the underlying charges all involve a mens rea or intentional element.

23        Thus, Su's delusional thinking process is directly relevant to her inability to form the

24   requisite intent that is an element of the crimes charged in the indictment, but the jury did not

25   have any expert testimony to guide its deliberations on this issue.

26

27

28   DEF RULE 33 REPLY                          5

**0324**

**B.      This Court Should Grant a New Trial for Newly Discovered Evidence**

Alternatively, this Court may grant a new trial on the grounds of newly discovered evidence.

As argued in Su's opening memorandum, the proffered testimony of Dr. Gregory also qualifies as newly discovered evidence. See *United States v. Hinkson*, 585 F.3d 1247, 1257 (9th Cir. 2009 ) (en banc), modified, 611 F.3d 1098 (9th Cir. 2010), *cert. denied,* 131 S.Ct. 2096 (2011), citing *United States v. Harrington,* 410 F.3d 598 (9th Cir. 2005), *cert. denied,* 546 U.S. 1115 (2006).

First, contrary to the government's position, the report of Dr. Gregory is newly discovered.  No such detailed report was done earlier, and there was certainly no prior in-depth analysis, equal to that done by Dr. Gregory.  Su's behavior appeared to be more balanced prior to the stress of the trial, a circumstance that is consistent with the findings of Dr. Gregory.   But, by the last day of trial, the defendant's mental health issues had come to the surface and been recognized.

Second, the failure to discover the evidence was not the result of the defendant's lack of due diligence.  The earlier therapy ordered by the magistrate did not disclose the extent of Su's mental condition.  Counsel for the defense believed an earlier event had been a nervous breakdown. TR 1934. Again, the stress of the trial exposed the depth of the problem, and now Dr. Gregory's report describes the issue in detail.  If the defendant had been acting throughout the case as she did at trial, the situation would be different.

Third, Dr. Gregory's testimony is material to the issue of intent.

Fourth, Dr. Gregory's proffered testimony is in no way cumulative or merely impeaching.

Here, as in *Gutierrez,* a psychologist's report reveals that Su suffers from a mental defect that might affect her ability to appreciate the nature and quality of the criminal conduct for which she was convicted.  At the same time, she had been convicted by a jury that did not hear any evidence as to her mental condition.  Dr. Gregory's testimony should be heard by a jury, so that

DEF RULE 33 REPLY                              6

1  the jury could have all the relevant evidence it needs to determine if Su had the requisite intent

2  and mens rea required by the elements of the crimes charged in the indictment.

3                                                    **CONCLUSION**

4          The Court should grant defendant's motion.

5  Dated: October, 2014.                         Respectfully submitted,

6                                                 /s/ John J. Jordan
                                                  JOHN J. JORDAN
7                                                 Attorney for Defendant
                                                  SUSAN XIAO-PING SU

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  DEF RULE 33 REPLY                              7

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   J. DOUGLAS WILSON (DCBN 412811)
3  Chief, Criminal Division

4  HARTLEY M.K. WEST (CABN 191609)
   WADE M. RHYNE (CABN 216799)
5  Assistant United States Attorneys

6        1301 Clay Street, Suite 340S
         Oakland, California 94612
7        Telephone: (510) 637-3680
         FAX: (510) 637-3724
8        E-Mail:  hartley.west@usdoj.gov
                  wade.rhyne@usdoj.gov
9
   Attorneys for United States of America
10

11                      UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          OAKLAND DIVISION

14

15  UNITED STATES OF AMERICA,           )  CASE NO. CR-11-00288 JST
                                        )
16        Plaintiff,                    )  **UNITED STATES' SENTENCING
                                        )  MEMORANDUM**
17     v.                               )
                                        )  Hearing Date: October 31, 2014
18  SUSAN XIAO-PING SU,                 )  Time: 9:30 a.m.
                                        )  Judge:  Hon. Jon S. Tigar
19        Defendant.                    )
                                        )
20  _____  )
21

22

23

24

25

26

27

28

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST

0327

1

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

RELEVANT PROCEDURAL HISTORY ..................................................................1

SUMMARY OF RELEVANT FACTS .......................................................................2

    A.  Student Visa Program ..................................................................................2

    B.  TVU's Fraudulent Form I-17 Petition ........................................................3

    C.  Student Recruiting, Admission, and Form I-20s .........................................4

    D.  Su's Student Victims ....................................................................................5

    E.  Su Enrolls Fictitious TVU Students for Money...........................................6

    F.  Su's Money Laundering...............................................................................6

    G.  Search Warrants and Su's Interview ...........................................................7

LEGAL STANDARD....................................................................................................8

ARGUMENT .................................................................................................................8

    A.  Su's Crimes Place Her at Total Offense Level 40 ......................................8

    B.  The Section 3553(a) Factors Support a Sentence of 292 Months' Imprisonment.......18

        1.  Nature and Circumstances of the Offense and Characteristics of the Defendant ................18

            a.  Nature and Circumstances of the Offense................................18

            b.  Characteristics of the Defendant ...........................................19

        2.  Need to Reflect the Seriousness of the Offenses ..............................20

        3.  Deterrence of Criminal Conduct ......................................................21

        4.  Need to Protect the Public.................................................................21

        5.  Avoiding Sentencing Disparities ......................................................21

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    i

**TABLE OF AUTHORITIES**

**Cases**

United States v. Bussell, 504 F.3d 956 (9th Cir. 2007) ............................................ 21, 22

United States v. Cantrell, 433 F.3d 1269 (9th Cir. 2006) ............................................ 8

United States v. Crandall, 525 F.3d 907 (9th Cir. 2008) ............................................ 21

United States v. Gordon, 393 F.3d 1044 (9th Cir. 2004).............................................. 21

United States v. Horob, 735 F.3d 866(9th Cir. 2013) ............................................ 13

United States v. McCormac, 309 F.3d 623 (9th Cir. 2002) ............................................ 11

United States v. Showalter, 569 F.3d 1150 (9th Cir. 2009)............................................ 12

United States v. Tanke, 743 F.3d 1296 (9th Cir. 2014) ............................................ 13

United States v. Zolp, 479 F.3d 715 (9th Cir. 2007) ............................................ 11, 12

**Statutes**

8 U.S.C. § 1324(a)(1)(A) ............................................................................................ 2

18 U.S.C. § 371 ...................................................................................................... 2, 9

18 U.S.C. § 1001 ........................................................................................................ 9

18 U.S.C. § 1001(a)(2) ............................................................................................... 2

18 U.S.C. § 1001(a)(3) ............................................................................................... 2

18 U.S.C. § 1030(a)(3) .......................................................................................... 2, 10

18 U.S.C. § 1324 ...................................................................................................... 10

18 U.S.C. § 1341 ..................................................................................................... 2, 9

18 U.S.C. § 1343 ..................................................................................................... 1, 9

18 U.S.C. § 1546(a) ................................................................................................. 2, 9

18 U.S.C. § 1957 ................................................................................................... 2, 10

18 U.S.C. § 3553(a) ................................................................................................... 8

18 U.S.C. § 3663A(a)(2) ............................................................................................ 21

18 U.S.C. § 3663A(c) ................................................................................................ 21

**Rules**

U.S.S.G. §1B1.1(a)(1) & (2)........................................................................................ 8

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    ii

0329

1    U.S.S.G. § 1B1.1(a)(3) & (4) ................................................................. 8

2    U.S.S.G. § 2B1.1 ............................................................................ 11, 12, 17

3    U.S.S.G. § 2B1.1(a)(1) .......................................................................... 9

4    U.S.S.G. § 2B1.1(a)(2) .......................................................................... 9

5    U.S.S.G. § 2B1.1(b)(1)(J) .................................................................. 9, 11

6    U.S.S.G. § 2B1.1(b)(2)(C) ...................................................................... 9

7    U.S.S.G. § 2B1.1(b)(9)(A) ...................................................................... 9

8    U.S.S.G. § 2B1.1(b)(9)(C) ..................................................................... 13

9    U.S.S.G. § 2B1.1(b)(10)(C) ................................................................ 9, 14

10   U.S.S.G. § 2B2.3(a) ............................................................................. 10

11   U.S.S.G. § 2B2.3(b)(1) ......................................................................... 10

12   U.S.S.G. § 2B2.3(c)(1) ......................................................................... 10

13   U.S.S.G. § 2L2.1 .............................................................................. 9, 17

14   U.S.S.G. § 2L2.1(a) .............................................................................. 9

15   U.S.S.G. § 2L2.1(b)(2)(C) ................................................................. 9, 10

16   U.S.S.G. § 2S1.1(a)(1) ......................................................................... 10

17   U.S.S.G. § 2S1.1(b)(2)(A) ..................................................................... 10

18   U.S.S.G. § 2X1.1 .................................................................................. 9

19   U.S.S.G. § 3B1.1 ................................................................................. 14

20   U.S.S.G. § 3B1.1(a) ....................................................................... 9, 10, 14

21   U.S.S.G. § 3C1.1 ....................................................................... 9, 10, 11, 15

22   U.S.S.G. § 3D1.2 ................................................................................. 17

23   U.S.S.G. § 3D1.2(b) ............................................................................. 17

24   U.S.S.G. § 3D1.2(d) ..................................................................... 11, 17, 18

25   U.S.S.G. § 3D1.4(b) ............................................................................. 11

26

27

28

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                          iii

0330

**INTRODUCTION**

The United States of America respectfully requests this Court to sentence the defendant Susan Xiao-Ping Su to: (1) serve 292 months of imprisonment, representing the low-end of the applicable United States Sentencing Guidelines range for Offense Level 40 and Criminal History Category I; (2) serve five years of supervised release; (3) pay restitution to the victims of her fraud scheme; (4) be subject to a preliminary order of forfeiture in an amount not less than $5,601,844.72; and (5) pay a $3,100 special assessment.

This sentencing recommendation is fair and reasonable for Su who carried out a sophisticated multi-year scheme to defraud non-immigrant student aliens out of over $5.6 million, in the form of tuition and other payments, through her creation and operation of Tri-Valley University (TVU).  As part of her scheme, Su fraudulently obtained authorization from the U.S. Department of Homeland Security (DHS), Student and Exchange Visitor Program (SEVP), to admit foreign students.  She then collected millions of dollars from the aliens in exchange for maintaining their student visas in active status, and used these funds to purchase millions of dollars' worth of real property and other assets, including a mansion on the Ruby Hills Golf Course and a Mercedes Benz.  Su also employed some of these aliens at TVU, instructing them to access government databases without authorization and to create fraudulent visa-related documents in furtherance of her scheme.  When questioned by DHS agents regarding her students' status, Su made materially false representations and submitted materially false documents to the agents.

Su never provided TVU's student aliens with the education she had promised, yet she continued to demand tuition payments.  When students complained about TVU's lack of classes, course materials, or instructors, Su responded by demanding additional tuition payments and threatening them with deportation if they did not pay up.  Su's chain of lies, her insatiable greed, and an absence of mitigation on this record collectively compel the conclusion that a Guideline sentence of 292 months is appropriate and not greater than necessary to achieve the goals of sentencing.

**RELEVANT PROCEDURAL HISTORY**

On November 10, 2011, the Grand Jury returned a thirty-five count Superseding Indictment, charging Su with wire fraud, in violation of 18 U.S.C. § 1343 (Counts 1-12); mail fraud, in violation of

0331

1    18 U.S.C. § 1341 (Counts 13-14); conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371

2    (Count 15); visa fraud, in violation of 18 U.S.C. § 1546(a) (Counts 16-19); use of a false document, in

3    violation of 18 U.S.C. § 1001(a)(3) (Count 20); false statements, in violation of 18 U.S.C. § 1001(a)(2)

4    (Count 21); alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A) (Counts 22-24); unauthorized

5    access, in violation of 18 U.S.C. § 1030(a)(3) (Count 25); and money laundering, in violation of 18

6    U.S.C. § 1957 (Counts 26-35). (Dkt. 41.) The Superseding Indictment also included four forfeiture

7    allegations.

8         Trial commenced on March 3, 2014. (Dkt. 99.) On March 18, the Court granted the United

9    States' motion to dismiss Counts 23, 28, 30, and 33. (TR 1713.) On March 24, the jury returned guilty

10    verdicts as to all remaining counts. (Dkt. 119, TR 1919-24.)

11                **SUMMARY OF RELEVANT FACTS**

12         The following facts are taken from the trial record and from the United States Probation

13    Officer's (USPO) pre-sentence investigation report (PSR).

14         **A.**     **Student Visa Program**

15         There are different categories of foreign nationals who may be admitted to the United States for

16    nonimmigrant purposes, and that one such category, designated "F-1" based on the applicable statutory

17    subsection, comprised bona fide students coming temporarily to study at an approved school. (TR 232.)

18    Aliens wishing to study in the United States obtain F-1 visas, and those students are admitted for a

19    temporary period called "duration of status," which federal regulations define as the time during which

20    the student is pursuing a full course of study at an approved school. (TR 228-33.)

21         Schools seeking to admit foreign students must submit a petition known as a Form I-17 to SEVP

22    in Washington, DC, and meet the criteria for approval. (TR 247-48.) Among other things, the school

23    must establish that it is a bona fide educational institution and, if unaccredited, must provide

24    "articulation agreements" showing that its courses have been and are unconditionally accepted to at least

25    three accredited institutions of higher learning. (TR 256-60.) The I-17 must also identify "Designated

26    School Officials" (DSOs), who certify their knowledge of and intent to comply with student

27    immigration laws and regulations. (TR 284.) The I-17 warned DSOs that they could "not delegate

28    [their] designation to any other person." (Exh. 1 and 3.)

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST         2

1    Once a school's I-17 is approved, SEVP issues the DSOs login IDs and passwords enabling them

2   to access the Student and Exchange Visitor Information System (SEVIS) – a nonpublic computer system

3   located in Rockville, Maryland, which is used by the United States government and operated through

4   SEVP for the purpose of collecting nonimmigrant student information from approved schools and

5   monitoring such aliens' status.   (TR 248 -54.)  SEVIS is used to create student records, including a

6   Certificate of Eligibility for Nonimmigrant (F-1) Student Status, also known as a Form I-20, which is

7   required to obtain a student visa. (TR 287, 296, 329-38.)  SEVP may decertify a school that fails to

8   follow immigration laws and regulations.  (TR 243, 271-72.)

9        **B.    TVU's Fraudulent Form I-17 Petition**

10    DHS's approval of Su's fraudulent I-17 was a foundational component of her scheme.  Su

11   electronically submitted her I-17 to SEVIS on September 15, 2008, on behalf of TVU.  (TR 261-62, 278,

12   311; Exh. 1.)  Su's I-17 was full of materially false statements.  It fraudulently identified as TVU's

13   administrators and DSOs Su's sister, Sophie Su, and Sophie's husband, Vince Wang.  (TR 301, 590.)

14   Su admitted to agents that when she submitted the I-17 she knew that her DSOs had no intention to be

15   DSOs but that she submitted the false I-17 anyway.  (TR 589-90.)  Su also included with her I-17 a

16   fraudulent list of instructors, many of whom never agreed to teach at TVU, as Su later admitted to

17   agents. (TR 447-51, 467-68, 561-62, 599.)  Su's I-17 also contained materially false representations

18   about TVU's admissions standards, grading policies, and graduation requirements. (Exh. 1.)   In

19   December 2008, in response to SEVP's request for clarification, Su mailed SEVP a revised Form I-17,

20   which contained the same materially false statements.  (TR 316-17, 411; Exh. 3.)

21    As part of TVU's approval process Su also provided materially false documents to a DHS

22   contractor who had physically inspected TVU's campus as part of the approval process.  Su gave the

23   contractor a signed copy of her I-17, as well as articulation agreements from three schools, which the

24   contractor passed on to SEVP.  (TR 278-82; Exh. 5 at p. 8.)

25    Su later mailed revised articulation agreements to SEVP on February 10, 2009, two of which

26   were confirmed to be forgeries based on testimony from two school officials and from a DHS expert

27   forensic document examiner. (TR 319-28; Exh. 4, 102, 112.)  The school officials testified they never

28   entered into articulation agreements with TVU.  (TR 774-80, 474-97.)  The forensic document examiner

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                           3

1  established that the signatures of the purported school officials on TVU's articulation agreements were

2  essentially lifted from other "source" documents. (TR 511-52.) SA Mackey confirmed that those

3  source documents were located on Su's computer and in her residence during execution of the search

4  warrant. (TR 667, 649.)

5        Relying on Su's materially false submissions, SEVP approved TVU to admit F-1 students on

6  February 19, 2009. (Exh. 7.) Su's SEVIS electronic I-17 submission and supplemental mailings formed

7  the basis of the first wire fraud charge (Count 1), and both mail fraud charges (Counts 13 and 14).

8        **C.   Student Recruiting, Admission, and Form I-20s**

9        After TVU received SEVP's approval to admit F-1 students, Su entered into recruiting

10 agreements, paying as commissions a percentage of tuition fees for each new F-1 student recruited. Su

11 agreed to pay these "referral" commissions to ABS Consultancy (ABS) and to her own TVU students to

12 find, recruit, and enroll non-immigrant student aliens. (Exh. 303b, 580-592 at TR 617-24, 711-12; Exh.

13 330 at TR 679-680; Exh. 477, 478 at TR 820-29; Exh. 588A at TR 831-32.) Indeed, Su's visa fraud

14 conspiracy with ABS began with an email proposal that she sent only two days after she had defrauded

15 SEVP. (Exh. 300; TR 609-13.) ABS well knew that TVU was not a legitimate school, as confirmed by

16 email correspondence in which Su sells TVU diplomas and transcripts to ABS's clients. (Exh. 305; TR

17 660, Exh. 307; TR 654, Exh. 309 at TR 658, Exh. 311 at TR 756.) ABS's knowledge of TVU's

18 illegitimacy was further confirmed by more emails and by Su's admissions to the agents all showing that

19 she used TVU to fraudulently maintain F-1 immigration status for her ABS coconspirators. (Exh. 315;

20 TR 610-12.)

21       To process the admission of the new student recruits, Su admitted that she hired her own F-1

22 students to work in the TVU office. (TR 605, 624-25.) Multiple F-1 students testified that Su gave

23 them access to SEVIS through DSO accounts and instructed them to create and print Form I-20s for new

24 F-1 students, after which time Su forged DSO signatures on the I-20s. (TR 813-815, 1163-65, 1213-14,

25 1223-24, 1228-30, 1244-45, 1323-24, 1445, 1449, 1514-15.) TVU employees also testified that Su

26 admitted all alien applicants without regard to their academic qualifications or intent to pursue a full

27 course of study (TR 809-11, 1172-74, 1506-07); that she instructed them to enter false addresses and

28 other information in SEVIS for hundreds of students (TR 809-11, 1173, 1514-15); that there were no

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                          4

1  physical classes although some were taught online (TR 818, 920-21, 1186-87, 1518, 1525, 1362, 1405,
2  1407, 1420-21, 1464-65); and that Su directed passing grades for everyone, with none below a B+ (TR
3  626, 801, 804, 811-12, 912, 914, 1186, 1385-86, 1575). The student-employees testified that they did
4  not attend online classes at TVU, as Su knew. (Id.)

5        TVU student-employees Vishal Dasa and Anji Dirisanala were criminally charged for their
6  criminal conduct with Su, pleaded guilty pursuant to plea agreements, cooperated with the United
7  States' investigation of TVU, and were awaiting sentencing at the time of trial. (TR 876, 1292.)

8        The unauthorized SEVIS access was charged in Count 25. The agreement between Su and her
9  student-employees to create fraudulent SEVIS records was charged as conspiracy to commit visa fraud,
10  Count 15. Su's employment of two student-employees was charged as alien harboring in Counts 22 and
11  24. The above-referenced email from Su soliciting recruiters of Indian students was charged as wire
12  fraud in Count 2.

13      **D.    Su's Student Victims**

14        By January 2011, TVU had approximately 1,760 active students in SEVIS, many of whom
15  enrolled believing TVU was a legitimate school. (TR 572.) However, when these students arrived at
16  TVU they quickly learned that TVU did not have proper infrastructure to provide the education it had
17  promised in its website and course catalogue. Students confirmed that TVU consisted of a single
18  classroom and offered no physical classes or legitimate instructors. The only classes that did exist were
19  a handful of online classes that were fraught with log in issues and/or minimal instructional content.

20        To allay concerns about TVU's legitimacy, Su routinely lulled students by telling them that
21  classes would soon begin and that their immigration status would be secure. To create the appearance
22  that TVU's tuition-paying students were progressing in their studies, as required by the terms of their
23  visas, Su created bogus transcripts with passing grades for classes that the students did not take. In
24  many instances the classes depicted on the transcripts did not exist at all. By doing so she was able to
25  create the perception that she controlled the aliens' visa status thereby allowing her to demand additional
26  tuition payments.

27        Several students testified that they felt "stuck" with no choice but to pay Su or face possible
28  deportation. Indeed, if a student requested to transfer or if they complained about TVU's lack of classes,

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST     5

**0335**

1   course materials, or instructors, then Su would either ignore them or threaten them. Su's threats came in

2   the form of a demand for more tuition payments followed by a threat to terminate the student's visa

3   status if they did not pay her. Many TVU students saw no good choice but to pay her.

4   **E.   Su Enrolls Fictitious TVU Students for Money**

5       HSI agents and a student-employee testified regarding the enrollment of four fictitious students

6   at TVU during nine undercover operations in late 2010 and early 2011. A more detailed summary of the

7   operations is set forth in the United States' Opposition to Su's Rule 29 Motion. (Dkt. No. 186.) In

8   summary, using Dirisanala and an undercover agent, HSI agents were able enroll four fictitious students

9   at TVU. Su approved the enrollment of, and granted immigration status to, the fictitious students after

10  receiving tuition payments. Thereafter agents contacted Su during a series of airport ruses claiming to

11  be airport officials. The agents claimed that the students were stuck at the airport with inadequate

12  evidence of their immigration status. During the calls, Su vouched for the students and later emailed

13  false admissions documents, I-20s, and transcripts to the agents.

14      As a further part of the operation, an agent posing as an airport official went to TVU to

15  personally pick up the requested documents from Su. During the encounter, Su advised the agent that

16  she had not had time to complete one of the student's attendance sheets, but that he had attended a class

17  that she personally taught, and that the attendance log reflected that his attendance had been good.

18  **F.   Su's Money Laundering**

19      The jury convicted Su of money laundering in Counts 26, 27, 29, 31, 32, 34, and 35, arising out

20  of her purchases of commercial properties, three residences, and a Mercedes Benz. (Dkt 119.) Su

21  utilized five different financial accounts to funnel fraud proceeds from her students into her pockets.

22  (Exh. 650.) Su's accounts included, PayPal (#1921), Citibank (#3045), and Wells Fargo (#0454, #3640,

23  and #4780). Su engaged in a series of monetary transactions using those accounts over the course of

24  nearly two years.

25      Su admitted that she engaged in the charged transactions using TVU business accounts that she

26  controlled. Financial analysis confirmed that close to 99% of the funds consisted of money received

27  from F-1 students, commingled with about 1% that was in the account before she got F-1 approval.

28  (Exh. 650, 651.) SA Mackey further testified how his financial analysis tracked the money into and out

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    6

1    of Su's accounts. (Exh. 650, 651.)  Furthermore, Su admitted to SA Mackey that she purchased these

2    assets entirely with TVU F-1 student proceeds.  (TR 630, 633, 634.)

3       **G.      Search Warrants and Su's Interview**

4          Su's fraud scheme ended on January 19, 2011, when HSI executed search warrants at TVU's

5    offices, Su's homes, and Su's car.  (TR 584.)  During the searches, agents found the Articulation

6    Agreements, draft I-17 Petitions, student records, Form I-20s and other SEVIS documents, emails, and

7    correspondence, among other things.

8          Su consented to an interview at the time of the search and then made a series of incriminating

9    admissions. (TR 587.)  She admitted hiring recruiters and paying commissions to get F-1 students (TR

10   610-12, 620); instructing her staff to enter false addresses in SEVIS as applicants' residences (TR 605);

11   providing her student-employees with unauthorized access to SEVIS (TR 624-25); and instructing her

12   staff not to give students grades below B+ (TR 626).  She also admitted sending the I-17 and its

13   supplements (TR 588), and the emails and attachments to HSI regarding the fictitious students enrolled

14   during undercover operations.  (TR 642-43, 1060-61, and 1071).  While Su denied falsifying the

15   articulation agreements, she asked the agents "please, please, please" not to contact the schools.  (TR

16   591-96.)  When the agents said they already did, she refused to discuss the articulation agreements

17   further.  (TR 597.)

18      **H.      Su's Pre-Trial Conduct**

19          After the Grand Jury indicted Su, she continued her efforts to operate TVU.  TVU's website

20   content included a solicitation for credit card or PayPal donations to save the school.  The monetary

21   solicitation was accompanied by a picture of a burning candle and a dove.  Shortly thereafter, in or about

22   January 2012, Su attempted to re-open TVU under the name of "Global TV University" ("Global

23   TVU").  Su created a Global TVU website at www.globaltvu.us and incorporated the entity with the

24   California Department of State identifying herself as the agent for service of process at her Ruby Hills

25   mansion.

26      **I.       Su's Attempts to Obstruct Justice During Trial**

27          Immediately before and during trial Su made multiple attempts to influence the testimony of

28   government witnesses by emailing information using aliases and fictitious online accounts.  (Rhyne

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                          7

**0337**

1  Decl., Ex. 1; PSR, ¶¶ 39-46.)  A more detailed summary of her email content is set out below in

2  discussing the application of the guideline adjustment for Su's attempted obstruction of justice.

**LEGAL STANDARD**

4     In arriving at an appropriate sentence, the first step is to accurately calculate the Sentencing

5  Guidelines offense level and sentencing range.  United States v. Cantrell, 433 F.3d 1269, 1280-81 (9th

6  Cir. 2006).  After calculating the guidelines, the Court must then apply the factors set forth in 18 U.S.C.

7  § 3553(a) to arrive at a reasonable sentence.  See id. (stating that after determining the guidelines

8  calculation is correct the appellate court turns to whether the sentence is reasonable "in light of all the 18

9  U.S.C. § 3553(a) factors").  These factors include consideration of the circumstances of the offense and

10  the defendant, along with the need for the sentence to (a) reflect the seriousness of the offense (including

11  promoting respect for the law and providing just punishment), (b) afford adequate deterrence, (c) protect

12  the public from further criminal conduct by the defendant, and (d) avoid sentencing disparities among

13  similarly situated defendants.

**ARGUMENT**

15     **A.     Su's Crimes Place Her at Total Offense Level 40**

16     Su's total offense level is 40 with criminal history category I, resulting in a guideline range of

17  292 to 365 months.  In calculating the total offense level, the Court must first compute the offense level

18  for each count of conviction under Chapter 2: wire fraud (Counts 1-12), mail fraud (Counts 13-14),

19  conspiracy to commit visa fraud (Count 15), visa fraud (Counts 16-19), use of a false document (Count

20  20), false statements to a government agency (Count 21), alien harboring (Counts 22 and 24),

21  unauthorized access (Count 25), and money laundering (Counts 26-27, 29, 31-32, 34-35).  U.S.S.G.

22  §1B1.1(a)(1) & (2); Dkt. 41.  The next step is to apply any "adjustments" related to victim, role, and

23  obstruction for each count of conviction pursuant to Chapter 3.  U.S.S.G. §1B1.1(a)(3) & (4).  And

24  finally, the court must "group" any related counts of conviction pursuant to Part D of Chapter 3.

25  U.S.S.G. §1B1.1(a)(4).

26  ///

27  ///

28

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    8

1    In this case, Su's total offense level, followed by a more detailed analysis of the calculation, is as

2  follows:

3                                    **GROUP 1**:

4    <u>COUNTS ONE – FOURTEEN</u>:  (18 U.S.C. §§ 1343 & 1341 – Wire Fraud/Mail Fraud)

5        a.      <u>Base Offense Level</u>:
                 (U.S.S.G. §2B1.1(a)(1) – wire fraud/mail fraud):                    7
6
         b.      <u>Specific Offense Characteristics</u>:
7                (U.S.S.G. §2B1.1(b)(1)(J) – Loss of more than $2.5 million
                 and less than $7 million):                                         +18
8                (U.S.S.G. §2B1.1(b)(2)(C) – Offense involved more than 250 victims):  +6
                 (U.S.S.G. §2B1.1(b)(10)(C) – Offense involved sophisticated means):   +2
9
         c.      <u>Adjustment for Role</u>:
10               (U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a
                 criminal activity that involved five or more participants or was
11               otherwise extensive, increase by 4 levels – wire fraud/mail fraud):   +4

12       d.      <u>Adjustment for Obstruction</u>:
                 (U.S.S.G. §3C1.1 – Defendant attempted to obstruct
13               administration of justice):                                         <u>+2</u>

14       e.      <u>Group Offense Level</u>:                                          39

15  <u>COUNTS FIFTEEN – NINETEEN</u>:  (18 U.S.C. §§ 371 & 1546(a) – Conspiracy/Visa Fraud)

16       a.      <u>Base Offense Level</u>:
                 (U.S.S.G. §§ 2X1.1 & 2L2.1(a) – Use base offense level for substantive
17               Offense (visa fraud)):                                              11

18       b.      <u>Specific Offense Characteristics</u>:
                 (U.S.S.G. §2L2.1(b)(2)(C) – Offense involved 100 or more documents):  +9
19
         c.      <u>Adjustment for Role</u>:
20               (U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a
                 criminal activity that involved five or more participants or was
21               otherwise extensive, increase by 4 levels – visa fraud):             +4

22       d.      <u>Adjustment for Obstruction</u>:
                 (U.S.S.G. §3C1.1 – Defendant attempted to obstruct
23               administration of justice):                                         <u>+2</u>

24       e.      <u>Group Offense Level</u>:                                          26

25  <u>COUNTS TWENTY – TWENTY-ONE</u>:  (18 U.S.C. § 1001 – False Document/Statements)

26       a.      <u>Base Offense Level</u>:
                 (U.S.S.G. §2B1.1(a)(2)):                                            6
27
         b.      <u>Specific Offense Characteristics</u>:
28               (U.S.S.G. §2B1.1(b)(1)(J) – Loss of more than $2.5 million
                 and less than $7 million):                                         +18

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    9

|   |   |   |   |
|---|---|---|---|
| | | (U.S.S.G. §2B1.1(b)(2)(C) – Offense involved more than 250 victims): | +6 |
| | | (U.S.S.G. §2B1.1(b)(9)(A) – Offense involved a misrepresentation the defendant was acting on behalf of an educational organization): | +2 |
| | c. | Adjustment for Role: (U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels – wire fraud/mail fraud): | +4 |
| | d. | Group Offense Level: | 36 |

COUNTS TWENTY-TWO & TWENTY-FOUR:  (18 U.S.C. § 1324 – Alien Harboring)

|   |   |   |   |
|---|---|---|---|
| | a. | Base Offense Level: (U.S.S.G. §2L1.1(a)(3)): | 12 |
| | b. | Specific Offense Characteristics: (U.S.S.G. §2L1.1(b)(2)(C) – Offense involved harboring 100 or more aliens): | +9 |
| | c. | Adjustment for Role: (U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels – alien harboring): | +4 |
| | d. | Adjustment for Obstruction: (U.S.S.G. §3C1.1 – Defendant attempted to obstruct administration of justice): | +2 |
| | e. | Group Offense Level: | 27 |

COUNTS TWENTY-SIX, TWENTY-SEVEN, TWENTY-NINE, THIRTY-ONE, THIRTY-TWO, THIRTY-FOUR, AND THIRTY-FIVE:  (18 U.S.C. § 1957 – Money Laundering)

|   |   |   |   |
|---|---|---|---|
| | a. | Base Offense Level: (U.S.S.G. §2S1.1(a)(1) – Offense level for the most serious underlying conduct *before* application of Chapter Three adjustments (See App. N. 2(C)) – wire fraud/mail fraud): | 33 |
| | b. | Specific Offense Characteristics: (U.S.S.G. §2S1.1(b)(2)(A) – Convicted under 18 U.S.C. § 1957): | +1 |
| | c. | Group Offense Level: | 34 |

## GROUP 2:

COUNT TWENTY-FIVE:  (18 U.S.C. § 1030(a)(3) – Unauthorized Access of a Government Computer)

|   |   |   |   |
|---|---|---|---|
| | a. | Base Offense Level: (U.S.S.G. §2B2.3(a)): | 4 |
| | b. | Specific Offense Characteristics: (U.S.S.G. §2B2.3(b)(1) – Offense involved computer system used in furtherance of national security): | +2 |

c.   Cross Reference:
     (U.S.S.G. §§ 2B2.3(c)(1) & 2L2.1 – Offense committed with intent
     to commit a felony offense (visa fraud)):                          20

d.   Adjustment for Role:
     (U.S.S.G. §3B1.1(a) – Defendant was an organizer or leader of a
     criminal activity that involved five or more participants, increase
     by 4 levels – unauthorized access):                                +4

e.   Adjustment for Obstruction:
     (U.S.S.G. §3C1.1 – Defendant attempted to obstruct
     administration of justice):                                        +2

f.   Group Offense Level:                                               32

### DETERMINING COMBINED OFFENSE LEVEL:

MULTIPLE COUNT ANALYSIS:
(U.S.S.G. §§ 3D1.2(d), 3D1.4(b) – charged offenses constitute two Groups:
(1) unauthorized access to government computer count; and (2) all other counts.
Count as one-half unit any Group that is 5 to 8 levels less serious than the Group
with the highest offense level, resulting in 1.5 units and 1 additional level):   39+1

TOTAL OFFENSE LEVEL:                                                    **40**

A more detailed discussion of the contested components of this calculation is set forth below.

### 1.   Su is Responsible for Between $2.5 and $7 Million of Loss

The United States and the USPO agree that the applicable loss amount is between $2.5 million and $7 million, resulting in an 18-level increase in Su's offense level pursuant to U.S.S.G. §2B1.1(b)(1)(J).

The starting point for calculating loss is §2B1.1. See Cantrell, 433 F.3d at1280. Typically, the loss amount is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1, cmt. n. 2(A) (Nov. 2002) (emphasis added); see also United States v. Zolp, 479 F.3d 715, 718-19 (9th Cir. 2007); United States v. McCormac, 309 F.3d 623,627-28 (9th Cir. 2002).

"Actual loss" means the reasonably foreseeable pecuniary harm that result from the offense. U.S.S.G. § 2B1.1, cmt. n. 2 (A)(i) and (iii) (Nov. 2002). "Intended loss" means the pecuniary harm that was intended to result from the offense, even including intended harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value). U.S.S.G. § 2B1.1, cmt. n. 2(A)(ii) (Nov. 2002). "Pecuniary harm" is "harm that is monetary or that otherwise is readily measurable in money." U.S.S.G. § 2B1.1, cmt. n. 2

1  (A)(iii) (Nov. 2002).  And finally, "reasonably foreseeable pecuniary harm" means harm "that the

2  defendant knew or, under the circumstances, reasonably should have known, was a potential result of the

3  offense." U.S.S.G. § 2B1.1, cmt. n. 2(A)(iv).  Where the court is unable to determine either actual or

4  intended loss with sufficient certainty, it may rely on the defendant's personal gain from the fraud as an

5  alternate measure of loss.  U.S.S.G. § 2B1.1, cmt. n. 2(B) (Nov. 2002).

6      In determining loss amount under these approaches, the court need only make "a reasonable

7  estimate of the loss." U.S.S.G. § 2B 1.1, cmt. n. 2(C) (Nov. 2002).  The court's estimate of monetary

8  loss can be based on "[t]he approximate number of victims multiplied by the average loss to each

9  victim" or "[m]ore general factors, such as the scope and duration of the offense and revenues generated

10  by similar operations." United States v. Showalter, 569 F.3d 1150, 1161 (9th Cir. 2009) (citing U.S.S.G.

11  § 2B1.1, cmt. n. 3(C)(iii) & (v)).  Thus, a district court has a number of permissible methods for

12  determining monetary loss, and "need not make its loss calculation with absolute precision." Zolp, 479

13  F.3d at 719.

14      Here, in calculating "actual loss" and "gain," it cannot be reasonably disputed that Su is

15  responsible for over $5.6 million. (Exh. 651-2.)  SA Mackey's financial analysis confirmed Su's

16  opening bank account balances and traced the flow of fraud proceeds into, out of, and among the

17  accounts over time. (Exh. 650.)  His $5.6 million conclusion was conservative.  He gave Su the benefit

18  of the doubt over nearly $400,000 of additional income that he could not directly trace to a particular F-

19  1 student, despite Su's admissions to him that all her income came from TVU. (Exh. 651-3) (showing

20  total deposit amount into Su's accounts of over $5.9 million.)  Because the Court can calculate the $5.6

21  million of actual loss, and gain, with certainty, it should use that amount for purposes of Su's guideline

22  calculation.

23      Although "intended loss" is somewhat speculative, Su's admissions from her tort claim against

24  DHS confirm that she intended to make much more from her operation of TVU:  "The University grows

25  within 3 years into close to 20 million incomes [sic] yearly.  With the business model, in Summer 2011,

26  the student body is expected to double or triple, more than 20 million income expecting [sic] this year."

27  (Exh. 800-4.)  Accordingly, had Su been able to run TVU without law enforcement intervention, she

28  would have inflicted millions more in victim losses.

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST            12

**0342**

1        **2.      Su Used Sophisticated Means to Carry Out Her Scheme**

2        The United States and the USPO agree that Su utilized sophisticated means to execute her

3    scheme, thereby qualifying her for an additional 2-level increase pursuant to U.S.S.G.

4    §2B1.1(b)(10)(C).

5        The guidelines define "sophisticated means" as "especially complex or especially intricate

6    conduct pertaining to the execution or concealment of an offense." U.S. S.G. §2B1.1(b)(9)(C), n. 8 (B).

7    The 2-level increase for sophisticated means does not require the defendant to be responsible for

8    designing the "sophisticated means" of the scheme, only that she engaged in a scheme involving such

9    means. See United States v. Tanke, 743 F.3d 1296, 1307 (9th Cir. 2014) (affirming district court

10   application of sophisticated means where defendant showed high level of planning, created six false

11   invoices, and falsified carbon copies of checks); United States v. Horob, 735 F.3d 866, 872 (9th Cir.

12   2013) (per curiam) (affirming the application of sophisticated means because, among other things, the

13   defendant "fabricated numerous documents" and "the complicated and fabricated paper trail made

14   discovery of his fraud difficult). Sophisticated means must be something more than a usual fraud

15   offense. See United States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013).

16       Here, Su's scheme went far beyond the usual fraud offense. Su's multistaged scheme required a

17   high level of planning that included layers of lies to DHS in order to obtain SEVP approval; the forgery

18   of two articulation agreements using a photoshop-type program; the aid of family members to forge I-17

19   documents as DSOs; the assistance of her sister-in-law to pose as a DSO during SEVP's site visit; the

20   creation and preservation of a facade of a legitimate university, to include the use of a website, course

21   catalogue, and bogus instructors; the use of specialized knowledge in the area of student visas that she

22   used to legitimize her deportation threats; the daily entry of false information into SEVIS to create the

23   appearance that TVU and its students were complying with visa regulations; the creation and issuance of

24   bogus school schedules and transcripts; the marketing of Su's own academic credentials as President of

25   the school; and the use of multiple bank accounts at different financial institutions through which she

26   funneled fraud proceeds. In summary, Su was continuously orchestrating diverse facets of her scheme

27   to keep it all going.

28

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    13

**0343**

1   Su's elaborate scheming also made her crimes difficult to detect.  But for one student's

2   complaint to DHS, the scheme may have continued for a significantly longer duration.  Because Su's

3   scheme went far beyond the usual fraud offense, this Court should apply the 2-level increase for

4   sophisticated means pursuant to U.S.S.G. §2B1.1(b)(10)(C).

5              **3.    Su Was An Organizer/Leader of Extensive Criminal Activity**

6         The United States and the USPO further agree that Su acted as an organizer or leader for each

7   count of conviction, thereby qualifying her for a four-level adjustment pursuant to U.S.S.G. §3B1.1(a).

8         Section 3B1.1 of the guidelines provides for a four-level adjustment for aggravating role "[i]f the

9   defendant was an organizer of leader of a criminal activity that involved five or more participants or was

10  otherwise extensive."  In applying the adjustment, the court should consider "the exercise of decision

11  making authority, the nature of participation in the commission of the offense, the recruitment of

12  accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in

13  planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control

14  and authority exercised over others."  See id., cmt. n. 4.

15        The record is full of compelling examples of Su's leadership role.  Su was the self-proclaimed

16  Founder and President of TVU.  (Exh. 1-017.)  Once created, Su exclusively controlled TVU's proceeds

17  and directed over $5.9 million into accounts she controlled.  (Exh. 650-651.)  At no time did anyone else

18  exercise control over TVU's income or expenditures.  Su also exercised exclusive decision-making

19  authority at TVU.  She recruited accomplices and controlled the payroll and payment of recruiting

20  bonuses.  As TVU's leader, Su recruited three members of ABS to assist her in increasing enrollment.

21  And, to further ABS's efforts, Su used her authority as TVU's President to create and maintain

22  immigration status for ABS's members.

23        Su also exercised control by making hiring decisions of office staff, including Dasa, Dirisanala,

24  Tambe, Ignatius, and Kundur, to input fraudulent data into SEVIS or create bogus school records.

25  Because SEVIS access was vital to her control of the scheme, Su limited who had access to it and

26  controlled which student-employees could print I-20s.  Multiple witnesses testified that before Su

27  distributed SEVIS laptops to office workers she would first login using the password of one TVU's

28  approved DSOs.  In turn, all subsequently printed I-20s came to Su for approval and signature before

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                          14

0344

1 issuance. By controlling the immigration status of her subordinates Su was able to project a higher

2 degree of authority than most fraud scheme leaders. For each of these reasons the Court should find that

3 Su qualifies for this adjustment.

4 **4. Su Attempted to Obstruct Justice Before and During Trial**

5 The United States and the USPO also agree that Su qualifies for the two-level adjustment for

6 obstruction of justice pursuant to U.S.S.G. §3C1.1 arising from her conduct immediately before and

7 during trial.

8 Section 3C1.1 provides that the adjustment applies where the defendant's obstructive conduct

9 occurred with respect to the investigation, prosecution, or sentencing in the instant offense. See id., n. 1.

10 Qualifying "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness .... [and

11 it] is not subject to precise definition." See id., cmt. n. 3. As a result, the commentary provides "a non-

12 exhaustive list of examples" to "assist the court in determining whether application of this enhancement

13 is warranted in a particular case." Id., cmt. nn. 3 & 4. Those examples include "threatening,

14 intimidating, or otherwise unlawfully influencing a [ ] witness [ ] directly or indirectly, or attempting to

15 do so. Id.

16 As noted in the PSR, Su made multiple attempts to intimidate and influence the testimony of

17 government witnesses by sending emails using fictitious names from bogus email accounts. The United

18 States reported Su's conduct to the Court during trial and provided notice of its intent to seek the

19 obstruction adjustment at sentencing based on her emails, which are set out more fully below. (TR 349-

20 55.)

21 On February 25, 2014, less than one week before trial, Su emailed cooperating witness Dasa

22 under the name of "Dacey Dale" at "dacey2012@yahoo.com." Su threatened Dasa that the United

23 States would arrest him in court if he admitted to being out of immigration status:

24 We have your class attendance record, and will prove ur legal status in
court Do not be intimated by the gov and lied. Look at what they did to
25 Anji Reddy, they used him as a decoy, and right after they arrest him. only
if we can prove your legal status, all you did was just administrative
26 mistakes, not a big deal. that you can stay in US and reduce the
sentence..do not be afraid to tell all the truth .. [sic]

27

28

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    15

**0345**

1  (Rhyne Decl., Exh. 1, Witness Email #1.) Su attached multiple emails and school record screenshots

2  with her version of the facts embedded therein.

3     The next day, Su wrote to Syed Ahmed, another witness identified on the government's witness

4  list. Su provided Ahmed a summary-like script for his testimony telling him among other things, that he

5  "earned two grades in Spring 2010," that he "also audited and studied three more TVU course [sic] in

6  the Summer, that "he never requested a transfer out," that the "President has made it mandatory to all

7  TVU students to attend class meeting [sic]," that he "did attend lots of classes," and that his "transcript

8  is just a record to keep what course you took each term." (Id., Exh. 1, Witness Email #2.) Su's emails

9  continued days later.

10     Two days before trial, she again emailed Dasa as "Dacey Dale" this time attaching TVU records

11  and warning him about trial questions pertaining to the fictitious students that Su enrolled at TVU during

12  HSI's ruses. (Id., Exh. 1, Witness Email #3.) Su encouraged Dasa to state that he only "contingently

13  admitted" the fictitious students and that they intended to collect the rest of their application at a later

14  date. (Id.) Su provided more information for Dasa about the fictitious students: "They were admitted

15  late in Summer, they have one more term to complete their study and earn a grade. They are in the

16  process of studying. You did the right thing, except for a couple of typos. Need to tell truth here!" (Id.)

17     The following day, while posing as "Dacey Dale," Su emailed testifying government witness Dr.

18  Shy-Shenq Liou. (Id., Exh. 1, Witness Email #4.) Su provided Dr. Liou with her version of the

19  "[c]omplete truth on TVU's I-17 petition . . ." and attached over 100 pages of attachments summarizing

20  Su's opinions of the evidence. (Id.) The attachments included trial exhibits, emails, TVU records,

21  testimony summaries of witnesses, and written issue summaries pertaining to the case. (Id.) In the

22  attachment entitled "TVU I-17.pdf," Su lied about the authenticity of TVU's articulation agreements and

23  wrote, "[a]ll of these three documents are all with original signatures." (Id., at Tab: TVU I-17.pdf.)   In

24  the attachment entitled "Gov-Mistakes.pdf," Su told Dr. Liou about the problems in the government's

25  case. (Id., at Tab: Gov-Mistakes.pdf.)   Therein, she accused SA Jason Mackey of committing perjury

26  during the grand jury investigation, among other unsupported contentions. (Id.)

27

28

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST     16

**0346**

1    On March 3, after the first day of trial, Su again emailed Dr. Liou this time posing as "Josephie

2 || Jo" using another bogus email account. (Id., Exh. 1, Witness Email #5.)  Su attached voluminous

3 || documents including emails, school records, and I-17 excerpts with embedded commentary. (Id.)

4    On March 4, after the second day of trial, Su emailed Amy Guo, identified on the government's

5 || witness list as someone whose name appeared in TVU's catalogue without her permission.  Again

6 || posing as "Dacey Dale," Su emailed Guo with a proposed explanation as to how her name came to be

7 || used in TVU's instructor listing: "Research Faculty are normally manger and directors at industry and

8 || do not need to teach classes. [sic] only to supervise graduate student dissertation." (Id., Exh. 1, Witness

9 || Email #6.)

10    Because Su used aliases and bogus email accounts in an attempt to intimidate and influence the

11 || testimony of multiple government witnesses, the Court should apply the 2-level adjustment for

12 || obstruction.

13                **5.    Su's Total Offense Level is the Same Under §3D1.2(b) and (d)**

14    The United States and the USPO agree that Su's total offense level is 40, but disagree on the

15 || grouping methodology under §3D1.2.  The USPO finds two groups pursuant to §3D1.2(b) (grouping

16 || counts that involve the same victim and two or more acts connected by a common criminal objective,

17 || scheme, or plan); while the United States finds two groups pursuant to §3D1.2(d) (grouping counts

18 || where offense levels are determined on the basis of loss or quantity, or where behavior is ongoing or

19 || continuous in nature.)

20    The United States contends that its grouping methodology under §3D1.2(d) is more applicable

21 || on this record.  Recognizing that subsection (d) "likely will be used with the greatest frequency," the

22 || Application Notes specify that § 3D1.2(d) should apply where the crimes' guidelines are based on loss,

23 || harm, or quantity or otherwise contemplate continuing behavior. Id., cmt. n. 6.

24    Here, each of Su's offenses in the United States' Group 1 is calculated based on some type of

25 || aggregation resulting from continuing criminal behavior.  Her mail/wire fraud offenses are based on loss

26 || amount (§2B1.1); visa fraud/conspiracy offenses based on number of documents (§2L2.1), alien

27 || harboring offenses based on number of aliens (§2L1.1), false statement/document offenses based on

28 || amount of harm (§2B1.1), and money laundering offenses based on underlying loss amount (§2B1.1).

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                     17

Case4:11-cr-00288-JST   Document195   Filed10/24/14   Page22 of 27

1  Furthermore, each of these Group 1 offenses are specifically enumerated in §3D1.2(d) as offenses to be
2  grouped. See id.

3      In contrast, only Su's conviction for unauthorized access of a government computer (§2B2.3)
4  stands alone in Group 2. Its placement in Group 2 is proper because it is the only guideline provision at
5  issue not based on some form of aggregation and not enumerated in §3D1.2(d). As such, it should not
6  be grouped with the remaining counts of conviction.

7      For these reasons, the Court should adopt the United States' grouping methodology pursuant to
8  §3D1.2(d) and find Su's total offense level at 40.

9      **B.      The Section 3553(a) Factors Support a Sentence of 292 Months' Imprisonment**

10      The current record offers no reasonable justification for a variance below the low-end of the
11  guidelines. The recommended 292 months' of imprisonment fairly holds Su responsible for her criminal
12  conduct.

13      **1.      Nature and Circumstances of the Offense and Characteristics of the
            Defendant**
14
            **a.      Nature and Circumstances of the Offense**
15

16      The nature and circumstances of the offense counsel in favor of a 292-month term of
17  imprisonment. Su lied in furtherance of her fraud scheme at every turn, from her creation and
18  submission to SEVP of the fraudulent I-17 and her manufactured articulation agreements, to her lies to
19  DHS officers posing as immigration officials and site inspectors, to her lies to students that the school
20  would begin classes soon, to her lies to HSI agents when they interviewed her.

21      These lies were about exploiting others for her own benefit. When Dr. Liou had generously
22  offered to assist Su in starting a legitimate educational institution, she chose to betray him by forging his
23  signature on a bogus articulation agreement. She exploited student-employees to create and print I-20s
24  because, as she told SA Mackey, it would have been too expensive to hire a full-time DSO at a $50,000
25  salary. (TR 625.) She locked her employees in, requiring them to work exceptionally long days for
26  very little pay – which she paid by deducting it from their tuition. She refused to let students she
27  ensnared transfer out of TVU unless they paid three semesters' tuition.

28      The evidence was that Su created and operated TVU with a single purpose – to make her rich.

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST              18

**0348**

Case4:11-cr-00288-JST   Document195   Filed10/24/14   Page23 of 27

1   She showed no signs of stopping or changing TVU's business practices. Financial analysis and her own

2   admissions prove that TVU's revenue was increasing each year. And, as noted above, in her tort claim,

3   Su anticipated receiving close to $20 million per year from TVU at the time DHS executed the search

4   warrants. She even sold TVU transcripts and diplomas. (Exh. 305; TR 660, Exh. 307; TR 654, Exh.

5   309 at TR 658, Exh. 311 at TR 756.) From its inception to its closure, the record proves that Su never

6   intended to lawfully operate TVU, and that every dollar of TVU's proceeds went to Su's exclusive

7   benefit.

8          Aside from the well-documented financial losses to her fraud victims, Su caused additional non-

9   economic harm. Su victimized family members, colleagues, and strangers through her creation and

10   operation of TVU. As a result of her conduct, Su implicated her brother and Dr. Liou based on their

11   signatures appearing on the bogus articulation agreements. Su also implicated a long list of purported

12   TVU instructors. Su used the names and credentials of these industry experts – some colleagues and

13   some strangers – to make TVU appear legitimate. TVU's fraudulent catalogue claimed that these

14   purported instructors were receiving salaries from TVU. When HSI confirmed the classes did not exist

15   it conducted interviews with the purported instructors to learn their involvement, if any, with TVU.

16   After confirming they had no association with TVU, many of the purported instructors were upset to

17   have their names and reputations associated with TVU.

18          For these reasons, 292 months is an appropriate term of imprisonment.

19                        **b.    Characteristics of the Defendant**

20          Su's background and characteristics also support the recommended sentence. She appears to

21   have grown up in an extremely supportive family with every advantage. She is highly educated, with

22   Masters and PhD degrees and an undergraduate degree from what she reports to be the best university in

23   China. She had a steady work history and was gainfully employed before embarking on this fraud

24   scheme.

25          The only mitigating circumstances she presents are a purported history of mental and emotional

26   issues. There is no evidence, however, that these issues caused her to commit her crimes. Nor did they

27   apparently hinder her efforts to carry out her scheme with ruthless efficiency as she generated over $5.6

28   million.

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    19

1    Consistent with her intelligence and penchant for fraud, Su also appears to be faking at least

2    some of her mental health problems. Her retained mental health expert noted that Su's "responses fell in

3    the range of scores for individuals who are likely to be malingering. . . . [She] appeared to be

4    exaggerating or feigning some symptoms of psychosis and mood on this test." (Rpt. at 6.) Indeed, Dr.

5    Gregory observed that Su appeared to be claiming schizophrenia because she read that such a diagnosis

6    may help her get her convictions reversed. Even if Su's mental health may have contributed to her

7    impulsiveness, the expert nonetheless determined that it does not appear that "her behavior was driven

8    by mental illness throughout the process." (Rpt. at 12.)

9                   **2.      Need to Reflect the Seriousness of the Offenses**

10    The economic harm does not fully reflect the seriousness of Su's offenses. Su's student victims

11    not only suffered $5.6 million in economic losses; they also suffered from the opportunity cost of

12    choosing to attend TVU. None of TVU's students received the benefit of what Su promised them.

13    Therefore, each of TVU's students lost out on available alternatives of attending another U.S. school

14    during the duration of their visas, of attending a school in their home country, or of working at paying

15    job. Su's acts of lulling the students with promises of future classes, along with her threats of

16    deportation for transfer requests, all contributed to more lost semesters of education and time. As a

17    result, most of TVU's student body wasted countless semesters that could have been spent more

18    productively elsewhere.

19    Also compelling is that Su fails to see the seriousness of her conduct. She has completely failed

20    to express any degree of remorse. Her defense at trial was essentially that she tried her best but fell

21    short because the regulations were confusing. Still post-trial, as reported in the PSR, she couches her

22    conduct more like negligence: "I was always trying to learn the law, but my mind is a huge mess, and

23    was not good enough to identify what I can and cannot do. I am sorry for causing such a big mess."

24    There is no question that Su knew it was wrong to lie, cheat, and steal from vulnerable non-

25    immigrant students whom she had lured to TVU with false promises of a real education, and that it was

26    wrong to forge signatures, create false documents and records, and lie to federal officers. Su's failure to

27    accept responsibility for her obvious criminal conduct coupled with resulting negative externalities that

28    go beyond the economic harm all support a guideline-based sentence of 292 months.

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    20

### 3.   Deterrence of Criminal Conduct

The need to deter future criminal conduct is also a compelling sentencing factor in this case. Her criminal conduct – whether lying, forging, stealing, laundering, or concealing – occurred on a daily basis for nearly two years. More concerning is that following SEVP's closure of TVU and HSI's search warrants, Su was undeterred. Shortly thereafter, she took steps to solicit donations and open a new for-profit school, Global TVU. Su's relentless efforts to re-open TVU, together with her greed and apparent lack of remorse, raise credible concerns about her future intent to run a similar scheme. A lengthy sentence is necessary for specific deterrence.

From the standpoint of general deterrence, this case provides an opportunity to demonstrate that white collar criminals are similarly sentenced in accordance with the guidelines.

### 4.   Need to Protect the Public

This sentencing factor is closely related to specific deterrence. A sentence of 292 months would prevent Su from targeting and defrauding additional vulnerable victims with the same or similar schemes.

### 5.   Avoiding Sentencing Disparities

For the same reasons noted above, Su should be held to the same guideline-based consequences as other criminals, namely 292 months' imprisonment. This sentence will hold Su similarly accountable and will reflect the true gravity of her greed and criminal conduct.

### C.   Full Restitution to the Victims is Mandatory

The Mandatory Victims Restitution Act (MVRA) requires courts to order restitution to victims who have suffered pecuniary loss as a result of certain criminal offenses, such as mail fraud, wire fraud, and visa fraud. See 18 U.S.C. § 3663A(c). The "purpose of restitution" under the MVRA, however, is not to punish the defendant, but to "make the victim[ ] whole" again by restoring to him or her the value of the losses suffered as a result of the defendant's crime. United States v. Crandall, 525 F.3d 907, 916 (9th Cir. 2008) (quoting United States v. Gordon, 393 F.3d 1044, 1052 n. 6 (9th Cir. 2004)). The statute defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." 18 U.S.C. § 3663A(a)(2). Although the amount of loss for purposes of the guidelines may be higher, the amount for purposes of restitution "is limited to

UNITED STATES' SENT. MEM.
No. CR-11-00288 JST                    21

**0351**

1 | the victim's actual losses." United States v. Bussell, 504 F.3d 956, 964 (9th Cir. 2007); see also

2 | Crandall, 525 F.3d at 916.  "[A]ctual loss for restitution purposes is determined by comparing what

3 | actually happened with what would have happened if the defendant had acted lawfully."  Bussell, 504

4 | F.3d at 964 (quotations and brackets omitted).

5 |       Here, the primary financial victims are PayPal and Total Merchant Services (TMS).  PayPal and

6 | TMS provided financial services to TVU in the form of processing online and credit card payments,

7 | respectively.  TVU used these payment processing services to process approximately $2.4 million of

8 | credit card payments and $2.9 million of online payments.  (Exh. 651-2.)  Accordingly, after TVU

9 | closed its doors many students exercised their right to seek refunds from PayPal and TMS on grounds

10 | that they did not receive the promised services they had purchased.  Such requests are commonly called

11 | "chargebacks," "buyer protection claims," or "bank reversals."  PayPal and TMS honored their

12 | customers' requests and refunded a total of $595,111.00 and $420,684.64, respectively.  PayPal's claim

13 | would have been higher, however they were unable to confirm their losses as to some of the older TVU

14 | student chargeback claims.

15 |       Because PayPal and TMS have suffered pecuniary losses as a result of Su's offenses, the Court

16 | should order restitution accordingly.

17 |     **D.**    **An Order of Forfeiture is Also Mandatory**

18 |       For the reasons stated in its Application for a Preliminary Order of Forfeiture, the United States

19 | respectfully requests this Court to enter a preliminary order of forfeiture in an amount not less than $5.6

20 | million. (Dkt. 129.)

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

**CONCLUSION**

For the above reasons, the United States requests the Court to sentence Su to: (1) serve 292 months of imprisonment; (2) serve five years of supervised release; (3) pay restitution to the victims of her fraud scheme; (4) be subject to a preliminary order of forfeiture in an amount not less than $5,601844.72; and (5) pay a $3,100 special assessment.

DATED: October 24, 2014

Respectfully submitted,

MELINDA HAAG
United States Attorney

HARTLEY M. K. WEST
WADE M. RHYNE
Assistant United States Attorneys

0353

1   MELINDA HAAG (CABN 132612)
    United States Attorney
2
    J. DOUGLAS WILSON (DCBN 412811)
3   Chief, Criminal Division

4   HARTLEY M.K. WEST (CABN 191609)
    WADE M. RHYNE (CABN 216799)
5   Assistant United States Attorneys

6       1301 Clay Street, Suite 340S
        Oakland, California 94612
7       Telephone: (510) 637-3680
        FAX: (510) 637-3724
8       E-Mail: hartley.west@usdoj.gov
                wade.rhyne@usdoj.gov
9
    Attorneys for United States of America
10

11                          UNITED STATES DISTRICT COURT
12
                           NORTHERN DISTRICT OF CALIFORNIA
13
                                   OAKLAND DIVISION
14

15  UNITED STATES OF AMERICA,            )   CASE NO. CR-11-00288 JST
                                         )
16          Plaintiff,                   )   **DECLARATION OF AUSA WADE M. RHYNE**
                                         )   **IN SUPPORT OF UNITED STATES'**
17     v.                                )   **SENTENCING MEMORANDUM**
                                         )
18  SUSAN XIAO-PING SU,                  )   Hearing Date: October 31, 2014
                                         )   Time: 9:30 a.m.
19          Defendant.                   )   Judge: Hon. Jon S. Tigar
                                         )
20  _____)
                                         )
21

22          I, Wade M. Rhyne, hereby declare and state as follows:

23          1.      I am an Assistant United States Attorney at the United States Attorney's Office for the

24  Northern District of California. I submit this declaration in support of the United States' Sentencing

25  Memorandum in the above-entitled case.

26          2.      Attached hereto as Exhibit 1 is a true and correct copy of a compilation of six emails with

27  attachments, respectively identified as Witness Email #1 through #6. The original recipients of the

28
                                                    1
    AUSA RHYNE DECLARATION
    No. CR-11-00288 JST

1  emails provided copies of the communications to law enforcement agents of the United States.

2

3      I declare under penalty of perjury that the foregoing is true and correct. Executed on October 23,

4  2014, in Oakland, California.

5

6

7                                              WADE M. RHYNE
                                               Assistant United States Attorney
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    2
AUSA RHYNE DECLARATION
No. CR-11-00288 JST

**0355**

# EXHIBIT 1 - BINDER

NOTICE OF MANUAL FILING
Exhibit 1 – BINDER Compilation of Six Emails With Attachments

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office.   If you are a participant on this case, this filing will be served in hard-copy shortly.  For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reasons:

Exhibit 1 is a BINDER compilation of six emails with attachments

**0356**

1  JOHN J. JORDAN, ESQ. (State Bar No. 175678)
   400 Montgomery Street, Suite 200
2  San Francisco, CA 94104
   Tel: (415) 391-4814
3  FAX: (415) 391-4308
   email:jjordanesq@aol.com
4
   Counsel for Defendant
5  SUSAN SU

6              IN THE UNITED STATES DISTRICT COURT

7            FOR THE NORTHERN DISTRICT OF CALIFORNIA

8  UNITED STATES OF AMERICA,        )  No. CR 11-0288 JST
                                     )
9                  Plaintiff,        )  **DEFENDANT'S SENTENCING**
                                     )  **MEMORANDUM**
10 vs.                               )
                                     )
11 SUSAN SU,                         )  Date: October 31, 2014
                                     )  Time: 9:30 a.m.
12             Defendant.            )  Hon. JON S. TIGAR
                                     )
13 ─────────────────────────────     )  *E-Filed Chambers Copy*
                                     )
14

15

16

17

18

19

20

21

22

23

24

25

26

   Su   Sent. Mem.

1

**TABLE OF CONTENTS**

2  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . 1

3  Procedural Background.. . . . . . . . . . . . . . . . . . . . 2

4  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5  1.   Introduction. . . . . . . . . . . . . . . . . . . . . . 3

6  2.   Applicable Law. . . . . . . . . . . . . . . . . . . . . 3

7  3.   The Defendant's Objections to the Pre-Sentence Report.. . . . 4

8  a.   Objection Number One. . . . . . . . . . . . . . . . . . 5

9  i.   All offenses should be grouped. . . . . . . . . . . . . 5

10  ii. The sentencing calculations are incorrect for Group Two.. . 7

11  b.   Objection Number Two. . . . . . . . . . . . . . . . . . 9

12  c.   Objection Number Three (Listed as a second No. 2 in PSR). . 9

13  d.   Objection Number Four (Listed as Number Three in PSR).. . 11

14  e.   Objection Number Five (Listed as Number Four in PSR). . . 12

15  f.   Objection Number Six (Listed as Number Five in PSR).. . . 13

16  g.   Summary of Guidelines Argument. . . . . . . . . . . . . 13

17  4.   The Defendant's Request for a Below-Guidelines Sentence.. 14

18  a.   The nature and circumstances of the offense.. . . . . . 14

19  b.   The history and characteristics of the defendant. . . . . 16

20  c.   The need for the sentence to reflect the seriousness of
21       the offense, promote respect for the law, provide just
         punishment, afford adequate deterrence, avoid sentencing
22       disparity, and protect the public.. . . . . . . . . . . 19

    d.   The need to provide the defendant with needed educational
23       or vocational training, medical care. . . . . . . . . . 20

24  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . 21

25

26

Su `Sent. Mem.                    i

1

**TABLE OF AUTHORITIES**

2 **Cases:**

3 *Cleveland v. United States*, 531 U.S. 12 (2000). . . . . . . .   11

4 *Gall v. United States,* 552 U.S. 38 (2007).. . . . . . . . . . .   4

5 *McNally v. United States*, 483 U.S. 350 (1987).. . . . . . . .   10

6 *Skilling v. United States*, 561 U.S. 358 (2010). . . . . . . .   10

7 *United States v. Alexander,* 48 F.3d 1477 (9th Cir.)
*cert. denied,* 516 U.S. 878 (1995).. . . . . . . . . . . . . . .   6
8
*United States v. Ameline,* 409 F.3d 1073
9 (9th Cir. 2005) (en banc).. . . . . . . . . . . . . . . . . . .   4

10 *United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . .   3

11 *United States v. Cantrell,* 433 F.3d 1269 (9th Cir. 2006). . . .   3

12 *United States v. Carter,* 742 F.3d 440 (9th Cir. 2014).. . . . .   19

13 *United States v. Gardner,* 988 F.2d 82 (9th Cir. 1993).. . . . .   12

14 *United States v. Lofton,* 905 F.2d 1315 (9th Cir.)
*cert. denied,* 498 U.S. 948 (1990).. . . . . . . . . . . . . .   12
15
*United States v. Mares-Molina,* 913 F.2d 770 (9th Cir. 1990)..   11
16
*United States v. Mix,* 450 F.3d 375 (9th Cir. 2006). . . . . .   3, 4
17
*United States v. Reese,* 2 F.3d 870 (9th Cir. 1993),
18 *cert. denied,* 510 U.S. 1094 (1994). . . . . . . . . . . . . .   6

19 *United States v. Santos,* 527 F.3d 1003 (9th Cir. 2008). . . . .   9

20 *United States v. Smith,* 196 F.3d 1034 (9th Cir. 1999),
*cert. denied,* 529 U.S. 1028 (2000). . . . . . . . . . . . . .   6
21
*United States v. Stroud*, 893 F.2d 504 (2d Cir. 1990). . . . .   12
22
*United States v. Tank,* 200 F.3d 627 (9th Cir. 2000).. . . . .   6, 11
23
*United States v. Zuniga,* 66 F.3d 225 (9th Cir. 1995). . . . . .   9
24
**Statutes:**
25
8 U.S.C. § 1324(a)(1)(A)(iii).. . . . . . . . . . . . . . . . .   2, 7
26

Su   Sent. Mem.                    ii

**0359**

1   18 U.S.C. § 2.. . . . . . . . . . . . . . . . . . . . . . 2

2   18 U.S.C. § 371.. . . . . . . . . . . . . . . . . . 2, 7

3   18 U.S.C. § 981(e)(6).. . . . . . . . . . . . . . . . 19

4   18 U.S.C. § 1001(a)(2). . . . . . . . . . . . . . . 2, 7

5   18 U.S.C. § 1001(a)(3). . . . . . . . . . . . . . . 2, 7

6   18 U.S.C. § 1030(a)(3). . . . . . . . . . . . . . . 2, 8

7   18 U.S.C. § 1341. . . . . . . . . . . . . . . . . 2, 10

8   18 U.S.C. § 1343. . . . . . . . . . . . . . . . . 2, 10

9   18 U.S.C. § 1546(a).. . . . . . . . . . . . . . . . 2, 7

10  18 U.S.C. § 1957(a).. . . . . . . . . . . . . . . . . 2

11  18 U.S.C. § 3553. . . . . . . . . . . . . . . 1, 4, 14, 19

12  **U.S.S.G. Provisions**

13  2B1.1.. . . . . . . . . . . . . . . . . . . . . . . . 9

14  2B1.1(b)(2).. . . . . . . . . . . . . . . . . . . . . 8

15  2B1.1(b)(9)(A). . . . . . . . . . . . . . . . . . 8. 13

16  3B1.1.. . . . . . . . . . . . . . . . . . . . . . 11, 12

17  3B1.1(a). . . . . . . . . . . . . . . . . . . . . . 11

18  3B1.1(b)(9)(C). . . . . . . . . . . . . . . . . . . 15

19  3C1.1(a). . . . . . . . . . . . . . . . . . . . . . 12

20  3D1.2(b). . . . . . . . . . . . . . . . . . . . . . 5

21  3D1.2(c). . . . . . . . . . . . . . . . . . . . . . 5

22  3D1.2(d). . . . . . . . . . . . . . . . . . . . . 6, 7

23  3D1.4(c). . . . . . . . . . . . . . . . . . . . . . 9

24  5K2.13. . . . . . . . . . . . . . . . . . . . . 14, 19

25

26

Su   Sent. Mem.                iii

0360

1  JOHN J. JORDAN, ESQ. (State Bar No. 175678)
   400 Montgomery Street, Suite 200
2  San Francisco, CA 94104
   Tel: (415) 391-4814
3  FAX: (415) 391-4308
   email:jjordanesq@aol.com
4
   Counsel for Defendant
5  SUSAN SU

6              IN THE UNITED STATES DISTRICT COURT

7           FOR THE NORTHERN DISTRICT OF CALIFORNIA

8  UNITED STATES OF AMERICA,      )   No. CR 11-0288 JST
                                  )
9              Plaintiff,          )   **DEFENDANT'S SENTENCING**
                                  )   **MEMORANDUM**
10 vs.                            )
                                  )
11 SUSAN SU,                      )   Date: October 31, 2014
                                  )   Time: 9:30 a.m.
12             Defendant.          )   Hon. JON S. TIGAR
                                  )
13                                )
                                  )
14 _____)

15                      **INTRODUCTION**

16     The defendant SUSAN SU, through counsel of record, John J.

17 Jordan, hereby files this sentencing memorandum, to assist the

18 Court at the defendant's sentencing hearing.

19     Initially, the defendant objects to the U.S.S.G. sentencing

20 calculations contained in the pre-sentence report, and asks the

21 Court to adjust the guidelines to level 29, criminal history I.

22     Dr. Su then asks the Court to downwardly depart and/or grant

23 a variance from the Sentencing Guidelines range, after

24 considering the factors spelled out in 18 U.S.C. § 3553, and

25 sentence her to 70 months incarceration, followed by 3 years

26 supervised release.

Su  Sent. Mem.                    1

1 | **PROCEDURAL BACKGROUND**

2 |     The defendant was tried on a thirty-five count superseding

3 | indictment, charged with a scheme to defraud non-immigrant aliens

4 | of money and property.

5 |     The indictment charged 12 counts of wire fraud, in

6 | violation of 18 U.S.C. §§ 1343 and 2 (counts 1 through 12); two

7 | counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2

8 | (counts 13 and 14); one count of conspiracy to commit visa fraud,

9 | in violation of 18 U.S.C. § 371 (count 15); four counts of visa

10 | fraud, in violation of 18 U.S.C. §§ 1546(a) and 2 (counts 16

11 | through 19); one count of using a false document, in violation of

12 | 18 U.S.C. §§ 1001(a)(3) and 2 (count 20); one count of false

13 | statements, in violation of 18 U.S.C. §§ 1001(a)(2) (count 21);

14 | three counts of alien harboring, in violation of 8 U.S.C. §§

15 | 1324(a)(1)(A)(iii) and 2 (counts 22 through 24); one count of

16 | unauthorized access of a government computer, in violation of 18

17 | U.S.C. §§ 1030(a)(3) and 2 (count 25); and ten counts of money

18 | laundering, in violation of 18 U.S.C. §§ 1957(a) and 2 (counts 26

19 | through 35).  The superseding indictment also contained four

20 | forfeiture allegations.

21 |     Trial on the superseding indictment began on March 3, 2014,

22 | with jury selection.  On March 18, 2014, the court granted the

23 | government's motion to dismiss counts 23, 28, 30 and 33.

24 |     On March 24, 2014, the trial ended with the jury finding Su

25 | guilty of all 31 remaining counts in the indictment.

26 |     The defendant has reviewed the final pre-sentencing report

Su   Sent. Mem.                    2

1   (PSR) prepared by the U.S. Probation Department.  The PSR

2   calculates a final offense level of 40, criminal history I, with

3   an advisory guideline range of 292-365 months incarceration.

4       Probation Officer Goldsberry, however, recommends that the

5   Court impose a below-Guidelines sentence of 168 months, followed

6   by 3 years supervised release, restitution in the amount of

7   $904,198.84, and a special assessment of $3100.00.

8       The defendant alternatively recommends that the Court impose

9   a sentence of 70 months, followed by 3 years supervised release.

10                         **ARGUMENT**

11   **1.   Introduction**

12       The defense asks this Court to impose a below Guidelines

13   sentence of 70 months, with a requirement of mental

14   health/alcohol treatment both before and after incarceration.

15   **2.   Applicable Law**

16       In this post-*Booker* sentencing, a district court is "not

17   mandated to sentence within an applicable Guideline range because

18   the Sentencing Guidelines are advisory--not mandatory." *United*

19   *States v. Mix,* 450 F.3d 375 (9th Cir. 2006), citing *United States*

20   *v. Cantrell,* 433 F.3d 1269, 1279-81 (9th Cir. 2006) and *United*

21   *States v. Booker,* 543 U.S. 220, 259-60 (2005).  District courts,

22   however "'must consult [the] Guidelines and take them into

23   account when sentencing,' even though they now have the

24   discretion to impose non-Guidelines sentences." *United States v.*

25   *Cantrell,* 433 F.3d at 1279, quoting *Booker,* 543 U.S. at 264.

26       This Court should begin the sentencing proceeding by

Su  Sent. Mem.           3

1  correctly calculating the applicable Sentencing Guideline range.
2  See *Gall v. United States,* 552 U.S. 38 (2007) (stating that "a
3  district court should begin all sentencing proceedings by
4  correctly calculating the applicable Guideline range.").

5       "In addition, a district court must apply the factors
6  enumerated in 18 U.S.C. § 3553(a) in its sentencing decision."
7  *United States v. Mix, supra,* citing *United States v. Cantrell,*
8  433 F.3d at 1279-80; see also *United States v. Ameline*, 409 F.3d
9  1073, 1085-86 (9th Cir. 2005) (en banc).

10      Thus, in addition to the advisory Guideline range, the
11 district court must consider "the nature and circumstances of the
12 offense and the history and characteristics of the defendant" as
13 well as the need for the sentence to reflect the seriousness of
14 the offense and provide the defendant with needed training and
15 medical care.  18 U.S.C. § 3553(a)(1)-(2).

16 **3.   The Defendant's Objections to the Pre-Sentence Report**

17      While appreciative of the work done by the Probation
18 Officer, Su objects to several of the Guidelines calculations.

19      Initially , there appear to be a few minor corrections to
20 the final PSR.

21      In paragraph 85, the name is "David Kerns."  In paragraph
22 26, the salary should read "$1000 per month."  See TR 1192-93
23 ("she would pay me a thousand dollars per month.").  In
24 paragraphs 22 and 35, the lowest grade should read "B-."  See TR
25 1575 ("The least you can give is B-minus.").

26

Su  Sent. Mem.                   4

a.    **Objection Number One**

i.    **All offenses should be grouped**

The defense submits that all counts of conviction should be grouped under U.S.S.G. § 3D1.2(b) and (c).  As noted in the PSR, the government also agrees that grouping is appropriate.

U.S.S.G. § 3D1.2 provides that for purposes of sentencing, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group."  Application Note 2 to § 3D1.2 explains that ambiguities should be resolved in accordance with the purpose of § 3D1.2, which is to identify counts involving substantially the same harm.

Grouping is appropriate under U.S.S.G. § 3D1.2(b) because all the counts charged in the indictment involve the same set of victims and the acts are all connected by a common objective or are part of a common scheme or plan.

Grouping is also appropriate under U.S.S.G. § 3D1.2(c) because all the counts share the same conduct that is treated as the specific offense characteristics, and the same adjustments for both "groups" identified in the PSR.  Both "groups" used the same loss figure and the same number of victims, such that the offenses must all be included in a single group.

The defense appreciates that the probation officer consulted with an official at the sentencing commission.  However, the official perhaps did not have the benefit of the trial transcripts fully describing the behavior at issue here.

Another way of looking at the issue is to consider that if

Su   Sent. Mem.                        5

1   the PSR's position stands, it will result in impermissible double

2   counting.

3         "Impermissible double counting occurs only when 'one part of

4   the Guidelines is applied to increase a defendant's punishment on

5   account of a kind of harm that has already been fully accounted

6   for by application of another part of the Guidelines.'" *United*

7   *States v. Smith,* 196 F.3d 1034, 1036-37 (9th Cir. 1999), *cert.*

8   *denied,* 529 U.S. 1028 (2000), citing *United States v. Alexander*,

9   48 F.3d 1477, 1492 (9th Cir.), *cert. denied,* 516 U.S. 878 (1995),

10  quoting *United States v. Reese*, 2 F.3d 870, 895 (9th Cir. 1993),

11  *cert. denied,* 510 U.S. 1094 (1994).

12        Here, the PSR enhances Group Two (in paragraph 59), 18

13  additional levels for loss, using the exact same loss figure that

14  is already being used to enhance Group One in paragraph 51.

15  Similarly, the PSR enhances Group Two (in paragraph 60), 6 levels

16  for the number of victims, using the exact same victims figure

17  that is already being used to enhance Group One in paragraph 52.

18  Thus, not grouping would result in impermissible double counting.

19        Finally, while unauthorized use of a computer offense cannot

20  be grouped under U.S.S.G § 3D1.2(d), the Ninth Circuit, in *United*

21  *States v. Tank*, 200 F.3d 627 (9th Cir. 2000), held that "the list

22  of exclusions under § 3D1.2(d) only bars grouping of the listed

23  offense sections under subsection § 3D1.2(d) itself.  In fact,

24  the last sentence of § 3D1.2(d) states "exclusion of an offense

25  from grouping under this subsection does not necessarily preclude

26  grouping under another subsection.""   *Id.*, at 633-34.

Su   Sent. Mem.                    6

**ii.   The Sentencing Calculations are incorrect for Group Two**

Alternatively, if the Probation Officer is correct that there are two groups because of separate victims, then the sentencing calculations in Group Two are incorrect.  The sentencing calculations use the loss and number of victim figures from Group One.  But, the crimes listed in Group Two have much more limited loss and victim figures.

Count 15, charging conspiracy to commit visa fraud, in violation of 18 U.S.C. § 371, charges a conspiracy to commit an offense against one victim, the United States.

Counts 16 through 19 charge four counts of visa fraud, in violation of 18 U.S.C. §§ 1546(a), with the same victim, the United States.  All four counts, count 16 (Sparsh Agrawat); count 17 (Kadir Dirikan); count 18 (Mohammad Rizwan); and count 19 (Rajeev Batra); involve government created fictitious students, not actual students.

Count 20, charging using a false document, in violation of 18 U.S.C. § 1001(a)(3), charges only one transaction, involving the United States and its fictitious student "K.D." (Kadir Dirikan).

Count 21, charging one count of false statements, in violation of 18 U.S.C. § 1001(a)(2), charges only one transaction, involving the government and its fictitious student "M.R." (Mohammad Rizwan).

Count 22 and 24, charging two counts of alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), involve two discrete

1   incidents involving two alleged victims, Dasa and Dirisanala.

2        Finally, Count 25, charging one count of unauthorized access

3   of a government computer, in violation of 18 U.S.C. § 1030(a)(3),

4   has only one victim, the United States.

5        Thus, for the counts in Group Two, the victims are only the

6   United States (with its four fictitious students) and two others,

7   Dasa and Dirisanala.  The victim total is thus 3 (or at most 7,

8   if counting the fictitious students), so there should be no

9   increase for number of victims.  See U.S.S.G. §2B1.1(b)(2).

10       In addition, the loss figure in Paragraph 59 should be

11  deleted, because there is no financial loss, or very little, in

12  connection with the criminal offenses in Group Two.  There is no

13  financial loss to the United States for the various counts in

14  which it is the victim, and there are only two civilian victims

15  on the two harboring counts.

16       Finally, as argued below, the enhancement for Su

17  misrepresenting that she was acting on behalf of an educational

18  institution, under U.S.S.G. §2B1.1(b)(9)(A), should be stricken.

19  This is not a case where Su was falsely claiming she represented

20  an institution with which she had no actual connection.  There

21  was testimony that there some instructors (TR 818); there were

22  some online classes (TR 818); and there were assignments (TR 818-

23  19, 923).

24       Thus, the offense level for Group Two should be corrected to

25  offense level 6.  The grouping rules provide that the Court

26  should "Disregard any Group that is 9 or more levels less serious

Su  Sent. Mem.                    8

1   than the Group with the highest offense level." U.S.S.G. §

2   3D1.4(c).  Group One has an offense level of 39.  PSR 57, 66.  As

3   level 6 is well below level 39, Group Two should be disregarded.

4       The defense also notes that even if only the 6-level number

5   of victims enhancement is stricken from Group Two, that change

6   alone would bring the offense level for Group Two to 26, well

7   below the 9 level threshold.

8   **b.   Objection Number Two**

9       The defendant submits that the scheme does not appear to be

10  so sophisticated as to require a further 2 level adjustment.

11  **c.   Objection Number Three (Listed as a second No. Two in PSR)**

12      The defense submits that the loss is best estimated as

13  between $1M and $2.5M, and that any further increase is not fully

14  supported by the evidence, such that only a 16-level increase is

15  justified.

16      "The government bears the burden of proving loss for the

17  purposes of § 2B1.1 by a preponderance of the evidence." *United*

18  *States v. Santos,* 527 F.3d 1003, 1006-07 (9th Cir. 2008), citing

19  *United States v. Zuniga*, 66 F.3d 225, 228 (9th Cir. 1995).

20      The defense is aware of the testimony by Special Agent

21  Mackey at trial regarding the total proceeds traced into Tri-

22  Valley accounts.  See, e.g., TR 1635-36.  However, this falls

23  short of establishing loss to the victims of the scheme to

24  defraud, because there is no showing that every F-1 student was a

25  victim.

26      The defense points to the trial testimony of Parth Patel,

Su  Sent. Mem.                    9

**0369**

1   who testified there were two types of students enrolled at Tri-
2   Valley.  TR 1543.  Patel testified that the first group just
3   wanted to maintain their status to stay in the United States,
4   while the second group were students who really want to attend
5   the classes.  TR 1543.  Patel believed that 65 percent to 70
6   percent of the students were just interested in maintaining their
7   immigration status.  TR 1543-44.

8        There is no showing by the government that the first group
9   of students, those who just wanted to maintain their status in
10  the United States, are victims, or have any complaints.

11       It must be remembered that the victims in the scheme to
12  defraud are limited to actual foreign students, and not the
13  United States.

14       The defendant draws the Court's attention to Su's October
15  11, 2011 pre-trial motion to dismiss the indictment.  CR 19.  The
16  original indictment filed by the government attempted to
17  criminalize a scheme to defraud the U.S. Government with respect
18  to its ability to control entry of foreign nationals.  But, Su,
19  citing Supreme Court case law, argued that the indictment did not
20  charge a property interest for purposes of 18 U.S.C. §§ 1341 and
21  1343.  In *McNally v. United States*, 483 U.S. 350, 360 (1987), the
22  Supreme Court held that the federal mail fraud statute is
23  "limited in scope to the protection of property rights."  When
24  Congress amended the law to cover the intangible right of honest
25  services, the Supreme Court then ruled in *Skilling v. United*
26  *States*, 561 U.S. 358 (2010) that "honest services fraud" applies

Su  Sent. Mem.                    10

1   only to bribes and kickbacks.  Finally, in *Cleveland v. United*
2   *States*, 531 U.S.12 (2000), the Supreme Court explained that the
3   property being protected is property of the victim.

4        The government filed a superseding indictment that it said
5   addressed Su's concerns.  CR 20, 21.  The superseding indictment
6   charges a scheme to defraud non-immigrant aliens of money and
7   property.  The superseding indictment does not cover willing
8   participants, and thus the blanket inclusion of all F-1 students
9   as victims is unsupported by any evidence.

10  **d.    Objection Number Four (Listed as Number Three in PSR)**

11       The defense objects to a 4 level increase for role in the
12  offense, under U.S.S.G. § 3B1.1(a), because under the
13  government's theory of the case and the evidence introduced at
14  trial, Su acted alone in the scheme to defraud.  While other
15  defendants were charged with lesser crimes, no defendant
16  conspired with Su in the scheme to defraud.

17       The government bears the burden of proving aggravating role
18  for the purposes of § 3B1.1 by a preponderance of the evidence.
19  *United States v. Mares-Molina,* 913 F.2d 770, 773 (9th Cir. 1990).

20       In *United States v. Tank*, 200 F.3d 627, 633-34 (9th Cir.
21  2000), the Ninth Circuit held that a defendant cannot be deemed
22  an "organizer or leader" when the evidence did not show that he
23  had any control over his co-conspirators.  The *Tank* case also
24  noted that the Sentencing Guidelines clearly indicate that "the
25  defendant must have been the organizer, leader, manager, or
26  supervisor of one or more other [criminally responsible]

Su  Sent. Mem.                    11

1  participants ... [or must have] exercised management

2  responsibility over the property, assets, or activities of a

3  criminal organization" to merit an upward adjustment.  *Id.,*

4  citing U.S.S.G. § 3B1.1, comment notes 1-2.

5      Here, because no other defendant shared in the common plan,

6  no other defendant shared in the proceeds, no one else was

7  criminally responsible for the crimes for which Su was convicted.

8      Alternatively, if an addition for role is appropriate, then

9  the increase should be limited to two points, as the trial

10  evidence showed, at best, that only 4 individuals, Ramakrishna

11  Reddy Karra, Vishal Dasa, Anji Dirisanala, and Parth Patel, were

12  conceivably involved.  TR 809, 813-14, 845, 1157-68, 1501-13.

13  **e.    Objection Number Five (Listed as Number Four in PSR)**

14      The defense submits that no adjustment for willful

15  obstruction of justice under U.S.S.G. § 3C1.1(a) is justified,

16  because the defendant's mental state negated the specific mens

17  rea needed.   Dr. Su's mental condition and the stress of trial

18  were the root cause of the incidents in question.

19      "Sentencing Guidelines § 3C1.1 contains a clear mens rea

20  requirement that limits its scope to those who 'willfully'

21  obstruct or attempt to obstruct the administration of justice."

22  *United States v. Lofton*, 905 F.2d 1315, 1316 (9th Cir.), *cert.*

23  *denied*, 498 U.S. 948 (1990).  The "term 'willfully' requires that

24  the defendant 'consciously act with the purpose of obstructing

25  justice.'" *Id*. at 1316-17 (quoting *United States v. Stroud*, 893

26  F.2d 504, 507 (2d Cir. 1990)); *United States v. Gardner,* 988 F.2d

Su   Sent. Mem.                    12

1  82, 84 (9th Cir. 1993).

2      The report of Dr. Gregory corroborates and supports Su's

3  position here.  Su's delusional thinking can easily be seen as

4  the motivation behind her efforts to have the various witnesses

5  she contacted testify consistently with her version of the

6  evidence.

7      It should also be noted that the email communications

8  detailed in PSR 39-46 do not appear to be attempts to dissuade or

9  prevent the witnesses from appearing at court and testifying.

10 **f.   Objection Number Six (Listed as Number Five in PSR)**

11     An adjustment under the specific offense characteristics for

12 misrepresentation that the defendant was acting on behalf of an

13 educational organization under U.S.S.G. § 2B1.1(b)(9)(A) is not

14 justified, as Tri-Valley was an educational organization.

15     This is not the situation where a defendant falsely

16 represents him or herself to be a school to which the defendant

17 actually has no connection.  Here, in contrast, even under the

18 government's evidence, Tri-Valley did have a physical location,

19 had instructors, and did have online classes.

20 **g.   Summary of Guidelines Argument**

21     Applying the above objections of the defendant, the defense

22 submits that the adjusted offense level should be level 29, or

23 alternatively level 31, if a 2 point adjustment for role is

24 justified.  This would result in a final Guideline sentencing

25 range of 87 to 108 months under level 29, or 108-135 months, if

26 level 31.

Su  Sent. Mem.                    13

**0373**

**4.    The Defendant's Request for a Below-Guidelines Sentence**

The defense requests that the Court grant a downward departure/variance due to the defendant's diminished mental capacity, under U.S.S.G. § 5K2.13, and the mitigating factors under 18 U.S.C. § 3553, based on the defendant's mental condition; lack of criminal record; and the overly high guidelines score.

The probation officer rightly concludes that a variance from the harsh guidelines sentence is appropriate in this case. As argued above, Su believes that Guidelines calculations should result in a lower final offense level, such that the "starting point" for the downward departure/variance should be lower. However, regardless of the final offense level, an examination of the factors set out in 18 U.S.C. § 3553(a)(1)-(2) support a variance to the 70 month sentence recommended by the defense.

**a.    The nature and circumstances of the offense**

The defense acknowledges that this is a serious offense. The PSR concludes there were numerous victims, and a large financial loss.

However, the 70-month sentence recommended by the defense is a lengthy prison sentence, particularly for a 44 year old woman who has no prior criminal record and who appears to present little risk of recidivism.

This sentence takes into account the pre-trial negotiations between the parties, where the government submitted a draft plea agreement to the defense which contained a proposed stipulated

Su  Sent. Mem.                  14

1  recommended sentence of 41 months, based on a proposed guideline
2  offense level of 22.  The plea agreement did contain a 3-level
3  reduction for acceptance of responsibility, and did not contain a
4  2-level adjustment for obstruction of justice.

5      The defendant did go to trial and did not accept the plea
6  agreement.  But, the agreement was drafted when all the facts
7  about the nature and circumstances of the underlying offense were
8  known, and concluded that 41 months was a reasonable sentence for
9  this offense.  At this time, assuming that the 3-level reduction
10  for acceptance of responsibility in not appropriate, and even
11  assuming a 2-level adjustment for obstruction, that results in a
12  5-level increase from the plea agreement calculations.  This
13  leads to an offense level of 27, and a guideline sentencing range
14  of 70-87 months.  The defense recommendation is at the low end of
15  that range.

16      The defense acknowledges that this is a range below the
17  guideline ranges calculated by the parties in this case.  But,
18  even assuming the accuracy of the calculations proposed by the
19  probation officer, several of the enhancements have the effect of
20  overstating the appropriate offense level.

21      First, the loss figure of $5.6 million overstates the actual
22  harm done.  As argued above, government witness Parth Patel
23  testified that 65 percent to 70 percent of the students were just
24  interested in maintaining their immigration status.  TR 1543-44.
25      Second, while there is a provision for a 2-level increase
26  for sophisticated means (U.S.S.G. § 3B1.1(b)(9)(C)), there is

Su   Sent. Mem.                    15

1   already a large increase for loss, even if the Court adopts the

2   defendant's view of the loss.  The defendant submits that the

3   large increase for loss already adequately reflects the

4   seriousness of the scheme to defraud.

5        Third, assuming the Court rejects Su's argument that she

6   lacks the mens rea for obstruction of justice, the Court may

7   still conclude that her mental condition at least explains that

8   she had significant problems controlling her behavior, such that

9   mitigation of her sentence is appropriate.

10       Fourth, assuming the Court rejects Su's argument that a 4-

11  level adjustment for role is not appropriate, then the Court may

12  consider that this case is not the typical large-scale criminal

13  conspiracy, such that a full increase for role is appropriate.

14  **b.    The history and characteristics of the defendant**

15       The defendant submits that this factor supports her

16  sentencing recommendation.

17       The defendant has been suffering from a mental condition

18  that has been largely untreated.  There were prior documented

19  incidents, including a hospitalization in 2005.  PSR 92, see also

20  Recommendation, page 3.  As the probation officer notes, despite

21  the family noting that the defendant had significant mental

22  health issues, "the family chose not to pursue help for her, even

23  after her two hospitalizations. Left untreated and sometimes

24  ignored by her family, Su was able to create her own world

25  without being held accountable by anyone."  PSR Rec. at p. 3.

26       In addition to the material provided by Doctor Gregory (PSR

Su  Sent. Mem.                    16

0376

1  93), the PSR notes corroboration from Sophie Su that her sister

2  would "talk nonsense" during the trial.  PSR 89.  Years before

3  the trial, Sophie Su noticed "weird behavior" that included

4  imaginations such as believing she was Princess Diana.  PSR 89-

5  90.

6      In addition, the attached letters of Su's two daughters, her

7  former husband Hong Yang, and Sophie Su all corroborate this

8  mental condition.

9      Following the trial, the defense retained Dr. Amanda Gregory

10  to evaluate the defendant, in light of a series of events, that

11  culminated in Su's bizarre behavior at the conclusion of the jury

12  trial.  A copy of Dr. Gregory's report had been previously

13  submitted under seal, and is incorporated here by reference.

14      Dr. Gregory states that "the current assessment results, the

15  inpatient psychiatric records from 2005, and the treatment

16  records from 2011, all suggest that Ms. Su has significant mental

17  health issues. Ms. Su has a history of unstable mood including

18  depressive symptoms and more prominently episodes of mania

19  involving euphoric or abnormally elevated or irritable mood,

20  agitation, impulsivity and poor decision-making, pressured

21  speech, racing thoughts, decreased need for sleep, and increased

22  energy and hyper focus on specific goal-directed activities."

23  The report details that "Su also has a history of psychotic

24  symptoms, which appear to escalate during episodes of mania.

25  Psychotic features include grandiose and paranoid delusions

26  (thinking she can communicate with God, thinking she is being

Su  Sent. Mem.              17

0377

1  followed and people are trying to harm her), disorganized speech

2  and hallucinations.  Ms. Su also appears to have a history of

3  psychotic symptoms in the absence of prominent mood symptoms."

4  Report at 11.

5      Dr. Gregory concludes that Su's symptoms are consistent with

6  a diagnosis of Schizoaffective Disorder, Bipolar Type, and

7  explains that Schizoaffective Disorder is a combination of

8  symptoms of bipolar disorder and schizophrenia and tends to

9  involve episodes of severe symptoms followed by periods of

10  improvement and less severe symptoms.  *Id.*  Dr. Gregory also

11  stated that "Other diagnoses to be considered for Ms. Su include

12  Bipolar Disorder with Psychotic Features and Schizophrenia,

13  depending on the relative prominence over time of psychotic

14  versus mood symptoms. These disorders are all considered to be

15  major mental illnesses."  Report at 11.

16      In Dr. Gregory's opinion, Su's "untreated mental illness

17  appears to have played a role in her behavior that resulted in

18  her convictions and her erratic behavior during the trial.

19  People experiencing manic and psychotic symptoms often exhibit

20  impulsive behavior and extremely poor judgment. These symptoms

21  likely played a role in Ms. Su's decisions to contact the judge

22  and witnesses during her trial. Her grandiose delusional thinking

23  and unstable mood may also have played a role in her behavior

24  that resulted in her charges, i.e. enrolling large numbers of

25  students without the staff to teach classes, not paying adequate

26  attention to the rules of the process."  Report at 12.

Su  Sent. Mem.                    18

1      Dr. Gregory, after interviewing family members, has now

2   provided an updated report that again corroborates Su's mental

3   condition.  See attached report.

4      The defense submits that Su's mental condition justifies a

5   downward departure due to diminished mental capacity, under

6   U.S.S.G. § 5K2.13, and is a significant mitigating factor under

7   18 U.S.C. § 3553.  Her mental condition mitigates her actions

8   regarding Tri-Valley and her actions during the litigation of

9   this case.  Su's delusional thinking, counsel submits, persisted

10  throughout this time period, and differentiates her from someone

11  acting merely from greed.  Perhaps the simplest and best way to

12  make this point is to quote from Rachel Yang, Su's youngest

13  daughter, who wrote this Court that her mother "*thought* what she

14  was doing was right."  See attached letter, emphasis in original.

15     Su's condition is also relevant to the obstruction

16  enhancements.  This Court itself expressed a belief that Su had

17  difficulties controlling her behavior during the trial.  TR 1935.

18     Dr. Su has no prior criminal record.  She achieved

19  significant success by obtaining a doctorate in engineering, and

20  should be able to obtain work upon release.

21     In addition, Dr. Su is fortunate to be supported by her

22  family and her boyfriend, David Kerns.  See attached letters.

23  This support system should held ensure a good transition back

24  into society.   Dr. Su's family is now aware of the seriousness

25  of Su's mental condition, and the need for continued treatment.

26

Su   Sent. Mem.                    19

**c.    The need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, avoid sentence disparity, and protect the public.**

The defense acknowledges that this is a serious offense. However, 70 months is a lengthy prison sentence, particularly for a 44-year old woman who has no prior criminal record and appears to present little risk of recidivism.

Moreover, the government has seized and moves to forfeit substantial properties.  Proceeds from those properties can be used to compensate victims in this case.  See *United States v. Carter,* 742 F.3d 440, 446 (9th Cir. 2014) ("the Government may choose to assign forfeited proceeds to victims, as was the case here."), citing 18 U.S.C. § 981(e)(6).

Finally, the sentence recommended by the defendant minimizes sentencing disparity with the other criminal defendants in this investigation.  The defendant takes note of the public record in CR 11-0742-KAW, which indicates that Anji Dirisinala was sentenced to 1 day probation and a $25 special assessment; Vishal Dasa was sentenced to 30 days probation and a $25 special assessment; Ramakrishna Karra was sentenced to 6 months probation; a $2000 fine; and a $25 special assessment; and Tushar Tambe was sentenced to 3 years probation and a $25 special assessment.  See CR 11-0742-KAW.

**d.    The need to provide the defendant with needed educational or vocational training, medical care.**

This factor also supports the defendant's recommendation.

Su   Sent. Mem.                    20

1    The defendant can receive mental health counseling during

2  incarceration.  After her release and placement on supervised

3  release, the probation department can require that she receive

4  the treatment she needs.

5                            **CONCLUSION**

6    The defendant asks this Court to impose a 70-month sentence,

7  followed by 3 years supervised release.

8  DATED: October 24, 2014.        Respectfully submitted,

9

10                                 /s/ John J. Jordan
                                   JOHN J. JORDAN
                                   Attorney for Defendant
11                                 Dr. Susan Su

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Su  Sent. Mem.                    21

**Amanda Gregory, Ph.D.**
**Forensic and Clinical Psychologist**
**California License Number PSY 20207**
**55 New Montgomery Street, Suite 420**
**San Francisco, CA 94105**
**(415) 796-2801**

October 23, 2014

John Jordan, Esq.
400 Montgomery Street
Suite 200
San Francisco, CA 94104

Re:   **United States vs. Susan Xiaoping Su**
       *ADDENDUM TO PSYCHOLOGICAL EVALUATION SUMMARY*

Dear Mr. Jordan:

Pursuant to your request, this letter summarizes my follow-up interviews with Ms. Su's family members. The interviews were conducted to gain further information on Ms. Su's mental health history for an addendum to my Psychological Evaluation Summary Report on Ms. Su, dated August 27, 2014. As you know, Ms. Su is a 44-year-old (date of birth XXXX, XX, 1970), divorced, Chinese woman who was found guilty in Federal Court of multiple charges including money laundering and conspiracy to commit visa fraud in March of this year. I interviewed Ms. Su's ex-husband Hong (Henry) Yang, her sister Sophie Su, and her older daughter Jenny Yang.

**Interview with Henry Yang, Ms. Su's ex-husband**
I met with Mr. Yang for just less than two hours on October 8, 2014. Mr. Yang is a 49-year-old, divorced (from Susan Su) man of Chinese descent with a doctorate in Materials Science and Engineering who lives in Pleasanton, California. Mr. Yang reported that he is a Senior Manager of Technology at Intermolecular Inc. Mr. Yang reported that he met Ms. Su in Beijing, China in January of 1992 and that they were married in May of the same year. He reported that they officially separated in December of 2009. (Ms. Su moved out, although Mr. Yang reported that they had been distant in the two years before that.) He reported that they officially divorced in December of 2013.

Mr. Yang reported that he had concerns about his wife's mental health when, as a graduate student at the University of California, Berkeley in 1997, Ms. Su believed she was having a romantic relationship with her professor. Apparently, these thoughts were not based in reality. He also described how she told him another professor had put listening devices in the walls of the students' offices to monitor their conversations. He said she displayed a tendency to "link things that don't need to be linked," and make inaccurate associations between unrelated events. He said, "Her thought process is strange." He reported that her professor refused to continue working with her and she transferred to working with another professor.

Mr. Yang also noted Ms. Su's mood instability and tendency to be easily upset. He noted that she could become very upset and angry during their relationship and she would call the police. He

**0382**

said things could be fine for a couple of weeks and then there could be an explosion. He reported that she has no history of substance abuse issues. He indicated that she is alcohol intolerant. He said that on one occasion she drank a beer and started screaming nonsense.

Mr. Yang also reported that Ms. Su was "obsessed" with the British Royal Family, saying things like, "I'm going to be Queen of England," and believing that her daughters would be princesses. He reported that from 2001 to 2002 she would spend many nights online in chat rooms discussing the Royal Family. He said he logged on to the chats on a few occasions and learned that his wife believed that Prince William was going to marry one of her daughters and that she and Princess Diana were connected by their similar life stories.

Mr. Yang reported that Ms. Su had a severe episode of mental illness in 2005 at which point she was hospitalized. He reported that in the three to four months preceding the hospitalization, she was acting "pretty strange." He reported that just prior to her hospitalization, the family was in San Antonio for the daughter's softball tournament and her mind appeared to be wandering. He described how she started screaming and crying that people were following her. He said he was able to take her to the hospital by convincing her that she needed a physical checkup. She did not believe she had any mental health issues. He reported that she had to be restrained due to agitation when she went to the hospital. He said that she did not recognize him or her daughter and appeared very confused. He noted that she was misperceiving things and thought people were wearing masks, which appeared to scare her. He described this episode as "very frightening."

Mr. Yang said that after the hospitalization, he chose to take his wife home to care for her rather than admitting her to a psychiatric hospital because he thought he and Ms. Su's brother and sister could care for her. He said that he tried to keep having her take medication but she refused to take it soon after she left the hospital. He reported that he did not seek additional mental health treatment for his wife because she did not think she was sick and did not want to go to treatment. He also said that in Chinese culture it is "shameful" to be seen as having a mental illness and that blame is placed on the person or the family. He reported that when she was hospitalized he did not tell any of his Chinese friends the nature of his wife's difficulties.

Mr. Yang reported that after Ms. Su came home from the hospital she was still "very sick and thinking about the Royal Family." He reported that she told him she was waiting for mail from the Royal Family and every time she saw the postman arrive, she would get excited. He reported that her strange behavior persisted for approximate five or six months. He reported that during periods of mental illness, Ms. Su tends to talk very quickly to the point that she is difficult to follow and make grandiose statements (e.g. "I can win the Nobel Prize," and "I can be the Queen of England").

Mr. Yang also noted Ms. Su's history of paranoid thoughts including thinking people were following her. He noted that she also believed she could speak directly to God. He also reported that she would write in a journal and on random pieces of paper, and that her writing would often not make much sense. He also noted episodes where her difficulty with thinking rationally resulted in other problems for her. He reported that she lost $75,000 in a Ponzi scheme in 2007

Susan SU
Psychological Assessment Summary Addendum
Page 3 of 8

and lost $10,000 to $20,000 when she sent twenty or thirty laptops to Nigeria and was shocked when she was not paid for the items.

Mr. Yang reported episodes where Ms. Su would improve and be less set on her unusual beliefs, but then she would get worse again. Mr. Yang reported that there was no reasoning with or talking Mr. Su out of these beliefs.

When I asked Mr. Yang about his knowledge of his ex-wife's family history of mental health issues, he reported that Ms. Su's father also appears to have some grandiose thinking, including writing a book and telling people he is the best writer in China. He also reportedly wanted to start a school in China. Mr. Yang reported that Ms. Su's father has also written letters to the White House and senators. He reported that Ms. Su's mother has some difficulty getting along with other people.

Mr. Yang described examples of grandiose thinking in Ms. Su during the period when she was running the school. He reported that she talked of making the school global, with "tens of thousands of students." She felt the school was good for the community because it was low cost and involved cutting edge technology. He also reported that she believed it was God's wish for her to start the school, which is why she made it a Christian school. He reported that she was very focused on the school. He reported that she would stay up very late, night after night, studying different topics (including those in which she had no prior knowledge, such as nursing and law) in order to develop the curriculum. He reported that when she told him she had a lot of students, he told her she needed to get help in managing the school. He reported that any time he tried to tell her she was "crazy" for what she was doing with the school, "There was a big argument." He reported that he was amazed that she was able to proceed so far because she is not very detail oriented and tends to be "sloppy." He reported that if he tried to say something that did not support her beliefs about her school she "got very upset," saying, "I'm doing everything right," and staying in her "own unreal world." He reported that she believed she could take care of everything. He reported that he did not think she would be given a certification/granted a permit to run the school in the first placed because she was so disorganized. He equated her getting the permit to giving a driver's license to a blind person. He said he anticipated the school would soon get shut down again because of her difficulty with organization. He reported that he was shocked when she was arrested.

Mr. Yang reported that during his ex-wife's criminal trial, she was not being realistic about the trial, telling him, "Everything's going well." He stated that she told him the statements of government witnesses were helping her and she felt "100% they will drop the charges." He said she also did not believe she had committed any crimes or understand the severity of her behavior. He said she believed these things all the way to the end of her trial. He reported that he had contact with her every week or two during that time. He said she was also quite depressed after the trial.

Mr. Yang reported that the only time his wife has thought she might have a mental illness has been during her time in jail. He reported that he is not sure if she truly believes she is mentally ill or if she sees this as a potential defense in her case, while not really believing she is actually

Susan SU
Psychological Assessment Summary Addendum
Page 4 of 8

mentally ill. He noted that she is feeling depressed about the upcoming court date on October 31, 2014. He reported that she has said the potential for a bad outcome is elevated because court is on Halloween. He concluded by saying that his ex-wife is not a bad or mean person but that she has a mental illness and has a hard time seeing reality. He reported that he hopes that a condition of her sentence includes taking medication and getting the mental health treatment she needs.

**Interview with Sophie Su, Ms. Su's sister**
I spoke with Ms. Su for one-and-a-half hours on October 22, 2014. Ms. Su reported that she is 41-years-old and lives in Pleasanton. She reported that she has a Master's degree in Computer Science and is the Lead Software Release Engineer at Kaiser Permanente, Pleasanton. Ms. Su reported that she moved to the United States from China in 1996.

Ms. Su reported that the first time she had her concerns that her sister had a mental illness confirmed was when her sister received inpatient psychiatric treatment in 2005. She reported thinking that her sister had mental health problems prior to the hospitalization because, "The way of her thinking is not normal like everyone else." She gave examples of Ms. Su thinking her professor was in love with her and saying, "I'm going to marry him," which resulted in "very bad problems." She reported that her attempts to reason with her sister that her thinking was irrational did not sway her opinion. She said that ultimately this professor would no longer have her as a student. She also reported that her sister had another relationship which she thought would result in marriage, but that was actually only romantic in her mind, with a coworker at a startup in 2001 to 2002. She said that her sister often thinks that God is guiding her thinking and no one else understands.

Ms. Su's sister also referenced her sister's fixation on the British Royal Family. She reported that she would read books about them and imagine herself as Princess Ann and think the Prince was going to marry her. She reported that this behavior started around 2004 or 2005 and escalated in the months prior to her hospitalization in 2005. She reported that her sister "lost herself" in books and on the Internet day and night. She reported that her sister believed that someone from the Royal Family was going to come to give her a wedding ring, wedding dress and marry her. She reported that when Susan was in the hospital in 2005, her brother flew in to see her. She reported that when he arrived at the hospital, Susan asked him, "Where's my wedding ring." She reported that when Susan was discharged, "She was still very confused for the next week or two." She continued to maintain that the Royal Family was coming to give her a package and she would wait expectantly for the mailman.

Ms. Su reported that when she saw her sister after Susan had started teaching part-time, she thought she had recovered. However, she said Susan's husband indicated that she was still spending a lot of time on the Internet researching the Royal Family. She also said as recently as the day before our interview, she had told Susan their mother had fallen in the street and broken her arm. Susan asked if someone was trying to hurt her mother and had pushed her. She did not believe Sophie when she asserted this was not the case, and insisted on talking to her mother. Ms. Su reported that Susan believes people from the government are trying to hurt her family.

0385

When I asked Ms. Su about a family history of mental illness, she reported that she has sometimes wondered if her father has similar problems to Susan with regard to being set on an idea and not listening to the reasoning of others. She reported that her mother has a history of depression. She reported that her sister has no history of substance abuse.

Ms. Su said that when her sister was running the school, there were times when she was worried about her mental health. She reported that before she was arrested, Susan told her she thought someone was following her and trying to kill her. Susan told her she saw blood on her window and thought the students or staff were trying to kill her. She reported that she also appeared to have episodes of elevated mood while running her school. She said that when she talked about the school, Susan had a vey high opinion of it and that it would be very successful. She said that when she tried to give Susan advice, she would not listen to her. She reported that some days Susan would be more down and in crisis because there were too many students coming in. She described Susan as disorganized in running the school and stated "She's a very impulsive person. She thinks something and does it right away." She also reported that Susan talked about God's guidance and how God spoke to her and wanted her to run the school. She reported that Susan said that God had told her to have at least 5000 students; hence, she could not stop admitting more students, even when her sister told her she could not handle more students. Ms. Su said, "She didn't listen to me."

Ms. Su reported that well before the trial, Susan told her the government was trying to protect her. She reported that she was "very confused" in her thinking. She reportedly told Ms. Su that the government and her lawyer were working on a plea bargain. She reportedly believed the government was trying to protect her if she proceeded with trial, and that she did nothing wrong, so she did not take the deal. Ms. Su said of Susan: "During the trial, she became very seriously mentally ill." She noted that at the start of the trial, Susan told her everyone was trying to help her, including the government with whom she had a deal. She described her mood as "very strange, so weird. I think she had a problem." She reported that Susan was convinced she was going to win at trial, despite Ms. Su's protestations that this was in her imagination. She reported that Susan appeared "extremely happy" and told her that the jury and judge were helping her and on her side, which she could tell from their facial expressions. She reported that she no longer saw Susan after the start of the trial because there was a Court order for her to have no contact because she was a witness. Ms. Su said that when she saw Susan right after the trial, Susan was very sad and crying.

Ms. Su reported that whenever family members would attempt to reason with Susan and "help her see reality," Susan would not want to talk about it." Ms. Su also said that they thought reasoning with her would make a difference. She also said, "In China, no one is willing to talk about this kind of thing (mental illness). They will always hide it." She reported that suggestions to her sister to enter treatment did not go well. She said that when she would try to tell her she might have a problem and that she might need to see a doctor to "check why you think that way," Susan would become angry. She asserted that her sister never thought she had a mental illness. She did say that she thinks that her sister might consider treatment currently. She concluded, "I hope she can become normal and to think the right way and do something really good."

Susan SU
Psychological Assessment Summary Addendum
Page 6 of 8

**Interview with Jenny Yang, Ms. Su's Daughter**

I spoke with Ms. Yang for one hour on October 23, 2014. Ms. Yang is the 20-year-old (older) daughter of Ms. Su and Mr. Yang. She is currently in her junior year at the University of California, Berkeley studying Material Science and Engineering.

Ms. Yang reported that she recalls her mother having unusual beliefs for as long as she can remember. She also recalls that her mother was easily agitated resulting in frequent arguments between her mother and father She reported that she also learned not to discuss certain topics with her mother because of her odd beliefs. She reported that when she would tell her mother about her softball games, she would tend to "put a meaning behind the numbers" when she would tell her a score. Apparently there were good and bad numbers, which explained why the team won or lost. She recalls one "big episode" where her mother was behaving strangely during her softball tournament. (This appears to have been just prior to Ms. Su's psychiatric hospitalization in 2005.) Ms. Yang said that her team's uniform had a mask on the jersey (the team was the Phantoms, the mask was from Phantom of the Opera) and her mother was uncomfortable around masks. She reported, "They were scary to her." She reported that her mother became fixated on the mask and started behaving strangely. She reported that they had to leave the tournament early because her mother "had a breakdown" and was subsequently hospitalized. She said that while her mother was in the hospital, "She couldn't recognize who we were." She also said her mother was talking incoherently about masks and black gates. She does not recall her mother receiving treatment after she left the hospital. She noted that her mother came home so her family could take care of her. She said her mother did not believe she needed mental health treatment. She also noted the stigma in Asian culture of being mentally ill.

Ms. Yang described another episode of bizarre behavior in her mother when Ms. Yang was around the age of ten to twelve. She reported that the family was at a dinner given by her father's co-worker. She said her mother became fixated on the number of shrimp being served and the family had to leave early when she became upset. She reported that when they were driving home, her father had to stop the car because her mother was "hysterically crying" and saying, "I'm going to die." She does not recall what happened once they got home other than that her father "handled it to protect us instead of letting us watch."

Ms. Yang reported that when she was in middle school, her mother would spend hours and hours on the computer. She reported that her father tried to get her mother to use the computer less. Ms. Yang said that her mother did not think the behavior was problematic and told him to let her do what she was doing. She said that her parents frequently argued whenever her father tried to suggest she spend less time on the computer or counter his wife's unusual beliefs about the Royal Family. She also reported that her mother sometimes forgot to pick her up from school because she was on the computer.

Ms. Yang said her mother was looking up information on the computer about the British Royal Family. She reported that her mother was "obsessed with Princess Diana." She also said her mother expressed the strange belief that she had the right to be the Queen of England. She

**0387**

reported that she was also fixated on a particular type of china tea set that had roses on it and was apparently used by the Royal Family. She reported that her mother had to buy this style every time she saw it and she was fixated on red roses.

Ms. Yang said of her mother, "There's always a little bit of her off day to day." She reported that she would avoid certain topics (e.g. softball scores, roses) because her mother could go off on tangents. She also noted that her mother experienced episodic mood swings and when she became upset and irritable, "She started to not make sense." She also reported that her mother would sleep a lot when she was younger. She reported that she did not really bring friends home because of concerns that her mother might say something "off" and people might think, "She was rude or weird and not that she can't help it." She also noted that her mother could create a good impression, and that often her first impression would not necessarily suggest there was anything wrong with her. She noted that her mother was an enthusiastic supporter, getting along with other parents, of her tennis pursuits.

Ms. Yang reported that during the time her mother was running the school, she had moved to her own house in Pleasanton, the summer before Ms. Yang's sophomore year in high school. She reported that she and her sister would stay with their mother during the week and with their father on the weekends. She recalls that even before she got her own place, her mother would spend a lot time working on the school in the home office. She recalls looking at the website her mother made for the school and observing a lot of grammatical errors. She said she recalls thinking, "No one's going to let her run her own school." She also recalls her mother talking about the religious aspect of her school and telling her, "God wants her to do whatever she's doing." Ms. Yang reported that her mother's religiosity made her uncomfortable. She reported that she was at her mother's home when she was arrested which she described as "really scary." She went to live with her father full time after that.

Ms. Yang reported that she would sometimes become frustrated with her mother: "I'd mention a number and she'd go all crazy." She said that she would stop feeling frustrated when she would think about how her mother can't help herself and appears to have a chemical imbalance. She said she learned not to talk to her about her day-to-day activities with her mother to prevent her from being able to make special meanings out of events. She reported that she and her sister "matured very fast" in having to manage their mother's mental health difficulties.

Ms. Yang reported that she did not have much contact with her mother during the trial. She was at school and said she "didn't want to deal with it" and placed her focus on school. She did talk to her mother on the phone a few times. She reported that she has been more involved recently. She reported that her mother appears to have been doing better with the structure and routine of jail. Ms. Yang reported that she hopes her mother will be able to get the mental health treatment she needs.

## Discussion

The collateral information provided by Ms. Su's family members provide further information

indicating that Ms. Su has had a major mental illness for many years that has largely gone untreated. They described psychotic symptoms (primarily grandiose and paranoid delusions[1]) and episodic mood instability involving symptoms of mania (elevated or irritable mood, pressured speech, disorganized thinking and behavior, decreased need for sleep, excessive involvement in plans that seem to be a good idea to Ms. Su but to few others, and with the potential to cause signficant harm). Symptoms appear to have been present to some degree since Ms. Su's early adulthood. Mood symptoms appear to have been episodic (with periods of relative stability as well as long periods of mood instability). Delusional thinking appears to have been present during some periods in the absence of mood symptoms.

The mental health information on Ms. Su provided by her family members further supports my previous diagnosis of **Schizoaffective Disorder, Bipolar Type**. Monitoring Ms. Su's mental health over time will be necessary to make a definitive diagnosis. Other diagnoses that should still be considered in the differential diagnosis include Bipolar Disorder with Psychotic Featues and Schizophrenia, depending on the relative prominence over time of psychotic versus mood symptoms. Medication treatment is highly recommended to address Ms. Su's psychotic and mood symptoms.

Please let me know if I can provide any further information. Should additional relevant records or other collateral information become available, I will gladly amend my report.

Sincerely,

*A.L. Gregory PhD*

Amanda Gregory, Ph.D.
Clinical Neuropsychologist

---

[1] A delusion, as defined by the Diagnostic and Statistical Manual-5, is a false belief based on incorrect inferences about external reality that is firmly held despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary. The belief is not ordinarily accepted by other members of the person's culture or subculture (i.e., it is not an article of religious faith). When a false belief involves a value judgment, it is regarded as a delusion only when the judgment is so extreme as to defy credibility.

October 01, 2014

Dear the Honorable Judge Jon Tigar,

My name is Jenny Yang, and I am writing to you on behalf of my mother, Susan Su. I would like to share with you a unique glimpse of Susan's life through a daughter's perspective.

Growing up with my mother was not always easy due to her mental condition, but by no means was it all bad. Upon first meeting Susan, she seems like your everyday mother, compassionate, caring, and full of enthusiasm. However, through spending more and more time with her, nuances in her behavior become apparent. I remember certain mundane things like roses, masks, and lucky numbers that I learned to never mention because doing so would trigger nonsensical thoughts and tangents from her. Her greatest delusion was thinking she, in righteousness, was the Queen of England, and during her darkest times, my mom was hospitalized due to an episode in which she did not recognize her own family.

Despite these unfortunate incidents, the majority of my memories with her are pleasant and happy ones. My mom always tries staying up to date with everything in my life. She remembers practically every one of my friends' names I've ever mentioned, even the ones I made and may have only known back in elementary school. I am 20 years old now and a third year college student. From when I was 5 years old through to high school, the activity I loved most was participating in sports like gymnastics, tennis, as well as playing for a traveling softball team. This would not have been possible for me without my mom's efforts in driving me to every practice, setting up carpools when she couldn't, consoling me when I felt exhausted, and cheering me on from the sidelines during all my competitions and tournaments.

Currently I am attending college at UC Berkeley which is not too far from my home in Pleasanton. Although my mom is being held in the same city, she feels so incredibly far away. Over the summer when I was back home, my sister and I visited her in prison at least once every week. Now a simple phone call is so difficult to achieve, not because she doesn't try to call, but because every time she does try, I sadly find myself unavailable due to being in class or work. I really miss the contact we used to have. Especially attending such a demanding and competitive university like UC Berkeley, my mother's alma mater, I need her comfort and support now more than ever to pick myself up during rough times. Whenever we are able to catch up over the phone, my mom never forgets to remind me of how proud of me she is, and how confident she is in me accomplishing what I set my mind to. I am not sure how possible this is, but it would mean the world to me having my mom able to watch me graduate from both her and my dream school.

My mom is a good and sincere person at heart. Sometimes what is going on in her head gets in the way and she can't help it. My mom has never been someone who intentionally hurts or tries to do wrong to someone else. In her state of mind, I firmly believe she thought she was doing everything genuinely and never meant to deceive anyone.

Considering all this, I kindly ask you and would immensely appreciate any leniency you may extend to my mother, Susan Su. Thank you so much, Honorable Judge Jon Tigar, for your time and consideration.

Respectfully,

Jenny Yang

October 01, 2014

Dear the Honorable Judge Jon Tigar:

My name is Rachel Yang. I am a first-year student at Duke University in Durham, NC, and I am writing this letter on behalf of Susan Su, who is my mother.

Every mother deserves the unconditional love and respect from her children, and I am ashamed to say that it took me far too many years to develop the love and respect that I have for my mother today. Throughout my elementary and middle school years, my family was whole, but in no way were we functional or happy. My mother was distant, often lost in her delusions and thoughts of grandeur, and the only consistency I could expect was hearing her raised voice in her arguments with my father. She was almost a stranger in my life.

When my parents eventually separated in the year end of 2009, I saw a change in my mother. On one hand, she became a much more active part of my life: she began cooking dinner for my sister and me, she would call me every other day to ask how my day went, she wanted to know everything and anything. On the other hand, I think not being able to see my sister and me everyday drove her to want to prove herself as our mother. I can genuinely say that, at the time she was running her business, she *thought* what she was doing was right. She thought she was following all the rules and procedures. She thought she was making an honest living for herself, and for her two daughters.  I understand that sometimes one's thinking can be flawed, but it seems just human to make mistakes.

One thing that my mother has taught me is to learn from my mistakes. I think my biggest mistake is taking for granted her impact on my life. Every week when I see her behind the thick glass window at Santa Rita Jail, every part of me wishes I could somehow give her the hug I should have given her before she was taken into custody. I wish I could visit her every day, but at the same time I wish I never had to see her deal with what she must be experiencing right now. I wish I could somehow do the impossible and give her the life she deserves.

The honorable Judge Jon Tigar, I have a deep respect for your profession as a United States District Judge. I see my mother as someone who is caring, loving, and dependable, and I can only hope that you see my mother as someone who acts with pure intentions and who is capable of learning from her mistakes, mistakes which she sometimes just has difficulty realizing. I miss my mother, and I need my mother. I need her to cheer me up on those days when nothing seems to go right. I need her to watch me adjust to life in college, to welcome me home during the holidays. I just need her to be there for me, just as she always used to be.

Sincerely,

Rachel Yang

Hong S. Yang
3518 Ovella Way
Pleasanton, CA 95615
Phone: 925 209 0975
September 30, 2014

The Honorable Judge Jon S. Tigar

United States District Court, Norhern Dsitrict of California

Dear Honorable Judge Jon Tigar,

On a beautiful late August day at the picturesque Duke University campus, my older daughter Jenny and I were with my 18-year old daughter, Rachel, attending a reception for the parents of students in the Class of 2018. Excited by her first day at college, Rachel politely introduced herself to her fellow freshmen and had conversations with their parents. Occasionally, her mind appeared to wander away, and I could see that she missed her mom very much and wished her mom could be there with her to check out the place she would spend her next four years away from home for the first time. Unfortunately, her mother, Susan Su, could not come to Duke, and nor could she go to Rachel's high school graduation months earlier, because she was sitting in a jail, waiting to be sentenced. How could the fun-loving, energetic, musically talented, top-college graduate I had married for 18 years end up in a prison?

When I first dated Susan in 1992, she just graduated from Tsinghua University, one of the top-ranking universities in China; at the time, I was doing my postdoctoral research at UC Davis after receiving Ph.D from University of Birmingham, UK. Susan's fun-loving spirit, and her musical and athletic talents attracted me, and we fell in love and got married shortly after we met. Unfortunately, it was a difficult marriage from the very beginning. I got very frsutrated when every female friend I talked to automatically became my mistress in Susan's mind. Unaware of her mental illness at the time, I thought she was just feeling insecure in our new marriage. We had two wonderful daughters together, and Susan worked very hard and managed to complete her M.Sc at UC Davis and Ph.D at UC Berkely while raising two young girls. Susan always wanted to be the best in whatever she pursued.

I started to notice Susan's serious mental illness while she was working on her Ph.D at Berkeley (1997 - 2001). On one rainy afternoon, she told me that she believed that her professor had placed a listening device in the Laboratory wall to listen to her conversations with her labmates. I told her that it was purely her imagination.

Susan lost her first full-time job in 2002. In the aftermath of the dot com bubble, she could not find a regular full-time job for a while. Susan started part-time teaching at San

**0392**

Francisco State, San Jose State, and other local private colleges. With the extra free time she had, she got addicted to the Internet, and was fasinated with the British Royal Family. She often stayed up very late at night, chatting online with other members of royal family fan clubs. For years, she believed she could become the Queen of England someday and our daughters could become the princesses. In the summer of 2005, after returning home from a national softball tournemant for our older daughter Jenny, Susan complained to me that some people from the Royal Family were chasing her around in our house and she screamed loudly. I used an excuse of her need for a physical health check-up to get her hospitalized for a week. In the hospital bed the next day, Susan could not recognize who I was and she could not recognize her daughters either. Shocked by Susan's mental condition, my two young daughers (11 and 9 years of age) and I cried as we stood next to her hosipital bed. Not sure how well she could recover from this psychotic episode, I prayed to God and promised to take care of her for the rest of myself no matter what happens to her in the future. It is beyond my imagination that years later she would be put behind bars. After Susan's hospital stay, we took her home instead of sending her to a mental hospital as we believed home environment would help her recovery. She did recover somewhat, but was never fully recovered to good mental health because she refused to aceept the fact that she was mentally sick. As a result, she stopped seeing doctors and getting the medications she needed. Mental health is a taboo topic for many Chinese Americans, in part because psychiatric illness is stigmatized in traditional Chinese culture, and I could not, without getting in to a major argument, ask her to seek help and get treated for her mental illness. I always hoped certain legal means which would force her to get treated for her mental illness, but I could not find any before. Now that she is waiting to be sentenced, I hope the Court can impose a probation condition by which she is required to get mental health help and take prescribed medications on a regular basis until she gets a clean bill of mental health.

For simple and basic things, Susan can tell right from wrong, and make the right decisions. She is a loving mother to our two daughters, and seldomly raises her voice to them even during her severe mood swings, for which I am very thankful. Susan is kind to others, even to strangers. We are both Christians, and Susan has used her music talents for church chiors and Bible study groups for more than 10 years. When it comes to more complicated matters like running a business, however, Susan had troubles in making right desicisons because of her mental illness. Her thoughts were often delusional, detached from reality. She has repeatedly been a fraud victim in her business endeavours. She lost thousands of dollars in 2006 after shipping laptops to scammers in Nigieria without receiving payments first. She also lost $75,000 in 2007 by investing in a ponzi scheme run by Swainson Hawke who has been recently convicted.

Susan is fully capable of learning from her mistakes.  After several jail visits to see her, I was encouraged to learn that she had a strong interest in a cosmetology class run at Santa Rita jail and possibly opening a beauty salon after her release form prison, and she also likes to teach computer skills and mathematics to fellow inmates.  I see that Susan can make significantly more contributions to the society if her mental condition is properly treated.

The Honorable Judge Jon Tigar, I understand that Susan has made terrible mistakes that negatively affected the lives of many people and resulted in her being incarcerated.  I also undersand that, as a United States District Court judge, you are obliged to follow federal sentencing guidelines when imposing a sentence on Susan.   Considering many factors including (i) Susan has no prior crimial convictions, (ii) Susan is a kind-hearted person, (iii) Susan's severe mental illness, I would greatly appreciate any leniency you may extend to Susan Su, my ex-wife and mother of my two daughters.  I hope Susan can attend at least one of her daughters' college gradution.  Thank you very much, Honorable Judge Jon Tigar, for your time and consideration.

Sincerely,

Hong S. Yang

0394

Sophie Su
1174 Wenig Court
Pleasanton, CA 94566
Phone: 925-595-2717

September 28, 2014

The Honorable Judge Jon Tigar:

I'm Susan Su's younger sister Sophie Su. I wished I could come to court during the trial so I could talk to you, but I was not called in as a planned witness.

We were born in a teachers' family in a remote rural area in China. Our father is a high school math teacher, and our mother is a middle school physics teacher. Our parents were very strict with us during our childhood. They taught us to follow the laws, rules and regulations, respect other people and care for people. Susan is the oldest kid in our family. She was very intelligent, and was always ranked number one in her class from elementary school to high school, so she was accepted by Tsinghua University, the top university in China. She was always a good guide and example to me and younger brother Xiaogang Su. She taught us many effective study strategies. We looked up to her.

After she graduated from Tsinghua University in China, she quickly got married and came to United States. She was only 22 years old. Because of different language, culture and custom, she struggled with the new life in United States at the beginning. She didn't allow herself to relax and enjoy, but chose to continue her graduate study. She studied very hard. Even with two little babies at that time, she managed to complete the Master's Degree in Mechanical Engineering from UC Davis, and PhD's Degree in Mechanical Engineering from UC Berkeley. That year she was 31 years old and a mom with 2 daughters (7 and 5 years old). Everyone admired her.

She was a very good sister to me and my brother and a good daughter to our parents. She always tries to help us. She helped my brother apply schools in US and paid the school application fees for my brother. She encouraged me to study and get a degree in US, so I could get a job and be independent.

After she graduated from UC Berkeley, she had worked in a small company for about two years, and then recession happened. She lost her job. She started working as an instructor in different colleges or universities around SF Bay Area. She learned how to run a college during those years of teaching at colleges although it's proven that she used some wrong strategies.

Another important thing I should let you know is that Susan has a history of mental problem. This mental disorder has deeply affected her thinking and behaviors. At the worst time, she was taken to Valley Care Hospital and stayed there for a few days. Even during her trial, she had ongoing mental illness. My mom noticed the symptoms and problems, so my mom told me about it. I  Due to her mental illness, she might behave improperly, think and even believe non-existing things. Please kindly forgive her behaviors.

I humbly ask you to reduce the sentence and consider alternative punishment to Susan. She is a remarkable woman, mom, sister, daughter, sister-in-law, friend and teaching instructor who made some terrible mistakes. She has shown great remorse. Please show your leniency to Susan to reduce her sentence.

If you have any question, please feel free to contact me.

Sincerely,

Sophie Su

Case4:11-cr-00288-JST   Document205   Filed11/03/14   Page1 of 3

JOHN J. JORDAN, ESQ. (State Bar No. 175678)
400 Montgomery Street, Suite 200
San Francisco, CA 94104
Tel:  (415) 391-4814
Fax: (415) 391-4308

Counsel for Defendant
SUSAN XIAO-PING SU

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 11-0288 JST |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **Amended** |
| | ) | **NOTICE OF APPEAL** |
| | ) | |
| SUSAN XIAO-PING SU, | ) | |
| | ) | |
| Defendant. | ) | |

PLEASE TAKE NOTICE that SUSAN XIAO-PING SU,  the defendant in the above-named case, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final judgment, sentence, and preliminary order of forfeiture entered in this action.

November 3, 2014.                         Respectfully submitted,

                                          JOHN J. JORDAN
                                          Attorney for Defendant
                                          SUSAN XIAO-PING SU

NOTICE OF APPEAL                          1

0397

## CERTIFICATE OF SERVICE

I, the undersigned, declare that I am over 18 years of age and not a party to the within cause; my business address is 400 Montgomery St, 2nd floor, San Francisco, CA 94104.

On November 3, 2014 I served a true copy of the attached:

Defendant's Amended NOTICE OF APPEAL

on the following parties, by U.S. mail:

**HARTLEY M.K. WEST**
**WADE M RHYNE**
Asst. U.S. Attorney
450 Golden Gate Ave. 11th Floor
P.O. Box 36055
San Francisco, CA 94102


Dated: November 3, 2014

JOHN J. JORDAN

1

AO 245B (Rev. AO 09/11-CAN 9/14) Judgment in Criminal Case
 Sheet 1

# UNITED STATES DISTRICT COURT
## Northern District of California

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| Susan Xiao-Ping Su | ) USDC Case Number: CR-11-00288-001 JST |
| | ) BOP Case Number: DCAN411CR00288-001 |
| | ) USM Number: 15773-111 |
| | ) Defendant's Attorney: John J. Jordan (Retained) |

**THE DEFENDANT:**

☐  pleaded guilty to count(s):

☐  pleaded nolo contendere to count(s):_ which was accepted by the court.

☑  was found guilty on count(s): 1-12, 13-14, 15, 16-19, 20, 21, 22, 24, 25, 26, 27, 29, 31, 32, 34, 35 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1343 and 18 U.S.C. § 2 | Wire Fraud | 01/19/2011 | 1-12 |
| 18 U.S.C. § 1341 and 18 U.S.C. § 2 | Mail Fraud | 01/19/2011 | 13-14 |
| 18 U.S.C. § 371 | Conspiracy to Commit Visa Fraud | 01/19/2011 | 15 |
| 18 U.S.C. § 1546(a) and 18 U.S.C. § 2 | Visa Fraud | 01/19/2011 | 16-19 |
| 18 U.S.C. § 1001(a)(3) and 18 U.S.C. § 2 | Use of a False Document | 09/24/2010 | 20 |
| 18 U.S.C. § 1001(a)(2) and 18 U.S.C. § 2 | False Statements to a Government Agency | 01/07/2011 | 21 |
| 8 U.S.C. § 1324(a)(1)(A)(iii), 8 U.S.C. § 1324(a)(1)(A)(v)(II) and 8 U.S.C. § 1324(a)(1)(B)(I) | Alien Harboring | 01/19/2011 | 22,24 |
| 18 U.S.C. § 1030(a)(3) and 18 U.S.C. § 2 | Unauthorized Use of a Government Computer | 01/19/2011 | 25 |
| U.S.C. § 1957(a) and 18 U.S.C. § 2 | Money Laundering | 12/2010 | 26,27, 29, 31, 32, 34, 35 |

The defendant is sentenced as provided in pages 2 through  8  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐  The defendant has been found not guilty on count(s):

☑  Count(s) 23, 28, 30 and 33 are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Susan Xiao-Ping Su

Judgment - Page 2 of 8

CASE NUMBER: CR-11-00288-001 JST

10/31/2014
Date of Imposition of Judgment

Signature of Judge

The Honorable Jon S. Tigar
United States District Judge

Name & Title of Judge

November 6, 2014

Date

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Susan Xiao-Ping Su                                      Judgment - Page 3 of 8
CASE NUMBER: CR-11-00288-001 JST

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
   198 months; this term consists of 198 months on Counts 1-14; 60 months on Counts 15, 20, 21; 120 months on Counts 16-19,
   22, 24, 26, 27, 29, 31, 32, 34 and 35; and 12 months on Count 25, all counts to be served concurrently.

☑  The Court makes the following recommendations to the Bureau of Prisons: The defendant shall be housed as close to the San
   Francisco Bay Area as possible, at a facility that can provide mental health treatment, as it is consistent with her classification.
   The defendant shall participate in the Bureau of Prisons Residential Drug Treatment Program.

☑  The defendant is remanded to the custody of the United States Marshal. The appearance bond is hereby exonerated.

☐  The defendant shall surrender to the United States Marshal for this district:

   ☐  at  on  (no later than 2:00 pm).

   ☐  as notified by the United States Marshal.

   The appearance bond shall be deemed exonerated upon the surrender of the defendant.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐  at  on  (no later than 2:00 pm).

   ☐  as notified by the United States Marshal.

   ☐  as notified by the Probation or Pretrial Services Office.

   The appearance bond shall be deemed exonerated upon the surrender of the defendant.

## RETURN

I have executed this judgment as follows:


Defendant delivered on _____ to _____ at
_____ , with a certified copy of this judgment.


                                          _____
                                                UNITED STATES MARSHAL

                              By  _____
                                          DEPUTY UNITED STATES MARSHAL

0401

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Susan Xiao-Ping Su                                     Judgment - Page 4 of 8
CASE NUMBER: CR-11-00288-001 JST

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: <u>three years.</u> This term consists of terms of three years on each of Counts 1-22, 24, 26, 27, 29, 31, 32, 34, 35, and one year on Count 25, all such terms to run concurrently.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☑ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. *(Check, if applicable.)*

☑ The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. *(Check, if applicable.)*

☑ The defendant shall cooperate in the collection of DNA as directed by the probation officer. *(Check, if applicable.)*

☐ The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense. *(Check, if applicable.)*

☐ The defendant shall participate in an approved program for domestic violence. *(Check, if applicable.)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) The defendant shall not leave the judicial district without the permission of the court or probation officer;
2) The defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) The defendant shall support his or her dependents and meet other family responsibilities;
5) The defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) The defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) The defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and
13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

0402

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Susan Xiao-Ping Su                                      Judgment - Page 5 of 8
CASE NUMBER: CR-11-00288-001 JST

## SPECIAL CONDITIONS OF SUPERVISION

1.  The defendant shall participate in a mental health treatment program, as directed by the probation officer. The defendant is to pay part or all cost of this treatment, at an amount not to exceed the cost of treatment, as deemed appropriate by the probation officer. Payments shall never exceed the total cost of mental health counseling. The actual co-payment schedule shall be determined by the probation officer.

2.  The defendant shall abstain from the use of all alcoholic beverages.

3.  The defendant shall not maintain a position of fiduciary capacity without the prior permission of the probation officer.

4.  The defendant shall pay any restitution and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

5.  The defendant shall not open any new lines of credit and/or incur new debt without the prior permission of the probation officer.

6.  The defendant shall provide the probation officer with access to any financial information, including tax returns, and shall authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

7.  The defendant shall submit her person, residence, office, vehicle, or any property under her control to a search. Such a search shall be conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

8.  The defendant shall not possess any false identification and shall provide his or her true identity at all times.

9.  The defendant shall cooperate in the collection of DNA as directed by the probation officer.

10. The defendant shall not own or possess any firearms, ammunition, destructive devices, or other dangerous weapons.

0403

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Susan Xiao-Ping Su
CASE NUMBER: CR-11-00288-001 JST

Judgment - Page 6 of 8

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| TOTALS | $ 3,025 | Waived | $1,015,795.64 |

☐ The determination of restitution is deferred until . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss[*] | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| PayPal Inc.<br>Attn: Michael Rou<br>Global Regulatory Policy<br>2211 North First Street<br>San Jose CA 95131 | $595,111 | $595,111 | |
| Total Merchant Services, Inc.<br>Restitution Payment<br>c/o Jonathan E. Orell, Esq.<br>Berkoxitz, Trager & Trager, LLC<br>8 Wright Street<br>Westport, CT 06880 | $420,684.64 | $420,684.64 | |
| | | | |
| | | | |
| | | | |
| TOTALS | $1,015,795.64 | $1,015,795.64 | |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the .

    ☐ the interest requirement is waived for the is modified as follows:

[*] Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT: Susan Xiao-Ping Su                                                    Judgment - Page 7 of 8
CASE NUMBER: CR-11-00288-001 JST

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows[*]:

**A** ☑ Lump sum payment of ___$1,018,820.64___ due immediately, balance due

    ☐ not later than , or
    ☑ in accordance with ☐ C, ☑ D, or ☐ E, and/or ☑ F below); or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal  (e.g., weekly, monthly, quarterly) installments of _ over a period of (e.g., months or years), to commence (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☑ Payment in equal <u>monthly</u> installments of <u>at least</u> <u>$200</u> over a period of <u>three years</u>, to commence <u>60 days</u> after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within  (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
    **When incarcerated, payment of criminal monetary penalties are due during imprisonment at the rate of not less than $25 per quarter and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program. Criminal monetary payments shall be made to the Clerk of U.S. District Court, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
|  |  |  |  |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States: $5,601,844.72 in property derived from total tuition proceeds traceable to Defendant's crimes, including: (a) 2009 Mercedes Benz; (b) 1087 Murrieta Blvd., #113, Livermore, CA; (c) 405 Boulder Court, Suites 700 and 800, Pleasanton, CA; (d) 2890 Victoria Ridge Court, Pleasanton, CA; (e) 1371 Germano Way, Pleasanton, CA; (f) any remaining funds in bank accounts identified in the government's application for forfeiture, ECF No.129 at 6-7, which the government calls "Bank Proceeds"; (g) any interest or appreciation accrued on the aforementioned property; and (h) a monetary judgment in the amount of the difference between $5,601,844.72 and the total value of the aforementioned property subject to forfeiture, if the total value of the aforementioned property is less than $5,601,844.72.

---

[*] Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

AO 245B (Rev. AO 09/11-CAN 03/14) Judgment in Criminal Case

DEFENDANT:  Susan Xiao-Ping Su                                                    Judgment - Page 8 of 8
CASE NUMBER:  CR-11-00288-001 JST

☐   The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or
     part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the
     defendant's responsibility for the full amount of the restitution ordered.**

**0406**

APPEAL,CLOSED,E-Filing

# U.S. District Court
## California Northern District (Oakland)
## CRIMINAL DOCKET FOR CASE #: 4:11-cr-00288-JST All Defendants

Case title: USA v. Su

Date Filed: 04/28/2011
Date Terminated: 10/31/2014

Assigned to: Hon. Jon S. Tigar

Appeals court case number:
14-10499 Ninth Circuit Court of
Appeals

### Defendant (1)

**Susan Xiao-Ping Su**
*TERMINATED: 10/31/2014*
*also known as*
Susan Su
*TERMINATED: 10/31/2014*

represented by **John J. Jordan**
Law Office of John J. Jordan
400 Montgomery Street, Suite 200
San Francisco, CA 94104
(415) 391-4814
Email: jjordanesq@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Camellia Baray**
Law Offices of Camellia Baray
4096 Piedmont Ave.
Suite 111
Oakland, CA 94611
510-595-6678
Email: cb@baraylaw.com
*TERMINATED: 12/12/2011*
*Designation: Retained*

**David Harris Billingsley**
2241 24th Street
Sacramento, CA 95818
510-409-2332
Email: dhbilling@yahoo.com
*TERMINATED: 12/12/2011*
*Designation: Retained*

**Erik G. Babcock**
Law Offices of Erik Babcock
717 Washington St., 2d Floor
Oakland, CA 94607
510-452-8400
Fax: 510-452-8405
Email: erik@babcocklawoffice.com
*TERMINATED: 05/09/2014*
*Designation: CJA Appointment*

### Pending Counts

18:1343, 18:2: Wire fraud, Aiding
and abetting
(1s-12s)

18:1341, 18:2: Mail fraud, Aiding
and abetting

### Disposition

committed to custody of BOP for a term of 198
months on each count to run concurrent; 3 years
supervised release to run concurrent; $1200 special
assessment; $1,015,795.64 restitution

committed to custody of BOP on each count to run
concurrent to term imposed in Counts 1s-12s; 3

**0407**

| | |
|---|---|
| (13s–14s) | years supervised release to run concurrent to term imposed in Counts 1s–12s; $200 special assessment |
| 18:371: Conspiracy to commit visa fraud (15s) | committed to custody of BOP for a term of 60 months to run concurrent to term imposed in Counts 1s–14s; 3 years supervised release to run concurrent to term imposed in Counts 1s–14s; $100 special assessment |
| 18:1546(a), 18:2: Visa fraud, Aiding and abetting (16s–19s) | committed to custody of BOP for a term of 120 months on each count to run concurrent to term imposed in Counts 1s–15s; 3 years supervised release to run concurrent to term imposed in Counts 1s–15s; $400 special assessment |
| 18:1001(a)(3), 18:2: Use of false document, Aiding and abetting (20s) | committed to custody of BOP for a term of 60 months to run concurrent to term imposed in Counts 1s–19s; 3 years supervised release to run concurrent to term imposed in Counts 1s–19s; $100 special assessment |
| 18:1001(a)(2), 18:2: False statements to a government agency, Aiding and abetting (21s) | committed to custody of BOP for a term of 60 months to run concurrent to term imposed in Counts 1s–19s; 3 years supervised release to run concurrent to term imposed in Counts 1s–19s; $100 special assessment |
| 8:1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), (a)(1)(B)(i): Alien harboring (22s) | committed to custody of BOP for a term of 120 months to run concurrent to term imposed in Counts 1s–21s; 3 years supervised release to run concurrent to term imposed in Counts 1s–21s; $100 special assessment |
| 8:1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), (a)(1)(B)(i): Alien harboring (24s) | committed to custody of BOP for a term of 120 months to run concurrent to term imposed in Counts 1s–22s; 3 years supervised release to run concurrent to term imposed in Counts 1s–22s; $100 special assessment |
| 18:1030(a)(3), 18:2: Unauthorized access of a government computer, Aiding and abetting (25s) | committed to custody of BOP for a term of 12 months to run concurrent to term imposed in Counts 1s–22s, 24s; 1 year supervised release to run concurrent to term imposed in Counts 1s–22s, 24s; $25 special assessment |
| 18:1957(a), 18:2: Money laundering, Aiding and abetting (26s–27s) | committed to custody of BOP for a term of 120 months on each count to run concurrent to term imposed in Counts 1s–22s, 24s–25s; 3 years supervised release to run concurrent to term imposed in Counts 1s–22s, 24s–25s; $200 special assessment |
| 18:1957(a), 18:2: Money laundering, Aiding and abetting (29s) | committed to custody of BOP for a term of 120 months to run concurrent to term imposed in Counts 1s–22s, 24s–27s; 3 years supervised release to run concurrent to term imposed in Counts 1s–22s, 24s–27s; $100 special assessment |
| 18:1957(a), 18:2: Money laundering, Aiding and abetting (31s–32s) | committed to custody of BOP for a term of 120 months on each count to run concurrent to term imposed in Counts 1s–22s, 24s–27s, 29s; 3 years supervised release to run concurrent to term imposed in Counts 1s–22s, 24s–27s, 29s; $200 special assessment |
| 18:1957(a), 18:2: Money laundering, Aiding and abetting (34s–35s) | committed to custody of BOP for a term of 120 months on each count to run concurrent to term imposed in Counts 1s–22s, 24s–27s, 29s, 31s–32s; 3 years supervised release to run concurrent to term imposed in Counts 1s–22s, 24s–27s, 29s, 31s–32s; |

0408

$200 special assessment

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:1343 & 2 − Wire Fraud; Aiding and Abetting (1−10) | dismissed, superseding indictment filed |
| 18:1341 & 2 − Mail Fraud; Aiding and Abetting (11−12) | dismissed, superseding indictment filed |
| 18:371 − Conspiracy to Commit Visa Fraud (13) | dismissed, superseding indictment filed |
| 18:1546(a) & 2 − Visa Fraud; Aiding and Abetting (14−17) | dismissed, superseding indictment filed |
| 18:1001(a)(3) & 2 − Use of False Document; Aiding and Abetting (18) | dismissed, superseding indictment filed |
| 18:1001(a)(2) & 2 − False Statements to a Government Agency; Aiding and Abetting (19) | dismissed, superseding indictment filed |
| 8:1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), 1324 (a)(1)(B)(i) − Alien Harboring (20−22) | dismissed, superseding indictment filed |
| 18:1030(a)(3) & 2 − Unauthorized Access of a Government Computer, Aiding and Abetting (23) | dismissed, superseding indictment filed |
| 8:1324(a)(1)(A)(iii), (a)(1)(A)(v)(II), (a)(1)(B)(i): Alien harboring (23s) | dismissed on government's motion |
| 18:1957(a) & 2 − Money Laundering; Aiding and Abetting (24−33) | dismissed, superseding indictment filed |
| 18:1957(a), 18:2: Money laundering, Aiding and abetting (28s) | dismissed on government's motion |
| 18:1957(a), 18:2: Money laundering, Aiding and abetting (30s) | dismissed on government's motion |
| 18:1957(a), 18:2: Money laundering, Aiding and abetting (33s) | dismissed on government's motion |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|

None

**Plaintiff**

USA                                             represented by  **Wade Maxwell Rhyne**
                                                                Department of Justice
                                                                United States Attorney's Office
                                                                1301 Clay Street
                                                                Suite 340S
                                                                Oakland, CA 94612
                                                                510−637−3693
                                                                Fax: 510−637−3724
                                                                Email: wade.rhyne@usdoj.gov
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **David Countryman**
                                                                US Attorney's Office
                                                                Criminal Division, Asset Forfeiture
                                                                450 Golden Gate Ave.
                                                                11th Floor
                                                                San Francisco, CA 94102
                                                                415−436−7303
                                                                Fax: 415−436−6748
                                                                Email: david.countryman@usdoj.gov
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Hartley M.K. West**
                                                                U.S. Attorney's Office
                                                                450 Golden Gate Avenue
                                                                11th Floor
                                                                San Francisco, CA 94102
                                                                (415)436−7200
                                                                Email: hartley.west@usdoj.gov
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Patricia Jean Kenney**
                                                                U.S. Attorney's Office
                                                                450 Golden Gate Ave.
                                                                10th Floor
                                                                San Francisco, CA 94102
                                                                415−436−6857
                                                                Fax: 415.436.6847
                                                                Email: patricia.kenney@usdoj.gov
                                                                *TERMINATED: 02/06/2014*
                                                                *Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/28/2011 | 1 | INDICTMENT as to Susan Xiao−Ping Su (1) count(s) 1−10, 11−12, 13, 14−17, 18, 19, 20−22, 23, 24−33. (cpS, COURT STAFF) (Filed on 4/28/2011) (kc, COURT STAFF). (Entered: 04/29/2011) |
| 04/28/2011 | 2 | Order to Seal Case as to Susan Xiao−Ping Su.. Signed by Judge Magistrate Judge Donna M. Ryu on 4/28/2011. (cpS, COURT STAFF) (Filed on 4/28/2011) (kc, COURT STAFF). (Entered: 04/29/2011) |
| 05/02/2011 | 3 | Minute Entry for proceedings held before Magistrate Judge Donna M. Ryu: Initial Appearance as to Susan Xiao−Ping Su held on 5/2/2011. GRANTING government's motion to UNSEAL indictment. Arraignment as to Susan Xiao−Ping Su (1) on Counts 1−33 held on 5/2/2011. NOT GUILTY plea entered. Detention Hearing as to Susan Xiao−Ping Su held on 5/2/2011. Defendant released on $300,000 P/R bond. Attorney Appointment Hearing held on 5/2/2011. Added attorney Camellia Baray and David Harris Billingsley for Susan Xiao−Ping Su. Bond Hearing set for 5/12/2011 at 09:30 |

| | | |
|---|---|---|
| | | AM before Magistrate Judge Donna M. Ryu. (Recording #FTR 5/2/11 10:49–11:06, 2:37–2:48 (Sealed), 2:48–2:56, 3:03–3:21, 5:28–6:00.) (kc, COURT STAFF) (Filed on 5/4/2011) (Entered: 05/04/2011) |
| 05/02/2011 | | CASE DESIGNATED for Electronic Filing. (kc, COURT STAFF) (Filed on 5/2/2011) (Entered: 05/04/2011) |
| 05/02/2011 | 4 | P/R bond issued as to Susan Xiao−Ping Su in the amount of $300,000. Signed by Magistrate Judge Donna M. Ryu on 5/2/11. (kc, COURT STAFF) (Filed on 5/2/2011) (Entered: 05/04/2011) |
| 05/02/2011 | 5 | Stipulated ORDER Excluding Time Under the Speedy Trial Act as to Susan Xiao−Ping Su. Signed by Magistrate Judge Donna M. Ryu on 5/2/11. (kc, COURT STAFF) (Filed on 5/2/2011) (Entered: 05/04/2011) |
| 05/04/2011 | 6 | NO BAIL Warrant Returned Executed on 5/2/11 as to Susan Xiao−Ping Su. (kc, COURT STAFF) (Filed on 5/4/2011) (Entered: 05/05/2011) |
| 05/12/2011 | 7 | STIPULATION *AND [PROPOSED] PROTECTIVE ORDER REGARDING PRODUCTION OF CONFIDENTIAL DISCOVERY* by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 5/12/2011) (Entered: 05/12/2011) |
| 05/12/2011 | 8 | Minute Entry for proceedings held before Magistrate Judge Donna M. Ryu: Status Hearing as to Susan Xiao−Ping Su held on 5/12/2011. Bond Hearing as to Susan Xiao−Ping Su held on 5/12/2011. Further Bond Hearing set for 6/13/2011 at 09:30 AM before Magistrate Judge Donna M. Ryu. Status or Trial Setting Hearing set for 7/12/2011 at 10:00 AM before Hon. Saundra Brown Armstrong. (Recording #FTR 5/12/11 9:40–9:57.) (kc, COURT STAFF) (Filed on 5/12/2011) (Entered: 05/13/2011) |
| 05/12/2011 | 9 | Stipulated ORDER Excluding Time Under the Speedy Trial Act as to Susan Xiao−Ping Su. Signed by Magistrate Judge Donna M. Ryu on 5/12/11. (kc, COURT STAFF) (Filed on 5/12/2011) (Entered: 05/13/2011) |
| 05/16/2011 | 10 | STIPULATION AND PROTECTIVE ORDER as to Susan Xiao−Ping Su. Signed by Judge Hon. Saundra Brown Armstrong on 5/13/11. (lrc, COURT STAFF) (Filed on 5/16/2011) (Entered: 05/16/2011) |
| 05/27/2011 | 11 | MOTION REQUEST FOR AUTHORIZATION TO DISCLOSE CERTAIN GRAND JURY MATERIAL PURSUANT TO FED. R. CRIM. P. 6(e)(3)(E) AND [PROPOSED] ORDER by USA as to Susan Xiao−Ping Su. (Rhyne, Wade) (Filed on 5/27/2011) (Entered: 05/27/2011) |
| 05/31/2011 | 12 | ORDER granting 11 MOTION FOR AUTHORIZATION TO DISCLOSE CERTAIN GRAND JURY MATERIAL as to Susan Xiao−Ping Su (1). Signed by Judge Saundra Brown Armstrong on 5/31/11. (lrc, COURT STAFF) Modified on 6/1/2011 (kc, COURT STAFF). (Entered: 05/31/2011) |
| 06/13/2011 | 13 | Minute Entry for proceedings held before Magistrate Judge Donna M. Ryu: Bond Hearing as to Susan Xiao−Ping Su held on 6/13/2011. Status or Trial Setting Hearing set for 7/12/2011 at 10:00 AM before Judge Saundra Brown Armstrong. (Recording #FTR 6/13/11 10:04–10:10.) (kc, COURT STAFF) (Filed on 6/13/2011) (Entered: 06/14/2011) |
| 07/12/2011 | 14 | Minute Entry for proceedings held before Hon. Saundra Brown Armstrong: Status Conference as to Susan Xiao−Ping Su held on 7/12/2011 Status Conference set for 7/26/2011 10:00 AM before Hon. Saundra Brown Armstrong. (Court Reporter RAYNEE MERCADO.) (lrc, COURT STAFF) (Filed on 7/12/2011) Modified on 7/14/2011 (kc, COURT STAFF). (Entered: 07/13/2011) |
| 07/26/2011 | 15 | Minute Entry for proceedings held before Judge Hon. Saundra Brown Armstrong:Status Conference as to Susan Xiao−Ping Su held on 7/26/2011 Status Conference set for 9/27/2011 10:00 AM before Hon. Saundra Brown Armstrong. (Court Reporter LEO MANKIEWICZ.) (lrc, COURT STAFF) (Filed on 7/26/2011) (Entered: 07/26/2011) |
| 09/14/2011 | 16 | CLERKS NOTICE Continuance of Hearing Status Conference set for 9/30/2011 10:00 AM in Courtroom 1, 4th Floor, Oakland before Hon. Saundra Brown Armstrong. (lrc, COURT STAFF) (Filed on 9/14/2011) (Entered: 09/14/2011) |

| 09/30/2011 | 17 | Minute Entry for proceedings held before Judge Hon. Saundra Brown Armstrong:Status Conference as to Susan Xiao−Ping Su held on 9/30/2011 Motion due by 10/21/11. Responses due by 11/10/2011. Replies due by 11/18/2011. Motion Hearing set for 12/12/2011 11:00 AM before Hon. Saundra Brown Armstrong. (Court Reporter DIANE SKILLMAN.) (lrc, COURT STAFF) (Filed on 9/30/2011) (Entered: 09/30/2011) |
|---|---|---|
| 10/18/2011 | 18 | MOTION to Dismiss *Indictment for Failure to State an Offense* by Susan Xiao−Ping Su. Motion Hearing set for 12/12/2011 11:00 AM before Hon. Saundra Brown Armstrong. (Billingsley, David) (Filed on 10/18/2011) (Entered: 10/18/2011) |
| 10/18/2011 | 19 | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF 18 MOTION TO DISMISS COUNTS 1−12 OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE by Susan Xiao−Ping Su (Billingsley, David) (Filed on 10/18/2011) Modified on 10/19/2011 (kc, COURT STAFF). (Entered: 10/18/2011) |
| 11/10/2011 | 20 | RESPONSE to Motion by USA as to Susan Xiao−Ping Su re 18 MOTION to Dismiss Indictment. (Rhyne, Wade) (Filed on 11/10/2011) Modified on 11/14/2011 (kc, COURT STAFF). (Entered: 11/10/2011) |
| 11/10/2011 | 21 | SUPERSEDING INDICTMENT as to Susan Xiao−Ping Su (1) count(s) 1s−12s, 13s−14s, 15s, 16s−19s, 20s, 21s, 22s−24s, 25s, 26s−35s. (kc, ) (Filed on 11/10/2011) (kc, COURT STAFF). (Entered: 11/14/2011) |
| 11/15/2011 | 22 | Letter from AUSA WADE RHYNE *REQUESTING MATTER BE SET FOR NOVEMBER 18, 2011 AT 9:30 A.M.* as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 11/15/2011) (Entered: 11/15/2011) |
| 11/18/2011 | 23 | Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Arraignment as to Susan Xiao−Ping Su (1) on Counts 1s−12s, 13s−14s, 15s, 16s−19s, 20s, 21s, 22s−24s, 25s, 26s−35s of the superseding indictment held on 11/18/2011. NOT GUILTY plea entered. Status or Trial Setting Hearing set for 12/12/2011 at 10:00 AM before Hon. Saundra Brown Armstrong. (Recording #FTR 11/18/11 9:43−9:48.) (kc, COURT STAFF) (Filed on 11/18/2011) (Entered: 11/21/2011) |
| 11/18/2011 | 24 | Stipulated ORDER Excluding Time Under the Speedy Trial Act as to Susan Xiao−Ping Su. Signed by Magistrate Judge Laurel Beeler on 11/18/11. (kc, COURT STAFF) (Filed on 11/18/2011) (Entered: 11/21/2011) |
| 11/21/2011 | 25 | MOTION to Withdraw as Attorney *of Record* by David Billingsley as to Susan Xiao−Ping Su. Motion Hearing set for 12/12/2011 10:00 AM before Hon. Saundra Brown Armstrong. (Billingsley, David) (Filed on 11/21/2011) Modified on 11/22/2011 (kc, COURT STAFF). (Entered: 11/21/2011) |
| 11/22/2011 | 27 | Sealed Document as to Susan Xiao−Ping Su (kc, COURT STAFF) (Filed on 11/22/2011) (Entered: 12/01/2011) |
| 11/28/2011 | 26 | NO BAIL Warrant Returned Executed on 5/2/11 as to Susan Xiao−Ping Su. (kc, COURT STAFF) (Filed on 11/28/2011) (Entered: 11/29/2011) |
| 11/30/2011 | 28 | Sealed Document as to Susan Xiao−Ping Su (kc, COURT STAFF) (Filed on 11/30/2011) (Entered: 12/01/2011) |
| 12/06/2011 | 29 | ORDER REFERRING MOTION as to Susan Xiao−Ping Su 25 MOTION to Withdraw as Attorney *of Record* by David Billingsley filed by Susan Xiao−Ping Su. Signed by Judge Hon. Saundra Brown Armstrong on 12/6/11. (lrc, COURT STAFF) (Filed on 12/6/2011) (Entered: 12/06/2011) |
| 12/06/2011 | | MOTION as to Susan Xiao−Ping Su REFERRED to Magistrate Judge Laurel Beeler re 25 MOTION to Withdraw as Attorney *of Record* by David Billingsley (kc, COURT STAFF) (Filed on 12/6/2011) (Entered: 12/07/2011) |
| 12/08/2011 | 30 | ORDER denying 18 Motion to Dismiss as to Susan Xiao−Ping Su (1). Signed by Judge Hon. Saundra Brown Armstrong on 12/8/11. (lrc, COURT STAFF) (Entered: 12/08/2011) |
| 12/09/2011 | 31 | Letter from AUSA WADE M. RHYNE *REQUESTING MATTER BE SET FOR DECEMBER 12, 2011 AT 9:30 A.M.* as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 12/9/2011) (Entered: 12/09/2011) |

| 12/12/2011 | 32 | Minute Entry for proceedings held before Magistrate Judge Laurel Beeler: Motion Hearing as to Susan Xiao−Ping Su held on 12/12/2011 re 25 MOTION to Withdraw as Attorney. Motion GRANTED. Attorney Appointment Hearing held on 12/12/2011. CJA 23 submitted. Added attorney Erik G. Babcock for Susan Xiao−Ping Su. Attorney David Harris Billingsley terminated in case as to Susan Xiao−Ping Su. Status Hearing set for 1/24/2012 at 10:00 AM before Hon. Saundra Brown Armstrong. (Recording #FTR 12/12/11 9:44−9:56, 9:56−9:59.) (kc, COURT STAFF) (Filed on 12/12/2011) (Entered: 12/13/2011) |
| 12/12/2011 | 33 | Stipulated ORDER Excluding Time Under the Speedy Trial Act as to Susan Xiao−Ping Su. Signed by Magistrate Judge Laurel Beeler on 12/12/11. (kc, COURT STAFF) (Filed on 12/12/2011) (Entered: 12/13/2011) |
| 12/12/2011 | 34 | CJA 23 Financial Affidavit by Susan Xiao−Ping Su (kc, COURT STAFF) (Filed on 12/12/2011) (Entered: 12/13/2011) |
| 12/28/2011 | 35 | ORDER: The Court has reviewed the information supplied by Pretrial Services as to Susan Xiao−Ping Su and this matter requires no action from the Court at this time. Signed by Magistrate Judge Donna M. Ryu on 12/28/11. (igS, COURT STAFF) (Filed on 12/28/2011) (Entered: 12/28/2011) |
| 12/29/2011 | 36 | STIPULATION *and Proposed Protective Order Regarding Production of Confidential Discovery* by USA as to Susan Xiao−Ping Su (West, Hartley) (Filed on 12/29/2011) (Entered: 12/29/2011) |
| 01/03/2012 | 37 | STIPULATION AND PROTECTIVE ORDER as to Susan Xiao−Ping Su. Signed by Judge Hon. Saundra Brown Armstrong on 1/3/12. (lrc, COURT STAFF) (Filed on 1/3/2012) (Entered: 01/03/2012) |
| 01/05/2012 | 38 | CJA 20: Appointing Attorney Erik G. Babcock for Susan Xiao−Ping Su. Signed by Magistrate Judge Laurel Beeler on 12/22/11. (kc, COURT STAFF) (Filed on 1/5/2012) (Entered: 01/06/2012) |
| 01/06/2012 | 39 | *** FILED IN ERROR. REFER TO DOCUMENT 40 . *** STIPULATION *TO MODIFY CONDITIONS OF PRETRIAL RELEASE; [PROPOSED] ORDER* by USA as to Susan Xiao−Ping Su (Attachments: # 1 Exhibit A)(West, Hartley) (Filed on 1/6/2012) Modified on 1/6/2012 (feriab, COURT STAFF). (Entered: 01/06/2012) |
| 01/06/2012 | 40 | STIPULATION *TO MODIFY CONDITIONS OF PRETRIAL RELEASE; [PROPOSED] ORDER* by USA as to Susan Xiao−Ping Su (Attachments: # 1 Exhibit A)(West, Hartley) (Filed on 1/6/2012) (Entered: 01/06/2012) |
| 01/10/2012 | 41 | STIPULATION AND ORDER modifying Susan Xiao−Ping Su's pretrial release conditions to require her compliance with the Protective Order filed on 1/3/2012 (see attached). 40 Stipulation filed by USA. Signed by Magistrate Judge Donna M. Ryu on 1/10/12. (Attachments: # 1 Protective Order filed 1/3/2012) (ig, COURT STAFF) (Filed on 1/10/2012) (Entered: 01/10/2012) |
| 01/20/2012 | 42 | STIPULATED REQUEST TO CONTINUE HEARING DATE TO MARCH 13, 2012 AND TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT AND [PROPOSED] ORDER by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 1/20/2012) Modified on 1/23/2012 (kc, COURT STAFF). (Entered: 01/20/2012) |
| 01/24/2012 | 43 | ORDER TO CONTINUE − Ends of Justice as to Susan Xiao−Ping Su Time excluded from 1/24/12 until 3/13/12., Terminate Deadlines and Hearings as to Susan Xiao−Ping Su: 42 Stipulation filed by USA. Status Conference set for 3/13/2012 10:00 AM before Hon. Saundra Brown Armstrong.. Signed by Judge Hon. Saundra Brown Armstrong on 1/23/12. (lrc, COURT STAFF) (Filed on 1/24/2012) (Entered: 01/24/2012) |
| 02/23/2012 | | CLERKS NOTICE Continuance of Hearing as to Susan Xiao−Ping Su Status Conference set for 3/15/2012 10:00 AM before Hon. Saundra Brown Armstrong. THIS IS A TEXT ONLY ENTRY, THERE IS NO DOCUMENT ASSOCIATE WITH THIS ENTRY.(lrc, COURT STAFF) (Filed on 2/23/2012) (Entered: 02/23/2012) |
| 03/08/2012 | 44 | STIPULATED REQUEST AND PROPOSED ORDER TO CONTINUE HEARING DATE TO APRIL 16, 2012 AND TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 3/8/2012) |

0413

| | | Modified on 3/9/2012 (kc, COURT STAFF). (Entered: 03/08/2012) |
|---|---|---|
| 03/13/2012 | 45 | ORDER TO CONTINUE – Ends of Justice as to Susan Xiao−Ping Su Time excluded from 3/13/12 until 4/16/12., Terminate Deadlines and Hearings as to Susan Xiao−Ping Su: 44 Stipulation filed by USA. Status Conference set for 4/16/2012 10:00 AM before Hon. Saundra Brown Armstrong.. Signed by Judge Hon. Saundra Brown Armstrong on 3/9/12. (lrc, COURT STAFF) (Filed on 3/13/2012) (Entered: 03/13/2012) |
| 04/16/2012 | 46 | Minute Entry for proceedings held before Judge Hon. Saundra Brown Armstrong:Status Conference as to Susan Xiao−Ping Su held on 4/16/2012 (Court Reporter JAMIE HOPP.) (lrc, COURT STAFF) (Filed on 4/16/2012) (Entered: 04/16/2012) |
| 04/16/2012 | 47 | ORDER as to Susan Xiao−Ping Su Jury Selection set for 10/22/2012 08:30 AM before Hon. Saundra Brown Armstrong. Jury Trial set for 10/22/2012 08:30 AM before Hon. Saundra Brown Armstrong. Pretrial Conference set for 10/16/2012 11:00 AM before Hon. Saundra Brown Armstrong.. Signed by Judge Hon. Saundra Brown Armstrong on 4/16/12. (lrc, COURT STAFF) (Filed on 4/16/2012) (Entered: 04/16/2012) |
| 04/18/2012 | 48 | STIPULATION and Proposed Order Removing Curfew Condition by Susan Xiao−Ping Su (Babcock, Erik) (Filed on 4/18/2012) (Entered: 04/18/2012) |
| 04/23/2012 | 49 | STIPULATION AND ORDER Modifying Release Conditions of defendant Susan Xiao−Ping Su by deleting the curfew condition. All other terms and conditions of release to remain the same. 48 Stipulation filed by Susan Xiao−Ping Su. Signed by Magistrate Judge Donna M. Ryu on 4/23/12. (ig, COURT STAFF) (Filed on 4/23/2012) (Entered: 04/24/2012) |
| 04/30/2012 | 50 | CLERKS NOTICE as to Susan Xiao−Ping Su (lrc, COURT STAFF) (Filed on 4/30/2012) (Entered: 04/30/2012) |
| 07/30/2012 | 51 | STIPULATION And Proposed Order Continuing Trial Date by Susan Xiao−Ping Su (Babcock, Erik) (Filed on 7/30/2012) (Entered: 07/30/2012) |
| 08/02/2012 | 52 | ORDER TO CONTINUE – Ends of Justice as to Susan Xiao−Ping Su Time excluded from 8/1/12 until 4/15/13., Terminate Deadlines and Hearings as to Susan Xiao−Ping Su: 51 Stipulation filed by Susan Xiao−Ping Su. Jury Selection set for 4/15/2013 08:30 AM before Hon. Saundra Brown Armstrong. Jury Trial set for 4/15/2013 08:30 AM before Hon. Saundra Brown Armstrong. Pretrial Conference set for 4/2/2013 11:00 AM before Hon. Saundra Brown Armstrong.. Signed by Judge Hon. Saundra Brown Armstrong on 8/1/12. (lrc, COURT STAFF) (Filed on 8/2/2012) (Entered: 08/02/2012) |
| 11/29/2012 | 53 | STIPULATION And Proposed Order Modifying Protective Order by Susan Xiao−Ping Su, USA (Babcock, Erik) (Filed on 11/29/2012) Modified on 11/30/2012 (kcS, ). (Entered: 11/29/2012) |
| 12/03/2012 | 54 | STIPULATION AND ORDER as to Susan Xiao−Ping Su 53 Stipulation filed by Susan Xiao−Ping Su, USA. Signed by Judge Hon. Saundra Brown Armstrong on 11/30/12. (lrc, COURT STAFF) (Filed on 12/3/2012) (Entered: 12/03/2012) |
| 01/07/2013 | 55 | STIPULATION AND [PROPOSED] ORDER CONTINUING TRIAL DATE TO MAY 13, 2013; SPEEDY TRIAL EXCLUSION by USA as to Susan Xiao−Ping Su (West, Hartley) (Filed on 1/7/2013) (Entered: 01/07/2013) |
| 01/16/2013 | 56 | STIPULATION AND ORDER as to Susan Xiao−Ping Su, ORDER TO CONTINUE – Ends of Justice as to Susan Xiao−Ping Su Time excluded from 4/15/13 until 5/13/13., Terminate Deadlines and Hearings as to Susan Xiao−Ping Su: 55 Stipulation filed by USA. Jury Selection set for 5/13/2013 08:30 AM before Hon. Saundra Brown Armstrong. Jury Trial set for 5/13/2013 08:30 AM before Hon. Saundra Brown Armstrong.. Signed by Judge Hon. Saundra Brown Armstrong on 1/16/13. (lrc, COURT STAFF) (Filed on 1/16/2013) (Entered: 01/16/2013) |
| 02/20/2013 | 58 | ORDER: Bond/Bail Review Hearing set for 3/7/2013 09:30 AM as to Susan Xiao−Ping Su before Magistrate Judge Donna M. Ryu.. Signed by Magistrate Judge Donna M. Ryu on 2/20/13. (ig, COURT STAFF) (Filed on 2/20/2013) (Entered: 03/04/2013) |

| 02/25/2013 | 57 | First Forfeiture Bill of Particulars by USA as to Susan Xiao−Ping Su (Kenney, Patricia) (Filed on 2/25/2013) Modified on 2/26/2013 (kcS, ). (Entered: 02/25/2013) |
|---|---|---|
| 03/01/2013 | | CLERKS NOTICE Continuance of Hearing as to Susan Xiao−Ping Su Pretrial Conference set for 4/9/2013 11:00 AM before Hon. Saundra Brown Armstrong. THIS IS A TEXT ENTRY ONLY. THERE IS NO DOCUMENT ASSOCIATED WITH THIS ENTRY.(lrc, COURT STAFF) (Filed on 3/1/2013) (Entered: 03/01/2013) |
| 03/04/2013 | | CLERKS NOTICE: Notice is hereby given that there has been a change in the Courtroom Assignment for the Bond/Bail Review Hearing as to Susan Xiao−Ping Su scheduled on 3/7/2013 9:30 a.m. before Magistrate Judge Donna M. Ryu. Hearing will be held in Courtroom No. 3, 3rd Floor instead of Courtroom No. 2, 4th Floor.<br><br>**(This is a text only docket entry, there is no document associated with this notice.)**<br><br>(ig, COURT STAFF) (Filed on 3/4/2013) (Entered: 03/04/2013) |
| 03/05/2013 | 59 | STIPULATION *RE: PRETRIAL PREPARATION; [PROPOSED] ORDER* by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 3/5/2013) (Entered: 03/05/2013) |
| 03/06/2013 | | CLERKS NOTICE: Notice is hereby given that the Bail Review Hearing as to Susan Xiao−Ping Su previously scheduled on 3/7/2013 9:30 a.m. has been moved to 3/7/2013 9:00 a.m. before Magistrate Judge Donna M. Ryu. Hearing will be held in Courtroom No. 3, 3rd Floor.<br><br>**(This is a text only docket entry, there is no document associated with this notice.)**<br><br>(ig, COURT STAFF) (Entered: 03/06/2013) |
| 03/07/2013 | 60 | Minute Entry for proceedings held before Magistrate Judge Donna M. Ryu: Bond/Bail Review Hearing as to Susan Xiao−Ping Su held on 3/7/2013. Pretrial Release MODIFIED. Request to relocate GRANTED. Pretrial Conference set for 4/9/2103 at 11:00 AM before Hon. Saundra Brown Armstrong. (Recording #FTR 3/7/13 9:05−9:18.) (kc, COURT STAFF) (Filed on 3/7/2013) (Entered: 03/08/2013) |
| 03/13/2013 | 61 | ORDER as to Susan Xiao−Ping Su re 59 Stipulation filed by USA, Terminate Deadlines and Hearings as to Susan Xiao−Ping Su: 59 Stipulation filed by USA. Pretrial Conference set for 5/7/2013 11:00 AM before Hon. Saundra Brown Armstrong.. Signed by Judge Hon. Saundra Brown Armstrong on 3/12/13. (lrc, COURT STAFF) (Filed on 3/13/2013) (Entered: 03/13/2013) |
| 03/14/2013 | 62 | STIPULATION *AND [PROPOSED] ORDER CONTINUING TRIAL DATE TO MAY 13, 2013; SPEEDY TRIAL EXCLUSION* by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 3/14/2013) (Entered: 03/14/2013) |
| 03/18/2013 | 63 | STIPULATION *And Proposed Order Modifying Pretrial Filing Deadlines* by Susan Xiao−Ping Su (Babcock, Erik) (Filed on 3/18/2013) Modified on 3/19/2013 (kcS, ). (Entered: 03/18/2013) |
| 03/20/2013 | 64 | STIPULATION AND ORDER MODIFYING PRETRIAL FILING DEADLINES as to Susan Xiao−Ping Su. Signed by Judge Hon. Saundra Brown Armstrong on 3/19/13. (lrc, COURT STAFF) (Filed on 3/20/2013) (Entered: 03/20/2013) |
| 04/02/2013 | 65 | STIPULATED *REQUEST TO CONTINUE TRIAL DATE TO APRIL 15, 2013 AND TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT* by USA as to Susan Xiao−Ping Su (West, Hartley) (Filed on 4/2/2013) Modified on 4/3/2013 (kcS, COURT STAFF). (Entered: 04/02/2013) |
| 04/02/2013 | 66 | AMENDED STIPULATED *REQUEST TO CONTINUE TRIAL DATE TO SEPTEMBER 30, 2013 AND TO EXCLUDE TIME UNDER THE SPEEDY TRIAL ACT AND [PROPOSED] ORDER* by USA as to Susan Xiao−Ping Su (West, Hartley) (Filed on 4/2/2013) Modified on 4/3/2013 (kcS, COURT STAFF). (Entered: 04/02/2013) |
| 04/08/2013 | 67 | **ORDER as to Susan Xiao−Ping Su, Terminate Deadlines and Hearings as to Susan Xiao−Ping Su: 66 Stipulation, filed by USA. Jury Selection set for 9/30/2013 08:30 AM before Hon. Saundra Brown Armstrong. Jury Trial set for 9/30/2013 08:30 AM before Hon. Saundra Brown Armstrong. Pretrial Conference** |

| | | |
|---|---|---|
| | | set for 9/17/2013 11:00 AM before Hon. Saundra Brown Armstrong.. Signed by Judge Hon. Saundra Brown Armstrong on 4/2/13. (lrc, COURT STAFF) (Filed on 4/08/2013) (Entered: 04/08/2013) |
| 06/18/2013 | 68 | STIPULATION *and Proposed Travel Order* by Susan Xiao−Ping Su (Babcock, Erik) (Filed on 6/18/2013) (Entered: 06/18/2013) |
| 06/21/2013 | 69 | STIPULATED *Request and Proposed Order re Travel* by Susan Xiao−Ping Su (Babcock, Erik) (Filed on 6/21/2013) Modified on 6/24/2013 (kcS, COURT STAFF). (Entered: 06/21/2013) |
| 06/21/2013 | 70 | **STIPULATION AND ORDER modifying release conditions of Susan Xiao−Ping Su to allow her to travel to Alabama from 7/19/2013 to 7/29/2013 69 Stipulation filed by Susan Xiao−Ping Su. Signed by Magistrate Judge Donna M. Ryu on 6/21/13. (ig, COURT STAFF) (Filed on 6/21/2013) (Entered: 06/24/2013)** |
| 07/11/2013 | 71 | DESIGNATION OF EXPERT WITNESSES; SUMMARY OF TESTIMONY AND QUALIFICATIONS PURSUANT TO FED. R. CRIM. P. 16(a)(1)(G) by USA as to Susan Xiao−Ping Su. (Attachments: # 1 Attachments 1−4)(Rhyne, Wade) (Filed on 7/11/2013) Modified on 7/12/2013 (kcS, COURT STAFF). (Entered: 07/11/2013) |
| 07/17/2013 | 72 | CLERKS NOTICE Continuance of Hearing as to Susan Xiao−Ping Su Pretrial Conference continued to 9/17/2013 03:00 PM before Hon. Saundra Brown Armstrong. THIS IS A TEXT ENTRY ONLY. THERE IS NO DOCUMENT ASSOCIATED WITH THIS ENTRY.(lrc, COURT STAFF) (Filed on 7/17/2013) (Entered: 07/17/2013) |
| 07/30/2013 | 73 | CLERKS NOTICE Continuance of Hearing as to Susan Xiao−Ping Su Pretrial Conference set for 9/18/2013 03:00 PM before Hon. Saundra Brown Armstrong. THIS IS A TEXT ENTRY ONLY. THERE IS NO DOCUMENT ASSOCIATED WITH THIS ENTRY.(lrc, COURT STAFF) (Filed on 7/30/2013) (Entered: 07/30/2013) |
| 08/14/2013 | 74 | TRIAL MEMORANDUM by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 8/14/2013) (Entered: 08/14/2013) |
| 08/14/2013 | 75 | WITNESS LIST by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 8/14/2013) (Entered: 08/14/2013) |
| 08/14/2013 | 76 | Proposed Voir Dire by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 8/14/2013) (Entered: 08/14/2013) |
| 08/14/2013 | 77 | Proposed Form of Verdict by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 8/14/2013) (Entered: 08/14/2013) |
| 08/14/2013 | 78 | MOTION in Limine No. 1 by USA as to Susan Xiao−Ping Su. (Rhyne, Wade) (Filed on 8/14/2013) Modified on 9/12/2013 (kcS, COURT STAFF). (Entered: 08/14/2013) |
| 08/14/2013 | 79 | Jointly Proposed Jury Instructions by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 8/14/2013) Modified on 8/15/2013 (kcS, COURT STAFF). (Entered: 08/14/2013) |
| 08/14/2013 | 80 | TRIAL EXHIBIT LIST by USA as to Susan Xiao−Ping Su. (Rhyne, Wade) (Filed on 8/14/2013) Modified on 8/15/2013 (kcS, COURT STAFF). (Entered: 08/14/2013) |
| 09/10/2013 | 81 | First Amended EXHIBIT LIST by USA as to Susan Xiao−Ping Su. (Rhyne, Wade) (Filed on 9/10/2013) Modified on 9/11/2013 (kcS, COURT STAFF). (Entered: 09/10/2013) |
| 09/10/2013 | 82 | Supplemental Trial WITNESS LIST by USA as to Susan Xiao−Ping Su. (Rhyne, Wade) (Filed on 9/10/2013) Modified on 9/11/2013 (kcS, COURT STAFF). (Entered: 09/10/2013) |
| 09/11/2013 | 83 | REPLY by USA as to Susan Xiao−Ping Su in Support of 78 MOTION in Limine No. 1. (Rhyne, Wade) (Filed on 9/11/2013) Modified on 9/12/2013 (kcS, COURT STAFF). (Entered: 09/11/2013) |
| 09/13/2013 | 84 | **ORDER as to Susan Xiao−Ping Su VACATING PRETRIAL CONFERENCE AND TRIAL DATE AND SCHEDULING TRIAL SETTING. Trial Setting Hearing set for 9/27/2013 10:00 AM before Hon. Saundra Brown Armstrong.** |

| | | |
|---|---|---|
| | | Signed by Judge Hon. Saundra Brown Armstrong on 9/13/2013. (ndr, COURT STAFF) (Filed on 9/13/2013) (Entered: 09/13/2013) |
| 09/27/2013 | 85 | Minute Entry for proceedings held before Judge Hon. Saundra Brown Armstrong:Trial Setting Hearing as to Susan Xiao−Ping Su held on 9/27/2013. Pretrial Conference set for 2/11/2014 10:00 AM before Hon. Saundra Brown Armstrong. Jury Selection / Jury Trial (10 day) set for 2/24/2014 08:30 AM before Hon. Saundra Brown Armstrong. (Court Reporter Cheryl Wyatt.) (ndr, COURT STAFF) (Filed on 9/27/2013) (Entered: 09/30/2013) |
| 11/25/2013 | 86 | **ORDER as to Susan Xiao−Ping Su. Signed by Judge Hon. Saundra Brown Armstrong on 11/25/2013. (ndr, COURT STAFF) (Filed on 11/25/2013) (Entered: 11/25/2013)** |
| 11/26/2013 | 87 | **ORDER REASSIGNING CASE. Case reassigned to Judge Jon S. Tigar for all further proceedings. Judge Saundra Brown Armstrong no longer assigned to case as to Susan Xiao−Ping Su. Signed by Executive Committee on 11/26/13. (kc, COURT STAFF) (Filed on 11/26/2013) (Entered: 11/26/2013)** |
| 11/26/2013 | 88 | CLERK'S NOTICE SETTING STATUS CONFERENCE as to Susan Xiao−Ping Su. A Status Conference is set for 12/20/2013 at 2:00 PM in Courtroom 2, 4th Floor, **Oakland** before Hon. Jon S. Tigar. *This is a text only entry. There is no document associated with this notice.* (wsn, COURT STAFF) (Filed on 11/26/2013) (Entered: 11/26/2013) |
| 12/20/2013 | 89 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Status Conference as to Susan Xiao−Ping Su held on 12/20/2013. (Court Reporter: Raynee Mercado.) (wsn, COURT STAFF) (Filed on 12/20/2013) (Entered: 12/20/2013) |
| 12/20/2013 | | Set/Reset Deadlines/Hearings: Pretrial Conference set for 2/7/2014 at 9:30 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Further Pretrial Conference set for 3/3/2014 at 9:00 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Jury Selection set for 3/4/2014 − 3/5/2014 at 8:30 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Jury Trial set for 3/11/2014 − 4/3/2014 at 8:30 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 12/20/2013) (Entered: 12/20/2013) |
| 12/23/2013 | 90 | Proposed Order by USA as to Susan Xiao−Ping Su *EXCLUDING TIME FROM DECEMBER 20, 2013 TO MARCH 3, 2014* (Rhyne, Wade) (Filed on 12/23/2013) (Entered: 12/23/2013) |
| 12/24/2013 | 91 | **ORDER EXCLUDING TIME FROM DECEMBER 20, 2013 TO MARCH 3, 2014 as to Susan Xiao−Ping Su re 90 Proposed Order filed by USA. Signed by Judge Jon S. Tigar on December 24, 2013. (wsn, COURT STAFF) (Filed on 12/24/2013) (Entered: 12/24/2013)** |
| 01/27/2014 | 92 | **NOTICE of *EX PARTE* COMMUNICATION as to Susan Xiao−Ping Su. Signed by Judge Jon S. Tigar on January 24, 2014. (Attachments: # 1 Letter) (wsn, COURT STAFF) (Filed on 1/27/2014) (Entered: 01/27/2014)** |
| 02/06/2014 | 93 | NOTICE OF ATTORNEY APPEARANCE AND NOTICE OF SUBSTITUTION by David Countryman appearing for USA. (Countryman, David) (Filed on 2/6/2014) Modified on 2/7/2014 (kcS, COURT STAFF). (Entered: 02/06/2014) |
| 02/07/2014 | 94 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Pretrial Conference as to Susan Xiao−Ping Su held on 2/7/2014 (Court Reporter: Sarah Goekler.) (wsn, COURT STAFF) (Filed on 2/7/2014) (Entered: 02/07/2014) |
| 02/07/2014 | | Set/Reset Deadlines/Hearings: Jury Selection set for 3/3/2014 at 8:00 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Jury Trial set for 3/4/2014 at 8:00 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Jury Trial set for 3/5/2014 at 8:00 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 2/7/2014) (Entered: 02/07/2014) |
| 02/07/2014 | 95 | **ORDER GRANTING IN PARTY AND DENYING IN PART GOVERNMENT'S REQUEST TO ALLOW CASE AGENTS TO REMAIN PRESENT AT** |

0417

| | | COUNSEL TABLE DURING TRIAL as to Susan Xiao−Ping Su. Signed by Judge Hon. Jon S. Tigar on February 7, 2014. (wsn, COURT STAFF) (Filed on 2/7/2014) (Entered: 02/07/2014) |
|---|---|---|
| 02/07/2014 | | Set/Reset Deadlines/Hearings: Jury Trial set for 3/3/2014 − 4/3/2014 at 8:00 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 2/7/2014) (Entered: 02/07/2014) |
| 02/20/2014 | 96 | SECOND AMENDED EXHIBIT LIST by USA as to Susan Xiao−Ping Su. (Rhyne, Wade) (Filed on 2/20/2014) Modified on 2/21/2014 (kcS, COURT STAFF). (Entered: 02/20/2014) |
| 03/03/2014 | 97 | JOINT EVIDENTIARY STIPULATIONS, filed by USA. (wsn, COURT STAFF) (Filed on 3/3/2014) (Entered: 03/03/2014) |
| 03/03/2014 | 98 | JOINT FACTUAL STIPULATIONS, filed by USA. (wsn, COURT STAFF) (Filed on 3/3/2014) (Entered: 03/03/2014) |
| 03/03/2014 | 99 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial: Voir Dire completed on 3/3/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/3/2014) (Entered: 03/03/2014) |
| 03/04/2014 | 100 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao−Ping Su held on 3/4/2014. Further Jury Trial on 3/5/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/4/2014) (Entered: 03/05/2014) |
| 03/05/2014 | 101 | Minute Entry for proceedings held before Judge Jon S. Tigar: Jury Trial as to Susan Xiao−Ping Su held on 3/5/2014. Further Jury Trial on 3/10/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/5/2014) (Entered: 03/05/2014) |
| 03/05/2014 | 102 | [PROPOSED] ORDER MODIFYING PRETRIAL RELEASE CONDITIONS by USA as to Susan Xiao−Ping Su. (West, Hartley) (Filed on 3/5/2014) Modified on 3/10/2014 (kcS, COURT STAFF). (Entered: 03/05/2014) |
| 03/05/2014 | 103 | ORDER MODIFYING PRETRIAL RELEASE CONDITIONS as to Susan Xiao−Ping Su re 102 Proposed Order filed by USA. Signed by Judge Hon. Jon S. Tigar on March 5, 2014. (wsn, COURT STAFF) (Filed on 3/5/2014) (Entered: 03/06/2014) |
| 03/10/2014 | | Set/Reset Deadlines/Hearings: Jury Trial set for 3/10/2014 − 4/3/2014 at 8:00 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 3/10/2014) Modified on 3/11/2014 (kcS, COURT STAFF). (Entered: 03/10/2014) |
| 03/10/2014 | 104 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao−Ping Su held on 3/10/2014. Further Jury Trial on 3/11/2014. (Court Reporter James Pence.) (wsn, COURT STAFF) (Filed on 3/10/2014) (Entered: 03/10/2014) |
| 03/11/2014 | 105 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao−Ping Su held on 3/11/2014. Further Jury Trial 3/12/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/11/2014) (Entered: 03/11/2014) |
| 03/12/2014 | 106 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao−Ping Su held on 3/12/2014. Further Jury Trial on 3/13/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/12/2014) (Entered: 03/12/2014) |
| 03/12/2014 | 107 | JOINT FACTUAL STIPULATION, filed by USA, Susan Xiao−Ping Su. (wsn, COURT STAFF) (Filed on 3/12/2014) (Entered: 03/12/2014) |
| 03/13/2014 | 108 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao−Ping Su held on 3/13/2014. Further Jury Trial on 3/17/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/13/2014) (Additional attachment(s) added on 3/14/2014: # 1 CORRECTED Minute Entry − date corrected) (wsn, COURT STAFF). Modified on 3/14/2014 (wsn, COURT STAFF). (Entered: 03/13/2014) |

| 03/16/2014 | 109 | Proposed Form of Verdict by USA as to Susan Xiao–Ping Su *Amended* (West, Hartley) (Filed on 3/16/2014) (Entered: 03/16/2014) |
|---|---|---|
| 03/16/2014 | 110 | AMENDED Jointly Proposed Jury Instructions by USA as to Susan Xiao–Ping Su. (West, Hartley) (Filed on 3/16/2014) Modified on 3/17/2014 (kcS, COURT STAFF). (Entered: 03/16/2014) |
| 03/17/2014 | | Set/Reset Deadlines/Hearings: Jury Instruction hearing set for 3/18/2014 at 2:30 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 3/17/2014) (Entered: 03/17/2014) |
| 03/17/2014 | 111 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao–Ping Su held on 3/17/2014. Further Jury Trial on 3/18/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/17/2014) (Entered: 03/17/2014) |
| 03/18/2014 | 112 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao–Ping Su held on 3/18/2014. Further Jury Trial on 3/19/2014. (Court Reporters: Kelly Polvi; James Pence.) (wsn, COURT STAFF) (Filed on 3/18/2014) (Entered: 03/18/2014) |
| 03/18/2014 | 113 | **ORDER RE: CLOSING ARGUMENT** Signed by Judge Hon. Jon S. Tigar on 3/18/14. (jstlc1, COURT STAFF) (Filed on 3/18/2014) (Entered: 03/18/2014) |
| 03/18/2014 | 114 | MOTION for Reconsideration of 113 Order *re Closing Argument* by USA as to Susan Xiao–Ping Su. (West, Hartley) (Filed on 3/18/2014) Modified on 3/19/2014 (kcS, COURT STAFF). (Entered: 03/18/2014) |
| 03/18/2014 | | DISMISSAL OF COUNTS as to Susan Xiao–Ping Su (1), Count(s) 23s, 28s, 30s, 33s dismissed on government's motion. (kc, COURT STAFF) (Filed on 3/18/2014) (Entered: 03/25/2014) |
| 03/19/2014 | 115 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao–Ping Su held on 3/19/2014. (Court Reporter: Kelly Polvi.) (wsn, COURT STAFF) (Filed on 3/19/2014) (Entered: 03/19/2014) |
| 03/20/2014 | 116 | **ORDER TO PAY ADDITIONAL ATTENDANCE FEE; as to Susan Xiao–Ping Su. Signed by Judge Hon. Jon S. Tigar on March 20, 2014. (wsn, COURT STAFF) (Filed on 3/20/2014) (Entered: 03/20/2014)** |
| 03/20/2014 | 117 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao–Ping Su held on 3/20/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/20/2014) (Entered: 03/20/2014) |
| 03/24/2014 | 118 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Jury Trial as to Susan Xiao–Ping Su held on 3/24/2014. (Court Reporter: James Pence.) (wsn, COURT STAFF) (Filed on 3/24/2014) (Entered: 03/24/2014) |
| 03/24/2014 | | Set/Reset Deadlines/Hearings: Status Conference set for 4/1/2014 at 9:30 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Sentencing set for 6/20/2014 at 2:00 PM in Courtroom 2, 4th Floor, Oakland before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 3/24/2014) (Entered: 03/24/2014) |
| 03/24/2014 | 119 | VERDICT FORM. (wsn, COURT STAFF) (Filed on 3/24/2014) (Entered: 03/24/2014) |
| 03/24/2014 | 120 | Jury Notes as to Susan Xiao–Ping Su. (wsn, COURT STAFF) (Filed on 3/24/2014) (Entered: 03/25/2014) |
| 03/24/2014 | 121 | JURY TRIAL EXHIBIT LIST for Susan Xiao–Ping Su. (wsn, COURT STAFF) (Filed on 3/24/2014) (Entered: 03/25/2014) |
| 04/01/2014 | 122 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Status Conference as to Susan Xiao–Ping Su held on 4/1/2014. Attorney Appointment Hearing set for 4/22/2014 at 9:30 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Motion Hearing set for 6/6/2014 at 9:30 AM in Courtroom 2, 4th Floor, Oakland before Hon. Jon S. Tigar. (Court Reporter: Jo Ann Bryce.) (wsn, COURT STAFF) (Filed on 4/1/2014) (Entered: 04/01/2014) |

| 04/01/2014 | 123 | Trial Exhibit Receipt as to Susan Xiao−Ping Su. (wsn, COURT STAFF) (Filed on 4/1/2014) (Entered: 04/01/2014) |
|---|---|---|
| 04/07/2014 | 124 | TRANSCRIPT ORDER for Court Reporter Kelly Polvi (West, Hartley) (Filed on 4/7/2014) (Entered: 04/07/2014) |
| 04/11/2014 | 125 | Transcript of Proceedings (Excerpt − Testimony of Jason Mackey only) as to Susan Xiao−Ping Su held on 03/18/2014, before Judge Jon S. Tigar. Court Reporter Kelly Polvi, Telephone number 503.779.7406; email kpolvi@comcast.net. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 7/10/2014. (Related documents(s) 124 ) (Polvi, Kelly) (Filed on 4/11/2014) (Entered: 04/11/2014) |
| 04/15/2014 | 126 | **NOTICE OF *EX PARTE* COMMUNICATION as to Susan Xiao−Ping Su. Signed by Judge Hon. Jon S. Tigar on April 15, 2014. (Attachments: # 1 Letter received April 14, 2014, # 2 Letter received April 15, 2014) (wsn, COURT STAFF) (Filed on 4/15/2014) (Entered: 04/15/2014)** |
| 04/22/2014 | 127 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Attorney Appointment Hearing as to Susan Xiao−Ping Su not held on 4/22/2014. Attorney Appointment Hearing set for 5/9/2014 at 9:30 AM before Hon. Jon S. Tigar in Courtroom 2, 4th Floor, Oakland. (Court Reporter Debra Pas.) (wsn, COURT STAFF) (Filed on 4/22/2014) (Entered: 04/22/2014) |
| 05/01/2014 | 128 | MOTION to Unseal Document and [Proposed] Order by USA as to Susan Xiao−Ping Su. (Countryman, David) (Filed on 5/1/2014) Modified on 5/2/2014 (kcS, COURT STAFF). (Entered: 05/01/2014) |
| 05/01/2014 | 129 | MOTION for Forfeiture of Property *(Application of the United States for a Preliminary Order of Forfeiture)* by USA as to Susan Xiao−Ping Su. (Countryman, David) (Filed on 5/1/2014) (Entered: 05/01/2014) |
| 05/01/2014 | 130 | **ORDER granting 128 Motion to Unseal Document as to Susan Xiao−Ping Su (1). Signed by Judge Hon. Jon S. Tigar on May 1, 2014. (wsn, COURT STAFF) (Entered: 05/02/2014)** |
| 05/02/2014 | 131 | NOTICE *of Filing Exhibits A and B to the Application of the United States for a Preliminary Order of Forfeiture)* by USA as to Susan Xiao−Ping Su re 129 MOTION for Forfeiture of Property *(Application of the United States for a Preliminary Order of Forfeiture)* (Countryman, David) (Filed on 5/2/2014) (Entered: 05/02/2014) |
| 05/09/2014 | 132 | Minute Entry for proceedings held before Judge Hon. Jon S. Tigar: Attorney Appointment Hearing as to Susan Xiao−Ping Su held on 5/9/2014. Motion Hearing set for 9/12/2014 at 1:30 PM in Courtroom 2, 4th Floor, Oakland before Hon. Jon S. Tigar. Sentencing set for 9/12/2014 at 1:30 PM in Courtroom 2, 4th Floor, Oakland before Hon. Jon S. Tigar. (Court Reporter: Raynee Mercado.) (wsn, COURT STAFF) (Filed on 5/9/2014) (Entered: 05/09/2014) |
| 05/12/2014 | 133 | **NOTICE OF *EX PARTE* COMMUNICATION as to Susan Xiao−Ping Su. Signed by Judge Hon. Jon S. Tigar on May 12, 2014. (Attachments: # 1 Letter, # 2 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 5/12/2014) (Entered: 05/12/2014)** |
| 05/19/2014 | 134 | Notice of Related Case in a Criminal Action by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 5/19/2014) Modified on 5/20/2014 (kcS, COURT STAFF). (Entered: 05/19/2014) |
| 05/20/2014 | 135 | **NOTICE OF *EX PARTE* COMMUNICATION; INSTRUCTIONS TO CLERK, as to Susan Xiao−Ping Su. Signed by Judge Hon. Jon S. Tigar on May 20, 2014. (Attachments: # 1 Letter, # 2 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 5/20/2014) (Entered: 05/20/2014)** |
| 05/28/2014 | 136 | **ORDER SETTING DEADLINE FOR RELATING CASES as to Susan Xiao−Ping Su. Signed by Judge Hon. Jon S. Tigar on May 28, 2014. (wsn,** |

| | | COURT STAFF) (Filed on 5/28/2014) (Entered: 05/28/2014) |
|---|---|---|
| 05/28/2014 | 137 | Certificate of Service by USA as to Susan Xiao−Ping Su re 134 Notice of Related Case (Rhyne, Wade) (Filed on 5/28/2014) (Entered: 05/28/2014) |
| 05/29/2014 | 138 | RESPONSE by Vishal Dasa to 134 Notice of Related Case filed by USA. (Hansen, Angela) (Filed on 5/29/2014) Modified on 5/30/2014 (kcS, COURT STAFF). (Entered: 05/29/2014) |
| 05/29/2014 | 139 | RESPONSE by Susan Xiao−Ping Su to 134 Notice of Related Cases filed by USA. (Jordan, John) (Filed on 5/29/2014) Modified on 5/30/2014 (kcS, COURT STAFF). (Entered: 05/29/2014) |
| 06/02/2014 | 140 | TRANSCRIPT ORDER for Court Reporter James Pence (Jordan, John) (Filed on 6/2/2014) (Entered: 06/02/2014) |
| 06/02/2014 | 141 | TRANSCRIPT ORDER for Court Reporter James Pence (Jordan, John) (Filed on 6/2/2014) (Entered: 06/02/2014) |
| 06/02/2014 | 142 | TRANSCRIPT ORDER for Court Reporter Kelly Polvi (Jordan, John) (Filed on 6/2/2014) (Entered: 06/02/2014) |
| 06/09/2014 | 143 | **ORDER FINDING CASES ARE NOT RELATED as to Susan Xiao−Ping Su re 134 Notice of Related Case filed by USA. Signed by Judge Hon. Jon S. Tigar on June 9, 2014. (wsn, COURT STAFF) (Filed on 6/9/2014) (Entered: 06/09/2014)** |
| 06/30/2014 | 144 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 3/3/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587−0173, e−mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Attachments: # 1 Master Index for Transcripts) (Related documents(s) 140 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 145 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 3/4/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587−0173, e−mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 140 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 146 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 3/5/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587−0173, e−mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 140 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 147 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 3/10/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587−0173, e−mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set |

| | | |
|---|---|---|
| | | for 9/29/2014. (Related documents(s) 140 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 148 | Transcript of Proceedings as to Susan Xiao–Ping Su held on 03/18/14, before Judge Jon S. Tigar. Court Reporter Kelly Polvi, Telephone number 503.779.7406; email kpolvi@comcast.net. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 142 ) (Polvi, Kelly) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 149 | Transcript of Proceedings as to Susan Xiao–Ping Su held on 03/19/14, before Judge Jon S. Tigar. Court Reporter Kelly Polvi, Telephone number 503.779.7406; email kpolvi@comcast.net. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 142 ) (Polvi, Kelly) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 150 | Transcript of Proceedings as to Susan Xiao–Ping Su held on 3/11/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587–0173, e–mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 140 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 151 | Transcript of Proceedings as to Susan Xiao–Ping Su held on 3/12/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587–0173, e–mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 140 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 152 | Transcript of Proceedings as to Susan Xiao–Ping Su held on 3/13/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587–0173, e–mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 141 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 153 | Transcript of Proceedings as to Susan Xiao–Ping Su held on 3/17/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587–0173, e–mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 141 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |

| 06/30/2014 | 154 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 3/18/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587−0173, e−mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 141 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| --- | --- | --- |
| 06/30/2014 | 155 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 3/20/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587−0173, e−mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 141 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 06/30/2014 | 156 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 3/24/2014, before Judge Jon S. Tigar. Court Reporter/Transcriber James Pence, Telephone number (619) 587−0173, e−mail: james_pence@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 9/29/2014. (Related documents(s) 141 ) (Pence, James) (Filed on 6/30/2014) (Entered: 06/30/2014) |
| 07/14/2014 | 157 | STIPULATION WITH PROPOSED ORDER *Continuing Motion and Sentencing Hearing*. (Jordan, John) (Filed on 7/14/2014) (Entered: 07/14/2014) |
| 07/14/2014 | 158 | TRANSCRIPT ORDER for Court Reporter Jo Ann Bryce (Jordan, John) (Filed on 7/14/2014) (Entered: 07/14/2014) |
| 07/23/2014 | 159 | **STIPULATION AND ORDER as to Susan Xiao−Ping Su re 157 STIPULATION WITH PROPOSED ORDER *Continuing Motion and Sentencing Hearing* filed by Susan Xiao−Ping Su. Motion Hearing set for 10/31/2014 at 9:30 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Sentencing set for 10/31/2014 at 9:30 AM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Signed by Judge Jon S. Tigar on July 23, 2014. (wsnS, COURT STAFF) (Filed on 7/23/2014) (Entered: 07/23/2014)** |
| 08/12/2014 | 160 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 4/1/14, before Judge Jon S. Tigar. Court Reporter Jo Ann Bryce, Telephone number 510−910−5888, email: joann_bryce@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction after 90 days. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 11/10/2014. (Related documents(s) 158 ) (Bryce, Joann) (Filed on 8/12/2014) (Entered: 08/12/2014) |
| 08/13/2014 | 161 | TRANSCRIPT ORDER for Court Reporter James Pence (Rhyne, Wade) (Filed on 8/13/2014) (Entered: 08/13/2014) |
| 08/13/2014 | 162 | TRANSCRIPT ORDER for Court Reporter James Pence (Rhyne, Wade) (Filed on 8/13/2014) (Entered: 08/13/2014) |
| 08/13/2014 | 163 | TRANSCRIPT ORDER for Court Reporter Kelly Polvi (Rhyne, Wade) (Filed on 8/13/2014) (Entered: 08/13/2014) |

| 08/13/2014 | 164 | TRANSCRIPT ORDER for Court Reporter Jo Ann Bryce (Rhyne, Wade) (Filed on 8/13/2014) (Entered: 08/13/2014) |
|---|---|---|
| 08/28/2014 | 165 | **DISREGARD, INCORRECT CASE NUMBER. DOCUMENT TO BE RE−FILED**<br>MOTION for Judgment NOV *pursuant to Fed. R. Crim. P. 29* by Susan Xiao−Ping Su. Motion Hearing set for 10/31/2014 09:30 AM before Hon. Jon S. Tigar. (Jordan, John) (Filed on 8/28/2014) Modified on 8/29/2014 (kcS, COURT STAFF). (Entered: 08/28/2014) |
| 08/29/2014 | 166 | MOTION Pursuant to Fed. R. Crim. P. 29 by Susan Xiao−Ping Su. Motion Hearing set for 10/31/2014 09:30 AM before Hon. Jon S. Tigar. (Jordan, John) (Filed on 8/29/2014) Modified on 9/2/2014 (kcS, COURT STAFF). (Entered: 08/29/2014) |
| 08/29/2014 | 167 | MOTION for New Trial *Pursuant to Fed. R. Crim. P. 33* by Susan Xiao−Ping Su. Motion Hearing set for 10/31/2014 09:30 AM before Hon. Jon S. Tigar. (Jordan, John) (Filed on 8/29/2014) (Entered: 08/29/2014) |
| 08/29/2014 | 168 | RESPONSE to Motion by Susan Xiao−Ping Su re 129 MOTION for Forfeiture of Property *(Application of the United States for a Preliminary Order of Forfeiture)* (Jordan, John) (Filed on 8/29/2014) (Entered: 08/29/2014) |
| 08/29/2014 | 169 | Sealed Document as to Susan Xiao−Ping Su (kc, COURT STAFF) (Filed on 8/29/2014) (Entered: 09/03/2014) |
| 08/29/2014 | 170 | Sealed Document as to Susan Xiao−Ping Su (kc, COURT STAFF) (Filed on 8/29/2014) (Entered: 09/03/2014) |
| 09/10/2014 | 171 | TRANSCRIPT ORDER for Court Reporter Raynee Mercado (Rhyne, Wade) (Filed on 9/10/2014) (Entered: 09/10/2014) |
| 09/10/2014 | 172 | TRANSCRIPT ORDER for Status Hearing Held on 07/26/11, before Judge Saundra Brown Armstrong filed by USA for Court Reporter: Leo Mankiewicz (Rhyne, Wade) (Filed on 9/10/2014) Modified on 9/11/2014 (jlmS, COURT STAFF). (Entered: 09/10/2014) |
| 09/10/2014 | 173 | TRANSCRIPT ORDER for Status Hearing Held on 09/30/11, before Judge Saundra Brown Armstrong for Court Reporter: Diane Skillman (Rhyne, Wade) (Filed on 9/10/2014) Modified on 9/11/2014 (jlmS, COURT STAFF). (Entered: 09/10/2014) |
| 09/10/2014 | 174 | TRANSCRIPT ORDER for Status Hearing Held on 09/30/11, before Judge Saundra Brown Armstrong for Court Reporter: Sarah Goekler (Rhyne, Wade) (Filed on 9/10/2014) Modified on 9/11/2014 (jlmS, COURT STAFF). (Entered: 09/10/2014) |
| 09/10/2014 | 175 | TRANSCRIPT ORDER for Attorney Appointment and Motion Setting Hearing Held on 04/22/14, before Judge Jon S. Tigar for Court Reporter: Debra Pas (Rhyne, Wade) (Filed on 9/10/2014) Modified on 9/11/2014 (jlmS, COURT STAFF). (Entered: 09/10/2014) |
| 09/10/2014 | 176 | TRANSCRIPT ORDER for Trial Setting Hearing Held before Judge Sandra Brown Armstrong on 09/27/13 for Court Reporter: Katherine Wyatt (Rhyne, Wade) (Filed on 9/10/2014) Modified on 9/11/2014 (jlmS, COURT STAFF). (Entered: 09/10/2014) |
| 09/12/2014 | 177 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 9−27−13, before Judge Saundra Brown Armstrong. Court Reporter/Transcriber Katherine Wyatt, Telephone number 925−212−5224. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 12/11/2014. (Related documents(s) 176 ) (kpw, COURT STAFF) (Filed on 9/12/2014) (Entered: 09/12/2014) |
| 09/15/2014 | 178 | Transcript of Proceedings as to Susan Xiao−Ping Su held on 07/26/2011, before Judge Saundra B. Armstrong. Court Reporter/Transcriber Leo T. Mankiewicz, CSR, RMR, CRR, Pro Tem Reporter, Telephone number (415) 722−7045; email: leomank@gmail.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be |

| | | |
|---|---|---|
| | | purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Redaction Request due 10/6/2014. Redacted Transcript Deadline set for 10/16/2014. Release of Transcript Restriction set for 12/15/2014. (Related documents(s) 172 ) (Mankiewicz, Leo) (Filed on 9/15/2014) (Entered: 09/15/2014) |
| 09/16/2014 | 179 | Transcript of Proceedings as to Susan Xiao–Ping Su held on September 30, 2011, before Judge Saundra Brown Armstrong. Court Reporter Diane E. Skillman, Telephone number 510–451–2930 Diane_Skillman@cand.uscourts.gov, diane.transcripts@aol.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 12/15/2014. (Related documents(s) 173 ) (Skillman, Diane) (Filed on 9/16/2014) (Entered: 09/16/2014) |
| 09/16/2014 | 180 | MOTION to Continue *Sentencing Portion Only of October 31, 2014 hearing* by Susan Xiao–Ping Su. (Jordan, John) (Filed on 9/16/2014) (Entered: 09/16/2014) |
| 09/17/2014 | 181 | Transcript of Proceedings as to Susan Xiao–Ping Su held on February 7, 2014, before Judge Tigar. Court Reporter/Transcriber Sarah Goekler, Telephone number (530)941–2621; sgoekler.csr@gmail.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 12/16/2014. (slg, COURT STAFF) (Filed on 9/17/2014) (Entered: 09/17/2014) |
| 09/17/2014 | 182 | Memorandum In Opposition to 180 MOTION to Continue Sentencing Portion Only of October 31, 2014 hearing by USA as to Susan Xiao–Ping Su (West, Hartley) (Filed on 9/17/2014) Modified on 9/18/2014 (kcS, COURT STAFF). (Entered: 09/17/2014) |
| 09/18/2014 | 183 | Transcript of Proceedings as to Susan Xiao–Ping Su held on April 22, 2014, before Judge Jon S. Tigar. Court Reporter Debra Pas, CSR, CRR, RMR, transcriber Belle Ball, CSR, CRR, RDR, belle_ball@cand.uscourts.gov, telephone number (415)373–2529. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Transcriber, Belle Ball, until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 12/17/2014. (Related documents(s) 175 ) (Ball, Belle) (Filed on 9/18/2014) (Entered: 09/18/2014) |
| 09/18/2014 | 184 | **Order Denying Motion to Continue** <br> The Motion To Vacate The Sentencing Hearing Portion Only of the Hearing Now Set for October 31, 2014, ECF No. 180, is DENIED. Sentencing will proceed on October 31, 2014 as scheduled. <br> (Entered by Judge Jon S. Tigar) (This is a text–only entry generated by the court. There is no document associated with this entry.) (Entered: 09/18/2014) |
| 09/26/2014 | 185 | Memorandum in Opposition by USA as to Susan Xiao–Ping Su re 167 MOTION for New Trial *Pursuant to Fed. R. Crim. P. 33* (Rhyne, Wade) (Filed on 9/26/2014) (Entered: 09/26/2014) |
| 09/26/2014 | 186 | Memorandum in Opposition by USA as to Susan Xiao–Ping Su re 166 MOTION Pursuant to Fed. R. Crim. P. 29 (Rhyne, Wade) (Filed on 9/26/2014) (Entered: 09/26/2014) |
| 09/29/2014 | 187 | TRANSCRIPT ORDER for Court Reporter Raynee Mercado (Jordan, John) (Filed on 9/29/2014) (Entered: 09/29/2014) |
| 10/09/2014 | 188 | REPLY TO RESPONSE to Motion by Susan Xiao–Ping Su re 166 MOTION Pursuant to Fed. R. Crim. P. 29 (Jordan, John) (Filed on 10/9/2014) (Entered: 10/09/2014) |

| 10/09/2014 | 189 | REPLY TO RESPONSE to Motion by Susan Xiao−Ping Su re 167 MOTION for New Trial *Pursuant to Fed. R. Crim. P. 33* (Jordan, John) (Filed on 10/9/2014) (Entered: 10/09/2014) |
|---|---|---|
| 10/09/2014 | 190 | Declaration of AUSA HARTLEY M.K. WEST in Support of 185 Memorandum in Opposition by USA as to Susan Xiao−Ping Su (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rhyne, Wade) (Filed on 10/9/2014) (Entered: 10/09/2014) |
| 10/15/2014 | 191 | Transcript of Proceedings as to Susan Xiao−Ping Su held on July 12, 2011, before Judge Saundra Brown Armstrong. Court Reporter Raynee H. Mercado, CSR, Telephone number 510−502−6175, cacsr8258@gmail.com, raynee_mercado@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 1/13/2015. (Related document(s) 171 ) (rhm) (Filed on 10/15/2014) (Entered: 10/15/2014) |
| 10/15/2014 | 192 | Transcript of Proceedings as to Susan Xiao−Ping Su held on December 20, 2013, before Judge Jon S. Tigar. Court Reporter Raynee H. Mercado, CSR, Telephone number 510−502−6175, cacsr8258@gmail.com, raynee_mercado@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Redaction Request due 11/5/2014. Redacted Transcript Deadline set for 11/17/2014. Release of Transcript Restriction set for 1/13/2015. (Related document(s) 171 ) (rhm) (Filed on 10/15/2014) (Entered: 10/15/2014) |
| 10/15/2014 | 193 | Transcript of Proceedings as to Susan Xiao−Ping Su held on May 9, 2014, before Judge Jon S. Tigar. Court Reporter Raynee H. Mercado, CSR, Telephone number 510−502−6175, cacsr8258@gmail.com, raynee_mercado@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction.After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Redaction Request due 11/5/2014. Redacted Transcript Deadline set for 11/17/2014. Release of Transcript Restriction set for 1/13/2015. (Related document(s) 171 ,[187]) (rhm) (Filed on 10/15/2014) (Entered: 10/15/2014) |
| 10/24/2014 | 195 | SENTENCING MEMORANDUM by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 10/24/2014) (Entered: 10/24/2014) |
| 10/24/2014 | 196 | Declaration of AUSA Wade M. Rhyne in Support of 195 Sentencing Memorandum by USA as to Susan Xiao−Ping Su (Rhyne, Wade) (Filed on 10/24/2014) (Entered: 10/24/2014) |
| 10/24/2014 | 197 | Exhibits: Submission of Transcript of 05/09/14 Hearing in Support of Defendant's Fed. R. Crim. P. 33 Motion Pursuant to Fed. R. Crim. P. 33 re 167 MOTION for New Trial, filed by Susan Xiao−Ping Su (Attachments: # 1 Exhibit Transcript of 5/9/2014 hearing)(Jordan, John) (Filed on 10/24/2014) Modified on 10/27/2014 (jlmS, COURT STAFF). (Entered: 10/24/2014) |
| 10/24/2014 | 198 | SENTENCING MEMORANDUM by Susan Xiao−Ping Su (Attachments: # 1 Exhibit Follow up Report of Dr. Gregory, # 2 Exhibit Letter of Jenny Yang, # 3 Exhibit Letter of Rachel Yang, # 4 Exhibit Letter of Hong Yang, # 5 Exhibit Letter of Sohie Su, # 6 Exhibit Letter of David Kerns)(Jordan, John) (Filed on 10/24/2014) (Entered: 10/24/2014) |
| 10/24/2014 | 199 | **PRELIMINARY ORDER OF FORFEITURE as to Susan Xiao−Ping Su re 129 MOTION for Forfeiture of Property *(Application of the United States for a Preliminary Order of Forfeiture)* filed by USA. Signed by Judge Jon S. Tigar on October 24, 2014. (wsn, COURT STAFF) (Filed on 10/24/2014) (Entered: 10/24/2014)** |

| 10/24/2014 | 200 | Exhibits 1–8 to 195 Sentencing Memorandum by USA as to Susan Xiao–Ping Su. (mjj2S, COURT STAFF) (Filed on 10/24/2014) Modified on 11/3/2014 (kc, COURT STAFF). (Entered: 10/24/2014) |
|---|---|---|
| 10/24/2014 | 201 | **DISREGARD, DUPLICATE OF DOCKET 200** CLERK'S NOTICE – Received Exhibit 1 – Binder re 200 Notice as to Susan Xiao–Ping Su (mjj2S, COURT STAFF) (Filed on 10/24/2014) Modified on 11/3/2014 (kcS, COURT STAFF). (Entered: 10/27/2014) |
| 10/31/2014 | 202 | **Sealing Order – General Order 54 as to Susan Xiao–Ping Su. Signed by Judge Jon S. Tigar on October 31, 2014. (wsnS, COURT STAFF) (Filed on 10/31/2014) (Entered: 10/31/2014)** |
| 10/31/2014 | 203 | Minute Entry for proceedings held before Hon. Jon S. Tigar: Motion Hearing as to Susan Xiao–Ping Su held on 10/31/2014 DENYING 167 MOTION for New Trial *Pursuant to Fed. R. Crim. P. 33* filed by Susan Xiao–Ping Su, DENYING 166 MOTION Pursuant to Fed. R. Crim. P. 29 filed by Susan Xiao–Ping Su. Sentencing held on 10/31/2014 for Susan Xiao–Ping Su (1), as to Count(s) 1s–14s of the superseding indictment, committed to custody of BOP for a term of 198 months on each count to run concurrent; 3 years supervised release on each count to run concurrent; $1400 special assessment; $904,198.84 restitution. Count(s) 15s, 20s, 21s of the superseding indictment, committed to custody of BOP for a term of 60 months on each count to run concurrent to term imposed in Counts 1s–14s, 3 years supervised release to run concurrent to term imposed in 1s–14s; $300 special assessment. Counts 16s–19s, 22s, 24s, 26s, 27s, 29s, 31s, 32s, 34s, 35s of the superseding indictment, committed to custody of BOP for a term of 120 months on each count to run concurrent to term imposed in Counts 1s–14s, 15s, 20s, 21s; 3 years supervised release on each count to run concurrent to term imposed in Counts 1s–14s, 15s, 20s, 21s; $1300 special assessment; Count 25s of the superseding indictment, committed to custody of BOP for a term of 12 months; 1 year supervised release; $25 special assessment. Count(s) 1–10, 11–12, 13, 14–17, 18, 19, 20–22, 23, 24–33 of the indictment dismissed, superseding indictment filed. Count(s) 23s, 28s, 30s, 33s of the superseding indictment, dismissed on government's motion. (Court Reporter Belle Ball.) (kc, COURT STAFF) (Filed on 10/31/2014) (Entered: 11/03/2014) |
| 10/31/2014 | 204 | NOTICE OF APPEAL by Susan Xiao–Ping Su re 203 Sentencing. Filing fee $ 505, receipt number 34611100283. Appeal Record due by 12/1/2014. (mjj2S, COURT STAFF) (Filed on 10/31/2014) (Entered: 11/03/2014) |
| 11/03/2014 | 205 | AMENDED NOTICE OF APPEAL by Susan Xiao–Ping Su re 203 Sentencing. Filing fee $ 505 paid with Notice of Appeal 204 . Appeal Record due by 12/3/2014. (mjj2S, COURT STAFF) (Filed on 11/3/2014) (Entered: 11/04/2014) |
| 11/05/2014 | 207 | JOINT STIPULATION WITH PROPOSED ORDER *TO AMEND PRONOUNCEMENT OF SENTENCE AS TO RESTITUTION* filed by USA. (Rhyne, Wade) (Filed on 11/5/2014) Modified on 11/6/2014 (kcS, COURT STAFF). (Entered: 11/05/2014) |
| 11/05/2014 | 208 | **STIPULATION AND ORDER as to Susan Xiao–Ping Su re 207 STIPULATION WITH PROPOSED ORDER *TO AMEND PRONOUNCEMENT OF SENTENCE AS TO RESTITUTION* filed by USA. Signed by Judge Jon S. Tigar on November 5, 2014. (wsn, COURT STAFF) (Filed on 11/5/2014) (Entered: 11/05/2014)** |
| 11/06/2014 | 209 | **JUDGMENT in a Criminal Case as to Susan Xiao–Ping Su. Signed by Judge Jon S. Tigar on November 6, 2014. (wsn, COURT STAFF) (Filed on 11/6/2014) (Entered: 11/06/2014)** |
| 11/06/2014 | 210 | USCA Case Number as to Susan Xiao–Ping Su 14–10499 for 204 Notice of Appeal – Final Judgment filed by Susan Xiao–Ping Su. (cjlS, COURT STAFF) (Filed on 11/6/2014) (Entered: 11/07/2014) |
| 11/11/2014 | 211 | TRANSCRIPT ORDER for Court Reporter Belle Ball (Jordan, John) (Filed on 11/11/2014) (Entered: 11/11/2014) |
| 11/11/2014 | 212 | Transcript Designation Form by Susan Xiao–Ping Su for proceedings held on 11/03/2014 before Judge Tigar, re 205 Amended Notice of Appeal – Final Judgment Transcript due by 12/22/2014. (Attachments: # 1 Supplement Supplemental Page Transcript Designation)(Jordan, John) (Filed on 11/11/2014) (Entered: 11/11/2014) |

| 12/16/2014 | 213 | Transcript of Proceedings as to Susan Xiao–Ping Su held on October 31, 2014, before Judge Jon S. Tigar. Court Reporter Belle Ball, CSR, CRR, RDR, belle_ball@cand.uscourts.gov, telephone number (415)373–2529. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerks Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Release of Transcript Restriction set for 3/16/2015. (Ball, Belle) (Filed on 12/16/2014) (Entered: 12/16/2014) |
|---|---|---|
| 12/24/2014 | 214 | Received Document: Letter from Fatima T. Johnson regarding request for U visa for Rebecca Rajkumari David. (Attachments: # 1 Form I–918, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(wsn, COURT STAFF) (Filed on 12/24/2014) (Entered: 12/24/2014) |
| 12/30/2014 | 215 | Certificate of Service by USA as to Susan Xiao–Ping Su re 199 Order, (Countryman, David) (Filed on 12/30/2014) (Entered: 12/30/2014) |
| 12/30/2014 | 216 | Declaration of Publication by USA as to Susan Xiao–Ping Su. (Countryman, David) (Filed on 12/30/2014) Modified on 12/31/2014 (kcS, COURT STAFF). (Entered: 12/30/2014) |
| 12/31/2014 | 218 | Petition of Hong S Yang for Ancillary Hearing as to Susan Xiao–Ping Su. (Attachments: # 1 Certificate/Proof of Service) (mjj2S, COURT STAFF) (Filed on 12/31/2014) (Entered: 01/02/2015) |
| 01/02/2015 | 217 | **ORDER DENYING REQUEST FOR U–VISA CERTIFICATION as to Susan Xiao–Ping Su re 214 Letter from Fatima T. Johnson regarding request for U visa for Rebecca Rajkumari David. Signed by Judge Jon S. Tigar on January 1, 2015. (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 1/2/2015) (Entered: 01/02/2015)** |
| 01/06/2015 | 219 | CLERK'S NOTICE SETTING ANCILLARY HEARING DATE as to Susan Xiao–Ping Su. Ancillary Hearing set for 2/3/2015 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 1/6/2015) (Entered: 01/06/2015) |
| 01/08/2015 | 220 | MOTION to Dismiss *(Notice and Motion to Dismiss Petition of Hong S. Yang Without a Hearing)* by USA as to Susan Xiao–Ping Su. Motion Hearing set for 2/12/2015 02:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (Countryman, David) (Filed on 1/8/2015) (Entered: 01/08/2015) |
| 01/16/2015 | 221 | CLERK'S NOTICE CONTINUING HEARING DATES as to Susan Xiao–Ping Su. Ancillary Hearing set for 2/17/2015 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. Motion Hearing set for 2/17/2015 at 2:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (Attachments: # 1 Certificate/Proof of Service) (wsn, COURT STAFF) (Filed on 1/16/2015) (Entered: 01/16/2015) |
| 01/16/2015 |  | Motion Hearing set for 2/17/2015 02:00 PM in Courtroom 9, 19th Floor, San Francisco before Hon. Jon S. Tigar. (wsn, COURT STAFF) (Filed on 1/16/2015) (Entered: 01/16/2015) |