**No. 14-10499**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

SUSAN XIAO-PING SU,

    Defendant-Appellant.

———————————————

**BRIEF FOR THE UNITED STATES AS APPELLEE**

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
DISTRICT COURT NO. 11-CR-00288 JST

———————————————

            **MELINDA HAAG**
            United States Attorney

            **BARBARA J. VALLIERE**
            Chief, Appellate Division

            **OWEN P. MARTIKAN**
            Assistant United States Attorney
            450 Golden Gate Ave., 11th Floor
            San Francisco, CA 94102
            (415) 436-7241

            **Attorneys for Plaintiff-Appellee**
**April 17, 2015**         **UNITED STATES OF AMERICA**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

JURISDICTION, TIMELINESS, AND BAIL STATUS ..........................................2

ISSUES PRESENTED.........................................................................3

STATEMENT OF THE CASE...................................................................4

    A.    Background Of The Student Visa Program ........................................4

    B.    Su Establishes Tri-Valley University And Enrolls F-1 Students..........7

    C.    Tri-Valley University Had No Classes ............................................11

        1.    Aspiring student Vishal Dasa.....................................................13

        2.    Aspiring student Anji Reddy Dirisanala...................................15

    D.    Su's Trial And Sentencing .................................................................18

SUMMARY OF ARGUMENT ...............................................................22

ARGUMENT ....................................................................................25

    I.    THE DISTRICT COURT PROPERLY DENIED SU'S
        MOTION FOR ACQUITTAL ...........................................................25

        A.    Standard Of Review ................................................................25

        B.    Sufficient Evidence Supported The Jury's Verdict On The
            Alien Harboring Counts............................................................26

            1.    The jury had sufficient evidence to find that Dasa
                and Dirisanala were in violation of United States law...26

            2.    The jury had sufficient evidence to find that Su
                shielded Dasa and Dirisanala from government
                detection.........................................................................30

i

C.    Wire Fraud And Visa Fraud Do Not Require Proof Of A Defrauded Victim....................................................................31

     1.    Wire fraud does not require proof of a defrauded victim .............................................................32

     2.    Visa fraud does not require proof of a defrauded victim .............................................................32

D.    Su's Money Laundering Convictions Do Not Merge With Her Wire Fraud Convictions......................................33

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED SU'S MOTION FOR NEW TRIAL..................35

A.    Standard Of Review.....................................................35

B.    The District Court's Decision That Su Failed To Present Newly-Discovered Evidence Was Not An Abuse Of Discretion .................................................................35

C.    The District Court's Denial Of Su's Motion For New Trial In The Interests of Justice Was Not An Abuse Of Discretion .................................................................37

III.    THE DISTRICT COURT'S SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY REASONABLE.......................................39

A.    Standard Of Review.....................................................39

B.    The District Court's Loss Amount Calculation Was Not An Abuse Of Discretion...........................................40

C.    The District Court's Grouping Of Offenses Was Not An Abuse of Discretion .............................................42

     1.    The application of the grouping rules...........................42

ii

       2.     The calculation of the offense level for unauthorized use of a government computer........................................44

    D.     The District Court's Imposition Of A Sentencing Enhancement For Obstruction Of Justice Was Reasonable .....46

    E.     The District Court's Sentence Was Substantively Reasonable ................................................................47

IV.    THE DISTRICT COURT WAS NOT REQUIRED TO HOLD A HEARING BEFORE ISSUING ITS PRELIMINARY ORDER OF FORFEITURE................................................................50

    A.     Standard Of Review ................................................................50

    B.     Su Was Not Entitled To A Hearing Preceding The Preliminary Order Of Forfeiture ................................................50

CONCLUSION ................................................................52

STATEMENT OF RELATED CASES ................................................................53

CERTIFICATE OF COMPLIANCE ................................................................54

CERTIFICATE OF SERVICE ................................................................55

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona v. United States*, 132 S. Ct. 2492 (2012)......................................................30

*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) .................31

*Dhital v. Mukasey*, 532 F.3d 1044 (9th Cir. 2008)...................................................27

*Ghorbani v. Immigration and Naturalization Service*,
    686 F.2d 784 (9th Cir. 1982) ....................................................... 28, 30

*Lemon v. United States*, 278 F.2d 369 (9th Cir. 1960)............................................32

*Lindsey v. United States*, 332 F.2d 688 (9th Cir. 1964)...........................................32

*Mohammadi-Motlagh v. Immigration & Naturalization Service*,
    727 F.2d 1450 (9th Cir. 1984) ..............................................................28

*Rita v. United States*, 551 U.S. 338 (2007)..............................................................47

*Runningeagle v. Ryan*, 686 F.3d 758 (9th Cir. 2012).............................................36

*United States v. Atandi*, 376 F.3d 1186 (10th Cir. 2004) .......................................29

*United States v. Bazargan*, 992 F.2d 844 (8th Cir. 1993) ......................................28

*United States v. Bush*, 626 F.3d 527 (9th Cir. 2010)...................................... 33, 34

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc)................ 39, 45, 47

*United States v. French*, 748 F.3d 922 (9th Cir. 2014) ..........................................35

*United States v. Fries*, No. 13-10116, 2015 WL 1403813
    (9th Cir. Mar. 30, 2015)........................................................................44

*United States v. Hernandez*, 913 F.2d 1506 (10th Cir. 1990) ................................30

iv

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) ...........................................50

*United States v. Krstic*, 558 F.3d 1010 (9th Cir. 2009) ...........................................32

*United States v. Lane*, 474 U.S. 438 (1986) ...........................................................32

*United States v. Latu*, 479 F.3d 1153 (9th Cir. 2007)................................ 28, 29, 30

*United States v. Maier*, 646 F.3d 1148 (9th Cir. 2011) ...........................................39

*United States v. McNeil*, 320 F.3d 1034 (9th Cir. 2003) ................................. 25, 32

*United States v. Morris*, 744 F.3d 1373 (9th Cir. 2014)...........................................40

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc)..........................25

*United States v. Ruiz-Lopez*, 749 F.3d 1138 (9th Cir. 2014)...................................25

*United States v. Santos*, 553 U.S. 507 (2008).................................................. 33, 34

*United States v. Smith*, 424 F.3d 992 (9th Cir. 2005)..............................................43

*United States v. Torlai*, 728 F.3d 932 (9th Cir. 2013)..............................................40

*United States v. Wilkes*, 744 F.3d 1101 (9th Cir. 2014) ..........................................36

*United States v. Williams*, 693 F.3d 1067 (9th Cir. 2012).......................................45

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) ..............................................50

## FEDERAL STATUTES

8 U.S.C. § 1324(a) .......................................................... 2, 26, 27, 29, 30

18 U.S.C. § 2 .................................................................................................2

18 U.S.C. § 371 .............................................................................................2

18 U.S.C. § 922(g) ......................................................................................29

18 U.S.C. § 1001 ................................................................................2

18 U.S.C. § 1030(a) ............................................................................2

18 U.S.C. § 1341 ................................................................................2

18 U.S.C. § 1343 ................................................................................2

18 U.S.C. § 1546(a) .......................................................................2, 32

18 U.S.C. § 1956 ..............................................................................33

18 U.S.C. § 1957(a) ............................................................................2

18 U.S.C. § 3231 ................................................................................2

18 U.S.C. § 3553(a) .....................................................................47, 50

18 U.S.C. § 3742 ................................................................................2

28 U.S.C. § 1291 ................................................................................2

## FEDERAL RULES, GUIDELINES AND REGULATIONS

Fed. R. Crim. P. 12.2 ........................................................................18

Fed. R. Crim. P. 29 ..........................................................................19

Fed. R. Crim. P. 32 ..........................................................................45

Fed. R. Crim. P. 32.2 ..................................................................50, 51

Fed. R. Crim. P. 33 ......................................................................19, 37

USSG § 2B1.1 .....................................................................21, 40, 41, 42

USSG § 2B2.3 .............................................................................43, 44

USSG § 3B1.1 ..................................................................................21

vi

USSG § 3C1.1 ................................................................................ 21, 46

USSG § 3D1.2 ............................................................................ 42, 43, 44

8 C.F.R. § 214.2(f) ...................................................................... 5, 27, 29

**No. 14-10499**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

         v.

SUSAN XIAO-PING SU,

Defendant-Appellant.

_____

**BRIEF FOR THE UNITED STATES AS APPELLEE**

Defendant Susan Xiao-Ping Su's convictions for alien harboring were supported by sufficient evidence, and her attempt to graft additional elements onto the wire and visa fraud statutes lacks legal basis. Su was not entitled to a new trial based on her claim, raised for the first time in an untimely motion for a new trial, that she had been mentally ill since before committing the crimes of conviction.

The district court's below-guidelines sentence was not an abuse of discretion. The Sentencing Guidelines calculation correctly reflected the loss amount, groups of offenses, and Su's obstruction of justice. And by varying downward by four levels from the Guidelines range, the district court imposed a sentence that balanced mitigating factors against the scale of Su's crime and her complete lack of remorse.

## JURISDICTION, TIMELINESS, AND BAIL STATUS

This is an appeal from a judgment following the defendant's conviction by a jury of fourteen counts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, five counts of visa fraud and conspiracy to commit visa fraud, in violation of 18 U.S.C. §§ 1546 and 371, two counts of false statements, in violation of 18 U.S.C. § 1001, two counts of alien harboring, in violation of 8 U.S.C. § 1324(a), one count of unauthorized use of a government computer, in violation of 18 U.S.C. § 1030(a)(3), seven counts of money laundering, in violation of 18 U.S.C. § 1957(a), and aiding and abetting all of these crimes, in violation of 18 U.S.C. § 2. Excerpts of Record ("ER") 397, 399. The district court had jurisdiction under 18 U.S.C. § 3231. The district court imposed judgment on October 31, 2014. ER 399. Defendant filed a timely notice of appeal of the judgment on November 3, 2014. ER 398. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

Su is in custody with a projected release date of August 5, 2028, according to the Bureau of Prisons inmate locator website, bop.gov/inmateloc/.

## ISSUES PRESENTED

1.      Whether the district court properly denied Su's motion for acquittal because (a) sufficient evidence supported the jury's findings that witnesses Vishal Dasa and Anji Reddy Dirisanala remained in the United States in violation of law during the time period charged in counts 23 through 24 of the indictment, and that Su shielded them from detection by immigration authorities; (b) Su's wire and visa fraud convictions did not require proof that she defrauded actual victims; and (c) Su's money laundering convictions did not merge into her wire fraud convictions.

2.      Whether the district court abused its discretion when it denied Su's motion for new trial because Su had failed to show that she had discovered new evidence that would probably have resulted in acquittal if introduced at trial, and because Su had failed to show that the interests of justice required retrial.

3.      Whether the district court's sentence was (a) procedurally reasonable in its calculation of the amount of loss, its application of the grouping rules, and its imposition of an enhancement for obstruction of justice; and (b) substantively reasonable.

4.      Whether the district court was required to hold a hearing before entering a preliminary order of forfeiture.

## STATEMENT OF THE CASE

Defendant Susan Xiao-Ping Su, who has a doctorate in mechanical engineering from the University of California, Berkeley, and who has taught engineering at San Francisco State University and other schools, established and ran a bogus university — called Tri-Valley University — for the sole purpose of extracting tuition money from immigrant students who relied on their student status to stay in this country. ER 113, 395; Supplemental Excerpts of Record ("SER") 27-28, 171. Over a two-and-a-half year period, Su recruited over 1,700 students to Tri-Valley University, all of them immigrants, and took $5.6 million in tuition and fees from them. SER 54, 56; ER 132-33. Su did not offer any courses in exchange for this tuition, and forged transcripts showing grades for non-existent classes. SER 174. She forged immigration documents to make it appear as if students were engaged in full-time study, though they were not taking any classes. SER 177-78. When students complained about the lack of classes or requested transfers to other schools, Su ignored or threatened them, knowing that their immigrant status depended on their enrollment in her school. SER 12-13.

### A. Background Of The Student Visa Program

Under federal immigration law, foreign nationals may apply for visas that allow them to study at schools in the United States, as long as the Department of Homeland Security ("DHS") Student and Exchange Visa Program has approved

4

the school for participation in the student visa program.  SER 18-19.  The student

visas, also known as F-1 visas, grant foreign students admission to the United

States for "duration of status," meaning for the time "during which an F-1 student

is pursuing a full course of study at an educational institution approved by the

[Department of Homeland Security] for attendance by foreign students."  8 C.F.R.

§ 214.2(f)(5)(i).  A student maintains status by making normal progress toward

completing a course of study.  *Id*.  The F-1 visa program limits students to one on-

line class per session, semester, term, trimester, or quarter.

8 C.F.R. § 214.2(f)(6)(i)(G).

 A school seeking approval to participate in the F-1 visa program must

submit a Petition for Approval of School for Attendance by Non-Immigrant

Student, or Form I-17, to the DHS Student Exchange Visa Program ("SEVP").

SER 23.  The school certifies through this petition that it is a bona fide school, that

it is an established institution of learning, that it has the necessary facilities,

personnel, and finances to instruct recognized courses, and that it is actually

engaged in instructing those courses.  SER 23-24.  If the school is unaccredited,

then it must submit "articulation agreements" with at least three accredited schools.

SER 25-26.  These are agreements in which the accredited schools promise to

unconditionally accept transfer credits from the unaccredited school, essentially

vouching for the quality of the unaccredited school.  *Id*.

5

The school must also submit to a site visit by a DHS inspector, who audits the school's facilities. SER 30-31. The SEVP relies on these site visits to ensure that the school has the facilities to provide an adequate course of instruction. SER 31. The school must provide physical classes for students pursuing a full course of study. SER 32. The school must allow students to transfer to other schools; it cannot impose a requirement that a student stay for a minimum time before transferring. SER 33.

The SEVP maintains a computer database — called the Student Exchange Visa Information System ("SEVIS") — that contains student records for all F-1 student visa holders studying in the United States. SER 19. The SEVP relies on this database to keep track of student visa holders. SER 44. Any school that seeks approval to admit F-1 visa holders as students must create an account on SEVIS, which can be accessed online, to submit its petition for approval. SER 20. Each school must name a "designated school official," or DSO, who has the sole authority to access SEVIS and to maintain the school's records on that database. SER 21. A DSO may not receive a referral fee for recruiting students. SER 36. The online access page for SEVIS contains a warning banner stating that access to the system is restricted to authorized users. SER 22.

A foreign student who wishes to study at a United States school with an F-1 visa first applies to United States schools from abroad. SER 15. A school that

6

accepts the student will issue the student a Form I-20, which is a certificate of eligibility for study in the United States. *Id.* The student takes this form to the nearest United States consulate along with a passport and some other documentation, and applies for an F-1 visa. SER 15-16. A consular officer will refer to the SEVIS database to ensure the student has paid to engage in a full course of study at a school that has been approved by the SEVP, and will ensure that the student has the financial ability to pay for their education. SER 16-17.

### B. Su Establishes Tri-Valley University And Enrolls F-1 Students

Su established Tri-Valley University in Pleasanton, California, in March 2008. SER 27-28. Six months later, Su applied through SEVIS to admit F-1 visa holders as students. SER 28. In her application, Su claimed that Tri-Valley University had average of 9 teachers or instructors and 30 students per year. SER 29. Su described the school as having classrooms, research facilities, and distance-learning facilities that provided graduate programs in engineering, business, and Christian ministry. SER 239. Su created a course catalog for Tri-Valley University that listed dozens of classes in mechanical engineering, accounting, finance, economics, marketing, business administration, theology, ministry, and Bible studies. SER 244-90. The Tri-Valley University faculty, according to Su, possessed doctorate and other advanced degrees. SER 298. When a SEVP site

inspector toured Tri-Valley University and saw no classes in session, Su told him the school only held night classes. SER 34-35.

Su sent copies of three purported articulation agreements with accredited universities — San Francisco State University, the University of Central Florida, and the University of East West Medicine — to the SEVP official responsible for determining Tri-Valley University's eligibility to admit F-1 students, and certified their authenticity. SER 37-38, 303. The agreement with San Francisco State was forged; the other two were invalid because they were not signed by people authorized to enter into them. SER 46, 52, 57-58, 75.

Based on Su's false representations, SEVP approved Tri-Valley University to admit F-1 students on February 17, 2009. SER 39. Soon after receiving this approval, Su hired a company in India, ABS Consultancy, to recruit students for Tri-Valley University. SER 61-62. The company recruited Tri-Valley University's first 200 students. SER 62. From May 2010 through January 2011, Tri-Valley University's enrollment grew from 900 to approximately 1,760 students, 95% of them from India. SER 54, 56. When Tri-Valley University had an enrollment of 900 students, over half of them were listed on SEVIS as living in the same Sunnyvale two-bedroom apartment. SER 55.

The Tri-Valley University campus occupied two floors in an office park in Pleasanton, California. SER 116. The office had a "networking closet" for servers

and other networking equipment, but they were still packed in boxes.  SER 117.

The university staff worked in one office, and the university library consisted of

two bookshelves with "various books," and one computer.  SER 118.  The school

had a couple other empty offices, and an area that Su did not allow government

agents to see.  SER 119-20.  Su told government agents that she held physical

classes at this facility, although she noted that "sometimes the students don't like

to drive" to the school, so they access classes online.  SER 121.

     Tri-Valley University's admission standards were low: Su told her staff to

admit everyone who applied.  SER 140.  Tri-Valley University's admissions

policies required applicants to submit various documents with their application, but

Su told her staff to admit anyone who applied, even if all they attached to their

application was "a picture with their puppy."  SER 171.  One staff member who

handled admissions could not remember a single United States citizen ever

applying to the school; the applicants either wanted F-1 student visas, or had H-4

visas, meaning that they were the spouses of foreign nationals holding H-1 work

visas.  SER 140-41.

     After Tri-Valley University admitted its new students, Su instructed her staff

to prepare I-20 forms for them, which allowed them to obtain F-1 student visas.

SER 176-77.  All I-20s were to contain the same student residence address: the

apartment in Sunnyvale.  SER 176.  To prepare these forms, Su's staff was

required to use SEVIS, even though access to the database is restricted to designated school officials. SER 176-77. Su would enter her password and the other DSOs' passwords into a laptop to access the SEVIS database, and then hand the laptop to her staff to create I-20 forms. SER 176. Each day, Su's staff created and printed out a stack of I-20 forms for Su to sign. SER 177. Su signed her own name on the forms, and forged the signatures of other school officials. SER 178.

Su's priority was to obtain tuition payments from applicants to Tri-Valley University. SER 173. She instructed her staff that a phone call from a student who wanted to make a payment took priority over all other calls. *Id*. As soon as students enrolled in classes, Su instructed her staff to create transcripts for them that included their grades in the courses. SER 174. Su directed her staff to make up any grades that they wanted, so long as none were lower than A-, and none of the students received only As, because that would look suspicious. *Id*. When Su's staff approached her with questions about the school's admissions procedures, Su would lose her temper and yell, "Don't ask any questions. Okay? Just give them admission." SER 175.

An agent investigating Tri-Valley University placed a ruse phone call to Su in September 2010, pretending to be calling from San Francisco International Airport. SER 112-14. The agent told Su that a student had arrived without identification, claiming to be a Tri-Valley University student. SER 114. The agent

asked Su to send him a signed I-20 for the student, as well as a transcript and a letter certifying that the student was a current student in good standing. *Id*. Su complied, even though the student was fictitious. SER 63-65, 115.

### C.    Tri-Valley University Had No Classes

Tri-Valley University had no actual classes, and no faculty. Su advertised faculty members who did not actually teach at her school. SER 45, 53, 59. Su advertised classes that would be taught at the Tri-Valley University campus, but then stated that they were online. SER 60, 73-74. The online classes counted as physical classes, Su reasoned, because the students were always "physically somewhere" while taking the online classes. SER 73-74.

Tri-Valley University did not offer online classes that included actual lectures by instructors, and students tried, without success, to log on to courses on the Tri-Valley University website. SER 12, 66, 67, 84, 106, 148, 169, 186. When students complained about the absence of classes, Su told them to "be patient," and that she "would get back to" them. SER 11, 84. Su instructed her staff that if students called to complain about the absence of online classes, they should respond that "we are working on it." SER 172. Eventually, the school offered "a couple of online classes," but they did not involve any lectures by professors. SER 96-97.

11

Students were generally surprised by Tri-Valley University's evanescence. Two students who had arrived from India to study at Tri-Valley University — one of whom had chosen the school because he thought Christian schools were "reliable" — were surprised when they were met at the airport by a man driving a shabby little car, instead of a van with a university logo on the side. SER 159, 160. They were shocked when the driver told them that Tri-Valley University was "no university," just a "small room or something." SER 161. Another student, who had attended a large university in India, expected to see a "huge building, like, with a lot of students and offices." SER 105. Yet another student was surprised that he had so much trouble finding Tri-Valley University, which he had expected to be a "huge university," until he learned that it was just "a small room." SER 130.

As soon as new students arrived to begin their anticipated studies at Tri-Valley University, Su asked them for payment. SER 131, 168. She accepted payments by check, but also took credit cards and PayPal. SER 10, 72, 131, 168. When a student tried to transfer out of Tri-Valley University, Su told her she could not until she had paid all of her course fees. SER 170. When another student asked to transfer out of Tri-Valley University, Su told him that he could not transfer until he had enrolled for two semesters there. SER 162. Su also threatened to terminate him instead of allowing him to transfer, which would have jeopardized his immigration status. SER 163-64. Su threatened to have another

12

student deported after she asked for a refund of the tuition that she had paid for a non-existent course. SER 12-13.

Su offered referral fees, or credits against tuition, to students who brought other potential students to Tri-Valley University. SER 98. She also employed some students to process I-20 forms, take tuition payments, and handle student complaints about the absence of classes. SER 90, 134, 135, 173, 179. One student remembers working about twelve hours per day, six or seven days per week. SER 179. Su paid a student $60 for eight hours of work. SER 167. One day, when Su left the building for lunch, she locked her staff inside the building until she returned. SER 167. The confined students ate sandwiches that they had brought with them. *Id.*

### 1.   *Aspiring student Vishal Dasa*

Vishal Dasa is an Indian national who transferred to Tri-Valley University in 2009 from International Technological University, in Sunnyvale, California. SER 77-78. Dasa had a bachelor's degree in pharmacy from the Bharat Institute of Technology in Hyderabad, India, and had studied toward a master in science in healthcare management. SER 76, 77. Dasa was studying in the United States on an F-1 visa, and transferred to Tri-Valley University because it purported to offer the degree program that he was interested in, and it was cheaper than International Technological University. SER 79-80.

13

Dasa met with Su, who told him that classes in his degree program would be held on campus, and enrolled at Tri-Valley University. SER 81. Dasa registered for three classes, and his uncle wired an initial tuition payment of $1,000 to the school. SER 82, 84. When Dasa called Su to ask her when his classes would begin, she said that she "would get back to [him]." SER 85. Dasa was never able to begin taking the classes that he had paid for, but he did receive a transcript showing that he had earned As in two classes and an A- in the third. SER 85. The transcript listed grades for classes that were different from the ones in which Dasa had enrolled. SER 86-87. Su told Dasa this was because fewer than five students had enrolled in the healthcare management classes that he wanted to take, so she had switched him to some different classes. SER 87.

The following semester, Su told Dasa that he could "take a break" for the semester, and offered him an on-campus job as the Assistant to the President. SER 88-89. Su paid Dasa $10 per hour to register students and answer their emails. SER 89-90. He worked about twelve hours per day, five days per week. SER 103. Su instructed Dasa to admit as many students as possible to Tri-Valley University, and became angry and yelled at Dasa when he asked prospective students for the basic documents required for the application process, such as the applicant's passport, visa number, and previous I-20s. SER 92.

14

Su also had Dasa enter student information into the SEVIS database, such as students' residence address, which was always the same apartment in Sunnyvale, California. SER 91. Only DSOs are allowed to access the SEVIS database, and Dasa was not a DSO. SER 93. Su would log into SEVIS on a laptop, and then hand the laptop to Dasa to use. *Id*. Dasa would generate and print 15 to 20 I-20 forms per day through SEVIS. SER 94. Dasa saw Su sign her own name on the I-20 forms, and forge the names of the two other DSOs. SER 94-95.

Dasa received 15 percent credits against his tuition for referring other students to Tri-Valley University. SER 99-100. He also referred students who had already decided to enroll in the school to other Tri-Valley University students, so that they could pretend to refer them, get the referral credit, and then pay Dasa a kickback. SER 101. One student gave Dasa an iPhone as payment for referring students to him. SER 101-02.

### 2. Aspiring student Anji Reddy Dirisanala

Anji Reddy Dirisanala is an Indian national who came to the United States on an F-1 visa to earn a master's degree in industrial engineering at International Technological University. SER 125, 127. He had earned a bachelor's degree in automotive engineering in India, and had worked for Hyundai for two and a half years. SER 125. The tuition cost at International Technological University was a concern for Dirisanala, as was his inability to get a part-time campus job there,

15

because he was supporting his parents at the time and had come to the United States with only $30.  SER 125-28.  Dirisanala learned about Tri-Valley University from a friend who told him he could get a campus job there.  SER 127-28.

Dirisanala's friend referred him to Dasa, who gave him admissions documents and a form I-20, and told him he could have a campus job at Tri-Valley University.  SER 129.  Dirisanala's brother-in-law made the initial $1,000 tuition payment for Dirsanala, who had no money at the time.  SER 130.  When they visited the Tri-Valley University campus, Dirisanala's brother-in-law asked Su where the classes were being held, and Su said the classes were taking place in the building, which Dirisanala and his brother-in-law assumed all belonged to Tri-Valley University.  SER 131-32.  In fact, the classrooms were being used by first- and second-graders at a local grade school.  SER 133.

Dirisanala brought a notebook to what he expected to be his first day of classes, but his classes never started.  SER 143-44.  After a week or so, Dirisanala realized that Tri-Valley University was a "university where there are no classes."  SER 144.  He never saw a class take place at the purported Tri-Valley University classroom during his three months at the school.  SER 142, 144.  Dirisanala was worried about his F-1 visa status given the absence of classes at Tri-Valley University, but Su told him not to worry because she would "take care of" him.

16

SER 145.  Dirisanala became too busy working for Su to take classes anyway.
SER 146.

Unlike the classes, Dirisanala's job at Tri-Valley University began
immediately.  SER 131.  Dirisanala went to work in the Tri-Valley University
admissions office, where he reviewed incoming emails from prospective students
and printed out their addresses.  SER 134.  He then addressed envelopes and
stuffed them with the students' I-20s.  *Id.*  Dirisanala worked twelve hours per day,
six or seven days per week.  *Id.*  Eventually, Su instructed Dirisanala to create I-
20s on SEVIS, and to use the same residential address in Sunnyvale for every
student.  SER 135-36.  Su told Dirisanala that the purpose of this address was that
"they need some address in California to show students are living there and they're
coming to the Tri-Valley University."  SER 136.  Su also instructed Dirisanala to
put in the same financial information on every student's I-20, because the school
did not ask students to submit their own financial information.  SER 137-38.  Su
bypassed the SEVIS access restrictions by entering her own login and password
information into SEVIS on a laptop, and then handing the laptop to Dirisanala to
use.  SER 139.  Su directed Dirisanala to admit every applicant immediately.  SER
140.

Su refused to pay Dirisanala the referral fees that she paid other Tri-Valley
students, because he was already working in admissions.  SER 149.  But Dirisanala

learned that he could send referrals to other students, who would receive a $1,200 referral fee from Su and then pay a kickback of $1,000 to Dirisanala. SER 149-51. In total, Dirisanala made about $20,000 from referral fee kickbacks. SER 151.

After an employee of the consulting company that recruited students for Tri-Valley University took Dirisanala to the Immigration & Customs Enforcement office in San Francisco one day, Dirisanala agreed to cooperate with the government in its prosecution of Su; he later transferred to International Technological University to study for his master's degree. SER 152-54.

### D.    Su's Trial And Sentencing

This case was tried to a jury over several weeks. ER 418-19. Su did not testify or present a defense. SER 188, 193-94. Su waived her right to have a jury decide the indictment's forfeiture count. SER 5. At the pre-trial conference, Su's counsel confirmed that Su was competent to stand trial. SER 4. Su's previous counsel had also represented to the district court that Su was competent. ER 275. Su did not give notice of intent to introduce either any expert evidence concerning her mental condition, or an insanity defense, as required by Fed. R. Crim. P. 12.2. *Id*. Su never placed her mental health at issue during the trial. SER 195-223. Su contacted several government witnesses by email during the trial, using pseudonyms, and tried to influence their testimony. SER 225-38. The jury found Su guilty of all 31 of the tried counts. ER 4-12.

18

After the trial, Su moved for a judgment of acquittal under Fed. R. Crim. P. 29, and for a new trial under Fed. R. Crim. P. 33. ER 219, 249. In her new trial motion, Su argued for the first time that she "is and was suffering from an unrecognized mental impairment" that influenced her decision not to testify and that would have been relevant to the jury's consideration of her intent to commit the charged crimes. ER 255. Su contended that this mental impairment constituted newly-discovered evidence, and also required a new trial in the interests of justice. ER 260, 267. Su included with her motion a psychologist's report of an examination conducted after the trial, which in Su's opinion showed that she was mentally ill when committing her crimes and during her trial. ER 259. Su also argued that her mental illness caused her to reject the government's pre-trial plea offer. ER 261.

Su's psychologist's report noted that Su's responses on one test "fell in the range of scores for individuals who are likely to be malingering" and that she "appeared to be exaggerating or feigning some symptoms of psychosis and mood." Appellant's Sealed Excerpts of Record ("ASER") 7. The doctor found Su "keen to communicate that she has [p]aranoid [s]chizophrenia because she has read a legal case where the defendant's [s]chizophrenia had worked in his favor in his case." *Id*. Su also stressed to the doctor that she was not suicidal, apparently because she thought this would facilitate her release from custody. *Id.*

19

The district court denied both of Su's post-trial motions. With respect to Su's motion for new trial, the district court held that Su's mental condition was not newly-discovered evidence, that she could have raised her mental state at trial, and that her behavior at trial reflected stress and not mental illness. ER 90-91. Su's mental diagnosis, the district court concluded, would not have resulted in acquittal in any event, because it did not suggest that Su could not have formed the intent necessary to commit the crimes of conviction. ER 91-92. The district court rejected Su's claim that she was entitled to a new trial in the interest of justice, concluding first that it was untimely given the 14-day deadline in the rule, and second that the interest of justice did not require overturning the verdict because Su was aware of what she was doing when she committed the crimes of conviction. ER 94.

The district court sentenced Su to a below-guidelines sentence of 198 months' imprisonment. ER 137. The district court calculated a total offense level of 40, which with no criminal history yielded an advisory sentencing guidelines range of 292 to 365 months. ER 130. The district court found that the amount of loss attributable to Su's crimes was almost $6 million, and that Su used her access to the SEVIS database to deceive the government, to deceive students, and to shield aliens from government detection. ER 132-33. The district court adopted the Probation Office's guidelines calculation, which included an 18-level

20

enhancement for amount of loss under USSG § 2B1.1(b)(1)(J), a 6-level enhancement for 250 or more victims under USSG § 2B1.1(b)(2)(C), a 2-level enhancement for use of sophisticated means under USSG § 2B1.1(b)(9)(C), a 4-level enhancement for her leadership role under USSG § 3B1.1(a), and a 2-level enhancement for obstruction of justice based on Su's witness-tampering efforts, under USSG § 3C1.1. Pre-Sentence Investigation Report ("PSR") ¶¶ 51-56. When added to the base offense level for wire fraud and a 1-level multiple count adjustment, the resulting total offense level was 40. PSR ¶¶ 50, 66, 69, 72. Because Su had no criminal history points, and did not accept responsibility for her crimes, these potential factors did not affect her sentencing guidelines computation. PSR ¶¶ 71, 76.

The district court found that Su showed a "striking" lack of remorse for her crimes, noting that Su had tried to establish another bogus university — called Global University — after her arrest in this case. ER 133. The district court emphasized that Su could have easily made better choices, given her intelligence, high level of education, supportive family, and comfortable upbringing. ER 134. The district court decided to vary downward from the low end of the guidelines range to account for Su's mental illness, her lack of criminal history, and because the guidelines range, in its view, overstated Su's crimes' severity. ER 136. The

21

district court did not, however, agree with Su that her mental health excused her conduct or prevented her from distinguishing right from wrong. *Id*.

The district court ordered Su to pay restitution in the amount of $904,198.84, which represented the total refund amount that Tri-Valley University students requested from PayPal and credit card processors. ER 141; PSR ¶ 38. The district court also ordered forfeiture of real property, personal property, and money, to the extent that its value totaled $5,601,844.72. ER 59-60.

## SUMMARY OF ARGUMENT

The jury had sufficient evidence to convict Su of harboring Dasa and Dirisanala. The F-1 visas that gave Dasa and Dirisanala legal status in the United States required them to make normal progress toward completing a course of study, which they did not do while enrolled at Tri-Valley University. The jury heard evidence that Dasa and Dirisanala took no classes, online or otherwise, at Tri-Valley University. The jury also had sufficient evidence to find that Su shielded Dasa and Dirisanala from detection by immigration officials. Su generated fraudulent I-20 immigration forms that led SEVP officials to believe that Dasa and Dirisanala were pursuing a course of study at an approved educational institution, and thus in compliance with their immigration status, when in fact they were not.

22

Su's claim that the visa and wire fraud statutes require proof that she successfully defrauded individual victims is legally incorrect. This Court has never held that wire fraud, which requires a scheme to defraud, specific intent, and an interstate wire in support of the scheme, also requires proof that the scheme successfully defrauded anyone. Nor does visa fraud require that a forged visa pertain to a real person.

The money laundering charges did not merge with the wire fraud charges because Su's expenditure of her gains from the fraud scheme on luxury goods was not a central component of her scheme.

It was not an abuse of discretion for the district court to find that Su's claimed mental illness, raised for the first time after her conviction, did not entitle her to a new trial. Su's mental condition was not newly-discovered evidence because she could have raised the issue at trial, and it would not have resulted in acquittal because it did not prevent Su from forming the intent necessary to commit her crimes. Nor was it an abuse of discretion for the district court to reject Su's claim that she was entitled to a new trial in the interest of justice, given its untimeliness and Su's awareness of what she was doing when she committed the crimes of conviction.

The district court's below-guidelines sentence was not an abuse of discretion. The loss-amount calculation properly took into account Su's full

23

intended gain, and the unauthorized use of a government computer conviction was properly separated, for purposes of the grouping rules, from the other convictions because it involved a different victim. The enhancement for obstruction of justice was appropriate given Su's attempts to tamper with several witnesses during her trial. Su's sentence was substantively reasonable given the scope of her crime, the number of victims, her misconduct during trial, and her lack of remorse. The district court varied downward based on Su's claimed mental illness, despite her psychologist's conclusion that one of the tests administered to Su showed that she was malingering.

Su has not shown that she was entitled to a hearing on the government's forfeiture count before the district court entered the preliminary order of forfeiture. Su offered no reason why such a hearing was necessary. And even if Su were entitled to a hearing, the district court's denial was harmless because Su does not suggest how the hearing might have affected the district court's forfeiture order, given her concession that she purchased the property subject to forfeiture with proceeds that she received from Tri-Valley University.

24

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY DENIED SU'S MOTION FOR ACQUITTAL

### A. Standard Of Review

The Court reviews de novo a district court's denial of a motion for acquittal based on insufficient evidence. *United States v. Ruiz-Lopez*, 749 F.3d 1138, 1141 (9th Cir. 2014). The Court views the trial evidence in the light most favorable to the prosecution, and then determines whether any rational trier of fact could have found the essential elements of the charged crimes beyond a reasonable doubt. *Id*. This standard, which protects the jury's key role in determining the defendant's guilt or innocence, prohibits reversal for insufficient evidence when the jury has heard evidence that would permit it to find guilt beyond a reasonable doubt on all of the essential elements of the charged crimes. *Id*.

The Court has held that it is error to construe evidence in a manner favoring innocence when ruling on a post-conviction motion challenging the sufficiency of the evidence. *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc).

The Court reviews de novo a district court's interpretation of a statute's elements in ruling on a motion for acquittal. *United States v. McNeil*, 320 F.3d 1034, 1035 (9th Cir. 2003).

25

**B.      Sufficient Evidence Supported The Jury's Verdict On The Alien Harboring Counts**

Su argued, in her post-trial motion for acquittal, that the jury had insufficient evidence to convict her of alien harboring because it had no evidence to find, according to Su, that the two aliens identified in the counts were in the United States in violation of law, or that Su shielded them from government detection. Appellant's Opening Brief ("AOB") 37.  The trial record shows otherwise: the two foreign national students named in these counts violated United States immigration law by remaining here on student visas without pursuing full courses of study, and Su shielded them from government detection by falsifying I-20 forms in a government database that made it appear that the two students were maintaining their student visa status, when in fact they were not.

*1.      The jury had sufficient evidence to find that Dasa and Dirisanala were in violation of United States law*

A conviction for alien harboring under 8 U.S.C. § 1324(a)(1)(A)(iii) requires proof that the harbored alien "has come to, entered, or remains in the United States in violation of law."  Aliens Dasa and Dirisanala both entered the United States on F-1 student visas.  SER 79, 125.  These visas only admit foreign nationals for "duration of status," which, in pertinent part, "is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution approved by the [Immigration] Service for attendance by foreign students."

26

8 C.F.R. § 214.2(f)(5)(i). A student studying on an F-1 visa "is considered to be maintaining status if he or she is making normal progress toward completing a course of study." *Id*. Su does not appear to dispute that Dasa's and Dirisanala's legal status in the United States depended on their F-1 visas. AOB 37, 38.

Dasa and Dirisanala both lost their status as student visa-holders after they enrolled at Tri-Valley University, when they stopped pursuing the full course of study that federal law requires. Dasa testified that he never began his course of study during his first semester at Tri-Valley University, and that he took the next semester off at Su's suggestion. SER 85, 88. Dirisanala testified that he gave up even trying to take courses at Tri-Valley University when he realized that it was a "university where there are no classes." SER 143-44. Soon Dirisanala became too busy working in Su's admissions office to take classes anyway. SER 146.

By failing to make normal progress toward completing a course of study, Dasa and Dirisanala fell out of F-1 status. 8 C.F.R. § 214.2(f)(5)(i); *Dhital v. Mukasey*, 532 F.3d 1044, 1050 (9th Cir. 2008) (noting that an immigrant whose status depends on a student visa surrenders that status by dropping below a full course of study without proper prior approval). At that point, Dasa and Dirisanala remained in the United States in violation of law within the meaning of 8 U.S.C. § 1324(a)(1)(A)(iii). This Court has held that foreign nationals whose status in the United States depends on an F-1 visa are subject to deportation if they violate the

27

regulations pertaining to F-1 visas, for example by transferring schools without seeking advance approval, or by working in an off-campus job while enrolled as a student without obtaining prior permission. *Ghorbani v. Immigration and Naturalization Service*, 686 F.2d 784, 786 (9th Cir. 1982). The Eighth Circuit has reached the same conclusion, relying on this Court's precedent. *United States v. Bazargan*, 992 F.2d 844, 847 (8th Cir. 1993) (quoting *Ghorbani*, 686 F.2d at 786, and citing *Mohammadi-Motlagh v. Immigration & Naturalization Service*, 727 F.2d 1450, 1453 (9th Cir. 1984)). This Court, in turn, has cited the Eighth Circuit's decision in *Bazargan* with approval. *United States v. Latu*, 479 F.3d 1153, 1158 (9th Cir. 2007).

Su argues that Dasa and Dirisanala were not "illegal aliens" because Tri-Valley University had not yet lost its authorization to admit F-1 students during the time covered by the harboring counts, and because removal proceedings had not yet been instituted against them. AOB 39. Neither argument has any basis in law.

First, Su's use of the term "illegal alien" is inaccurate; the harboring statute provides that the alien must "remain[ ] in the United States in violation of law," and this Court held in *Ghorbani* that an alien who violated the terms of his student visa — even if they were, in the alien's view, "technical" violations — was in the United States in violation of law and could be deported. 686 F.2d at 786.

28

Second, whether Tri-Valley University had authorization to admit F-1 students is irrelevant to Dasa's and Dirisanala's legal status in the United States. Their status depended on their pursuit of a full course of study, even if Tri-Valley University was authorized to admit them.  8 C.F.R. § 214.2(f)(5)(i).

Third, the harboring statute does not require that an alien must have been found removable, or be subject to removal proceedings, to be in violation of United States law.  8 U.S.C. § 1324(a)(1)(A)(iii).  This Court held, in *United States v. Latu*, 479 F.3d 1153, 1158 (9th Cir. 2007), that an alien who violated the terms of his status (there, by buying a gun) was unlawfully in the United States, even though he had applied for adjustment of status.  And the Tenth Circuit, in *United States v. Atandi*, 376 F.3d 1186, 1188 (10th Cir. 2004), held that an alien whose status in the United States depends on a student visa is unlawfully in the United States when the alien violates the terms of that status, even if the violation has not been "recognized by official decree."  Although both *Latu* and *Atandi* involved illegal possession of a firearm, that statute's reference to an alien "unlawfully in the United States" is indistinguishable from the harboring statute's reference to an alien "in the United States in violation of law."  8 U.S.C. § 1324(a)(1)(A)(iii); 18 U.S.C. § 922(g)(5)(A).

The cases that Su cites do not contradict this precedent. AOB 39-40. The Supreme Court's aphorism, in *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012), that "it is not a crime for a removable alien to remain in the United States," is beside the point. The harboring statute refers to aliens who remain in the United States in violation of law, not to aliens who have committed crimes, and this Court held in *Ghorbani* that an alien who violated the terms of his student visa was in the United States in violation of law. 686 F.2d at 786. The Tenth Circuit and Texas district court cases that Su cites (AOB 39-40) involved aliens who had applied for adjustment of status under a previous version of the immigration statute, which this Court recognized in *Latu* no longer applied. 479 F.3d at 1157-58 (distinguishing *United States v. Hernandez*, 913 F.2d 1506 (10th Cir. 1990)).

The Court should follow its precedent in *Ghorbani* and *Latu* and hold that Dasa and Dirisanala remained in the United States in violation of law when they stayed in the United States after violating the terms of their F-1 student visas by failing to pursue full courses of study.

2.      *The jury had sufficient evidence to find that Su shielded Dasa and Dirisanala from government detection*

Under the alien harboring statute, it is a crime for a person to shield an alien from detection while knowing or recklessly disregarding that the alien remains in the United States in violation of law. 8 U.S.C. § 1324(a)(1)(A)(iii). Su claims that she only employed Dasa and Dirisanala, which did not by itself shield them from

30

government detection.  AOB 42-43.  This is a mischaracterization of the record, because Su did more than employ Dasa and Dirisanala: she prepared forms I-20 and fraudulent transcripts that made it appear to officials administering the student visa program that Dasa and Dirisanala were lawfully pursuing a course of study in the United States, when in fact they were not.  SER 82-83, 85, 131, 147.

The Court has held that providing aliens with fraudulent immigration documents constitutes alien harboring.  *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 973 (9th Cir. 2008).  When Dirisanala told Su that he was worried about maintaining his F-1 student status despite not taking any classes, she told him not to worry because she would "take care" of him.  SER 144-45.

The Court should hold that the jury had sufficient evidence to find that by falsifying immigration documents to make it appear that Dasa and Dirisanala were pursuing a course of study under their F-1 student visas, Su was shielding them from government detection.

### C.  Wire Fraud And Visa Fraud Do Not Require Proof Of A Defrauded Victim

Su moved for acquittal on the wire fraud and visa fraud counts, arguing that these crimes were "impossible" for her to commit because no real persons were defrauded.  AOB 44, 47.  This argument is contrary to the plain language of the relevant statutes and this Court's precedent.

31

### 1. Wire fraud does not require proof of a defrauded victim

The Court has held that wire fraud has three elements: a scheme to defraud, use of the wires in furtherance of the scheme, and the specific intent to defraud. *McNeil*, 320 F.3d at 1040. The crime does not require proof that a victim was actually deceived. *Lindsey v. United States*, 332 F.2d 688, 690 (9th Cir. 1964). This is similar to mail fraud, which has almost identical elements and likewise does not require the completion of an actual fraud. *Lemon v. United States*, 278 F.2d 369, 373 (9th Cir. 1960). The wire may have been for a purpose other than depriving a victim of money or property, such as concealment of the scheme. *United States v. Lane,* 474 U.S. 438, 453 (1986).

Thus, it was not impossible for Su to have committed wire fraud, despite the government's use of fictitious aliens to catch Su in her scheme.

### 2. Visa fraud does not require proof of a defrauded victim

Su argues that she could not have committed visa fraud by forging immigration documents for fictitious students. AOB 47. But the visa fraud statute of which Su was convicted, 18 U.S.C. § 1546(a), does not require that the fraud have been in relation to any particular victim. Any knowing forgery of a visa will suffice. *Id*. Indeed, the Court has held that visa fraud is a possessory offense, because it criminalizes the mere knowing possession of a forged immigration document. *United States v. Krstic*, 558 F.3d 1010, 1017-18 (9th Cir. 2009).

Thus, the government was not required to prove that Su's visa fraud was in relation to any victim.

### D. Su's Money Laundering Convictions Do Not Merge With Her Wire Fraud Convictions

The jury convicted Su of twelve counts of wire fraud, and seven counts of money laundering. ER 399. Su contends that the money laundering convictions merge with the wire fraud convictions, and thus cannot stand as separate convictions, because part of the wire fraud scheme — according to Su — was that Su spent money from the scheme on luxuries for herself. AOB 47-48. This position misconstrues the merger problem that the Supreme Court confronted in *United States v. Santos*, 553 U.S. 507, 516 (2008), and that this Court addressed in *United States v. Bush*, 626 F.3d 527, 535 (9th Cir. 2010). In *Santos*, the Supreme Court noted that interpreting the term "proceeds" in 18 U.S.C. § 1956 to include "receipts" of unlawful activity would create a merger problem if the defendant spent the receipts as part of the unlawful activity, for example, if the operator of an illegal betting operation spent the receipts from losing bettors to pay the winners, because committing the unlawful activity would always involve liability for money laundering. 553 U.S. at 516. More broadly, the Supreme Court noted that the "merger problem" would extend to anyone who pays the costs of a crime with its proceeds. *Id*.

This Court, in *Bush*, held that the appropriate test for whether a money laundering charge created a merger problem when combined with a fraud charge was "whether the money laundering was a central component of the defendant's criminal scheme." 626 F.3d at 535. In this case, the money laundering counts related to Su's use of property derived from visa fraud to purchase a Mercedes-Benz and real estate. ER 164-65. These purchases were not a central component of Su's scheme; in fact, they were unnecessary to it. In *Bush,* the Court refused to hold that a defendant's profligacy was a basis for "weaving money laundering into a Ponzi scheme." 626 F.3d at 538. Similarly, Su's real estate and automobile purchases were not part of her overall scheme.

Su argues, without citation to the record, that the government "charged that it was an essential part of the scheme to defraud that [Su] used the money fraudulently transferred from Tri-Valley accounts for her own purposes, including purchasing real estate and an automobile." AOB 48. This is not true. The indictment described the scheme to defraud, and Su's purchases of real estate and an automobile were not included in that description. ER 157-58.

The Court should find that Su's money laundering convictions do not create the merger problem that the Supreme Court discussed in *Santos*, 553 U.S. at 516.

34

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED SU'S MOTION FOR NEW TRIAL

Su filed a motion for new trial, arguing for the first time that she should have been allowed to present the jury with evidence that she suffered from a mental impairment. AOB 55. The district court denied the motion during a hearing that preceded Su's sentencing. ER 90-94.

### A. Standard Of Review

The Court reviews a district court's denial of a motion for a new trial for abuse of discretion. *United States v. French*, 748 F.3d 922, 934 (9th Cir. 2014). In determining whether a district court abused its discretion, the Court determines de novo whether the district court identified the correct legal rule to apply to the relief requested. *Id*. If so, then the Court considers whether the trial court's application of the correct legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *Id*.

### B. The District Court's Decision That Su Failed To Present Newly-Discovered Evidence Was Not An Abuse Of Discretion

To obtain a new trial based on newly discovered evidence, a defendant must establish that: (1) the evidence is newly discovered; (2) the defendant's failure to discover the evidence sooner was not the result of a lack of diligence; (3) the evidence is material; (4) the evidence is neither cumulative nor merely impeaching;

and (5) the evidence indicates a new trial would probably result in acquittal. *United States v. Wilkes*, 744 F.3d 1101, 1110 (9th Cir. 2014).

Su did not meet this test. The evidence of her mental condition was not newly discovered just because she failed to obtain a psychologist's report until the trial was over. *Runningeagle v. Ryan*, 686 F.3d 758, 768 (9th Cir. 2012) (noting that a defendant must have exercised due diligence in seeking newly discovered evidence). Su's report suggests that her mental health issues predated the trial by many years. ASER 3-5. Nevertheless, Su never raised her mental health at trial, and never sought to introduce evidence of a mental illness, or of her supposed inability to form the requisite intent to commit the crimes with which she was charged.

Su presumes, without evidence, that her mental condition "worsened and came to a climax at the close of the trial," but even at that point Su failed to raise her mental health as an issue. AOB 60. Su had ample opportunity to raise her mental health at trial, and to retain an expert, given that her mental health was raised as an issue in her initial bond hearing. ER 18. Su has not met the first two prongs of the test for newly-discovered evidence because of the long-term nature of her mental health treatment, and her lack of diligence in raising it before or during trial.

36

Also, the mental health evidence offered by Su's psychologist, had it been presented at trial, would not have resulted in acquittal. The psychologist noted Su's "likely exaggeration of symptoms" during their meeting. ASER 13. And although the psychologist noted that Su's mental illness may have "played a role in behaviors that resulted in her charges," she did not opine that Su was unable to form the level of intent necessary to commit the crimes of conviction. *Id*. Indeed, the extreme sophistication of Su's scheme, which involved establishing and running a bogus university with over 1,000 students for almost two years that generated over $5 million in revenue, argues against the proposition that she could not form the requisite intent to commit these crimes.

## C. The District Court's Denial Of Su's Motion For New Trial In The Interests of Justice Was Not An Abuse Of Discretion

Su claims that she should have been granted a new trial in the interests of justice because her mental health prevented her from considering pre-trial plea offers, made her distracting to the jury, and interfered with her decision whether to testify. ER 260-64. Also, Su claims that she should have been allowed to present psychological expert testimony about her mental condition at trial. ER 265-67. The district court did not abuse its discretion when it rejected these claims.

As an initial matter, Su's motion was untimely. A motion for new trial based on grounds other than newly-discovered evidence must be filed within 14 days after the guilty verdict. Fed. R. Crim. P. 33(b)(2). Su concedes that she

failed to meet this deadline.  AOB 57, 58.  Su's claim that the district court should have construed her motion for an extension of time to file her motion for acquittal as covering her new trial motion as well makes no sense.  AOB 57.  The motions are governed by different deadlines and rules of procedure, and the district court had no basis to presume that Su's reference to one motion was meant to refer to both.

But Su's motion, even if it were timely, lacked merit.  Su offers no evidence, and asks the Court to presume, that her mental health prevented her from evaluating the government's plea offer or deciding whether to testify.  AOB 62-63. Her psychologist's report does not support these claims.  ASER 12-13.  Su's counsel never raised these issues with the district court.  Nor is there evidence that Su's behavior during trial influenced the jury against her, or if it did, that she should not be held responsible for her behavior.  Again, her psychologist's report does not support this claim.  ASER 12-13.

Su could have asked to present evidence of her mental health at trial, but chose not to, even as the district court confirmed with her counsel that she was competent to stand trial.  SER 3-4.  Su does not contend that her trial counsel was ineffective, or that the district court in some way prevented her from presenting mental health evidence at trial, or from asking to present it.  AOB 63, 66.  In the absence of this or some other indication that Su tried but was unable to present

38

mental health evidence at trial, the Court should not find that the interests of justice required the district court to grant Su a new trial on this basis.

## III. THE DISTRICT COURT'S SENTENCE WAS PROCEDURALLY AND SUBSTANTIVELY REASONABLE

The district court sentenced Su to a below-guidelines sentence of 198 months' imprisonment after calculating Su's Sentencing Guidelines range and conducting a sentencing hearing at which the district court explained the reasons for its sentence.  ER 61.

### A.    Standard Of Review

The function of appellate review of a sentence is to determine whether the sentence is reasonable.  *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).  Only a procedurally erroneous or a substantively unreasonable sentence will be set aside.  *Id*.  Review is for abuse of discretion.  *Id*.  The abuse of discretion standard involves a two-part analysis.  *United States v. Maier*, 646 F.3d 1148, 1156 (9th Cir. 2011).  First, the Court examines de novo whether the district court identified the correct legal rule to the relief requested.  *Id*.  If so, then the Court examines whether the district court's application of the correct legal standard was illogical, implausible, or without support from inferences that may be drawn from facts in the record.  *Id*.

**B.    The District Court's Loss Amount Calculation Was Not An Abuse Of Discretion**

Under USSG § 2B1.1, a defendant's base offense level is increased according to the amount of loss caused by the offense, where the initial measure of "loss" is the greater of actual or intended loss.  USSG. § 2B1.1(b)(1).  *United States v. Morris*, 744 F.3d 1373, 1374 (9th Cir. 2014).  The application note for this enhancement defines "intended loss" as: (1) "the pecuniary harm that was intended to result from the offense," and (2) "includes intended pecuniary harm that would have been impossible or unlikely to occur."  USSG § 2B1.1 cmt. n.3 (A)(ii).  The district court's estimate of the loss, if reasonable, deserves appropriate deference given its unique position to assess the evidence and estimate the loss based upon that evidence.  *United States v. Torlai*, 728 F.3d 932, 938 (9th Cir. 2013).

The district court used the total amount that students holding F-1 visas who had enrolled at Tri-Valley University paid to Su in tuition as her intended loss.  ER 108.  Su argued that the district court should reduce this amount by tuition payments from students whose only interest in enrolling in Tri-Valley University was in maintaining their immigration status.  ER 105-06.  The district court decided that while some students may have had no interest in studying toward a degree, it would be impossible to determine how many students of that type were enrolled at Tri-Valley University.  ER 109.  In the absence of that information, the

40

district court decided that Su's intended gain was the full amount of tuition payments, or $5.6 million. *Id*. Also, the intentions of former Tri-Valley University students were irrelevant to Su's intended loss, which by definition does not require that she have defrauded actual victims. USSG § 2B1.1 cmt. n.3 (A)(ii).

The Sentencing Guidelines allow the district court to estimate loss based on the defendant's gain, if there is a loss but it cannot reasonably be determined. USSG § 2B1.1 cmt. n.3 (B). The trial record shows that Su took tuition payments from many students who wanted to study toward a degree, but who enrolled in non-existent classes. SER 66, 67, 84, 106-07, 112, 148, 161, 169, 179, 186. Su instructed her employees to tell students who complained about their inability to log into online classes that she was "working on it." SER 172. One Tri-Valley University employee testified that for every 100 calls he received, 30 to 40 were from students complaining about their inability to take classes. SER 180.

Given the evidence that Su took $5.6 million in tuition payments from students for classes that she did not provide to them, and that many of the students complained about their inability to take classes, the district court did not abuse its discretion in finding that the full amount of tuition payments reflected Su's intended loss, or her gain, from her scheme to defraud. Su characterizes non-complaining victims as co-conspirators because she presumes they never wanted to

study toward a degree, AOB 75, but the loss amount calculation depends on her intentions, not those of her victims. USSG § 2B1.1 cmt. n.3 (A)(ii).

### C. The District Court's Grouping Of Offenses Was Not An Abuse of Discretion

Su argues that the district court erred in applying the Sentencing Guidelines' grouping rules to separate Su's conviction for unauthorized use of a computer from all of Su's other convictions. AOB 76-78. Su argues that the unauthorized use of a computer offense was "part and parcel" of the scheme that resulted in Su's other convictions, and should be grouped with them. AOB 78-79. In the alternative, Su argues that the district court improperly calculated the offense level for her unauthorized use of a government computer by adding an enhancement for her use of the computer with intent to commit another felony. AOB 79.

#### 1. The application of the grouping rules

The Sentencing Guidelines provide that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." USSG § 3D1.2. Counts involve "substantially the same harm," for purposes of this guideline, if they involve (1) the same victim and the same act or transaction; (2) the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan; (3) a count that embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another count; or (4) an offense level

determined largely on the basis of the total amount of harm or loss, the quantity of a substance, or some other measure of aggregate harm. *Id*. The guideline applicable to unauthorized use of a government computer, USSG § 2B2.3, is expressly excluded from grouping under the grouping guideline.
USSG § 3D1.2(d).

Su's argument that all of her offenses of conviction should be treated as one group suffers from three errors. First, the offenses cannot be grouped as part of a common scheme or plan because they involve different victims. AOB 79; USSG § 3D1.2(b). This Court has held that offenses in which the government is a victim should not be grouped with mail and wire fraud offenses that involve individual victims. *United States v. Smith*, 424 F.3d 992, 1015 (9th Cir. 2005). In this case, the government was the victim of Su's unauthorized use of a government computer, while her convictions for mail fraud, wire fraud, and other offenses involved individual victims.

Second, Su's unauthorized use of a government computer was not a specific offense characteristic or adjustment to any of the other offenses' Guidelines calculations. AOB 79; USSG § 3D1.2(c). The Guidelines calculations of all of Su's offenses of conviction, as set out in her pre-sentence report, do not include her unauthorized use of the SEVIS database as an offense characteristic or adjustment. PSR ¶¶ 50-72.

43

Third, the guideline applicable to the offense of unauthorized use of a government computer, USSG § 2B2.3, is expressly excluded from grouping with offenses that determine the offense level based on amount of loss or other quantities. USSG § 3D1.2(d). Thus, the grouping guidelines do not provide a way for Su's conviction for unauthorized use of a government computer to be grouped with her other offenses of conviction.

   2.    *The calculation of the offense level for unauthorized use of a government computer*

As an alternative argument, Su claims that the district court should not have enhanced her offense level for unauthorized use of a government computer because she committed it with the intent to commit another felony. AOB 80. In Su's view, this was double counting, AOB 81, but the guideline's cross-reference required it. USSG § 2B2.3(c). Also, the Guidelines did not result in double-counting because the offenses had different victims: the computer offense's victim was the government, while the other offenses had individual victims. It was for this reason that the offenses were not grouped in the first place. USSG § 3D1.2(a) & (b).

As the Court recently held in *United States v. Fries*, No. 13-10116, 2015 WL 1403813, at *15 (9th Cir. Mar. 30, 2015), it is not impermissible double counting to enhance the base offense level multiple times for the same criminal act if the Guidelines intended the enhancements to serve unique purposes. The Sentencing Guidelines' rule prohibiting the grouping of offenses that involve distinct victims

44

recognizes that it is not double counting to punish a defendant's wrongful conduct toward each of her victims. *Cf. United States v. Williams*, 693 F.3d 1067, 1073-74 (9th Cir. 2012) (finding error when the district court grouped offenses for which the primary victim was society in general, with fraud offenses for which the primary victims were individual investors).

Similarly, Su's complaint that the district court should not have included enhancements for her role or obstruction of justice in calculating the offense level for the unauthorized use of a government computer offense misunderstands that it is not double counting to punish a defendant for conduct toward different victims. AOB 81. And Su's argument that the district court was not allowed to calculate an offense level for unauthorized use of a government computer that was different from the probation officer's calculation in the pre-sentence report is wrong. AOB 80. The district court must resolve disputes regarding portions of the pre-sentence report at sentencing. Fed. R. Crim. P. 32(i)(3)(B). This Court has never held that a district court is required to agree with the probation office's Sentencing Guidelines calculation; indeed, the district court has the ultimate responsibility to calculate the Sentencing Guidelines range correctly. *Carty*, 520 F.3d at 991.

### D. The District Court's Imposition Of A Sentencing Enhancement For Obstruction Of Justice Was Reasonable

The district court enhanced Su's offense level by two levels for obstruction of justice, based on her attempts to tamper with several government witnesses during trial. ER 116. Su conceded that she was trying "to get the witnesses to tell the truth as she saw it." *Id*. Under USSG § 3C1.1, the district court should increase the offense level by two levels for a defendant who willfully obstructs or impedes the administration of justice with respect to the prosecution of the offense of conviction. The application notes accompanying this guideline provide that attempting to unlawfully influence a witness constitutes obstruction under this guideline. *Id*. at n.4(A).

During trial, Su sent six emails to government witnesses using the aliases Dacey Dayle and Jo Josephie, attempting to influence their testimony. SER 225-38. Su claims that she should not be held responsible for these emails because her mental state "negated the specific mens rea needed" to obstruct justice. AOB 82. As support, Su references her psychologist's report, but the psychologist merely speculated that Su's symptoms "likely played a role" in her decision to contact witnesses, but also qualified that statement by noting Su's "likely exaggeration of symptoms" during her mental health exam. ASER 13.

Moreover, Su's methods do not suggest impulsive behavior. She created two different email accounts using aliases to disguise her identity. SER 225-38.

46

She sent the emails on different days over the course of a week. *Id*. And the emails were highly detailed and tailored to the potential testimony of each witness. *Id*. The district court did not abuse its discretion when it found that Su willfully obstructed justice by contacting government witnesses with the purpose of influencing their trial testimony.

### E. The District Court's Sentence Was Substantively Reasonable

This Court echoes the Supreme Court's admonition, in evaluating a sentence for substantive reasonableness, that "'when the judge's discretionary decision accords with the [Sentencing] Commission's view of the application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable.'" *Carty*, 520 F.3d at 994 (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). In this case, the district court varied four levels below the sentencing guidelines range to account for Su's mental health and to properly reflect the severity of her crimes. ER 136.

Su argues that the district court's sentence was substantively unreasonable because her guidelines range was "inflated" by the amount of loss, because the victims could be made whole through restitution if the government sold her forfeited assets, because other charged defendants received much lower sentences, and because of her mental health. AOB 85-86. The Court should reject each of these claims.

47

First, Su's Guidelines range was high because she took an exceptional amount of money — $5.6 million — from over 1,000 student-visa holders during the course of her scheme.  SER 54, 56; ER 132-33.  Su spent two years operating a sham university for the sole purpose of taking tuition money from foreign students without providing anything more than an immigration form and a bogus transcript in return.  SER 174, 177.  While some students may have appreciated their immigration status, many others actually wanted an education.  Su punished students who wanted to transfer out of her university — also the students most likely to have wanted a real education — by threatening to terminate them or by otherwise delaying their transfers.  SER 12-13.

Second, Su's claim that the government can make her victims whole by selling her forfeited property is frivolous, given that she continues to contest the forfeiture.

Third, Su cannot reasonably compare her crimes to those of her co-defendants, who were employees that she directed to misuse the SEVIS database.  Two of these defendants, Dasa and Dirisanala, were aspiring students who enrolled at Tri-Valley University thinking that it was a legitimate university, and testified against Su at trial.  SER 104, 140.  Su established Tri-Valley University on her own, and merely used her employees to further her own goals.  Su paid Dasa $10 per hour to register students and answer their emails.  SER 89-90.  He worked

48

about twelve hours per day, five days per week.  SER 103.  Su, in contrast, paid herself over $5 million.  ER 132-33

Fourth, Su, who was given a four-level downward variance for her mental health, cannot show why it was an abuse of discretion not to give her a larger variance.  ER 136.  Despite her mental health, Su was able to plan and pursue over two years a sophisticated scheme from which she earned over $5 million, and to direct numerous employees and students whom she frequently intimidated and threatened until they did her bidding.  SER 13 (threatening students with deportation), 92 (screaming at employees), 163 (terminating a student who wanted to transfer), 170 (preventing a student from transferring until she paid her fees)].  Su tried to continue her scheme even after she was arrested, ER 133, convinced a magistrate judge that she did not need mental health counseling, ER 18, and attempted to influence several government witnesses' testimony at trial.  SER 225-38.  This conduct, over the course of years, does not suggest a person whose mental health interfered with her ability to devise and execute a sophisticated criminal scheme.

Finally, the district court found that Su showed a "striking" lack of remorse for her crimes.  ER 133.

49

The district court's below-guidelines sentence took into account the sentencing factors set forth in 18 U.S.C. § 3553(a), and was not an abuse of discretion.

## IV. THE DISTRICT COURT WAS NOT REQUIRED TO HOLD A HEARING BEFORE ISSUING ITS PRELIMINARY ORDER OF FORFEITURE

### A. Standard Of Review

The Court generally reviews district court decisions not to hold evidentiary hearings for abuse of discretion. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (suppression); *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004) (habeas). Su claims that the standard of review should be de novo because the issue involves an interpretation of federal forfeiture law. AOB 87. But here, the issue is not one of legal interpretation, but of whether sufficient factual basis for a hearing existed.

### B. Su Was Not Entitled To A Hearing Preceding The Preliminary Order Of Forfeiture

In criminal forfeiture proceedings, the indictment or information must give the defendant notice of the government's intended forfeiture of the defendant's property. Fed. R. Crim. P. 32.2(a). Once the defendant has been convicted, the district court must determine what property is subject to forfeiture, and enter a preliminary order of forfeiture, which directs that the property shall be forfeited.

Fed. R. Crim. P. 32.2(b). If the forfeiture is contested and either party requests a hearing, the district court must conduct a hearing. *Id*.

Su waived a jury determination of forfeiture. ER 32. After the government moved for a preliminary order of forfeiture, Su asked the district court to stay any forfeiture proceedings until it decided her post-trial motions. ER 272. Su also noted, without explanation, that she contested the preliminary order of forfeiture and requested a hearing. ER 273.

Su failed to show in the district court, and fails to show on appeal, why the hearing she requested would not have been a pointless formality. AOB 89-90. She does not proffer what evidence she would have introduced, or what argument she would have made, that could in any way have affected the district court's decision to enter a preliminary order of forfeiture. *Id*. And even if the district court had been required to hold a hearing at Su's request, the error was harmless. Su concedes that the she purchased the property subject to forfeiture with proceeds from Tri-Valley University. AOB 85 ("All, or almost all, of the proceeds from Tri-Valley were used by Su to buy real estate, or kept in cash in bank accounts. The government has seized all those assets, allowing for full restitution."). It is unclear how a hearing would have affected this outcome.

The Court should affirm the district court's preliminary order of forfeiture.

51

## CONCLUSION

For the reasons set forth above, this Court should affirm the judgment of the district court.

Dated: April 17, 2015     Respectfully submitted,

           MELINDA HAAG
           United States Attorney

           BARBARA J. VALLIERE
           Chief, Appellate Division

            /s/ Owen P. Martikan
           OWEN P. MARTIKAN
           Assistant United States Attorney

           Attorneys for Plaintiff-Appellee
           UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

Pursuant to Rule 28-2.6(a) of the United States Court of Appeals for the

Ninth Circuit, counsel for the United States of America states that he is not aware

of any related cases to this appeal.

Dated: April 17, 2015       /s/ Owen P. Martikan

            OWEN P. MARTIKAN
            Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because :

X__    the brief contains __11,929__ words, excluding the parts of the brief exempted by Fed. R. APP. P. 32(a)(7)(B)(iii); or

____    this brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. (32)(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

X__    the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 program, with 14-font size Times New Roman style; or

____    the brief has been prepared in a monospaced spaced typeface using _____program with ____characters per inch and _____style.

Dated:  April 17, 2015                          _____/s/ Owen P. Martikan____
                                                OWEN P. MARTIKAN
                                                Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Hui Chen, certify that I am an employee of the Office of the United States Attorney, Northern District of California, a person over 18 years of age and not a party to the within action. I certify that on April 17, 2015, I electronically submitted the

- **Brief for the United States as Appellee**
- **Government's Supplemental Excerpts of Record (2 Volumes)**

in the case of *United States v Susan Xiao-Ping Su*, No. 14-10499, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  April 17, 2015                                  /s/ Hui Chen

                                                        Hui Chen
                                                        Paralegal Specialist