No. 14-10499

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

　　Plaintiff-Appellee,

　　　　v.

SUSAN XIAO-PING SU,

　　Defendant-Appellant.
_____

**GOVERNMENT'S SUPPLEMENTAL EXCERPTS OF RECORD
VOLUME I OF II**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 11-CR-0288 JST
_____

**MELINDA HAAG**
United States Attorney

**BARBARA J. VALLIERE**
Assistant United States Attorney
Chief, Appellate Division

**OWEN PETER MARTIKAN**
Assistant United States Attorney
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Telephone: (415) 436-7241

**Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA**

# TABLE OF CONTENTS

## VOLUME I OF II
### (SER0001-SER0155)

Excerpted Transcript for Pre-trial Conference, February 7, 2014 ............... SER0001

Excerpted Trial Transcript, March 4, 2014 ................................................. SER0007
    Vandana Satija .............................................................................. SER0010
    William Elliott .............................................................................. SER0015
    Susanna Warner ............................................................................ SER0018

Excerpted Trial Transcript, March 5, 2014 ................................................. SER0041
    Susanna Warner (Continued) ......................................................... SER0044
    Hao Luo ........................................................................................ SER0045

Excerpted Trial Transcript, March 10, 2014 ............................................... SER0048
    Carolyn Bayer-Broring .................................................................. SER0052
    Adolph Miller Allen ...................................................................... SER0053
    Jason Mackey ................................................................................ SER0054

Excerpted Trial Transcript, March 11, 2014 ............................................... SER0069
    Jason Mackey (Continued) ............................................................. SER0072
    Scott Cole ...................................................................................... SER0075
    Vishal Dasa ................................................................................... SER0076
    Bhanu Challagundla ....................................................................... SER0105

Excerpted Trial Transcript, March 12, 2014 ............................................... SER0109
    Dale Taylor ................................................................................... SER0112

Excerpted Trial Transcript, March 13, 2014 ............................................... SER0123
    Anji Reddy Dirisanala ................................................................... SER0125

# VOLUME II OF II
## (SER0156-SER0309)

Excerpted Trial Transcript, March 17, 2014.................................................SER0156
      Santhosh Ignatius...........................................................................SER0159
      Kalpana Challa................................................................................SER0168
      Parth Patel ......................................................................................SER0171

Excerpted Trial Transcript, March 18, 2014.................................................SER0182
      Naveen Kundur ...............................................................................SER0186

Excepted Trial Transcripts, March 18, 2014 ...............................................SER0188

Excerpted Trial Transcript, March 19, 2014.................................................SER0191
      Jury Instructions.............................................................................SER0193

Excerpted Emails from Susan Su to Government Witnesses
      (Exhibit 1 to the U.S. Sentencing Memorandum) ............................SER0225

Excerpts from the Tri-Valley University Catalogue
      (Government's Trial Exhibit 1) ........................................................SER0239

Articulation Agreements
      (Government's Trial Exhibit 4) ........................................................SER0303

Pages 1 – 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>                )<br>       Plaintiff, )<br>                )<br>  vs.             )<br>                )<br>SUSAN XIAO-PING SU,  )<br>                )<br>       Defendant. )<br>                ) | No. CR 11-0288 JST<br><br>San Francisco, California<br>Friday, February 7, 2014<br>9:47 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:       Melinda L. Haag
                       United States Attorney
                       450 Golden Gate Avenue
                       San Francisco, California 94102
              BY:  **HARTLEY WEST**
                   **DAVID COUNTRYMAN**
                   **ASSISTANT UNITED STATES ATTORNEYS**

                       Department of Justice
                       United States Attorney's Office
                       1301 Clay Street, Suite 340S
                       Oakland, California 94612
               BY:  **WADE MAXWELL RHYNE**
                   **ASSISTANT UNITED STATES ATTORNEY**

(APPEARANCES CONTINUED ON FOLLOWING PAGE.)

Reported By:  Sarah Goekler, RPR, CSR No. 13446
               Court Reporter Pro Tem

1    **APPEARANCES:** (CONTINUED)

2    For Defendant:          Law Offices of Erik Babcock
                             717 Washington Street, 2nd Floor
3                            Oakland, California 94607
                        **BY:  ERIK G. BABCOCK, ATTORNEY AT LAW**
4

5                             ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   health by her father, who's the author of the letter, and

2   requesting, based on that, that the Court dismiss the charges

3   because there has been some discussion of the defendant's

4   mental health over the course of this trial.

5        We've spoken with defense counsel and just wanted to make

6   sure that we do have on the record defense counsel's belief and

7   full familiarity with the case law that this defendant is

8   competent to stand trial and that he does not have any concerns

9   as her attorney, so I think Mr. Babcock's prepared to do that.

10         **THE DEFENDANT:** (Inaudible.)

11         **THE COURT:** Ma'am, don't talk.

12        Excuse me, Mr. Babcock. Ms. Su is attempting to address

13   the Court.

14        Ms. Su, if you have something to say, ask to speak to your

15   lawyer and he'll tell me. You have the right to remain silent

16   and not incriminate yourself. You're on the record. You talk

17   through your lawyer. If you insist on talking to the Court,

18   please consult with your lawyer first. But until you've done

19   that, please don't address me. Okay?

20        Mr. Babcock?

21         **MR. BABCOCK:** I wouldn't go so far as to say I have

22   no concerns, Your Honor. My client did have a 5150 commitment

23   about nine years ago for a couple of nights. And when she

24   appeared -- first came to Magistrate's Court on the complaint

25   in this case where I was not the attorney of record yet, but I

1   do know that Judge Ryu had some concerns.  I think more

2   addressed to whether or not she was suicidal.  And one of the

3   conditions of her release was that she attend counseling or

4   therapy, which she did for a couple years as a condition of her

5   pretrial release.

6       So -- but I have not declared a doubt as to her competence

7   to stand trial at this point.  And I'm not a therapist; I'm a

8   lawyer, but I do believe she understands the proceedings and is

9   able to help me to the extent required.  That's what the

10  Court's looking for -- or the Government, I guess.

11      **MS. WEST:**  We -- just so the Court's aware of some of

12  the prior proceedings regarding this, the counsel preceding

13  Mr. Babcock had asked for some sort of evaluation of the

14  defendant, after which he advised the Government and I believe

15  the Court as well; is that right?

16      **MR. RHYNE:**  I believe so.

17      **MS. WEST:**  That he did not have any concerns as to

18  the defendant's competence to stand trial and there were

19  whatever conditions had been put in place by the Court at that

20  early stage were lifted at defense counsel's request.

21      I do note that there's been no sort of mental health-type

22  defense proffered -- affirmative defense proffered by the

23  defense here, so we did want to raise it and just to advise the

24  Court that despite this filing, there has been no concern

25  raised by either defense counsel as to the competency of this

1  overreaching.

2         **MS. WEST:**  So the one thing that we do need to do on

3  the forfeiture issue right now is to have the defense announce

4  on the record that they waive the jury review of the forfeiture

5  aspect and are prepared to have the Court decide that.

6         **THE COURT:**  Mr. Babcock?

7         **MR. BABCOCK:**  That has been my discussions with the

8  Government.  I have never tried a forfeiture issue to a jury.

9  I wasn't planning to start now.  In past cases, the forfeiture

10  issue has been dealt with by briefing an argument after the

11  verdict when appropriate.  And that was my intention here.

12         **THE COURT:**  Mr. Babcock, your client has a right to

13  have any forfeiture issue in this case decided by a jury.  Does

14  she waive that right?

15         **THE DEFENDANT:**  I'm thinking ...

16         **THE COURT:**  I can pass this case, ma'am.  If you need

17  more time.

18         **THE DEFENDANT:**  Please.  Thank you.

19         **THE COURT:**  That means that you'd have to sit down

20  and I'll take some pleas in some other cases and you can have

21  the time you need to think about it.  We'll recall your case in

22  about an hour and a half.

23         **THE DEFENDANT:**  Okay.  We'll have the Court decide.

24         **THE COURT:**  All right.  Mr. Babcock, that's your --

25  you join in your client's waiver?

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4    _____    September 16, 2014

5    Signature of Court Reporter/Transcriber    Date
     Sarah L. Goekler

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3          BEFORE THE HONORABLE JON S. TIGAR

4   UNITED STATES OF AMERICA,        )
                                     ) Volume 2
5             Plaintiff,             ) Pages 137 - 345
                                     )
6        VS.                         ) NO. 11-00288 JST
                                     )
7   SUSAN XIAO-PING SU,              )
                                     ) San Francisco, California
8             Defendant.            ) Tuesday, March 4, 2014
    _____ ) 8:31 a.m.

9

10          **TRANSCRIPT OF COURT PROCEEDINGS**

11

    **APPEARANCES:**

12

13  **For Plaintiff:**        MELINDA HAAG
                              UNITED STATES ATTORNEY
14                            1301 Clay Street, Suite 340S
                              Oakland, California 94612
15                      BY:   **HARTLEY M.K. WEST, ESQ.**
                              **WADE M. RHYNE, ESQ.**
16                            **ASSISTANT UNITED STATES ATTORNEYS**

17

    **For Defendant:**       Law Offices of Erik G. Babcock
18                           717 Washington Street, Second Floor
                             Oakland, California 94607
19                      BY:  **ERIK G. BABCOCK, ESQ.**
                             **ATTORNEY AT LAW**

20

21

22

23

24
    Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                Official Court Reporter - U.S. District Court
                  Computerized Transcription By Case CATalyst

1                        **I N D E X**

2       Tuesday, March 4, 2014 - Volume 2

3                                                      **PAGE  VOL.**

4       Opening Statement by Mr. Rhyne                  157    2
        Opening Statement by Mr. Babcock                169    2
5
        **GOVERNMENT'S WITNESSES**                      **PAGE  VOL.**
6
        **SATIJA, VANDANA**
7        (SWORN)                                        171    2
        Direct Examination by Mr. Rhyne                 172    2
8       Cross-Examination by Mr. Babcock                186    2
        Redirect Examination by Mr. Rhyne               213    2
9       Recross-Examination by Mr. Babcock              220    2

10      **ELLIOTT, WILLIAM**
         (SWORN)                                        226    2
11      Direct Examination by Mr. Rhyne                 227    2
        Cross-Examination by Mr. Babcock                235    2
12
        **WARNER, SUSANNA**
13       (SWORN)                                        240    2
        Direct Examination by Ms. West                  240    2
14
                         **E X H I B I T S**
15

16       **GOVERNMENT'S EXHIBITS**              **IDEN  EVID  VOL.**

17          1                                    260    261    2

18          2                                    309    310    2

19          3                                    314    315    2

20          4                                    318    319    2

21          5                                    278    280    2

22          12                                   330    331    2

23          13                                   335    335    2

24          50                                   336    337    2

25          102                                  326           2

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**DEFENDANT'S EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 106A | 251 | 252 | 2 |
| 860 | 217 | 217 | 2 |
| 862 | 184 | 185 | 2 |
| 1000 | 204 | 205 | 2 |
| 1001 | 208 | 208 | 2 |
| 1002 | 209 | | 2 |
| 1003 | 221 | | 2 |

SATIJA - DIRECT / RHYNE

1    about the tuition that you would have to pay at Tri-Valley

2    University?

3    A.   Yes.

4    Q.   What did she say?

5    A.   It was $900 per course or 300 per credit, and she advised

6    taking three courses at a time per semester, and so I'd pay --

7    ended up paying $2,700 for three courses.

8    Q.   900 per course?

9    A.   Yes.

10   Q.   Three courses?

11   A.   Yes.

12   Q.   Did Susan Su send you any documents after you had that

13   conversation?

14   A.   Yes.  She had sent me documentation working on getting me

15   to regular status, going to F-1, which I had filed -- filed

16   with the authorities for getting a different status.  However,

17   it didn't work out.  I missed out signing the regular form and

18   got rejected.  So -- but I didn't go for it again.  I had

19   decided to rearrange for and continue with my studies like

20   that.

21   Q.   So did you agree to still go to Tri-Valley or take classes

22   at Tri-Valley University?

23   A.   Yes.

24   Q.   How did you pay for those classes?

25   A.   I paid through PayPal.

1    all the courses -- they mentioned that there would be lectures,

2    discussions, midterms.  But I spoke to Susan Su about it as to

3    will the professor come in, and she just asked me to be

4    patient.

5    Q.   Now, you said you expected lectures, courses, and

6    interaction; is that correct?

7    A.   Yes.

8    Q.   Why were you expecting that?

9    A.   Because initially when I spoke to Susan Su about how the

10   courses will be, that's what was communicated to me, and I was

11   going to be under the impression that this would happen.

12   Q.   Okay.  You also stated that you then contacted Susan Su; is

13   that correct?

14   A.   Yes.

15   Q.   To raise your concerns with her?

16   A.   Yes.

17   Q.   Okay.  Tell me about those conversations.  What did you say

18   to her, and what did she say back to you?

19   A.   I told her that this is what is going on and will the

20   professor come in and how the lectures would be, how the

21   midterms have to be.

22        And she said, "Be patient," and -- and she would just say,

23   "Be patient," and just -- the conversation would end there, and

24   I understand that there can be some problems initially with any

25   courses that's just technical or anything that can happen.  So

SATIJA - DIRECT / RHYNE

1    I was patient, but of course my money and time is getting

2    wasted.  So I didn't want to wait any further with her.

3    Q.  As time went on during the Spring 2010 semester, did the

4    classes improve as you had hoped?

5    A.  No.

6    Q.  Did you have any more conversations with Susan Su about the

7    quality or lack of instruction with respect to these classes?

8    A.  I would just continue to follow up on a weekly basis or

9    twice a week to see what's going on because time is getting

10   wasted, and so I just continued to follow up.

11   Q.  Were you familiar or did you become familiar with

12   Tri-Valley University's refund policy?

13   A.  Yes.  Initially, when I was going through the website, I

14   just -- I went through all the pages, whatever information I

15   could seek, and the refund policy initially that was there was

16   40 percent for an ongoing course.

17   Q.  Did you raise this refund policy with Susan Su?

18   A.  Yes.

19   Q.  How did she respond?

20   A.  Well, initially I had spoken to her to -- for a refund of a

21   hundred percent on the Dreamweaver course because it was not an

22   ongoing course.  It was just a PDF book online and no

23   instructors.  So it was not an ongoing course at all.  Nothing

24   happened.

25        So I was -- I wanted to get a full refund for that course,

1    and the other two -- I understand that the videos were there,

2    but still as -- as far as I'm concerned, they were incomplete

3    because the professor was not there.  So I asked for a prorated

4    refund.  Whatever time I was there, I was okay with reducing

5    that amount from the refund.

6    Q.   What did Susan Su say when you made this request?

7    A.   When I made this request, she said that that's not what

8    happens, and as for the website, she would only give me

9    30 percent.  And again, I questioned that 30 percent because as

10   per the website, it was 40 percent.  So after that

11   conversation, then I went back to the website to see.  I saw

12   that the page had completely changed.

13   Q.   Did you confront Susan Su with the fact that you thought

14   the page had changed?

15   A.   I again spoke to her and told her that this is what

16   happened, that I don't see 40 percent anymore.  It seems that

17   somebody has completely changed the page and reduced that --

18   that number to 30 percent.

19   Q.   Can you tell the jury about the tone of this conversation

20   that you were having with Susan Su?

21   A.   Well, we had many conversations with Susan Su over the

22   refund because what we expected was not what she wanted to

23   give.  So solely a refund, but she was getting agitated, she

24   was getting impatient, and to a point of -- she got impatient

25   to a point that she threatened me and my husband that she would

SATIJA - DIRECT / RHYNE

1    cancel our visa statuses and would get us deported.

2        That's the point when we got scared of this individual, and

3    we didn't really want to mess much with her, but we still

4    wanted the money because we knew that what we were doing was

5    the right thing.

6    Q.   So what did you do to try to get the money?

7    A.   Well, initially, Susan Su -- she just gave us 30 percent,

8    but later on we decided to file a complaint with the Better

9    Business Bureau.  That's what we did, and we had exchange of

10   e-mails and conversations over the BBB -- through the BBB

11   portal, and ultimately I got the remainder money back.

12       So I got full hundred percent eventually for the

13   Dreamweaver course, and I got additional 10 percent for the

14   remaining two courses.  So I got a total of 40 percent for two

15   courses and a total of hundred percent for the Dreamweaver

16   course.

17   Q.   And these refunds came after you engaged with the Better

18   Business Bureau; is that correct?

19   A.   Yes.  The forced 30 percent came in before BBB complaint

20   and the remainder amount after the BBB complaint.

21   Q.   And the 30 percent was the 30 percent you were referring to

22   on the -- what you believed to be the second version of TVU's

23   website; is that correct?

24   A.   Yes.

25           MR. RHYNE:  Okay.  Your Honor, may I approach the

**SER0014**

1    Special Agent training.  We start training with the Federal Law

2    Enforcement Training Center in Glynco, Georgia.  We follow that

3    up by more specialized training in basic Special Agent courses

4    specific for diplomatic security.  We cover things that we do

5    in our professional duties more often than, say, some other

6    federal agents, visa protection, passport and visa fraud

7    investigation, which is one of the things we primarily focus

8    on.

9    Q.   And in each of these trainings, have you been instructed

10   and received training on how student visas are issued at least

11   with respect to the Department of State?

12   A.   Yes.

13   Q.   Are you familiar with the Immigration and Nationality Act?

14   A.   I am.

15   Q.   I want to focus on the F-1 student visa category that you

16   talked about earlier.  Can you walk the jury through the

17   process through which a student in a foreign country would go

18   through in order to get an F-1 student visa to come to the

19   United States?

20   A.   Absolutely.  So a prospective student would shop for

21   schools and apply to different universities that they might be

22   interested in, and once they're accepted, they would be issued

23   an I-20, which is a form.  It's a certificate of eligibility

24   for studies.  They would come to the U.S. consulate.

25        So in my situation, the consulate would be in Guangzhou.

ELLIOTT - DIRECT / RHYNE

1    They'd bring their passport, other supporting documentation,

2    and a copy of that I-20, and they would see a consular officer.

3    Q.   And the information on the I-20 indicates the school that

4    they had been accepted to; is that correct?

5    A.   That's correct.  That's correct.

6    Q.   What's assessed at the consulate when they come in with

7    these documents?

8    A.   Okay.

9    Q.   Can you walk through that process?

10   A.   So when these prospective students come into the consulate,

11   they're applying for a visa to go to the United States, which

12   is basically their ticket to get to the U.S. and request entry

13   from DHS, Department of Homeland Security.  And so when they're

14   applying for the visa, we're required to review some of the

15   facts of their application to make sure that they're actually

16   qualified for a visa to travel to the United States.

17       The consular officer assesses the -- it's a bona fide

18   student.  It's an actual student who plans to go to the United

19   States for a full course of study and presents intent to return

20   to their own country after they've completed the studies.

21   Consular officers can also ensure that they have a financial

22   ability to pay for the education.  So if they have an expensive

23   education permit, they have to make sure they can show you they

24   have the funds available to pay for that.

25   Q.   What if there are red flags or something that concerns the

234
ELLIOTT - DIRECT / RHYNE

1   officer during this process?  What happens?

2   A.   Well, a couple of different things can happen.  If the

3   officer thinks that it's -- there's no chance that the student

4   is a bona fide student, they can just refuse them under 14B of

5   the Immigration and Naturalization Act and not give them a

6   visa.  They can also refer the case for fraud, in which case

7   the Fraud Prevention Unit eventually might end up on my desk,

8   where we would look into it for visa fraud.

9   Q.   Are you familiar with the term "SEVIS"?

10  A.   I am.

11  Q.   Can you just briefly tell the jury what SEVIS is -- or can

12  you spell it and then tell the jury what it is?

13  A.   Absolutely.  So SEVIS or SEVIS is a program on our computer

14  system that we would use, and it's the Student Exchange

15  Visitors Identification System, and basically these prospective

16  students present an I-20 to the consular officer.

17       And on there, there is an individual SEVIS or SEVIS number,

18  and then the consular officer would check that number in the

19  computer system and ensure that all of the things line up.  So

20  if it says the student is in active status as far as the -- on

21  the computer, then we would know that they've paid their fee

22  and are eligible for studies at that university.

23            MR. RHYNE:  Thank you.

24       No further questions, your Honor.

25            THE COURT:  Thank you.

WARNER - DIRECT / WEST

1          THE CLERK:  Do you solemnly swear or affirm that the

2      testimony you're about to give in the matter now pending before

3      this Court shall be the truth, the whole truth, and nothing but

4      the truth?

5          THE WITNESS:  Yes, I do.

6          THE CLERK:  Thank you.  Speak close to the

7      microphone.

8          THE WITNESS:  Thank you.

9          THE CLERK:  Please state your full name and spell

10     your last name.

11         THE WITNESS:  Susanna Lee Warner, W-a-r-n-e-r.

12         THE COURT:  Thank you, Ms. West.

13       Your witness.

14         MS. WEST:  Thank you.

15                         **SUSANNA WARNER,**

16     Called as a witness by the Government, having been duly sworn,

17     testified as follows:

18                        **DIRECT EXAMINATION**

19     BY MS. WEST:

20     Q.  Good afternoon, Ms. Warner.

21     A.  Good morning.

22     Q.  What do you do for a living?

23     A.  I'm a section chief at the Student Exchange Visitor

24     Program.

25     Q.  Can you please tell the jury what the Student Exchange

WARNER - DIRECT / WEST

1    Visitor Program is.

2    A.   The Student Exchange Visitor Program is a program that

3    falls under the Department of Homeland Security, and what it

4    does is it certifies schools that want to bring foreign

5    students to study.

6    Q.   And is that -- well, first of all, is the Student Exchange

7    Visitor Program -- is that abbreviated SEVP --

8    A.   Correct.

9    Q.   -- or sometimes called SEVP?

10   A.   Correct.

11   Q.   And is that its only function, to certify schools, or does

12   it have another function as well?

13   A.   It also manages a system called SEVIS, which is used to

14   track and monitor students at the schools that it's certified,

15   and then we also oversee the immigration status of students

16   that enter the country.

17   Q.   All right.  And is SEVIS -- is that the Student Exchange

18   Information System?

19   A.   Correct.

20   Q.   How long have you been in the position of section chief?

21   A.   Three years.

22   Q.   Is that approximately March 2011?

23   A.   Yes.

24   Q.   Can you tell us a little bit, please, about your role as

25   section chief.

WARNER - DIRECT / WEST

1    A.   It's monitored by the Department of Homeland Security, and

2    it -- you need a user ID and password to enter it.

3    Q.   Now, you mentioned that a school seeking to get approval to

4    admit foreign students gets a temporary ID and password.  At

5    some point, does that need to be converted into a permanent

6    one?

7    A.   It is once they receive approval to participate.

8    Q.   Okay.  So a school or an individual with that temporary ID

9    and password that you mentioned -- do they have access to all

10   of the information in SEVIS?

11   A.   No.

12   Q.   So that's access control; right?

13   A.   Right.

14   Q.   Is the use of SEVIS controlled in some way?

15   A.   Is the use?  Yes.

16   Q.   Okay.  Why is the access and use of SEVIS controlled?

17   A.   Because we just don't want anybody to go -- once a school

18   is approved, they gain the ability to issue an immigration

19   document that a student uses to -- in order to obtain a visa

20   and maintain status when they're here.  So we don't want just

21   anybody to go in and be able to create these documents.

22   Q.   Why not?

23   A.   Because the Department of Homeland Security is relying --

24   the system is primarily managed by what we call designated

25   school officials.  Those are what's -- you get -- once the

WARNER - DIRECT / WEST

1    school gets approval, they have to designate a school official

2    to be the person who accesses SEVIS, that creates the

3    documents, and keeps the proper records on the school, and we

4    just don't want anybody to do that because we're really putting

5    our trust in these designated school officials.

6    Q.   Okay.  So that's a little bit of foreshadowing.  We're

7    going to come back to the designated school officials in a

8    moment.

9         Let's stick a little bit for another moment or two with the

10   access and use of the SEVIS database.  Are users advised that

11   access and use of SEVIS is controlled?

12   A.   Yes.

13   Q.   I'm going to show you what is marked as Government

14   Exhibit 106 and ask if you recognize this.

15   A.   Yes.

16   Q.   What is this?

17   A.   It's a warning that someone will see the minute they access

18   SEVIS.

19   Q.   Is this a SEVIS warning banner?

20   A.   Yes.

21            MS. WEST:  The Government offers Exhibit 106 in

22   evidence.

23            THE COURT:  Any objection?

24            MS. WEST:  It would be 106, Page 2, your Honor.

25            MR. BABCOCK:  Just -- just to clarify the foundation

1          THE WITNESS:  Yeah, sure, please.

2          MS. WEST:  Can we please pull up Exhibit 106, which

3     is now 106A.

4          Thank you.  And if we could enlarge the warning banner on

5     this.

6     BY MS. WEST:

7     Q.  All right.  Ms. Warner, you testified that this is the

8     warning banner that was in effect at SEVIS between 2008 and

9     2011?

10    A.  Correct.

11    Q.  And has this warning banner changed over time?

12    A.  No.

13    Q.  All right.  I'd like to direct your attention, please, to

14    the first line of this warning.  First of all, do you see it in

15    all capitals at the top, the word "WARNING"?

16    A.  Yes.

17    Q.  And then the first line below that:  "This system is for

18    the use of authorized users only"?

19    A.  Yes.

20    Q.  Now, every time anybody accesses SEVIS, would this warning

21    banner pop up?

22    A.  Yes.

23          MS. WEST:  All right.  If we could go back, please,

24    to the full page, and if you could please blow up the bottom

25    portion just below the box where it has "User Name, Password,

1    A.   It gives us the rules for a school to be eligible to apply

2    for the Student Exchanges Visitor Program and SEVIS access.

3    Q.   All right.  And if we look there in Subsection (a), it

4    says, "Filing Petition"; is that right?

5    A.   Yes.

6    Q.   And Subsection (3) is "Eligibility"?

7    A.   Yes.

8    Q.   Okay.  So then Subsection little (1) here or little (i) --

9    does that essentially lay out what the criteria is for a school

10   in order to be eligible to admit foreign students?

11   A.   Yes.

12   Q.   All right.  Let's look through it, please.  If you'd turn

13   your direction, please, to little (i), do you see there it

14   states, "The petitioner to be eligible for certification must

15   establish at the time of filing that it..." and then there's A,

16   B, C, and D?  Do you see that?

17   A.   Yes.

18   Q.   A is "Is a bona fide school."  Can you please tell the jury

19   what that means.

20   A.   For a school to be a bona fide school, when they fill out

21   their form and they put a name and address, we want to make

22   sure that there's actually a school at the name and address.

23   Q.   B states, "Is an established institution of learning or

24   other recognized place of study."  Do you see that?

25   A.   Yes.

**SER0023**

WARNER - DIRECT / WEST

1    Q.   Can you please tell the jury what that means.

2    A.   An established institution of learning means that the

3    school has some history behind it, graduated students,

4    something like that.  "Other recognized place of study" means

5    the school is accredited or has something that is akin to

6    accreditation.

7    Q.   Okay.  And C, "Possesses the necessary facilities,

8    personnel, and finances to conduct instruction and recognized

9    courses."  Please tell the jury what that means.

10   A.   It means that we want to make sure that, you know, it's --

11   I don't want to use the word "established" again but

12   established so we know, you know, that they're not going to go

13   out of business quickly, that they actually have the ability to

14   conduct instruction.

15   Q.   And D states, "Is, in fact, engaged in instruction in those

16   courses."  Do you see that?

17   A.   Yes.

18   Q.   What does that mean?

19   A.   It means that when they apply for a SEVP certification,

20   they have to have a history of conducting the courses that

21   their -- of study that they're asking for.  They can't be

22   intending to conduct those courses of study in the future.

23   Q.   Now, are these criteria the criteria that SEVP actually

24   uses in determining whether to certify a school to admit

25   foreign students?

**SER0024**

WARNER - DIRECT / WEST

1    A.   Yes.

2    Q.   Can you explain to us why A, B, C, and D are important?

3    A.   They're important because, as we've stated, we rely on

4    school officials out there to populate or, you know, fill out

5    the form that we're getting, and so we want to make sure

6    that -- you know, we're also responsible -- SEVP -- for

7    bringing in the students into the country and monitoring them.

8         So we want to make sure that when they're coming here,

9    they're going to what we call a bona fide school, that, you

10   know, they're actually going to be able to complete the purpose

11   for why they're coming, which is to get an education.

12   Q.   Are there special requirements aside from the generic A, B,

13   C, and D as set forth here -- are there specific requirements

14   that apply to a school that may not be accredited?

15   A.   Yes.

16   Q.   Can you tell us about that?

17   A.   If a school is not an accredited school or a recognized

18   place of study, we permit those schools to get three

19   articulation agreements from schools that are accredited that

20   essentially vouch for that school's -- you know, whatever you

21   want to call it -- vouch that that school is good.

22   Q.   All right.  So let's break that down a little bit.

23        First, what do you mean when you use the word "accredited"?

24   A.   Accredited schools -- typically, we like to see that they

25   have been accredited by an accrediting association that's

WARNER - DIRECT / WEST

1    recognized by the Department of Education.

2    Q.   So if a school is not recognized by an accrediting

3    association that's recognized by the Department of Education,

4    is it then that the articulation agreement component can kick

5    in?

6    A.   Correct.  They can send instead -- well, not "instead," but

7    they would have to submit that.

8    Q.   That's a requirement?

9    A.   Yes.

10   Q.   Where does that requirement come from?

11   A.   From the regulations.

12   Q.   All right.  And you mentioned that it was three

13   articulation agreements?

14   A.   Correct.

15   Q.   Do articulation agreements have two components to them?

16   A.   Yes.

17   Q.   What are those?

18   A.   The components are that in order to submit an articulation

19   agreement, the first component is that the school has to be

20   accredited, and then the second component to the school that is

21   submitting the agreement on behalf of the nonaccredited

22   institution has to state that they have been and will

23   unconditionally accept the transfer credits from the

24   unaccredited school.

25   Q.   Why is that important?

1        MS. WEST:  Can we enlarge now Box 2 of this document?

2    BY MS. WEST:

3    Q.   What school does this I-17 pertain to?

4    A.   Tri-Valley University.

5    Q.   Thank you.

6        And is it fair to say that the name of the school in there

7    is something that is important to SEVP?

8    A.   Yes.

9    Q.   Why?

10   A.   Because we want to know the name of the school that's

11   applying to bring nonimmigrants into the country for study.

12   Q.   All right.  Thank you.

13       MS. WEST:  If we can please pull up Box -- have it

14   maybe just the bottom quarter of the document starting from

15   just above the stamp.

16       Thank you.  That's perfect.

17   BY MS. WEST:

18   Q.   Can you see there in Box 8 "Date School was Established:

19   March 2008"?  Do you see that

20   A.   Yes.

21   Q.   Is the date that the school is established something that

22   is important to SEVP?

23   A.   Yes.

24   Q.   Why?

25   A.   Because per the regulation that we just looked at, we need

WARNER - DIRECT / WEST

1    to know essentially when they would start it.

2    Q.   Is that part of being established?

3    A.   Yes.

4    Q.   Now, does it -- is it something that is determinative for

5    SEVP if a school is applying in September of 2008 but was only

6    established in March of 2008?  If that school had not yet

7    matriculated students or graduated students, does that rule it

8    out?

9    A.   No.

10   Q.   Let's look at Section 9, "Location of School."  Do you see

11   that?

12   A.   Yes.

13   Q.   And the address there, "4455 Stoneridge Drive, Pleasanton,

14   California"?

15   A.   Yes.

16   Q.   Does the address -- is that something that matters to SEVP?

17   Is that important?

18   A.   Yes.

19   Q.   Why?

20   A.   Because we want to know there's a school actually at the

21   address that's reported.

22   Q.   Why?

23   A.   Because the law requires it.

24   Q.   Is that part of it being a bona fide school?

25   A.   Correct.

WARNER - DIRECT / WEST

1    A.   Yes.

2    Q.   How so?

3    A.   Because Part C of the regulation over here -- we want to

4    make sure that they have adequate facilities for students to be

5    able to be educated.

6    Q.   So --

7    A.   Several of these instructors --

8    Q.   There we go.

9         So if we look at Paragraph -- or Subpart (b) here where it

10   says, "The average annual number of students is 30," then if

11   you look at "Teachers or Instructors:  9," does that seem to

12   fit together in a way that would be satisfactory to SEVP?

13   A.   Yes.

14   Q.   Why?

15             THE COURT:  Ms. West, I'm sorry to interrupt.

16   Anytime in the next five minutes, I'd like to take our second

17   recess.

18             MS. WEST:  Perfect.  We'll be there in about one

19   minute.

20             THE COURT:  Very good.

21             THE WITNESS:  Because it's -- just by looking at how

22   many students and the ratio to instructors, it just -- it seems

23   like they have enough instructors to teach the amount of

24   students.

25   BY MS. WEST:

WARNER - DIRECT / WEST

1    Q.   Is this question and answer provided something that is

2    important to SEVP in making its certification determination?

3    A.   Yes.

4    Q.   Why?

5    A.   Because designated school officials are the ones that are

6    responsible for the school to follow the regulations and the

7    law pertaining to both their school certification and the

8    students that they bring in.

9    Q.   And so why -- how does the answer -- this question and

10   answer relate to that fact?

11   A.   How do -- I'm sorry.  Repeat that.

12   Q.   The fact that DSO's are charged with the responsibility of

13   following the regulations, how does that relate to the question

14   about the resources to ensure DSO compliance and knowledge of

15   SEVIS rules and regulations?

16   A.   Because we need to know that they have, in fact, become

17   familiarized with all of that because, again, they're the only

18   ones that put the information in SEVIS, and they have --

19   they're the ones that have to make sure the school stays in

20   compliance.

21   Q.   Let's take a look at Question 2.  "Verify that the number

22   of students and programs of study being pursued are supported

23   by the facilities available."  Why -- is this question

24   important to SEVP?

25   A.   Yes.

1    Q.   Why?

2    A.   Because it's in the law that -- again, the regulation we

3    reviewed -- that they have to have the proper and necessary

4    facilities.

5    Q.   And then the answers provided here:  "Number of Students in

6    School:  25.  Average Number of Students per Class:  10."  Are

7    those answers something that is important to SEVP?

8    A.   Yes.

9    Q.   Why?

10   A.   Again, to make sure that they're abiding by regulation with

11   having the necessary and proper facilities, you know?

12   Q.   And there's actually comments down below mentioning,

13   "There's a very small library, but there is computer access.

14   The school had just opened this year."  Is that sort of

15   information something that is important to SEVP as well?

16   A.   Yes.

17   Q.   Why?

18   A.   Again, it goes back to the facilities, and we want to

19   record the observations that the site visitor sees when they're

20   at the school.

21           MS. WEST:  Can we blow up now the bottom part of this

22   page, please, Question 3 and the answers.

23   BY MS. WEST:

24   Q.   Question 2 states:  "The following questions directly

25   relate to processes for both F-1 and M-1 nonimmigrant foreign

WARNER - DIRECT / WEST

1    A.   Yes.

2    Q.   And is that information there something that would be

3    important to SEVP?

4    A.   Yes.

5    Q.   Why?

6    A.   Again, it goes back to the standards that they're going to

7    admit students who are eligible by their admissions standing to

8    get there.

9    Q.   Let's look at Question C.  "How do," slash, "will you

10   verify that F-1 and/or M-1 students are maintaining a full

11   course of study?"

12        Let me just ask you about the language in here, "full

13   course of study."  Is that going back to what you just

14   explained with regard to duration of status for students?

15   A.   Yes, and the fact that regulations describe what the full

16   course of study means.  It essentially means the student has to

17   be attending a study full time.

18   Q.   And what does that mean?

19   A.   As far as what?

20   Q.   Is there a physical-class component to that?

21   A.   Yes.  There's a physical component, and depending on what

22   they're studying, it tells you how many credits or clock hours

23   of coursework they have to do.

24   Q.   And the answer provided here:  "By tracking students

25   successfully completion of nine units a semester."  Is that

1    fault of their own, they are permitted -- again, it goes back

2    to the school official, who is responsible for reporting on

3    their students.  The school official can make a recommendation

4    that that student have their legal status reinstated, and then

5    the student has to apply to USCIS to, in fact -- for their

6    adjudication of the reinstatement.

7    Q.  I don't think we need to pull it back up, but I want to go

8    back to a question that we just took a look at, and that was

9    Section 3(b) about students transferring to the school.  Do you

10   recall that?

11   A.  Yes.

12   Q.  Is there a -- are there limitations on a student being able

13   to transfer an F-1 student?

14   A.  No.

15   Q.  Is there something known as a two-semester rule?

16   A.  No.

17   Q.  Have you ever heard of a two-semester rule?

18   A.  I've heard of schools trying to make a two-semester rule,

19   but SEVP allows students to transfer because -- because of the

20   physical presence component.  We need to know where students

21   are going to be, and so we don't permit schools to hold the

22   student's record.  That's the way that we track the students.

23   Q.  So for an F-1 student who seeks to transfer according to

24   the rules in Department of Homeland Security, is that student

25   allowed to transfer?

WARNER - DIRECT / WEST

1    A.   Yes.

2              MS. WEST:  Can we please go to Exhibit 5, Page 8, and

3    just the top half, please.

4         Thank you, Ms. Hughes.

5    BY MS. WEST:

6    Q.   If we look at Page 7 of this same exhibit, do you see at

7    the top it states, "Section 3.  Tour of Campus"?

8    A.   Yes.

9    Q.   Why does SEVP require a tour of the campus?

10   A.   Again, it goes back to the school's eligibility.  We like

11   to make sure that there's a bona fide school there and to have

12   a site visitor record their observations.  So we can use that

13   as part of our adjudication.

14   Q.   And Subparagraph (a) here -- it states, "Comments of

15   observation of live classroom instruction, classroom space,

16   labs and/or library facilities."  And just above that, I'll

17   actually read for context, "Observe that school business

18   operations are taking place even if classes are not in

19   session."

20        Is it a deal-breaker if classes are not in session?

21   A.   No.

22   Q.   All right.  So then the answer provided here:  "No classes

23   were being conducted at the time of site inspections."  As you

24   just stated, that's -- on its face, is that a problem?

25   A.   No.

1    Q.   "Night classes are only being offered at this time.

2    Building has 5,000 square feet, medium to large class" -- I'm

3    sorry -- "five medium to large classrooms.  On" -- I think it's

4    supposed to be "One large meeting area, library, computer lab,

5    and four office spaces.  Sufficient space for planned

6    activities."

7         What is the site inspector supposed to look for in

8    responding to Question A?

9    A.   They look at the classrooms and the seating and make sure

10   that they have -- the facilities are adequate to host the

11   number of students they're reporting that they will be having.

12   Q.   So that would in place -- we refer back to the number of

13   students stated who were attending at the beginning?

14   A.   Correct.

15        MS. WEST:  And if we could now go to the bottom part

16   of this page, please, to Section 2(b).

17        That's great.  Thank you.

18   BY MS. WEST:

19   Q.   Section 2 is "Evidence the DSO is compliant with

20   regulations and reporting requirements or has the ability to be

21   compliant with SEVIS rules and regulations."  And Question B

22   specifically says, "Comments on site visit to location

23   where" -- I'm sorry.  Did I get the right section?  Yes -- "of

24   where nonimmigrant students' records are kept or will be kept

25   upon SEVIS approval."

1    Q.   The next sentence there reads:  "A DSO may not delegate

2    this designation to any other person."  Do you see that?

3    A.   Yes.

4    Q.   Why is that rule in place?

5    A.   Because, again, we limit the access to SEVIS for the reason

6    that -- the designated school official wants to take their job

7    seriously, and they have to populate all the information about

8    students.  And the fact that we have 9,000 schools out there --

9    we really have to trust that that is, in fact, the person that

10   the school has asked to take on this job, is the person who's

11   doing it.

12   Q.   Let's look at the next sentence.  "An individual whose

13   principal obligation to the school is to recruit foreign

14   students for compensation may not be a DSO."  Why is that the

15   rule?

16   A.   Because we -- again, it goes back to integrity and

17   accountability, and then we want to make sure that the reason

18   is that they're actually choosing valid students to come in and

19   not doing it because they're receiving some kind of

20   compensation for it.

21   Q.   All right.  Let's skip to the last paragraph.  "The

22   principal DSO is required to have a thorough knowledge of the

23   regulations, policies, and procedures governing nonimmigrant

24   students and is responsible for ensuring that each additional

25   DSO has a thorough knowledge of the same."

SER0036

```
1              MR. BABCOCK:  Sorry.  What exhibit were you on?

2              MS. WEST:  4.

3              MR. BABCOCK:  Thank you.

4              THE WITNESS:  Yes.

5    BY MS. WEST:

6    Q.   What is Exhibit 4, please.

7    A.   It's correspondence from Tri-Valley University to SEVP.

8              MS. WEST:  The Government offers Exhibit 4 in

9    evidence.

10             THE COURT:  Any objection?

11             MR. BABCOCK:  No objection.

12             THE COURT:  Exhibit 4 is admitted.

13                 (Government's Exhibit 4 received in evidence.)

14             MS. WEST:  Can we please pull up Page 1 of Exhibit 4,

15   and let's just do the top half where it's the -- the addressee

16   and the "From" part.

17        Great.  Thank you.

18   BY MS. WEST:

19   Q.   Page 1 of Exhibit 4 is a letter that appears to be

20   addressed to a Mr. Barry Kobe.  Have I pronounced that right?

21   A.   Uh-huh.

22   Q.   Do you know who that individual is?

23   A.   Yes.

24   Q.   Who is that?

25   A.   He was the adjudicator on the Tri-Valley University SEVP
```

1    approval.

2    Q.   What do you mean "adjudicator"?

3    A.   He's the one who makes the ultimate decision per whether or

4    not they would have received certification or not.

5    Q.   All right.  And then on the lower right of this expanded

6    view, we see "Dr. Susan Su, President, Tri-Valley University,"

7    and the date below, February 10th, 2009.  Do you see that?

8    A.   Yes.

9    Q.   All right.  Thank you.

10           MS. WEST:  And can we now enlarge the text of this

11   letter, please -- "Dear Mr. Kobe" -- and then the bottom of the

12   letter.

13       Great.  Perfect.  Thank you.

14   BY MS. WEST:

15   Q.   This letter states:  "Dear Mr. Kobe, per our phone

16   conversation, here are the three originals of the three

17   articulation" -- I'm sorry -- "the originals of the three

18   articulation agreements."  Do you see that?

19   A.   Yes.

20   Q.   And is there in front of you an original signature from Ms.

21   Su?

22   A.   Yes.

23   Q.   Attached to this cover letter, are there, in fact, three

24   what purport to be articulation agreements?

25   A.   Yes.

WARNER - DIRECT / WEST

1          Perfect.

2     BY MS. WEST:

3     Q.   What does this information here reflect?

4     A.   That SEVP headquarters approved the school on

5     February 17th, 2009.

6     Q.   And do you recognize that signature there?

7     A.   Yes.  That's Barry Kobe.

8     Q.   All right.  Thank you.

9              MS. WEST:  You can take that down.

10    BY MS. WEST:

11    Q.   Now, after SEVP has approved or certified a school to admit

12    foreign students, does SEVIS at that point get used for some

13    reason?

14    A.   Does it get used?

15    Q.   Yes.

16    A.   Yes.

17    Q.   For what?

18    A.   The school has used SEVIS to create -- that's when they

19    actually gain the full access to the system, and they use it to

20    create the Form I-20 to bring students in at that time.

21    Q.   Now, you say that they get full access to the system at

22    that time.  Does anyone get full access, or is that limited to

23    the DSO's?

24    A.   Just the designated school officials.

25    Q.   All right.  So from the designated school officials being

1

2           I, James C. Pence, Federal Official Realtime Court

3      Reporter, in and for the United States District Court for the

4      Northern District of California, do hereby certify that

5      pursuant to Section 753, Title 28, United States Code that the

6      foregoing is a true and correct transcript of the

7      stenographically reported proceedings held in the

8      above-entitled matter and that the transcript page format is in

9      conformance with the regulations of the Judicial Conference of

10     the United States.

11

12                          Dated this 10th day of June, 2014.

13

14                          _____

15                          JAMES C. PENCE, RMR, CRR, CSR NO. 13059
                            FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25

1                  UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3           BEFORE THE HONORABLE JON S. TIGAR

4   UNITED STATES OF AMERICA,     )
                             ) Volume 3

5          Plaintiff,     ) Pages 346 - 533
                             )

6      VS.               ) NO. 11-00288 JST
                             )

7   SUSAN XIAO-PING SU,       )
                             ) San Francisco, California

8         Defendant.     ) Wednesday, March 5, 2014
   _____) 8:36 a.m.

9

10            **TRANSCRIPT OF COURT PROCEEDINGS**

11

    **APPEARANCES:**

12

13    **For Plaintiff:**        MELINDA HAAG
                          UNITED STATES ATTORNEY

14                         1301 Clay Street, Suite 340S
                          Oakland, California 94612

15                 **BY:   HARTLEY M.K. WEST, ESQ.**
                          **WADE M. RHYNE, ESQ.**

16                          **ASSISTANT UNITED STATES ATTORNEYS**

17

    **For Defendant:**       Law Offices of Erik G. Babcock

18                         717 Washington Street, Second Floor
                          Oakland, California 94607

19                 **BY:   ERIK G. BABCOCK, ESQ.**
                          **ATTORNEY AT LAW**

20

21

22

23

24

25   Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
                  Official Court Reporter - U.S. District Court
                  Computerized Transcription By Case CATalyst

347

```
 1                          I N D E X

 2      Wednesday, March 5, 2014 - Volume 3

 3      GOVERNMENT'S WITNESSES                    PAGE  VOL.

 4      WARNER, SUSANNA (RECALLED)
        (PREVIOUSLY SWORN)                         361   3
 5      Direct Examination (Resumed) by Ms. West   361   3
        Cross-Examination by Mr. Babcock           380   3
 6      Redirect Examination by Ms. West           433   3
        Recross-Examination by Mr. Babcock         440   3
 7
        LUO, HAO
 8      (SWORN)                                     442   3
        Direct Examination by Mr. Rhyne            442   3
 9      Cross-Examination by Mr. Babcock           453   3

10      JING, QI
        (SWORN)                                     463   3
11      Direct Examination by Mr. Rhyne            464   3
        Cross-Examination by Mr. Babcock           469   3
12
        LIOU, SHY SHENG
13      (SWORN)                                     474   3
        Direct Examination by Ms. West             474   3
14      Cross-Examination by Mr. Babcock           497   3
        Redirect Examination by Ms. West           506   3
15
        BAYER-BRORING, CAROLYN
16      (SWORN)                                     511   3
        Direct Examination by Ms. West             512   3
17
                          E X H I B I T S
18

19      COURT'S EXHIBITS                  IDEN EVID VOL.

20         A                              349        3

21

22      GOVERNMENT'S EXHIBITS             IDEN EVID VOL.

          10                              361  363   3
23
          11                              378  379   3
24
          30                              362  363   3
25
          31                              378  379   3
```

**I N D E X**

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 51 | 378 | 379 | 3 |
| 60 | 362 | 363 | 3 |
| 61 | 378 | 379 | 3 |
| 70 | 362 | 363 | 3 |
| 71 | 379 | 379 | 3 |
| 80 | 363 | 363 | 3 |
| 81 | 379 | 379 | 3 |
| 102 | | 479 | 3 |
| 112 | 518 | 519 | 3 |
| 420 | 363 | 364 | 3 |
| 430 | 371 | 371 | 3 |
| 440 | 373 | 374 | 3 |

435

WARNER - REDIRECT / WEST

1    Q.   Yes.

2    A.   In Washington, DC.

3    Q.   So as you sit there in Washington, DC, do you have any idea

4    what a student in the San Francisco Bay Area is actually doing,

5    whether they are actually going to their classes?

6    A.   No.  I mean, no.  We rely on the designated school

7    officials to tell us.

8    Q.   There were some questions also about SEVIS training --

9    A.   Yes.

10   Q.   -- and whether you know to what extent Ms. Su had SEVIS

11   training.

12   A.   Correct.

13          MS. WEST:  Let's -- if we could please pull up

14   Exhibit 3, Page 10.

15       Oh.  You know what?  We've already got this on.  I'll just

16   use this.  Let's zoom out for a moment so we see what we're

17   looking at.

18   BY MS. WEST:

19   Q.   This is Page 10 of Exhibit 3, which we looked at earlier,

20   on Tri-Valley University letterhead, and do you recall that

21   this was submitted to SEVP by Ms. Su?

22   A.   Yes.

23   Q.   All right.  And in fact, we actually see Ms. Su's signature

24   on the first line there?

25   A.   Yes.

LUO - DIRECT / RHYNE

1    University?

2    A.   Never.

3    Q.   Did Susan Su ever ask you to teach a particular class at

4    Tri-Valley University?

5    A.   No.

6    Q.   Okay.  I want to publish, if we can, Exhibit 1, Page 8, and

7    can we just zoom in at --

8    A.   I can't see very clear.

9    Q.   -- "Tri-Valley University Instructor Listing" in the first

10   paragraph.

11        And you stated your background was in engineering; correct?

12   A.   Yes.

13        MR. RHYNE:  Okay.  Can we pull back out of that, and

14   can we go down to the line for Hao Luo?

15   BY MR. RHYNE:

16   Q.   Is that your name there on the left?

17   A.   Yes.

18   Q.   And is that your educational background in the next column

19   over?

20   A.   Yes.  Yes.

21   Q.   Okay.  And over on the far right, it says, "TA,

22   Carnegie-Mellon University."  Were you a TA at Carnegie-Mellon?

23   A.   Yeah, I was a TA there.  Yes.

24   Q.   And were you also a senior engineer at HP?

25   A.   Yes.

LIOU - DIRECT / WEST

1    Francisco State University is accepted and approved by the

2    participating entities this 2nd day of February 2009."

3         Do you see that?

4    A.   Yes.

5    Q.   Were you the director of the School of Engineering in

6    February of 2009?

7    A.   No, I am not.

8    Q.   Had you retired by then?

9    A.   I had not retired, but I stepped down from the director in

10   summer of 2008.

11   Q.   Right.  You're not the director of the School of

12   Engineering anymore; right?

13   A.   Yes, I was not.

14   Q.   Dr. Liou, I want to ask you:  Did you sign this document?

15   A.   I did not sign that document.

16   Q.   How sure are you?

17   A.   A hundred percent sure.

18   Q.   Thank you, Dr. Liou.

19             THE COURT:  Mr. Babcock, questions of this witness?

20             MR. BABCOCK:  Yes, please, your Honor.

21             THE COURT:  Dr. Liou, that water there is for you in

22   case you get thirsty.

23             THE WITNESS:  Okay.  Thank you.

24   ///

25   ///

1                         CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5        I, James C. Pence, Federal Official Realtime Court

6   Reporter, in and for the United States District Court for the

7   Northern District of California, do hereby certify that

8   pursuant to Section 753, Title 28, United States Code that the

9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14                         Dated this 11th day of June, 2014.

15

16

17                         _____

                         JAMES C. PENCE, RMR, CRR, CSR NO. 13059

18                       FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

```
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3              BEFORE THE HONORABLE JON S. TIGAR

 4   UNITED STATES OF AMERICA,    )
                                  ) Volume 4
 5               Plaintiff,       ) Pages 534 - 726
                                  )
 6         VS.                    ) NO. 11-00288 JST
                                  )
 7   SUSAN XIAO-PING SU,          )
                                  ) San Francisco, California
 8               Defendant.       ) Monday, March 10, 2014
     _____    ) 8:08 a.m.
 9
```

**10**            **TRANSCRIPT OF COURT PROCEEDINGS**

11

**APPEARANCES:**

12

13   **For Plaintiff:**          MELINDA HAAG
                                  UNITED STATES ATTORNEY
14                                1301 Clay Street, Suite 340S
                                  Oakland, California 94612
15                         BY:    **HARTLEY M.K. WEST, ESQ.**
                                  **WADE M. RHYNE, ESQ.**
16                                **ASSISTANT UNITED STATES ATTORNEYS**

17

18   **For Defendant:**          Law Offices of Erik G. Babcock
                                  717 Washington Street, Second Floor
                                  Oakland, California 94607
19                         BY:    **ERIK G. BABCOCK, ESQ.**
                                  **ATTORNEY AT LAW**
20

21

22

23

24

25   Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
                    Official Court Reporter - U.S. District Court
                    Computerized Transcription By Case CATalyst

```
 1                          I N D E X

 2      Monday, March 10, 2014 - Volume 4

 3      GOVERNMENT'S WITNESSES                      PAGE  VOL.

 4      BAYER-BRORING, CAROLYN (RECALLED)
        (PREVIOUSLY SWORN)                          543   4
 5      Direct Examination (Resumed) by Ms. West    543   4
        Cross-Examination by Mr. Babcock            552   4
 6
        ALLEN, ADOLPH MILLER
 7      (SWORN)                                     556   4
        Direct Examination by Mr. Rhyne             556   4
 8      Cross-Examination by Mr. Babcock            563   4

 9      MACKEY, JASON
        (SWORN)                                     568   4
10      Direct Examination by Mr. Rhyne             569   4
        Cross-Examination by Mr. Babcock            685   4
11
                            E X H I B I T S
12

13      GOVERNMENT'S EXHIBITS               IDEN  EVID  VOL.

14         7                                587   588   4

15         100                              575   576   4

16         100A                             580   580   4

17         100C                             670   671   4

18         109                              648   649   4

19         122                              650   651   4

20         206B                             639   640   4

21         207B                             639   640   4

22         300                              612   613   4

23         303B                             617   618   4

24         305                              660   661   4

25         307                              653   654   4
```

SER0049

## I N D E X

## E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 309 | 658 | 659 | 4 |
| 315 | 663 | 664 | 4 |
| 320 | 666 | 667 | 4 |
| 320A | 672 | 673 | 4 |
| 327 | 675 | 676 | 4 |
| 330 | 677 | 678 | 4 |
| 331 | 680 | 681 | 4 |
| 332 | 682 | 682 | 4 |
| 333 | 684 | 684 | 4 |
| 400 | 631 | 632 | 4 |
| 401 | 631 | 632 | 4 |
| 403 | 631 | 632 | 4 |
| 405 | 633 | 634 | 4 |
| 406 | 628 | 629 | 4 |
| 407 | 584 | 585 | 4 |
| 580 | 621 | 622 | 4 |
| 581 | 621 | 622 | 4 |
| 582 | 621 | 622 | 4 |
| 582A | 621 | 622 | 4 |
| 583 | 621 | 622 | 4 |
| 584 | 621 | 622 | 4 |

**I N D E X**

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 585 | 621 | 622 | 4 |
| 587 | 621 | 622 | 4 |
| 588 | 621 | 622 | 4 |
| 589 | 621 | 622 | 4 |
| 590 | 621 | 622 | 4 |
| 591 | 621 | 622 | 4 |
| 592 | 621 | 622 | 4 |
| 706 | 582 | 582 | 4 |
| 709 | 606 | 607 | 4 |

BAYER-BRORING - DIRECT (RESUMED) / WEST

1    make it overlap, if you were to try to do this perhaps by

2    holding it up to the light, you couldn't make two signatures

3    overlap.  There's always just natural variation.  So showing

4    that these two overlap -- will overlay exactly, thus causing a

5    dark image, that shows me that those two signatures were

6    exactly the same signature at some point.

7    Q.    Meaning that one is just a total duplicate of the other?

8    A.    That's correct.

9    Q.    And they may, in fact, be both duplicates of some other

10   original signature?

11   A.    That's correct because these are both toner.  I don't

12   have -- I've never seen another document that had an original

13   ink signature from which these came.  So I don't know where

14   they came from, but I can just tell you that these two, both

15   being toner signatures, both came from some other signature

16   someplace.  They are both the same signature.

17   Q.    And could you put Chart 4 back up for us, please.

18   A.    Chart 4?

19   Q.    Yes, please.

20         Okay.  So then just circling back, Government Exhibit 4 was

21   an articulation agreement between San Francisco State

22   University and Tri-Valley University; is that right?

23   A.    Yes, ma'am.  It says so right here, "Articulation Agreement

24   Between Tri-Valley University and San Francisco State

25   University."  Yes, ma'am.

ALLEN - DIRECT / RHYNE

1    A.   I heard of it about three years later.  My boss asked me if

2    I'd heard of this and was I -- did I know I was listed as a

3    faculty member, and -- and then another coworker of mine

4    Googled it to see what it was, and we saw sure enough, you

5    know, I'm listed there as a lecturer.  And I was kind of

6    surprised by that because I never had heard of the place or

7    signed up to do anything like that.  So --

8    Q.   Was there any -- when you viewed the website, was there any

9    reference to Applied Materials?

10   A.   There -- yes, there was.  So in addition to my name,

11   there's also a link -- a hotlink to our corporate website.

12   Q.   When you viewed the website, did you note anybody else that

13   you knew from Applied Materials that was on the website?

14   A.   Yes.  My -- my current boss.  His name was there but

15   misspelled.  They did have his correct colleges that he

16   attended, and also another colleague who had left Applied was

17   also listed there.

18   Q.   When you viewed the website, could you see the credentials

19   that were listed for you?

20   A.   Yes, I did.

21   Q.   How did those credentials compare to the credentials you

22   told Dr. Su at the party?

23   A.   Yeah.  It said along the lines of, you know, "Ph.D., UC

24   Berkeley."

25   Q.   So a few more questions here.

1    and had to support articulation agreements.  I looked at the

2    standards for admissions, standards for graduations, and I

3    looked at the teaching roster that the school had submitted as

4    well.

5    Q.   Okay.  Why did you note the number of students at 30?  Why

6    was that relevant to you?

7    A.   Because when I subsequently checked the SEVIS database,

8    they indicated they were enrolling a far greater number than

9    30.

10   Q.   Do you recall approximately how many were enrolled at that

11   point?

12   A.   At that time in May of 2010, they had probably 900

13   students.

14   Q.   And you subsequently checked the SEVIS database towards the

15   end of the investigation as well; is that correct?

16   A.   I did.

17   Q.   That number grew --

18   A.   It did.

19   Q.   -- to --

20   A.   To approximately 1760 students, active students.

21   Q.   Okay.  You also said you noted the number of professors.

22   Why was that something that you noted?

23   A.   I was looking at the supporting documents submitted by the

24   school to see if their facilities and resources and faculty

25   were reasonable for the number of students that they were

MACKEY - DIRECT / RHYNE

1  when you checked SEVIS with respect to Tri-Valley University?

2  A.  Certainly.  Again, I noted that there were at the time 900

3  students.  I looked at the rate of growth, and the school

4  appeared to be enrolling its student base at an exponential

5  rate.  I also noted that over half of the students reported --

6  of those 900 students reported to us were reporting the exact

7  same apartment in Sunnyvale, California.

8  Q.  And that was -- do you remember what that apartment address

9  was?

10  A.  Yes.  It was 555 East El Camino Real, Apartment 415, in

11  Sunnyvale.

12  Q.  There was another address that Tri-Valley University

13  reported in SEVIS as well; correct?

14  A.  Yes.

15  Q.  Can you tell the jury what that address was?

16  A.  They also reported a large number of students at 620 Iris

17  Avenue in Sunnyvale, California.

18  Q.  Did you go to the El Camino Real location?

19  A.  I did.

20  Q.  Why?

21  A.  To interview the residents of 555 East El Camino Real,

22  Apartment 415, to determine whether or not there were any

23  Tri-Valley University students residing there.

24  Q.  Can you generally describe how big is this space?

25  A.  It was a two-bedroom -- two-bedroom apartment.

SER0055

MACKEY - DIRECT / RHYNE

1    Q.   Were you able to observe through your SEVIS observations

2    the nationality of most of the students at Tri-Valley

3    University?

4    A.   Yes.  Approximately 95 percent of the students were of

5    Indian nationality.

6    Q.   Now, I want to talk about what you saw when you looked at

7    Tri-Valley University's website.

8         Were you able to capture screenshots of the website?

9    A.   Yes.

10   Q.   Can you tell the jury what that means?

11   A.   We utilize one of our computer forensic agents to basically

12   download the website or portions of the website and preserve

13   them for me to view as part of this trial.

14            MR. RHYNE:  Your Honor, may I approach the witness?

15            THE COURT:  You may.

16       (Government's Exhibit 100 marked for identification.)

17            MR. RHYNE:  I'm handing the witness what's been

18   marked for identification as Exhibit 100.

19   BY MR. RHYNE:

20   Q.   Can you please take a look at that.

21        Do you recognize that?

22   A.   I do.

23   Q.   What is it?

24   A.   It's a "Welcome to Tri-Valley University" page from

25   Tri-Valley University's website.

1    Florida doesn't enter into blanket articulation agreements and

2    they review all other transfers on case-by-case basis, at which

3    point she then approached -- approached her brother, who worked

4    at the University of Central Florida and who then signed it.

5    Q.   She told you that her brother worked there?

6    A.   Yes.

7    Q.   Did she tell you what his job title was?

8    A.   I believe she called him a student advisor.

9    Q.   Did she tell you whether or not she approached her brother

10   at that point?

11   A.   She stated that she did approach her brother into signing

12   the agreement.

13   Q.   What did she say about that interaction?  Let me rephrase

14   the question.

15       Did she tell you whether her brother told her anything

16   different than the Department Chair had told her?

17   A.   Yes.  She stated that her brother confirmed that he had the

18   authority to sign such an agreement.

19   Q.   Did she say how he went about signing it?

20   A.   Yes.  She stated that he signed it in her presence.  She

21   actually observed him sign the document.

22   Q.   Did you also ask her about a third articulation agreement?

23   A.   Yes, I did.

24   Q.   And that articulation agreement was between Tri-Valley

25   University and what school?

MACKEY - DIRECT / RHYNE

1    A.   The University of East-West Medicine.

2    Q.   Did the defendant Dr. Su tell you how she obtained that

3    signature?

4    A.   Yes.

5    Q.   What did she say?

6    A.   She stated that she used to work for the signer of that

7    document, Ying Qiu Wang, that she approached this individual

8    after she had left.  She used to be a teacher at a school

9    called Herguan University, which Ying Qiu Wang also owns, which

10   is co-located with the University of East-West Medicine.

11        And she stated that she approached him and asked him to

12   sign an articulation agreement with Tri-Valley University, and

13   he agreed, and he signed the document.

14   Q.   Can you spell the name of that signer for the record?

15   A.   Sure.

16   Q.   It's probably in Exhibit 7, I believe.

17   A.   It's Y-i-n-g, middle name of Qiu, Q-i-u, last name Wang,

18   W-a-n-g.

19   Q.   Did you ask Dr. Su about the prospect of you contacting

20   people who purportedly signed these articulation agreements?

21   A.   I did.

22   Q.   How did you ask that question?

23   A.   I asked her if she felt that there were -- if the documents

24   were valid, and she indicated that she believed the documents

25   were valid, and then I asked her if that was the case if she

MACKEY - DIRECT / RHYNE

1    A.   She acknowledged that she had been contacted by at least

2    three of the professors on there to have their names removed

3    from Tri-Valley University's website.

4    Q.   There's some notes on this document; is that correct?

5    A.   Yes.

6    Q.   Can you tell the jury generally what these notes are?

7    A.   She started making checkmarks next to the names of

8    individuals that she claimed had actually taught classes, and

9    then she circled some names of instructors who had contacted

10   her regarding having the names removed, and at that point she

11   just started marking up the document because to me it appeared

12   she was nervous.

13   Q.   Did you discuss the topic of Tri-Valley University's site

14   visit with her?

15   A.   Yes.

16   Q.   Can you tell the jury your understanding at the time what a

17   site visit was?

18   A.   Yes.  A site visit occurs during the initial I-17

19   application process or during recertifications for

20   SEVP-approved schools.  It involves an inspector, an officer,

21   traveling to the school to verify the information on the I-17

22   and confirm that the school actually has the capacity to enroll

23   the number of students that they propose.

24   Q.   Did you ask her when Tri-Valley University had its site

25   visit?

MACKEY - DIRECT / RHYNE

1    Q.   Did you have any discussion with Dr. Su during this

2    interview about her understandings of the regulations and full

3    courses of study requirement for schools?

4    A.   Yes, I did.

5    Q.   What did you ask her?

6    A.   I asked her what Tri-Valley University considered a full

7    course of study.

8    Q.   What did she say?

9    A.   She stated that nine units was considered a full course of

10   study at Tri-Valley University.

11   Q.   Did you ask her about a physical attendance requirement?

12   A.   Yes.

13   Q.   What did you ask her?

14   A.   I asked her how many of those nine units that she permitted

15   her students to attend online or not actually physically at the

16   campus.

17   Q.   What did she say?

18   A.   She stated that her students were allowed to take three

19   units online and that the rest had to be done on campus -- or

20   "physical," I should say.  She didn't say "on campus."  She

21   said "physically."  She said they had to physically attend

22   those six units.

23   Q.   Did she tell you where those classes occurred?

24   A.   I asked a follow-up question, and she said that physical

25   attendance takes place at -- at 405 Boulder Court, which was a

MACKEY - DIRECT / RHYNE

1    that she used to teach at Herguan University, and they were

2    skilled recruiters for foreign students, and she approached

3    them very shortly after she received her SEVIS approval to help

4    her obtain foreign students for Tri-Valley University.

5    Q.   When you said "couple of associates," can you -- did Susan

6    Su tell you their names?

7    A.   Yes.

8    Q.   What were their names?

9    A.   One of them was Bhargav Boinpally, B-a-r-g-h-a-v [sic],

10   Boinpally, B-o-i-n-p-a-l-l-y.

11   Q.   Did you --

12   A.   And --

13   Q.   Did she mention the other name?

14   A.   Yes.  The other individual was Abhilash Surineni, I believe

15   A-b-h-a-s-h [sic], Surineni, S-u-r-i-n-e-n-i.

16   Q.   Did you ask her whether she had any contact with these

17   individuals regarding the recruitment process at Tri-Valley

18   University?

19   A.   Yes, I did.

20   Q.   What did she say?

21   A.   Again, she said that shortly after she received her SEVIS

22   approval, she contacted them to help her build her foreign

23   student base.

24   Q.   Did you ask her whether she met with them?

25   A.   Yes.

MACKEY - DIRECT / RHYNE

1    Q.   What did she say?

2    A.   She stated that she e-mailed them and subsequently met with

3    them and entered into a recruiting contract with them.

4    Q.   Did she tell you the name that they went by in the

5    contract?

6    A.   Yes.  She indicated they were part of a company or what

7    they call a consultancy in India, and the name of the

8    consultancy was ABS Consultancy.  The ABS stood for the first

9    three letters of the first names of the members.

10   Q.   Did Dr. Su indicate how many students, if any, this company

11   had referred to Tri-Valley University?

12   A.   Yes.  She estimated that the first 200 students at

13   Tri-Valley University were recruited by them, and she

14   specifically -- or she also estimated that the first 150

15   students were Samuel Steven Kancharakuntla's recruits, and

16   the -- Boinpally recruited -- recruited another 50 students.

17   Q.   Did you ask Dr. Su about the immigration status of the

18   three ABS members?

19   A.   Yes.  She stated that she basically made them Tri-Valley

20   University F-1 students after they entered into their

21   precontract.

22   Q.   Did you ask her whether they attended classes at Tri-Valley

23   University?

24   A.   I did.

25   Q.   What did she say?

MACKEY - DIRECT / RHYNE

1    Q.   Okay.  Same question with 207B.  Do you recognize that?

2    A.   Yes, I do.

3    Q.   And did Dr. Su also authenticate that during the interview?

4    A.   Yes, she did.

5              MR. RHYNE:  Your Honor, we move Exhibit 206B and 207B

6    into evidence.

7              THE COURT:  Any objection?

8              MR. BABCOCK:  No, I don't think so, your Honor.

9              THE COURT:  Exhibits 206B and 207B are admitted.

10   (Government's Exhibits 206B and 207B received in evidence.)

11   BY MR. RHYNE:

12   Q.   Now, Agent Taylor -- I believe another witness is going to

13   testify about this, but can you generally just describe -- set

14   the stage for how you received these two e-mails or how DHS

15   received these two e-mails?

16   A.   Sure.  So during the course of its investigation, we

17   basically enrolled students that didn't exist at Tri-Valley

18   University and get Tri-Valley University -- to see how long

19   they would be maintained in their status.

20        And towards the end of -- before we took our enforcement

21   actions, we began contacting Ms. Su posing as immigration

22   officials at the airport and telling Ms. Su that we encountered

23   these individuals and asking for transcripts, verification

24   letters, I-20 permission documents to confirm that they were,

25   in fact, maintaining their status, that they were studying,

1    full-time students.  And in response to those inquiries, she

2    sent these e-mails with those documents.

3              MR. BABCOCK:  Your Honor, I'm sorry.  I'm going to

4    have to object and move to strike.  I think pretty much all of

5    that last answer is hearsay-based.

6              THE COURT:  Do you want to be heard?

7              MR. RHYNE:  I think I can clear it up with one

8    question.

9              THE COURT:  All right.  I'll withhold a ruling on the

10   objection for the moment, but ask the question.

11   BY MR. RHYNE:

12   Q.  Agent Mackey, were you involved in these undercover

13   operations with first-hand knowledge of what happened?

14   A.  Yes.  I was present for all the phone calls.

15   Q.  And did you see these e-mails when they were received?

16   A.  Yes.

17              MR. BABCOCK:  Submitted.

18              THE COURT:  Overruled.

19   BY MR. RHYNE:

20   Q.  Agent Mackey, you're familiar with how the students' -- you

21   called them fictitious students -- names were selected?

22   A.  Yes.

23   Q.  How were they selected?

24   A.  We ran a report in our SEVIS database and basically

25   randomly pulled names of terminated students in the system to

MACKEY - DIRECT / RHYNE

1    see if Ms. Su would reactivate or attempt to reactivate those

2    students.

3    Q.   Okay.  Did you inform Dr. Su during this interview these,

4    in fact, were fictitious students?

5    A.   I did.

6    Q.   What was her reaction?

7    A.   At first, it seemed like surprise.  I believe she told us

8    that -- when we told her that they weren't real students at

9    Tri-Valley University, she said that was -- that's impossible,

10   and then I believe she basically called us tricky.

11   Q.   And Agent Taylor was present; correct?

12   A.   Yes.

13   Q.   And Agent Taylor was the individual who made the phone

14   call; is that correct?

15   A.   Yes.

16   Q.   Did you inform her at that point of that fact?

17   A.   Yes, I did.

18   Q.   Then did you then follow up regarding the legitimacy of

19   these attachments in both of these e-mails that she sent --

20   A.   Yes.

21   Q.   -- to you?

22   A.   I did.

23   Q.   What did she say?

24   A.   She explained that she created these transcripts and the

25   verification letters and the I-20 and sent them to us because

MACKEY - DIRECT / RHYNE

1    A.   Yes.

2         MR. RHYNE:  Could we publish Exhibit 330, Page 1, and

3    can we go from "Thursday, 5/11/09," all the way down to where

4    it says, "Thanks.  In regards, Harman"?

5    BY MR. RHYNE:

6    Q.   Agent Mackey, I'd like to start at the bottom of this

7    portion of the e-mail exchange.  The person is writing, "Susan.

8    Hi, Susan.  I want to say that as per your referral system, I

9    have referred my friend Vishal Dasa according to your referral

10   procedure.  Just make sure that I get 15 percent off on

11   first-semester tuition fee.

12        "And one more thing I want to ask, that there is no slide

13   uploaded in course material for Healthcare Management class.

14   So can you please tell me from where I can get that.  Thanks."

15        As we move up, we see a response from Dr. Su; is that

16   correct?

17   A.   Yes.

18   Q.   Dated 5 November 2009?

19   A.   Yes.

20   Q.   At this point, were you aware of the general dates of the

21   semester systems at Tri-Valley University?

22   A.   Yes.

23   Q.   And where would this fall, November of 2009 -- or 5

24   November?

25   A.   This would be about a month before the end of the semester.

1    BY MR. RHYNE:

2    Q.   Agent Mackey, I want to direct your attention to the

3    portion of the e-mail where it reads, "Hi, Susan.  I have a few

4    questions as follows..."

5        Do you see that?

6    A.   Yes.

7    Q.   And that e-mail reads from there, "When can I get my

8    student ID?  I can send my pic for that as well.  For my

9    classes, there is no ongoing meeting as well as no instructor.

10   How does it work?  Kindly explain.  I am hoping that these

11   three classes would be counted for my Ph.D.  Kindly let me

12   know.  Thanks, Anuja," A-n-u-j-a.

13        Is that correct?

14   A.   Yes.

15        MR. RHYNE:  Okay.  Can we go up to the e-mail that's

16   immediately above it?

17   BY MR. RHYNE:

18   Q.   Here, we have a response from Susan Su; is that correct?

19   A.   Yes.

20   Q.   Stating, "Anuja, please send in your pictures for student

21   ID.  For the courses, several courses are in developing stage

22   and are still waiting for instructors.  So now just reading the

23   course materials, and they will be counted towards your Ph.D.,

24   and normally you will have good grade for these courses."

25        Is that correct?

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5        I, James C. Pence, Federal Official Realtime Court

 6   Reporter, in and for the United States District Court for the

 7   Northern District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14
                          Dated this 12th day of June, 2014.
15

16

17        _____

          JAMES C. PENCE, RMR, CRR, CSR NO. 13059
18        FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25
```

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    BEFORE THE HONORABLE JON S. TIGAR

4    UNITED STATES OF AMERICA,      )
                                     ) Volume 5
5              Plaintiff,            ) Pages 727 - 927
                                     )
6         VS.                        ) NO. 11-00288 JST
                                     )
7    SUSAN XIAO-PING SU,             )
                                     ) San Francisco, California
8              Defendant.            ) Tuesday, March 11, 2014
     _____) 8:28 a.m.

9

10              **TRANSCRIPT OF COURT PROCEEDINGS**

11

     **APPEARANCES:**

12

13   **For Plaintiff:**          MELINDA HAAG
                                  UNITED STATES ATTORNEY
14                                1301 Clay Street, Suite 340S
                                  Oakland, California 94612
15                    BY:    **HARTLEY M.K. WEST, ESQ.**
                             **WADE M. RHYNE, ESQ.**
16                           **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**          Law Offices of Erik G. Babcock
18                                717 Washington Street, Second Floor
                                  Oakland, California 94607
19                    BY:    **ERIK G. BABCOCK, ESQ.**
                             **ATTORNEY AT LAW**

20

21

22

23

24

     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                 Official Court Reporter - U.S. District Court
                   Computerized Transcription By Case CATalyst

**SER0069**

# I N D E X

Tuesday, March 11, 2014 - Volume 5

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **MACKEY, JASON (RECALLED)** | | |
| (PREVIOUSLY SWORN) | | |
| Cross-Examination (Resumed) by Mr. Babcock | 731 | 5 |
| Redirect Examination by Mr. Rhyne | 748 | 5 |
| Recross-Examination by Mr. Babcock | 761 | 5 |
| Further Redirect Examination by Mr. Rhyne | 767 | 5 |
| Further Recross-Examination by Mr. Babcock | 771 | 5 |
| **COLE, SCOTT** | | |
| (SWORN) | 774 | 5 |
| Direct Examination by Ms. West | 774 | 5 |
| Cross-Examination by Mr. Babcock | 780 | 5 |
| **DASA, VISHAL** | | |
| (SWORN) | 785 | 5 |
| Direct Examination by Mr. Rhyne | 786 | 5 |
| Cross-Examination by Mr. Babcock | 836 | 5 |
| Redirect Examination by Mr. Rhyne | 881 | 5 |
| Recross-Examination by Mr. Babcock | 882 | 5 |
| **CHALLAGUNDLA, BHANU** | | |
| (SWORN) | 886 | 5 |
| Direct Examination by Ms. West | 887 | 5 |

# E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 15 | 903 | 904 | 5 |
| 19 | 909 | 909 | 5 |
| 311 | 755 | 756 | 5 |
| 450 | 874 | 875 | 5 |
| 477 | 821 | 822 | 5 |
| 478 | 821 | 825 | 5 |
| 479 | 798 | 799 | 5 |
| 480 | 802 | 803 | 5 |

1          **I N D E X**

2

3                        **E X H I B I T S**

4    <u>GOVERNMENT'S EXHIBITS</u>                              <u>IDEN</u> <u>EVID</u> <u>VOL.</u>

5     520                                          899  900   5

6     588A                                         831  831   5

7

8    <u>DEFENDANT'S EXHIBITS</u>                              <u>IDEN</u> <u>EVID</u> <u>VOL.</u>

      1004                                         742       5
9
      1005                                         742       5
10
      1006                                         764       5
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   process of matching up the credit card receipts with invoices

2   created at Tri-Valley University to identify F-1 foreign

3   students that their payments were being made for, and then I

4   matched up the names -- the invoices with the records in the

5   SEVIS database to confirm that -- whether or not payment was

6   being made for an F-1 student or not.

7   Q.   I want to follow up generally on this concept of

8   "taking" -- "taking class, maybe passing a test, after you're

9   granted a degree," and I forgot to ask you this yesterday.  You

10  have a degree; is that correct?

11  A.   I do.

12  Q.   Where is it from?

13  A.   UC Berkeley.

14  Q.   Did you get that before or after you took your classes and

15  passed your tests?

16  A.   After.

17        MR. RHYNE:  No further questions, your Honor.

18        THE COURT:  Thank you, Mr. Rhyne.

19     Mr. Babcock, recross?

20                    **RECROSS-EXAMINATION**

21  BY MR. BABCOCK:

22  Q.   You -- the -- you got a degree at Cal?

23  A.   I did.

24  Q.   If you missed a class, did the school call you and say

25  where were you?

**SER0072**

MACKEY - FURTHER REDIRECT / RHYNE

1    in?

2    A.   Physically.

3    Q.   And you conducted surveillance outside of Tri-Valley

4    University up to that point; is that correct?

5    A.   I had.

6    Q.   And you were choosing times where classes were supposed to

7    be held; is that correct?

8    A.   Yes.

9    Q.   Did you ever see any students come and go carrying

10   backpacks, anything like that?

11   A.   There were people coming and going.  I wouldn't

12   characterize them as appearing to be students.

13   Q.   You followed up with Dr. Su about the physical attendance

14   requirement, is that correct, during the interview?

15   A.   Yes.

16   Q.   What did she say next?

17   A.   We covered a lot of topics during her interview.

18   Q.   About the physical attendance requirement, she initially

19   gave you the answer you just spoke about.  Did that

20   subsequently change?

21   A.   Yes.  When I informed her that agents had been conducting

22   surveillance outside of her school, she changed her answer

23   about whether or not Tri-Valley students were physically

24   attending at the Tri-Valley campus, and she explained that

25   physical attendance was occurring online, that students were

MACKEY - FURTHER REDIRECT / RHYNE

1    physically somewhere when they were logging in.

2         So she considered that physical attendance, and she also

3    stated that students had the option of coming to class or

4    taking their classes on campus if they wanted to.  So because

5    of that, she characterized her classes as physical.

6    Q.   That was after you had informed her of your knowledge

7    regarding the surveillance; correct?

8    A.   Yes.

9    Q.   Mr. Babcock asked you also about the articulation

10   agreements.  During your investigation through the evidence

11   that's been admitted at trial, you're aware that SEVP

12   specifically requested articulation agreements from Dr. Su;

13   correct?

14   A.   They did.

15   Q.   And you've seen the letter where she sends them to SEVP;

16   correct?

17   A.   Yes.

18   Q.   My final question has to do with Mr. Babcock's question

19   about the regs not being attached to the I-17.  Can you tell

20   the jury, aside from referencing the regs, what other kind of

21   training can somebody like Dr. Su do in order to learn these

22   regs?  Actually, let me rephrase my question.

23        Does a DSO have to take any training in order to become a

24   DSO?

25   A.   Yes.

COLE - DIRECT / WEST

1    A.   My first -- first time I became aware was when two agents

2    came to my office in Orlando, and they showed me an agreement

3    that was supposedly between Tri-Valley and the University of

4    Central Florida, and that was the first time I became aware.

5    Q.   Okay.  Have you had an opportunity to determine whether UCF

6    actually entered into a real articulation agreement with

7    Tri-Valley University?

8    A.   I have.

9    Q.   How did you determine that?

10   A.   Well, I looked at the agreement they presented to me, and I

11   can tell just on the basis of how it was formatted and the

12   signatures that it was not a legitimate agreement.  There was

13   no approval by the dean, no approval by the vice president for

14   student development.  There was no stamp from our office that

15   one of our attorneys had reviewed the agreement.  So -- and

16   then it was not signed by our president.  So I knew it was not

17   a real agreement.

18   Q.   Did you take any steps to determine whether UCF had ever

19   entered into an articulation agreement properly with

20   Tri-Valley?

21   A.   I did.  I did two things.  One, we have an electronic log

22   of every contract that comes through our office, and so I had

23   my administrative assistant go through that log, did a key word

24   search and some other searches for Tri-Valley University, and

25   there were no contracts in our database for Tri-Valley.

SER0075

DASA - DIRECT / RHYNE

1                          **VISHAL DASA,**

2     Called as a witness by the Government, having been duly sworn,

3     testified as follows:

4                        **DIRECT EXAMINATION**

5     BY MR. RHYNE:

6     Q.   Good morning.

7     A.   Good morning.

8     Q.   Can you please summarize your educational background.

9     A.   I'm a registered pharmacist back from India.  I have

10    completed my Bachelor of Pharmacy.

11    Q.   Where did you go to school in India?

12    A.   Bharat Institute of Technology, Hyderabad, Andhra Pradesh,

13    India.

14    Q.   Can you spell the school for the court reporter?

15    A.   Sure.  It's B-h-a-r-a-t.  Bharat.  Technology,

16    T-e-c-h-n-o-l-o-g-y.  Technology.

17    Q.   Are you currently employed?

18    A.   Yes.

19    Q.   Where do you work?

20    A.   I work at eHarmony.com.

21    Q.   Whereabouts?

22    A.   I'm sorry?

23    Q.   In what -- in what city?

24    A.   It's in Santa Monica, California.

25                THE COURT:  Did you say eHarmony?

DASA - DIRECT / RHYNE

1    A.   Sure.

2    Q.   Can you tell the jury your immigration history beginning

3    when you first entered the United States?

4    A.   Sure.  I -- I entered the United States on an F-1 visa, and

5    I studied at Antioch University in Santa Barbara, California.

6    I came on -- I came to the U.S. to study initially on MA for

7    Organizational Psychology.  I completed my semester.  Then I

8    made -- took a transfer to International Technological

9    University.

10   Q.   What year did you come into the United States to study at

11   Antioch University?

12   A.   October 2008.

13   Q.   Okay.  And then you said you transferred from there?

14   A.   Yes.

15   Q.   Where did you transfer?

16   A.   I transferred to International Technological University,

17   which was in Sunnyvale, California.

18                    (Court reporter clarification.)

19               THE WITNESS:  Sunnyvale, California.

20   BY MR. RHYNE:

21   Q.   What did you study there?

22   A.   MS in Healthcare Management.

23   Q.   You said MS in Healthcare Management?

24   A.   Master of Science in Healthcare Management.

25   Q.   How long did you stay at ITU?

DASA - DIRECT / RHYNE

```
 1    A.   For two semesters.

 2    Q.   Okay.  Where did you go after that?

 3    A.   I went to Tri-Valley University.

 4    Q.   Did you go anywhere between leaving ITU and Tri-Valley

 5    University?

 6    A.   Yes.  I went to India.  I took a summer of vacation.  I

 7    went to India, and I came back and joined Tri-Valley

 8    University.

 9    Q.   Okay.  Do you know what your immigration status was when

10    you were traveling to India?

11    A.   Yes.  It was an F-1.

12    Q.   From which school?

13    A.   From ITU.

14    Q.   Okay.  And then when you came back from India, you started

15    at Tri-Valley University; is that correct?

16    A.   Yes.

17    Q.   Okay.  I want to talk about Tri-Valley University now.  I

18    want to direct your attention to the fall of 2009.

19    A.   Okay.

20    Q.   Is that about when you first contacted Tri-Valley

21    University?

22    A.   Yes.

23    Q.   Okay.  How did you hear about Tri-Valley University?

24    A.   After I come back to United States, one of my friends --

25    her name is Harman Jeet Kaur.
```

DASA - DIRECT / RHYNE

1    Q.   Can you spell that name for the court reporter?

2    A.   H-e -- I don't know the exact spelling, but H-e-r-m-a-n

3    [sic].  J-e-e-t.  K-a-u-r.

4    Q.   So you heard about the school from this person?

5    A.   From -- yes, and she actually told me about this

6    universities.  And then after that, I contact -- I e-mailed

7    Tri-Valley University, and I got a reply and an appointment

8    from Susan Su --

9    Q.   Okay.

10   A.   -- to come to the university and meet her on September 4th.

11   Q.   Okay.  I want to back up a little bit.  Before you went to

12   Tri-Valley University and before you spoke with Dr. Su, did you

13   research Tri-Valley University?

14   A.   Yes, I did.

15   Q.   How did you research it?

16   A.   After listening from Harman Jeet, I went to Tri-Valley

17   University's web page, and I looked for it in, I believe, a

18   random way, and I saw that the university was accredited.  I

19   saw they had an MS in Healthcare Management course available.

20   Q.   Did you have an opportunity to look at the faculty that was

21   listed?

22   A.   Yes, I did, and all of the faculty names right next to the

23   courses were, like, all of them having doctorates and high

24   professional degrees.

25   Q.   Did you have an opportunity to see how much it charged per

DASA - DIRECT / RHYNE

1    semester?

2    A.   No.

3    Q.   Okay.  Did you later learn that?

4    A.   Yes.

5    Q.   And how did that -- how did the fees at Tri-Valley compare

6    to the fees at your prior school?

7    A.   Compared to International Technological University, it was

8    a thousand dollars less than compared to International

9    Technological University.

10   Q.   Okay.  Now, you stated you called, and you spoke to Dr. Su;

11   is that correct?

12   A.   Yes.

13   Q.   I want to talk about that phone call.

14        How do you know it was Dr. Su?

15   A.   I don't know about her.  I called her, and then later on, I

16   came to know that she was the president of the university

17   because I've seen her name at the time on the web page stating,

18   "Dr. Susan Su, President of Tri-Valley University."

19   Q.   Did she tell you she was the president?

20   A.   When I met her in person, yes, she did.

21   Q.   Okay.  How was the school described to you during the phone

22   conversation?

23   A.   She didn't describe anything on -- while I was talking on

24   the phone.

25   Q.   Did you ask whether they offered a degree in your area?

DASA - DIRECT / RHYNE

```
 1    A.   When she was making -- taking me on a tour of the

 2    classrooms, she did mention -- saying students would be coming

 3    over there and taking physical classes.

 4    Q.   After this tour, did you make a decision on whether you

 5    were going to transfer to Tri-Valley University?

 6    A.   Yes, I did make a -- made a decision to join Tri-Valley

 7    University.

 8    Q.   Okay.  Now, after this visit, you had some e-mail

 9    correspondence with Dr. Su; is that correct?

10    A.   Yes.

11    Q.   Were you employed at the time?

12    A.   No.

13    Q.   Did you want to be employed?

14    A.   I was looking for an on-campus job at that time.

15    Q.   Can you summarize the nature of those e-mails with Dr. Su?

16    A.   On the day when I met -- I was asking her, "Are there any

17    on-campus jobs available or not?"

18         Then she said, "As of that time, there are no on-campus

19    jobs available," and she said she would let me know when

20    that -- any jobs available.

21    Q.   Okay.  So I want to move forward now, and I want to talk

22    about -- you had another visit to Tri-Valley University; is

23    that correct?

24    A.   Yes.

25    Q.   Okay.  Approximately how much later did you go back to
```

DASA - DIRECT / RHYNE

1        And so counsel normally stand up when I come in here.  I
2    don't ask them to, but it's our practice here when the jury
3    enters and leaves the courtroom for everyone to stand up.  It's
4    just the way folks -- folks view your role.
5        So please -- I don't -- I can't know that you're waiting
6    for me, but it looks like you might be.  So please don't do
7    that.
8        Mr. Rhyne?
9            MR. RHYNE:  Thank you, your Honor.
10   BY MR. RHYNE:
11   Q.  Mr. Dasa, when we left off, we were talking about fall of
12   2009.  I want to pick up there.
13       At some point during the fall of 2009, did you sign up for
14   classes at Tri-Valley University?
15   A.  Yes, I did.
16   Q.  How did you pay for those classes?
17   A.  I -- excuse me.  My uncle actually made a wire transfer to
18   the university account, and the first transaction he made was
19   that thousand dollars on September 11th.
20   Q.  After that transfer, did you get anything from Tri-Valley
21   University?
22   A.  Yes.
23   Q.  What did you get?
24   A.  I got my fee payment receipt along with my continued
25   attendance I-20 showing that --

DASA - DIRECT / RHYNE

1   Q.   When --

2   A.   -- I registered for the classes.

3            MR. RHYNE:  Your Honor, may I approach the witness?

4            THE COURT:  You may.

5            MR. RHYNE:  479.

6        (Government's Exhibit 479 marked for identification.)

7   BY MR. RHYNE:

8   Q.   Mr. Dasa, I'm going to hand you an exhibit that's been

9   marked Exhibit 479 for identification.  I'll just ask you to

10  take a look at it.

11       Do you recognize those documents?

12  A.   Yes.

13  Q.   What are they?

14  A.   Admission letter, my fee payment invoice, my good standing

15  letter, and my address DMV verification letter, the results of

16  my invoice, which shows that I registered for these courses.

17  Q.   Did you get those documents from Tri-Valley University?

18  A.   Yes, I did.

19  Q.   Did you give them to any member of the Government in this

20  case?

21  A.   Yes, I did.

22  Q.   Who did you give them to?

23  A.   Jason Mackey.

24  Q.   Do those documents look like they looked when you got them

25  from Tri-Valley University?

DASA - DIRECT / RHYNE

1   A.   Yes.

2            MR. RHYNE:  Can we go to the next page, and can we,

3   just starting with the box with his name, go all the way down

4   to the signature block at the bottom, please.

5        Thank you.

6   BY MR. RHYNE:

7   Q.   Are these the classes that you registered for initially?

8   A.   Yes.

9   Q.   I want to talk about what happened after you registered for

10  these classes.  Did you ever receive a schedule from the school

11  about when these classes would take place?

12  A.   No.

13  Q.   Did you ever receive any information about who your

14  professors would be?

15  A.   No.

16  Q.   Did you ever receive any information about when the start

17  of instruction would be?

18  A.   She used to send me an e-mail.  As soon as the classes

19  would begin, she would let me know.

20  Q.   At some point, did you call to inquire about the status of

21  these classes that you had enrolled in?

22  A.   Yes.

23  Q.   Who did you call?

24  A.   I called Tri-Valley University, and Susan Su answered the

25  call.

DASA - DIRECT / RHYNE

1    Q.   Okay.  What did you ask her?

2    A.   I asked her, like, when are the classes would begin from.

3    Q.   And what did she say?

4    A.   She said she would get back to me.

5    Q.   Did you ask her about the status of what your grades would

6    be?

7    A.   No.

8    Q.   Was there any discussion about what your grades would be in

9    these classes?

10   A.   No.

11   Q.   Would there later be a discussion about what your grades

12   would be in these classes?

13   A.   There was no discussion, but finally, I received a

14   transcript from Susan Su, and I got A, A, A-minus.

15   Q.   Did you continue to ask Dr. Su about when these classes

16   would start throughout that semester?

17   A.   I asked a couple of times.

18   Q.   Okay.  Did you stay enrolled in these classes?

19   A.   Yes.

20   Q.   Okay.  Was there any attempt to enroll you in some other

21   classes?

22   A.   Yes.

23   Q.   Can you tell the jury about that?

24   A.   So back in September, like, I -- after I registered for my

25   classes, I e-mailed her, and one day she replied back to me

804

DASA - DIRECT / RHYNE

1    A.   Yes.

2    Q.   In the School of Medicine business; correct?

3    A.   Yes.

4    Q.   And here, we have some indications that some prior classes

5    had transferred; is that correct?

6    A.   Yes.

7    Q.   This says from Antioch?

8    A.   Yes.

9    Q.   And also from ITU?

10   A.   From ITU, I only studied the first three.  I didn't do CEN

11   and SEN subjects.

12   Q.   Okay.  So the bottom two, you didn't actually complete?

13   A.   I didn't register those at International Technological

14   University at any time.  I don't know how it got added.

15   Q.   Okay.  I want to go down to the -- do you see the fall of

16   2009?

17   A.   Yes.

18   Q.   You received grades in those classes, you mentioned

19   earlier?

20   A.   Yes.

21   Q.   And that was A, A, A-minus; correct?

22   A.   Yes, but there's a different subject than -- compared to

23   what I registered.

24   Q.   Explain that.

25   A.   I never -- like, Susan Su added two of the classes, which

805

DASA - DIRECT / RHYNE

1   were, like, Database Management and Human Resource Management,

2   which -- I never opted for those, but you can see the third

3   subject is Human Resources Management, which -- I never

4   enrolled for that course at all.

5   Q.  I want to talk about the computer science classes that she

6   said you were going to be auditing.  Did she tell you why you

7   needed to audit those classes and not take the classes that you

8   signed up for?

9   A.  She did mention in the e-mail saying for Healthcare

10  Management -- that only less than five students enroll.  That's

11  the reason why she's making me enroll for those classes.

12  Q.  Okay.  Did you try to log into the computer science

13  classes?

14  A.  Yes, I did.

15  Q.  What happened when you tried to log into those classes?

16  A.  Obviously, I'm a healthcare management guy.  So when I

17  logged into classes, everything was looking new to me.  So I

18  e-mailed back to her saying I couldn't able to do anything nor

19  understand the subjects.

20  Q.  And that's when she told you you're just auditing?

21  A.  Yes.

22  Q.  I want to move forward now to the spring of 2010.

23  A.  Okay.

24  Q.  Did you have any more discussions with Dr. Su about

25  classes -- having classes?

806

DASA - DIRECT / RHYNE

1    A.   I had only a few times before I got the grades, but once I

2    got the grades, I never discussed about that.

3    Q.   Okay.  Did you have a discussion with her about what you

4    would do during the spring semester?

5    A.   No.  Actually, when I met Dr. Susan Su early -- first or

6    second week of January, as soon as I'm over there, she told me

7    that I can take a break in the spring semester.

8    Q.   Okay.  I want to talk about that.  Tell me about that

9    conversation.

10   A.   So I went along with my friend, and my friend was asking

11   courses, and then when it -- when I started talking to her, she

12   told that I can take a break for that semester, and even I was

13   happy for that because there's no need for me to pay the

14   tuition fees for that semester.

15   Q.   Okay.  What was your immigration status during the spring

16   of 2000 --

17   A.   F-1 visa.  F-1 student visa.

18   Q.   Let me finish my question.

19        That's the spring of 2010; correct?

20   A.   Yes.

21   Q.   And the F-1 visa was for Tri-Valley University?

22   A.   Yes.

23   Q.   And that was after Dr. Su told you you didn't have to take

24   classes that semester?

25   A.   Yes.

DASA - DIRECT / RHYNE

1    Q.   What did you do instead that semester?

2    A.   She offered me an on-campus job.  So I started working at

3    Tri-Valley University in that semester.

4    Q.   Now, I just want to talk generally.  You worked different

5    time frames at Tri-Valley University; correct?

6    A.   Yes.

7    Q.   Approximately how many different periods of employment did

8    you have at Tri-Valley University?

9    A.   Three.

10   Q.   And we'll talk about those in a little while, but I want to

11   talk about how your position started there.

12        Did Dr. Su offer you the employment?

13   A.   Yes.

14   Q.   Did she tell you how much you would make?

15   A.   She told me I'll be getting paid $10 an hour.

16   Q.   Are you familiar with the term "Assistant to the

17   President"?

18   A.   Not when I was joining, but later on I came to know about

19   it.

20   Q.   What was that?  What was that job title?  Who had that job

21   title?

22   A.   Susan Su told me to put that title when I'm trying to send

23   the e-mails.

24   Q.   So you would send e-mails with that job title?

25   A.   Yes.

DASA - DIRECT / RHYNE

1    Q.   What were some of your initial duties when you started

2    working at Tri-Valley University?

3    A.   At the beginning, I used to answer the phone calls and

4    reply back to the e-mails and register a few of the students.

5    Q.   Would calls and e-mails normally be questions from

6    students?

7    A.   Yes.

8    Q.   I want to talk about any instruction or training that you

9    received on how to perform your duties at Tri-Valley

10   University.  Did you receive instruction and training from

11   anyone?

12   A.   Yes.

13   Q.   Who trained you and instructed you?

14   A.   Susan Su and Parth Patel.

15   Q.   That was Parth Patel?

16   A.   Yes.

17   Q.   As you continued to work at Tri-Valley University, did you

18   take on additional jobs?  Did you handle other things besides

19   just answering the phone?

20   A.   Yes.

21   Q.   Okay.  Are you familiar with the term "SEVIS"?

22   A.   Yes.

23   Q.   And the SEVIS database?

24   A.   Not at the beginning when I joined, but later on, I came to

25   know.

DASA - DIRECT / RHYNE

1    Q.   Okay.  And did you receive training on how to operate

2    SEVIS?

3    A.   Yes.

4    Q.   Who trained you?

5    A.   Susan Su and also Parth Patel.

6    Q.   Did Dr. Su provide you any information or training about

7    what addresses to enter into SEVIS?

8    A.   Yes.

9    Q.   What did she tell you?

10   A.   If a student was not providing any address while applying

11   to Tri-Valley University, the student who got enrolled into CPT

12   and is working at some other -- apart from California, I should

13   use the California address, which was listed in that manual.

14   Q.   Okay.  What do you mean "manual"?

15   A.   There was a -- they gave me a manual, which was created by

16   Parth Patel and other folks, which was having the California

17   address, which I needed to copy and paste into the SEVIS.

18   Q.   And how did that address in the manual -- was that the same

19   address that Dr. Susan Su told you to enter as well?

20   A.   Yes.

21   Q.   Do you remember what that address was?

22   A.   555 East El Camino Real, Sunnyvale, California.  There was

23   some apartment number.  I don't remember.

24   Q.   Did you ever receive any training or hear Dr. Su talk about

25   the Tri-Valley University admissions process?

DASA - DIRECT / RHYNE

1    A.   Always -- not particularly, but every time she used to

2    scream at me, and she used to tell, like, I should process an

3    application as soon as possible.

4    Q.   Did she tell you about whether any students should or

5    should not get into the school?

6    A.   I haven't seen any student not getting an admission at

7    Tri-Valley.

8    Q.   Did you hear Dr. Su give people instructions on who to

9    admit?

10   A.   We used to admit all the students.

11   Q.   Why?

12   A.   Because it was from Susan Su.  She told us to do that.

13   Q.   She -- did you ever request additional information from

14   applicants that were applying to Tri-Valley University?

15   A.   Yes, I did.

16   Q.   How would you request that information?

17   A.   There is an application requirement which has -- like, the

18   basic requirements is passport, visa, previous I-20's, and

19   other financial information.  But when I requested the

20   students, she actually yelled at me, and she said what those

21   students submit, I should process the application even if all

22   the documents are not available.

23   Q.   How did she know you were requesting this information?

24   A.   Every day when I sent an -- when I sent e-mails to -- when

25   I reply back to the students in the night, she used to verify

813

DASA - DIRECT / RHYNE

1   Q.  I want to talk a little bit more about SEVIS.  Did you

2   access SEVIS while you were working at Tri-Valley University?

3   A.  Yes, I did.

4   Q.  On what kind of machine were you working on?

5   A.  There were a couple of laptops and one desktop, I guess,

6   one or two desktops.

7   Q.  Do you know what the term "designated school official"

8   means?

9   A.  Not at the beginning, but later on, I came to know.

10  Q.  And you've heard of it referred to as DSO?

11  A.  Yes.

12  Q.  Do you know who the DSO's at Tri-Valley University were?

13  A.  Yes.

14  Q.  Who were they?

15  A.  Susan Su, Wenchao Wang, and Sophie Su.

16  Q.  Explain to me how your day would start.  How would you

17  access SEVIS?

18  A.  I would come in the morning, and once I'm over there, Susan

19  Su used to -- she used to tell me to grab a laptop.  I used to

20  grab a laptop and give it to her.  She used to log into some of

21  the sites, and then after logging in, she used to hand the

22  laptop to me.

23  Q.  And the site that she was logging into -- was that SEVIS?

24  A.  Yes.

25  Q.  When you would work in SEVIS, what would you do?

814

DASA - DIRECT / RHYNE

1   A.   I'd go back to the e-mails.  I'd take the application,

2   documents.  I tried to input the student's first name, last

3   name, date of birth, address, course, and financial information

4   and print the I-20.

5   Q.   How many I-20's would you say you printed per day?

6   A.   An average, like, 15 to 20.

7   Q.   What would you do with those I-20's at the end of the day?

8   A.   I would print out and give it to Susan -- Susan Su, then

9   she would sign it, and then we were going to mail it.  And

10  before that, like, once I create the I-20, I attach those to

11  the student's e-mail and reply back to them saying, "Your I-20

12  has been created."

13  Q.   Is it true that the DSO's name is preprinted on the I-20?

14  A.   Yes.

15  Q.   And that depends on which account you're using; correct?

16  A.   Yes.

17  Q.   Did you always use the same account?

18  A.   No.  It was different accounts.

19  Q.   When you would take the I-20's to Dr. Su, were they all the

20  same DSO, or were there different names?

21  A.   They were all the same DSO's --

22  Q.   Did you sign --

23  A.   -- on a particular day.

24  Q.   On a particular day.

25       Okay.  Did you take I-20's to Dr. Su that were in her name?

815

DASA - DIRECT / RHYNE

1    A.   Yes.

2    Q.   Did you see her sign her name on those I-20's?

3    A.   Yes, I did.

4    Q.   Did you take I-20's to Dr. Su in the DSO name of Sophie Su?

5    A.   Yes, I did.

6    Q.   Did you see Dr. Su sign those names?

7    A.   Yes.

8    Q.   Or those signatures?

9    A.   Yes.

10   Q.   Whose name would she sign?

11   A.   Sophie Su's and Wenchao Wang.

12   Q.   So you saw her do the same thing with Wenchao Wang as well?

13   A.   Yes.

14   Q.   Did you come to learn that you weren't supposed to be

15   accessing SEVIS?

16   A.   Yes.

17   Q.   What did you do when you learned that -- well, let me ask

18   you this:  How did you learn that?

19   A.   So one day what happened -- every day, she used to log in

20   and give it to me.  One day, the SEVIS logged out, and when

21   I -- when the site got logged out, there was a disclaimer on

22   the site saying only DSO's should be accessing the SEVIS.

23   Q.   What did you do at that point?

24   A.   At that point, I took the laptop and went back to Susan,

25   and she logged in back and gave it to me.

DASA - DIRECT / RHYNE

1    A.   Yes.

2    Q.   During your time frame working at Tri-Valley University,

3    did you ever see any physical classes?

4    A.   No.

5    Q.   How often would you see an instructor?

6    A.   Twice -- once or twice a month.

7    Q.   What was the purpose of the instructor's presence at

8    Tri-Valley University, if you know?

9    A.   Couple of them were, like, Ph.D. students at Tri-Valley

10   University.  They were coming at the university to get enrolled

11   for the classes, and that's how I met them.

12   Q.   Were these also F-1 students?

13   A.   Yes.

14   Q.   How did you know they were F-1 students?

15   A.   Because I was helping them in order to register their

16   classes, and sometimes they used to come for their paycheck.

17   Q.   Did you ever see them sit at the front of a room and start

18   to teach a class?

19   A.   No.

20   Q.   What about an online class?  Did you ever see them get in

21   front of a camera and start teaching an online class?

22   A.   At the beginning, there were no classes, but later on there

23   were a couple of online classes.

24   Q.   You saw a couple of those?

25   A.   Couple of them, yeah.

**SER0096**

DASA - DIRECT / RHYNE

1   Q.   Now, you actually tried to log into some of your classes;

2   is that correct?

3   A.   Yes.

4   Q.   What would happen when you would log into your classes?

5   A.   I see a few of the books attached and materials attached to

6   it, and that's what I've seen.  When I was getting bored while

7   I'm working, I used to log in, and I used to go through the PDF

8   documents.

9   Q.   How did you log in?

10  A.   I used to have my user ID and password.  It's -- we need to

11  go onto TVU's admin website where they administer the classes,

12  and that's when I log into -- using my account.  I see my

13  classes over there.

14  Q.   What else would you see when you would log into these

15  classes?  Anything else?

16  A.   No, and there would be always a professor's name right next

17  to the course.

18  Q.   Would you see the live professor?

19  A.   I haven't seen at any time.

20  Q.   Did Dr. Su give -- or did you hear Dr. Su give instructions

21  to you or other people that worked in Tri-Valley's office about

22  what to do if a teacher submits grades that have F's for their

23  students?

24  A.   I never heard about that, and up to my knowledge, I never,

25  like, college students -- to know a student who got F grade.

821

DASA - DIRECT / RHYNE

1    A.   Susan Su.

2    Q.   And what percentage of the students' tuition would the

3    referring student get?

4    A.   15 percent and -- plus 5 or 3 percent if the other student

5    refers some other students.

6    Q.   So the first student -- if you're at the top, you'd get

7    15 percent for this student; correct?

8    A.   Yes.

9    Q.   And then if this student refers other students, then 5

10   percent would go up to the top person?

11   A.   Yes.

12            MR. RHYNE:  Your Honor, may I approach the witness?

13            THE COURT:  You may.

14       (Government's Exhibits 477 and 478 marked for

15   identification.)

16   BY MR. RHYNE:

17   Q.   Mr. Dasa, I'm going to hand you Exhibit 477 and 478 for

18   identification, and I'll ask you to look at Exhibit 477 first.

19       Do you recognize that?

20   A.   Yes.

21   Q.   What is it?

22   A.   It's a referral agreement.

23   Q.   Where did you get it?

24   A.   From Susan Su.

25   Q.   Is that a document you provided to Agent Mackey in this

DASA - DIRECT / RHYNE

1    A.   Yes.

2    Q.   -- of the Tri-Valley --

3    A.   Yes.

4    Q.   You're referring to this spot right here?

5    A.   Yes.

6    Q.   Okay.  Let me ask you to close that, put that back in the

7    folder there, and look at Exhibit 478.

8         Do you recognize Exhibit 478?

9    A.   Yes.

10        MR. RHYNE:  You can take that down.  Thanks.

11   BY MR. RHYNE:

12   Q.   What's Exhibit 478?

13   A.   It states that I've got, like, 15-percent referral fees,

14   and it also states that 12 -- like, 12-percent extra bonus for

15   those 12 and for the other students.

16   Q.   Is this a receipt for your payments?

17   A.   Yes.

18   Q.   Okay.  You received referral payments?

19   A.   Yes.

20   Q.   Did you get this from Tri-Valley University?

21   A.   Yes.

22   Q.   Did you give it to Agent Mackey?

23   A.   Yes.

24   Q.   Does it look -- if you look at Exhibit 478, does it look

25   like it looked when you got it?

DASA - DIRECT / RHYNE

1    A.   Yeah.

2            MR. RHYNE:  Your Honor, we'd ask that 478 be admitted

3    into evidence.

4            THE COURT:  Any objection?

5            MR. BABCOCK:  No objection, your Honor.

6            THE COURT:  478 is admitted.

7            (Government's Exhibit 478 received in evidence.)

8            MR. RHYNE:  Can we publish Exhibit 478, the first

9    page, please, and can we just start at the top, "Agent Referral

10   Fees," and go down about halfway.

11           Thank you.

12   BY MR. RHYNE:

13   Q.   Mr. Dasa, this is the receipt you're referring to?

14   A.   Yes.

15   Q.   It's for Spring 2010?

16   A.   Yes.

17   Q.   And it has a referral agreement rate of 15 percent?

18   A.   Yes.

19   Q.   Has your e-mail address there?

20   A.   Yes.

21   Q.   A mailing address for a check?

22   A.   Yes.

23   Q.   Is that your address?

24   A.   Yes, that's my address.

25   Q.   It was?

828

DASA - DIRECT / RHYNE

```
1    A.  Yes.

2    Q.  And as you were working at Tri-Valley University over time,

3    you did some of that; is that correct?

4    A.  Yes.

5    Q.  And other people in the office were doing that as well; is

6    that correct?

7    A.  Yes.

8    Q.  And that was against the instructions that Dr. Su had given

9    to you about the referral fees; is that correct?

10   A.  Yes.

11   Q.  Now, you would also refer walk-in students to other people

12   that you knew; correct?

13   A.  Yes.

14   Q.  One of those people was Ram Karra?

15   A.  Yes.

16   Q.  And his name is spelled R-a-m, C-a-r-r-a; correct?

17   A.  No.  R-a-m, K-a-r-r-a.

18   Q.  K-a-r-r-a.  I'm sorry.

19       And you would refer those students out so he could get the

20   referral fee; correct?

21   A.  Yes, and he told me that he will give me some percentage of

22   it.

23   Q.  He, in fact, gave you something in return for that; is that

24   correct?

25   A.  He just gave me a cell phone.
```

SER0101

829

DASA - DIRECT / RHYNE

1    Q.   What kind of phone?

2    A.   iPhone.

3    Q.   You also passed along some walk-in students to somebody

4    named Golla; is that correct?

5    A.   Yes.

6    Q.   Who is that?

7    A.   He was a student at Tri-Valley University.

8    Q.   Okay.  How do you spell his name?

9    A.   Hari, H-a-r-i.  His middle name is B, and Golla is his last

10   name, G-o-l-l-a.

11   Q.   And he got referral fees for those students; is that

12   correct?

13   A.   Yes.

14   Q.   Even though they were walk-in students?

15   A.   Yes.

16   Q.   You also received extra payments for some other things you

17   did at Tri-Valley University; is that correct?

18   A.   Yes.

19   Q.   Would you -- did you ever expedite referred students'

20   application fees, speed them up?

21   A.   Hari Golla actually used to message to myself saying that

22   if I give a high priority to his applications, then he will

23   give me some money, and he gave me a thousand dollars for it.

24   Q.   What was Dr. Su paying you at this point?

25   A.   She was paying about, like -- it was depending on the

DASA - DIRECT / RHYNE

1    number of days when I worked over there.  So it was about 1500

2    to $1800 per month.

3    Q.   Okay.  And how many days a week were you working?

4    A.   At that time, I used to work five days a week, and I used

5    to work, like, more than -- like, about 12 hours a day.  Not

6    every day I used to work 12 hours.  It would -- like, ten to

7    12 hours.

8    Q.   Did Dr. Su find out that you were referring these students

9    and breaking some of these rules?

10   A.   Yes.

11   Q.   What did she do?

12   A.   Actually, for the second time when I joined, she came to

13   know in the month of May, and we had a very bad argument, and I

14   left the university.  I left the job, and she was telling me to

15   go off.

16        Then later on, I started coming to the university for my

17   friend's -- friend's I-20's and other admission documents.  She

18   actually took me aside, and she asked me what happened, why I

19   was doing that.  And I told her -- saying it was Ramakrishna

20   Karra who made me do all these, and he told me that he will pay

21   a percentage, and that's how I got involved in it.  And then

22   later on when -- after I told her everything, she rehired me.

23   Q.   I want to jump back to -- to one question I asked you

24   earlier.

25              MR. RHYNE:  Your Honor, may I approach the witness?

843
DASA - CROSS / BABCOCK

1   Q.   Is that why you transferred to ITU?

2   A.   That's one of the reasons, but the major reason was --

3   like, at Antioch University, I was doing MA in Organizational

4   Psychology because I'm from a science background.  I've done my

5   Bachelor of Pharmacy.  I wanted to do my Master's in Healthcare

6   Management so that it's related to my course of study.  That's

7   the reason why I transferred to International Technological

8   University.

9   Q.   And Antioch did not offer the program you were interested

10  in?

11  A.   They were not offering me that.

12  Q.   Okay.  But I'm curious.  Why did you go to Antioch in the

13  first place if it didn't offer a program you were interested

14  in?

15  A.   I was -- at the beginning, I was interested to do some

16  organizational psychology stuff, but later on, I think, like,

17  healthcare management would be more, like, closer to my

18  professional Bachelor of Pharmacy degree than organizational

19  psychology because psychology is completely different.

20  Q.   Okay.  When you -- so you registered in September of 2009

21  for -- strike that.

22       I meant to ask and forgot:  The ITU -- did ITU offer -- so

23  ITU did offer courses that you were interested in studying?

24  A.   Yes.  They were having an MS in Healthcare Management.

25  Q.   And isn't it true one of the main reasons, if not the

CHALLAGUNDLA - DIRECT / WEST

1   A.   When I went there, I see a large room in the building, what

2   I saw on the website the day I was in India when I did research

3   for that, and I told her I saw some pictures of the university.

4   So that's the same building I had seen there when I went.

5        And after getting into the room, it's a very big room.  In

6   one corner of the room, a person was busy having three lines in

7   front of her and taking calls, and when I asked Keerthana, she

8   told me that she was Susan Su, Director of the Tri-Valley

9   University.  And then on the other side of the room, I see two

10  people, one girl and then a boy.  They were assisting the

11  people who were coming to the -- to the university.

12  Q.   What do you mean "assisting people"?

13  A.   If anybody wants to -- if new-coming students who want to

14  pay the fee or if they need an ID card or that information,

15  they will help the student then.

16  Q.   Now, what you saw when you arrived, was that what you

17  expected?

18  A.   No.

19  Q.   Why not?  How was it different?

20  A.   In -- when I was in India when doing my Bachelor's, like --

21  I've done my Bachelor's in Andhra University.  So it was a huge

22  university, and when I was coming to the United States, I

23  expected more than that.  I expected a huge building, like,

24  with a lot of students and offices, and I expected a different

25  thing than what I had seen on that day.

921
CHALLAGUNDLA - DIRECT / WEST

1    A.   After paying some amount at the university, I went back to

2    my home, and after a couple of weeks, I got a link for

3    registration of the courses, and at that time I -- I'm able to

4    see the -- see the link -- see the e-mail provided with the

5    date and the time of the class.

6    Q.   Okay.  And did you find out whether that class was online

7    or in person?

8    A.   It's online.

9    Q.   All right.  Did you find out whether there were any

10   physical classes that semester?

11   A.   No.

12   Q.   Let me try that question again.

13        Did you learn one way or another whether there were going

14   to be physical classes that semester?

15   A.   On that day when I was at the university as per our

16   conversation, I came to know that there would be in-person

17   classes for that semester.

18   Q.   And did you later find out whether that was true?

19   A.   Later that -- I found out that there would be no in-person

20   classes also for the second semester, too.

21   Q.   Did you ever try to log into the online classes for that

22   second semester?

23   A.   Yes.

24   Q.   What happened when you tried to log in?

25   A.   In the second semester when I tried to log in, I can just

CHALLAGUNDLA - DIRECT / WEST

1    see the -- regarding a "Play" button and some -- some -- I

2    don't know whether those were student names or professors'

3    names.  I can see some names listed on the left side of the web

4    page.

5    Q.   Okay.  So you saw a list of names on the side?

6    A.   Yes.

7    Q.   And you saw a window with a "Play" button?

8    A.   Yes.

9    Q.   Did you press "Play"?

10   A.   Yeah.

11   Q.   And what happened?

12   A.   After -- after I started playing the recording, I thought

13   there was, like, a professor who was teaching the students

14   because that's the first time I'm taking the online -- online

15   course, and I don't have that option in India.

16   Q.   So --

17   A.   So --

18   Q.   So you thought there was an instructor there?

19   A.   Yes.

20   Q.   Did you find -- did you do anything to find out whether

21   that was correct?

22   A.   I just -- I just tried to say, "Hello?  Hello?" for a

23   couple of times, and I did not get any response, and then I

24   came to know that it's just a recording.  There was no

25   instructor.

1                   CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5       I, James C. Pence, Federal Official Realtime Court

6  Reporter, in and for the United States District Court for the

7  Northern District of California, do hereby certify that

8  pursuant to Section 753, Title 28, United States Code that the

9  foregoing is a true and correct transcript of the

10  stenographically reported proceedings held in the

11  above-entitled matter and that the transcript page format is in

12  conformance with the regulations of the Judicial Conference of

13  the United States.

14
                       Dated this 13th day of June, 2014.

15

16

17            _____
          JAMES C. PENCE, RMR, CRR, CSR NO. 13059

18            FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

```
 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3                BEFORE THE HONORABLE JON S. TIGAR

 4   UNITED STATES OF AMERICA,      )
                                    ) Volume 6
 5              Plaintiff,          ) Pages 928 - 1123
                                    )
 6        VS.                       ) NO. 11-00288 JST
                                    )
 7   SUSAN XIAO-PING SU,            )
                                    ) San Francisco, California
 8              Defendant.          ) Wednesday, March 12, 2014
     _____) 8:34 a.m.
 9

10              TRANSCRIPT OF COURT PROCEEDINGS

11
     APPEARANCES:
12

13   For Plaintiff:          MELINDA HAAG
                              UNITED STATES ATTORNEY
14                            1301 Clay Street, Suite 340S
                              Oakland, California 94612
15                      BY:   HARTLEY M.K. WEST, ESQ.
                              WADE M. RHYNE, ESQ.
16                            ASSISTANT UNITED STATES ATTORNEYS

17
     For Defendant:          Law Offices of Erik G. Babcock
18                            717 Washington Street, Second Floor
                              Oakland, California 94607
19                      BY:   ERIK G. BABCOCK, ESQ.
                              ATTORNEY AT LAW
20

21

22

23

24
     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                 Official Court Reporter - U.S. District Court
                   Computerized Transcription By Case CATalyst
```

1                               **I N D E X**

2        Wednesday, March 12, 2014 - Volume 6

3        **GOVERNMENT'S WITNESSES**                          **PAGE  VOL.**

4        **CHALLAGUNDLA, BHANU  (RECALLED)**
         (PREVIOUSLY SWORN)                                   932    6
5        Direct Examination (Resumed) by Ms. West             932    6
         Cross-Examination by Mr. Babcock                     935    6
6
         **CRITTEN, DYLAN**
7        (SWORN)                                              958    6
         Direct Examination by Ms. West                       958    6
8        Cross-Examination by Mr. Babcock                     972    6
         Redirect Examination by Ms. West                     986    6
9        Recross-Examination by Mr. Babcock                   988    6

10       **TAYLOR, DALE**
         (SWORN)                                              992    6
11       Direct Examination by Ms. West                       992    6
         Cross-Examination by Mr. Babcock                     1101   6
12
                                **E X H I B I T S**
13

14       **GOVERNMENT'S EXHIBITS**                      **IDEN  EVID  VOL.**

15        200B                                          998   998   6

16        202B                                          1033  1033  6

17        202C                                          1010  1012  6

18        202D                                          1009  1009  6

19        203C                                          1026  1026  6

20        203D                                          1028  1028  6

21        203E                                          1017  1018  6

22        203F                                          1031  1032  6

23        204B                                          1038  1039  6

24        204C                                          1045  1045  6

25        204D                                          1043  1043  6

1            **E X H I B I T S**

2
    **GOVERNMENT'S EXHIBITS**                        **IDEN EVID VOL.**
3
      205B                                           1053 1053   6
4
      205C                                           1051 1051   6
5
      206                                            1058 1058   6
6
      206A                                           990  991    6
7
      207                                            1069 1069   6
8
      207A                                           990  991    6
9
      208B                                           1092 1093   6
10
      208D                                           1095 1096   6
11
      209D                                           961  961    6
12

13

14

15

16

17

18

19

20

21

22

23

24

25

SER0111

TAYLOR - DIRECT / WEST

1    A.   It's a Tri-Valley University fee receipt.

2    Q.   For Rajiv Batra?

3    A.   Yes.

4    Q.   Same courses?

5    A.   Correct.

6    Q.   And does this reflect that a thousand dollars had been paid

7    on that day?

8    A.   Yes, it does.

9    Q.   Now, were you involved in a ruse call at some point?

10   A.   Yes, I was.

11   Q.   I want to direct your attention to September 20th, 2010.

12   Do you have that date in mind?

13   A.   I do.

14   Q.   What happened on that day?

15   A.   That day, myself and Agent Mackey conducted a surveillance

16   at the Tri-Valley University campus.  We waited for Ms. Su to

17   arrive in her vehicle, which we were familiar with at this

18   point.  Upon her arrival, we placed a ruse phone call to the

19   Tri-Valley office.

20   Q.   Okay.  And roughly what time of day was this?

21   A.   This was afternoon, after 4:00 o'clock, I believe.

22   Q.   Was it light outside?

23   A.   It was still light, yes.

24   Q.   Okay.  So you were able to see what was going on?

25   A.   Yes.

1056

TAYLOR - DIRECT / WEST

1   Q.   And I'm sorry.  You said you saw Dr. Su arrive?

2   A.   Yes, we did.

3   Q.   How did she arrive?

4   A.   In her red Mercedes.

5   Q.   How did you decide what numbers to call or what number to

6   call?

7   A.   We picked the numbers off the Tri-Valley website, the

8   contact numbers, and began randomly dying -- dialing them.

9   Q.   Did you ultimately reach anyone?

10  A.   Yes.

11  Q.   Who did you reach?

12  A.   Initially, a female voice answered the phone.  I wasn't

13  aware of who that person was.

14  Q.   Did you identify yourself in some way?

15  A.   I identified myself as Officer Taylor from the airport.

16  Q.   And did you ask to speak with anyone in particular?

17  A.   I asked to speak with a DSO.

18  Q.   Did somebody else then get on the phone?

19  A.   Yes.

20  Q.   And how did that person identify themselves?

21  A.   It was Dr. Su.

22  Q.   Did you recognize her voice at that point?

23  A.   Yes, I did.

24  Q.   Can you explain generally what happened?

25  A.   Yes.  We informed Dr. Su that there was a student that

1057
TAYLOR - DIRECT / WEST

1    appeared to be a Tri-Valley student that had arrived at the

2    airport without any proper documentation.

3    Q.   Which airport?

4    A.   San Francisco International Airport.

5    Q.   And did you --

6    A.   And --

7    Q.   -- ask her for anything?

8    A.   Yes, we did.

9    Q.   What did you ask her for?

10   A.   We asked her to provide a letter from the school stating

11   that the identified student was in good standing and a current

12   student.  We requested a signed copy of the student's I-20 and

13   current transcripts for the student.

14   Q.   And what identifying information did you provide for that

15   student to make sure she was checking for the right person?

16   A.   We spelled his name out for her.

17   Q.   What was the name?

18   A.   Sparsh Agrawat.

19   Q.   Did you provide other information besides spelling the

20   name?

21   A.   No, I don't believe so.

22   Q.   Okay.  Did you ask her to do anything?

23   A.   We requested her to submit those documents via fax and via

24   e-mail to my e-mail address.

25   Q.   Was this call recorded in some way?

1060
TAYLOR - DIRECT / WEST

1    A.   I provided a fax number.

2    Q.   I'm sorry.  Fax number.

3         What was that fax number?

4    A.   (415) 844-5335.  That's our office fax.

5    Q.   Okay.  And what happened after you hung up from that call?

6    A.   Agent Mackey and I continued to surveil the location, and

7    we witnessed Ms. Su exit the building and retrieve something

8    from her car and then reenter the building.

9    Q.   Okay.  At some point, did you get e-mails?

10   A.   Yes.

11   Q.   About how long after?

12   A.   Not too long, maybe ten, 15 minutes.

13   Q.   Okay.  I'm going to show you Exhibit 206B, which is already

14   in evidence.

15        MR. BABCOCK:  Sorry.  What number are you getting?

16        MS. WEST:  206B.  It's already in.

17   BY MS. WEST:

18   Q.   Agent Taylor, is this the e-mail that you received from

19   Dr. Su?

20   A.   Yes, it is.

21   Q.   September 20th, 2010?

22   A.   Yes.

23   Q.   And was that your true e-mail address that you provided?

24   A.   The e-mail addresses I provided?  Yes, it was my DHS e-mail

25   address.

SER0115

1079
TAYLOR - DIRECT / WEST

1    that she had a point of contact to go to if she had any issues

2    with students.  She seemed to agree to that.

3    Q.   Did anything else substantive happen in her office?

4    A.   No.

5    Q.   Okay.  What happened after you were in her office?

6    A.   For the brief time we were in her office, we then exited

7    and asked for a tour.  She provided us a tour of the campus.

8    Q.   Let me ask you about that.

9         How many floors were there?

10   A.   Two floors.

11   Q.   And did you start on the first floor?

12   A.   We did.  We were outside her office.

13   Q.   What did you see outside the office?

14   A.   She took us right outside her main office and showed us an

15   open-space area that contained a screen similar to that, which

16   didn't have anything projected on it, and a few tables and

17   chairs that were lined up.

18   Q.   Okay.  When you say "similar to that," are you referring to

19   the projection screen?

20   A.   Yeah, similar to that projection screen.

21   Q.   The one that we've been using to show exhibits?

22   A.   Yes.  It was affixed to the wall.  It was one of the ones

23   you can pull down.

24   Q.   Okay.  It's just -- on the record, it just says "that."  So

25   we need to describe it a little more particularly.

TAYLOR - DIRECT / WEST

```
 1        After you saw the projection screen and some chairs, what

 2    else did you see?

 3    A.   At that time, Ms. Su identified that as the classroom.

 4    Q.   Okay.  Any other classrooms?

 5    A.   No.  No.  We didn't -- we weren't shown any other

 6    classrooms during our site visit there.  She next showed us her

 7    networking closet, wire closet.

 8    Q.   What is a networking closet?

 9    A.   It's a room where typically IT equipment is kept, network

10    servers, exchange servers, stuff like that --

11    Q.   Okay.

12    A.   -- routers.

13    Q.   Did you see anything in there?

14    A.   We did see some boxes of what appeared to be equipment.  I

15    didn't open the boxes.  Ms. Su stated something to the effect

16    that there were -- there was an e-mail server in the box, but

17    she was going to have to set up a -- she didn't have the funds

18    at the time.

19    Q.   And did she have any explanation for that e-mail server?

20    A.   I don't recall off the top of my head.

21    Q.   What else did she show you after the networking closet?

22    A.   Next, we traversed from Suite -- we were now in Suite 800.

23    She took us to Suite 700 and showed us her staff area where her

24    staff worked.

25    Q.   Okay.  So are these two areas connected to 800 --
```

1081
TAYLOR - DIRECT / WEST

1    A.   They are connected.

2    Q.   Okay.  You have to wait for me to finish asking my question

3    so we don't upset the court reporter.

4         Okay.  So they're connected inside?

5    A.   Yes.

6    Q.   You walked from 800 into 700, and what did you see?

7    A.   It was another open room, appeared to be desks on the

8    outsides, and at this time we were introduced to Sophie Su.

9    Q.   Okay.  Did Susan Su say anything about what that space was

10   used for?

11   A.   Yes.  She said that this was where her staff worked, and

12   she also identified the back left corner as the TVU library.

13   Q.   Can you describe the TVU library?

14   A.   It consisted of two bookshelves, which had various books on

15   it, and a single computer.

16   Q.   Did you see any staff working in the staff work center?

17   A.   We saw what she identified as staff.  They were basically

18   standing there waiting to greet us.

19   Q.   How many people?

20   A.   Two.

21   Q.   And you said you met Sophie Su at that point?

22   A.   Yes.

23   Q.   Did Dr. Su introduce her to you?

24   A.   Yes, she did.

25   Q.   How did she -- how did she do that?

1083

TAYLOR - DIRECT / WEST

1    Q.   How many chairs?

2    A.   There was two chairs.  Sorry.

3    Q.   Can you explain where the two chairs were situated?

4    A.   On the opposite side of Ms. Su's desk.

5    Q.   So guest chairs?

6    A.   Yes.

7    Q.   Okay.  Was there a chair behind the desk?

8    A.   Yes, there was.

9    Q.   And was that the one that Dr. Su was seated in when you met

10   with her?

11   A.   Yes.

12   Q.   Okay.  Did you have an opportunity to -- let me make sure I

13   cover -- was there anything else on the first floor that you

14   saw, or did we cover it?

15   A.   That was it.

16   Q.   Okay.  Did you get a chance to go upstairs?

17   A.   I did.

18   Q.   What did you see upstairs?

19   A.   Ms. Su escorted us to the top of Suite 700, which consisted

20   of three consecutive rooms.

21   Q.   What -- what did you see?  Can you describe the rooms for

22   us, please.

23   A.   The rooms were sparsely furnished.  Ms. Su identified them

24   as staff rooms, faculty rooms.  In the center room, Ms. Sophie

25   Su was there with a small child.

1084
TAYLOR - DIRECT / WEST

1    Q.   And was that room furnished?

2    A.   It was sparsely furnished.

3    Q.   What do you mean by that?

4    A.   It appeared to be -- it looked to me as if it was a folding

5    picnic table, not an actual desk.

6    Q.   Was there a chair?

7    A.   Yes, there was a chair.

8    Q.   And was Sophie Su in that?

9    A.   Yes, she was.

10   Q.   By herself?

11   A.   In the chair, yes, but again, she had a small child with

12   her.

13   Q.   Okay.  But by herself in the chair?

14   A.   Yes.

15   Q.   Okay.  What else did you see upstairs?

16   A.   That was it.

17   Q.   Did you get to see the second floor of Suite 800?

18   A.   No.

19   Q.   Why not?

20   A.   We requested to see it, but she was very insistent that we

21   couldn't go in there for some reason.  I believe she stated it

22   was under construction and that they were building some type of

23   student auditorium.  I asked a couple times and -- you know,

24   "Can we just go on the steps and take a look?"  And it was "No"

25   each time.  So we never made it up there.

SER0120

TAYLOR - DIRECT / WEST

1  Q.  Did she say anything about whether those classes were

2  physical; that is, in-person classes or online?

3  A.  We asked her where classes took place, and she said, "At

4  this campus," and then she went kind of off on a tangent

5  saying, "Sometimes the students don't like to drive here.  They

6  don't like the traffic."  So they project it on the wall, and

7  they can -- the students can watch it in their system.

8  Q.  Did you seek any clarification on that?

9  A.  Yeah, we did ask her to clarify.  I think we -- it was

10  myself that said, "When classes are held, they're held at this

11  location?"

12      And she said, "Yes."

13  Q.  Did she say anything about what days or what times the

14  classes were offered?

15  A.  Yeah.  She said the classes were offered from 5:30 to 8:30,

16  I believe, Monday through Saturday.  And we asked her if there

17  was classes that evening, and she said, "Yes."

18  Q.  Was there any discussion as to requirements for attendance?

19  A.  We did ask her if the DSO's reviewed attendance records,

20  who kept track of attendance, and she initially said it was the

21  instructors' job to do that.  And then we asked her, "Do DSO's

22  review those, seeing as how they're responsible for the

23  students' attendance?"

24      And she said, "Yes."

25  Q.  Was there any question posed to her about the regulations

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, James C. Pence, Federal Official Realtime Court

6     Reporter, in and for the United States District Court for the

7     Northern District of California, do hereby certify that

8     pursuant to Section 753, Title 28, United States Code that the

9     foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14
                              Dated this 19th day of June, 2014.
15

16

17    _____
                              JAMES C. PENCE, RMR, CRR, CSR NO. 13059
18                            FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

1                   UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3            BEFORE THE HONORABLE JON S. TIGAR

4    UNITED STATES OF AMERICA,    )
                            ) Volume 7
5              Plaintiff,     ) Pages 1124 - 1332
                            )
6        VS.                 ) NO. 11-00288 JST
                            )
7    SUSAN XIAO-PING SU,       )
                            ) San Francisco, California
8             Defendant.     ) Thursday, March 13, 2014
         _____) 8:31 a.m.

9

10             **TRANSCRIPT OF COURT PROCEEDINGS**

11   **APPEARANCES:**

12

13   **For Plaintiff:**        MELINDA HAAG
                           UNITED STATES ATTORNEY
14                         1301 Clay Street, Suite 340S
                           Oakland, California 94612
15                  BY:   **HARTLEY M.K. WEST, ESQ.**
                         **WADE M. RHYNE, ESQ.**
16                       **ASSISTANT UNITED STATES ATTORNEYS**

17

     **For Defendant:**       Law Offices of Erik G. Babcock
18                         717 Washington Street, Second Floor
                           Oakland, California 94607
19                  BY:   **ERIK G. BABCOCK, ESQ.**
                         **ATTORNEY AT LAW**

20

21

22

23

24

     Reported By:  James C. Pence, RMR, CRR, CSR No. 13059
25                Official Court Reporter - U.S. District Court
                  Computerized Transcription By Case CATalyst

**I N D E X**

Thursday, March 13, 2014 - Volume 7

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **TAYLOR, DALE (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 1128 | 7 |
| Cross-Examination (Resumed) by Mr. Babcock | 1128 | 7 |
| Redirect Examination by Ms. West | 1142 | 7 |
| Recross-Examination by Mr. Babcock | 1144 | 7 |
| **DIRISANALA, ANJI REDDY** | | |
| (SWORN) | 1145 | 7 |
| Direct Examination by Ms. West | 1146 | 7 |
| Cross-Examination by Mr. Babcock | 1248 | 7 |
| Redirect Examination by Ms. West | 1304 | 7 |
| **BHATIA, RAJEEV** | | |
| (SWORN) | 1307 | 7 |
| Direct Examination by Ms. West | 1308 | 7 |
| Cross-Examination by Mr. Babcock | 1326 | 7 |

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 86 | 1314 | 1315 | 7 |

```
1          Please state your full name and spell your last name.

2              THE WITNESS:  Anji Reddy Dirisanala,

3      D-i-r-i-s-a-n-a-l-a.

4                       ANJI REDDY DIRISANALA,

5      Called as a witness by the Government, having been duly sworn,

6      testified as follows:

7                       DIRECT EXAMINATION

8      BY MS. WEST:

9      Q.  Good morning, Mr. Dirisanala.

10     A.  Good morning.

11     Q.  Where did you grow up?

12     A.  In India.

13     Q.  Where are you living now?

14     A.  I'm living in Sunnyvale.

15     Q.  Why did you come to the United States?

16     A.  I came here to do my Master's in Industrial Engineering.

17     Q.  Can you tell us about your educational background in India?

18     A.  I did my Bachelor's in Automotive Engineering.  Then after

19     that, I did -- I worked for two and a half years in Hyundai.

20     Then I came here for doing my Master's.

21     Q.  What made you decide to do your Master's?

22     A.  Most of my classmates and friends came here to do their

23     Master's.  Then they wanted to come here, finish their

24     Master's, then get into a good job.  So that's why I came here

25     to do it.
```

DIRISANALA - DIRECT / WEST

1    Q.   Well, that's what your friends did; right?

2    A.   Yeah.

3    Q.   What made you decide to do that?

4    A.   Oh.  I came here to finish my Master's and get into some

5    good job to --

6    Q.   Did you say H-1?

7    A.   H-1.

8    Q.   Was making money a factor in your decision to come?

9    A.   Yes.

10   Q.   Why was money a factor for you?

11   A.   I've been supporting my family from the day I finished my

12   Bachelor's, and I'm the only son in my family.  So my father is

13   in too many debts.  So I took up all the responsibilities.  So

14   that's the main factor for me to come here to do Master's, then

15   to earn money here.

16   Q.   And was part of your motivation for coming to the United

17   States to get a Master's itself to make money?

18   A.   See, the only option I have as a Bachelor's student is only

19   to come as a Master's to the United States.  I do not have much

20   experience.  So there's nobody to file an H-1 visa for me.

21   That's work regulation here.  So for students, it is the only

22   option to come to the United States to do the Master's degree.

23   Q.   So you thought an F-1 visa would be your only chance?

24   A.   Yes.

25   Q.   Now, do you know the defendant in this case, Susan Su?

SER0126

1148

DIRISANALA - DIRECT / WEST

1    A.   Yes.

2    Q.   Can you identify her here in the courtroom?

3    A.   Yeah.  She's sitting there.

4    Q.   Are you referring to this table between the two gentlemen?

5    A.   Yes.

6         MR. BABCOCK:  Stipulate they know each other.

7    BY MS. WEST:

8    Q.   How do you know Susan Su?

9    A.   Oh, she's the Tri-Valley University president, and I worked

10   in the university along with her for three months in that

11   office.

12   Q.   When you first came to the United States, did you -- excuse

13   me.  Did you go to Tri-Valley University or someplace else?

14   A.   No.  I actually got a visa to attend International

15   Technological University in Sunnyvale.  So -- but I didn't join

16   the university due to financial issues, and I'm not able to get

17   some part-time job in -- like, a campus job in the college.

18   Then I was -- I told through my friends to join that Tri-Valley

19   University.  That's my second option going there.

20   Q.   All right.  I want to talk about how you came to learn

21   about Tri-Valley University.  You mentioned it was through a

22   friend.  What was -- or how did Tri-Valley University first

23   come up for you?

24   A.   I was waiting in the ITU university.  Then I met an Indian

25   guy named -- the name of Vandesh.  Then he told me there is one

**SER0127**

DIRISANALA - DIRECT / WEST

1    university in Pleasanton, but he didn't give me much details,

2    but he told me through his friend he would give me an

3    admission, and he would talk to the university president so I

4    can -- that he can give me a campus job.  So --

5    Q.   Let me stop you for a moment, please.

6         Was the campus job important to you?

7    A.   Yes, the campus job was important to me.

8    Q.   Why?

9    A.   Because I have to support myself to pay the fee, and if

10   there is some money remaining, I need to send it to India to

11   support my family.

12   Q.   How much money did you have when you came to the United

13   States?

14   A.   When I enter first entered the United States, I had around

15   $30.

16   Q.   And why couldn't you work while at ITU?

17   A.   Can you repeat it?

18   Q.   Why could you not work at ITU?

19   A.   Oh.  ITU University -- they are full with all the students,

20   and they do not have much jobs available there.  So they said

21   they can only try to give me a campus job the next semester.

22   Q.   And would that work for you?

23   A.   No.  I thought -- no.  I need to work somewhere in, like, a

24   legal job to make money.  So that was my option, to look up

25   something else who can offer me a job.

SER0128

1        THE COURT:  Mr. Dirisanala, that pitcher there is

2    water, and it's there for you if you get thirsty.

3        THE WITNESS:  Yes.

4    BY MS. WEST:

5    Q.   So then you heard about Tri-Valley University and the

6    possibility of a job there; is that correct?

7    A.   Yes.

8    Q.   Okay.  And did you follow up on that?

9    A.   No.  Van -- he referred me to a person by the name of

10   Vishal.  So Vishal confirmed it to me if that -- he talked with

11   the university president, and they are ready to give me a

12   campus job if I move into that university.

13   Q.   So you actually had a direct conversation with Vishal?

14   A.   Yes.

15   Q.   After he told you that you could get a campus job if you

16   switched to that university, what did you do?

17   A.   So I send my documents to Vishal, and he give me -- he came

18   to my house, and he gave me the admission letter and the

19   initial I-20 to transfer to the Tri-Valley University.

20   Q.   What documents did you provide to Vishal?

21   A.   I gave him my educational documents to get a -- like,

22   documents required for a -- for my education, my certificates,

23   then my passport.  I think I gave all the documents required

24   for --

25   Q.   And then you received an admission letter?

DIRISANALA - DIRECT / WEST

1    Q.   But why did your brother-in-law go with you?

2    A.   He came with me to pay the fee because I do not have any

3    money.  My brother-in-law said he will pay my college fee.  So

4    Tri-Valley gave me an option to just pay a thousand dollars at

5    the start.  So he came along with me to pay the fee.

6    Q.   Did you have any trouble locating Tri-Valley University?

7    A.   Yes.

8    Q.   Can you describe that to us, please.

9    A.   On the website, we saw an address.  It's, like, on

10   Stoneridge Avenue.  So me and brother-in-law went to Stoneridge

11   Avenue, but we couldn't find it.  We researched all the

12   buildings.  There's nothing at Tri-Valley University there.

13        Then we took the phone number of Susan Su and called her.

14   She said, "No.  Come over here.  Our office has moved to Bernal

15   Avenue."  Then we later on went to the Bernal Avenue to meet

16   Susan Su.

17   Q.   And did you have any trouble finding it then?

18   A.   Yeah, because it's, like, a used building.  I think -- when

19   I went first, I do not know what kind of -- I was thinking it's

20   a huge university, but I couldn't find where is the university

21   located.  So I needed to call her from the parking lot, and she

22   just came out, and she get me to the university, but it was a

23   small room.

24   Q.   I'm sorry.  You said a small room?

25   A.   A small room.  She got us to the university admission

1154

DIRISANALA - DIRECT / WEST

1     office.

2     Q.   When you got to the admission office, did you have a

3     conversation with Susan Su?

4     A.   Yes.

5     Q.   What did you talk about?

6     A.   Okay.  I told her, like, "Okay.  This is a problem."  And

7     Vishal confirmed it to me that "You are going to give me a

8     campus job if I come to your university."

9          Then she said, "Yeah.  Yes."  Then she said, "Yes."  Then

10    she asked us to pay the fee right away, and we paid a

11    thousand-dollar fee, and she gave the receipt to us.  In

12    addition, she also told me, "Okay.  You can come over tomorrow.

13    I'm going to give you the job."

14    Q.   All right.  Let me break that down a little bit, please.

15         After you paid the fee, you said she gave you a receipt?

16    A.   Yes.

17    Q.   Did she also give you an I-20?

18    A.   Yeah, she gave me a register I-20.

19    Q.   And did she sign it?

20    A.   Yes.

21    Q.   Now, did you have any conversation with her about classes?

22    A.   Yeah.  In the conversation with her -- and I was also

23    imagination [sic] the whole building belongs to Tri-Valley

24    University.  The way she told us -- actually, I was sitting

25    next to my brother-in-law, and he asked where are the classes

**SER0131**

1155

DIRISANALA - DIRECT / WEST

1      going on.

2           She said, like, "This" -- "these are all the classes where

3      people take classes."  So we were on the assumption that the

4      entire rooms there belong to Tri-Valley University.

5      Q.   Did you have any conversation with Dr. Su about when the

6      classes would start?

7      A.   Oh, I talked with her when other classes were going to

8      start.  She said once all the students sign up, it's going to

9      start.  So she didn't give me a specific time period, but she

10     said all the classes are going to start once all the people

11     sign up for the classes.

12     Q.   Now, how did you know where to go for your campus job?

13     A.   Oh, she told me to come over to the same office tomorrow.

14     So I took the -- we have the address over there, the Bernal

15     Avenue address.  So I came early morning by 7:30.  She didn't

16     tell me the timing -- what time to come since I do not have a

17     car, and my brother-in-law has to go to the office.  He dropped

18     me early morning around 7:00 o'clock, 7:30.

19     Q.   Was Dr. Su there when you arrived?

20     A.   No, she's not there.

21     Q.   What time -- or did she arrive?

22     A.   She came somewhere around 9:00 o'clock time, around

23     9:00 o'clock.

24     Q.   Did you have any conversation with Dr. Su that day about

25     classes?

1156
DIRISANALA - DIRECT / WEST

1    A.   Oh, we really didn't have any conversation with her.  The

2    moment I came, I started noticing a lot of schoolchildren

3    coming there to all the classrooms there until 7:30.  I am

4    there until 9:00 o'clock.  I noticed most of the schoolchildren

5    coming there.

6    Q.   When you say "schoolchildren," what do you mean?

7    A.   Oh, like, maybe, like, five years, six years, seven, like,

8    up to eight years, kids like that, small kids.

9    Q.   Five, six, seven years old?

10   A.   Something like that, maybe first time -- first-grade,

11   second-grade -- somewhere around that age -- students.

12   Q.   Did you discuss that with Dr. Su?

13   A.   No, I didn't talk with her about anything the first day.  I

14   didn't talk with her about anything.

15   Q.   Now, this is -- do you remember what day this was that you

16   went there for your first day of work?

17   A.   It was on February 10th, 2010.

18   Q.   And was this -- where did this fall in Tri-Valley

19   University's semester, if you know, or trimester?

20   A.   I think it's spring or something.  I don't what the

21   semesters --

22   Q.   Okay.

23           MR. BABCOCK:  I'm sorry.  I didn't hear any of that.

24           THE COURT:  I'm sorry.  I didn't hear -- I didn't

25   hear your testimony.  Can you say that more loudly?

SER0133

1158

DIRISANALA - DIRECT / WEST

1     and give it in the evening back to Susan Su.

2     Q.   Okay.  Do I understand correctly you were supposed to go

3     through the e-mails?

4     A.   Go through the e-mails and print all the address of the

5     students.

6     Q.   And put everything -- put the address on envelopes?

7     A.   Yes.

8     Q.   And put I-20's in the envelopes?

9     A.   Yes.

10    Q.   What time did you leave that day?

11    A.   I left evening, around 7:00.

12    Q.   So from that first day, February 10th -- do I have that

13    right?

14    A.   Yes.

15    Q.   How long did you work for Tri-Valley?  What was your last

16    day?

17    A.   Last day is May 12th.

18    Q.   And approximately over that roughly three-month period,

19    approximately how many hours a day did you work?

20    A.   Most of the day is Monday to Saturday and some days on

21    Sunday.  Most of the days I worked, I used to come to the

22    university around 7:00 o'clock, 7:30 in the morning, and I

23    leave around 6:30 to 7:30 in the evening.

24    Q.   From those hours and the days Monday through Saturday,

25    sometimes Sunday, did you ever see somebody -- or do you know

1     Q.   Over time, did your job duties expand at Tri-Valley?

2     A.   Yes.

3     Q.   How did they -- how did they first enlarge?

4     A.   First I was printing all the envelopes, addresses, and

5     everything, and then later on I was told by Susan Su that

6     "Okay.  I'm going to give you this I-20," and she gave me a

7     laptop, and she started telling me to do the I-20 admission

8     letters and I-20's for the students who wish to transfer into

9     Tri-Valley.

10    Q.   Okay.  So that was for students transferring in?

11    A.   Transferring in.

12    Q.   How -- how did you learn how to do that?  Did somebody

13    instruct you?

14    A.   Yes.  Susan Su instructed to me, and she gave me a working

15    manual, what all I should input there in the new I-20.

16    Q.   What do you mean "a working manual"?

17    A.   Like, a -- there are some steps to be followed in the

18    I-20 -- with creating an I-20 like putting the address, then

19    what is the starting day of the semester and what other funds

20    are available for the student to do their studies and how much

21    is their expenditure in the U.S. and what is the physical

22    address they are staying.  So there's some things like this.

23         So everything -- Susan Su gave me a manual, and on it with

24    paper, she gave -- wrote and gave to me the starting and ending

25    of the semester dates I should input in the SEVIS system.

1    Q.   Now, how would you know what address to list for the

2    students?

3    A.   It was given to me by Susan Su.

4    Q.   And was there a particular address?

5    A.   Yeah.  It is 555 El Camino Real, Sunnyvale.

6    Q.   Did she explain to you why to use that address?

7    A.   Oh, she told me, like, "This is the address where all the

8    students are going to stay to show that this is the record

9    being maintained by SEVIS," and they need some address in

10   California to show students are living there and they're coming

11   to the Tri-Valley University.

12   Q.   Did you know one way or another whether these people were

13   actually staying at 555 El Camino?

14   A.   Later on, I came to know that nobody stays in address, and

15   it is just us putting some address there in --

16           MR. BABCOCK:  Objection.

17           THE WITNESS:  -- in the SEVIS system.

18           MR. BABCOCK:  Objection.  I'm sorry.  Move to strike

19   absent a foundation for the last response.

20           THE COURT:  Overruled.

21   BY MS. WEST:

22   Q.   How did you come to know that, Mr. Dirisanala?

23   A.   Later on, there is a person by the name Samuel Steven who

24   comes to the university often.  I have a discussion with him,

25   and I asked him, like, "Who are the people staying at this 555

SER0136

1162

DIRISANALA - DIRECT / WEST

```
1     El Camino Real?"  Then he told me it was this apartment address

2     he previously lived in in Sunnyvale, and Susan Su is using the

3     address on I-20.

4             MR. BABCOCK:  I'm going to renew my objection and

5     move to strike.

6             MS. WEST:  Statement of coconspirator.

7             MR. BABCOCK:  It's hearsay.

8             THE COURT:  The motion will be granted.

9     BY MS. WEST:

10    Q.   How did you get the information about student finances to

11    put in the I-20's?

12    A.   Okay.  Please repeat it.

13    Q.   Yes.

14         You mentioned that one of the things that you had to enter

15    into the I-20 was something about the students' money?

16    A.   Yes.

17    Q.   How did you get that information?

18    A.   Oh, there is a fixed amount for all the students.  So it

19    was written in the manual that is given to me by Susan Su.  So

20    it states that -- put 5,500 for education, 5,000 for

21    expenditure live -- to live, and $500 for miscellaneous

22    charges.  So it come out to be about $11,000.

23    Q.   That's the expenses for the school?

24    A.   For the school and for the students to stay in the United

25    States.  Basically, it is like -- every student has to give
```

SER0137

DIRISANALA - DIRECT / WEST

1    their own financial information when applying for college

2    admission, and everybody has their own financial, like -- okay.

3    I have $30,000 or $40,000.  That is the amount to be put in the

4    SEVIS system, but Tri-Valley has the same option of following

5    the same amount for all the students.

6    Q.   Okay.  I want to make sure that we understand what you're

7    saying.

8         All students have their own amount of money that they

9    possess when they're transferring; right?

10   A.   Yes.

11   Q.   How -- did students convey to you maybe through e-mails or

12   some other way how much money they had?

13   A.   Basically, no, because that is a process that students have

14   to do, sending the financial information, but Tri-Valley

15   University doesn't request the students to give financial

16   information.  So that --

17   Q.   So stop for a moment.

18        How do you actually get that information to put in the

19   I-20, then?

20   A.   It was given to me by Susan Su in a working manual to put a

21   particular amount for all the students.  I do the I-20's.

22   Q.   Now, how do you actually access the I-20 form?  Is that

23   through a computer?

24   A.   Yeah, through a computer.

25   Q.   And were you able to log into the computer and open up the

1164

DIRISANALA - DIRECT / WEST

1    I-20?

2    A.   No.  Actually, Susan Su carries the laptops always with

3    her, and she logs in the login information and password, and

4    she gives computers to the students -- students and to me also

5    to access the I-20 on the SEVIS system.

6    Q.   Okay.  So would you actually enter a login ID and password?

7    A.   No.

8    Q.   That would be done by Susan Su?

9    A.   By Susan Su, and sometimes she will ask -- if I am standing

10   next to her, she will say, "Okay.  Turn that side.  I'm going

11   to enter the details."

12   Q.   And then what would she do after she entered that

13   information?

14   A.   After she enters the information, I take the laptop and

15   just sit next to her maybe this much distance.  She sits here,

16   and I'd be almost sitting next to her because the size of the

17   room is so small, everybody has to sit next to each other.

18           THE COURT:  Indicating a distance of not more than

19   three feet for the record.

20   BY MS. WEST:

21   Q.   So she would log in, and then she'd hand the computer to

22   you to work on.  Is that fair?

23   A.   Yes.

24   Q.   Okay.  Aside from working on the transfer I-20's -- well,

25   actually, let me ask you first:  Do you know the name of that

DIRISANALA - DIRECT / WEST

1    they are telling.  Just keep on transferring the student."

2    Most of the admissions coming to the university are only

3    transfer students.  They're all from different universities.

4    So she told me, "Just don't worry about it.  Just keep on

5    giving the I-20's, whether they have it or not."

6    Q.  Okay.  So that's for transfers; right?

7    A.  Yes.

8    Q.  Did you ever have a conversation with Dr. Su about whether

9    to admit or deny anyone who was a new applicant, not a

10   transfer?

11   A.  No.  She told me, "Don't deny anybody.  Just put them in

12   place.  Immediately do it."

13   Q.  Did you --

14        MR. BABCOCK:  I'm sorry.  I missed that last part.

15        THE WITNESS:  Oh.  "Whoever applies for admission,

16   give them the admission."  There's no denying anyone in the

17   university.

18   BY MS. WEST:

19   Q.  Did you ever see any applicants, whether transfer or new

20   admission, who were not already F-1 students?

21   A.  Yes.

22   Q.  Were there people who were United States citizens?

23   A.  I don't think I'd done even one or two citizens.  I'm not

24   sure about it.  I don't think I did any citizen applications.

25   Q.  So who were the non-F-1's?

DIRISANALA - DIRECT / WEST

1   A.   Most of the students that got an admission are -- who are

2   H-4 visa -- like, most of the women who come -- if their

3   husband is working as an H-1 visa, they come as an H-4.  So

4   they are not supposed to do anything here.  So since this

5   university has an option of giving CPT --

6   Q.   What is CPT?

7   A.   It's credit program training.  It's like a permission to

8   work in any company related to the field they're taking.

9   Q.   Okay.

10  A.   So they got there -- all the students -- like, some

11  students who are on a tourist visa -- there is only -- who come

12  to visit the United States, they're going to apply for an

13  admission, and they are given I-20.  Then H-4 -- they are --

14  that's their dependents.  Even dependents are given an I-20.

15  Q.   All right.  So from all of the applicants you saw, you

16  don't remember seeing any citizens; is that right?  Yes or no?

17  A.   I'm not sure about it --

18  Q.   Okay.

19  A.   -- but up to my knowledge, I don't think I did, and --

20  because U.S. citizens -- there is no need to do any SEVIS for

21  them.  It's just an admission to them.

22  Q.   Okay.  But I'm talking not just about the I-20 but all of

23  the e-mails.  Do you remember doing an admission -- a letter of

24  admission for anybody you did not have to create an I-20 for?

25  A.   I don't remember.

1    Philip.  See, this system -- how it works is since four DSO's

2    are there and a few people are working in the university,

3    anybody can get any DSO's user ID and their password.  One day,

4    I can work on Sophie Su's ID or Susan Su's ID or Wang's ID or

5    Renu Philip's ID.  If me or other students work in Renu

6    Philip's ID, then Susan Su signs Renu Philip.  If Renu is

7    working on her name, she signs it in the office.

8    Q.   Okay.  Did you -- you said that you never saw Sophie Su

9    there?

10   A.   No, I never saw her.

11   Q.   Okay.  So I take it that means you never saw Sophie sign

12   her own name?

13   A.   Yes.

14   Q.   And did you ever see Wenchao Vince Wang sign his own name?

15   A.   No.

16   Q.   But you did sometimes see Renu Philip sign her own name?

17   A.   Yes.

18   Q.   Okay.  So for -- let's put aside Renu Philip.  Did you see

19   Susan Su sign Sophie Su and Wenchao Wang's names?

20   A.   Yes.

21   Q.   How often?

22   A.   Every day.

23   Q.   Can you give us a rough number from your three months

24   there?

25   A.   I did more than a hundred.  It can be very large number of

1    A.   I only -- see, I came to know that after I am working for

2    some time.  If I don't access the system for a few minutes, it

3    automatically logs off.  Then the warning comes on the screen,

4    and it says it is accessible only to the DSO's who are

5    authorized, and it says, "Authorized people are allowed to

6    access this," something like that.

7    Q.   Okay.  So when you first learned that you weren't allowed

8    to do it was when it timed out and you saw that warning?

9    A.   Yes.

10   Q.   Did you have a discussion with Susan Su about that?

11   A.   Within two -- like, two, three days after I started working

12   on I-20's, I asked her, "Susan, this sign came up.  I'm

13   unauthorized to do it."

14        She said, "Don't you worry.  I'm the university president.

15   You take just continue doing it.  Don't worry."

16   Q.   Mr. Dirisanala, did you attend classes while you were

17   working in Tri-Valley's office?

18   A.   No, I didn't attend any classes.

19   Q.   Why not?

20   A.   I'm working in the university.  So at -- starting, I was

21   thinking there will be classes.  Actually, to be frank, on the

22   first day, I came with the hopes also -- like, to take notes if

23   any classes would go on, anything like that.

24   Q.   On your first day?

25   A.   On my first day, I came with, like, a notebook.  So I was

DIRISANALA - DIRECT / WEST

1    on the assumption classes would go on, but eventually then I

2    thought, "Okay.  Maybe it will start within one week or

3    ten days," but the classes didn't start.  So I never took any

4    classes there.

5    Q.  Did you have any conversation with Susan Su about "Hey, the

6    classes haven't started yet.  When are they going to start?"

7    A.  The first two or three days, she said that classes are

8    going to start when all the people show up.  And within four,

9    five -- like, a week at a time, then it is clear there are no

10   classes.

11        So this university doesn't -- like, all the classrooms are

12   not belonging to this university, only that small room and the

13   next -- one classroom she's renting a few hours a day.  So I

14   came to know that, and it is clear.  Okay?  This is one

15   university where there are no classes.

16   Q.  Did you actually see any classes take place at that

17   classroom next door she had rented?

18   A.  No.  There are no classes at all.

19   Q.  Did you ever worry about being here as an F-1 student but

20   not taking classes?

21   A.  Yes.

22   Q.  Did you ever have a conversation with Susan Su about that?

23   A.  Yes.  I had a conversation with her that I'm not taking

24   classes.  "What will happen?"

25        And she told me, "Since you are working in the university,

1186
DIRISANALA - DIRECT / WEST

1    you don't worry.  I'll take care of you."

2    Q.  At any point, did you switch your degree program to help in

3    that somehow?

4    A.  Yeah.  It went on around a month time.  Then there are no

5    classes going on.  And, like, someone told me, "If you are an

6    F-1 student, it's mandatory for you to take classes.  Somebody

7    might check on you any time what you are doing."

8        Then I asked Susan Su in the office.  I said, "I'm not

9    taking any classes.  So what will happen to me now?  I'm really

10   scared."

11       And she said, "Okay."  She asked me then, "What degree did

12   you have?"

13       I told her, "Automotive Engineering," and I told her the

14   subject I took.

15       Then she said, "Okay.  I already have a Ph.D. in

16   Mechanical.  So why don't you shift to Mechanical.  Then I will

17   be your professor."

18   Q.  That Susan Su would be your professor?

19   A.  Yes.  And she said, "I will take care of your grades even

20   if you don't take care of" -- "if you don't attend online

21   classes."  Then she changed my SEVIS to Mechanical Engineering

22   from Computer Science.

23   Q.  Okay.  So you just mentioned online classes.  You said that

24   there weren't any classes at all.  At some point, did there

25   start online classes?

DIRISANALA - DIRECT / WEST

```
1    A.   I have one --

2    Q.   I mean for yourself.

3    A.   For myself, there's one professor who used to send an

4    e-mail.  I showed it to Susan Su.  "Susan, this guy is sending

5    me e-mails to attend the class.  What do I do?"

6         She said, "Don't worry.  Leave it."  So that's only one I

7    got an e-mail to attend classes -- for one class.

8    Q.   And did you ever even try to log in for that class?

9    A.   No, I didn't do it.

10   Q.   Why not?

11   A.   Because I'm already working from 1:00 -- 7:00 o'clock in

12   the evening, 7:00 o'clock, approximately at that time.  So

13   there's no time for me to attend classes or do anything, and in

14   addition, I got assurances from Susan she would take care of

15   me.

16   Q.   Did you ever get a transcript --

17        THE COURT:  I'm just looking at the transcript, sir.

18   Can you say again what time would you typically start your work

19   day?

20        THE WITNESS:  I come around in the morning,

21   7:00 o'clock, and I stay at least up to 6:30, 7:00 o'clock in

22   the evening.

23        THE COURT:  Thank you.

24   BY MS. WEST:

25   Q.   Did you ever receive a transcript from Tri-Valley?
```

SER0146

DIRISANALA - DIRECT / WEST

1   A.   At the end of the semester, I received a transcript.

2   Q.   How did you receive it?

3   A.   On May 17th, when I was interviewed by ICE for the first

4   time, I was a little bit scared, and I went to the university

5   on the 18th requesting for a transfer.  Then they give me a

6   transcript for Mechanical Engineering.

7   Q.   Who gave you a transcript?

8   A.   Susan Su gave me a transcript.

9   Q.   Okay.  Let me -- let me stop for a second.

10       So this is when?  When did this happen?

11  A.   On May 18th.

12  Q.   Of 2010?

13  A.   2010.

14  Q.   Okay.  And were you still working for Tri-Valley on that

15  day?

16  A.   No.  I worked only until May 12th.

17  Q.   Okay.  So from February to May 18th, you did not receive a

18  transcript; is that right?

19  A.   Yes.

20  Q.   So did you actually go to Tri-Valley University on

21  May 18th?

22  A.   Yes.

23  Q.   And did you create your own transcript?

24  A.   No.  Susan Su typed it and gave it to me.

25  Q.   Did you ask her for it?

DIRISANALA - DIRECT / WEST

1    Q.  Did you ever see an instructor teaching on a camera?

2    A.  No, I never saw any instructor teaching on camera.

3    Q.  From -- you mentioned that you received calls from students

4    about no instructor or they can't access the system; is that

5    right?

6    A.  Yes.

7    Q.  Can you estimate for us, please, about how many of those

8    kinds of calls that you received from students who actually

9    seemed to be trying to attend a class.

10   A.  Very few.  Very few.  Maybe one or two in a day.

11   Q.  One or two a day?

12   A.  One or two a day.

13   Q.  So over the three-month period --

14   A.  Yeah.

15   Q.  -- can you give us an estimate?

16   A.  I would attend, like, ten or 15 people on the phone because

17   the phone keeps on changing to all the people.  Something --

18   Q.  Okay.  So then you received -- you recall maybe ten to 15?

19   A.  Ten to 15 people would call me.

20   Q.  Did you receive a salary working at Tri-Valley?

21   A.  Yes.

22   Q.  What was the salary?

23   A.  First day when I joined the university, she told me she

24   would pay me a thousand dollars per month.

25   Q.  Did you receive a thousand dollars per month?

SER0148

1    profit off of the FedEx fees; is that right?

2    A.   Yes.

3    Q.   Was there another way that you found to make money?

4    A.   Yeah.  I -- in the university, I see a lot of students

5    coming in, and they are referring the students, and they are

6    getting paid money.  Like, the first semester -- if a student

7    pays $2,750, Susan used to write a check to them for $1,200 for

8    referring the students.

9    Q.   A referral fee?

10   A.   A referral fee for referring the students to the

11   university.

12   Q.   Did you try to do the same thing?

13   A.   Yeah.  I tried to do the same thing and told Susan, "There

14   are many people calling me.  Can I" -- "can I also refer the

15   students and get that $1,200?"

16        She told, "No.  You're already working in the office.  You

17   cannot do that."

18        And I said, "Okay."  Then I talked with my friend, and I

19   told him, see, there's an option like this.  Many people who

20   are all on F-1 status are referring their students -- referring

21   their friends, and they are getting paid $1,200 per student.

22   Then me and my friend thought, "Okay.  She's not going to give

23   out my name, but she can give it on your name."

24        Then my friend contacted Susan Su, and she gave a referral

25   agreement to my friend.  He can send the documents for new

SER0149

DIRISANALA - DIRECT / WEST

```
 1    students, and she will pay him for every student $1,200 if they
 2    pay the fee.
 3    Q.   Were you going to make money off of that somehow?
 4    A.   Yes.
 5    Q.   How?
 6    A.   Since I was attending phone calls, some people asked me --
 7    the phone is always busy.  If I am taking one phone call, there
 8    will be, like, five or six phone calls waiting on that.  So not
 9    all calls are returned back to the students.  So some people --
10    they state, "I'm going to" -- "I'm trying to get hours.  Can
11    you give me your phone number?"  And some people -- I give my
12    phone number.  So my number works.
13         Some people are, like, "Okay.  This guy is working in the
14    university.  You can call him day to day."  Somehow, they have
15    my number, and some people say, "We want to get into this
16    university."
17         Then I tell them, "Okay.  This is my friend.  You will call
18    him, he will send you the documents, and he will get admission
19    for you."  So there is -- we got new admissions, and then Susan
20    Su pays.  I got money off of it.
21    Q.   What portion of the referral fee of your friend did you
22    get?
23    A.   Most of the money, I got it because I'm only just using my
24    friend as a name there.  Most of the monies was based on -- I
25    got at least a thousand dollars per student and around 200 for
```

SER0150

1203
DIRISANALA - DIRECT / WEST

1    my friend because he's not doing anything.  Everything -- I did

2    it like passing on the number -- passes on the phone number for

3    the admission.

4    Q.   About when did you start getting money from referrals?

5    A.   February -- somewhere in -- after one month or one and a

6    half month I joined -- after May 15th, I believe.

7    Q.   I'm sorry.  You said May?

8    A.   March.  Sorry.  After March 15th or something like that.

9    Q.   And about how many students did you refer?

10   A.   I had through my friend e-mailed -- he forwarded around 35,

11   40 students, and he got paid for 18 to 20 students, referral

12   fee.

13   Q.   Okay.  So he did not get paid for all of the referrals?

14   A.   Yes.

15   Q.   So approximately how much money did you make from the

16   referral fees?

17   A.   Around 20,000.

18   Q.   Did you ever do any work for Susan Su that was not at

19   Tri-Valley University?

20   A.   Yes.

21   Q.   Can you tell us about that, please.

22   A.   One day, Susan Su took me to her mother's house.  Me and

23   Susan went to her mother's house and bought all the furniture.

24   Like, she wants to add new tables and computers to the next two

25   rooms she had for a few hours a week, she wants to put a few

SER0151

1206

DIRISANALA - DIRECT / WEST

```
1    You just stay out there for one week.  You don't come to the

2    office."

3         So I said, "Okay."

4    Q.   Now, after that week, did you go back to work at

5    Tri-Valley?

6    A.   No, I didn't go back there.  She told she was going to call

7    me when I can come back and start working.

8    Q.   What happened during that week?

9    A.   So within three days, all this simultaneously -- many

10   things happened in two or three days' timing.  She told me not

11   to come.  I said, "Okay."  I'm at home for two days.  I didn't

12   go anywhere.  Then Ramakrishna came to my house.  Usually,

13   Ramakrishna had a car, and he used to take me and Previn

14   somewhere to San Francisco or somewhere just to -- for fun.  He

15   takes us --

16   Q.   Let me just stop you for a moment.

17        Who is Ramakrishna?  Is that another employee?

18   A.   No.  He's not an employee at Tri-Valley University, but he

19   has a consulting company in India.  He recruits students to

20   Tri-Valley University.  He has a referral agreement from Susan

21   Su to recruit new students.

22   Q.   So he doesn't work in the office, but he would often come

23   there?

24   A.   Yes.  He doesn't work often -- actually, he comes every day

25   to the university, collects the documents, and go back.
```

SER0152

DIRISANALA - DIRECT / WEST

1    Q.   Okay.  So please continue.

2    A.   So I left.  Ramakrishna came to my house, and he said,

3    "Anji, let's go to San Francisco."  I just went with him.  Then

4    he took me to the ICE office.  Until that time, not -- I'm not

5    aware why he's taking me there.  Then I met Agent Mackey.  Then

6    he told me, "We want to talk with you regarding this

7    university.  You are working in this."

8         So since it's the very first time for me and I do not have

9    any idea, I didn't talk with them much, and I am not very

10   clear -- like, I'm not very truthful to them, what I'm telling.

11   Q.   All right.  Let me stop you for a moment.

12        You said that Ramakrishna took you to ICE.  Do you mean the

13   immigration --

14   A.   Yeah, Immigration --

15   Q.   -- building?

16   A.   -- Customs Enforcement office.

17   Q.   Okay.  And you spoke with Agent Mackey?

18   A.   Yes.

19   Q.   And did you tell him the truth that day?

20   A.   No.

21   Q.   Did you have -- did you have another opportunity to speak

22   to Agent Mackey?

23   A.   Yes.

24   Q.   When was that?

25   A.   So after that, May 17th, I met.  Then I went back home.  By

1208
DIRISANALA - DIRECT / WEST

1     that time, they told me, "Okay.  This is one university."

2     While riding back, Ramakrishna told me --

3     Q.  Well, hold on.  Did you ultimately give more information to

4     Agent Mackey about Tri-Valley University?

5     A.  Yes.

6     Q.  And did you at some point agree to cooperate with the

7     United States Government's investigation --

8     A.  Yes.

9     Q.  -- of Tri-Valley?

10    A.  Yes.

11    Q.  Did you at some point during this period transfer to

12    another university?

13    A.  Yeah.  The very next day, I transferred back to the ITU

14    University, where I got a first-time visa to attend that

15    college.

16    Q.  The next day after you first spoke with Agent Mackey?

17    A.  Yes.

18    Q.  All right.  Now, is that the time that you're referring to

19    where you got a transcript from Susan Su?

20    A.  Yes.

21    Q.  Why did you transfer to ITU then?

22    A.  After talking with Agent Mackey, I was a little bit scared,

23    and while coming back, even Ramakrishna told me that if I

24    didn't report that this is one fraud university running all

25    these things --

SER0154

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, James C. Pence, Federal Official Realtime Court

6     Reporter, in and for the United States District Court for the

7     Northern District of California, do hereby certify that

8     pursuant to Section 753, Title 28, United States Code that the

9     foregoing is a true and correct transcript of the

10    stenographically reported proceedings held in the

11    above-entitled matter and that the transcript page format is in

12    conformance with the regulations of the Judicial Conference of

13    the United States.

14                          Dated this 20th day of June, 2014.

15

16

17    _____

      JAMES C. PENCE, RMR, CRR, CSR NO. 13059

18    FEDERAL OFFICIAL COURT REPORTER

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, Hui Chen, certify that I am an employee of the Office of the United States Attorney, Northern District of California, a person over 18 years of age and not a party to the within action. I certify that on April 17, 2015, I electronically submitted the

- **Brief for the United States as Appellee**
- **Government's Supplemental Excerpts of Record (2 Volumes)**

in the case of *United States v Susan Xiao-Ping Su*, No. 14-10499, with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  April 17, 2015                                  /s/ Hui Chen

Hui Chen, Paralegal Specialist