No. 14-10499

─────────────────────────────────────────────
─────────────────────────────────────────────


IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

─────

UNITED STATES OF AMERICA,

Appellee,

v.

SUSAN XIAO-PING SU,

Appellant.

─────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

(D.C. No. CR 11-0288-JST)

─────────────────────────

APPELLANT'S REPLY BRIEF

─────────────────────────



JOHN J. JORDAN (Cal. Bar No. 175678)
        400 Montgomery St. Ste. 200
        San Francisco, CA 94104
        Tel:  (415) 391-4814
        FAX:  (415) 391-4308

    Attorney for Appellant
    SUSAN XIAO-PING SU

─────────────────────────────────────────────
─────────────────────────────────────────────

**TABLE OF CONTENTS**

I.   INTRODUCTION. ................................... 1

II.  ARGUMENT...................................... 3

A.   THE DISTRICT COURT ERRED IN DENYING SU'S
     MOTION FOR A JUDGMENT OF ACQUITTAL. ............. 3

1.   Introduction. ................................... 3

2.   Legal Argument................................... 3

a.   The evidence is insufficient to convict Su
     of the two counts of harboring. ................. 3

i.   Neither Dasa nor Dirisanala were illegal aliens.  3

ii.  Su did not harbor either Dasa or Dirisanala. ... 10

b.   Counts 5 through 12, the wire fraud charges
     involving the fictitious aliens and Counts 16
     through 19, charging visa fraud, were all
     factually impossible to commit. ................. 12

c.   The money laundering charges should be dismissed. 14

B.   THE DISTRICT COURT ERRED IN DENYING SU'S
     MOTION FOR A NEW TRIAL, PURSUANT TO
     FED. R. CRIM. P. 33. ........................... 16

1.   Introduction. ................................... 16

2.   Legal Argument. ................................. 17

a.   Su's mental condition justified granting a
     new trial. ..................................... 17

i.   The motion was timely.......................... 17

ii.  The motion should have been granted on
     the merits.................................... 20

C.   THE DISTRICT COURT ERRED IN SENTENCING SU TO
     196 MONTHS INCARCERATION. ..................... 26

1.   Introduction. ................................. 26

2.   The District Court Committed Procedural Error. . 26

a.   The government failed to meet its burden of
     establishing the loss figure. ................. 27

b.   The district court erred in not grouping
     all offenses. ................................. 32

i.   All offenses should be grouped. ............... 32

ii.  The sentencing calculations are incorrect for
     Group Two. .................................... 34

c.   The district court erred in applying an
     obstruction enhancement. ...................... 37

4.   The 196 Month Sentence was Substantively
     Unreasonable. ................................. 38

D.   THE TRIAL COURT IMPROPERLY ISSUED A PRELIMINARY
     FORFEITURE ORDER AGAINST SU. .................. 41

1.   Introduction. ................................. 41

2.   Legal Argument. ............................... 41

Conclusion....................................... 45

Statement of Related Cases

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**CASES:**

*Arizona v. United States,* 132 S.Ct. 2492 (2012)... 4, 5

*Canyon County v. Syngenta Seeds, Inc.,*
519 F.3d 969 (9th Cir.)
*cert. denied,* 555 U.S. 970 (2008)................... 11

*Dhital v. Mukasey*, 532 F.3d 1044 (9th Cir. 2008).. 6, 7

*Ghorbani v. Immigration & Naturalization Service*,
686 F.2d 784 (9th Cir. 1982)......................... 8

*United States v. Armstead*,
552 F.3d 769 (9th Cir. 2008)........................ 27

*United States v. Atandi*,
376 F.3d. 1186 (10th Cir. 2004).................... 9

*United States v. Bazargan*,
992 F.2d 844 (8th Cir. 1993)........................ 9

*United States v. Brissett*,
720 F.Supp. 90 (S.D. Tex. 1989)..................... 6

*United States v. Brown,*
771 F.3d 1149 (9th Cir. 2014)...................... 31

*United States v. Bush*,
626 F.3d 527 (9th Cir. 2010)....................... 14

*United States v. Christensen,*
732 F.3d 1094 (9th Cir. 2013)................. 27, 31

*United States v. Christian*,
749 F.3d 806 (9th Cir. 2014)................... 23-25

*United States v. Fries*,
2015 U.S. App. LEXIS 5072
(9th Cir. March 30, 2015)....................... 35, 36

*United States v. Harrington*,
410 F.3d 598 (9th Cir. 2005),
*cert. denied*, 546 U.S. 1115 (2006)............. 18, 19

*United States v. Hernandez*,
913 F.2d 1506 (10th Cir. 1990),
*cert. denied*, 499 U.S. 908 (1991)................ 5, 6

*United States v. Latu*,
479 F.3d 1153 (9th Cir.)
*cert. denied,* 552 U.S. 868 (2007)................... 8

*United States v. Luttrell*,
889 F.2d 806 (9th Cir. 1989), vacated in part
on other grounds, 923 F.2d 764 (9th Cir. 1991),
*cert. denied*, 112 S.Ct. 1558 (1992)................ 13

*United States v. Lofton*,
905 F.2d 1315 (9th Cir.),
*cert. denied*, 498 U.S. 948 (1990)................... 37

*United States v. Morales*,
108 F.3d 1031 (9th Cir. 1997)(en banc).............. 25

*United States v. Noriega-Perez*,
670 F.3d 1033 (9th Cir. 2012),
*cert. denied*, 133 S.Ct. 834 (2013)............... 4, 5

*United States v. Rahm,* 993 F.2d 1405
(9th Cir. 1993).................................... 25

*United States v. Santos*, 553 U.S. 507 (2008)........ 14

*United States v. Santos*,
527 F.3d 1003 (9th Cir. 2008).................... 28, 30

*United States v. Shakur,*
691 F.3d 979 (8th Cir. 2012),
*cert. denied,* 133 S.Ct. 1510 (2013)............. 43, 44

*United States v. Smith*,
196 F.3d 1034 (9th Cir. 1999),
*cert. denied*, 529 U.S. 1028 (2000).................. 35

*United States v. Smith*,
656 F.3d 821 (8th Cir. 2011),
*cert. denied*, 132 S.Ct. 1586 (2012)................. 44

*United States v. Vargas-Cordon*,
733 F.3d 366 (2nd Cir. 2013)........................ 11

**Statutes and Rules**

8 U.S.C. § 1324(a)(1)(A).......................... 3, 5

18 U.S.C. § 1957(a)................................. 14

21 U.S.C. § 853..................................... 44

Fed. R. Crim. P. 29.................. 2, 3, 17, 18, 41

Fed. R. Crim. P. 32.2(b)(1)(B)............. 42, 43, 45

Fed. R. Crim. P. 33...................... 2, 16-18, 20

Fed. R. Crim. P. 45(b).............................. 18

Fed. E. Evid. 704(b).......................... 24, 25

8 C.F.R. § 214.2(f)(5)(i)............................ 7

8 C.F.R. § 214.2(f)(6)(iii)........................... 6

U.S.S.G. § 2B1.1..................................... 28

U.S.S.G. § 2B2.3(c)(1).............................. 35

U.S.S.G. § 2L2.1..................................... 35

U.S.S.G. § 3B1.1(a)................................. 35

U.S.S.G. § 3C1.1................................. 35, 37

U.S.S.G. § 3D1.2.......................... 32, 33, 38

U.S.S.G. § 3D1.2(b)........................... 32, 33

U.S.S.G. § 3D1.2(c)........................... 32, 33

U.S.S.G. § 3D1.4(c)................................ 36

No. 14-10499

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

Appellee,

v.

SUSAN XIAO-PING SU,

Appellant.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(D.C. No. CR 13-00288-JST)
_____

APPELLANT'S REPLY BRIEF
_____

## I.  INTRODUCTION

Susan Xiao-Ping Su appeals from her conviction,
after a jury trial, of engaging in a scheme to defraud
F-1 non-immigrant foreign students, and related
charges, while President of Tri-Valley University.

Dr. Su raised four issues in her opening brief.

1

One, the district court erred in denying Su's motion for a judgment of acquittal, made pursuant to Fed. R. Crim P. 29(c).

Two, the district court erred in denying Su's motion for a new trial, made pursuant to Fed. R. Crim. P. 33.

Three, the district court's imposition of a 196 month sentence was procedurally and substantively unreasonable.

Four, the district court procedurally erred when it entered into a preliminary order of forfeiture against Su.

The government has now filed a brief in opposition, arguing that Su's appeal should be rejected in its entirety.

The government's arguments, however, are misplaced and not supported by Ninth Circuit precedent. The arguments should be rejected by this Court and Su's appeal granted.

2

## II.  ARGUMENT

## A.  THE DISTRICT COURT ERRED IN DENYING SU'S MOTION FOR A JUDGMENT OF ACQUITTAL.

### 1.  Introduction

The district court erred in denying Su's motion for a judgment of acquittal under Fed. R. Crim. P. 29, because the government failed to prove its case.  There were particular problems with several counts.

### 2.  Legal Argument

### a.  The evidence is insufficient to convict Su of the two counts of harboring

Su was convicted, in counts 22 and 24 of the indictment, of alien harboring, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).  However, viewing the evidence in the light most favorable to the government, the government failed to prove that the two named aliens were here illegally, or that Su harbored them.

### i.  Neither Dasa nor Dirisanala were illegal aliens

The government had the burden of proving that the aliens named in counts 22 and 24, Vishal Dasa and Anji

3

Dirisanala, were illegal aliens. *United States v. Noriega-Perez*, 670 F.3d 1033, 1037 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 834 (2013). However, Dasa and Dirisanala were actually legal aliens.

The government's position in the District Court and in this Court is that both Dasa and Dirisanala were here illegally because Tri-Valley was a fraudulent school, which, without any notice or action by the government, voided their visas. TR 1849.

However, as pointed out in Su's opening brief, at the time charged in the indictment, Tri-Valley was certified by Homeland Security to admit foreign students with F-1 visas under the Department's Student Exchange Visitor Program (SEVP). While it later lost its authorization, that was an event that had not yet happened.

Moreover, even if Dasa and Dirisanala were potentially removable, this did not make them illegal aliens. See *Arizona v. United States,* 132 S.Ct. 2492,

4

2496 (2012)("As a general rule, it is not a crime for a removable alien to remain in the United States.").

In its opposition, the government attempts to distinguish *Arizona v. United States* by arguing that Su is being inaccurate in using the term "illegal alien." Govt. Brief at 28. However, that is the very term this Court has used. This Court bluntly stated in *Noriega-Perez* that for harboring, "the Government had the burden of proving that each of the material witnesses named in the indictment was an **illegal alien**." *United States v. Noriega-Perez*, 670 F.3d at 1037 (emphasis added).

Whatever the terminology, Dasa and Dirisanala were enrolled as F-1 students at Tri-Valley at a time when the school was certified by Homeland Security to admit F-1 students. As immigration proceedings had not been started against them, they were not illegally in this country. See *United States v. Hernandez*, 913 F.2d 1506, 1513 (10th Cir. 1990), *cert. denied*, 499 U.S. 908

(1991). The court in *Hernandez* held that an alien was not illegal if he had an ongoing amnesty application, seeking legal status. *Id.*

Similarly, *United States v. Brissett*, 720 F.Supp. 90 (S.D. Tex. 1989) held that "because the defendant had an application for adjustment of status to permanent resident pending at the time he obtained the firearm, he was not an alien illegally or unlawfully in the United States." *Id.*, at 90.

In its brief in opposition, the government relies heavily on *Dhital v. Mukasey,* 532 F.3d 1044, 1050 (9th Cir. 2008). But, this reliance is misplaced. *Dhital* does note, as cited by the government, that "the government regulation states that '[a] student who drops below a full course of study without the prior approval of the [designated school official] will be considered out of status.'" *Id.*, citing 8 C.F.R. § 214.2(f)(6)(iii).

6

But *Dhital* also notes that the "regulation further provides that 'an F-1 student is admitted for duration of status.  Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution ....  The student is considered to be maintaining status *if* he or she is making normal progress toward completing a course of study.'"  *Id*. at 1050, fn 2, citing 8 C.F.R. § 214.2(f)(5)(i) (emphasis in *Dhital*).

Thus, these regulations do not establish that a student is immediately and automatically out of status if there is a temporary interruption in studies. Instead, status is maintained if a student is making normal progress.  That would seem to include being allowed to transfer to another SEVIS certified school if the original school falls out of status.  And, in fact, students at Tri-Valley, such as Bhanu Teja Challangunda, were able to do just that and maintain

7

their F-1 status by transferring to other schools.  TR
933-34.

The government also places too much reliance on
*Ghorbani v. Immigration & Naturalization Service*, 686
F.2d 784 (9th Cir, 1982).  *Ghorbani* only recognizes
that an alien who falls out of status is potentially
deportable, not that he has suddenly and automatically
become an illegal alien once he pauses a course of
study in this country.

The government also relies on *United States v.
Latu*, 479 F.3d 1153 (9th Cir.), *cert. denied,* 522 U.S.
868 (2007), a case in which a defendant stayed past a
set legal departure date, rendering him an illegal
alien.  But, in *Latu*, the defendant conceded "that he
was required to depart the United States on or before
April 8, 2003."  *Id.,* at 1157.  This is not the
situation here; there was no evidence at trial that
either Dasa or Dirisanala had a set departure date and
stayed past it illegally.

8

The government also cited *United States v. Atandi*, 376 F.3d. 1186 (10th Cir. 2004), a case relied on by the district court. ER 89. But, *Atandi* involved a defendant who put himself out of status in 1999 by stopping attendance at school; had removal proceedings instituted against him in 2000; was found deportable by an immigration judge in March 2002; all before he was arrested as an illegal alien in possession of a firearm. *United States v. Atandi*, 376 F.3d. at 1187.

Similarly, in another case cited by the government*, United States v. Bazargan*, 992 F.2d 844 (8th Cir. 1993), the alien again put himself out of status; was warned by an immigration official that his asylum application had been denied; and was served with an order to show cause why he should not be deported, all before he was arrested for possession of a firearm by an illegal alien. *Id*., at 845.

Here, neither Dasa or Dirisanala were required to immediately depart the United States after Homeland

9

Security had revoked Tri-Valley's authority to enroll F-1 students. Instead, they had a reasonable time to transfer to another, certified school. To hold otherwise is to hold that all F-1 students enrolled at a school that loses its Homeland Security SEVP certification are suddenly here illegally and subject to arrest and prosecution.

Nor was there any immigration court finding of a status violation for either Dasa or Dirisanala, nor any finding by an immigration judge that either alien was removable. To this day, it appears both Dasa and Dirisanala legally remain in this country.

Thus, neither were illegal aliens at the time charged in the indictment.

## ii. Su did not harbor either Dasa or Dirisanala

The government also failed to prove that Su harbored Dasa or Dirisanala, because it only proved that Su provided employment to them. This is insufficient. Instead, the government must also show

10

that Su engaged in conduct that is intended both to substantially help an unlawfully present alien remain in the United States and to help prevent the detection of the alien by the authorities. See *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2nd Cir. 2013).

In it opposition, the government argues that Su did more than provide employment, pointing out that Tri-Valley filed I-20s with Homeland Security regarding the two aliens. Govt. Brief at 20.

First, the case cited by the government as support for this point, *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir.), *cert. denied,* 555 U.S. 970 (2008), is a civil RICO case and not a criminal case, and only states in dicta that the defendants supplied false documents to illegal migrant workers. *Id.,* at 973. Here, the documents were I-20 forms, which Tri-Valley was authorized at the time to issue.

Second, of course it is true that Tri-Valley provided I-20 forms to Homeland Security for Dasa and

11

Dirisanala.  But these forms identified the two aliens and told Homeland Security exactly where to find the two aliens, at Tri-Valley.  So, far from harboring and concealing the two aliens by issuing I-20 forms, Su told the government just exactly where to find them.

**b.  Counts 5 through 12, the wire fraud charges involving the fictitious aliens and Counts 16 through 19, charging visa fraud, were all factually impossible to commit**

The government's proof was insufficient as to the wire fraud convictions in counts 5 through 12, as well as all four visa fraud convictions in counts 16 through 19, because the charges all involve fictitious aliens created by the government during its undercover operations.

These convictions cannot stand because the crimes were all factually impossible to commit, as there were no real persons who could be defrauded, and there were no real persons who could receive visas or who needed immigration papers.  Thus, it was factually impossible

12

for Su to commit these crimes.  See *United States v. Luttrell*, 889 F.2d 806, 810 (9th Cir. 1989), vacated in part on other grounds, 923 F.2d 764 (9th Cir. 1991), *cert. denied*, 112 S.Ct. 1558 (1992).

In its opposition, the government argues that because visa fraud does not require an actual victim, Su's actions regarding the fictitious victims furthered the scheme to defraud, and that the convictions can stand based on Su's possession of the immigration documents.

But, the incidents involving the fictitious victims could never further the scheme to defraud, because the government was already investigating Su and contrived these actions to gather evidence against her.  Su's actions could never further the scheme.

Nor can the incidents be considered as evidence of concealment, because again the government was actually using these fictitious students to gather evidence against Su.

13

**c.   The money laundering charges should be dismissed**

Su's convictions for seven counts of money laundering, in violation of 18 U.S.C. § 1957(a)(counts 26, 27, 29, 31, 32, 34 and 35) cannot stand, because the withdrawal of funds was an essential element of the fraud scheme and consequently cannot constitute a financial transaction involving the proceeds of independent illegal activity.  See *United States v. Bush*, 626 F.3d 527 (9th Cir. 2010), citing *United States v. Santos*, 553 U.S. 507, 516-517 (2008).

The government complains in its brief that Su did not support this argument with citations.  But, the government's case at trial set out that Su's withdrawal of funds was an essential part of the scheme to defraud, and the funds were directly used to purchase real estate and an automobile.

First, the indictment clearly lays out, in the scheme to defraud, charged in paragraphs 1 through 14, that Su (and others) "engaged in a scheme to defraud

14

non-immigrant aliens of money and property, specifically tuition and other fees." ER 189 (paragraph 9).

The indictment, drafted by the government, then specifically incorporated the scheme to defraud, charged in paragraphs 1 through 14, in the money laundering charges in counts 26 through 35. ER 196 (paragraph 32).

The government then proceeded to trial and introduced evidence that Su directly withdrew money from the Tri-Valley bank accounts to purchase assets for herself. Agent Mackey testified that he traced funds from Tri-Valley bank accounts directly to purchases of various assets in the name of Susan Su, including a red Mercedes (TR 1645); the Murrieta Road condo (TR 1647-49); the Boulder Court property (TR 1654-58); the Germano Way property (TR 1658-63); and the Victoria Ridge property. TR 1663.

15

Thus, the circumstances surrounding the fraud convictions were not distinct from the money laundering. Su was charged with engaging in a scheme for her to defraud immigrant aliens of tuition and other fees. Until she removed the money from Tri-Valley's bank accounts, she had not completed the fraud. Then she directly transferred money from Tri-Valley accounts to purchase assets, without any intermediate steps.

Su's withdrawal of funds is thus an essential element of the charged frauds and consequently cannot constitute a financial transaction involving the proceeds of independent illegal activity. Under the merger doctrine, the money laundering charges must be dismissed.

**B. THE DISTRICT COURT ERRED IN DENYING SU'S MOTION FOR A NEW TRIAL, PURSUANT TO FED. R. CRIM. P. 33.**

**1. Introduction**

Su's Rule 33 motion for a new trial should have been granted by the district court, on the grounds that

16

the jury was not presented relevant evidence that Su
was suffering from a mental impairment.

**2.  Legal Argument**

**a.  Su's mental condition justified granting a new trial**

The district court erred in not ordering a new
trial, in the interest of justice.

**i.  The motion was timely**

Preliminarily, Su contends that the Rule 33 motion
in the interest of justice was timely, even though it
was filed more than 14 days after the jury verdict.
See Fed. R. Crim. P. 33(b)(2).

Here, as pointed out in Su's opening brief, the
district court granted the defense request for
additional time to brief a post-verdict Rule 29 motion.
On May 9, 2014, counsel, new to the case, informed the
court that both Rule 29 and Rule 33 motions would be
filed, and the district court acknowledged that the
post-trial motions to be filed included both Rule 29
and Rule 33 motions.  ER 52-55.  Thus, Su's earlier

17

request for additional time to file the Rule 29 motion can be found to have encompassed the Rule 33 motion.

Alternatively, the failure to file the motion within the 14-day limit was the result of excusable neglect, due to the delay in the hiring of new counsel. See Fed. R. Crim. P. 33(b)(1) & 45(b)(1)(B). This would be appropriate, as finding the motion timely would have raised no danger of prejudice to the nonmoving party, the government. In addition, the filing of the Rule 33 motion did not delay the proceedings, as it was filed on the same day that the Rule 29 motion was filed. Finally, the reason for the delay was the retention of new counsel.

The motion could also be found timely filed under Fed. R. Crim. P. 33(b)(1), because the proffered testimony of Dr. Gregory qualified as newly discovered evidence. See *United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005), *cert. denied*, 546 U.S. 1115 (2006).

18

The *Harrington* factors are: (1) the evidence must
be newly discovered; (2) the failure to discover the
evidence sooner must not be the result of the
defendant's lack of diligence; (3) the evidence must be
"material" to the issues at trial; (4) the evidence may
not be (a) cumulative or (b) "merely impeaching"; and
(5) the evidence must indicate that a new trial would
"probably" result in acquittal. *United States v.
Harrington*, 410 F.3d at 601.

In Su's opening brief, counsel argued that all five
factors are met here.  In its opposition, the
government argues that Dr. Gregory's report was not
newly discovered, as Su had exhibited mental health
problems in the past.  But, Su's mental condition
worsened and came to a climax at the close of the
trial, when she emailed the district court after a late
night breakdown. The stress of the trial exposed the
depth of the problem, and now Dr. Gregory's report
describes the issue in detail.

19

In addition, the government is wrong in thinking that Dr. Gregory's testimony was not material to the issue of intent. Dr. Gregory's testimony regarding Su's diminished capacity would be offered at trial not as an affirmative defense, but to negate the mens rea element of the crimes charged in the indictment, as described more fully below in section ii.

Thus, the motion was timely.

## ii. The motion should have been granted on the merits

The district court erred in denying the Rule 33 motion for a new trial.

First, Su's mental condition impacted her ability to consider and weigh the pre-trial plea offer made by the government. Prior to trial, Su was presented with a written plea offer with an agreed-upon recommended sentence of 41 months. ER 374-75. In light of the government's evidence, and 196 month sentence imposed after she went to trial, rejection of this 41-month plea offer raised a red flag that Su's mental condition

was affecting her decision making process.  Su's mental
ability, particularly any delusional view of the
government's evidence and strength of its case, appears
to have impacted her ability to intelligently consider
the 41-month plea offer before trial.

Second, Su's mental condition impacted her right to
a fair trial, in terms of the jury's view of her during
the trial.  As described in Su's opening brief, the
increasing stress as trial progressed resulted in
repeated instances of in-court behavior that could only
have prejudiced her before the jury.  The district
court noted at one point that her behavior might be
distracting to the jury (TR 721-22), and described at
another point her inappropriate smiling in court with
the jury present.  TR 883.

Third, the stress peaked at the moment when Su had
to make an intelligent decision on whether to testify.

Fourth, the most compelling reason to grant a new
trial in the interest of justice is that Su was not

able to present Dr. Gregory's expert testimony to the jury on Su's diminished capacity.

Dr. Gregory's report detailed that Su had a history of psychotic symptoms, with hospitalizations in 2005 and 2011.  PSR 93; SER 3-5.[1]  These psychotic features included grandiose and paranoid delusions (thinking she could communicate with God, thinking she was being followed and people were trying to harm her), disorganized speech and hallucinations.  SER 5.

Dr. Gregory concluded that Su's symptoms were consistent with a diagnosis of Schizoaffective Disorder, Bipolar Type.  PSR 95; SER 12.

In Dr. Gregory's opinion, while Su may have exaggerated some symptoms during her assessment, Su's "untreated mental illness appears to have played a role in her behavior that resulted in her convictions and her erratic behavior during the trial... Her grandiose delusional thinking and unstable mood may also have

---

[1]  "SER" refers to Sealed Excerpts of Record.

22

played a role in her behavior that resulted in her charges." SER 13.

In *United States v. Christian*, 749 F.3d 806 (9th Cir. 2014), this Court recognized the relevance of such testimony, when it vacated a conviction for transmitting email communications containing threats to injure another, in a case in which the defendant argued that the district court should have allowed his expert, a psychologist who had earlier examined him for competency to stand trial, to testify regarding his diminished capacity defense. *Id.,* at 813-14.

Dr. Gregory's report similarly reveals that Su had a diminished capacity. Su's Schizoaffective Disorder could have affected her ability to appreciate the nature and quality of the criminal conduct for which she was convicted, and may have played a role in her behavior at Tri-Valley  SER 1-13.

Dr. Gregory's expert testimony is particularly relevant here, because many, if not all, of the charges

23

brought against Su require specific intent, or
intentional conduct.

The government's main objection in its brief in
opposition appears to be that Dr. Gregory "did not
opine that Su was unable to form the level of intent
necessary to commit the crimes of conviction." Govt.
brief at 37.

However, Dr. Gregory is barred from making that
opinion, as recognized by this Court in the *Christian*
case cited by Su in her opening brief.

In *United States v. Christian*, 749 F.3d 806 (9th
Cir. 2014), this Court, in reversing a district court
for excluding similar testimony, noted:

> In fact, Dr. Colosimo could not have explicitly
> testified that Christian lacked the capacity to
> form the specific intent to threaten. See Fed. R.
> Evid. 704(b) ("In a criminal case, an expert
> witness must not state an opinion about whether the
> defendant did or did not have a mental state or
> condition that constitutes an element of the crime
> charged or of a defense."); *United States v.
> Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997) (en
> banc) (holding that Rule 704(b) prohibits an expert
> witness in a criminal case from "stat[ing] an
> opinion or draw[ing] an inference which would

necessarily compel the conclusion" that the defendant lacked the requisite mental state). In *Rahm*, we pointed out that "[i]t would make little sense to require a conclusive opinion in determining admissibility, and then absolutely to forbid expression of the opinion in testimony." 993 F.2d at 1411 n.3. So too here. Because Dr. Colosimo could not have properly testified that Christian lacked the capacity to form the requisite specific intent to threaten, the absence of an opinion to that effect in his report is not a valid reason to preclude his testimony. Particularly under these circumstances, focusing on the expert's evaluation rather than his ultimate conclusion makes perfect sense.

*Id.,* at 812.

Here, just as in *Christian*, Su was convicted by a jury who had not had the opportunity to hear any evidence as to defendant's mental condition, as it might impact her ability to form the requisite mens rea. This is precisely the type of evidence that, if presented to the jury, would have made it unlikely that the government would be able to prove Su's intent beyond a reasonable doubt.

For these reasons, the district court erred in denying Su's motion.

25

## C.   THE DISTRICT COURT ERRED IN SENTENCING SU TO 196 MONTHS INCARCERATION.

### 1.   Introduction

The district court erred in sentencing Dr. Su, a forty-four year old woman with no prior criminal record and a history of mental illness that included grandiose delusions about her place in Britain's royal family (PSR 92) to 16 years, 4 months in prison.

The sentencing process, however, was marred by procedural error, because the court incorrectly denied several of Su's objections to the Sentencing Guidelines Calculations, which resulted in a final offense level significantly higher than the correct level.

In addition, the sentence was substantively unreasonable, in light of the circumstances of this case.

### 2.   The District Court Committed Procedural Error

The district court committed procedural error here in: (a) its loss calculations; (b) its grouping decision; and (c) its decision on obstruction.

See *United States v. Christensen*, 732 F.3d 1094, 1100 (9th Cir. 2013), citing *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008).

**a.  The government failed to meet its burden of establishing the loss figure**

The government claimed in the district court that the loss figure for the scheme to defraud included all tuition payments by all F-1 students (ER 339), including the large portion of students, who, in the words of the district court, were "co-conspirators" in the activities at Tri-Valley.  ER 109.

Over Su's objection, both the Probation Department (PSR 50, 51) and then the district court adopted the government's position (ER 109), resulting in an 18 level increase for loss for the Group One offense, to level 39.  PSR 50-57.  The loss figure was also used to inflate the Guideline score for the Group Two offense, which resulted in an additional one point increase. PSR 59.  The end result was a final offense level 40,

27

criminal history I, with a sentencing range of 292-365 months.

The district court used the government's loss figure, even though it stated: "I take it as a given that many of the students who paid TVU tuition only wanted visas, and never actually expected to go to class... Those people are just co-conspirators in Dr. Su's visa fraud." ER 109.

This was clear error.

"The government bears the burden of proving loss for the purposes of § 2B1.1 by a preponderance of the evidence." *United States v. Santos*, 527 F.3d 1003, 1006-07 (9th Cir. 2008).

In its brief in opposition, the government argues that the district court was within its discretion to impose the government's loss figure because "the district court decided that while some students may have no interest in studying towards a degree, it would

be impossible to determine how many students of that type were enrolled at Tri-Valley." Govt. brief at 40.

Actually, the district court did not say it was impossible, but rather "hard to determine." ER 109. The court's entire comments on the point are:

> I take it as a given that many of the students who paid TVU tuition only wanted visas, and never actually expected to go to class. How many were there? I don't know. Was there at least one? Is it reasonable to think that there was at least one who was in on it from the beginning? We don't -- I can't say for certain. That person didn't testify. But, the argument that there were such people is not frivolous. Those people are just co-conspirators in Dr. Su's visa fraud.
>
> And even accepting that argument, there's no way to quantify the number of students who were intent on visa fraud versus the number who thought they were getting actual classes, because the only evidence on that point is the estimate of a TVU student who didn't have good information, and I find that estimate to be unreliable.
>
> And then lastly, to the point that it's hard to know how many of the students were actually defrauded and how many were in on it, to the extent that that's even relevant, and I'm not sure that it is, then we get back to this comment that Mr. Rhine had to straighten out a few minutes ago. And that is that the actual loss is hard to determine.
>
> ER 109.

29

The district court was quite correct when it stated that the only evidence on the point was the estimate of one Tri-Valley student (Parth Patel:  TR 1543-44).

But, while the district court could conclude that Patel did not have good information and was within its discretion to find Patel's estimate unreliable, that actually left the court with no basis for increasing the guidelines due to a $5.6 million loss.

Again, it is the government's burden to prove loss. *United States v. Santos,* 527 F.3d at 106-07.  If the government failed to introduce evidence in the district court as to how many Tri-Valley students were actual victims who suffered a loss, then the district court had no basis for imposing an increase for loss.

Su does not even concede that the actual loss was that hard to determine.  The government was aware, because of Tri-Valley's reporting to Homeland Security through its SEVIS database, of all the F-1 students ever enrolled at Tri-Valley.  See, e.g., TR 571-74.

30

There were I-20 forms filed with the government
identifying each student, resulting in information
stored in the SEVIS database.  See, e.g., TR 572.

    All F-1 alien students could have been located,
identified, and fed into the United States Attorney's
victim/witness system.  In short order, the entire F-1
student population could have been mailed victim impact
statement forms.  After all, victim impact statements
are routinely collected and filed by the government in
fraud cases.  See, e.g., *United States v. Brown,* 771
F.3d 1149, 1161 (9th Cir. 2014); *United States v.
Christensen,* 732 F.3d at 1102.  But, this was
apparently never done here.

    The government clearly failed to meet its burden.
Only two actual victims, Bhanu Teja Challagundla (count
three) and Kalpana Challa (count four) were named in
the indictment.  Only five students were called to
testify at trial, one of whom Vandana Virmani, was not
even an F-1 student, but instead an H-1 visa student

31

(TR 172-74).  No further showing was made at sentencing.  This was insufficient.

## b.  The district court erred in not grouping all offenses

### i.  All offenses should be grouped

The district court also erred in not grouping all counts of conviction under U.S.S.G. § 3D1.2(b) and (c).

Su argued in her opening brief that all groups should be grouped under U.S.S.G. § 3D1.2 for involving the same harm, as the crimes involve the same set of victims and the acts are all connected by a common objective or are part of a common scheme or plan.  ER 102.  Su also again argued that grouping was appropriate under U.S.S.G. § 3D1.2(c) because all the counts share the same conduct that is treated as the specific offense characteristics, and share the same adjustments.  ER 102.

Finally, Su argued that splitting the offenses into two groups would result in impermissible double counting.  ER 103.

The government now argues that the grouping
decision by the district court was proper, because
separate victims were involved in the two groups.  But,
the offense conduct for the unauthorized use of the
government SEVIS computer program was part and parcel
of the scheme to defraud, as well as the convictions
for visa fraud and conspiracy to commit visa fraud.
Indeed, without using the SEVIS program, the crimes in
Group One could not have been committed.  U.S.S.G. §
3D1.2 specifically provides that for purposes of
sentencing, "[a]ll counts involving substantially the
same harm shall be grouped together into a single
Group."  And, the government is a victim to the visa
fraud charges, which are contained in count one.

Here, all the charges involved the same harm, the
same victims, and connected by a common objective or
are part of a common scheme or plan.  See U.S.S.G. §
3D1.2(b).  In addition, all the counts share the same
conduct that are treated as the specific offense

characteristics, and share the same adjustments.  See U.S.S.G. § 3D1.2(c).  Thus, the charges should all be in one group.

## ii. The sentencing calculations are incorrect for Group Two

Alternatively, if the district court was correct that there are two groups because of separate victims, then the sentencing calculations in Group Two are incorrect.

First, the PSR used by the district court did not actually calculate an offense level for the computer count (group two), so the district court did not have an accurate final PSR before sentencing Su.  This alone was procedural error.

Su also contends that the government's calculations for the computer count, adopted by the district court, were wrong.  The government in its sentencing memorandum concluded that the conviction for unauthorized access of a government computer had an offense level of 32.  The government's figures,

34

however, included a 20 level increase under a cross reference to U.S.S.G. §§ 2B2.3(c)(1) & 2L2.1, claiming the offense was committed with intent to commit visa fraud, as well as a 4 level increase for role, under U.S.S.G. §3B1.1(a), and a two level increase for obstruction, under U.S.S.G. §3C1.1.  ER 341.

These calculations resulted in impermissible double counting, as one part of the Guidelines was applied to increase Su's punishment on account of a harm that has already been fully accounted for by application of another part of the Guidelines.  *United States v. Smith*, 196 F.3d 1034, 1036-37 (9th Cir.), *cert. denied,* 529 U.S. 1028 (2000)(further citations omitted).

The government now claims that these calculations are correct, citing *United States v. Fries*, 2015 U.S. App. LEXIS 5072 (9th Cir. March 30, 2015).  But, in *Fries,* this Court only noted that "it is not always impermissible to enhance ... the base offense level multiple times for the same criminal act: It is

sometimes authorized and intended by the Sentencing Guidelines when each invocation of the behavior serves a unique purpose under the Guidelines." *Id.* (citation, alteration, and internal quotation marks omitted).

Here, something is out of joint. If there should be two groups because there are two separate victims, then the Group Two guidelines should not be inflated by the 20 level visa fraud cross-reference, because the visa fraud conviction is already included in Group One. PSR 50. Including the visa fraud 20 level increase in Group Two does not serve a separate, unique purpose.

Su was prejudiced by this error, because if the double counting is avoided by eliminating these upward adjustments, then Group Two's guideline score would be too low to qualify for grouping. See U.S.S.G. § 3D1.4(c)("Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level.").

36

**c.    The district court erred in applying an obstruction enhancement**

The district court also erred in applying a 2-level upward adjustment for willful obstruction of justice under U.S.S.G. § 3C1.1(a) (PSR 56; ER 116), because Su's mental state negated the specific mens rea needed. Dr. Su's mental condition and the stress of trial were the root cause of the incidents in question.  See *United States v. Lofton*, 905 F.2d 1315, 1316 (9th Cir.), *cert. denied*, 498 U.S. 948 (1990).

The report of Dr. Gregory corroborates and supports the defense's contention at sentencing that Su's delusional thinking was the motivation behind her efforts to have the various witnesses she contacted testify consistently with her version of the evidence.

At a minimum, the district court should have held a hearing on the matter, instead of summarily denying Su's objection to the enhancement.

37

**4.  The 196 Month Sentence was Substantively Unreasonable**

The district court abused its discretion by the imposition of a 196-month sentence.  Su acknowledges that the district court did impose a below-guideline sentence (although Su contends the guidelines calculations were incorrect).  But, no matter what the correct guideline range is, the 196-month sentence imposed was an unreasonable sentence for a 44-year-old woman, with no prior criminal record (PSR 73-76), who suffered from such delusions as believing she is member of the British royal family.  PSR 92.

The district court explained its decision by describing this case as "a massive fraud that was done for greed, for which Dr. Su still refuses to take responsibility."  ER 135.  In it brief, the government similarly points to Su's lack of remorse.

But, Su did apologize to the probation officer in the pre-sentence interview, telling her "I am sorry for causing such a big mess."  PSR 47.  The absence of any

38

stronger indication of remorse by Su is yet another indication of the depth of her mental health issue and her belief that she was starting up a world class university. It should also be noted that Su did take some steps to further the school. Su told Agent Mackey that there were three instructors hired besides herself (ER 745) and Dirisanala testified that he received emails from an instructor about one of his own class. TR 1188-89.

Further, as pointed out in Su's opening brief, there are also significant mitigating factors here. Su's mental condition that had been largely untreated. In addition, contrary to many fraud cases, any real victim here can be made whole from assets seized by the government.

In addition, another argument raised by Su in her opening brief, not adequately countered by the government, is that the 196-month sentence is far out of proportion to the much lower sentences imposed

against the accomplices.  Anji Dirisanala was sentenced
to 1 day probation; Vishal Dasa was sentenced to 30
days probation; Ramakrishna Karra was sentenced to 6
months probation and a $2000 fine; and Tushar Tambe was
sentenced to three years probation, in the parallel
case CR 11-0742-KAW.  ER 380.  The sentence imposed
against Su is far higher, yet no attempt was made in
the district court to explain this extreme disparity.

The government now argues that Su's behavior was
far worse than these other co-conspirators.  But, the
range here is far too extreme: 196 months for Su,
probation for the others.

Su acknowledges that this is a serious offense, and
that the district court did grant a variance from the
original guidelines.  However, 196 months is an overly
lengthy prison sentence, particularly for a defendant
with a documented mental illness that predated the
offense conduct.

**D.  THE TRIAL COURT IMPROPERLY ISSUED A PRELIMINARY
     FORFEITURE ORDER AGAINST SU**

**1.  Introduction**

The district court erred substantively and
procedurally when it issued a preliminary forfeiture
order on October 24, 2014.  CR 199; ER 56.

First, the court used an incorrect loss amount as a
basis for the order.

Second, as there was insufficient evidence to
support the alien harboring charges, the forfeiture of
the Boulder Court properties based solely on those
convictions (ER 59) should be reversed.

Third, Su's right to due process was violated when
the district court issued a preliminary forfeiture
order without first holding a requested hearing.

**2.  Legal Argument**

On May 1, 2014, following the jury conviction, the
government filed a motion for a preliminary order of
forfeiture.  CR 129.

41

On August 29, 2014, Su filed a response to the
government's motion for a preliminary forfeiture order,
and requested that the district court stay the
forfeiture proceedings pending a decision on the Rule
29 and 33 motions, and then hold a hearing.  ER 272-73.
Su specifically requested that a hearing be held on the
forfeiture allegations, pursuant to Fed. R. Crim. P.
32.2(b)(1)(B).  ER 273.

On October 24, 2014, the district court issued a
written preliminary order of forfeiture, rejecting Su's
request for a stay, with a later hearing held prior to
the entrance of the order.  CR 199; ER 56.

Su argued in her opening brief that the preliminary
forfeiture order should be vacated because Su was never
granted the opportunity to challenge its contents.
Rule 32.2(b)(1)(B) requires that, "[i]f the forfeiture
is contested, on either party's request the court must
conduct a hearing after the verdict or finding of
guilty."  Su requested a hearing, so that she could

42

have the opportunity in open court to dispute the forfeiture allegations.

In its brief in opposition, the government argues that because Su waived a jury trial on the forfeiture issue, she was not entitled to a Rule 32 hearing.

But, "Rule 32.2(b) does not provide that submitting the issue to the jury is the only way to 'contest' a forfeiture allegation." *United States v. Shakur,* 691 F.3d 979, 989 (8th Cir. 2012), *cert. denied,* 133 S.Ct. 1510 (2013).  In *Shakur*, the defense agreed to waive submitting the issue to the jury, yet the Eighth Circuit still reversed because the defendant requested a hearing post-verdict.  *Id.*

Here, Su also agreed not to submit the forfeiture issues to the jury, but then requested a hearing post-verdict, specifically citing Rule 32.2(b)(1)(B).  ER 272-73.  That was her right.

"Procedural due process requires that an individual receive adequate notice and procedures to contest the

43

deprivation of property rights" that result from criminal forfeiture under 21 U.S.C. § 853. *United States v. Smith*, 656 F.3d 821, 827 (8th Cir. 2011), *cert. denied*, 132 S.Ct. 1586 (2012).

Su timely contested the government's allegations and requested a hearing. The district court's summary ruling before any such hearing denied Su a meaningful opportunity to contest the deprivation of her property rights, such that the preliminary forfeiture order should be reversed. See *United States v. Shakur,* 691 F.3d at 989-90.

Although the government claims in its brief in opposition that Su fails to set out what issues she would raise at such a hearing, Su did set out in her opening brief that the defense disputed the loss amount which was used as the basis for the judgment. In addition, Su pointed out in her opening brief that she contends there is insufficient evidence to support the alien harboring charges, such that the forfeiture of

44

the Boulder Court properties based solely on those convictions (ER 59) should be reversed.

These points would have been raised by Su at the requested hearing, a hearing mandated by Rule 32.2(b).

In any event, the government's belief that the mandatory Rule 12 hearing would have been a "pointless formality" is not a sufficient basis to violate Su's due process rights.

## Conclusion

Su's convictions should be dismissed for lack of evidence and the forfeiture reversed. Alternatively, Su should be granted a new trial.

If the conviction is upheld, then this Court should reverse Su's sentence and remand for re-sentencing.


April 30, 2015.                    Respectfully submitted,

                                   /S/ John J. Jordan
                                   JOHN J. JORDAN
                                   Attorney for Appellant

**STATEMENT OF RELATED CASES**

Appellant is unaware of any related cases pending before this Court.

**CERTIFICATE OF COMPLIANCE**

Counsel for appellant hereby certifies that this reply brief uses 14 point monospaced typeface, is 45 pages in length, and contains approximately 6,953 words, which complies with F.R.A.P. 32.

/S/ John J. Jordan
JOHN J. JORDAN

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on April 30, 2015, I electronically filed the foregoing with the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system:

APPELLANT'S REPLY BRIEF

I certify that the United States Attorney, 450 Golden Gate Ave., San Francisco, CA 94102, the attorney for the appellee, is a registered CM/ECF user and that service will be accomplished by the appellate CM/ECF system.

Dated: April 30, 2015.                    /S/ John J. Jordan
                                          JOHN J. JORDAN